1                      United States District Court

2                     Southern District of California

3

4    UNITED STATES OF AMERICA,      )
                                    )
5                     Plaintiff,    )
                                    )
6        vs.                        ) Case No. 10-CR-4246 JM
                                    ) Status Hearing
7    BASAALY SAEED MOALIN,          ) Thursday, February 9, 2012
     MOHAMED MOHAMED MOHAMUD,       )
8    ISSA DOREH,                    )
     AHMED NASIR TAALIL MOHAMUD,    )
9                                   )
                      Defendants.   )
10   _____)

11

12                Before the Honorable Jeffrey T. Miller
                     United States District Judge

13

14

15

16

17

18

19

20   Official Interpreter:    Maryam Abdi, Court Interpreter

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
22                            940 Front Street, Suite 5190
                              San Diego, CA  92101
23                            (619) 238-4538

24

25               Record produced by stenographic reporter

```
1    Appearances

2    For the Government:        Laura E. Duffy
                                UNITED STATES ATTORNEY
3                               William P. Cole
                                Caroline P. Han
4                               ASSISTANT U.S. ATTORNEYS
                                880 Front Street, Suite 6293
5                               San Diego, CA  92101

6    For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
7                               Alice L. Fontier, Esq.
                                OFFICE OF JOSHUA L. DRATEL
8                               2 Wall Street, Third Floor
                                New York, NY  10005
9
     (Mr. M. Mohamud)          Linda Moreno, Esq.
10                              LINDA MORENO, P.A.
                                P.O. Box 10985
11                              Tampa, FL  33679

12   (Mr. Doreh)               Ahmed Ghappour, Esq.
                                LAW OFFICES OF AHMED GHAPPOUR
13                              P.O. Box 20367
                                Seattle, WA  98102
14
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
15                              DURKIN & ROBERTS
                                2446 N. Clark Street
16                              Chicago, IL  60614

17

18

19

20

21

22

23

24

25
```

1          San Diego, California - Thursday, February 9, 2012

2      Defendant A. Mohamud is being assisted by a Somali

3  interpreter.)

4          THE CLERK:  Calling matter 1 on calendar,

5  10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamed Mohamed

6  Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, for a motion

7  hearing.

8          THE COURT:  Good morning, counsel.  Would you like

9  to state your appearances, please.

10          MR. COLE:  Yes, your Honor.  Thank you.  William

11  Cole and Caroline Han for the United States.

12          THE COURT:  Thank you.

13          MR. DRATEL:  Good morning, your Honor.  Joshua

14  Dratel with Alice Fontier for Mr. Moalin.

15          MS. FONTIER:  Good morning, your Honor.

16          THE COURT:  Good morning.

17          MR. DURKIN:  Good morning, Judge.  Tom Durkin on

18  behalf of Ahmed Nasir Mohamud, who's in custody and being

19  brought into the courtroom now.

20          MS. MORENO:  Good morning, your Honor.  I'm sorry.

21  I have --

22          THE COURT:  I'm sorry, Ms. Moreno.  It might be

23  difficult -- why don't you remain seated, and we can bring a

24  microphone over to you to make it a little bit more

25  comfortable for you.

 1              MS. MORENO:  Thank you so much, your Honor.

 2              THE COURT:  You're welcome.

 3              MS. MORENO:  Linda Moreno on behalf of Mr. Mohamed

 4    Mohamud, who's present in Court in custody.

 5              MR. GHAPPOUR:  Good morning, your Honor.  Ahmed

 6    Ghappour on behalf of Issa Doreh, who is present in court.

 7              THE COURT:  Good morning.  Okay.  I think that's

 8    everyone.  Good morning, gentlemen.  All the defendants are

 9    here.  And this is the time we have set for a further motion

10    hearing.  We have several matters to take up today, and the

11    government has made a motion for a CIPA Section 2 pretrial

12    conference; and in addition to that, we have -- we have

13    several substantive motions and other motions filed by the

14    various defendants that we can address today as well.

15              With respect to the government's motion for a

16    pretrial conference pursuant to Section 2 of CIPA, Mr. Cole,

17    did you have anything further to add to that, sir?

18              MR. COLE:  Your Honor, at this time I think the

19    conference, to the extent we have it, would be pretty minor

20    and limited.  Essentially what I wanted to alert the parties

21    to and the Court is that the government does intend to submit

22    some information to the Court under Section 4 of CIPA for the

23    Court's consideration ex parte.  There may be a small volume

24    of classified discovery in this case to give to the defense.

25    That question is not yet settled and I don't think will be

1    settled for at least a few more weeks until the Court can

2    consider a Section 4 motion, but I just wanted to note the

3    issue for the parties and the Court now, mainly just flag it

4    because with the trial date of May 7, in the event classified

5    discovery is provided to the defense, there would need to be

6    a Section 5 notice from the defense if they intend to use the

7    information at trial within 30 days of the trial date, no

8    later than 30 days of the trial date, which would be about

9    April 6 or 7.

10        I don't think there's really much else to discuss

11   right now, and because the potential volume even -- I think

12   there well may not be any classified discovery ultimately,

13   but potential volume, if there is, is going to be very low, I

14   think a handful of items.  And so I just wanted to sort of

15   paint that general landscape for the Court and the parties.

16        THE COURT:  What are you intending on submitting to

17   the Court for -- I mean in terms of the volume of material,

18   the task of the Court under Section 4, what are you

19   contemplating at this point?

20        MR. COLE:  The Section 4 material for the Court I

21   think will be also very limited, and -- I think it will be

22   less than 50 pages, briefing and items, perhaps substantially

23   less than that.  The large bulk of information -- the larger

24   volume of information that will be submitted to the Court

25   will be in relation to the response to the FISA suppression

1    motion; that's really where the volume of just pages is is in

2    response to the FISA suppression.  The Section 4 filing

3    relating to discovery will be very, very small.  And we

4    currently anticipate having both those filings to the Court

5    on or about February 17, in other words, the response to the

6    FISA suppression motion and the Section 4 filing.

7            THE COURT:  Has anything gone over to the defense

8    yet?

9            MR. COLE:  Anything --

10           THE COURT:  Any classified information gone over to

11   the defense yet?

12           MR. COLE:  No.  And under Section 3 of CIPA, before

13   that could happen, we'll have to have a protective order and

14   a few minor details worked out with the Court.

15           THE COURT:  Have you broached the subject of a

16   protective order with the defense; has that discussion even

17   begun?

18           MR. COLE:  It hasn't only because I am still not

19   certain as I stand there that there even be will --

20           THE COURT:  I sorry.  I missed --

21           MR. COLE:  I'm sorry.  It hasn't because I'm not

22   certain as I stand here that we actually will have to provide

23   classified discovery.  It could be that items just simply

24   will be -- the information will be available in unclassified

25   format or we will determine that it's not needed to be turned

1   over in discovery at all.  And so -- but I think the filing

2   with the Court on the 17th will further the resolution of

3   those questions, and so I haven't broached the subject,

4   although the protective order is a statutory requirement

5   under CIPA and it's standard, and these counsel are all

6   experienced in those matters, so I don't think the terms of

7   the order itself will be any issue.

8          THE COURT:  Are there security clearances for all

9   counsel?

10          MR. DRATEL:  Your Honor, if I may?  Yes, all

11   counsel are cleared.  Obviously there are just administrative

12   issues with respect to a particular case which the --

13   Classified Information Security Officer's I think what they

14   call them now -- would have to do administrative filing to

15   get us cleared for this particular case.  But we all do have

16   active clearances that would be available in this case.

17          MR. COLE:  And I was going to say, your Honor, that

18   the Court -- the CISO is present today, Mr. Slade, and he is

19   aware of these four counsel and has already been -- well, I

20   shouldn't speak for him, but I believe that issue is in good

21   hands and underway to the extent that we do need to turn over

22   classified discovery.

23          THE COURT:  Okay.

24          MR. DRATEL:  Your Honor, may I speak to some of the

25   other issues that Mr. Cole addressed with respect to Section

1    4 and to the FISA?

2          THE COURT:  Yeah.  I'm just trying to get a

3    preliminary handle on this right now; I'm trying to establish

4    a framework for --

5          MR. DRATEL:  That's what I'd like to speak to.

6          THE COURT:  -- and you'll certainly have an

7    opportunity.  I have few more questions --

8          MR. DRATEL:  Oh, certainly.

9          THE COURT:  -- for Mr. Cole first.  Mr. Cole, this

10   date of February 17 that you've indicated the material will

11   be ready, is that a firm date by you?

12         MR. COLE:  I believe it is a firm date.  I have --

13   I had anticipated in our motion response in a footnote

14   anticipating the 13th, and I was off by --

15         THE COURT:  I saw that, and that's why I'm asking.

16         MR. COLE:  Yeah, I was off by a week.  There's --

17   we are -- we have received -- there's -- this is not -- this

18   is my problem, not the Court's, so I'm not trying to make it

19   sound like it's outside my control -- but there are a lot of

20   moving parts with various components in Washington to get

21   these filings ready and cleared and on their path, and I

22   believe that everything is in line with a solid deadline of

23   the 17th and that we will be able to make that date.  I have

24   every expectation that's going to happen.  I plan on that.

25         THE COURT:  Are you going to remain -- with your

1    new responsibilities and all, are you going to continue to

2    remain on this case as counsel of record --

3              MR. COLE:  I am.

4              THE COURT:  -- with Ms. Han?

5              MR. COLE:  This is -- yes.  It's the only case I'm

6    doing that on, but yes, I am.

7              THE COURT:  Okay.  Okay.  Have there been any

8    discussions between -- and I'm not talking about discussions

9    to resolve here -- have there been any discussions between

10   the two sides through counsel relative to discovery or any

11   other preliminaries that I should be made aware of at this

12   point before we proceed further?  Mr. Cole, you can answer

13   that, or anyone.

14             MR. COLE:  Well, I -- I don't think so, I mean

15   nothing -- I can't think of any discussion I've had with

16   counsel -- well, I did have a discussion just this morning

17   with counsel that they want -- an issue that they wanted to

18   raise, not with respect to discovery necessarily but with

19   respect to the dates set in this case.  But I think that --

20             THE COURT:  You're talking about the trial date of

21   May 7?

22             MR. COLE:  Yes.  But I think I'd refer to counsel

23   to state their position on that because it's --

24             THE COURT:  Yeah, we'll get to all of these issues,

25   but it sounds like what they're --

1          MR. COLE:  Counsel advised me that they -- well,

2     some counsel, at least a couple of the attorneys advised me

3     that they may want to move the trial back, and that was

4     something we just discussed briefly before court this

5     morning.  And our position is to keep the trial date where it

6     is, but we haven't a lot of chance to hear -- this was a very

7     brief conversation, and I'm not foreclosing hearing the

8     position and perhaps taking their position myself, but right

9     now our position is that the trial date should hold.

10          THE COURT:  Okay.  All right.  Anything else, Mr.

11     Cole, before I hear from the defense?

12          MR. COLE:  Other than the issues raised in the

13     motions, I don't think there's anything that we've discussed

14     with counsel that needs to be raised right now.

15          THE COURT:  All right.  Very good.  Okay.

16          MR. DRATEL:  Your Honor, just first talk about

17     just -- the Court's last question about conversations about

18     discovery -- and I'm not suggesting Mr. Cole didn't raise

19     this, but I think there was a conversation yesterday that he

20     had about we've received some material, and we -- as the

21     Court knows, we've moved for Brady material both in terms of

22     discovery letter and in terms of motions.  The government I

23     think has said that we'll be getting some additional

24     materials such as some grand jury material, and I don't know

25     whether that -- whether they classify that as Brady or if

 1    it's being produced under some other -- some other rubric,

 2    but we did raise with the government yesterday some issues

 3    with respect to particular people and particular information

 4    that we had about potential Brady, and I think the government

 5    was going to look into that and get back to us.  So we don't

 6    know that that's -- I didn't want to suggest that it's all

 7    resolved because this may be something we might come back to

 8    the Court on at a later date if what -- if our information

 9    doesn't match what the government tells us is its

10    information, but I obviously want to give the government the

11    opportunity to review its materials and produce what it --

12    what it feels it's obligated to produce --

13             THE COURT:  Let me --

14             MR. DRATEL:  -- before we join that issue.

15             THE COURT:  Let me stop you there for just a

16    moment.  So you're suggesting that you've made a request for

17    certain Brady material -- and you seem to be pretty specific

18    with respect to that -- that request being made of the

19    government.  You've also made a request, general request for

20    Brady; obviously all of you have in your papers.  Are you

21    suggesting that you're requesting something of the government

22    specifically that does not fall within the general requests

23    you've made in your papers?

