1                      United States District Court

2                    Southern District of California

3

4    UNITED STATES OF AMERICA,      )

5                       Plaintiff,  )
                                    )
6        vs.                        ) Case No. 10-CR-4246 JM
                                    ) Status Hearing
7    BASAALY SAEED MOALIN,          ) Friday, January 25, 2013
     MOHAMED MOHAMED MOHAMUD,       )
8    ISSA DOREH,                    )
     AHMED NASIR TAALIL MOHAMUD,    )
9                                   )
                        Defendants. )
10   _____)

11

                  Before the Honorable Jeffrey T. Miller
12                   United States District Judge

13

14

15

16

17

18

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
22                            221 W. Broadway, Suite 5190
                              San Diego, CA  92101
23                            (619) 238-4538

24

25              Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:      Laura E. Duffy
                             UNITED STATES ATTORNEY
 3                           William P. Cole
                             Caroline P. Han
 4                           ASSISTANT U.S. ATTORNEYS
                             Steven Ward
 5                           DEPUTY ATTORNEY GENERAL
                             880 Front Street, Suite 6293
 6                           San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)            Joshua L. Dratel, Esq.
 8                           Alice Fontier, Esq.
                             OFFICE OF JOSHUA L. DRATEL
 9                           2 Wall Street, Third Floor
                             New York, NY  10005
10
     (Mr. M. Mohamud)        Linda Moreno, Esq.
11                           LINDA MORENO, P.A.
                             P.O. Box 10985
12                           Tampa, FL  33679

13   (Mr. Doreh)             Ahmed Ghappour, Esq.
                             LAW OFFICES OF AHMED GHAPPOUR
14                           P.O. Box 20367
                             Seattle, WA  98102
15
     (Mr. A. Mohamud)        Thomas A. Durkin, Esq.
16                           DURKIN & ROBERTS
                             2446 N. Clark Street
17                           Chicago, IL  60614

18

19

20

21

22

23

24

25
```

 1          San Diego, California - Friday, January 25, 2013

 2          THE CLERK:  Calling matter 2 on calendar,

 3   10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamed Mohamed

 4   Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for

 5   status hearing.

 6          MS. FONTIER:  Do you mind if I speak to Mr. Moalin

 7   for one minute?

 8          THE COURT:  Sure.  Counsel, would you state your

 9   appearances, please.  We have Ms. Fontier for Mr. Moalin.

10          MR. COLE:  Yes, your Honor.  William Cole, Caroline

11   Han, and Steven Ward for the United States.

12          THE COURT:  Thank you.

13          MR. DRATEL:  Good afternoon, your Honor.  Joshua

14   Dratel for Mr. Moalin as well.

15          MS. MORENO:  Good afternoon, your Honor.  Linda

16   Moreno on behalf of Mr. Mohamed Mohamud.

17          MR. GHAPPOUR:  Good afternoon, your Honor.  Ahmed

18   Ghappour for Issa Doreh.

19          MR. DURKIN:  Judge, Tom Durkin on behalf of Ahmed

20   Nasir Taalil Mohamud, who's present in custody.

21          THE COURT:  Thank you.  Okay.  Gentlemen, good

22   afternoon to you.  Okay.  We have some matters to cover

23   today.  I understand we're without a Somali interpreter, but,

24   once again, Mr. Durkin, just to review, you were -- you

25   waived the presence of a Somali interpreter today.

1              MR. DURKIN:  I forgot.  I forgot to tell him that,

2    Judge.

3              THE COURT:  Mr. Dratel, you made it just under the

4    wire.

5              MR. DRATEL:  Yes, your Honor, I --

6              THE COURT:  Must have been a real adventure for you

7    today.

8              MR. DRATEL:  Well, I thought it was going to be

9    much better until we sat on the tarmac at the jetway for ten

10   minutes before they opened the door.

11             THE COURT:  Okay.  I thought -- with all the

12   weather, I thought it might be a challenge for you to be

13   here, but I'm glad you were able to make it.  Okay.

14             Well, we do have several matters we should cover

15   today, many of them are of an administrative quality or

16   character, and then we have some matters that we can perhaps

17   take available time to discuss that may be a little bit more

18   substantive.

19             First thing I'd like to do is to basically talk

20   about jury selection.  I'm sure you're all curious as to

21   exactly how this is going to happen over the course of a

22   couple of days.  I'd like to give you as much information as

23   I can, as much of a head's up as I can, understanding that

24   I'm going to be repeating this process more or less as we go

25   along so that you know what's coming up just before it does

1    come up.  And within that -- within that general discussion
2    I'd like to review any questionnaire issues and proposed voir
3    dire issues.  So that's pretty much what I'd -- how I'd like
4    to spend the first part of our session today, and then we
5    will move to other areas, but let's talk about jury selection
6    and issues related to jury selection.
7           First of all, let me get out my copy of the
8    questionnaire that you were good enough to prepare after our
9    last session where I made some suggestions and requests.  I
10   think there were only a couple of issues at this point from
11   what I can see, and so if we can turn to the parties'
12   proposed juror questionnaire, which is document 251, I'll
13   address those last few issues.  And I'll wait until you're
14   all there.  If you're there, we can proceed.
15          MS. MORENO:  Yes, your Honor.
16          THE COURT:  Okay.  Question 4 is -- each side has
17   staked out a position.  The United States's position states
18   that the reference to Christian fundamentalists should be
19   basically removed because it singles out a particular
20   religious persuasion and might make jurors feel discriminated
21   against and then add, should the Court disagree that that is
22   the case, that other persuasions such as atheists should be
23   included.  The defense position is Christian fundamentalists
24   should remain in the question.
25          I've given this some thought.  It goes on, the

1   position goes on from there, a movement closely identified

2   with the political right wing, i.e., moral majority, Pat

3   Robertson, Jerry Falwell, et cetera.  And there's a further

4   indication that the defense has no objection to including

5   atheists.  You know, the question itself really gets to a

6   political identification and not really religious

7   identification.  I think maybe that was lost sight of a bit

8   by the parties here.  So rather than Christian

9   fundamentalists, I think a reference to Christian

10  conservatives would be appropriate because the modifier is

11  "Christian," but the noun, the category here, once again,

12  would be conservative.  And this is a politically calibrated

13  question, not a religious one.  The Christian conservative

14  movement is often referred to in political columns, blogs,

15  writings, discussions as being illustrative of a particular

16  political persuasion whereas Christian fundamentalists

17  doesn't tell you too much about -- well, let me say that it

18  doesn't tell you as much as people who would identify

19  themselves as Christian conservatives.  So I would ask that

20  that be modified.

21         Where you have liberals -- I guess the new term for

22  liberals being used more and more would be progressives, so

23  liberals/progressives.  Perhaps conservatives have been

24  successful in creating the L word as a pejorative term,

25  but -- I don't know what's happened there, but in any event,

1   it should be liberals/progressives.

2           MR. DURKIN:  So you know, Judge, I refuse to be

3   called a progressive; I'm still a liberal.

4           THE COURT:  That really doesn't surprise me, Mr.

5   Durkin.

6           MR. DURKIN:  I didn't think it would, but I didn't

7   want you to think I was asleep.

8           MR. DRATEL:  I didn't know you moved to the right.

9           THE COURT:  Fair enough.  Fair enough.  I don't

10  know how progressives would define themselves; I would

11  imagine they're inclusive of liberals, but I don't know if

12  there's --

13          MS. MORENO:  It's a big tent, your Honor.

14          THE COURT:  It's a big tent.  Okay.  Good.  And I

15  see no need to include any reference to atheists because,

16  once again, that's strictly a religious connotation; I

17  daresay atheists probably find themselves spread out a little

18  bit on the political spectrum, so we'll eliminate any

19  reference to atheists.  Okay.  That takes care of question 4.

20          Question 39 was an area that I suggested I would

21  basically cover often and with different variations on the

22  theme.  I think that's the government's position, that that

23  was the government's understanding that this would be handled

24  by the Court in its own voir dire, and so I see -- I see no

25  necessity to have it in, but I have no objection to it

1   either; so we can leave it in, but of course you know that

2   this is something I'm going to be following up on.

3          The last question -- I don't know that it's

4   numbered.  This is on page 4.  Does it have a numerical --

5   oh, it's a proposed question.  All right.  Do you have any

6   experiences, feelings, impressions, or beliefs about the

7   FBI -- about how the FBI investigates terrorism cases, et

8   cetera.  The government's position is this is an appropriate

9   question because of the agency involved, and I would assume

10  because there would be a number of witnesses being called

11  from the FBI; is that correct?

12          MS. HAN:  Yes, your Honor.

13          THE COURT:  The defendants object that the question

14  is duplicative of previous questions.  I see no harm in

15  asking this.  It can be added as an additional question.

16  That takes care of what was proposed.  And then I was going

17  over the exhibit, the proposed questionnaire attached to the

18  joint submission as Exhibit 1, and I did have a few things I

19  needed to point out, counsel.

20          The first item would be under news sources on page

21  6 of document 251-2, question 30.  I see that there's no

22  reference to radio, and I daresay that many people get their

23  news in part from radio, particularly National Public Radio.

24          MS. MORENO:  Well, yes.

25          THE COURT:  Ms. Moreno, did you wish to be heard?

```
 1              MS. MORENO:  We actually address it in question 31,

 2   your Honor, the very next question.

 3              THE COURT:  Well --

 4              MS. MORENO:  But if the Court --

 5              THE COURT:  -- I took that -- I took that to mean

 6   political people --

 7              MS. MORENO:  Okay.

 8              THE COURT:  -- from Rush Limbaugh to people on the

 9   other end of the spectrum, if there are any of those left, as

10   political commentators, talk radio.  I wouldn't identify --

11              MS. MORENO:  I agree, your Honor.

12              THE COURT:  -- NPR as talk radio.

13              MS. MORENO:  I agree.

14              THE COURT:  Okay.  I think primarily it's news and

15   feature-related.  So if you could add that, that might be

16   appropriate.

17              MS. MORENO:  Yes.

18              THE COURT:  I think I'd have -- if I were being

19   asked that, I would have to check that box in a very

20   prominent way.  Okay.  Continuing on, on page 8 under the

21   heading experiences with law enforcement and the legal

22   system, specifically the question about halfway through

23   there -- this is question 40 -- if prior experience as a

24   criminal case juror, did your trial reach a verdict, yes, no.

25   That's fine, but in parens you should also add "Please do not
```

1  disclose what the verdict was," once again for obvious

2  reasons.

3          I think that's all I had on the proposed

4  questionnaire.  Were there any other issues about the

5  questionnaire before we leave that subject where counsel wish

6  to be heard?  Ms. Han, is that --

7          MS. HAN:  No, your Honor.

8          THE COURT:  -- your bailiwick today?  Okay.  And I

9  see no one from the defense indicating a desire to be heard.

10         MS. MORENO:  Nothing further on the questionnaire.

11         THE COURT:  Very good.  Thank you.  Proposed voir

12  dire, let's move to that then.  I'll go over the government's

13  first.  It's very short, very generic.  I see no issues or

14  potential problems with any of that.  In one way or another,

15  I would cover these areas at appropriate points during jury

16  selection, so five questions seem to be appropriate.

17         Then we get to the defense submission, and I do

18  need to alert you to a couple of issues here.  First of all,

19  I don't have many pet peeves, but one of them is asking --

20  counsel asking questions in voir dire that tend -- that have

21  a tendency to indoctrinate jurors or to ask prospective

22  jurors to prejudge evidence -- in this case you'll hear this,

23  how do you feel about that? -- or variations on that theme.

24  And basically I ask that you not try your case when you're

25  engaged in voir dire.

1              That being said, if we can turn to page 2 of

2    proposed voir dire by the defense -- this is document 255 --

3    there's some -- there is a heading entitled Beliefs regarding

4    al-Shabaab; there's only one question actually related to

5    that.  The first part of it I don't have a problem with; it

6    reads, the charges in this case involve material support of

7    al-Shabaab, designated by the United States as a foreign

8    terrorist organization.  Do any of you have any beliefs or

9    impressions regarding al-Shabaab that would affect how you

10   would view the evidence in this case and how you would view

11   the defendants?

12             Up to that point I don't have any concern, but the

13   following language, "despite what information you may hear in

14   court," I know it wasn't your intention to have jurors commit

15   to any particular point of view, but if the question here is

16   will their -- any impressions regarding al-Shabaab, you know,

17   they may have would affect how they view the evidence and

18   they say well, they have a -- they have some vague impression

19   about al-Shabaab and they can set it aside and view the

20   evidence fairly, then the terminology "despite what

21   information you may hear in court," I mean is just out there

22   and I think somewhat meaningless.  If I could suggest that

23   you substitute this language:  "that is, can you fairly judge

24   any such evidence along with all the other evidence in the

25   case?"  At least you're inquiring as to whether or not they

1  have any preconceived notions about al-Shabaab that could get

2  in their way of being fair, which is I think the primary

3  purpose of the question.  So strike that -- strike the

4  language "despite what information you may hear in court" and

5  either end the sentence there or put in "that is, can you

6  fairly judge such evidence along with all the other evidence

7  in the case?"  Then you had "beliefs regarding al-Qaeda," and

8  I'm going to come back to that in a bit.

9          MS. MORENO:  Your Honor, if I may -- I'm sorry.

10  Going back to the al-Shabaab paragraph.

11          THE COURT:  Right.

12          MS. MORENO:  I'm fine with just ending it after the

13  word "defendants" and striking that and not including what

14  your Honor has suggested --

15          THE COURT:  That's fine.

16          MS. MORENO:  -- because I believe that we can get

17  to what we need to, which is ideas or prejudices that cannot

18  be set aside --

19          THE COURT:  Okay.

20          MS. MORENO:  -- merely in a few minutes of asking

21  questions.

22          THE COURT:  Okay.  Anything from the government on

23  that particular point?

24          MS. HAN:  No, your Honor.

25          THE COURT:  Okay.  I'll get back to al-Qaeda, or

1    al-Qaida, in a bit.  Let's go over that for -- set that aside

2    for a bit.  The next issue I have is First Amendment

3    protections.  This whole section I have difficulty with

4    because I think it's confusing and argumentative, and it

5    implies that supporting terrorism is nothing more than

6    freedom of speech.  The defendants are not charged with

7    criticizing the United States government in its case; they

8    are charged with providing material support to terrorists and

9    terrorist organizations, so I think it's confusing the way it

10   is right now and I'm going to ask you to remove that.

11              MS. MORENO:  May I be heard briefly, your Honor?

12              THE COURT:  Yes.

13              MS. MORENO:  We now know, because of what the

14   government has told the defense, that they intend to

15   introduce conversations that actually touch upon many

16   discussions about politics, including the politics of the

17   United States with respect to their support of Ethiopia and

18   their role, if any, in the conflict over there, and I think

19   it's appropriate for us to inquire whether that discussion

20   alone is viewed by a juror -- if -- if the juror is of a mind

21   that if a discussion is critical of this government, then

22   they have a prejudice against that, against the speaker or

23   the person who holds those beliefs, we're entitled to know

24   that I believe.  Of course we're not saying that -- we know

25   what the charges are, and we've -- I wrote the questionnaire.

1    It's throughout, it's replete in the questionnaire, and the

2    juror or the prospective juror that's signing it will know

3    what the charges are.  I believe this is an important area

4    that the defense should be allowed to go into.  And if I may,

5    just briefly, the B and C, these are questions that I have

6    asked in --

7              THE COURT:  Let's deal with B first because I

8    wanted to ask you something about C.

9              MS. MORENO:  Okay.

10             THE COURT:  How does this go?  How does this

11   question go then, Ms. Moreno?  What are you proposing here?

12             MS. MORENO:  Because merely the fact that these

13   gentlemen are charged with material support of terrorism,

14   merely that fact alone will affect -- would affect anyone and

15   will affect these panel members, and so --

16             THE COURT:  What are you saying, that charges of

17   terrorism would affect panel members?  You know, yeah, it may

18   affect them one way or the other when they're reaching a

19   verdict in the case; I mean they're looking at the evidence

20   and comparing it to the charges.

21             MS. MORENO:  Well, if --

22             THE COURT:  Look, if what you're saying is -- well,

23   first of all, let me ask the government, are you intending to

24   introduce evidence of calls made, intercepts, where any or

25   all of these gentlemen were critical of the government of the

1    United States?  Is that what you're intending here?  Do you

2    see that coming in?  Do you see this being an issue?

3              MS. HAN:  Your Honor, I don't believe so.  What I

4    do believe is in the evidence is general beliefs, there are

5    discussions of interests that the United States may have

6    interests in, and so about the question that Ms. Moreno

7    specifically stated, you know, bias and support of people who

8    criticize U.S. interests or something like that, she can

9    certainly ask that question, we have no opposition to that,

10   but specifically though these questions are addressed under

11   the First Amendment protections header; they don't address

12   any of those issues that she just stated, and we don't

13   believe that the First Amendment, as you said, has anything

14   to do with the defense to this crime or anything in this

15   case, so for those reasons we do object to these questions.

16             THE COURT:  Well, my point is this.  You know, if

17   in fact you want to reiterate with prospective jurors the

18   First Amendment right of freedom of speech, freedom of

19   expression, however you'd like to couch it, and emphasize

20   that this is not a case where that's being -- they're not

21   being charged with that, and was there anyone here who would

22   form a negative impression if they were to hear any of these

23   individuals speaking critically of the United States such

24   that they couldn't judge the evidence fairly related to the

25   charges, I think that's okay.  But here I get the

1    impression -- I mean this is confusing.  It just conflates --

2    it conflates freedom of speech with terrorism charges, with

3    providing material support.  There's nothing about providing

4    material support to terrorists or a terrorist organization

5    that is protected by the First Amendment.

6         MS. MORENO:  Well, your Honor, I think that Ms. Han

7    actually answered your question when you asked her if they're

8    going to introduce conversations that talked that touched

9    upon criticisms of the United States, and they are, they are,

10   they absolutely are.  There is a number of conversations --

11   it's not the focus of the conversations, but it's touched

12   upon, and they make a big deal about it, and they will make a

13   big deal about it to the jury, and I feel we're entitled to

14   talk to the jurors on this issue.  I take the Court's

15   recommendation, and I think the defense would be happy to ask

16   the question the way the Court has designed it.

17        MR. COLE:  Your Honor, if I can just say the

18   fact -- the problem is if they link it to the First

19   Amendment, it will leave the impression with the jury, which

20   will be nowhere in the jury instructions and which isn't the

21   law -- it will leave the impression that words stated in the

22   very phone call that prove conspiracy, intent, and knowledge,

23   that those words stated are somehow protected and can't be

24   used as evidence in the case because of the First Amendment.

25   That's what's trying to be indoctrinated in this question,

1    and it's wrong.  There should be absolutely no mention of the

2    First Amendment at all.  The words "First Amendment" have no

3    relationship to anything in this case or any legal

4    instruction in the case.  And so from that standpoint, they

5    ought to ask there as to -- you may hear -- if you hear that

6    there's criticism of the United States -- I'm not sure how to

7    ask that question, frankly, but it shouldn't be tied to the

8    First Amendment because all of those statements that are

9    critical of the United States, to the extent they're

10   admitted, those are evidence we can use against them in the

11   charges.  And if they leave the impression that somehow

12   that's protected speech and can't be used, that would be a

13   wrong legal instruction.

14           THE COURT:  Well, you say that there is evidence

15   that the defendants are critical of the United States, and

16   you say that can be used as evidence; I don't know that

17   that's accurate.

18           MR. COLE:  Well, let me --

19           THE COURT:  Or what are you referring to?

20           MR. COLE:  If I can give you an example, if I can

21   give you an example.  There's an example where Mr. Moalin

22   tells Aden Ayrow that you ought to watch out for American

23   helicopters and shoot them down.  Now, that's critical of the

24   U.S., but certainly it's not protected by the First

25   Amendment, and it's evidence we can use in our argument and

1    in our case.

2            THE COURT:  Yes.  See, I don't see that as

3    criticism --

4            MR. COLE:  Well, they're going to --

5            THE COURT:  -- of the United States.

6            MR. COLE:  Then I don't know what they're talking

7    about with --

8            THE COURT:  Those are verbal acts.

9            MR. COLE:  Then I don't know what they're talking

10    about.

11            MR. DRATEL:  I'll give you an example, your Honor.

12    In the conversation where Mr. Moalin talks about the United

13    States and says the United States has problems, and the

14    economy's weak and things like that and also there's

15    criticism and they about -- there's mention of the Iraq war

16    at one point and there's mention of Palestine-Israel issues

17    at one point.  What we're concerned about -- and by the way,

18    there is a legal doctrine about the First Amendment in 2339

19    (b), 2339 (b)(i), that nothing in this statute should be

20    construed to infringe on First Amendment protections.  So

21    it's right there.  And the problem is -- and I think that's

22    what that statute recognizes -- is that there is a danger

23    that a jury hearing speech critical of the United States that

24    is protected speech in and of itself -- I'm leaving out the

25    evidentiary use because I think the Court will be able to do

1    that in instructions -- but just to substitute for elements

2    that are not satisfied about the statute because of this

3    criticism of the United States that they will bear an

4    impression of the defendants that will reduce the

5    government's burden, that's -- that's our problem.  Is

6    that -- yes.  And even, your Honor -- so even a vocalized or

7    verbal support of al-Shabaab does not violate the material

8    support statute.  In fact, even being a member of al-Shabaab

9    does not violate the material support statute.  One has to

10   provide material support as it's defined in the statute to

11   violate the statute.  So if someone who says I'm in favor of

12   what al-Shabaab is doing in a particular context is not

13   providing material support, and I think the jury has to be

14   cautioned about not making that leap, which is dangerous.

15   That's why a terrorism case is dangerous in the context of

16   First Amendment because they often involve political ideas

17   that sometimes they merge in their own way.

18            THE COURT:  Well, I tell you what.  Given -- given

19   the differences between the parties, this is something I'm

20   going to handle, and if after I handle it you feel that you

21   need to explore it in such a way that in my view would create

22   confusion or indoctrinate jurors, then I'll let you know;

23   I'll say please stay away from that area.  But I'll take a

24   crack at this and I think should have some success with

25   conveying the principle that you've just discussed --

1           MR. DRATEL:  Okay.

2           THE COURT:  -- Mr. Dratel --

3           MR. DRATEL:  Thank you very much.

4           THE COURT:  -- and Ms. Moreno, which is basically

5   this, that what is protected is somebody generally

6   criticizing the United States or any policies of the United

7   States; that's permitted, and it's permitted whether it's

8   done by someone who's a terrorist, a charged terrorist, or

9   not any kind of a terrorist.  I think that's the point you're

10  trying to make.  And without getting too deeply into the

11  evidence within the context of -- without getting into the

12  evidence at all, frankly, within the context of voir dire, I

13  think it can be handled more or less along those lines, and

14  as I say, I'll try to take a crack at it myself.

15          MS. MORENO:  Thank you, your Honor.

16          THE COURT:  One thing I want to do is to give both

17  sides an opportunity to participate in this thing without one

18  side or the other objecting while the questions are being

19  asked or without, frankly, the Court having to step in and

20  say look, this is not an appropriate inquiry or please don't

21  ask the question.  Okay.  On C, which if any of the

22  defendants are non U.S. citizens?

23          MS. MORENO:  My client is not a U.S. citizen.

24          THE COURT:  And only your client, Ms. Moreno?

25          MS. MORENO:  I don't know.