24             MR. DRATEL:  Yes.  It's material that we have --

25    it's specific -- it's about a specific person who we learned

1    about since the time that we filed the motions, and, in fact,

2    that we got significantly more information much more recently

3    about, so that we would be able to present to the government

4    a bit more specificity about what we thought it was.  So it's

5    not covered -- the stuff that we put in the motion we're

6    prepared to argue today because I think we've joined those

7    issues and the government's presented its position.  This is

8    another issue that rather than raise with the Court to

9    resolve today, we just wanted -- we thought it would be

10   better to run through the ordinary process that would give

11   the government the opportunity to fulfill its obligations to

12   the extent it thought necessary, and then if we thought that

13   that was insufficient, then we'd raise it with the Court.

14   But I think it's just premature right now to raise it with

15   the Court.

16            THE COURT:  Mr. Cole?

17            MR. COLE:  It's just one specific grand -- they

18   asked for one specific grand jury transcript yesterday, and

19   yesterday we weren't sure who they were talking about or the

20   name.  This morning I got information that identified exactly

21   who they were talking about, and I told them that we'd have

22   no trouble reviewing that specific transcript and turning it

23   over if it's discoverable, and --

24            THE COURT:  Is this Jencks?

25            MR. COLE:  -- we could do that right away.

 1              THE COURT:  Is it Jencks or something other than

 2   Jencks?

 3              MR. COLE:  No, it's certainly not Jencks, so it

 4   would only be -- the only way it could be discoverable is if

 5   it's Brady, and so we're going to go back and look at it with

 6   that eye, and -- but it's one short transcript, and we could

 7   easily have an answer to them very quickly on that.

 8              THE COURT:  Okay.  With respect to the intercepts,

 9   all of those early materials -- and I know it's been a while

10   since we've discussed that particular subject -- is

11   everything resolved, provided, with respect to those, that

12   class of discovery?

13              MR. COLE:  Yes, with the exception of Jencks.  So

14   one thing that we -- as the case develops and as we identify

15   witnesses, it is the case that we will have to, you know,

16   reconsider, to some extent, whether there are additional

17   audio intercepts available to the government that may qualify

18   as Jencks or impeachment, which -- for example, for a witness

19   that we never even anticipated having available until

20   recently -- and so we do plan to turn over -- we do plan to

21   turn over some additional intercepts that are not intercepts

22   we would use in our case-in-chief or not affirmative evidence

23   but just out of an abundance of caution in case somebody

24   could view them as impeachment or Jencks.

25              THE COURT:  Okay.  All right.  Anything else?  I'm

1   going to get to the matter of the trial date toward the end

2   of this morning's hearing.  I'd like to cover other matters

3   before we start talking about what the future may portend.

4   Anything else on discovery or the matters raised by Mr. Cole

5   thus far --

6            MR. DRATEL:  Yes, your Honor.

7            THE COURT:  -- Mr. Dratel?

8            MR. DRATEL:  On the last matter, well, we'll defer

9   that when we hear from the government more in terms of the

10  Jencks issue with the witness they talked about, but this is

11  the first we're hearing of that, and I have a sense -- let me

12  not jump the gun.  I'll just go to the other issue, which is

13  the classified filings, separate them into two categories,

14  one is Section 4 and one is the FISA response.

15           Traditionally, while the statute does not require

16  it, traditionally and I think invariably, I think it's safe

17  to say, the government has always filed its Section 4

18  material ex parte.  The statute permits the Court to disclose

19  to the defense in its discretion.  We obviously would like to

20  see the Section 4 filing so that we could respond to it in a

21  meaningful way.  And there are different tiers.  One is

22  obviously the factual information, which is the most

23  important in terms of the relevance, but then there are also

24  legal arguments as well as to why it's not discoverable or

25  what they're asking the Court to review.  Some of these

1    in-camera reviews are also for the Court to determine whether

2    the information is Brady, and so that's another issue.  And

3    so we would -- and we can file this in writing if the Court

4    wishes in terms of our position with respect to sort of the

5    different tiers, if one is getting the entire file, including

6    the factual part, or at least getting the legal submissions

7    so that we can have a context in which to respond.

8            Also, which has become traditional in the context

9    of these cases, is that in order to assist the Court in

10   making a determination that it is fair and consistent with

11   the legal standards for Brady and exculpatory material, that

12   we would be permitted ex parte to essentially have an

13   audience with the Court to alert the Court or give the Court

14   an outline of why we would think certain material would be

15   Brady, in other words, the types of material that we're

16   looking for, theories of defense, particular factual issues

17   that could assist the Court; if the Court is going to review

18   the material in-camera and we are not going to have access to

19   it, that the Court would be able to then have a context in

20   which to determine Brady.  I think without that, it would be

21   almost impossible for the Court to accurately or at least in

22   a comprehensive way to make a determination as to what would

23   be exculpatory or not, what would qualify as Brady.  So that,

24   again, has become traditional in these cases to give the

25   defense an opportunity to do that, and we would very much

1    like to avail ourselves of that opportunity before the Court

2    were to make a decision on the Section 4 filings.

3              With respect to FISA, the FISA, again, invariably,

4    and the government has in every FISA situation filed

5    something that is ex parte; whether it's all ex parte or

6    partial ex parte is different in different cases.  I think in

7    most cases nothing is disclosed to the defense with respect

8    to the FISA response.

9              Obviously, again, there's a tiered response.  One

10   is to say that whatever affidavits and factual information

11   are of course extremely relevant because these are very

12   fact-specific and case-specific determinations, that we would

13   want to see that.  But also the legal argument, again, is one

14   that is obviously something that it would be -- it hamstrings

15   the reply obviously in a fundamental way if we don't have an

16   opportunity to see what the government's arguing.  I know

17   just generally but that obviously this is a case with its own

18   set of facts and circumstances.  Again, also because of the

19   way that the FISA process has evolved -- and, again, it's the

20   Court's discretion as to whether to disclose to the defense

21   the underlying affidavits and applications, to assist the

22   Court, and also for due process purposes, there are two

23   separate sections; but I think -- that are in our papers, so

24   -- because we anticipated that obviously this issue was going

25   to arise.

1              But, in addition, to the extent that we don't get

2    an opportunity to hash this out in a way that we get access,

3    that, again, we would like the opportunity with the Court to

4    apprise the Court of what we would be looking for in the

5    context of the defense information, again, to the extent

6    necessary, in an ex-parte manner so that the Court would be

7    aware of what to look for if we don't get an opportunity to

8    look at it ourselves.  And that's what we're -- that's the

9    opportunity we're looking for in that context.  Again, you

10   know, obviously we think that in terms of the language of the

11   statute, to assist the Court in the accurate determination we

12   think about the --

13             THE COURT:  Well, you have pages and pages of

14   assistance, proposed assistance, in your papers indicating

15   what your -- in your opinion the Court should be looking for,

16   and I think you've done a very thorough job of touching all

17   the bases.  But I assume that this particular request you're

18   making now is more specific and fact-oriented?

19             MR. DRATEL:  Yes, and also based on the continued

20   investigation and evolution of the information that we have

21   been able to gather, not necessarily about the FISA itself

22   but about the case that we think is useful as well.

23             THE COURT:  Thank you.  Yes, Mr. Durkin?

24             MR. DURKIN:  Judge, there was one minor discovery

25   issue I had meant to raise with the government this

1    morning --

2              THE COURT:  Sure.

3              MR. DURKIN:  -- and we got talking about other

4    things.  I believe there had been some discussion about

5    transcripts being made of the videotaped statements of

6    clients, and I don't recall getting it; I was wondering about

7    the status of that.

8              MR. COLE:  Okay.  Yes.  Mr. Durkin's referring to

9    an issue I think has been raised at every hearing we've had,

10   which is whether there will be turned over to the defense a

11   transcript of his own client's post-arrest statement, and the

12   answer is yes.  It just hasn't been a top priority for us.

13   This is an English-language post-arrest recorded statement

14   that he's had the recording of since basically the initiation

15   of this case and which can be transcribed by him if he really

16   wants one.  We do have a transcript.  We're editing it.

17   We'll give it to him soon, but it certainly hasn't been on

18   top of our list because it's not a discovery obligation, and

19   we've had lots of other obligations we've been trying to

20   meet.  But we will provide him with a transcript as a

21   courtesy, and we will do that within -- I think within a

22   couple weeks.  We're just doing final edits to it.

23             MR. DURKIN:  That's fine.  I'm not -- I wasn't

24   complaining, I was just --

25             MR. COLE:  No, I understand.  I just want to -- I

1    just wanted to let the Court know that we're not trying to

2    ignore the request, we just have to kind of prioritize --

3              THE COURT:  Well, this is the kind of thing I think

4    you can discuss between yourselves and -- because it seems

5    that there's been a pretty significant amount of cooperation

6    up to this point in time, so I think that's the kind of thing

7    that can be handled between counsel outside the context of

8    the courtroom.  But if anything arises, if there's any kind

9    of an issue, just don't hesitate to let me know.  Okay.  Was

10   there anything else anyone had?  Ms. Moreno, Mr. Ghappour,

11   anything else on discovery before we move to another subject?

12             MS. MORENO:  No, your Honor.  I actually had spoken

13   with counsel --

14             THE COURT:  Mr. Moreno, why don't you just remain

15   seated and that way you're closer to the microphone and --

16             MS. MORENO:  I'm stronger than I sound, your Honor.

17             THE COURT:  Okay.  I'm glad to hear that.

18             MS. MORENO:  I appreciate the Court's -- I

19   appreciate the Court's sensitivity.  So I had spoken with Mr.

20   Cole this morning about this particular transcript, and I

21   trust Mr. Cole that he will look into it and provide it

22   accordingly, so that's all.

23             THE COURT:  Okay.  Thank you.  Mr. Ghappour?

24             MR. GHAPPOUR:  No, your Honor.

25             THE COURT:  All right.  Very good.  Thank you.

1    Okay.  Does that -- have we touched upon the discovery

2    matters that we need to discuss?  Mr. Cole, anything further

3    that you might -- that might come to mind relative to any of

4    the provisions you've made or supplements other than what

5    you've already addressed today?

6              MR. COLE:  No.  I mean certainly I think as a

7    standard in most cases as trial approaches, we will turn over

8    additional Jencks and impeachment on witnesses that are --

9    that are perhaps cooperating with the government or otherwise

10   we wouldn't want to disclose or put in harm's way prior to

11   getting a little closer to trial, especially now that

12   apparently there's going to be request to continue the trial.

13   But other than minor things like that that I think are common

14   in every case, we don't have any major discovery issues to

15   discuss.

16             THE COURT:  All right.  There should be a cutoff

17   data for what the government is going to provide for trial

18   purposes --

19             MR. COLE:  Sure.

20             THE COURT:  -- whether it be Jencks or whether it

21   be other material, so that the defense has an opportunity to

22   consider the material and prepare for trial.  So I'll

23   certainly take your -- I have a cutoff point in mind myself,

24   but I'd be happy to hear what the suggestions of the parties

25   are.  Okay.  Very good.  All right.

1             We can get to some of the substantive motions if

2    counsel wish to do that.  There haven't too many substantive

3    motions that need to be addressed.  I've been through the

4    papers, and when it comes to the substantive motions, I do

5    understand we're on two separate tracks here; we're on the --

6    we've got the FISA track, which I think counsel have already

7    acknowledged is a separate track, and we'll have to set up a

8    schedule for that; but we also have the other motions as

9    well, motion to suppress evidence and the motion to suppress

10   statements brought by Mr. Moalin.  So if there's no

11   objection, I propose at this point we move into some of those

12   substantive motions.

13            I've been -- as I say, I've been through the

14   papers.  I don't think it's necessary for you to repeat what

15   you have in the papers.  If there's anything you'd like to

16   highlight or underscore, I'm happy to hear you.  It appears

17   that with respect to these two substantive motions, there's

18   no need for an evidentiary hearing because the facts really

19   aren't in dispute, at least the factual underpinnings for the

20   motions themselves.  So this involves you, Mr. Dratel.  Would

21   you like to proceed?

22            MR. DRATEL:  Yes.  Ms. Fontier is going to argue

23   the suppression motion --

24            THE COURT:  All right.

25            MR. DRATEL:  -- but I just want to add one thing

1   about the FISA and Section 4, which just so as not to be

2   misunderstood, when I'm talking about disclosure to defense

3   counsel, I'm talking about in the context of a -- it can

4   remain classified, it can be discovered by the appropriate

5   protective order; I'm not talking about the dissemination

6   wider than counsel.  So I didn't want to sort of let that sit

7   out there that that was a possibility.  We understand what

8   the nature of the information in terms of its -- whether it's

9   classified or simply in camera or sealed or however it's

10  categorized, we would be obviously amenable to that.

11          THE COURT:  Okay.  All right.  Thank you.  All

12  right.  Ms. Fontier, would you like to proceed with the

13  motion?  Why don't we take these motions one at a time.  We

14  have a motion to suppress evidence, that is, taken from the

15  residence, then you have the motion to suppress the statement

16  or statements made at the airport.

17          MS. FONTIER:  Yes, your Honor, and --

18          THE COURT:  Would you like to use the microphone

19  there.  It might be easier for you.  You can -- I know it

20  would be easier for the court reporter and easier for those

21  who are seated in the back to hear what you have to say.