```
 1              MR. DURKIN:  My client is not either, Judge.
 2              THE COURT:  Okay.  Then I think this -- I think
 3    this is a fair question, and I'll take a crack at it as well.
 4    Is that --
 5              MR. COLE:  That was not --
 6              THE COURT:  -- coming out at all?  I mean would
 7    that come out in the evidence?
 8              MS. MORENO:  Oh, yes, your Honor.  We've got --
 9    I've got discovery that they're going to introduce some INS
10    documents that --
11              MR. COLE:  It will --
12              MS. MORENO:  Excuse me.  -- around my client's --
13              THE COURT:  So the answer is yes --
14              MS. MORENO:  Yes, yes.
15              THE COURT:  -- as far as you're concerned.  Mr.
16    Cole?
17              MR. COLE:  Yes.
18              THE COURT:  Okay.  Thank you.  I'll attempt to
19    address that.  Thank you.  And on the next question, language
20    use issues, what is meant by the tone?  Would you define
21    "tone"?
22              MS. MORENO:  I'm sorry, your Honor?
23              THE COURT:  The word "tone" on line 5 of page 3.
24              MS. MORENO:  Sure.  Well, your Honor, tone gives
25    meaning to the words.  So, for instance, when I was married,
```

1   if I said "I could just kill my husband" and I had a certain

2   sarcastic tone, people who were hearing me -- or "I'm going

3   to kill my husband," people who were hearing me would know

4   that I was -- just had a frustrating day or what have you.

5   But on paper that's being used as my -- as evidence of intent

6   for a particular crime, I think it's very different.  So I'm

7   just -- all we want to know is will the jury allow -- and

8   clearly in the transcripts that we've gotten, their linguist

9   describes laughing, giggling, et cetera, so I just believe

10  it's an inappropriate area of inquiry, right, particularly in

11  the foreign language context exactly.

12          MS. HAN:  Your Honor, if we could be heard briefly.

13  Your Honor, what I understand that Ms. Moreno is asking is

14  that she has questions about the context of a call

15  essentially; that's what her question is about.  Your Honor,

16  in this case the jury's going to hear the audio for itself.

17  If she has questions about the jurors' ability to understand

18  that a statement should not be seen in a vacuum and that

19  there's context, that's a question that certainly could be

20  asked, but the way that it is phrased about whose belief

21  about the tone of a conversation, that is an attempt to

22  indoctrinate the jury to that point of view.

23          THE COURT:  Well, I'm still a little concerned

24  about the use of "tone" here because you've identified it as

25  "meaning."  So if you plug that into this term, into this

1    sentence, as who believes that the meaning of a conversation

2    lends meaning to the substance.  If you're talking about

3    demeanor during a conversation and whether that can affect

4    the meaning of a conversation or the interpretation of a

5    conversation, I can understand that.  But I didn't know what

6    you meant by "tone."  And also you're asking the jury to

7    respond to that, so I was responding to it myself, and

8    responding to it myself, I didn't really know what you meant

9    by that.  I mean if the demeanor and manner of a conversation

10   can be taken into account in interpreting the conversation, I

11   think that's perfectly appropriate.

12            MS. MORENO:  So the Court would allow an inquiry

13   into the area of demeanor and manner of a conversation?  I'm

14   a little puzzled by Ms. Han's response because, Judge, the

15   audios are played; they're in Somali.  I mean I don't know

16   how the jury is going to necessarily --

17            THE COURT:  Well, as I was going through the

18   deposition transcripts -- I realize that we're going to hear

19   the English translation, but we're also going to -- the

20   camera's also on the deponents, right?

21            MS. MORENO:  Right.

22            MR. DRATEL:  Right.

23            THE COURT:  So the camera's going to -- has

24   recorded certain demeanor --

25            MS. MORENO:  Yes.

```
1            THE COURT:  -- and manner --
2            MS. MORENO:  Yes.
3            THE COURT:  -- of the deponents as they're
4    testifying; I think that's perfectly appropriate.  We tell --
5    we tell jurors the same thing when they're asked to assess
6    credibility:  You can take into account the demeanor, the
7    manner of the witness, the attitude about testifying, and
8    things of that type.
9            MS. MORENO:  Yes, your Honor, for the Rule 15
10   conversations, but there's a plethora of other conversations
11   where there's no camera rolling, unfortunately, for the
12   defense, frankly.  But I take your point.
13           THE COURT:  So all they're going to hear is what,
14   Somali being spoken --
15           MS. MORENO:  Yes.
16           THE COURT:  -- and without anything more.  Well
17   then, what can be made of the tone of a conversation or the
18   demeanor or manner?  I thought you were referring more to
19   deposition testimony than to --
20           MS. MORENO:  I was referring to both, Judge.  I was
21   referring to both.
22           THE COURT:  Well, how could -- how could jurors
23   understand the tone of a conversation that they are just
24   hearing audio for?
25           MS. MORENO:  Well, that's the government's
```

1   evidence.  There might be some defense evidence that provides

2   the tone to the jury; that's what I'm suggesting.

3          MS. HAN:  Your Honor, again, if that is the

4   context, that's their point of view, then again they are

5   indoctrinating -- seeking to indoctrinate the jury to their

6   point of view.

7          THE COURT:  I don't know that -- I don't know that

8   I would agree with that.  Basically I asked the question

9   because you're asking it of jurors so I asked it of myself,

10  as I indicated, what does that mean to me, and I came up with

11  a blank.  And, once again, I think all you're doing here is

12  asking jurors will you take into account evidence related to

13  demeanor and manner whether you observe it personally or

14  whether it comes in in any other form --

15         MS. MORENO:  That's fine, your Honor.

16         THE COURT:  -- and can you fairly deal with that

17  evidence.  Accept it or reject it and give it the weight you

18  feel it's entitled to.

19         Okay.  At the bottle of page 3, expert witnesses,

20  that's out.  It's -- the jury will be instructed on the

21  credibility of experts as well as other witnesses, and it's

22  argumentative, in any event.  I don't think it's appropriate

23  to at the first instance as experts are being discussed refer

24  to them as hired guns, so that is out.  And that's -- those

25  are the only concerns I had about the proposed voir dire

1    submitted by the defense.

2         MS. MORENO:  I think you were going to go back to

3    the al-Qaeda issue.

4         THE COURT:  I will later on.  Yeah, I wanted to

5    discuss that issue again a little bit later in a broader

6    context.  Okay.  Should I be -- I assume that everyone's

7    going to be here for the weekend, that no one's flying out,

8    but if anyone is flying out, to come -- to return back before

9    Monday.  Let me know.  I don't want to interfere with any

10   travel plans.

11        MR. DRATEL:  Just the hotel and back.

12        THE COURT:  Okay.  You've said goodbye to your

13   significant others for some time, in other words.

14        MR. DRATEL:  The way it is Back East, they wanted

15   to come out here.

16        THE COURT:  Okay.

17        MR. DURKIN:  I'm bringing mine on Monday.

18        THE COURT:  All right.  Let's get to the method and

19   manner of jury selection here just in terms of the mechanics.

20   We'll go over this again, but this is pretty much how it will

21   go.  First of all, on the questionnaires themselves, getting

22   back to them -- Mr. Cole, once again, I appreciate your

23   office photocopying a sufficient number.  And actually on the

24   cover sheet it should just have the -- you know, the title of

25   the cause and a juror identification number and nothing else,