22          MS. FONTIER:  Your Honor, given that I am fully

23  aware that you will read all papers, I'll be very brief.  As

24  to the motion to suppress the evidence seized from

25  Mr. Moalin's home, I just want to highlight this very unique

 1    factual scenario that occurred here.

 2            Mr. Moalin was actively under investigation in 2007

 3    and 2008.  That investigation included the FISA wiretap

 4    warrant and also physical surveillance of him, his home, all

 5    in 2008.  That investigation concluded at the end of 2008.

 6    The FISA wiretap was shut down, the surveillance was no

 7    longer being conducted, and -- I won't speak to their modes

 8    or methods or even their motivation, but I do think that it's

 9    worth pointing out that the San Diego Field Intelligence

10    Group issued an assessment of Mr. Moalin in which they

11    determined that he was not ideologically supporting

12    al-Shabaab.  All of that occurred at the end of 2008,

13    beginning of 2009.

14            THE COURT:  Well, was that really the finding

15    though, that he was not ideologically supporting al-Shabaab

16    or was it -- was it more that a primary motivating factor may

17    have been tribal in nature or reasons other than

18    ideologically supporting al-Shabaab?  I didn't see anything,

19    at least in the papers submitted thus far, indicating that

20    the sole motivation was -- was clan-based motivation.

21            MS. FONTIER:  Your Honor, what -- the information

22    that we have -- and, again, Mr. Dratel will address the --

23            THE COURT:  I know you don't have all of it.  I

24    know that's a discovery issue.

25            MS. FONTIER:  -- as related to this, but FBI

1    report, which summarizes the -- I'm just going to call them

2    FIG for the Field Intelligence Group -- the San Diego FIG

3    assessment, which was done on April 23 of 2009, and this is,

4    I quote, although Moalin has previously expressed support for

5    al-Shabaab, he is likely more attentive to Ayr sub fed issues

6    and is not ideologically driven to support al-Shabaab.

7              Your Honor, as it applies to the search warrant, I

8    just -- I bring this up because the government determined at

9    some point that Mr. Moalin was not ideologically driven to

10   support al-Shabaab and essentially all the investigation was

11   concluded; the wiretaps stopped, the physical surveillance

12   stopped.  All of this ended at the end of 2008, and the

13   application for the search warrant includes facts only from

14   what was taken from the investigation in 2008.  So there is,

15   you know, discussion about the surveillance and about his

16   general habits and where he lived and where -- that he came

17   and went from his house and that the documents in other items

18   that they sought were likely to be in his house because his

19   habits in 2008 indicated that they would be in his home.

20             THE COURT:  Does motivation trump knowledge and

21   intent in this context?  Let me give you a hypothetical, and

22   let's assume that there's an individual who is -- feels an

23   affinity, a connection with Zawahiri and begins to contribute

24   money to Zawahiri, not because Zawahiri is at the top of the

25   al-Qaeda chain but he's a doctor and they like to support

1    Doctors Without Borders and he might be healing people in the

2    mountain regions between Pakistan and Afghanistan.  Would

3    that be -- would that be enough to in a sense trump the

4    knowledge and intent of supporting a foreign terrorist

5    organization?

6              MS. FONTIER:  Your Honor, the question --

7              THE COURT:  I know this is -- it's a hypothetical

8    that's a little far out there.

9              MS. FONTIER:  It is a hypothetical, and the

10   question of his motivation, why he was supporting or who he

11   was supporting certainly is evidence of what the intent was,

12   and the intent and the knowledge are certainly elements of

13   the criminality.  But in the context of this search

14   warrant -- and, again, I think the government conflated this

15   in their papers -- we didn't raise the question of whether

16   there was probable cause to arrest Mr. Moalin.  The probable

17   cause that's necessary for the search is the determination --

18   again, the actual language is that there has to be facts

19   sufficient to justify a conclusion that the property which is

20   the object of the search is probably on the premises to be

21   searched at the time the warrant is issued.  So that's the

22   actual question of probable cause as it relates to the

23   search.

24             The question of his motivation, his intent, his

25   knowledge all goes to the probable cause for his arrest or to

1    his eventual, you know, whether -- the question of whether he

2    is guilty of the offense, all which will be addressed in far

3    too much detail I'm sure in the course of time.  But as it

4    relates to this motion, that question is not an issue.  It

5    really is just whether or not there was sufficient facts to

6    justify the search of Mr. Moalin's house on November 1st,

7    2010 based on information that was garnered through an

8    investigation that was shut down in 2008.

9              THE COURT:  Well, you brought up the subject of

10   motivation though.  I agree with your last statement, but it

11   was you who brought up the subject of motivation.  I'm just

12   asking you does motivation trump knowledge and intent.  You

13   know, if that's conflation of the issues, then I guess that's

14   your response.  But to the extent that you were bringing that

15   up as some kind of a mitigating factor, and I was asking you

16   does knowledge and intent -- isn't it really knowledge and

17   intent that goes into the probable cause formula or analysis.

18             MS. FONTIER:  Well, your Honor, the reason I

19   brought it up is just to highlight the fact that this

20   investigation stopped, and there was I believe a reason that

21   this investigation stopped, and that was the independent

22   assessment of FIG.

23             THE COURT:  Okay.

24             MS. FONTIER:  That is the reason that I brought it

25   up --

1          THE COURT:  Okay.

2          MS. FONTIER:  -- and not to address the greater

3    issues of motivation versus knowledge and intent.

4          THE COURT:  Okay.  And perhaps the hypothetical I

5    used was an unfortunate hypothetical in this respect, that I

6    know you all are very sensitive to the reference to al-Qaeda

7    in the operative indictment, and you've made a motion to

8    strike any of that, which I think the government does not

9    oppose, and so there's no -- that -- that motion will be

10   granted, and any reference I think to al-Qaeda would be

11   unfortunate in this case, assuming this case goes forward to

12   trial.  So you should -- I think you should be -- any

13   concerns you have about the mention of that group should be

14   allayed.

15         MS. FONTIER:  And I appreciate that, your Honor,

16   and -- but, again, what I'm focusing on here, it's actually a

17   very narrow issue.  The question is is the information that

18   was garnered through an investigation in 2007 and 2008 that

19   was shut down sufficient to create the probable cause to

20   believe that the evidence that they sought through the search

21   warrant was on the premises where Mr. Moalin lived in

22   November of 2010.  As we set forth in our papers, we believe

23   that it is not.

24         There is an intervening fact which is I think

25   critical and fatal to the probable cause, and that is that

1   all of -- Mr. Moalin moved in May of 2010, so the premises

2   that was searched, the home that was searched in November of

3   2010, he had only lived in since May, and any of the facts --

4   May of 2010 -- so all of the facts in the application relate

5   to a different house.  There's absolutely no connection to

6   the house that was searched and the information that is in

7   the search warrant application.

8           THE COURT:  So what -- what conclusion am I to draw

9   from the fact that this gentleman changed his residence?  Am

10  I to conclude that it would have been more probable, assuming

11  he kept books, records of donations and so on and so forth on

12  individuals, am I to assume that simply because someone is

13  moving from one location to another location, they're going

14  to destroy all of that stuff, it will no longer remain in

15  existence?  Or should I assume that it's reasonable, as set

16  forth in the affidavit supporting the application for a

17  search warrant, that those are the kinds of materials that

18  are going to be retained if the individual is going to

19  continue with his interests in supporting individuals

20  mentioned in the papers?

21          MS. FONTIER:  Your Honor, respectfully I think that

22  your question is your answer.  I don't think you should

23  assume anything, and that is exactly what the government has

24  asked you to do.  They want you to assume that because there

25  was evidence in 2008, because he was under surveillance in

1  2008, because he made some transactions in 2008, you should

2  assume that he was still doing that in 2010 and find probable

3  cause.  But there is nothing to support that assumption.

4  There's nothing that says, you know, we were -- Mr. Moalin

5  was under surveillance; when he moved, he emptied his

6  apartment and took everything with him; Mr. Moalin continues

7  to behave in these manners in 2010; Mr. Moalin continues to

8  do these things in 2010.  There's none of that in here.  And

9  to assume anything thwarts probable cause completely.

10  There's no facts.  And so I am asking you to assume nothing.

11          THE COURT:  Aren't there indications, however,

12  that -- at least in the record -- that Mr. Moalin was going

13  to remain active in his fundraising capacity into the future?

14          MS. FONTIER:  In 2008, that -- the last facts in

15  this search warrant application --

16          THE COURT:  Into the future.

17          MS. FONTIER:  -- are in 2008.  It is assumed that

18  he may support other people.  But, again -- and part of the

19  reason that I brought up the FIG assessment is that their own

20  assessment of him was that he wasn't.  So it's false, and

21  it's also, as I pointed out in the reply, it doesn't go to

22  the question of whether or not there was probable cause at

23  the time of this search to believe documents and evidence

24  they sought were in the premises that they were going to

25  search.

1         THE COURT:  Okay.

2         MS. FONTIER:  If you have no further questions, I

3    don't have anything further on that issue.

4         THE COURT:  Okay.  But I'd like to give you a bit

5    of time to respond to Mr. Cole's statement or Ms. Han's

6    statement, her argument, if they're going to argue this

7    point.  I'll give you -- it's your motion; you should have an

8    opportunity to --

9         MS. FONTIER:  Thank you, your Honor.  And just so

10   your Honor knows, I'm not intending to argue any further than

11   what's in the papers the statement issue.

12        THE COURT:  You're not going to argue that --

13        MS. FONTIER:  No.

14        THE COURT:  -- issue?  Okay.  Fine.  Good.  Ms.

15   Han, please.

16        MS. HAN:  Your Honor, as is clear from the papers,

17   the defendant's main contention with probable cause in the

18   search warrant are a couple of issues:  First, the FIG

19   assessment, as Ms. Fontier just made clear, and second, the

20   connection between the home and the records that were sought.

21        Your Honor, addressing that FIG assessment

22   specifically, I'd just like to read the context in which the

23   sentence that Ms. Fontier read about that FIG assessment.

24        THE COURT:  May I break in for just a moment before

25   you begin --

1            MS. HAN:  Yes, your Honor.

2            THE COURT:  -- reading from the FIG assessment?  As

3     I went through the papers, I was a little unclear as to

4     whether or not the FIG -- it doesn't seem that the FIG

5     material, or at least the FIG material that the defense is

6     requesting, is Section 4 material.  Am I incorrect in that

7     assumption?  Mr. Cole?

8            MR. COLE:  There's confusion.  Because this

9     document refers to an earlier document by date, they're

10    assuming there's more information they're entitled to.  This

11    document extracts from an earlier document the discoverable

12    information.  So, in other words, if -- the earlier document

13    does not contain any additional discoverable information

14    that's not -- was not put into the format we produced it in.

15    And --

16            THE COURT:  I'm not talking about discoverable

17    information --

18            MR. COLE:  Right.

19            THE COURT:  -- I'm talking about the defense is

20    making broad-based requests for any underlying information --

21            MR. COLE:  Oh, I'm sorry.

22            THE COURT:  -- that might have ultimately gone into

23    the FIG assessment.  You've got the FIG assessment.  They

24    want any statements that may have been utilized in the group

25    reaching its conclusions, et cetera, et cetera.  Is that

1   Section 4 material or --

2            MR. COLE:  No.

3            THE COURT:  -- is that -- that's --

4            MR. COLE:  It's the --

5            THE COURT:  -- regular discovery.

6            MR. COLE:  -- audio intercepts.  It's the audio

7   intercepts.  I mean the FIG assessment is an opinion by an

8   analyst; that's what it is.

9            THE COURT:  Are your saying they have --

10           MR. COLE:  Yes --

11           THE COURT:  -- everything?

12           MR. COLE:  -- they have -- they have the audio, and

13  they can draw their own opinion as to Mr. Moalin's

14  motivations, just the way somebody listening to the calls

15  drew an opinion here.

16           THE COURT:  All right.  The way the papers framed

17  it, I was under the impression that there were other written

18  materials out there from which the ultimate assessment was

19  drawn.  But that is not the case, so that in a sense moots

20  the defense request for discovery.

21           MR. DRATEL:  I don't know.  I would like to argue

22  that, your Honor, just based on what I think is --

23           THE COURT:  All right.  Okay.  That's another

24  issue.  And that's something that falls into the realm of

25  discovery, so, Ms. Han, pardon the interruption.  You were

1   about to respond to Ms. Fontier by reading a portion of the

2   assessment.

3        MS. HAN:  Your Honor, Ms. Fontier made much of this

4   assessment, saying essentially that this assessment stopped

5   the investigation of Mr. Moalin, and it's actually completely

6   inaccurate.  And in light of the information that's in this

7   assessment, it would -- it's certainly information that would

8   have sparked a greater, perhaps wider investigation.

9   Specifically, the report says the San Diego FIG assessment is

10  that Moalin, who belongs to the Hawiye tribe/Habr Gedir

11  clan/Ayr subclan, is the most significant al-Shabaab

12  fundraiser in the San Diego area of operations.  And then the

13  report goes on to say that Mr. Moalin had previously

14  expressed support for al-Shabaab, and then goes on to say

15  that he might have been otherwise ideologic -- or might have

16  been otherwise influenced by these clan affiliations.