```
1   just a blank line for the identification -- well, actually
2   you can go ahead and preprint numbers 1 through 80.
3            MR. COLE:  Okay.  Just to make sure, we're going to
4   bring in the morning of trial the set they're going to fill
5   out in blank, 1 through 80 on the front, on the cover of each
6   one; is that what you're saying?
7            THE COURT:  Yeah, the first copy will be numbered
8   "1" on the cover sheet.
9            MR. COLE:  Gotcha.
10           THE COURT:  Second copy number "2," third copy
11  number "3."  We're going to have a randomized list of jurors.
12           MR. COLE:  Okay.
13           THE COURT:  And there are going to be gaps; sooner
14  or later, there're going to be gaps; some people will be
15  excused, so there are going to be gaps in the -- in the
16  stack, numerical gaps in the stack.
17           MR. COLE:  That's fine.  Does the cover need to
18  have anything on it other than just number 1, number 2, juror
19  number 1, juror number 2; anything else on the cover besides
20  that?
21           THE COURT:  Just the cause.
22           MR. COLE:  Oh, U.S. versus --
23           THE COURT:  U.S. versus Moalin, yeah --
24           MR. COLE:  Okay.
25           THE COURT:  -- that's all you need to have.
```

1          MR. COLE:  Okay.

2          THE COURT:  And you can indicate this is a

3    confidential questionnaire.

4          MR. COLE:  On the front page?

5          THE COURT:  On the front page, confidential

6    questionnaire, and you can also put they're to be used only

7    by court personnel and others authorized by the presiding

8    judge so that each individual has some level of comfort or

9    security --

10         MR. COLE:  Yes.

11         THE COURT:  -- as they're filling out their

12   questionnaires.  And then just number them 1 through 80.

13   Now, if you would, would you prepare perhaps another 10 or 12

14   that are unnumbered?

15         MR. COLE:  No problem.

16         THE COURT:  Thank you.  Single-sided, single-sided.

17   Thank you.

18         MS. MORENO:  May I ask a question, your Honor?

19         THE COURT:  Okay.

20         MS. MORENO:  I just have a question.

21         THE COURT:  Sure.

22         MS. MORENO:  So I understood that your Honor had

23   shall we say reserved 500 jurors, potential jurors, panel

24   members.

25         THE COURT:  No, 500 --

1           MS. MORENO:  Summons.

2           THE COURT:  -- questionnaires and summons went out,

3    but we're going to have -- we're going to have somewhere

4    between -- probably between 80 and 90 individual show up,

5    hopefully.

6           MS. MORENO:  Only --

7           THE COURT:  Oh, that will be -- yeah.

8           MS. MORENO:  Okay.

9           THE COURT:  That's a lot of people.

10          MS. MORENO:  All right.

11          THE COURT:  Some will never -- will never get as

12   far as we're going in the process, and that's what I'm going

13   to explain to you at this point.  But basically we're going

14   to have a pool -- even though 500 went out there, they were

15   being time-qualified, and that's why we got only 85 or 90 or

16   so back.  We were time-qualifying for the length of the

17   trial, and they're not -- they're not subject-matter

18   qualified but they're time-qualified.  So these are people

19   who can stay with us for the anticipated length of trial.

20          MS. MORENO:  I understand.  Thank you.

21          THE COURT:  Good enough.  So basically the first

22   day, on Monday, the 28th, the jurors are going to come over

23   from the jury assembly room and they're going to assemble in

24   the courtroom just below ours, Courtroom 1, which is the

25   ceremonial courtroom.  It has greater seating, and it will be

1    able to accommodate all of the prospective jurors, the jury

2    pool.  That's on the fourth floor, right underneath this

3    courtroom.  They'll be here at 9 a.m. or as shortly after 9

4    a.m. as possible.  Roll will be taken to make sure we haven't

5    lost anybody from the jury assembly room to Courtroom 1.

6            So after that, we have the jurors seated -- and

7    they'll be seated in no particular order, by the way; they'll

8    just be randomly seated behind the bar or the railing, and

9    roll will be taken.  I'll come out, I'll take the bench, I'll

10   welcome the jurors.  I'm going to explain the importance of

11   the oath.  The oath has not been administered to them yet,

12   but I'll explain the importance of the oath, and then I will

13   tell them that after the oath is administered, I have a very

14   important question to ask them.  The oath will be

15   administered and then I will ask them, after telling them

16   what the brief nature -- what the nature of the case is

17   briefly, whether they can sit as fair and impartial jurors

18   knowing what the nature of the case involves.  And it's a

19   question of basic fairness and impartiality that will be

20   asked more than once during jury selection as we proceed

21   forward.

22           I would assume that there may be some individuals,

23   given the nature of the case, who may advise that they cannot

24   sit on the case as fair and impartial jurors, so we're

25   immediately going to be dealing with a certain number who may

1   be excused for cause.  We'll see how that goes.  Let's assume

2   that we lose a certain number of people, so we're down --

3   let's say we've started with 90.  Let's say we're down to 80

4   or 70 at that point or some other number, and at that point

5   I'm going to give them some traditional instructions, general

6   instructions that might be of assistance to them if they are

7   selected as jurors.  These are general principles; they're

8   not general questions tailored to the specifics of the case,

9   but they relate generally to the administration of a trial,

10  general principles, constitutional principles, and the like.

11  I'm going to basically present these general instructions to

12  all of the jurors who are remaining at that point.  This will

13  probably take something on the order of a half hour, maybe a

14  little bit more, on my part.

15          I will tell them that they're going to be asked to

16  fill out a questionnaire, emphasize how important it is that

17  they be candid, as honest as they can be, and then we'll be

18  passing out the questionnaires.  We'll have a master index, a

19  master list of the randomized jurors that will be correlated

20  to obviously their names and also to their questionnaires.

21  So the questionnaires will be passed out to the individual

22  jurors at that point.

23          I don't think it will take the jurors too long to

24  respond to this questionnaire.  I would think that within

25  half an hour or less, people will be responding to this

 1  questionnaire.  In any event, as soon as they're finished

 2  with it, they're free to go.  They'll be told that they are

 3  free to go for that day and that they will be provided with a

 4  telephonic message later that evening, Monday evening, as to

 5  whether they are to report back at 9 a.m. the following day,

 6  Tuesday, the 29th, outside of Courtroom 1.

 7          After all the questionnaires are gathered, Mr.

 8  Cole, we would appreciate it if your office can spring into

 9  action and make the requisite number of copies; I'm thinking

10  six -- an original and six copies should do it, maybe seven.

11  I'll need the original and one copy, one or two copies for

12  the government, a couple of copies for the -- for the

13  defense.  I realize that we're dealing with a time element

14  here, and that's why I'm trying to keep the number of copies

15  down to a reasonable number, to say nothing of the expense;

16  but time is primary, is the primary consideration here.

17          Do you have any idea how long it would take for --

18  let's say you get -- well, you know, I assume there's --

19  first of all, there's a stipulation between all counsel that

20  the original questionnaires can be released to the government

21  in trust for photocopying purposes; am I correct in that?

22          MR. DRATEL:  Yes, your Honor.

23          MS. MORENO:  So stipulated, yes.

24          THE COURT:  Okay.  All counsel have agreed to that.

25  So you don't need -- you don't have to wait until you have

1   all --

2         MR. COLE:  Right.

3         THE COURT:  -- the copies; you can take them back

4   in smaller groups and get the photocopying started.  Do you

5   have any idea how long you'll need to get that done?

6         MR. COLE:  I think -- once we have all the

7   questionnaires, I think we'll try to do it in an hour.  We're

8   going to have a lot of people on hand waiting, try to find

9   all the copy machines that work, which varies from day to

10  day, and we'll use all that I can find, and we'll just divvy

11  it up, get them copied.  And I think if we had a solid --

12  we'll have to address it -- I think that once they're back

13  there in our office with the staff, if we have -- certainly

14  within two hours, your Honor, I'm confident of that, but I

15  think within an hour, maybe an hour and a half.

16        THE COURT:  Well, okay.  Here's what I'm thinking.

17        MR. COLE:  Just to make sure they're collated again

18  right, stapled right, and all that.

19        THE COURT:  Right.  If you get these questionnaires

20  to you in, you know, not all at once but in sequence, between

21  generally the 11:30 to noon time period, which I think is

22  reasonable -- it may go into the noon hour for a bit -- if

23  you could get these returned by let's say 1:30 or as soon

24  thereafter as possible to all counsel, to me, we could review

25  what we have within a period of an hour and a half to two

1   hours.  We're just going to be looking at this superficially

2   just to identify those people who are out and those people we

3   can advise telephonically when they call in you don't need to

4   come back tomorrow, those people, it will be become pretty

5   apparent to us, we can't have on this jury for one reason or

6   another, and I think we'll probably have a consensus as to

7   who should be excused.

8        MS. MORENO:  And the Court -- we would do that in

9   the courtroom in the afternoon?

10       THE COURT:  Yes, yes, we would go over that.  So

11  I'm hopeful that, you know, between -- after you've had an

12  opportunity to look at what's come back, you're going over

13  your copies together, you're caucusing, obviously both sides

14  are conferring, I'm looking at these myself to red-flag

15  any --

16       MS. MORENO:  Obvious.

17       THE COURT:  -- people that need to be red-flagged,

18  that by 4:30 or five o'clock we know who is deselected, who

19  is excused for cause at that point.  Then we have even a

20  smaller group of people coming back the next day.  So maybe,

21  you know, initially we've gone from 90 to 80, and now we're

22  down from 80 to let's say 60, just for sake of the analysis

23  here, and at that point we have 60 coming back.

24       I'll be working with a 34 pack, what I call a 34

25  pack, which happens to fit beautifully with the configuration

1    of Courtroom 1 downstairs because they'll be -- if you add up

2    the number of regular jurors and alternates -- I'd like to go

3    with 12 plus three alternates, so 15 -- plus the number of

4    challenges each side has, you come out with 34; and all of

5    the seats in -- well, in the jury box downstairs and in the

6    front row on either side of the aisle in front of the railing

7    equal 34 seats.  So we're going to be working with a 34 pack.

8              At that point I'll be asking basically general

9    questions, I'm going to do my voir dire at that point,

10   following up on questions I think need to be followed up on

11   the -- from the questionnaires, I'll have general questions

12   that I'm going to direct to the 34 pack, and then -- that's a

13   process that will take a bit of time -- each side will have

14   approximately an hour to do their thing if they wish to take

15   that much time.

16             As people are excused -- and it's entirely

17   conceivable that we will excuse further individuals out of

18   the 34 pack -- then we'll be pulling people in from behind

19   the railing to substitute for those individuals.  Ultimately

20   we're going to wind up with our net 34 pack, at which point

21   you'll be exercising your peremptory challenges, 7 and 12.

22   And I use the blind strike system; you'll each have a strike

23   sheet, you go ahead make your strikes.  Mr. Dratel?

24             MR. DRATEL:  Do you do it in rounds or just all --

25             THE COURT:  No, blind strike.

1          MR. DRATEL:  Just all of them at once?

2          THE COURT:  All at once, blind strike.  And we'll

3    identify all of the jurors who have been stricken, and then

4    we will seat the first unchallenged 12 as the jury in the

5    case, and the next three will be our -- the next three or the

6    last three will be our alternates, and that will be our jury.

7    Mr. Cole?

8          MR. COLE:  One question.  On the phase where we get

9    the questionnaires back, and it'll just be with counsel and

10   the Court, the jury's excused, and we go through and look for

11   potential cause issues, is it the case that we will have a

12   chance -- those will probably be extreme cases -- we'll have

13   a chance to rehabilitate people who may express a -- I'm just

14   not sure what you meant by remove people for cause without

15   having a chance to engage them and see if they can be fair

16   and impartial.

17         THE COURT:  I'm saying it may be obvious.

18         MR. COLE:  Okay.  I thought --

19         THE COURT:  You know, if it's pretty obvious, you

20   know, if it doesn't pass the smell test --

21         MR. COLE:  Gotcha.

22         THE COURT:  -- I don't want to spend time

23   rehabilitating people only to see them gone.  So in any

24   event, I mean that's -- there's no percentage in that.  So if

25   somebody's, you know, responding to a question in an

1  outlandish way or in a way that clearly evinces bias one way

2  or the other --

3             MR. COLE:  Yeah.

4             THE COURT:  -- I mean it can go either way --

5             MR. COLE:  Yes.

6             THE COURT:  -- they're gone -- and we don't have

7  time to play games here -- they're gone, and we come down

8  with our net group of people who haven't been, you know,

9  flagged for obvious bias or would need substantial

10 rehabilitation ultimately, you know, without any net gain in

11 the process.  Ms. Moreno?

12            MS. MORENO:  Yes, your Honor.  Thank you.  After

13 Monday when the obvious cause jurors have been stricken and

14 the numbers have winnowed down, will we be able to know what

15 order they will come in the next day and sit --

16            THE COURT:  Keep in mind that they've -- each one

17 has been assigned a random number, so it will be the first --

18 it will be the first 34 who are left, who are left after the

19 initial process of letting go some jurors who didn't even

20 make it past the first question.

21            MS. MORENO:  So you will seat them sequentially --

22            THE COURT:  Yes.

23            MS. MORENO:  -- by their juror number.  That's what

24 I --

25            THE COURT:  Not by their badge number.  You're

1   pointing to your --

2             MS. MORENO:  By their juror number.  I'm sorry.

3             THE COURT:  Yeah.  There'll be a randomized list,

4   so you'll have -- each juror will be assigned a number, let's

5   say 1 to 90, assuming there are 90, there will be 90 jurors

6   initially, they'll have that number on their questionnaire,

7   on their anonymous questionnaire, and they're also going to

8   bear that number when they're asked to take their seats.  So

9   we'll only be calling jurors in the order in which they're on

10  the randomized list.

11            MS. MORENO:  Okay.  Thank you.

12            THE COURT:  So that number serves them for a couple

13  of different purposes.  Okay.  Any other questions so far?

14  We'll probably hold off -- after the exercise of peremptory

15  challenges, obviously I'll ask if there are any

16  constitutional challenges.  That's always -- you can

17  always -- believe me, you can always determine the question

18  of constitutional challenges after you've seen all the

19  strikes; that's one of the reasons I use the system that I do

20  use rather than back and forth and back and forth.

21            So that's pretty much what we'll do the first two

22  days.  I'll probably hold off swearing the jury until the

23  beginning of the third day, so that will be Wednesday I'll

24  swear the jury, I'll have other administrative matters I need

25  to cover with them from notebooks to parking, et cetera, and

1    then we'll start, we'll start with the case proper, opening

2    statements, and then proceed from there.  Mr. Dratel?

3              MR. DRATEL:  Just one question, your Honor, about

4    alternates.  One at a time or all three at once?  In other

5    words, strike, strike, strike, strike, strike, strike,

6    strike, as opposed to three and three.  In other words,

7    each -- the Court said that it was considering three

8    alternates.  In other words, we get through the 12 and 7,

9    then we have alternates to do.  Strikes are by alternate --

10             THE COURT:  No, the 7 and 12 includes strikes for

11   the alternates.

12             MR. DRATEL:  Oh, it does?

13             THE COURT:  Yeah.  It was going to be 6 and 10,

14   remember, and then we agreed on 7 and 12, which would include

15   the strikes for the alternates.  Do you recall that, Ms.

16   Moreno?

17             MS. MORENO:  I actually vaguely do recall that,

18   your Honor, I do.

19             THE COURT:  Would you like a transcript?  And I

20   think I was talking to Mr. Durkin about that as well; he was

21   asking for an extra strike, and I said okay, you've got the

22   extra strike, there would be an extra strike for the

23   alternates, so we agreed on 7 and 12.  So in answer to your

24   question, you'll be exercising all your peremptory challenges

25   because we're using a 34 pack.

1          MR. DRATEL:  Okay.

2          THE COURT:  And, once again, the first 12 -- the

3    first 12 who are unchallenged are the jurors; the next three

4    unchallenged are the three alternates and in that order.

5    Okay?  Can we move to another subject then if we're done with

6    the jury selection?  I just wanted you to have a general idea

7    of what we were going to be doing.  The protective order, the

8    proposed protective order, apparently that's the subject of a

9    difference of opinion here.

10         MS. MORENO:  Excuse me, your Honor.  I'm so sorry.

11   On the revisions to the questionnaire that your Honor has

12   ruled upon, did you -- is there a decision on who does that?

13   I'm happy to do that and then send it to the government.

14         THE COURT:  Either way.  Can you work that out?

15         MS. MORENO:  Yes.

16         MS. HAN:  Yes, your Honor.

17         MS. MORENO:  And with respect to the proposed voir

18   dire questions that I submitted that the Court has now also

19   revised, would you like me to submit a new amended one?

20         THE COURT:  Not necessary.

21         MS. MORENO:  I can just use it as a guide?

22         THE COURT:  Yeah.  I just -- all it did, Ms.

23   Moreno, was alert me to certain issues that we needed to

24   discuss.  You don't need to in any way modify that at this

25   point or update it.  Okay.  Then I received a proposed order;

1    this relates to the linguist.  Okay.  I think the term -- are

2    you with me, everyone?

3            MR. DRATEL:  Yes.

4            THE COURT:  Okay.  I think the term "linking" was

5    of concern to the government.  In the government's proposed

6    order regarding the linguist, it's set forth:  It is further

7    ordered that defense counsel may use the witness's true name

8    for investigation of his background and qualifications but

9    without linking his true name with, one, his status as an FBI

10   employee; two, his status as a government witness in this or

11   any other matter; or three, the pseudonym he uses.  Do you

12   wish to be heard on this?

13           MR. WARD:  Your Honor, I don't have much to add.  I

14   think we're fairly close to a solution to this.  The reason

15   we used the term "linking" is the objective of this is not to

16   impair anybody's ability to cross-examine the witness, but to

17   protect him by not going out and trying to prepare for

18   cross-examination by saying oh, by the way, this guy, he's

19   going to be -- he's the government's expert linguist and he's

20   testified in other government trials.  So if you want to go

21   out and talk to other linguists about his skills as an

22   interpreter or their experience with him, that's fine, so --

23           THE COURT:  You don't want his cover blown

24   basically; is that it?  You don't want his position linked

25   with his name as a linguist as they're doing their

1    investigation.

2              MR. WARD:  As they're doing their investigation.

3              THE COURT:  I thought "linking" was a little

4    unclear myself.  How about just using the term "disclosing"

5    or "affirmatively disclosing"?

6              MR. WARD:  That's fine, your Honor.

7              THE COURT:  Is that acceptable?

8              MR. WARD:  That is acceptable to me.

9              THE COURT:  Doesn't that serve the same purpose?

10             MS. FONTIER:  It does, your Honor.

11             THE COURT:  I didn't know whether you were talking

12   about doing an Internet search such that the search that you

13   have conducted would automatically create a link in that

14   sense between the individual and his occupation as an FBI

15   employee; I thought maybe that's what you were referring to.

16   So just go ahead and do your investigation, but don't

17   affirmatively disclose the name and association with the --

18   with his job as I understand it.  Is that acceptable?

19             MR. WARD:  Thank you, your Honor.  That's exactly

20   what we're looking for.  I'll resubmit an order --

21             THE COURT:  Okay.

22             MR. WARD:  -- reflecting that.

23             MS. MORENO:  That's acceptable, your Honor.

24             THE COURT:  Just use -- yeah, you can substitute

25   "disclosing" or "affirmatively disclosing" for the term

1    "linking," okay?

2              MR. WARD:  Yes, your Honor.

3              THE COURT:  Okay.  Thank you, Mr. Ward.

4              MR. WARD:   Thank you.

5              THE COURT:  Okay.  Then we have the 17 (c) issue,

6    the order or issuance of Rule 17 (c) subpoenas.  This came in

7    not under seal I assume -- well, it did come in under seal.

8    May we discuss this openly?

9              MR. GHAPPOUR:  Yes, your Honor.

10             THE COURT:  Okay.  Well, so some of the articles

11   referred to by Mr. Bryden in connection with his background

12   or that have been of assistance to him in forming opinions

13   are not available, you can't find them; is that what it is,

14   Mr. Ghappour?

15             MR. GHAPPOUR:  There are 72 of his listed

16   publications that he authored -- I'm sorry -- 57 of his

17   listed publications that he authored that --

18             THE COURT:  Yeah, that --

19             MR. GHAPPOUR:  -- were not available on the 12

20   major academic search engines that we ran through in addition

21   to my law school librarian, who, after a day and a half of

22   searching through all of his databases, said that he doesn't

23   believe they're publications, so --

24             THE COURT:  Okay.  But I want to make -- I want to

25   make clear that these are his own articles, these are his own

1   publications, not third-party publications.

2             MR. GHAPPOUR:  No, your Honor.

3             THE COURT:  So you made a request of the government

4   or --

5             MR. GHAPPOUR:  I made a request -- I can get you

6   the exact date; I think it's listed in the --

7             THE COURT:  Okay.

8             MR. GHAPPOUR:  I believe the government had contact

9   with Mr. Bryden and he said -- they just got back to me last

10  week -- and he said that he checked his computer, I think his

11  computer hard drive had crashed and therefore he was unable

12  to search his computer and he didn't know where else to find

13  these publications.

14            THE COURT:  So you didn't have --

15            MR. GHAPPOUR:  And he couldn't find them on Google

16  either.

17            THE COURT:  Okay.  And no hard copies that you were

18  advised of?

19            MR. GHAPPOUR:  I'm -- not to my knowledge.

20            THE COURT:  Okay.  Mr. Ward, Ms. Han, Mr. Cole?

21            MS. HAN:  Your Honor, I don't have the exact number

22  of articles that were listed on the CV that we provided to

23  defense counsel; I assume Mr. Ghappour can tell me.  But I

24  believe that we provided approximately half of the articles,

25  and those are the articles in which we are in possession.  He

1   is correct, I did reach out to Mr. Bryden.  Mr. Bryden

2   explained that he lost essentially -- he had a -- his hard

3   drive crashed, so all of the electronic versions of his

4   article that he had he no longer possesses.  He did attempt

5   to find other articles, and he told me as of Monday that he

6   was not able to do so.  He told me that would himself

7   continue to try to do that, and whenever he found an

8   additional one, he would provide one to me; he has not

9   provided any additional ones to me.

10          THE COURT:  Okay.  So is he trying to get this

11  computer problem solved?  I imagine that's something that's

12  going to be quite a setback for him in the future.

13          MS. HAN:  Your Honor, what I understand is that the

14  hard drive crashed -- I don't believe it was that recently.

15  I don't exactly know when that was, but that was an issue

16  that occurred, and as a result he lost all of these

17  documents.

18          THE COURT:  So that work product is gone forever, a

19  forensic can't even pull it out?

20          MS. HAN:  Your Honor, I don't know the extent to

21  which Mr. Bryden has gone to try to recover his hard drive; I

22  just know that -- what he informed me is that electronically

23  this hard drive, he's not able to access anything that was on

24  that before and that -- I guess in terms of a backup, I don't

25  believe that he had any backup, he just had additional

1    electronic versions of these articles that Mr. Ghappour asked

2    for.

3            THE COURT:  Have you asked him to continue

4    reasonable diligence in efforts to obtain these missing

5    articles?

6            MS. HAN:  Of course, your Honor, yes.

7            THE COURT:  Would you do that?

8            MS. HAN:  Yes, your Honor, we did; we did it a week

9    ago and we did it on Monday of this week as well.

10           THE COURT:  Okay.

11           MR. GHAPPOUR:  Your Honor, in light of recent

12   revelations, I would like to either make another application

13   for the hard drive or, alternatively, extend the current

14   application to include Mr. Bryden's hard drive so that --

15           THE REPORTER:  Excuse me.  I didn't hear the end of

16   that.

17           THE COURT:  Yes, you're soft-spoken, Mr. Ghappour.

18           MR. GHAPPOUR:  I'll come and use the --

19           THE COURT:  You're -- feel free, any of you, to use

20   the microphone; I know it will be helpful to Ms. Henson.

21           MR. GHAPPOUR:  Your Honor, the point is this is why

22   we need a subpoena, and I would submit that we can either

23   apply -- submit a separate application for Mr. Bryden's hard

24   drive or, in the alternative, extend the current one to

25   include the hard drive so that we can conduct a forensic

1    analysis and recover the publications, the 57 publications,

2    over half of the publications provided on his CV.

3              THE COURT:  Ms. Han?

4              MS. HAN:  Your Honor, I'm not exactly sure to what

5    end.  It is one thing -- so I actually reached out to

6    Mr. Ghappour and asked him if there were specific articles on

7    the CV that he liked that we did not have or that we had not

8    already provided to him because certainly the articles that

9    are provided and are listed on the CV, not all of them are

10   related to the testimony that Mr. Bryden is going to provide

11   here in court, so I'm not exactly sure to what end every

12   single article that Mr. Bryden listed on his CV, what benefit

13   that would be to the defendants.

14             THE COURT:  Well, has Mr. Bryden identified any

15   articles that -- that he is no longer in possession of or

16   can't retrieve as material for him in reaching any of the

17   opinions or the testimony he'll give in this case?

18             MS. HAN:  No, your Honor.  And, your Honor, in

19   terms of the opinions, they are his -- actually they are his

20   own writings.  They're not writings that he's relying upon;

21   they are his own writings.

22             THE COURT:  Understood.  Thank you for the

23   clarification, but I still have the question.  I mean are

24   these writings essential for his testimony in this case?  Is

25   his testimony based on these writings?

1           MS. HAN:  No, your Honor.

2           THE COURT:  Would he have any objection to -- I

3    don't know if you discussed this with him -- would he have

4    any objection to seeing if any of these things could be

5    retrieved by a forensic that might be available to the

6    government?

7           MS. HAN:  Your Honor, I do not know the answer to

8    that.

9           THE COURT:  I'm sorry?

10          MS. HAN:  I do not know the answer to that.

11          THE COURT:  Could you --

12          MS. HAN:  I don't know whether or not he's still in

13   possession of the hard drive, I don't know where the hard

14   drive is; I don't have any of that information.

15          THE COURT:  Okay.  Well, why don't you continue on

16   with your conversation with Mr. Bryden about possible

17   approaches to retrieve any of this.  Tell him that obviously

18   the Court is concerned.  If there are ways -- if there is a

19   way that the missing articles can be retrieved without undue

20   time or expense, including forensic that might be available

21   to the government for that purpose, then perhaps that should

22   be utilized as well.  I think under the -- you know, I could

23   sign off on something like this, but I think it might be

24   useless.  If you want to -- I would encourage the two sides

25   to continue discussing this, and it may be that you can reach

1   some kind of an agreement here and, if not, rework an

2   application or a request for an order, Mr. Ghappour.

3              MR. GHAPPOUR:  Well, just a couple points.  The

4   first is I would submit they're all relevant, and I question

5   how Ms. Han can make the statement that they're not relevant

6   without actually having read the documents.

7              Second, we've -- I believe my first communication

8   to the government about this matter was back in October,

9   might have been November.  Now that we're on the eve of trial

10  and that the government has asserted that their trial is

11  based on calls and expert testimony and nothing else, I would

12  say that Mr. Bryden's testimony is of paramount importance

13  and specifically the cross on that testimony; and in order do

14  an effective cross, we need his prior statements and prior

15  publications, and we need to determine if the publications

16  are his, and at this point, without a forensic analysis of

17  his hard drive, I can't even tell if they're even on this, I

18  can't even tell if these are made-up publications, to be

19  honest.

20             THE COURT:  Okay.  Well, once again, I encourage

21  you to -- I encourage the government to do what they can

22  along the lines that have been suggested and to keep the

23  defense advised of any progress here, letting Mr. Bryden know

24  that this is something that should be done and all reasonable

25  efforts to retrieve additional material from the hard drive

 1    should be undertaken at this point in concert with the

 2    government.

 3            MS. HAN:  Yes, your Honor.

 4            THE COURT:  Very good.  Okay.  Very good.  So I'll

 5    put the matter of the 17 (c) subpoena aside for the moment at

 6    this time.  Okay.  Next thing I wanted to cover was status of

 7    the wiretap transcripts.  How are we doing there?

 8            MR. COLE:  Yes, if I can address that, your Honor.

 9            THE COURT:  Sure.

10            MR. COLE:  The Court -- if the government recalls

11    correctly, the Court had set a deadline for January 18 for

12    the defense to provide us with their transcripts, either

13    transcripts of calls they wanted to use that we weren't using

14    or their disputes with our transcripts.  And we have

15    continued to receive transcripts throughout the week; we

16    received six I think last night.  And the government would

17    like, first of all, a firm deadline that we're done, that

18    there's no more transcripts coming from the defense.  They're

19    a week past the Court's deadline after the last hearing, and

20    we'd like to at least know that as of last night, we're --

21    we've received our transcripts; that's one request the

22    government has.

23            Secondly, the -- there's been -- I know there's

24    been talk in trial memos and prior hearings about the rule of

25    completeness.  The United States -- we are receiving

1    transcripts on a rolling basis from the defense so late that

2    the United States -- and we have not received any specific

3    delineation of what they would want played as part of the

4    rule of completeness, and so we would request that -- I know

5    the determinations of whether or not something will be played

6    under the rule of completeness will be made later on by the

7    Court, so we're not asking for any ruling about that now

8    obviously, but what we would request is if the defense

9    believes and convinces the Court that some other part of an

10   audio call should be played or that a different call

11   altogether should be played, that that happen in their case

12   because we do not have the ability or time, having received

13   no delineation of that and only receiving transcripts up to

14   last night, to even determine yet if we agree with their

15   transcripts.  And so that's our request simply with respect

16   to the rule of completeness, but as the Court decides what

17   ought to come in, if anything, that those things come in in

18   their case.

19           And so those are our two only points about the

20   transcripts.  Everything else seems to be moving forward.  We

21   have been successful in resolving some of the issues with the

22   transcripts.  There have been various discrepancies pointed

23   out by the defense.  Last time you might recall there was

24   discussion about the word "infidel" versus the word

25   "non-Muslim."  We resolved that; we just decided to go with

1  what the defense wanted and made all those changes.  So a

2  lot's been resolved.  Frankly, I don't think there's really

3  that much material difference in the transcripts anymore, but

4  there will be still some lingering disputes over them.

5  It's -- I think that both sides know what those are, and

6  we'll just proceed in the ordinary course from this point.

7  If there's any other questions the Court has in that

8  regard --

9          THE COURT:  Well, no.  I'm concerned about the late

10  submission by the defense of audio transcripts, if that be

11  the case.  I would have certainly wanted this to be resolved

12  so that issues, specific issues, could be addressed if there

13  are any.  Ms. Fontier?

14          MS. FONTIER:  Your Honor, I don't make any -- I'm

15  not pretending that we have, you know, given things over

16  early, certainly.  We are doing this as quickly as we -- I

17  actually withdraw that -- our interpreter is doing this as

18  quickly as he humanly can.  Your Honor will recall that we

19  had an extreme amount of difficulty even finding someone who

20  did not have a conflict.  This whole process started, you

21  know, late in the game as to getting our transcripts together

22  and figuring out exactly what it is that we want.  We had

23  our -- we were reviewing different transcripts that the

24  government had provided.  I think it's worth pointing out,

25  your Honor, that the latest version of the government's

1    transcripts that we were told they were the calls and the

2    portions of the calls that they were going to play in their

3    case-in-chief was handed to us on January 10.  This wasn't --

4    it's not like this was an extremely long time ago.  It's a

5    different version.  Some of the calls have some material

6    differences in them.  We had to go through and check all of

7    those, have our interpreter go back and listen to calls for a

8    second, third, fourth time and look at the transcript that he

9    had done and check whether it was correct starting on

10   January 10.  And then we also had to go through with this new

11   version that they gave us on the 10th, compare it to the old

12   version, see if there was differences and whether we needed

13   to have a complete transcript done.  And then also from that

14   there were also at least one call that was not previously

15   noted in other -- in their prior submissions that they were

16   going to play, so then we had to go back and see if there

17   were any additional calls.

18          So while this is happening late in the game, we

19   are -- every time we can get a new version of transcripts

20   from the government, we have to start over, and so we started

21   this process over on January 10.  And giving one interpreter

22   eight days to go through 80 calls --

23               THE COURT:  Well, I understand that --

24               MS. FONTIER:   -- to see whether or not these are --

25               THE COURT:  Hold on, hold on, Ms. Fontier, please.

1    I was under the impression that there were just a few
2    remaining transcripts that you were getting into January.  I
3    thought that what the government perceives as pertinent was
4    given a long time ago.  Am I incorrect in that?
5              MS. FONTIER:  It keeps -- we started at about 180
6    calls I think, it went to 120, at some point they whittled
7    that down to 100, I think there's about 80 now.  But the
8    problem is, your Honor, there's no indication of what they've
9    changed, what has been taken out, and there are some where
10   the translations were actually changed.  I think we've worked
11   some of that out, but we have to -- every time we get a new
12   set, there's no indication of how it's different from the
13   previous one --
14             THE COURT:  You mean --
15             MS. FONTIER:  -- so it's a matter of going --
16             THE COURT:  Ms. Fontier, please.  The court
17   reporter can't take down two people speaking at the same
18   time, so I'll try to give you the courtesy of finishing, but
19   I need to ask some questions here --
20             MS. FONTIER:  Yes, your Honor.
21             THE COURT:  -- just to see where we are in terms of
22   teeing this thing up.  I mean you can consider that we're in
23   trial right now, and I'm still hearing that there's
24   unfinished business with respect to transcripts, and that's
25   very disconcerting because we're not going to break down this