17       But based on that conversation -- on that

18  particular text and the information that's in the FIG

19  assessment, it's not the kind of information at all that

20  would stop this investigation, and it's -- does not draw any

21  negative light of any of the information that is actually in

22  the search warrant application.

23       And, your Honor, in that search warrant affidavit,

24  as you've reviewed that search warrant affidavit -- I'll just

25  go over it briefly -- the search warrant affidavit discusses

1    the extensive nature of the fundraising that Mr. Moalin was

2    doing.  In addition, it talks about his list of donors that

3    he had and also, in particular, that he had a contact book

4    that was so important to him that when he traveled

5    internationally, he asked somebody to keep it for him because

6    he did not want to be found with that particular item.

7           In addition, your Honor, it describes Agent

8    Kaiser's training and experience that the kinds of records

9    that were being sought are the kinds of records that would be

10   kept by someone like Mr. Moalin specifically because, based

11   on the information in the search warrant application, it was

12   clear that these records were so important to him.

13          In addition, your Honor, in terms of connection

14   between the home and the records, again, that goes to the

15   point of the nature of the records that were being sought.

16   The nature of the records that were being sought were lists

17   of donors, hawala records, the kinds of things that would be

18   maintained.

19          Moreover, your Honor, should the Court find that

20   Magistrate Adler's finding of probable cause was in fact

21   clearly erroneous, the good faith exception does apply in

22   this case because the agents did rely on that search warrant

23   in an objectively reasonable manner.  Moreover -- and there

24   was a colorable argument for probable cause as set forth in

25   the search warrant.  So with that we would submit.

 1              THE COURT:  So the -- the suggestion -- there was a

 2     suggestion by the defense that the investigation of Mr.

 3     Moalin had stopped at some point.  Of course, the defense is

 4     urging that the reason for that was a finding or conclusion

 5     in the field group or Field Intelligence Group assessment.

 6              They also suggest that the only reason why the

 7     investigation restarted -- their parlance or their

 8     characterization -- or lighted up was because of the

 9     investigation into the Shidaal Express, that but for the

10     investigation into the Shidaal Express, the investigation

11     into Mr. Moalin never would have resumed.  Do you have any

12     response to that?

13              MS. HAN:  Your Honor, I guess it's -- essentially

14     what you're asking the United States to speak to is

15     essentially what happened between April of 2009 and October

16     of 2010 when the defendants were arrested; is that

17     essentially what you're asking?

18              Your Honor, during that time period, as you're

19     aware, there are a number of intercepts, and they required

20     Somali translations, and there's was a great number --

21     there's a great amount of work to be done during that time

22     period to get this case ready to the point at which the

23     defendants could be arrested.  So that is my response about

24     what was occurring during that time period.

25              THE COURT:  Okay.

1          MR. COLE:  And, your Honor, I know that two counsel

2     shouldn't be speaking on the same issue, so if you want me to

3     wait -- I don't want to stand up while Ms. Han's on the

4     podium, but I was with the case from 2008 all the way and

5     so -- and so that's why I'm standing up now.  And I can tell

6     you that the notion that this FIG assessment had anything to

7     do with the investigation of this case starting or stopping

8     is completely based in no reality.  This investigation never

9     stopped; it never stopped until the time that this defendant

10    was charged, and it was not restarted ever by the Shidaal

11    Express investigation at all.  In fact, as Ms. Han pointed

12    out, to be able to get a case like this to the point where we

13    could comply with discovery obligations and be in any place

14    and ability to move an investigation like this into the

15    prosecution stage, especially because of the high volume of

16    Somali intercepts, we had a lot of work to do before we could

17    bring it public.  But the FIG assessment was not even on the

18    radar screen as an issue in that time line.

19         THE COURT:  Okay.  Thank you, Mr. Cole.  Thank you,

20    Ms. Han.  Ms. Fontier, anything further?

21         MS. FONTIER:  Your Honor, I just very briefly want

22    to point out that, again, each of the facts that Ms. Han has

23    alluded to occurred in 2008.  They are telling you that the

24    investigation was open, and by that they interpret that as

25    translating intercepts.  But there's nothing in the search

1    warrant affidavit that relates to 2010, and because of that

2    it is stale, there was a lack of probable cause, and it's

3    really not even a colorable argument, so the good faith

4    exception would not apply.

5              THE COURT:  Okay.  Very good.  All right.  I will

6    take this motion under submission, that is, Mr. Moalin's

7    motion to suppress evidence.  You've indicated, Ms. Fontier,

8    that you have no desire to argue at this point the motion to

9    suppress statements, you're going to rely on what's in the

10   papers?

11             MS. FONTIER:  That's correct, your Honor.  I would

12   submit on the papers on that.  Mr. Dratel does further want

13   to address the specific Brady request that we've made in our

14   papers.

15             THE COURT:  Well, we'll get to that.  All right.

16   Did the government want to argue the matter of the motion to

17   suppress?  Ms. Han?

18             MS. HAN:  No, your Honor.  We would also submit on

19   our papers.

20             THE COURT:  Okay.  Then I will take that matter

21   under submission at this time.  Okay.  Mr. Dratel, the --

22             MR. DRATEL:  Yes.

23             THE COURT:  -- this is the motion for exculpatory

24   evidence now, Brady?

25             MR. DRATEL:  Yes, your Honor.  And I'm not going to

1    rehash what's in the papers, but I do want to address the

2    Court's question that you posed to Ms. Fontier on the -- on

3    the question of motivation, intent, and knowledge because I

4    think it does relate to the relevance of the material that

5    we're talking about here.

6         One of the complexities in this case is that the

7    government has charged four different statutes, and we'll

8    leave aside money laundering for a moment because obviously

9    that requires the predicate of the underlying criminal

10   conduct that's charged in the other statute.  But you have

11   2339 (a), which is material support for a -- in this case

12   alleged a conspiracy overseas to -- a conspiracy to kill,

13   maim overseas; you have 2339 (b), which is material support

14   to a foreign terrorist organization, a designated entity; the

15   third is the -- an underlying 956 (a) conspiracy, which is a

16   conspiracy to murder and maim overseas.

17        With respect to 2339 (b), the material support to a

18   foreign terrorist organization, motivation is certainly not

19   an element, and the knowing or intentional provision of

20   material support, regardless of motivation, if it's done with

21   knowledge and intent that it's to a foreign terrorist

22   organization, is a violation of the statute.  So in that

23   context motivation is certainly less important.  Motivation

24   obviously casts light on intent, and also motivation can be,

25   in some ways, a manifestation of intent in this context.

1              If -- and to take the Court's -- to take the

2    Court's hypothetical, which is that if you were to give

3    material support -- if a person were to give material support

4    to a member of a designated group -- and in the case that the

5    Court, Edwari (phonetic) -- and Edwari (phonetic) is himself

6    designated, so perhaps it's not the best example -- but let's

7    say if it's someone who's not designated himself but is

8    someone who's part of a designated group -- if you are giving

9    money to -- for the purpose of that person's personal

10   activities as opposed to the organizational context, it would

11   not be a violation of 2339 (b); there are cases to that

12   effect.  But if it's obviously in the organizational context,

13   even if it's for a purpose that might not be considered

14   terroristic in the sense that for food or humanitarian

15   assistance or something like that, the way that 2339 (b) is

16   structured and the way that the designation system is

17   structured, that that's indivisible, the organization's

18   activities are indivisible.  So even if it's for a social

19   service arm of an organization -- let's say like a Hezbollah

20   or something -- that has different categories, military,

21   social, political -- even if it wasn't to the military or for

22   a terrorist purpose specifically, going to the organization

23   itself is deemed to be sort of the fungibility of money or

24   resources, that it frees up other resources for terrorist

25   activity.  So in that context anything that's given with

1    knowledge and intent to an -- in an organizational capacity

2    is a violation of the statute regardless of the motivation,

3    even if the motivation is somewhat purer than that.

4            For 2339 (a) it's very different.  That's to

5    provide a -- material support to a conspiracy that is

6    designed to harm.  So, therefore, you have to have the

7    specific intent in 2339 (a) -- and again, the case law

8    supports this -- that 2339 doesn't require a specific intent

9    to do something with respect to violence.  So, for example,

10   so giving material support for the purpose of medical

11   treatment or for the purpose of humanitarian aid would not be

12   a violation of 2339 (a).  Therefore, motivation is critical

13   in that statute.

14           For the 956 conspiracy, same thing in the sense

15   that if you are not -- if your agreement is not about

16   committing violence but is instead about some other form of

17   assistance that you're providing, it would not be a violation

18   of 956 (a) if you did not have a -- an intention -- when I

19   say intention, it really encompasses motivation in that

20   context -- an intention to -- to participate in a conspiracy

21   to commit violence.

22           So those are three different statutes with, in some

23   ways, very different elements in the context of the Court's

24   question.  So I think that complicates it, but my point in

25   the context of the Brady is that even if the motivation were

1    not directly relevant for 2339 (b), it is certainly directly

2    relevant for 2339 (a) and the 956 charges.  So in that

3    context what we're asking for is certainly relevant.  And the

4    government did put in its papers that any assertion that this

5    FIG assessment is based solely on intercepts, and reading it

6    that was not apparent to me.  I don't know if the

7    government's taking that position categorically, but the

8    government has just taken the position with the Court this

9    morning that the intercepts weren't even prepared as of

10   April 2009 when the initial assessment was made that's

11   referenced in this later FIG report, the later FIG

12   assessment.

13           So I think that the Court at the very least should

14   order the government to provide whatever foundational

15   material goes to the exculpatory parts of this document that

16   are not intercepts.  If they're intercepts, then we have

17   them, obviously we have them.  But I believe that the way

18   this document reads is that there's more to it than just

19   intercepts, and to that extent I think the Court should order

20   the government to provide it, to review its files to make

21   sure that it's provided it.  Even if the government is under

22   the impression at this stage, two or three years down the

23   road, that that's what it's based on, I think there at least

24   be a review and order that other material that forms the

25   foundation for this.  And, you know, it's in our papers as to

1  what the law is on this in the sense that the government

2  can't just say "by the way, we have information that's

3  exculpatory" without providing the basis or the foundation

4  for it and puts it in a usable format for the defense; they

5  can't just say there's a witness who did identify your client

6  or --

7           THE COURT:  Well, I don't think the government

8  would take issue with that.  I think if Mr. Cole, for

9  example, were to rethink exactly what went into the FIG

10  assessment and all of a sudden remembered no, wait a minute,

11  there were some other materials, that that would be provided

12  to you.  I have that -- I have that impression.  But let me

13  let Mr. Cole speak to that, and he may want to speak to the

14  issue that you've suggested, that based on what he says,

15  there were no transcriptions completed until '09 and that

16  nothing had been transcribed before that.

17           MR. DRATEL:  I don't want to say nothing, but that

18  the transcription process was such a long one that by April

19  of '09, they could not have had a full picture just from

20  interceptions alone.

21           THE COURT:  All right.  Mr. Cole, should something

22  come up, should there be additional foundational material for

23  the assessment, I assume you have no objection to providing

24  those to the defense.

25           MR. COLE:  No, I don't have any objection provided

1    they are -- that the foundational material itself is in fact

2    discoverable.  In other words, I'm not aware of any

3    foundational material for this other than the audio

4    intercepts, and we've gone back and checked.  And so if there

5    is any foundational information, I'll need to -- if I find

6    any other foundational information, I would need to look at

7    it, is it classified, I'd have to talk to the Court maybe.

8    I'm not trying to be coy here at all because I'm not aware of

9    any, but as soon as something like that comes to my mind,

10   either it will turned over or you'll be hearing about it from

11   us ex parte if necessary.

12             THE COURT:  Okay.  Well, I think that's fair.

13             MR. COLE:  Right.

14             THE COURT:  I think what you're saying right now is

15   even though you think you've provided everything to the

16   defense without CIPA concerns, and perhaps even out of an

17   overabundance of caution, believing yourself that it goes

18   beyond Brady, what you seem to be saying is that whatever

19   additional materials might exist, you're going to at least

20   submit to the Court --

21             MR. COLE:  Yes.

22             THE COURT:  -- for an in-camera review if in fact

23   you think it's -- CIPA may be implicated.  What if -- what if

24   there are -- there are just other statements of individuals

25   or other reports, notes --

1            MR. COLE:  Sure.

2            THE COURT:  -- those kinds of things, not

3     classified; would you be providing that to the defense?