```
1    trial, we're not going to use jury time for going over

2    evidentiary issues or taking care of matters should have been

3    taken care of a long time ago; everybody's got to understand

4    that.

5              So rather than the recriminations or finger

6    pointing, I just want to be sure that we're going to be ready

7    to go with all of the transcripts in final form.  I

8    understand that there may be a few differences here and there

9    that need to be ironed out, as counsel's referred to it, but

10   we're far beyond the point where these things should be

11   exchanged.  And if there are audio transcripts of other

12   snippets of calls or intercepts that the defense already has,

13   or if there are audio transcripts of new calls not previously

14   identified by the government, they've got to go over

15   immediately, absolutely immediately, so that everybody's on

16   board as to what's going to be proffered and whatever issues

17   relating to differences in transcription or translation can

18   be undertaken and finished.

19             MS. FONTIER:  Your Honor, I just want to say that

20   we're not sitting on transcripts.  We have turned over what

21   we have.  We have provided additional -- I think what I'm

22   trying to say is that we're not done, and I don't -- I would

23   love it if we were, but we're not.  We have provided -- based

24   on the calls that the transcripts, the final transcripts that

25   we received on the 10th, we've provided additional calls and
```

1   asked for complete transcripts of calls that were further

2   winnowed -- sorry -- further whittled down from the

3   government from our interpreter.  We haven't received all of

4   the transcripts yet.

5           I wish I had a different answer, but I don't.

6   We're providing everything as quickly as our interpreter can

7   produce it.  I think what I was concerned about is that if

8   the Court set a -- say if they're not turned over tomorrow,

9   you can't use them, that would be something that I would be

10  very -- I would have a very severe objection to and hope that

11  we would be able to work out because it's one man who's a

12  certified interpreter that has to do the lion's share of

13  work.

14          THE COURT:  Well, I understand your limitations;

15  you've indicated what the limitations have been with respect

16  to your interpreter.  But what we cannot have would be

17  transcripts going over at the last minute without the

18  government really having an adequate opportunity to go over

19  what the transcript is so they can take -- they can do their

20  due diligence and confirming whether it's a proper

21  translation and then identifying any issues and/or requests

22  to bar any particular part of it, of a transcript.

23          As I say, I'm not -- I'm not going to create down

24  time for the jury for those purposes.  And keep in mind the

25  Court has to be able to go over these issues as well and

1    hopefully come up with reasoned rulings.  So if it means

2    redoubling the effort at one level or another, then it needs

3    to be done.  I haven't said that any of this is barred, but

4    are there circumstances under which conceivably some of this

5    could be barred?  Yes, I can envision some circumstances.  I

6    certainly wouldn't want to see the case get to that point, I

7    wouldn't want to see the case having to be mistried because

8    one side or the other wasn't ready to proceed with all of the

9    evidence lined up; that would be terrible, especially given

10   what the Court has already gone through -- and the parties as

11   well -- in terms of preparing this case for trial.  So I'd

12   urge -- I urge the defense to do whatever it needs to do to

13   get this thing ready to go, get these materials exchanged and

14   in proper form.  Ms. Moreno?

15           MS. MORENO:  Thank you, your Honor.  In fairness,

16   so that the Court knows, on behalf of Mr. Mohamud, I have

17   produced what I believe to be one of six conversations of

18   transcripts to the government and asked them if their

19   linguist could go over the full translation to see if there

20   are any problems or differences so that perhaps we can

21   resolve them.  I produced I think somewhere between six and

22   eight conversations that would fall under that category, and

23   I've heard nothing back from the government on that, so that

24   the Court understands the full picture of --

25           THE COURT:  When did you produce those, all at

1    once?

2              MS. MORENO:  No, no, it's a rolling production.

3              THE COURT:  From when to when?

4              MS. MORENO:  I want to say the last -- the first

5    two or three calls probably a few weeks ago, the last call I

6    produced was maybe a few days ago.  So it's been -- it's been

7    a period of time.  But each time I did give them the full

8    transcript, I asked if there are any problems, please let me

9    know, and I haven't heard.

10             MR. COLE:  And we will be getting back to all of

11   them with their -- on our comments about their transcripts,

12   but in some -- and I don't want to lump them all in one --

13   one brush because they're all submitted separately and some

14   submitted -- Mr. Durkin submitted his earlier.  And so we're

15   dealing with them as they come in.  We will be getting back

16   to all of them about their issues, if we have them, with

17   their transcripts, and so they will be hearing back from us

18   on that.  But we don't know -- unless they mean by Rule 106

19   we want them to play the whole -- all these calls in total,

20   if that's what they meant, that's as far as we've gotten in

21   any identification of what portions of a call they believe

22   are necessary.  They've just given us a list of calls, and

23   entire calls.  And so all I'm saying is I think the Rule 106

24   issue is easier -- obviously the Court needs to see what's

25   going on later in trial to rule on it anyways, but we're not

1  going to be in a position to -- they just need to play those

2  in their case if it's admitted because we're not going to be

3  in any position to be able to do that for them without being

4  able to vouch for their transcript or agree to their

5  transcript much less have it ready to play for them is all

6  I'm pointing out.

7          THE COURT:  Well, in the event there's a

8  disagreement as to a transcript, I mean, you know, the

9  translation I assume --

10          MR. COLE:  Sure.

11          THE COURT:  -- that your -- Mr. Dratel, you're

12  saying that's not going to happen?

13          MR. DRATEL:  No, no, what I'm saying is that's a

14  separate issue.  I agree that the -- competing transcripts is

15  different than 106.  I think it would be -- I think it would

16  be unfair to -- unless a particular defendant wanted to, I

17  think it would be unfair to defer completion until the

18  defense case for this reason:  If the purpose of the rule is

19  for fairness and not to mislead the jury about context, I

20  don't want to mislead them for a two-week period and then all

21  of a sudden be telling them remember that conversation you

22  heard two weeks ago, here's the rest of it; I don't think

23  that's fair.

24          I think that -- and I'm also -- it's also possible

25  just to read a transcript, if the transcript is agreed upon,

1    to do the completeness rather than play a particular part of

2    a call if the government feels that, you know, the technology

3    -- the technological part of it is too daunting.  And I'm

4    not, you know, making that decision for them; that's their

5    decision because it's their evidence.  But in terms of -- and

6    that's the way I've done it in other cases is that it doesn't

7    necessarily require a foreign language call to be played at

8    the same time; rather, if a transcript is agreed upon, it can

9    be read to complete the particular conversation or the

10   portion that's being sought to be introduced under 106.

11             THE COURT:  Did you want to respond to that?

12             MR. COLE:  Well -- well, certainly that is a lot

13   more potentially doable than anything else, so then the jury

14   will not be hearing audio that goes with the transcript as

15   they will with all the parts we're playing.  But that said, I

16   do know that under the case law, the Court has discretion to

17   order -- or to order to prove, and even in the context of 106

18   can -- it's well within the Court's discretion to let it

19   happen in the defense's case, to have it be played in context

20   contemporaneously with the clip we played in the defense's

21   case.

22             THE COURT:  Well, that -- probably that would be

23   the most -- that would be the preferable way to do it.  But

24   other than saying look, you need to work, you need to confer,

25   you need to communicate where you are, what can be provided

1    to you now, what remains, what the best estimate is for

2    what's remaining, making any agreements you can make,

3    entering into stipulations you can enter into so this comes

4    in, as I say, as seamlessly as it can.  Mr. Durkin?

5              MR. DURKIN:  Judge, if we're done with this, I have

6    a related issue to this.  I think the government and I are

7    in -- I've got my tapes to them.  I don't think I have an

8    issue with that, but I have a separate issue that is related,

9    and this may be because of a misunderstanding on my part, but

10   we received these calls in -- we had audio waves, but then we

11   got summaries or verbatims.  And the summaries are just two,

12   three, four paragraphs, identified the speaker, someone from

13   the government summarized them, and we have those, and

14   there's a much larger number of those, and --

15             THE COURT:  Are these line sheets you're talking

16   about, Mr. Cole?

17             MR. COLE:  Yes.  I mean that's -- they're not line

18   sheets but they're similar in terms of just summaries.

19             THE COURT:  Okay.

20             MR. DURKIN:  Here's the problem.  The line

21   sheets -- these aren't line sheets, and I was under the

22   impression that they were the equivalent of line sheets, and

23   therefore I thought we were getting identified pursuant to

24   Rule 16 any statements of our client, and we identified I

25   think 16 calls of our client from either the summaries or the

1   verbatims.

2          Recently I asked Mr. Cole if that was correct, that

3   those were all the calls in the government's possession that

4   my client was a speaker in, and he told me they have no way

5   of knowing that.  And I guess it is what it is, but in terms

6   of something being barred, I guess I'd like to reserve my

7   right.  If there's some other call out there in the universe

8   that we come across in the course of the trial -- I mean if

9   somebody starts talking -- and I think I have a pretty good

10  handle on what's out there, but if somebody starts talking

11  about a time period involving perhaps other people and I go

12  back and have somebody listen to some other tapes and find

13  one for my client, I don't want to be barred from trying to

14  use that at some point.  I just don't have any other way of

15  knowing how to do it.  It would be an insurmountable task to

16  have someone -- I would have had to hire an interpreter to

17  listen to the calls.

18          THE COURT:  Okay.  Thank you.  You'll reserve

19  whatever you need to reserve I think is what you're saying.

20  I mean your concern is that you're surprised by something, a

21  new call identifying your client --

22          MR. DURKIN:  You understand my point?  Have I made

23  myself clear in terms of the dilemma we're in?  We can't --

24  there's no way we could possibly go through every one of

25  these foreign language calls to try to determine whether our

1    client's on it.  Like in an organized crime case, when you

2    have the line sheets, you go through the line sheets and

3    generally get a pretty good idea of who the speaker is, and

4    that's how you find out which calls you want to look at.  So

5    I mistakenly thought the summaries were the equivalent of the

6    line sheets in terms of what we would have.  And, frankly, I

7    don't know how the government gets around Rule 16 by saying

8    we may have a whole slew of audio calls out there in which

9    your client's voice is recorded, we just don't know whether

10   it is or not.

11           MR. COLE:  Well, I -- I'm sorry to interrupt.  I'm

12   sorry.

13           THE COURT:  Go ahead, Mr. Cole.

14           MR. COLE:  I don't think that's fair.  We complied

15   with Rule 16.  We gave the audio recordings, and we didn't

16   hold back our summaries to the extent we had one.  If we had

17   a summary of a call, we turned it over.  What Mr. Durkin is

18   saying is that -- is that if we turned over the audio that

19   may contain his client's calls -- turned over the audio

20   itself -- that we have an additional obligation to turn over

21   some summary that doesn't exist or prepare one for him.

22   That's not Rule 16.  And these -- this case has been pending

23   now for a very long time presumably because the defense --

24   and then all the status conferences -- because they needed to

25   review the audio, and the defendants themselves can listen to

```
 1    their own audio calls.