4            MR. COLE:  Yes.  If there is a basis for this, that

5     this individual who makes this assessment or the FIG who

6     makes the assessment, if they were drawing on something other

7     than what I believe they were drawing on or what we

8     understand they were drawing on --

9            THE COURT:  Okay.

10            MR. COLE:  -- then that's not a problem, your

11     Honor.

12            THE COURT:  Okay.

13            MR. COLE:  And I do want to just -- I think I've

14     already referenced this point and made it clear, but just in

15     case I didn't, so all the parties and the Court understand,

16     the reason this document's dated 6-15-2011 is this was simply

17     the document prepared so we could provide discoverable

18     information.  It's simply -- the reason it refers back to

19     a -- it's sort of like, as we often do, if we get information

20     in a particular format, and that format may involve lots of

21     information that isn't discoverable, we will send a letter to

22     the defense about the part that is discoverable.  This was

23     essentially that.  This was a document prepared specifically

24     for discovery so we could parse out from a larger collection

25     of information what's actually relevant and discoverable

1   here, which is why it's referring back to the April 2009

2   document.  Does that make sense?

3                  THE COURT:  Yes.

4                  MR. COLE:  Thank you.

5                  THE COURT:  All right.  Thank you.  Mr. Dratel --

6                  MR. DRATEL:  Yes.

7                  THE COURT:  -- anything further?

8                  MR. DRATEL:  Your Honor, just two things.  One is

9   with respect to that April 23, 2009 initial assessment that

10  this later FIG assessment is based on, this is redacted

11  itself.  I don't see why we couldn't get a redacted version

12  of that that had the material.  I don't know to what extent

13  this is summarized.  I would certainly ask at a minimum that

14  the Court be provided that document to look in camera as to

15  whether or not this document satisfactorily or sufficiently

16  captures what we're talking about in terms of Brady material

17  what's in the original document.

18                  Second thing is that I think the Court's question

19  earlier to I guess Ms. Han or Mr. Cole in the context of the

20  argument that Ms. Fontier was making I think foreshadows

21  something when you asked about Section 4 is that obviously

22  intelligence assessments are, to some extent, in a

23  traditional sense incorporate a lot of information, some of

24  which would be classified, some of which is not, so obviously

25  I appreciate the Court's attention to that, which I think you

1    covered here in the sense that some of that may be something

2    that will be provided to the Court in camera, again, in the

3    context of hopefully we'll have an opportunity to at least

4    provide the Court with our sort of sense of what we'd be

5    looking for very specifically.

6             THE COURT:  Okay.  All right.  Thank you.  I think

7    that covers the motions brought by Mr. Moalin.  And why don't

8    we get to the motions brought by Mr. Doreh.  Is that a

9    correct pronunciation of Mr. Doreh's name, Mr. Ghappour?

10            MR. GHAPPOUR:  Your Honor, I believe it's "door-ra"

11   (phonetic).

12            THE COURT:  Mr. Doreh.  Thank you.  I appreciate

13   that.  Okay.  Mr. Ghappour, you've -- you can certainly use

14   the lectern there.  You've moved for a bill of particulars.

15   I've been through that.  Anything further there?

16            MR. GHAPPOUR:  No, your Honor.  The government's

17   opposition addressed several of the particulars sought, so

18   I'd just like to address a few of those that are outstanding.

19   Specifically, first, there's no way really to tell whether or

20   not the indictment references one, two, three, or four

21   conspiracies to violate 18 USC Section 956, and that is the

22   conspiracy to kill persons in a foreign country.  Count 3

23   charges a conspiracy to kill persons in a -- sorry.  Count 3

24   charges a conspiracy to kill persons in a foreign country in

25   violation of Section 956.  It delineates overt acts, and

1    we're satisfied with that.

2          Similarly, Counts 1 and 4 charge conspiracies in

3    violation of different statutes, but both in preparation for

4    and in carrying out violations of Section 956.

5          Count 5 charges a substantive violation, a

6    violation of material support statute 2339 (a), and that is

7    the provision of material support to terrorism in preparation

8    for and carrying out a conspiracy to kill persons in a

9    foreign country, again, in violation of Section 956.

10          As it stands, there is no way to tell whether the

11    conspiracies referenced in Counts 1, 2, and 5 -- sorry --

12    Counts 1, 4, and 5, all reference that conspiracy delineated

13    in Count 3, and Mr. Doreh's entitled to know whether the

14    government views these conspiracies alleged to be one

15    encompassing conspiracy or several separate and distinct

16    conspiracies.  This goes to the core of our ability to defend

17    the case, avoids surprise, and plead double jeopardy down the

18    line.

19          So the same is true with respect to the

20    conspiracies referenced in Counts 2 and 4.  Count 2 is a 2339

21    (b) charge, conspiracy to provide material support to a

22    foreign terrorist organization.  And similarly, Count 4 is a

23    conspiracy to launder monies, and that is for preparation and

24    carrying out a 2339 (b) conspiracy.  That's a defect that we

25    can't get our head around.

1              Second point is the particularization with respect

2    to the identity of the victims or the class of victims for

3    Counts 1, 3, 4, and 5.  All of these reference a conspiracy

4    to kill in a foreign country.  However, the conspiracy to

5    kill in a foreign country is basically an agreement to commit

6    an offense overseas that if performed within the jurisdiction

7    of the United States would constitute murder.  And just as

8    murder has defenses that turn on the identity of a victim, so

9    would the Section 956 violation.

10             And, your Honor, I don't want you to lose sight of

11   the nature in this case in making this consideration,

12   specifically that the indictment and discovery indicate that

13   there's been activity in this case in Somalia and several

14   parts of the United States.  Based on what we know so far

15   about the case, witnesses could be anywhere from the Horn of

16   Africa to St. Louis.  So our ability to investigate and I

17   think that -- I think the international scope of this case

18   should have a particularly important bearing on that.

19             Third, your Honor, is particularization with

20   respect to the manner in which the transactions in Counts 1,

21   4, and 5 were to be used in -- in order to carry out a

22   conspiracy to kill persons in a foreign country.  Put in

23   contest -- put in context, in contrast to Count 1 -- I mean

24   Count 2 -- Count 2 would be satisfied if a defendant sent

25   money to al-Shabaab instructing them to buy marshmallows.

1    Very simple.  It's material support to a foreign terrorist

2    organization.  However, the conduct that would otherwise --

3    that otherwise innocuous conduct would not satisfy Counts 1,

4    4, or 5.  So the question is was the money that was sent, how

5    was it intended to be used to kill persons in a foreign

6    country, and that is not answered in the discovery or the

7    indictment.

8              Alternatively, is the government alleging a global

9    jihadist theory, in which case we can contend that.  Are they

10   alleging that any money provided to any jihadist constitutes

11   a promotion of a conspiracy to kill in a foreign country?

12   Because there are defenses against that as well.  And, your

13   Honor, that's all I've got.

14             THE COURT:  All right.  Thank you, Mr. Ghappour.

15   Mr. Cole?

16             MR. COLE:  Thank you, your Honor.  Sort of similar

17   to a drug case, your Honor, you have a conspiracy to import

18   narcotics and you have money laundering, which is -- the

19   predicate act is importation of narcotics.  There is one

20   conspiracy to kill overseas.  It simply alleges a predicate

21   in other offenses in the indictment.  And so if that's the

22   question ultimately at bottom, that Mr. Doreh wanted to

23   address through the motion for a bill of particulars, that is

24   not a hard one to answer.  I don't think it requires any

25   particulars.

1              The conspiracy to kill is alleged in the

2     indictment, and it simply alleges a predicate offense in the

3     other charges that require predicate offenses.  We're not

4     suggesting there were four separate, different, distinct

5     conspiracies to kill.  And so I think that's -- that

6     addresses one question.

7              I don't know what was meant by a global jihadist

8     theory.  I'm just not familiar with that issue, but I will

9     say that the theory of the case is simply that these

10    defendants conspired to send money to Somalia so that it

11    could be used to kill people, and that's the theory.  We

12    don't have a detail either to put on a trial, it's not part

13    of our case at trial, or need be alleged in the indictment

14    exactly how the money was used ultimately or even how someone

15    who received the money would in fact intend to use it.  The

16    whole focus of our case is going to be on the intent of these

17    four defendants here in the United States; what did they

18    intend when they sent the money over?  And our -- our theory

19    of the case, as alleged in the indictment, is that they

20    intended that the money would be used to kill overseas.  And

21    so that's why the government resists a bill of particulars

22    asking for details of how the money precisely was used, how

23    it precisely was going to be used because none of those

24    things are required to prove this case at trial, and so they

25    shouldn't be required to be detailed.

1          Although we are going to show money transfers took

2     place, we don't have to.  The money transfers are evidence of

3     the conspiracy.  There is not even any requirement that we

4     show a money transfer ever occurred in terms of the elements,

5     and a bill of particulars should address the elements and

6     nature of the offense, not the evidence we're going to use to

7     prove it.  So that's why we resist a bill of particulars that

8     would artificially require the government to explain how it's

9     going to prove its case; that is already alleged fairly

10    simply and straightforward in the indictment.

11          Also, although we know that -- we're not trying to

12    be hypertechnical in relying on the timeliness of the

13    motion -- that would be silly -- but it is -- it is not

14    helpful to the government to receive a bill of particulars

15    when the grand jury that returned the indictment is long

16    gone.  If it was received at a time where there was actually

17    a valid reason to address something in the indictment, it

18    would have left up to us the option to supersede to address

19    issues, so now --

20          THE COURT:  This raises the timeliness --

21          MR. COLE:  Yes.

22          THE COURT:  -- issue?

23          MR. COLE:  And it would have allowed us that.  Now

24    here we are not far from the trial date after a very long

25    period of litigation, and the government just submits that

1    there really isn't a lot of question what this case is about.

2    It's actual quite simple in terms of theory.  I'm not saying

3    it'll be simple in terms of proof; that of course is for the

4    trial to find out and for the jury to find out.  But in terms

5    of theory, it's simply that these individuals wanted to send

6    money to people and organizations in Somalia knowing and

7    intending that the money would be used to kill other people.

8    And we are not alleging the specific -- that there was only

9    one specific person intended to be killed; it was being sent

10   to the organization for the purpose of killing, and that's

11   the theory.  And so we don't think a bill of particulars is

12   required, and we think the case law that we cited in our

13   papers indicates that what Mr. Doreh is really requesting is

14   proof, not a bill of particulars.

15          THE COURT:  All right.  Thank you, Mr. Cole.  All

16   right.  The other motion that was filed by Mr. Doreh was a

17   motion for leave to file further motions; I don't think we

18   need to address that.

19          Let's get to Mr. Mohamud's motions that need to be

20   addressed.  There's the -- there's the Brady motion; I think

21   we've already been over that.  And then there's the motion to

22   strike the surplusage --

23          MS. MORENO:  Your Honor, I --

24          THE COURT:  Yes?

25          MS. MORENO:  Let me savor the victory for a moment.

1          THE COURT:  I'm sorry?

2          MS. MORENO:  Let me savor the victory.

3          THE COURT:  On the motion to strike?

4          MS. MORENO:  Yes, your Honor --

5          THE COURT:  Okay.

6          MS. MORENO:  -- if I may.  As a defense lawyer,  I

7   don't --

8          THE COURT:  Well, you don't want to snap defeat out

9   of the jaws of victory.

10          MR. COLE:  I want to try.

11          MS. MORENO:  Perhaps I should just submit and sit

12   down, your Honor.

13          THE COURT:  No, no, please.

14          MS. MORENO:  No, your Honor.  Thank you.  I'm

15   mindful of the Court's previous comments with respect to this

16   particular sentence, and as the Court may or may not have

17   been considering, the government did drop a footnote in its

18   discussion of the particular issue of al-Qaeda and Zawahiri

19   and whatever other issues they want to bring up that we

20   believe are not only completely irrelevant but highly

21   prejudicial.  And if the government proceeds on its intention

22   as it says it might, then we will address those in a motion

23   in limine at the appropriate -- excuse me -- at the

24   appropriate time.

25          THE COURT:  Well, that would always be a

1    consideration of the Court going forward.  And I certainly

2    accept Mr. Cole's statement in the spirit in which he's made

3    the statement, or the statement of nonopposition, so I

4    wouldn't be concerned about that at this point.  All right?

5            MS. MORENO:  Thank you, your Honor.  I would submit

6    on the other.

7            THE COURT:  Thank you.  I think the other motions

8    can be submitted as well.

9            MS. MORENO:  Thank you.

10           THE COURT:  And then we have the motions brought by

11   Mr. Durkin's client.

12           MR. COLE:  Your Honor?

13           THE COURT:  Yes?

14           MR. COLE:  I'm sorry.  Could I just make -- just

15   make sure that Ms. Han and I tracking and we're all on the

16   same page with the Court.  We agreed to striking that out of

17   the indictment.  We don't need it in there.  It isn't an

18   element of the offense.  And we also would never venture to

19   insert the name "al-Qaeda" into a trial without the Court

20   having a chance to rule upon that ahead of time, but I just

21   wasn't sure if we heard an earlier comment by the Court to

22   mean that you'd already decided that there couldn't be, if --

23   before we had a chance to explain why, that there couldn't be

24   any reference necessarily to al-Qaeda in the trial.  And I

25   just -- I just want to say that we would -- we would bring

1    that pretrial or pre-putting on any evidence, but -- we don't

2    have a big plan about making this case about al-Qaeda at all,

3    but the point we want to preserve for future briefing to the

4    Court and to the parties is Mr. Ayrow was -- he was a rock

5    star, if you will, of jihadists in the Horn of Africa, and

6    part of his image, his persona, his well-known background,

7    was training in Afghanistan, being connected to al-Qaeda,

8    harboring individuals wanted for embassy bombings, that sort

9    of information.  The defense may dispute that, but that is --

10   that is part of what we see and what we would potentially

11   prove at trial was part of his well-known persona and

12   background and reputation.  And the reason we want to at

13   least preserve a chance to address this to the Court is

14   because, as the defense has pointed out, we have a lot we

15   have to show as to intent, and if it is the case that Mr.