 2              THE COURT:  I understand.  I don't see any Rule 16

 3    violation in light of what you've disclosed.  But I think

 4    what Mr. Durkin's concerned about is all of a sudden what

 5    happens if a call comes up that wasn't identified in any line

 6    sheets because there are no line sheets, he didn't see him in

 7    any summaries, and all of a sudden somehow it comes to his

 8    attention and it's not helpful.

 9              MR. DURKIN:  That's all I'm saying.

10              THE COURT:  Yeah, that's all he's saying.  He wants

11    to reserve his right to keep -- to keep that out.

12              MR. COLE:  We're not bringing in --  we're not

13    bringing in a call like that, but if what he wants is to --

14              THE COURT:  I know.  You've identified what's

15    pertinent, you did that very early on, and I know that the

16    pertinent calls have been reduced in number, and I understand

17    what Mr. Durkin's point is.  I don't see that as a realistic

18    likelihood in this case, but if it happens, we'll address --

19              MR. DURKIN:  I'd also like to reserve my right to

20    try to offer it if need be.  I don't think this is going to

21    happen --

22              THE COURT:  Okay.

23              MR. DURKIN:  -- but I just want to make --

24              THE COURT:  And that's why I say you reserve your

25    rights.  If it's unhelpful, if it's harmful, then you'd
```

1    obviously be preserving your right to have it barred; if it's

2    helpful, you'd want to use it --

3              MR. DURKIN:  That's right.

4              THE COURT:  -- and you'd be making a pitch of late

5    discovery and that you ought to be able to utilize it.  I

6    understand that.

7              MR. DURKIN:  Right.

8              THE COURT:  Okay.  All right.  Okay.  I think I've

9    said enough in terms of the transcripts here of the

10   intercepts.

11             MR. COLE:  Can I mention --

12             THE COURT:  And the only thing else I want to say

13   is if you feel that you need some assistance of the Court,

14   you're at an impasse right now, you just need something to

15   push yourselves across the line, let me know, and I'll get

16   Judge Gallo to assist you on it.  I don't think that's

17   necessary, but let me know if you need that kind of

18   assistance.  And if he can meet with you off hours at some

19   point, I'd sure he'd be happy to do so.

20             MR. COLE:  And just so you know, your Honor --

21   defense I'm sure will correct me if they see it differently

22   -- I think that to the extent we know what we're dealing

23   with, to the extent we have a transcript, okay, that we've

24   received so far, what we are seeing is a very few number of

25   discrepancies that are really material.  There are two

1   versions of transcripts because their interpreter would

2   interpret something and we would interpret something, and

3   anytime two people interpret something, the words they use

4   might be slightly different although the meaning is

5   usually -- usually not very different except in limited

6   cases, and those are what we all focus on; they focus on it

7   with us, we focus on that with them.  And I suspect that most

8   of the transcripts -- you know, we have a number of

9   transcripts, let's say 80, that's ballpark, they've given us

10  I think about 26 so far, this is much -- and to some extent,

11  this is much ado about not that much because I think the

12  actual disputes are not as many as it seems like, although

13  our wording is sometimes slightly different.

14          THE COURT:  Okay.  Ms. Moreno is certainly agreeing

15  with you.  I'll take that as a positive sign here.  Times

16  like this, we look for positive signs.

17          MR. COLE:  The only other transcript-related issue

18  I wanted to raise -- and I have not had the chance to discuss

19  it with the defense, and I'm not asking for any ruling on it

20  today by any means, but I wanted to highlight it -- and that

21  is this issue of transcripts in the jury.  We believe, your

22  Honor, that it will be important -- and again, I'm not asking

23  the Court to rule on this -- but the jury -- I don't know how

24  the jury can deliberate in this case or do its job in this

25  case without having the transcripts during its deliberation.

1    And if there's a disputed transcript, we're fine with the

2    defense's transcripts going back too; we're not trying to

3    seek to exclude the defense's transcripts if there's two

4    versions of a transcript.  But we will be back in the

5    courtroom a hundred times either if there's being playbacks

6    requested -- they're going to have to have the transcripts.

7    I just don't know how it will be possible otherwise.  And we

8    just wanted to highlight that for the Court as something that

9    we'll be asking for later in the trial, and we think that the

10   Court certainly has the ability to do it, especially if both

11   sides' transcripts, to the extent there is a dispute, both go

12   back.

13          THE COURT:  Well, we've already touched upon this,

14   as you know; we did so a while back.  And I think certainly

15   it's within the Court's discretion to allow the transcripts

16   to go back, and we'll -- if it becomes an issue --

17   apparently -- well, it will be a request in any event, and

18   I'll certainly deal with it at the appropriate time.  Okay.

19          MR. DRATEL:  Your Honor, on that issue, may I just

20   ask what the Court's practice is with respect to the

21   deliberations?  Some courts wait for the jury to ask for even

22   any exhibits --

23          THE COURT:  Yeah, we're getting way ahead of

24   ourselves on this.

25          MR. DRATEL:  Okay.