16   Ayrow was famous for these things, then we would argue that

17   it is relevant to intent when somebody decides to send Mr.

18   Ayrow money as to what it's going to be used for.  And so we

19   just want to hopefully preserve for future briefing and

20   decision by the Court when references to al-Qaeda would or

21   would not be appropriate.  We agree that it doesn't need to

22   be in the indictment, that that language should be struck

23   that's in that part of the indictment.  But that's all.  I

24   just wanted to flag that because we heard earlier a comment

25   that might have suggested that the Court had already decided

 1   that there would be no reference.

 2           THE COURT:  Well, it may well be that this needs to

 3   be looked at again, and I certainly take your statement at

 4   face value, Mr. Cole, that you're not going to make any

 5   references, for example, before the jury panel or in papers

 6   that would be available to the jury, whether it's a reading

 7   of the indictment or otherwise, without the Court having

 8   cleared any references based upon a bonafide and reasonable

 9   showing from the government that any reference to al-Qaeda or

10   any other hot-button group or movement or subject, for that

11   matter -- let's not define it just to groups -- could be

12   addressed by the Court ahead of time.

13           MS. MORENO:  And just, your Honor, more for

14   clarification purposes --

15           THE COURT:  Yes.

16           MS. MORENO:  Of course, as I've indicated, we would

17   have strenuous objections to al-Qaeda being anywhere in this

18   trial, but if that is going to be an issue that the Court

19   will allow in some context, we would need to know that

20   obviously before jury selection because that would be a very

21   important --

22           THE COURT:  Oh, absolutely.  But we're -- yeah,

23   that train has not pulled out of the station yet.  We're

24   still -- with respect to proceeding to trial and sanitizing

25   what might need to be sanitized and alerting jurors to what

1   might be in the evidence to make sure with that knowledge

2   they can still fairly consider all of that in connection with

3   all the evidence in the case, those are issues that will be

4   discussed before jury selection but at about that time, at

5   about that point in time.  So I wouldn't -- as Mr. Cole

6   indicated, he has flagged the issue, I know everyone is

7   concerned about it, and if we need to address it, we

8   certainly will before it's brought out in any form or fashion

9   before either a jury panel or the actual jury to be selected

10  for this case.

11            MS. MORENO:  Thank you, your Honor.

12            THE COURT:  Okay.  Thank you, Ms. Moreno.  All

13  right.  Okay.  Then, Mr. Durkin, we have your client's

14  motions.  You have early return of trial subpoenas being

15  requested in a one-sentence motion.  You're not really

16  specifying any issue here.  Anything further you wanted to

17  say on that, sir?

18            MR. DURKIN:  Judge, only that I'm used to filing

19  that in Chicago all the time.  I've filed it everywhere else

20  and never had --

21            THE REPORTER:  Mr. Durkin, I'm sorry.  I can't hear

22  you.

23            MR. DURKIN:  I said I'm used to filing that motion

24  routinely in Chicago and have filed it other places.  Perhaps

25  things are different here, but I have never had the

1   government oppose that motion as long as it was mutual, so I

2   don't understand the issue.  I think their references to

3   Nixon is out of a different context.  I don't think it would

4   be appropriate for me to have to say I want to subpoena eeny,

5   meeny, miney, moe, but if they're going to get access to the

6   materials, I don't know how they can be heard to complain.

7           THE COURT:  All right.  Mr. Cole or Ms. Han?

8           MR. COLE:  Your Honor, I don't think we have a real

9   huge opposition here.  It was just simply, like you said, it

10  was a one-sentence motion, and I don't know what it really

11  means or what this -- I don't even know what the subpoenas

12  are obviously; I don't think we have a right to know that.

13  That's something that we'll address with the Court, what Rule

14  17 subpoenas should or should not be issued.  We were just

15  simply trying to point out what we understood to be the legal

16  standard for that, and if we're wrong on legal standard,

17  we're wrong, but -- I don't think we are, but I assume he'll

18  have no trouble justifying his Rule 17 subpoenas to the

19  Court, and if the Court thinks it's appropriate, they'll be

20  given early return.  So I don't think we really have much of

21  a role in that.

22          THE COURT:  No, I don't think so.  I just see that

23  as a nonissue at this point.  Okay.  Thank you.  There was a

24  motion for preservation of notes as well.  You're moving to

25  produce all rough notes prepared by law-enforcement-related

 1    personnel, including prosecution witness interview notes.

 2    And obviously the government has an obligation to produce

 3    Brady and Jencks material, but I think your request at this

 4    point, Mr. Durkin, may be a little broad.  Did you want to

 5    address that?  It seems to go beyond Brady and Jencks.

 6             MR. DURKIN:  Well, it's --

 7             THE COURT:  I'm assume you're not requesting

 8    anything over and above Brady and Jencks.

 9             MR. DURKIN:  I'm -- I'm not, but what I'm asking --

10    and, again, maybe this is because I'm more accustomed to the

11    way it works in Chicago -- but it seems to me preservation is

12    a rather simple act.  I'm not asking for production.  And

13    what I don't want to have happen is have some unforeseeable

14    issue come up that turns into an impeachment issue or some

15    type of credibility question at trial and find out that

16    there -- that the only real source of the explanation could

17    have been the agents' notes but they were gone.  I don't know

18    how anybody's harmed here.  I just don't understand the

19    government's reticence.  I'm not asking for anything to be

20    produced that I'm not entitled to.

21             THE COURT:  Okay.  Mr. Cole, anything you'd like to

22    add?

23             MR. COLE:  No, I don't think there's really any

24    reticence to preserve what I guess the core request is, which

25    is to preserve notes of witness interviews.  The government

1    just gets concerned when the request is stated so broadly, it

2    makes it sound like I have to preserve my Post-It note when I

3    jot down a note about your Court's ruling today or I have to

4    preserve -- I mean it was asking for preservation of any note

5    by any prosecutor or agent working the case.  And I don't

6    think that's what's really desired by Mr. Durkin, but when

7    it's expressed that broadly, I don't want to say we're going

8    to comply, I want to tell the Court --

9              THE COURT:  It is broad.  The reference to

10   law-enforcement-related personnel is very broad; I think it's

11   broader than what I've seen in the past.  But this is not an

12   issue we need to spend any time on.  I understand what your

13   request is, Mr. Durkin.  I'll respond to it.  Okay.

14             We have a motion for adequate notice of any 404 (b)

15   evidence.  That's more in the nature of a motion in limine.

16   The government's indicating that it will produce any such

17   evidence no later than 30 days before trial is; is that

18   correct, Mr. Cole?

19             MR. COLE:  Yes, your Honor.

20             THE COURT:  Okay.  I think that's -- I think that's

21   reasonable.  Mr. Durkin, did you want to be --

22             MR. DURKIN:  I'll stand on the pleadings, Judge.

23             THE COURT:  Okay.  And a motion for a more

24   immediate disclosure of favorable evidence.  Well, I think

25   the government is committed to timely complying with all of

1    its discovery obligations.  I'll be setting further dates,

2    compliance dates, Mr. Durkin, either at the end of this

3    hearing today or at a future hearing.  I realize that there

4    may be a request to move the trial date a bit, so I think

5    that that would probably have a bearing on dates.  But I

6    think you can rest assured that the Court will set reasonable

7    dates for providing additional material, whether it's --

8    whether it's Jencks or Brady or Giglio or other materials.

9    Okay?

10            MR. DURKIN:  That's fair.

11            THE COURT:  Okay.  Very good.  And then there's a

12   motion for hearing concerning co-conspirator statements;

13   you're looking for a pretrial hearing on admissibility of

14   co-conspirator statements.  Anything further on that motion,

15   Mr. Durkin?

16            MR. DURKIN:  Well, only this, Judge.  It's -- I

17   haven't -- I haven't had a hearing on a co-conspirator

18   statement in about 35 years, which -- I hate to admit I've

19   been practicing even longer.

20            THE COURT:  Even in Chicago?

21            MR. DURKIN:  Even in Chicago.  And -- however, it

22   is -- and this may be unique to the Seventh Circuit in a case

23   called Santiago -- but it's -- the government routinely

24   provides a written proffer under that theory of law, and I

25   think it's consistent with the Ninth Circuit.  I'm very

1    concerned here about where my client fits in this case.

2            My client is involved in a $3,000 transfer, pure

3    and simple.  He is the low man on the totem pole, and he's

4    way down the pole.  And for him to have to -- you know, the

5    issue of his membership in this particular conspiracy is

6    going to be highly contested.  And to admit all of those

7    statements conditionally is a recipe for disaster I think,

8    and I just do not understand how even the Court would want to

9    run that risk.  I mean it's -- I don't think it's an onerous

10   burden on the government at some point, you know, 30 days

11   before trial or a reasonable period before trial, to simply

12   give you a proffer of that evidence.  I just think it's very

13   dangerous, and I did raise the issue of my client's right to

14   counsel of his choosing.  I mean I'd like to tell you we were

15   making millions off of this, but that would be a considerable

16   stretch.  My client will not have the resources to have a

17   second trial if there's a mistrial, and I think that's a

18   serious issue.

19           THE COURT:  All right.  Thank you, sir.  Mr. Cole,

20   do you wish to be heard, or Ms. Han, on this particular

21   matter?

22           MR. COLE:  Well, your Honor, the only things I'd

23   add on this issue are Mr. Durkin in his papers referred to a

24   Supreme Court case, Bourjaily, suggesting that the case

25   somehow trumped or overturned Ninth Circuit precedence in

1    this area, and I just want to point out that that's not the

2    case.  In that case, the Supreme Court expressly noted that

3    it expressed -- it did not express any opinion about the

4    proper or approved trial court's involvement in this area of

5    the law, and that's at note 1 in that Supreme Court case,

6    clearly saying that it wasn't addressed when it issued an

7    order approving.  Instead, the Ninth Circuit has a long

8    history and tradition in its precedent of allowing the Court

9    to do this during the trial itself and in fact has expressly

10   stated that it will not adopt the James approach from the

11   Fifth Circuit and the few circuits that have adopted it.  And

12   so the Ninth Circuit leaves this very much in the Court's

13   hands.

14            I think that I would -- the only thing I would say

15   as to the risk it creates, the government submits it's

16   minimal because this case, your Honor -- it's no secret, and

17   so we won't try to make it one, that the case against

18   Mr. Durkin's client is based on the intercepts.  If your

19   Honor decides those intercepts aren't admissible, there isn't

20   going to be a second trial.  So it's -- there's not a risk

21   here of there being trouble with perhaps your Honor making a

22   decision in the trial that it's not admissible and then

23   having to go through it all over again.  We think it can take

24   place.

25            We will put forth a detailed trial memorandum that

1   addresses in detail the order of proof, addresses in detail

2   the evidence, and it will give the Court plenty of

3   information to allow it, as the Court -- as the trial unfolds

4   to make the determinations in the ordinary course.

5              MR. DURKIN:  Judge, if I could just on that

6   briefly, the issue of the admissibility of the tape is a

7   totally separate issue as the admissibility of other

8   co-conspirator declarations that by definition they're going

9   to have to introduce against my client to prove the

10  membership in the conspiracy.  I mean, this is -- I mean,

11  there are very few tapes that my guy is on; there are some,

12  but I don't think under any stretch of the imagination those

13  tapes on their own are going to be able to show his knowing

14  and intentional membership in this particular conspiracy that

15  they have articulated and that the grand jury returned the

16  indictment on.

17             THE COURT:  Okay.  All right.  I think I understand

18  your position, Mr. Durkin.  You've got a Rule 14 motion for

19  severance.

20             MR. DURKIN:  I stand on the pleadings on that.

21             THE COURT:  Okay.  Mr. Cole or Ms. Han, anything on

22  that?