```
 1              THE COURT:  I just don't want to take up any more
 2   time on it.  I've got a list of things I really need to cover
 3   now, we're running short on time, and I know we won't even be
 4   able to finish what I've got scheduled for today.  So if you
 5   can defer on some of these --
 6              MR. DRATEL:  If that's the case, your Honor, can I
 7   go back to the jury number -- because it is important -- in
 8   the sense of looking at Rule 24, Federal Rules of Criminal
 9   Procedure, 24 (c), alternate jurors --
10              THE COURT:  One challenge for every two jurors,
11   alternates.
12              MR. DRATEL:  Right, or for three or four jurors,
13   three or four for two challenges.  But essentially we're not
14   getting any extra peremptories at the main body is what we're
15   getting because at 12 and 7 we're just getting 10 plus 2
16   really is what we're getting; we're not really getting any
17   extra.  I thought we were getting extra to the panel; we're
18   just getting now what we're statutorily entitled to.
19              THE COURT:  What do you mean extra for the panel?
20              MR. DRATEL:  In other words, when Mr. Durkin asked
21   for extra --
22              THE COURT:  Oh, I see, aside from the alternates.
23              MR. DRATEL:  From the 12, yeah, from the main
24   panel.  That's what I thought we were getting.  I guess I
25   misunderstood that.
```

1          THE COURT:  I wouldn't even be going with three

2   alternates except we're coming through flu season right now,

3   and, you know, the length of the case is a little problematic

4   at this point.  The latest submission from the government is

5   six to seven days, excluding jury selection, which basically

6   takes us through the second week; it completes the second

7   week.  Any reasonable estimate?  I'm not asking you to commit

8   to anything, but what's your feeling here?

9          MR. DRATEL:  I think we will probably -- we can do

10  our case within a full week, in other words, you know, a

11  five-day week, I think we'll be done.  I don't know if

12  that -- oh, and the Court -- I think it's a holiday, I think

13  it's Monday, the 18th; is that correct?  That's Presidents

14  Day.  Okay.  So, you know, we might finish that week if, you

15  know, if you go through the 14th with the government's case,

16  starting on the 19th, those four days.  You know, we'll give

17  it a shot.  We don't like to --

18         MR. COLE:  We hope to be done by the 8th hopefully.

19  Our case should be done that -- the week before.

20         MR. DRATEL:  Oh, I'm sorry, sorry.  Oh, that's

21  right, seven days.  All right.  Then we'd definitely be done

22  by the end of that week or the end of the week of the 19th

23  depending on when the government finishes precisely.

24         THE COURT:  Well, if you're done by the 8th,

25  Friday, the 8th, then what you're saying is you'd be done by

1  the 15th --

2           MR. DRATEL:  Yeah.

3           THE COURT:  -- by the next week.

4           MR. DRATEL:  Right.  So the Court's saying the 15th

5  is a calendar day.

6           THE COURT:  It is a calendar day --

7           MR. DRATEL:  So, you know, maybe that week, maybe

8  the beginning of the following week.  But --

9           THE COURT:  I know what the rule says --

10          MR. DRATEL:  Okay.

11          THE COURT:  -- and that's a correct reading of it.

12          MR. DRATEL:  So I don't know if the Court can make

13  adjustment with maybe one additional challenge in that

14  regard.  That's what we'd be asking for, your Honor.  Thank

15  you.

16          THE COURT:  Okay.  So we'll go with 8 and 13, and

17  we'll work with a 36 pack.

18          MS. MORENO:  Thank you.

19          MR. DRATEL:  Thank you, your Honor.

20          THE COURT:  Okay.  I've mentioned this before.  A

21  nonargumentative, neutral statement to be read to the jury

22  panel to acquaint them with the basic nature.  I know I put

23  something together in connection with coming up with a

24  questionnaire, which I'm happy to utilize, but if there was

25  anything that the parties had been working on, you felt you

1  wanted to utilize -- this is under the description of the

2  case on the first substantive page of the questionnaire:

3  This is a criminal case in which the United States has

4  charged four individuals, et cetera.  I'm happy to go with

5  that.  If there's anything else you feel you'd like to work

6  on together, the two sides, to put a little more meat on the

7  bones, would you let me know?

8                MR. DRATEL:  Yes, your Honor.

9                THE COURT:  Thank you.  Okay.  Once again, just

10 getting back to some of these administrative matters, do you

11 have any idea as to how many supporters or spectators from

12 the Somali community may be here?

13               MS. FONTIER:  Your Honor, I think we should expect

14 that the courtroom is going to be full on a daily basis.  I

15 asked them to start coming on the 30th since we will be back

16 in this courtroom, but I would expect that it would be full.

17               THE COURT:  Okay.  I'd like to reserve some seating

18 for -- for any family, friends, and other members of the

19 Somali community.  Obviously we have a limited number of

20 seats here, and I can certainly -- there are what, 36 seats

21 in the back.  We could certainly make a dozen or so

22 available, maybe even more.  Has anyone been working with the

23 community here just in terms of outreach and --

24               MS. FONTIER:  I'm sorry.  I'm very confused as to

25 what your Honor's saying.  I think you were making 12 -- 12

1   seats available to who?

2           THE COURT:  The Somali community, people who can

3   come into the courtroom and -- or more, I mean, if there are

4   seats available, but at least -- at the least, you know, a

5   group of seats.  We're limited here.  It's usually first

6   come, first served, and there will probably be other members

7   of the public who are not part of the Somali community who

8   would want to be here as well.  So I'd like to keep a certain

9   number -- a certain percentage of seats or a certain number

10  of seats reserved for people and perhaps rotate those seats

11  so that if there are people waiting to gain access to the

12  courtroom so they can see part of the proceedings, then

13  everyone has a chance to do that.  I mean have you given any

14  thought to how you'd like to handle that?

15          MS. MORENO:  Well, your Honor, this is the first

16  I've heard of the Court's pleasure, and we can certainly

17  communicate that to the community.  I do agree with Ms.

18  Fontier, there are many, many people in the community who, as

19  your Honor has seen, take a great interest in this case --

20          THE COURT:  Sure.

21          MS. MORENO:  -- and very supportive of these men.

22  But I think that -- all these men have large families

23  themselves individually, so I'm not so sure that 12 seats is

24  going to be sufficient.  But I can certainly communicate to

25  the community that perhaps they can come on alternate days or

1   I'd certainly be happy to liaison --

2            THE COURT:  Well, whatever you can do in that

3   regard would be appreciated.  I would like to create the

4   sense that everyone has a chance at least to see part of the

5   proceedings.  And, you know, I don't want to reserve the

6   entire courtroom, nor could I, just for members of the Somali

7   community, I mean members of the general public.  And there

8   may be some press here, probably in limited numbers, that may

9   want to follow up the trial; you can't bar the press from the

10  courtroom.

11           MS. MORENO:  You can't bar the press, your Honor?

12           THE COURT:  So do what you can.  Reach out a little

13  bit, and I'm certainly open to whatever reasonable

14  suggestions you might have.

15           MS. MORENO:  Thank you.

16           THE COURT:  I just want you to know that I've given

17  that some thought, and I'd like to work with you on that if

18  possible.

19           MS. MORENO:  Will do.

20           THE COURT:  Okay.  I've been through all the

21  deposition testimony already, and I've basically made rulings

22  on the issues that have been identified thus far; I spent a

23  couple of days doing that.  That will probably take some time

24  to go over that.  I'm not inviting additional argument at

25  this point, although there are a couple of points where I'm

1    going to ask counsel for some clarification or some context

2    that might be helpful.  But I think on most of these --

3    frankly, on a lot of them, it seems like the objections

4    should melt away because of other testimony that came in

5    right after the objection or came in at another part of that

6    deponent's testimony that, you know, just eliminated the need

7    for any objection.

8              So I imagine my first question to both sides would

9    be how -- when do you need these rulings in light of there

10   being a few other issues we need to talk about this

11   afternoon; when do you need these rulings for purposes of

12   going forward?  There certainly is quite a bit of testimony,

13   of evidence coming in that's not objected to, the vast

14   majority of it, so you can certainly frame your opening

15   statements as to what's coming in and we can deal with this

16   at a later time after the trial proper starts; or if you feel

17   that you need rulings now, then I need a little indication

18   from you on that.

19             MS. FONTIER:  Your Honor, we don't necessarily need

20   the Court's ruling right at this moment.  The jury -- one

21   thing to keep in mind is that for the objections that are

22   sustained and the portions that were nontestimonial, we do

23   need to edit the video --

24             THE COURT:  Good point.

25             MS. FONTIER:  -- and we need to get those

1   objections out to the tech person who's going to be doing

2   that for us; so there will be at least a -- I think to be

3   safe, you should give us a three-day lag between when we get

4   the objections and when we'll have the videos ready.

5              THE COURT:  That's a very good point.  I was

6   actually thinking about that and forgot to raise it myself.

7   Yeah, you do need time to edit the videotapes.  And that

8   raises the other point, a related point that I observed going

9   through these deposition transcripts.  There's a lot of

10  colloquy between counsel, a lot of underbrush that can just

11  be cleared out.  Were you planning on doing that?

12             MR. DRATEL:  Yes, your Honor.

13             MS. FONTIER:  Yes, your Honor.  What we did when we

14  color-coded them is, at least from the defense perspective,

15  we gave the government a copy that had additional

16  color-coding that was not to your Honor.  There were whole

17  sections that I highlighted -- I think red was my color of

18  choice -- for what just needs to be removed entirely, either

19  objections to form that were sustained --

20             THE COURT:  Yeah, I didn't see that.  You

21  communicated that to the government.

22             MS. FONTIER:  Yeah.  -- or were just colloquy, just

23  talk that was happening while the tapes were rolling.  So all

24  of those have already been marked out on the transcripts that

25  the two parties have.  What we ended up submitting to your

1  Honor was just the highlighted portions that your Honor would

2  need to review and not that we had -- we both agreed that

3  needed to come out.

4          THE COURT:  Okay.  And I really appreciate the work

5  both sides did in getting this to me in the way it was

6  organized.  It was pretty helpful and self-explanatory.  But

7  we've been going at this almost a couple of hours now.  I'll

8  be happy to break for anyone or who needs a bit of a rest,

9  ten minutes.

10          MS. MORENO:  Just ten minutes, your Honor.

11          THE COURT:  Would you like a break, Ms. Moreno?

12  Okay.  And maybe these gentlemen would as well.  Let's take

13  ten minutes then and then resume promptly.  Thank you.

14      (There was a break in the proceedings.)

15          THE COURT:  Okay.  All counsel are present, and we

16  have defendants present as well.  Mr. Durkin, we've been

17  talking about administrative matters, scheduling, you know,

18  we've kind of drifted into a few substantive areas, we'll

19  probably get into substantive areas as well if we're talking

20  about rulings on deposition testimony.  Are you -- is it

21  still your intention to waive the interpreter's presence for

22  your client?

23          MR. DURKIN:  Yes, sir.

24          THE COURT:  Okay.  You've discussed this with him

25  as well?

1              MR. DURKIN:  Yes, he understands.  He's -- he'll --

2    he has a pretty good command of English, and if he needs

3    anything, he's going to let me know.

4              THE COURT:  Very good.  Okay.  Well, Ms. Fontier,

5    getting back to you and your need to get the deposition

6    transcripts in order, how much -- I'm certainly happy to

7    spend time now going over these rulings if you feel that

8    would be helpful, or if Monday is too -- is sufficient time,

9    although we're going to be busy Monday and Tuesday with jury

10   selection -- the next possible time would be Wednesday.  You

11   want some rulings at this point?

12             MS. FONTIER:  No, your Honor.  I think Monday would

13   be fine.  And maybe just so that --

14             THE COURT:  I don't --

15             MS. FONTIER:  -- maybe as things slow down, maybe

16   we can just address it while the jury's filling out their

17   questionnaires.  We can go through it when we all have our

18   transcripts and are ready to go.

19             THE COURT:  I don't know that we'd have space to do

20   what.  Where were you anticipating doing that?

21             MS. FONTIER:  On the floor?  I don't know.

22             MR. COLE:  One suggestion -- again, your Honor may

23   know better maybe sort of timing-wise -- but as I understood

24   it, the jury's going to be excused, we're going to come back

25   in and go over the questionnaires like about 1:30 on Monday.

1    If that goes all the way to five o'clock, we'll have a little

2    extra time, but if that doesn't go all the way to 5:00, we

3    could have time Monday afternoon to turn to the jury

4    questionnaires, that prereview of the questionnaires, and

5    turn to the deposition transcripts at that point.  The jury

6    will be gone for the day.

7            MS. FONTIER:  Right.

8            THE COURT:  Well, we have to review all the

9    transcripts; keep that in mind --

10            MR. COLE:  Right.

11            THE COURT:  -- and that's going to take some time.

12    If we get those back by let's say 1:30 -- let's say we have

13    60 -- it's going to take I would think a minute or two to go

14    through each one of those to see if we can red-flag, if they

15    should be red-flagged.  So it's going to be somewhere between

16    an hour and two hours just to go over those, and it may be

17    more than 60 we're looking at.  So it's going to be 3:30 or

18    so probably earliest when we're ready to identify those

19    jurors who can be excused for cause and need not come back

20    based on their questionnaires.  Ms. Fontier?

21            MS. FONTIER:  Your Honor, I don't know if Ms. Han

22    and Mr. Cole are planning to man the photocopiers themselves,

23    but there's probably at least going to be an hour and a half,

24    hour, hour and a half break while all the photocopies are

25    getting done.  If Mr. Ward can run the photocopier, maybe we

1  can go through the depositions.

2          THE COURT:  Oh, the slings and arrows of outrageous

3  fortune.  You're being very patient with all of this.

4          MS. FONTIER:  I'm sure that's why he came from DC.

5  Seems like we may have a break somewhere in there on Monday

6  to do it.

7          THE COURT:  Well, that's fine.  They're done and

8  ready to go, so if you're comfortable with going over those

9  Monday or Tuesday, we can defer the individual rulings.

10         Couple of issues arose looking at the trial briefs

11 that came in, particularly the brief, trial brief of the

12 government.  You know, there were some additional either

13 requests -- Mr. Cole, if I can focus my comments at this

14 point for you, or Ms. Han if you prefer.  There were some

15 requests that sort of sounded in the nature of motions in

16 limine -- Mr. Ward, I wasn't meaning to ignore you, but I

17 think -- any one of you can step up.

18         Anyway, it seemed like there was some motions in

19 limine type requests or concerns, there were some categories

20 of evidence that were identified as not being admissible

21 under the rule of completeness or under 803 (3), so those

22 issues have been more or less joined in a very general way.

23         MR. COLE:  I'm sorry.  The government's intention

24 in that was just to brief legal matters in the trial memo,

25 not to ask you to address a specific issue --

1              THE COURT:  Okay.

2              MR. COLE:  -- until one arises.

3              THE COURT:  Okay.  May I just share some of my

4    thoughts here after going through your brief?  I think that

5    within the context of this case, you may be giving Evidence

6    Code Section 106 and the rule of completeness a bit too

7    narrow an application.  I don't know what is contained -- I

8    mean I haven't gone through all of the intercepts; I've seen

9    some of them, many I have not seen.

10             I think when we're talking about the confluence of

11   106 and 803 (3), a statement made evidencing an existing

12   state of mind, ultimately my sense is that a lot of these

13   statements made by defendants are going to come in under one

14   section or the other.  You know, cases like Ortega and

15   Collicot and maybe a few others dealt with scenarios where --

16   well, let's take Ortega, for example.  You had a confession,

17   you had a full-blown confession that was recorded.  It was a

18   drug case, and I guess it was kept out in the government's

19   case-in-chief; it came in, because there had been a Miranda

20   problem, on rebuttal or for impeachment purposes later, but

21   then there was the statement that was made by Ortega that he

22   wanted to come in, and that related to how he had acquired

23   the gun in the case, his cousin had given him the gun to

24   shoot chickens or something like that, and -- as if that were

25   an exculpatory matter.  I mean if he had a gun, the gun was

1    with the drugs, he had possession of both the drugs -- the

2    methamphetamine -- and the firearm.  So he wanted that to

3    come in because without that the confession would be

4    distorted somehow.  I mean I could certainly see the wisdom

5    of keeping it out.  It didn't distort his confession, it was

6    something else entirely.  And it didn't tend to mislead the

7    jury on the nature and effect of the confession that he made.

8              In this -- in these tapes and in this case, it

9    seems to me we're dealing with a different kind of statement.

10   A lot of these statements are verbal acts.  They seem to have

11   independent legal significance.  They're not being offered

12   for the truth of the matter, they're being offered for

13   another purpose.  Now, they have independent legal

14   significance.  Your -- I mean that's an argument you want to

15   make for the statements that you want to have admitted.  But

16   if, for example -- to take this away from this particular

17   context -- the sale of Blackacre:  A offers to sell Blackacre

18   to B, and Blackacre says I accept.  You know, each one those

19   statements have independent legal significance, offer and

20   acceptance.  Many of the statements here that the government

21   will use against individuals, defendants I'm assuming, have

22   independent legal significance.  This money is for the boys

23   with the bullets or a statement, coming back, this will --

24   this will go for our efforts against the Ethiopians or bombs

25   will be purchased, whatever.  Those are independent legal --

 1   verbal acts that have independent legal significance.
 2   They're not really being offered for the truth of the matter
 3   but the fact that they were said and they're indicative of
 4   certain knowledge and a certain intent.
 5           If you have statements made by the same individuals
 6   that indicate a different intent and are reflective of a
 7   then-existing state of mind, it doesn't seem to me that
 8   they're being offered for the truth of the matter.  Now, they
 9   may contain -- they may be a -- it may be a hybrid statement;
10   it may -- part of the statement may be offered for the truth
11   of the matter, but part of the statement is a directive, for
12   example:  Don't use this for bullets, direct this to drought
13   relief.
14           Your -- I get the impression going through your
15   papers here, your trial brief, that you would object to a
16   statement made at or about the same time that these
17   conversations are taking place by a defendant, "This is to go
18   for drought relief," you would object to it on the basis of
19   hearsay, self-serving hearsay, and that it's not part of any
20   rule of completeness.  So I wanted to give you an -- excuse
21   me for the interruption -- I wanted to give you an
22   opportunity to respond to that.  That's part of the issue I
23   had or the concern I had going through your trial brief and
24   some of the deposition testimony as well.
25           MR. COLE:  Okay.  What the government was most

1    concerned with is the notion -- and I'm not trying to put --

2    I'm not saying this has been the defense's position because

3    they haven't stated it this way, but I've had it stated this

4    way many times in other cases, that because something is

5    played from a tape, it therefore follows that the whole tape

6    falls under the rule of completeness, or because something is

7    played from this recording, this jail call -- just to take it

8    out of context -- I'm going to play those other jail calls.

9    And the government's main point is that -- which perhaps

10   isn't in dispute -- but is that that's not how it works;

11   there has to be a determination that that other portion -- if

12   it's admissible in its own right unrelated to the rule of

13   completeness because it's not hearsay, if it's not hearsay,

14   then our rule of completeness argument isn't going to matter

15   anyways because it's not hearsay.  So if it's an imperative

16   or if it's a question or if it's something that doesn't even

17   qualify as hearsay, then obviously they could admit it

18   without the rule of completeness; but if it's hearsay, our

19   point was simply that we would want a determination that that

20   portion they seek to admit in fact -- in fact corrects a

21   distortion that would otherwise occur.

22           And the reason that's important is because what we

23   understand the defense wants to do is play phone calls that

24   we're not playing at all.  Now, it may be that they can

25   convince the Court that those phone calls aren't hearsay for

1   some other reason apart from the rule of completeness, but if

2   they want to play a phone call of their own client that we're

3   not even playing, therefore, it isn't -- it isn't the case

4   that we spliced the call right in the middle to make sure

5   they didn't hear the part where he said when I say blue, I

6   mean red, then there needs to be a determination well, how is

7   that call -- how does that call clear up a distortion in us

8   playing only a portion of the second call?  And unless that's

9   the case, we shouldn't be talking about the rule of

10  completeness, we should only be talking about some other

11  independent basis for them to admit the call as nonhearsay if

12  they can.

13         And we think that calls, for example -- and this is

14  a -- at this point we start talking about hypotheticals; this

15  is sort of in a vacuum for your Honor, I understand, because

16  we haven't put any concrete --

17         THE COURT:  May I stop you for just moment --

18         MR. COLE:  Yes.

19         THE COURT:  -- and let's stay on the rule of

20  completeness first.  And it's judicial gloss that has created

21  this -- this reference to distortion, the other part of the

22  tape can be played if the initial part would distort the

23  meaning.  And if you look at those cases, I think those cases

24  -- that doctrine arose within the context of criminal cases.

25  You have a confession on it, yeah, I knew there were drugs in

1   the car, whatever, but, you know, I had this -- I had this

2   meeting with this guy and gosh, yeah, he told me -- you know,

3   then in comes the exculpatory part.  The exculpatory part

4   just, you know, the allegedly exculpatory part, doesn't

5   really distort the confession when it comes to knowledge of

6   the drugs.  And so I think the -- I think the rule of

7   distortion was probably developed judicially specifically for

8   cases where you have a confession and then you have the

9   so-called extenuating circumstances, you have the defense,

10  you have the excuse -- no, that doesn't come in.  I mean

11  defendant's got to take the stand if he wants to have that

12  type of evidence come in.

13          If you're talking about -- once again, if you're in

14  the realm, even if it's a criminal case, where you're not

15  talking about confessions, you're talking about statements

16  that are made that are evidencing a certain intent that are

17  going to be used by the government against an individual, I

18  think that other statements related to that particular intent

19  at or about that particular point in time may well have a

20  stronger argument for admission under the rule of

21  completeness than in those cases that created this

22  distortion/judicial gloss under 106.  106 says nothing about

23  distortion, does it?

24          MR. COLE:  Well, it doesn't say anything about

25  distortion, but it says that the Court determines in fairness

1    I believe is the word --

2              THE COURT:  Exactly.

3              MR. COLE:  -- used, "in fairness," and I think the

4    Courts look at well, what does fairness require, and --

5              THE COURT:  Right.

6              MR. COLE:  -- and guess the point I'm making

7    though, your Honor, is I would argue if the call -- and

8    again, if the defense has a basis that the Court agrees with

9    that -- let's take a call that isn't played at all by the

10   government.  If defense has a basis for saying it's not

11   hearsay, so be it, you know, we'll object, and if the Court

12   finds it's not hearsay, this discussion's over.  But if

13   it's -- let's take, for example, if they have an independent

14   call at some other time, not the call we're playing, where

15   they're talking about funding an orphanage, unless they can

16   show -- and they want to rely on the rule of completeness,

17   okay -- unless they can show that it is truly a distortion or

18   not fair because that is in fact about the same conversation

19   they're having here or it is in fact the context for this

20   call, then if they want to make that link without showing

21   that -- that connection to the call we're playing, then the

22   defendant ought to make that link on the stand under

23   cross-examination because otherwise all you have is

24   independent calls where they're talking about another call, a

25   different call, where they're talking about fundraising for a

1    different purpose.  And if they can put that in, the jury
2    never gets to have the defendant cross-examined on what that
3    actually related to, what the state of mind actually was;
4    they're just putting in hearsay calls that are then used to
5    claim that that somehow --
6         THE COURT:  No, it's not a hearsay.  Would it be
7    hearsay or would it be a statement of intent at a particular
8    point in time and therefore admissible under 803?  The
9    question -- 803 (3).  The question becomes whether or not
10   it's relevant.
11        MR. COLE:  Yes.  Well, it's relevant -- if it's not
12   offered for its truth, then they have to show its relevance,
13   and it's relevant then -- how do they show that relevance
14   without cross-examination of the declarant?  Unless your
15   Honor can see the relevance on its face because it's about
16   the same thing they're discussing in our calls, then it won't
17   be relevant except for its truth is our point.  And so -- and
18   the jury -- anyways, that was the thinking is -- I don't
19   disagree with -- I just -- the government anticipates a fair
20   amount of this coming up and just wanted to lay out, in our
21   mind at least, the different buckets that -- you know, that
22   we need to walk through.
23        THE COURT:  And in this area of relevance, you've
24   taken a fairly narrow view as well, and I don't mean that in
25   a critical way, but, for example, you were objecting in the

1  deposition transcripts to some of the colloquy undertaken

2  between the deponent and one of the defendants -- usually it

3  was defendant Moalin -- and it was related to, you know,

4  drought relief efforts or orphanage issues, or those kind of

5  things.  You were saying that that's -- you were objecting on

6  the basis of relevance because it had nothing to do with the

7  specific calls or contributions that were -- that are the

8  subject of the charging indictment.  So you're saying look,

9  if it doesn't have -- if you can't nail this particular

10 conversation to a particular donation or amount of money that

11 was sent at a particular point in time, then it's not

12 relevant.  I don't know that I draw relevance as narrowly as

13 you're indicating.

14          If you have a statement, if you have a -- and we've

15 already been through this in motions in limine -- you have a

16 conversation relative to a particular donation being made and

17 that there's a call relative to that donation, there's

18 discussion about an orphanage or discussion about drought

19 relief at about the same point in time --

20          MR. COLE:  Sure.

21          THE COURT:  -- then the question -- and it's not

22 really hearsay, it's a directive, it's an imperative.  So

23 it's not really offered for the truth of the matter, it's

24 just being offered for the fact that it was in fact made,

25 it's indicative of money being sent for a particular purpose

1    having nothing to do with al-Shabaab and is at a relatively

2    relevant point in time reflective of the state of mind.

3    Okay, fine, that may come in.

4            MR. COLE:  Understood.  Understood, your Honor.

5    And I guess though -- you know, interesting point about those

6    depositions -- and the defense may disagree, may see them

7    differently -- but of all those witnesses, no one, not a

8    single one of them ever even ventured to claim that any of

9    the transactions that we allege in the indictment were

10   received by them or that they knew -- or that they could

11   account for where that money went.  So you have this penumbra

12   of help for the poor all building -- being built up.  And I

13   understand it's relevant; I understand that's their defense;

14   I'm not seeking --

15           THE COURT:  Doesn't that get to the credibility of

16   the deponents?

17           MR. COLE:  Right.

18           THE COURT:  As they're saying, they've never taken

19   up arms and aligned with al-Shabaab, they've never, you know,

20   done anything, they've never engaged in any bad acts, they've

21   all been, you know, pure in thought and deed.  I mean I could

22   sense the frustration you were having, particularly with

23   Hassan at the end of your examination of him.  But that kind

24   of goes to credibility and the jury's assessment of all the

25   evidence, doesn't it?

1              MR. COLE:  We are not -- it may sound like we're

2      trying -- perhaps -- we are not trying to be that strict

3      obviously with our view of relevance.  We know the defense is

4      going to be, to some extent, based on the notion that this

5      was for -- this money was for charity, and that's their

6      defense and they ought to be able to present their defense.

7      And we will be playing in our own case calls that have

8      references to the ILYAS Foundation or the drought that was

9      going on and their concern over that.  And -- but to --

10     without the defendants taking the stand, there has to be a

11     limit to the extent -- well, without the defendants taking

12     the stand or some witness who's actually -- well, who else

13     can speak to their intent other than the defendants?  But in

14     any event, without someone taking the stand at some point,

15     how many times are they going to play a call --

16             THE COURT:  Well, no one has to speak to their

17     intent.  The intent may or may not be there based on -- I

18     mean intent may be inferred from the other evidence.

19             MR. COLE:  Yes.

20             THE COURT:  And you're going to have the

21     depositions coming in in any event.

22             MR. COLE:  Yes.

23             THE COURT:  All right.  So in a sense those are

24     people taking the stand or whose testimony is going to be

25     considered as if they had taken the stand.

1           MR. COLE:  Yes, right, right, right.  But -- well,

2    maybe enough's been said.  I just -- I just think the point

3    is though is that as long as the Court -- it sounds -- the

4    Court already obviously understands and has thought through

5    this whole issue.  So as the calls come up, I'm sure the

6    Court will make appropriate rulings.

7           THE COURT:  Yeah, you know, and the calls are going

8    to come up, the statements will be there.  Some of them may

9    be hybrids, some may come in, some may not come in, parts of

10   others may come and in with --

11          MR. COLE:  Sure, right.

12          THE COURT:  -- others excluded.  But to the extent

13   that the trial brief seem to take a pretty firm stance on any

14   other calls being automatically hearsay or outside the rule

15   of completeness, I wanted to raise that issue now because I

16   think there are grounds which arguably may sustain the

17   admissibility of what I anticipate is going to be proffered

18   by the defense by way of some of these calls and some of the

19   deposition testimony as well to which you objected.  Just a

20   bit of a head's up.

21          MR. COLE:  Okay.

22          THE COURT:  The other thing -- I wanted to mention

23   one other thing.  I want to revisit the al-Qaeda issue.  And

24   help me out with this.  I go through -- I go through this

25   entire binder of deposition transcript material, and correct

 1   me if I'm wrong, but I didn't see one reference to al-Qaeda
 2   in any of the questions or any of the testimony given.  Am I
 3   correct in that?
 4        MR. COLE:  I assume you're right.  I don't recall
 5   any specific reference.
 6        THE COURT:  I was looking for it.  I may have
 7   missed it, got a little bleary eyed the second day of going
 8   through that, particularly because of the structure of some
 9   of the Q and A and a lot of the colloquy -- I know it's going
10   to be swept out -- I tried to catch everything.  Here's my --
11   what I want to discuss with you.
12        Initially when we were discussing motions in
13   limine, I said okay, a reference to al-Qaeda may be made by
14   Bryden because apparently he's going to refer to al-Qaeda
15   somehow in the overall structure, history, culture of some
16   al-Shabaab kind of connection, so on and so forth.  I see --
17   I see no connection mentioned in any -- any of the material
18   before me, any of the evidence before me at this point, so I
19   question the value, the probative value, of a quick reference
20   to al-Qaeda by Mr. Bryden as he's playing out his testimony
21   in this case; I'm assuming he'll testify.  Is the probative
22   value outweighed by undue prejudice here?
23        We know the mention of al-Qaeda is a hot-button
24   deal; I mean we have to recognize that.  We've -- I know
25   we've all seen links -- well, we've all seen al-Shabaab

1    referred to at one time or another in news reports as an

2    al-Qaeda affiliate or linked to al-Qaeda.  I don't know

3    exactly what that means, but at this point I'm thinking you

4    know, I've been through all the deposition testimony, I've

5    been through some of the calls, not all of them by any

6    measure, I've seen no reference to al-Qaeda.  I saw no

7    questions related to al-Qaeda.  I saw questions related to

8    Ethiopia and to a myriad of clans and subclans and

9    sub-subclans, to the Union of Islamic Courts, to Ethiopians,

10   to militias, police forces in the Galguduud region -- I mean

11   so many different groups.  There's no evidence that any of

12   these individuals, the players, including some of the alleged

13   bad guys that you may have deposed, that they ever got any

14   training from al-Qaeda, that they were supported by al-Qaeda,

15   they weren't -- go ahead.  I've said enough.  You know my

16   concern.

17            MR. COLE:  I know where you're at.  Two things.

18   First, there would be no reason for us to ask any of those

19   deponents that.  These are the defense's witnesses.  We're

20   not accusing those defense witnesses of anything.  Those

21   really aren't bad guys; they're the people they've proffered

22   up to show the defendants are good guys.  And we had a --

23   Hassan Guled, for example, was proffered by the -- or was

24   presented by the defense to claim that he is the person they

25   were speaking to on the phone, that he is Sheikalow; that's

```
1    the reason that he testified.  We have no reason to accuse

2    Hassan Guled, the man who's shown in deposition, of being

3    part of anything wrong.  We now have to show the jury that

4    when they claim that he's Sheikalow on the phone, that's

5    nonsense.  And that's what we intend to strive to do in our

6    case.