23             MS. HAN:  No, your Honor.  We'd also submit.

24             THE COURT:  All right.  And there's a motion for

25  stay.  Anything further on that, Mister --

1              MR. DURKIN:  Well, to --

2              THE COURT:  -- Durkin?

3              MR. DURKIN:  -- the extent that it could also be

4    interpreted as a motion to continue the trial date, I think

5    it would be relevant.  I think --

6              THE COURT:  Was that the spirit you brought it in?

7    I mean is that --

8              MR. DURKIN:  Well, the spirit --

9              THE COURT:  -- what you're requesting?

10             MR. DURKIN:  -- that I brought it in, Judge, to be

11   perfectly frank, was based on the pleading that I had

12   attached as an exhibit in the other case in Virginia.  That

13   was a motion to dismiss, and I did not think a motion to

14   dismiss was appropriate here, but I did think that under the

15   circumstances a motion to stay might be the appropriate

16   remedy.  I think it is -- I know the government has suggested

17   in its papers that somehow all the conduct took place here,

18   so really what does it matter over there and so forth.  But

19   in the same breath, Mr. Cole just got up here and talked

20   about the rock star Ayrow being connected to al-Qaeda and

21   what could be coming into evidence.

22             I don't think there's any possible question that we

23   have -- we have an obligation to investigate in Somalia.  I

24   offered to propose in camera to you what some of the

25   specifics are; the government faulted me for not raising

1    that.  We have -- we have all sat down and discussed that

2    issue.  There are probably six to eight material issues that

3    we could relate to you on that.  But I certainly tell you in

4    good faith and I think everybody sitting here would also tell

5    you as officers of the Court that we believe in our

6    professional opinion that we need to, as -- in order to

7    fulfill our defense function for these clients, we need to

8    investigate in Somalia.

9              Now, it is conceivable, as Mr. Cole points out,

10   that we might well be able to get some material witnesses to

11   come out of Somalia, but like many things in this case, even

12   the simplest thing somehow, when there's a connection to

13   Somalia, seems to take even longer.  It takes longer to

14   connect phone calls to there, takes longer for people to get

15   back to you.  There's just a tremendous amount of lag time.

16             We do have some people -- we'd be happy to talk to

17   you about it in camera -- that we have talked to over there.

18   We have some -- we have some people that conceivably could

19   travel out of there, but that's a whole 'nother can of worms,

20   getting permission to even travel out of there in the midst

21   of the -- whatever you want to call it, civil war or war

22   that's going on there.

23             So it's just -- it's a real problem, and I just

24   don't think in good conscience I could sit back and tell you

25   that I could be prepared to try this case without at least

1    making a better effort in getting and seeing if some of the

2    results that we've begun to put in place are going to come to

3    fruition.

4              THE COURT:  Well, okay.  It's -- this is a little

5    bit of a gauzy request at this point, Mr. Durkin.  It arises

6    in the context of a motion for stay; as you point out, it may

7    spill over into the request that one or more of you may be

8    making for a continuance of the trial; then again you're also

9    referring to meeting with the Court in some kind of an

10   ex-parte manner.  That suggestion has been made earlier by

11   other defense counsel for different purposes.

12             I would say that any request that you may have to

13   meet with the Court to have the Court review materials or to

14   have the Court consider any other requests should be put in

15   the form of a motion/ex-parte application so that at least I

16   know what to -- what I'm looking at here rather than just

17   getting together with defense counsel for some amorphous

18   discussion.  I'd want to know exactly what the requests are

19   and what the ultimate request is obviously in terms of a

20   meeting, and then I think it should be buttressed, any

21   specific requests should be buttressed by the who, what,

22   when, where, and how of what you're requesting.  For example,

23   this case has been pending for quite some period of time.

24             With respect to this particular request, Mr.

25   Durkin, I'd want to know what investigative efforts you've

1    undertaken to -- up to this point in time to travel to

2    Somalia, who you're talking about, why this hasn't happened

3    earlier, why all of a sudden we are on the eve of trial here,

4    relatively speaking, and now this request is being made and

5    why it could not have been made at an earlier point in time.

6    Those are the things I think that ought to be addressed in a

7    motion.  Your motion may be -- or your application may be

8    very well taken, I don't know, but until I have an

9    opportunity to really assess what you're discussing here,

10   what you're specifically requesting, it's difficult to react.

11          So what I'm going to do is I'm just going to defer

12   any ruling on a motion for stay.  Obviously I'm going to hear

13   whatever you have to say today with respect to the -- to the

14   viability of the date that we currently have for trial, and

15   then after hearing what the positions of the parties are on

16   that issue, the motion for stay may or may not be moot.

17   We'll see.  Okay.

18          MR. DURKIN:  That's fine.

19          THE COURT:  All right.  Then we have a motion for

20   release on conditions, and I'm going to ask respectfully that

21   you take up any such matter with the magistrate judge, Judge

22   Adler.

23          MR. DURKIN:  Judge, just so you understand, the

24   only reason I did it this way is that I thought it dovetailed

25   into my first motion for a stay.  I wasn't trying to impose

 1   more work on you, but I thought it might be --

 2           THE COURT:  Okay.

 3           MR. DURKIN:  -- I thought that hearing might be

 4   relevant to the other motion.

 5           THE COURT:  Okay.  Understood.

 6           MR. DURKIN:  What I would ask, Judge, if you would

 7   on that, could we just enter and continue this motion along

 8   with the other motion?

 9           THE COURT:  Oh, sure.  The motion for release?

10           MR. DURKIN:  Yes.

11           THE COURT:  Okay.  We'll just defer ruling on

12   that --

13           MR. DURKIN:  I don't know --

14           THE COURT:  -- today.

15           MR. DURKIN:  -- that I want to raise -- depending

16   on the outcome of the first, the motion for a stay, it might

17   affect my position on that.

18           THE COURT:  Okay.  Very good.  Very good.  So I

19   think that handles all of the motions, the defense motions

20   before the Court from the four different defendants here.

21           MR. DURKIN:  There were several motions I had

22   filed, Judge, and I think some of the other defendants did,

23   about motions for an extension of time to file additional

24   pretrial motions.

25           THE COURT:  Yeah, and of course, those are always

1   granted.

2         MR. DURKIN:  Okay.  That's good.

3         THE COURT:  We just never close the courthouse

4   doors to any additional motions.  But what I'm going to do

5   with these matters before we discuss timing now is take all

6   of these matters under submission and issue a ruling --

7   hopefully it will be out soon -- on the matters that can be

8   ruled upon at this point in time, and then I'll be deferring

9   on other motions.

10         MR. DURKIN:  All right.

11         THE COURT:  Thank you, Mr. Durkin.

12         MR. COLE:  Your Honor --

13         THE COURT:  Mr. Cole?

14         MR. COLE:  -- the only thing I wanted to mention

15   that I failed to -- after the reply briefs came in, I was

16   going to let the Court know about some sort of supplemental

17   note before filing it with the Court, but the Shipman case

18   out of the Eastern District of Virginia, which I believe was

19   the one that was attached as an exhibit to Mister -- the

20   motions filed by Mr. Durkin on the issue of the stay --

21         THE COURT:  Yes.

22         MR. COLE:  -- the Court denied that.  That happened

23   after the issue was briefed by all the parties, and I just

24   wanted to let the Court know that that Court out on the East

25   Coast denied that motion for a stay --

1                THE COURT:  All right.

2                MR. COLE:  -- for dismissal.

3                THE COURT:  All right.  Okay.  Then have we reached

4      the point where we can discuss the trial date?  Apparently

5      one or more of you wanted to be heard on that.  Mr. Durkin?

6                MR. DURKIN:  Well, I was going to ask maybe could

7      we have five minutes to --

8                THE COURT:  Would you like a brief recess?  All

9      right.  Why don't we take -- all right.  Why don't we take --

10     we've been at it over an hour and a half now.  Let's take a

11     15-minute recess.  How's that?  Okay.

12           (There was a break in the proceedings.)

13               THE COURT:  Okay.  Please be seated, ladies and

14     gentlemen.  Thank you.  I just been advised that Mr. Mohamed

15     Mohamud briefly fainted in the back.  The medics are en route

16     or they've already arrived.  He seems to be fine.  He's not

17     here obviously.  Ms. Moreno, if you'd like to take some time

18     at this point, we can take some time, or because we have only

19     scheduling matters I think going forward left, you can waive

20     your client's presence.  Nothing substantive will take place

21     in his absence.

22               MS. MORENO:   I can certainly waive my client's

23     presence, your Honor.  Is -- is he back there?

24               THE COURT:  I think he is.  Would you like to take

25     an additional --

1           MS. MORENO:  May I have --

2           THE COURT:  All right.  Then we'll take an

3  additional five-minutes' recess and then resume.  If someone

4  can escort Ms. Moreno back to see how he's doing.  Okay.

5      (There was a break in the proceedings.)

6      (Following is a sidebar conference.)

7           THE COURT:  Okay.  You indicated before we broke

8  that you were going to waive his presence.  We're just into

9  scheduling at this point.  We can resume that, as you said,

10  in just a moment.  If you do wish to see him, you can see him

11  downstairs.

12           MS. MORENO:  Thank you.

13           THE COURT:  Maybe they can make an interview room

14  available for you down there.  Anything else that you're --

15           MS. MORENO:  No.

16           THE COURT:  -- or any other needs you may have with

17  respect to your client?

18           MS. MORENO:  Not with respect to my client, no.

19  Thank you.

20           THE COURT:  Okay.  We just came off a 15-minute

21  recess.  I know you were probably all talking about -- well,

22  were you talking about dates and so on and so forth?

23           MS. MORENO:  Yes.

24           THE COURT:  We can certainly resume in a more

25  public setting.  Are you together on a recommendation or

1   other issues that we need --

2           MR. COLE:  We're together -- we're together on what

3   date would work if it's continued.  We'd prefer the trial to

4   stay May 7, but we are together, if the Court decides to

5   continue it, on a date that will work.

6           MR. DRATEL:  I think just to give the questions of

7   what we were discussing in terms of dates --

8           THE COURT:  I think I'd rather do this -- with the

9   community back there --

10          MR. DRATEL:  That's fine.

11          THE COURT:  -- I think it's probably better if they

12  can hear everything that's happening, Mr. Dratel.  Thank you.

13      (Sidebar conference concludes.)

14          THE COURT:  Counsel, I'm glad to hear Mr. Mohamud

15  is much better.  He's resting now.  He need not be brought

16  back into the courtroom because we're dealing just with

17  scheduling issues from this point; we can do this outside the

18  presence of the proceedings.  Ms. Moreno has kindly waived

19  her client's appearance for this, and so we are able to

20  discuss I think the last matter, which was the pending trial

21  date.  Mr. Dratel?

22          MR. DRATEL:  Thank you, your Honor.  And just an

23  initial thought on it is that I think the Court was correct

24  back when we set this date, set this schedule, that it might

25  be too ambitious in the sense of what needed to be done and

1    the obstacles of doing it, and I think that's come to

2    fruition unfortunately.  And obviously it was our intention

3    and interest in proceeding to a trial date just as quickly as

4    we felt possible, but upon reflection and getting through

5    what we need to get through, we are obviously very concerned

6    about our ability to do that given the factors that I'm going

7    to explain now.

8         And I think the case, as the government's

9    acknowledged, begins fundamentally with the wiretap, and

10   there are 1800 calls there, of which the government has

11   provided I think 126 transcripts of calls.  So that leaves a

12   large number of calls that have not been transcribed.  In

13   addition, the government's 126 are not necessarily verbatim

14   for the calls.  There are pieces of those calls that are not

15   transcribed that we have had to go back to as well to get a

16   complete picture of the specific conversations.

17        The task of finding a court-certified -- meaning

18   someone on whom we can rely on not only in terms of

19   translating but also in terms of, if necessary, testimony so

20   as not to duplicate this task -- but the task of finding

21   someone proficient, sufficiently proficient, certified in the

22   Somali language who was not already conflicted out of this

23   case either by being in this community or through a rather

24   significant work load with the government already, given the

25   focus on al-Shabaab in the last year, year and a half, was

1    very difficult, much more difficult than we imagined.  But we

2    have now contracted with a sufficient number to do what needs

3    to be done.  But we have to start from scratch with a lot of

4    those calls in terms of translation because they're in

5    Somali, and obviously the lesser time-consuming task of

6    verifying the government's transcripts and filling in the

7    parts that the government has not transcribed, but it's -- I

8    think the government alluded to it in the context of the

9    suppression argument about how long it takes and how arduous

10   a task it is to go through these conversations in a way that

11   is comprehensive and makes sense to get a full appreciation

12   of what's necessary.  And as we go through our investigation,

13   we have been able through meeting with our clients to

14   identify conversations that we identify more and more as we

15   become more knowledgeable about the case.  So, for example,

16   certain things that might have been evident to us at the very

17   beginning as being relevant now, as we move forward and get

18   deeper into the facts and the investigation of the case,

19   other categories of conversations are becoming relevant and

20   now we have to identify those with the help of our clients,

21   get them to the interpreters.  So it's a huge undertaking

22   that will consume a lot of time.

23          And, in addition, what we heard today also is that

24   the government may at some point be providing additional

25   Jencks material with respect to conversations that, again,

1    will be subject to translation.  And depending on when those

2    are produced, obviously that's going to create a time problem

3    as well.  There just aren't enough people who are qualified

4    to do this who are in a position to do it for us to do it any

5    faster.  And we've delegated among ourselves various tasks so

6    as to be more efficient, to not duplicate, but this is a

7    product of that.  And as a part of that, as we go through

8    these conversations and develop what's relevant and talk to

9    our clients, questions of evidence and persons in Somalia

10   become more apparent in terms of their need and the problems

11   of access.