7             So the fact that there's no reference of al-Qaeda

8    in depositions shouldn't be used, in my view, as any

9    barometer because those witnesses were selected by the

10   defense, the reason they're being called has nothing to do

11   with the reason that we want to make a reference to al-Qaeda

12   in the case.  The calls actually do, but I want to -- the

13   calls actually -- the calls themselves, there actually are

14   references to al-Qaeda.  There's one in particular --

15             THE COURT:  The calls what now?

16             MR. COLE:  The calls actually do have reference to

17   al-Qaeda.  There's one call in particular where Aden Ayrow --

18   the defense would say Hassan Guled -- complains that his

19   enemies --

20             THE COURT:  Whoa, whoa, defense wouldn't say Hassan

21   Guled, would they?

22             MR. COLE:  Well --

23             THE COURT:  Aden Ayrow is not Hassan --

24             MR. COLE:  No, no, no.

25             THE COURT:  Sheikalow --
```

1          MR. COLE:  Sheikalow, the person in the phone call,

2    who is always called Sheikalow -- well, not always called

3    Sheikalow but typically called Sheikalow, our argument to the

4    jury is that's Aden Ayrow; that guy -- that's a code name for

5    Aden Ayrow.

6          THE COURT:  That I see in the papers, okay.

7          MR. COLE:  Their argument to the jury is that's

8    Hassan Guled, the guy you saw testify on the deposition.  And

9    so that now puts into play -- that now requires us to

10   convince the jury that the person who testified at the

11   deposition, that's not the guy on the phone, that's not

12   Sheikalow on the phone, and here's all the reasons you can

13   conclude that.  You have to now listen -- we have to now go

14   through the calls and explain why the references in the calls

15   make no sense whatsoever that they would relate to this

16   Hassan Guled, who is proffered as this clan police chief.

17   And one of the calls, for example, that is in the case, it

18   talks about Aden Ayrow, Sheikalow, complaining that his

19   enemies are accusing him of being al-Qaeda, and chasing him

20   to the ends of the earth.  Okay.

21          But even backing up from the calls, the reason --

22   the reason is we articulated before; the reason that the

23   al-Qaeda link is most relevant for us is for a limited

24   reason, and you're not going to see it all over the case

25   because we -- well, one, we know you don't want to see it all

1   over the case and it should only be there to the extent that
2   it is probative, and we don't want to overdo it.  But here's
3   the thing.  The defense pointed out in their motions in
4   limine that they're -- they're putting a tremendous amount of
5   significance on the date of the designation and were even
6   arguing in their motions in limine, which have been ruled on
7   now, but arguing that stuff that happened before the
8   designation date is somehow not criminal or it was perfectly
9   fine to send money to al-Shabaab before that, it couldn't be
10  criminal until February the 26th or March the 18th when it
11  was publicized, and that time period from December 21st --
12  well, in the indictment it's beginning on a date unknown, but
13  the first audio call being December 21, 2007 -- that time
14  period from December 21, 2007 to March 18th when the
15  designation is published in the Federal Register, that is in
16  play for the government, that is in our offense conduct.
17  That period is charged -- it's not charged under 2339 (b) but
18  it's charged under other counts in the indictment, and there
19  those counts, the count 2339 (a) and the money laundering
20  conspiracy with that (a) charge as a predicate and then the
21  substantive 2339 (a) count, that does not require proof of
22  giving money to al-Shabaab; that requires proof of giving
23  money to support the predicates we allege, which is killing
24  overseas and use of a weapon of mass destruction.  And so
25  therefore to limit us only to al-Shabaab -- we want to prove

1    knowledge, that these men had knowledge, and we want to make

2    that argument circumstantially, we want to put in the

3    references to al-Qaeda to show the jury that Aden Ayrow, who

4    they were giving money to then, they were giving money to

5    Aden Ayrow in that window of time before the designation,

6    that Aden Ayrow had links to al-Qaeda that were known, that

7    were leading to his notoriety and fame, and therefore we can

8    argue inferentially to the jury that when they gave money to

9    him, of course they had the intent to kill.

10         THE COURT:  What's the evidence that he had -- that

11   Ayrow had a link to al-Qaeda --

12         MR. COLE:  That will become --

13         THE COURT:  -- the statement he made, my enemies

14   are accusing me of being al-Qaeda?

15         MR. COLE:  No, it would be the testimony of -- the

16   expert testimony concerning the history of al-Shabaab and

17   Aden Ayrow and the, you know, what was being -- you know, it

18   will be -- the expert testimony will be.  And so that's the

19   only place -- other than a passing reference in a phone call,

20   the only place we're going to bring up al-Qaeda by name, any

21   reference to it like that, will be during the testimony of

22   Matt Bryden briefly, and it's not going to be dwelled on,

23   it's not going to be extensive, but it's going to be

24   saying -- it's going to be -- basically, the reason we're

25   bringing it up is to tell the truth.

1            THE COURT:  But what's the probative value of it?

2    I mean you've got Ayrow as one of the leaders of Shabaab;

3    even the deponents are saying he's Shabaab, and the defense

4    isn't taking issue with Shabaab being a terrorist

5    organization or certified as such as of February 26, '08 and

6    then later published.  So you've got -- you've got al-Shabaab

7    as a terrorist organization, you've got Ayrow -- everybody

8    agrees Ayrow -- I assume everybody agrees Ayrow is Shabaab

9    and affiliated with a terrorist organization.  What is the

10   probative value of a very brief mention of al-Qaeda --

11           MR. COLE:  Well, if --

12           THE COURT:  -- by an expert witness?

13           MR. COLE:  If the defense is going to agree -- or

14   will they argue against -- that if we prove they were giving

15   money to Aden Ayrow -- if the jury concludes that Sheikalow

16   in December or January or February, before the designation,

17   that if we convince the jury that it was Aden Ayrow they're

18   giving money to, that it follows automatically that these

19   defendants gave the money with the intent to kill and use

20   weapons of mass destruction in Somalia, if they're ready to

21   go there and stipulate to that, then we don't need any

22   reference to al-Qaeda.  But if they're not going to stipulate

23   to that, then we've got to convince the jury what a person in

24   their situation -- excuse me for pointing -- what a person in

25   the defendants' situation would know and intend when they

1   give money to a man with his reputation, history, and

2   background.  You intend the natural consequences of your

3   actions.  And so I've never heard the defense say --

4          THE COURT:  What is the testimony -- Mr. Cole, what

5   is the testimony going to be with respect to Ayrow's

6   background?

7          MR. COLE:  It's laid out in the trial memo.  It's

8   just -- it's going to be that he trained in Afghanistan, that

9   he grew up in the Council of Islamic Courts, that he harbored

10  al-Qaeda operatives and therefore had his home attacked.

11         THE COURT:  And this is based on what now --

12         MR. COLE:  Expert testimony.

13         THE COURT:  -- on Bryden?  This is Bryden's going

14  to testify?

15         MR. COLE:  Yes.  And it's limited to what's in the

16  trial memo.  There's not going to be any visuals of people,

17  dead people, or there's not going to be a picture of bin

18  Laden or Zawahiri or anyone from al-Qaeda.

19         THE COURT:  To whom did Ayrow make the statement

20  "even my enemies" -- well, you made that reference earlier --

21  even my enemies accuse me of being al-Qaeda.

22         MR. COLE:  That's a gross -- I mean that's a

23  paraphrase.  But the word "al-Qaeda," I mean I can't remember

24  the exact wording, but -- I actually might be able to find

25  it; I have the calls.  But the word "al-Qaeda" is right

1   there, and it's in the context of saying I'm being -- they're

2   accusing me of being al-Qaeda.  That's to Mr. Moalin.

3           THE COURT:  Who did he say that to?

4           MR. COLE:  Mr. Moalin.  Well, again, the defense

5   would say that was Hassan Guled, the police commissioner, who

6   said that, but we say it's Aden Ayrow who said that.  And --

7   and we understand.  I mean this is not --

8           THE COURT:  Tell me what that conversation was --

9   refresh my memory -- after Ayrow made that -- allegedly made

10  that statement to -- to Mr. Moalin you indicated?

11          MR. COLE:  Yes.

12          THE COURT:  Okay.  What was --

13          MR. COLE:  All of his statements were to

14  Mr. Moalin.

15          THE COURT:  Okay.  What was -- right after that --

16  that statement by Ayrow where he mentioned al-Qaeda, what was

17  the rest of the conversation; do you know?

18          MR. COLE:  We'll have to try to find it.  I have to

19  find -- I mean I know -- he would have long conversations

20  with Mr. Moalin about the state of affairs, disagreements

21  between Shabaab's position and the Alliance for the

22  Reliberation of Somalia, different -- Ayrow would and

23  Mr. Moalin would debate and discuss whether Shabaab should

24  agree with certain people in Somalia or not agree, whether

25  certain clan members were or were not hypocrites because of

1    the positions they were taking, and they would have these

2    conversations.  And Aden Ayrow would frequently complain that

3    he felt that he -- that he was -- that the clans or the

4    people in Somalia were siding with people who were weak or

5    who were hypocritical who were off flying to foreign

6    countries to meet with foreign people while he's back at home

7    actually doing the fighting.  And there's -- here it is.

8    This is a -- specifically this is a January 20th call,

9    January 20th at 1718, and he says about -- this is Sheikalow,

10   okay, who we say is Ayrow -- "about the disagreement, the

11   disagreement, we are wanted because of our beliefs.  How can

12   we sit with someone who's looking for us, killing us, and

13   claiming he is fighting al-Qaeda?"  And Mr. Moalin, "uh-huh,"

14   says "uh-huh."  And then Sheikalow goes on:  "What are we?

15   Am I a devil?  I prefer Abdullahi Yusuf" -- who was the

16   president of the TFG at the time -- because he's a powerful

17   man who's working with Ethiopians and not with them.  And

18   what he's saying is -- the context that of that call is that

19   Ayrow's saying I'd rather deal -- I'd rather deal with the

20   president of Ethiopia than my fellow jihadists who are off in

21   this other group trying to seek a peace accord -- because

22   they were off trying to have peace talks, this Alliance for

23   the Reliberation of Somalia, and he's basically saying I

24   don't want anything to do with those people, they're out

25   there isolating me as the guy who is al-Qaeda while I'm out

1    here doing the real fighting.  That's what the context, as we

2    read the calls, is basically saying.  And, you know, here we

3    have them claiming this is the police chief of the small town

4    of Guriel supposedly having these conversations.  We need to

5    be able to argue this to the jury and explain why all of

6    these -- why they should -- this is -- after they hear Matt

7    Bryden testify and hear other evidence, they need to be able

8    to hear these calls and say is this Aden Ayrow on the phone

9    or is this Hassan Guled, and --

10           THE COURT:  What is -- you're confident Bryden has

11   a foundation, a sufficient foundation for testifying that

12   Ayrow was linked to al-Qaeda?

13           MR. COLE:  Yeah.  And on that score, your Honor, we

14   think that Mr. Bryden -- and of course the defense will I'm

15   sure have their own opinion and will want to cross-examine

16   him -- but we think he's a preeminent expert in the area.

17   It's been his life's work.  And not only that, the truth --

18           THE COURT:  What does he base that on?  What does

19   he base that opinion on?

20           MR. COLE:  Years of research.  He was the U.N.

21   Security Council Chief Monitor for Somalia for an extensive

22   period of time, attempting to monitor the trafficking of arms

23   in Somalia, the insurgent groups in Somalia for the U.N.  He

24   was -- he was -- that was his work was to be there studying

25   everything he could about the conflict, why it was happening,

1   and what could be done to improve the peace and security of

2   the region.

3          And I'll tell you, your Honor, the truth of it

4   isn't even what's relevant because we're offering it for

5   knowledge and intent.  It doesn't even matter if everything

6   that was reported about Ayrow is true.  What matters is what

7   he was famous -- what he was known for because that's what

8   goes to knowledge and intent.  And so, you know, that's the

9   realm of this is the who he was, what his public image and

10  notoriety and reputation was because that is what would go to

11  knowledge and intent.

12         MR. DRATEL:  Just, your Honor -- may defendants

13  briefly respond, your Honor --

14         THE COURT:  Sure.

15         MR. DRATEL:  -- all points?  First, to permit

16  the -- well, for the government to argue to the jury that at

17  the end of this case that the defendants would be guilty of

18  violating 2339 (a) because they gave money ultimately for the

19  purpose that had anything to do with al-Qaeda would be an

20  amendment of the indictment of serious degree.

21         THE COURT:  I don't think that's what Mr. Cole

22  intends to do --

23         MR. DRATEL:  Well --

24         THE COURT:  -- and I don't think -- I don't get

25  that sense at all.

1           MR. DRATEL:  Okay.  But I think that's where it's

2    going because we've heard this -- that they need that to show

3    that that's -- that they can prove the 2339 (a) even if it's

4    not -- even if al-Shabaab isn't designated; so that's number

5    1.

6           Number 2 is it highlights dramatically the need to

7    define the 956 conspiracy now before we go to trial, to make

8    them do it, because otherwise the 956 conspiracy can mean

9    anything they want it to be whenever the case ends, and

10   that's a big problem.

11          Second, the 2339 (a) charge, the government wants

12   to merge it with (b) and say it's to a organization.  It's

13   not about an organization.  That's why there's a specific

14   intent requirement.  You can give money to any organization

15   under (a) if you have the specific intent that it not -- or,

16   rather, if you lack the specific intent to do it criminally,

17   in other words, to kill, maim, murder, et cetera.  So it's

18   not tied to an organization specifically; it's about the

19   purpose of the material support, you know, what's defined as

20   material support.  It's not about where it goes; it's about

21   why it goes.

22          Third -- fourth is it's bootstrapping to such a

23   significant degree in the sense that to take al-Qaeda, the

24   most toxic two words you can have in a courtroom, and use

25   that to bootstrap a failure, number 1, to prove the purpose

1    of these donations at a time when al-Shabaab is not

2    designated; and second, to be a substitute for the fact that

3    they can't prove it's Aden Ayrow on the phone calls.  This is

4    what this is about.  And that particular phone call, it's the

5    exact opposite inference that's reasonably drawn.  When he

6    says people that claim me I'm al-Qaeda, he says I'm not

7    al-Qaeda; that's what he's really saying in that

8    conversation.  They claim -- how do I sit down with a guy who

9    claims that I'm al-Qaeda.  You wouldn't sit down with someone

10   who claims you're al-Qaeda if you're al-Qaeda.

11          THE COURT:  What Mr. Cole is saying is, you know,

12   he might have been disclaiming it then, but there's going to

13   be evidence that he was in fact al-Qaeda.

14          MR. DRATEL:  I understand that, but --

15          THE COURT:  You're saying he can't prove --

16   ultimately he can't prove that.  But should this Court say

17   well, because there's a chance you won't prove it, you can't

18   mention it?

19          MR. DRATEL:  No, no, but if this claim -- we're

20   talking about the inference is not about him saying I am

21   al-Qaeda, it's the opposite.  But the other part is I would

22   also object to Mr. Bryden -- well, let me put it this way,

23   that it would be -- it would be Rule 29 territory if they

24   come in with Mr. Bryden saying what's rumored about Aden

25   Ayrow, they can't prove that it's true, that somehow the

1    defendants are saddled with rumor as opposed to what's true,

2    sort of they're supposed to believe every rumor they hear

3    about everything, and that puts them on notice with that

4    knowledge and intent, as opposed to what they might know or

5    what's proven.  That's an extraordinary leap here.  So in

6    other words, his reputation is X.  Doesn't matter what it

7    really is and that they might know something different than

8    what his reputation is or may not believe that reputation

9    when they act, but that reputation would serve as adequate

10   notice to satisfy the intent element, that to me is just not

11   permissible.  So those are -- I think I've covered my

12   grounds.  Thank you, your Honor.

13            THE COURT:  Okay.  No need to respond.  I just

14   wanted to point out a couple of concerns I had; I did that

15   with the issues that were referred to in the brief on the

16   rule of completeness and the 803 (3) issues.

17            Okay.  It's pushing four o'clock.  I can begin to

18   go over some deposition rulings if you'd like at this point,

19   or if you'd like to call it, we can call it at this point.

20            MR. DURKIN:  Judge, could I be heard on one issue?

21            THE COURT:  Sure.

22            MR. DURKIN:  I'd like to tender you a document I

23   just got.

24            THE COURT:  Has the government seen this?

25            MR. DURKIN:  Yes, I've given this to Mr. Cole.

1   This is a death certificate of my client's three-year-old

2   daughter, Judge, who died on November 19, 2012.  As you can

3   see at the bottom where it says cause of death, severe acute

4   malnutrition.

5            THE COURT:  My sympathies to your client.

6            MR. DURKIN:  Well, mine as well, but the reason I

7   raise it, other than the obvious irony of it, is that I

8   didn't learn of this until this week.  His sister and

9   brother-in-law came down from Minnesota to see me this week

10  and told me about it.  They told him -- they told me that

11  they had asked my client to tell me about it but that he told

12  them that he was just too distraught to bring it up --

13            THE COURT:  Okay.

14            MR. DURKIN:  -- which leaves me in a very awkward

15  position.  And the request I'm making -- I spoke to him

16  briefly today; he appears okay.  I did -- as soon as I heard

17  this -- there's someone at the MCC who's pretty good about

18  getting us a call if it's an emergency, and actually I think

19  we sent him an email and he called us right away, and he

20  confirmed what his brother-in-law had told me, that he simply

21  was too distraught and really just can't deal with it so he'd

22  rather not talk about it.  And I know I'm causing him trouble

23  bringing it up today, but I want to make sure that he's

24  medically okay to proceed to trial.  I think he is, but I

25  think as an officer of the Court I would request that at

1    least he be -- that he see a psychiatrist.  He has not seen

2    anyone.  He says he originally was -- when he was first

3    arrested, apparently there was a psychiatrist at the MCC that

4    had seen him, but I would feel remiss if I didn't raise it

5    now and find out either in the middle --

6              THE COURT:  You just learned about it, Mr. Durkin?

7              MR. DURKIN:  I literally learned about it Monday

8    night and then I sent him an email on Tuesday, I spoke to him

9    I think it was Wednesday, I think I spoke to Mr. Cole about

10   it on Wednesday, I got the death certificate yesterday, I

11   sent it to Mr. Cole.  I was hoping that maybe we'd get some

12   humanitarian relief, but I understand --

13             THE COURT:  Have you talked to anyone at MCC, any

14   of the people --

15             MR. DURKIN:  I have not.

16             THE COURT:  -- there?  Would you -- with the

17   permission of your client, could you contact MCC -- they're

18   usually pretty good about these things -- and let them know

19   what your concern is and suggest to them that he be evaluated

20   if you feel -- you feel there's a need --

21             MR. DURKIN:  I spoke with him today, and he said

22   that that was acceptable.  Could I just speak to him again?

23             THE COURT:  Sure.

24        (Brief pause.)

25             MR. DURKIN:  That's acceptable.