12           Just as an example, Mr. Ghappour was involved in

13   trying to figure out whether security arrangements sufficient

14   to give some -- not guarantee but at least some comfort level

15   as far as security goes, that took weeks to find out what

16   that would cost, and it's actually prohibitive given the

17   resources here, and I don't know that it's going to be

18   feasible to actually go to Somalia for any of us to do the

19   kind of investigation that we need to do; we're still trying

20   that.  But we do have contacts within, and it's just

21   extraordinarily difficult to make those contacts on a regular

22   basis.  It took weeks -- even with phone numbers and email

23   addresses, it took weeks to get a phone call to someone who

24   could get us in touch with someone.  It took more weeks to

25   then get in contact with the persons that we -- we've

1    identified probably three or four people, and we've been able

2    to contact one.  We're -- we have contact information for a

3    couple more, but yet we're still trying.  Sometimes you call

4    and there are no networks available.  You just don't get

5    through.  Email is -- Internet service is intermittent,

6    sporadic, unreliable --

7            So I think -- we've had conversations, and there's

8    at least certainly one witness that we've identified who we'd

9    want to do Rule 15, I think a Rule 15 deposition, and they

10   might -- I think that they could, if the logistics work out,

11   they could come to either Kenya or perhaps Djibouti or Qatar;

12   those are neighboring places in which this can be done.  In

13   Rule 15 depositions, obviously there's some logistical issues

14   there too in terms of finding the right place and someone who

15   could administer the oath.  It can be done, but, again, these

16   things take some time in getting together.  And we think it's

17   important in the case to do them.  We're hoping to have more,

18   maybe as many as three or four, as we reach the people who

19   we've -- we're looking to reach, and this has been an ongoing

20   process.

21           Another issue is the -- if there is classified

22   litigation, it's going to take time for a couple of reasons,

23   one of which is, just as a threshold matter, our ability to

24   review the material would be limited to the secure facility

25   that would be assigned to us -- I'm not sure if it's in the

1    courthouse or wherever it might be in San Diego -- that will

2    limit us in terms of our ability to review.  We'll have to do

3    it onsite, it's time-consuming.  Documents that we need to

4    prepare in terms of motions -- Ms. Han referred to a Section

5    5 application that we might make to the Court for either a

6    declassification or a substitution or some form of

7    evidentiary form for certain classified discovery if we get

8    it, those all have to be prepared on the computers in the

9    classified -- in the secure room.  And so the logistics of

10   that are somewhat cumbersome and time-consuming as well.

11          We have done a significant amount of work, and --

12   but it just -- that -- the problem is just sort of projecting

13   how much we'll accomplish before May 7 and how much more

14   material we're going to get before May 7 that we're going to

15   have to do -- and just the -- just the gross numbers,

16   particularly in terms of the intercepts and getting them

17   translated.  It's just there's only so much people can do,

18   the people who are translating this.  And there's certain

19   things that are within our control.  You know, we've met our

20   motion deadline.  That is within our control, we can do that.

21   There's just certain things that are out of our control.  One

22   is the volume of intercepts; another is obviously the fact of

23   the language problem; and the third being the inaccessibility

24   of Somalia on a regular basis, both in terms of

25   communications and investigation.  There are issues that we

1  need to investigate in Somalia that we -- I don't think --

2  just being practical, I don't think we're going to be able do

3  ourselves; we're going to have to try to create a way in

4  which -- and we're investigating that -- that we can do in

5  some evidentiary fashion either through witnesses or some

6  other way that our issues that are directly related to this

7  case, which is where the money went and all of that kind of

8  stuff.

9         THE COURT:  I think you've covered the three basic

10 areas you wanted to cover, counsel.  And I assume you're

11 speaking for everyone here, and --

12        MR. DRATEL:  I think so.  If anyone has anything

13 they wish to add, I'd be certainly willing to --

14        THE COURT:  If anyones does have anything they wish

15 to add from the defense, you certainly may, on this request

16 for a continuance of the trial date.  Seeing no indications

17 of anyone else wanting to speak.  Mr. Cole, I haven't heard a

18 specific request in terms of time, but perhaps you've had an

19 opportunity to discuss that.

20        MR. DRATEL:  You want -- are you asking me or

21 Mr. Cole?

22        THE COURT:  Either way.

23        MR. DRATEL:  Oh, we thought we would need a couple

24 of months.  We were hoping for something in September, but

25 two problems with September; there's a logistical problem

1    with the government in September, which we are willing to

2    accommodate certainly, and there are also issues in September

3    in terms of the Jewish holidays and things like that that

4    tend to break it up anyway that might make September not the

5    best.  So we among our -- or from the defense came up with,

6    based on some other scheduling issues, but came up with

7    October 15, Monday, October 15 as our firm date.

8              THE COURT:  Did you share that with Mr. Cole?

9              MR. DRATEL:  Yes.

10             MR. COLE:  Yes, your Honor.  We're clear.  That

11   would work fine.  We would like the trial to happen May 7.

12   We think there's still several months for the parties to

13   prepare, and so our preference would be to stick with the

14   trial date we have, but that date that is proposed is open on

15   the government's schedule.

16             THE COURT:  What's the estimated length of trial,

17   please, Mr. Cole, from your perspective?

18             MR. COLE:  I think the government's case would be a

19   week or a week and a half.  What I can't predict entirely is

20   the cross by four defense attorneys, so that's sort of a wild

21   card.  Our evidence itself is not particularly lengthy.  I

22   would think about a week and a half --

23             THE COURT:  Five --

24             MR. COLE:  -- for the case-in-chief.

25             THE COURT:  Five to seven days --

1          MR. COLE:  Yes.

2          THE COURT:  -- for a case-in-chief?

3          MR. COLE:  Right, once the jury is sitting.

4          THE COURT:  Mr. Dratel, you probably can't come up

5    with too fine an estimate for the defense, but if we were to

6    double the government's estimate for its case for a total of

7    the entire case, do you think that would be realistic at this

8    point?

9          MR. DRATEL:  Yes, I think that that would certainly

10   be the maximum would be a -- you know, another -- my guess

11   would just be somewhere between three and seven days.

12         THE COURT:  So we're looking at 10 to 15 days,

13   total, no more than that from what I'm hearing, which would

14   be two to three weeks or thereabouts.  All right.  As I

15   understand it, Mr. Cole, you're not opposing this motion, you

16   wish you could proceed on the 7th, but I think under the

17   circumstances you are probably understanding that the request

18   is reasonable for the reasons proffered by counsel?

19         MR. COLE:  Yes, your Honor.

20         THE COURT:  Okay.

21         MR. DRATEL:  And, your Honor, just due to the

22   nature of the case, just -- I don't know if the Court's

23   looking -- you know, in terms of looking at the Court's

24   calendar, probably additional time for jury selection more

25   than ordinary just because of the --

1          THE COURT:  Oh, I understand that.  No, I'm aware

2     of what might be needed in that area.  Okay.  You seem to

3     have worked pretty carefully in working out what your

4     estimate is and securing a date that's convenient for all

5     parties.  I assume that the date of October 15, which is a

6     Monday, is convenient for everyone.  All defense attorneys

7     have bought into that date so that we don't need to deal with

8     any issues of availability or scheduling down the line; is

9     that correct?

10          MR. DURKIN:  That's right, Judge.

11          THE COURT:  Ms. Moreno?

12          MS. MORENO:  Yes, your Honor.

13          THE COURT:  Mr. Ghappour?

14          MR. GHAPPOUR:  Yes, your Honor.

15          THE COURT:  Okay.  Everybody's indicating that

16     October 15 is a viable date for them.  All right.  What we'll

17     do at this point then is I'll grant the request for a

18     continuance; this is a request made by all defense counsel

19     and for good cause and for the reasons stated by Mr. Dratel,

20     I would find that the approximate five-month continuance is

21     necessary and reasonable for the defense to continue and

22     complete its preparation in this case, including receiving

23     additional material from the government, if anything is to be

24     provided, to finishing all of the translations that it

25     currently is aware of and any additional translations that

1   may need to be translated, and also to make the necessary

2   witness contacts earlier alluded to by Mr. Dratel.

3           What I am going to do, however, is order Mr.

4   Cole -- and, Mr. Cole, I do appreciate your willingness to

5   make these materials available to the Court, these CIPA

6   materials, as soon as possible.  You've indicated

7   February 17 --

8           MR. COLE:  Yes, your Honor.

9           THE COURT:  -- as a viable date, so I will request

10  that you provide those materials to the Court no later than

11  February 17, and that will allow me to begin my work under

12  CIPA.  And was there anything else that you needed to address

13  at this point, Mr. Cole?

14          MR. COLE:  No, your Honor.

15          THE COURT:  Okay.  Mister --

16          MR. DRATEL:  No, your Honor.

17          THE COURT:  -- Dratel?  Any other defense counsel

18  need to be heard?  Ms. Moreno?

19          MS. MORENO:  With respect to the attendant dates

20  and motions in limine --

21          THE COURT:  Well, I'm going to -- yes.  Well, go

22  ahead.  I was going to address that before we --

23          MS. MORENO:  I would just suggest that those dates

24  are also pushed over because as we continue our investigation

25  and our translations, they inform our motions in limine.

1    Additionally, I would ask the Court what is the Court's

2    pleasure with respect to jury questionnaires and voir dire?

3    I'm unfamiliar with your Honor's process.

4              THE COURT:  Okay.  Well, we'll certainly cover

5    those things the closer we get to a trial date, and if anyone

6    is requesting a jury questionnaire, I'll be happy to consider

7    anything that ultimately will be provided for my review, and

8    then we'll address those closer to the time of trial; I would

9    think that would be appropriate.

10             The motion to stay earlier made by Mr. Durkin will

11   be -- I think that's mooted at this point, Mr. Durkin, in

12   light of what the Court has just done.

13             MR. DURKIN:  I think it's temporarily mooted if you

14   would --

15             THE COURT:  Yes.

16             MR. DURKIN:  I would prefer, if it's okay with the

17   Court, to just enter a continuance.

18             THE COURT:  Right.  It's taken off calendar,

19   however, at this point.

20             MR. DURKIN:  That's fine.

21             THE COURT:  You can renotice it at any time.

22             MR. DURKIN:  That's fine.

23             THE COURT:  There was a motion for release as well.

24   I think that can be taken off calendar --

25             MR. DURKIN:  Just ask the same thing with that.

1            THE COURT:  All right.  So those two motions then,

2    the motion to stay, the motion for release on conditions,

3    would be taken off calendar subject to being renoticed upon

4    the request of counsel.

5            MR. DURKIN:  Thank you.

6            THE COURT:  All right.  And what I'm anticipating

7    at this point would be to set a further status conference --

8    not a motion hearing date but a status conference --

9    approximately 60 days out, as we've done early on in the

10   case, just to monitor the progress of the case, to address

11   any issues that need to be addressed, and to make sure that

12   we're doing everything we can to now keep this new date of

13   October 15 as a trial date viable.  So I'm looking at a

14   status date approximately, as I say, two months out.  Have

15   any of you discussed any of that?  I assume not.  We're

16   looking at I would say April -- we can do this on a Friday I

17   would think, April 6 in the afternoon or April 20 in the

18   afternoon.

19           MR. COLE:  Either one works for the -- we had an

20   April 5 date that we could convert to a status conference

21   unless the Court wants to do it on a Friday, and then --

22           THE COURT:  You have April 5 date?

23           MR. COLE:  That was for motions in limine.  And we

24   could convert that as one of --

25           THE COURT:  Yes, I see that.  Either way.  I can do

1    it on the 5th -- we can do it on the 5th; that way we can

2    spend a little more time.  So your pending date of April 5 at

3    9 a.m. will remain as a status conference date.  At that

4    point we'll make further arrangements for further dates to be

5    set.  The date of May 7 for trial is vacated at this point.

6    Your pending motions -- all pending motions not ruled upon

7    earlier than April 5 will be continued, including the

8    discovery motions.  As a result, the Speedy Trial Act is

9    tolled between today and April 5 at 9 a.m.  Anything further,

10   counsel?

11              MR. DRATEL:  Not from us, your Honor.

12              THE COURT:  All right.  Very well.  We'll be in

13   recess on this matter.

14        (The proceedings were concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                       Certificate of Reporter

2

3     I hereby certify that I am a duly appointed, qualified, and

4     acting Official Court Reporter for the United States District

5     Court; that the foregoing is a true and correct transcript of

6     the proceedings had in the mentioned cause on the date or

7     dates listed on the title page of the transcript; and that

8     the format used herein complies with the rules and

9     requirements of the United States Judicial Conference.

10

11    Dated August 10, 2012 at San Diego, California.

12                  *Debra M. Henson*

13                         /s/ Debra M. Henson  (electronic)
                           Debra M. Henson
14                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25