```
 1              THE COURT:  Okay.  They're usually pretty good

 2    about that, and --

 3              MR. DURKIN:  Well, that's fine.  I just -- you

 4    understand I just --

 5              THE COURT:  Sure.

 6              MR. DURKIN:  -- feel as an officer of the Court

 7    that I think it's an issue that we need to --

 8              THE COURT:  Well, you've given me this; you've

 9    notified me.  I'm certainly sympathetic for obvious reasons.

10    And as I say, if you're concerned, if you're concerned out of

11    observations that you're making that you could put in a

12    declaration -- and I'm not talking about any rulings to be

13    made by the Court at this time -- but if you feel that

14    there's a need for him to be evaluated at this point, it

15    would certainly help for you to put your observations in a

16    proper form.  But pending that, just advise the authorities

17    at MCC where he is that it would be appropriate for him to be

18    medically evaluated at this time.  I would certainly

19    recommend it just based upon your representation.

20              MR. DURKIN:  No, that's -- I intend to do that.  My

21    concern -- the only observation I can make and what my

22    concern was is that when he was encouraged by his brother,

23    brother-in-law and sister, to let me know and --

24              THE COURT:  Yeah.

25              MR. DURKIN:  -- which I think was significant, and
```

1    he was unable to do that, that's my -- that's the only

2    observation I have at the moment.  That's what concerns me.

3            THE COURT:  Okay, Mr. Durkin.  Thank you for

4    bringing this to my attention.

5            MR. DURKIN:  Thank you.

6            THE COURT:  Any preferences for plowing ahead with

7    deposition rulings or calling it a day?

8            MS. MORENO:  I need to -- I've agreed that I would

9    make the changes to the questionnaire and get them to the

10   government, so I would frankly ask to be --

11           THE COURT:  Sure.

12           MR. DRATEL:  I think we all --

13           MS. MORENO:  -- relieved.

14           THE COURT:  And you certainly may.  Mr. Cole?

15           MR. COLE:  We would prefer to do the deposition

16   another time as well only because we did not bring to court

17   our stack -- I don't think the defense did either -- our

18   stacks of everything.

19           THE COURT:  Good enough.

20           MR. COLE:  That said, we did have one last issue

21   that we wanted to raise, your Honor.

22           THE COURT:  Sure.

23           MR. COLE:  And that is going back to the issue of

24   expert -- expert witnesses, you might recall last time we

25   were before your Honor, the last status conference, we raised

1   a concern that we had -- there was a name mentioned of a

2   potential expert witness -- I think it was Mr. Samatar; the

3   defense mentioned in the hearing that they might call Mr.

4   Samatar as a witness -- I expressed concern about having

5   received no notice, and you indicated I needed to receive

6   notice right away, I think you said by the following day if I

7   remember right, although I don't have the transcript in front

8   of me.

9         THE COURT:  Well, I remember, yeah, that notice had

10  to be made or given forthwith, and I think I got assent from

11  the defense either verbally or certainly by gesture.  So

12  what's the issue?

13        MR. COLE:  We received a CV last -- this last week,

14  nothing further, a CV.  And maybe there's something that we

15  were sent that we didn't receive, but all we have is a CV

16  with no opinion or report or statement of what he may or may

17  not say at trial.

18        THE COURT:  Okay.

19        MR. DRATEL:  If that's the case, your Honor,

20  then -- I believed that we had sent a letter even before the

21  day that we actually spoke when we were in court; I thought I

22  had sent it earlier that day.  I will go back.  Maybe there's

23  something that happened with that email, but I will do that

24  immediately.

25        THE COURT:  Would you?  Thank you.

1           MR. DRATEL:  Yes, and I apologize for that

2    obviously.

3           THE COURT:  Okay.  Well, we've been at it for

4    status now for about three hours.  Anything else?

5           MR. DRATEL:  Two brief things, your Honor.  One

6    just I am informed by my colleagues with respect to this

7    al-Qaeda conversation with Sheikalow that the government

8    thinks is Aden Ayrow, the translation that we provided the

9    government back on November 6 has the word "terrorist"

10   instead of al-Qaeda, so there may not even be an "al-Qaeda"

11   mentioned at all based on our translator.  So just wanted the

12   Court to be aware of that.

13          Second is on the Section 5 CIPA submission, there's

14   some logistical problems in getting that done back in New

15   York.  If I have to do it in the government's office by, you

16   know, by hand, I'm going to do it by, you know, by sometime

17   Monday if I can't do it before then.  It's just a question of

18   doing it in a secure place.  I may have to do it without the

19   document and do it from memory, but I will tee it up for your

20   Honor as best we can.

21          THE COURT:  Well, the motion has to be made though,

22   as you know.

23          MR. DRATEL:  Yes, that's why I'm saying a Section 5

24   is going to be done -- it's not that the Court has to decide

25   before a defense case, so, you know, we'll have time to argue

1    it but --

2              MR. COLE:  No, I just want to make the Court

3    aware -- probably the Court is aware -- if a Section 5 motion

4    is made while trial is going on, that really could cause a

5    problem in the proceedings because whatever the Court's

6    ruling is in their motion, we can't just suddenly turn around

7    and have a classified -- we cannot resolve an issue over

8    classified information, as your Honor knows all the logistics

9    involvement, just on the spot while the jury is out in the

10   hallway.  So I don't know what the Section 5 issue is he

11   wants to raise, but I envision that if there is one raised,

12   we're quite at a bad time spot to be raising it.  I think the

13   rule itself, the section itself has time periods that are

14   usually in effect, but I don't know what the motion is about

15   yet.

16             MR. DRATEL:  It wasn't made available to us until

17   two weeks ago to begin with, and I've been trying to get it

18   done in a secure way like I'm supposed to do by communicating

19   with the -- we're flying all over the country, so they have

20   their own obligations, and I'm not faulting anyone for the

21   fact this has come up, but I will -- and it may be by hand on

22   paper, your Honor, but we'll get it to you by Monday.

23             THE COURT:  Okay.  We'll deal with what we have to

24   deal with.  If it's by hand, it better be legible; that's all

25   I --

1          MR. DRATEL:  I'm reminded by Ms. Fontier to just do

2    it slowly, your Honor, big block letters.

3          THE COURT:  Okay.  Very good.

4          MS. FONTIER:  I've been practicing reading his

5    writing for five years, and I can't do it yet.

6          THE COURT:  Maybe he was a doctor in his former

7    life.  Okay.  Well, thank you all once again for your

8    attention, and we'll next meet Monday morning one floor down,

9    9 a.m., as soon as we can get all of our -- as soon as we can

10   get the pool over.

11         MS. FONTIER:  One further issue.  What is the

12   actual schedule, the times and -- I know you said two Fridays

13   we have off, right, the 1st and the 15th?

14         THE COURT:  Right, the 1st and 15th would be

15   calendar days, the first and third Fridays, and then --

16         MS. FONTIER:  And Monday is -- the 18th is also a

17   holiday --

18         THE COURT:  It is.

19         MS. FONTIER:  -- and a four-day break there?

20         THE COURT:  It is.  It would be a four-day break,

21   yes.

22         MS. FONTIER:  Okay.

23         THE COURT:  Normal trial hours, 9:00 to 12:00, 1:30

24   to 4:30 -- we'll have plenty of time to go over this, but

25   9:00 to 12:00, 1:30 to 4:30, standard recesses, 15 minutes

1    midmorning, 15 about midafternoon, we'll -- you know what the

2    noon hour is.  Sidebars down to an absolute minimum once

3    we -- if we need to discuss matters that arise, we'll do it

4    in nonjury time either before nine o'clock or after 4:30.

5    And that's pretty much it in terms of how we're set up

6    schedule-wise.

7            MS. MORENO:  Does your Honor envision the -- that

8    our clients need to be present Monday morning or Monday

9    afternoon?

10           THE COURT:  Well, it would be -- I can't remember a

11   trial I had where the defendants were not present.

12           MS. MORENO:  I'm sorry.  I know that sounds like an

13   ignorant question.  I apologize.

14           THE COURT:  Is there some reason that --

15           MS. MORENO:  Well, it's about dressing them out.

16           THE COURT:  Sure.

17           MS. MORENO:  That's the question I had.  In the

18   past when I've done this, actually the jurors did it in a

19   jury room, but --

20           THE COURT:  The jurors?  You mean the defendants?

21           MS. MORENO:  No, no.  The panelists, the

22   prospective jurors filled out the questionnaires in a jury

23   room, not in the courtroom, and so the accused were not

24   anywhere present for that.

25           THE COURT:  Yeah.

```
 1            MS. MORENO:  But in this case it's going to be

 2   different, correct?

 3            THE COURT:  Yeah, I think it is, and I gave that

 4   some thought as well.  I don't think it would be

 5   appropriate -- either you have everybody there while the

 6   jurors are filling out their questionnaires or you have no

 7   one there.  And by no one I mean no attorneys, nor am I at

 8   the bench, and would advise -- I've done this before -- I've

 9   advised the jury that while they're filling out a

10   questionnaire or if they're doing some other business of a

11   similar type, that they're going to have the privacy of the

12   courtroom and that everybody basically leaves the courtroom.

13   So either way.  But I don't think it would be appropriate for

14   the defendants to be out of the courtroom if all counsel are

15   there and if I'm on the bench.  Either way it works.

16   Everybody there or no one there.

17            MS. MORENO:  May I just have just a couple of

18   minutes to confer with --

19            THE COURT:  On this issue?

20            MS. MORENO:  Yes.  Because frankly, your Honor,

21   speaking on behalf of Mr. Mohamud, I'm fine, while the jurors

22   are filling out their questionnaires, not to be there.  I

23   mean -- in fact, I've never experienced the situation in many

24   cases I've done where jurors are filling out questionnaires

25   that the accused are ever in the same room with the jurors,
```

1    prospective jurors, filling out questionnaires.  That's why I

2    asked, and --

3            THE COURT:  Well, it's not necessary.  If you're

4    asking me is it necessary for the defendants to be present

5    when a questionnaire is being filled out, no; there's no

6    court proceeding per se that's taking place.

7            MS. MORENO:  But your Honor's saying you want it

8    that way.

9            THE COURT:  No, I'm saying if there was a desire

10   for counsel to be present, then all of a sudden, you know,

11   four people are missing from the courtroom and jurors start

12   speculating -- and we do try to buttress the presumption of

13   innocence and that individuals are not in custody -- you

14   know, to the extent that's effective or not is open to

15   speculation.  But no, if we're leaving jurors to fill out

16   their questionnaires after giving them the direction that

17   they're to leave after turning their questionnaires in, we're

18   not in session at that point, no business is being conducted,

19   certainly no substantive business is taking place, and it's

20   not necessary for the defendants to be there nor for the

21   Court and counsel to be present.  You want to take a minute

22   or two and discuss this with your colleagues?

23           MS. MORENO:  Please, your Honor, I really would

24   appreciate that.

25           THE COURT:  Okay.  Sure.

1          MR. DURKIN:  Judge, a question.  I have not gotten

2     any clothes for my client.  I'm not -- I've frequently -- I

3     don't agree with the -- the jumpsuits make a difference or

4     that somehow clothing makes the presumption more likely, but

5     if I choose to dress my client, is there a way I can get him

6     clothes --

7          THE COURT:  Sure.

8          MR. DURKIN:  Do I give it to the marshal here or --

9          THE COURT:  No, you don't give it to the marshals,

10    you take it over to MCC.  There's a whole protocol for that.

11    You're going over there anyway to alert people over there

12    that your client may need to be observed or looked at.

13    They'll advise you of the protocol over there.  But typically

14    you get -- you get the clothing over there.

15         MR. DURKIN:  He doesn't have to be dressed, does

16    he?

17         THE COURT:  Dressed out for trial?  You don't want

18    to dress him out?

19         MR. DURKIN:  I don't think so.

20         THE COURT:  Well, I've got to take a waiver then.

21    I mean there's a protocol for that, and I'm going to take a

22    waiver and I'm going to tell him what the risks --

23         MR. DURKIN:  I'll think about it over the weekend.

24         THE COURT:  -- of that are.  But I do need to take

25    that up with your client then.

1            MR. DURKIN:  That's fine.

2            MS. MORENO:  Your Honor, I don't know how the

3    government feels about this, but certainly all defense

4    counsel would waive their presence and the presence of their

5    clients while the jurors are filling out the questionnaire.

6            MR. COLE:  We don't care either way, your Honor.

7    Whatever -- I assume we'll all be here during the

8    introductory stuff and explaining, and then if the Court

9    would like us to leave while they're actually filling out the

10   questionnaire, we have no problem with that.

11           THE COURT:  That's fine.  Okay.  Everybody's in

12   agreement on that one?

13           MR. COLE:  Yes.

14           THE COURT:  All right.  Ms. Moreno?

15           MS. MORENO:  I'm sorry, your Honor.

16           THE COURT:  You've taken the pulse of your

17   colleagues?

18           MS. MORENO:  I've taken their temperature, yes,

19   your Honor.

20           THE COURT:  Okay.  Mr. Dratel?

21           MR. DRATEL:  The only issue would be if we're all

22   here, including the defendants, and then the jurors fill out

23   the questionnaires, we can't all leave -- the defendants

24   really can't leave the same way, that's the problem I

25   foresee.  That's to telegraph in a certain way as to -- if we

1  broke maybe --

2          THE COURT:  We deal with that -- we deal with that

3  issue in every criminal case we have.  We never -- we never

4  have defendants brought out --

5          MR. DRATEL:  Right.

6          THE COURT:  -- in the presence of a jury, we never

7  have them removed in the presence of the jury, and in every

8  case they'll never see a defendant in custody in the hallway

9  while the jurors are on break.

10          MR. DRATEL:  Oh, I understand.  It's just different

11  moving 80 people out than 12, that's all.

12          THE COURT:  Well, I'd like them all to be in one

13  place, and frankly Courtroom 1 is the only courtroom that we

14  have where that can be accommodated.

15          MR. DRATEL:  Right.  So what I'm saying is I'd

16  rather them not be there at all than have a situation where

17  80 jurors have to get up and leave while we clear the

18  courtroom.

19          THE COURT:  Okay.  Very good.  So I'll take that as

20  agreement, Mr. Dratel.

21          MR. DRATEL:  Yes.

22          THE COURT:  Mr. Ghappour, you're in agreement as

23  well?

24          MR. GHAPPOUR:  Yes, your Honor.

25          THE COURT:  Mr. Durkin is --

1        MR. DURKIN:  Yes.

2        THE COURT:  -- as I understand, and the government

3   has no objection.  All right.  That's the way we'll handle it

4   then.  Okay.  Thank you all.  Have a good weekend.  Mr.

5   Dratel, all counsel, make sure your clients are dressed out

6   Monday morning, so you've got to get clothes over to them --

7   well, please deal with the MCC requirement and whatever --

8        MS. FONTIER:  GEO.  While we're on the subject of

9   clothes, GEO doesn't allow you to bring like belts and shoe

10  laces, so to the extent that -- I mean Mr. Moalin has lost a

11  lot of weight in the time that he's been in custody, so he

12  may require a belt, which I would just ask to be able to give

13  to him in court.

14       THE COURT:  Thank you.  We'll see you Monday.

15     (The proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

1                    Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated February 1, 2013 at San Diego, California.

12                 *Debra M. Henson*

13                          /s/ Debra M. Henson  (electronic)
                            Debra M. Henson
14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25