1                     United States District Court

2                   Southern District of California

3

4   UNITED STATES OF AMERICA,          )
                                       )
5                      Plaintiff,      )
                                       )
6       vs.                            ) Case No. 10-CR-4246 JM
                                       ) Jury Trial/Day 1
7   BASAALY SAEED MOALIN,              ) Monday, January 28, 2013
    MOHAMAD MOHAMAD MOHAMUD            )
8   ISSA DOREH,                        )
    AHMED NASIR TAALIL MOHAMUD,        )
9                                      )
                       Defendants.     )
10  _____)

11

12              Before the Honorable Jeffrey T. Miller
                    United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25
                  Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:      Laura E. Duffy
                             UNITED STATES ATTORNEY
 3                           William P. Cole
                             Caroline P. Han
 4                           ASSISTANT U.S. ATTORNEYS
                             Steven P. Ward, Trial Attorney
 5                           U.S. DEPARTMENT OF JUSTICE
                             880 Front Street, Suite 6293
 6                           San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)            Joshua L. Dratel, Esq.
 8                           Alice Fontier, Esq.
                             OFFICE OF JOSHUA L. DRATEL
 9                           2 Wall Street, Third Floor
                             New York, NY  10005
10
     (Mr. M. Mohamud)        Linda Moreno, Esq.
11                           LINDA MORENO, P.A.
                             P.O. Box 10985
12                           Tampa, FL  33679

13   (Mr. Doreh)             Ahmed Ghappour, Esq.
                             LAW OFFICES OF AHMED GHAPPOUR
14                           P.O. Box 20367
                             Seattle, WA  98102
15
     (Mr. A. Mohamud)        Thomas A. Durkin, Esq.
16                           Janis Roberts, Esq.
                             DURKIN & ROBERTS
17                           2446 N. Clark Street
                             Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1          San Diego, California - Monday, January 28, 2013

2          (Defendant A. Mohamud is being assisted by a Somali

3    interpreter.)

4          THE CLERK:  Calling matter 1 on calendar,

5    10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamad Mohamad

6    Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for jury

7    trial.

8          THE COURT:  Good morning to all of you, gentlemen.

9    It's nice to see you.  Nice to see you at counsel table.

10   Counsel, I just wanted to see you all here before we bring

11   the jurors over.  We have -- did all counsel state their

12   appearances?  Okay.  Counsel, why don't you state your

13   appearances, please.

14         MR. COLE:  William Cole, Caroline Han, and Steven

15   Ward for the United States.

16         THE COURT:  Thank you.

17         MR. DRATEL:  Good morning, your Honor.  Joshua

18   Dratel for Basaaly Moalin.  Alice Fontier will be joining me

19   momentarily.

20         THE COURT:  Okay.  Very good.  Thank you.

21         MS. MORENO:  Good morning, your Honor.  Linda

22   Moreno on behalf of Mr. Mohamad Mohamud.

23         MR. GHAPPOUR:  Good morning, your Honor.  Ahmed

24   Ghappour on behalf of Issa Doreh, who is present.

25         MR. DURKIN:  Tom Durkin on behalf of Nasir Taalil

 1    -- Ahmed Nasir Taalil Mohamud, who's present and in custody.

 2              THE COURT:  Okay.  Thank you very much.  Okay.

 3    We're still waiting on the interpreter.  I understand that

 4    the interpreter had to leave momentarily just to retrieve --

 5    is the interpreter here?  You're back.  You've returned.

 6    Okay.  The second interpreter?  Okay.  We're waiting for the

 7    second interpreter.  Sir, do you need the microphone?

 8              THE INTERPRETER:  I will need the microphone, your

 9    Honor, so that he can use --

10              THE COURT:  Very good.  Certainly.  Okay.  Very

11    good.  In any event, the second interpreter will be here just

12    as soon as a piece of equipment is retrieved.

13              We have I believe 75 -- 74 prospective jurors who

14    will be reporting here very shortly, which is a very good net

15    number.  We had a couple of people who needed to be excused

16    this morning, and there was -- for very good cause, emergent

17    matters affecting two people, so we will see 74 people over

18    here very shortly, and we will start the process.  I think

19    that's about it.  I just wanted to take the pulse and greet

20    everyone before we proceed.

21              I'm hopeful that we can get the jurors over here

22    within 10 or 15 minutes.  They'll all be brought in, they'll

23    be placed in seats randomly wherever they choose to sit

24    behind the bar, there may be some seating available in the

25    back for the public, and then we'll proceed.

1              I've got an updated or revised questionnaire.  I

2    haven't had an opportunity to review it.  I assume that the

3    changes we discussed have been made.  Ms. Moreno?

4              MS. MORENO:  Yes, your Honor.  That is correct,

5    sir.

6              THE COURT:  Okay.  Very good.  Thank you.  I would

7    think it's entirely foreseeable that we'll be proceeding into

8    the noon hour for some of the jurors to complete their

9    questionnaires.  I will be attending a meeting, a judges'

10   meetings of the Court, from 1:00 until 2:00 this afternoon,

11   so then when we do resume at two o'clock for the purpose of

12   reviewing the questionnaires that have been filled out and

13   submitted back, then we'll proceed at 2:00 with that.  We'll

14   each have an opportunity to look over the questionnaires and

15   identify any red flags and then have an opportunity to

16   discuss those issues and put those on the record.

17             So that's pretty much where we're going this

18   morning.  Any questions about this morning?  Mr. Cole, any

19   questions from the government?

20             MR. COLE:  No, your Honor.

21             THE COURT:  Okay.  Ms. Moreno?

22             MS. MORENO:  Your Honor, did the Court wish us to

23   file this final draft electronically?

24             THE COURT:  The final draft of --

25             MS. MORENO:  Of the questionnaire.

 1              THE COURT:  Well, it will -- it should be.  It

 2     should be.  It's either filing electronically or it's a court

 3     exhibit.  Either way it works because it's a part of the

 4     record if we proceed in that fashion.

 5              MR. DRATEL:  May I have a moment, your Honor?

 6              THE COURT:  Yes, sir.

 7              MR. DRATEL:  I just wanted to clarify on the time

 8     today in the sense that I thought I heard the Court say that

 9     jurors might need till the noon hour the complete the

10     questionnaire.

11              THE COURT:  They may well go into the noon hour.

12              MR. DRATEL:  Right.  And then they have to be

13     copied.  So coming back at two o'clock seems to be a little

14     early.  I think --

15              THE COURT:  Well, I'll be available at two

16     o'clock --

17              MR. DRATEL:  Oh, okay.

18              THE COURT:   -- So I'm hopeful that everybody will

19     be back here by two o'clock.  We'll be ready with all copies

20     that are necessary on or before two o'clock.

21              MR. DRATEL:  I think just for purposes of --

22              THE COURT:  You don't need -- technically you don't

23     need me to return if that's your concern, Mr. Dratel.

24              MR. DRATEL:  No, it was more about -- I think it

25     would be more efficient if, once we get the questionnaires

1    and they're copied and we get them, if we had a certain

2    amount of time to review them on our own and then talk to the

3    government about the possible agreements, that we could then

4    have less time before the Court.  So I think a little bit --

5    building a little bit of additional time --

6              THE COURT:  That's fine.  I have no objection or

7    concern about that, but I wouldn't want that process to slow

8    us down.  Keep in mind that our jury commissioner needs to

9    know what the final list is, those people who will be

10   requested to return for the second day, no later than five

11   o'clock.

12             MR. DRATEL:  Right.

13             THE COURT:  So time is going to be at a premium

14   here even though we're getting an early start.

15             MR. DRATEL:  The reason I say that is because if we

16   had an extra half hour or 45 minutes alone to review them and

17   split them up, it's actually better than going through them

18   one by one in court, which I think is more workable --

19             THE COURT:  If we can identify 10, 15, 20, however

20   many people that are clearly out because of the way in which

21   they responded to the questionnaire, that's fine.  Both sides

22   can stipulate to their -- to them being excused from any

23   service on this case, and then we can just concentrate on a

24   smaller number, and that's fine as well.  All I'm saying is

25   if you -- if you undertake that process, if we're going to

1   build that into our approach today, it really -- you need to

2   be very mindful of the time that you're going to spend on

3   that part of it.

4           MR. DRATEL:  I agree, your Honor.

5           THE COURT:  Okay.

6           MR. DRATEL:  I'm just thinking --

7           THE COURT:  I appreciate the suggestion.

8           MR. DRATEL:  Let's see where we are when we --

9           THE COURT:  Yeah, I appreciate the suggestion.

10  Thank you.  Anything further?  Okay.  Then we'll call over

11  our jury panel, and we will get started.  Thank you.

12          Counsel, excuse me.  One further thing.  The

13  indictment needs to be read to the jury in pertinent part.

14  Mr. Cole, you can certainly do that or I can do it; it makes

15  no difference to me.  Anybody have any preference?  Do you

16  have any preference as to whether the Court does it or

17  whether you do it?

18          MR. COLE:  Whatever the defense prefers.  It

19  doesn't matter to me if it's me or you.  I don't know if the

20  defense has a preference.

21          THE COURT:  I typically do it.

22          MR. DRATEL:  Judge, we prefer your Honor do it.

23          THE COURT:  All right.

24      (There was a break in the proceedings.)

25          THE CLERK:  Calling matter 1 on calendar,

1   10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamed Mohamad

2   Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for jury

3   trial.

4              THE COURT:  Counsel, would you please state your

5   appearances and indicate your readiness to proceed.

6              MR. COLE:  Good morning, your Honor.  William Cole

7   along with Caroline Han and Steven Ward for the United

8   States.  We're ready to proceed.

9              THE COURT:  Thank you.

10             MR. DRATEL:  Good morning, your Honor.  Joshua

11  Dratel and Alice Fontier for Basaaly Moalin.  We are ready to

12  proceed.  Mr. Moalin is seated between us.

13             THE COURT:  Thank you.

14             MS. FONTIER:  Good morning, your Honor.

15             MS. MORENO:  Good morning, your Honor.  Linda

16  Moreno on behalf of Mr. Mohamud.  Ready for the defense.

17             THE COURT:  Thank you.

18             MR. GHAPPOUR:  Good morning, your Honor.  Ahmed

19  Ghappour on behalf of Issa Doreh.  Ready for the defense.

20             MR. DURKIN:  Good morning, Judge.  Tom Durkin on

21  behalf of Ahmed Nasir Taalil Mohamud, who's seated to my

22  right, and we're ready to begin.

23             THE COURT: All right.  Thank you.  Ladies and

24  gentlemen of the jury pool, a very good morning to you.

25  Thank you for being here.  Thank you for your patience.  I

1   know logistically it was a little bit of a challenge getting

2   you over here today.  We have a new courthouse just behind

3   us, the annex.  We haven't even had the formal opening yet

4   for that courthouse, and so you're really truly one of the

5   first jurors, relatively speaking, to assemble in that new

6   jury assembly room, and of course being brought over here to

7   the old courthouse where they used to do everything is a bit

8   of a process.  So thank you for your time and your patience,

9   and it's very good that you're all here.

10          Judge Irma Gonzalez, one of our district judges

11   here in the Southern District of California, who occupies

12   this courtroom, has been very gracious in allowing me to use

13   her courtroom for just the first two days in the course of

14   jury selection; we're going to use this courtroom today and

15   tomorrow.  And once the trial itself starts, we're going to

16   be back into my courtroom, which is on the fifth floor.  So

17   we'll be moving you around a little bit.  We'll always give

18   you direction as a bit of a head's up, letting you know

19   exactly when and where you need to be.

20          I'm going to defer the introduction of counsel for

21   just a little bit and tell you a few basics about this case.

22   I want to give you a little bit of a roadmap as to where we

23   are going today and tomorrow in terms of jury selection.

24          There are several different aspects to this -- to

25   this process, but let me just say that at this point in time,

1  in just a few minutes, you'll be given an oath as prospective

2  jurors.  All prospective jurors take this oath, and the oath

3  is given to you to mark the solemnity of the proceedings

4  about which you are about to embark and also to impose upon

5  you the obligations of being truthful, of being candid with

6  us as you answer questions later on today and tomorrow and

7  also as you fill out a questionnaire.  It is really is

8  imperative, essential that you be truthful for us so that

9  ultimately we select a jury in this case of 12 jurors, and

10  we're going to select two or three alternates, in all

11  probability three alternate jurors, once we have the trial

12  ready to go.

13          In any event, after -- after the oath is

14  administered to you, I'm going to tell you a bit about this

15  case.  Suffice it to say at this particular point in time, it

16  is a criminal case.  The U.S. Attorney's office here in the

17  Southern District of California with Assistant U.S. Attorneys

18  seated to my right here, will be trying the case for the

19  government, and then we have the defense community, we have

20  four defendants here, each of whom is represented by counsel.

21  All of them will be introduced to you in just a little bit.

22          But in any event, after the oath then I'm going to

23  ask a very important question which will become apparent as

24  to its importance, and then after I ask you that important

25  question after you've taken the oath, I am going to give some

1    general instructions to you that might be of assistance to

2    you -- I dare say will be of assistance to you if you're

3    selected as a juror in this case.

4              I will ask some general questions of you bearing

5    upon your ability to be a fair and impartial juror in this

6    particular case, and then after that, after all of those

7    things have been done, we are going to distribute anonymous

8    questionnaires to each and every one of you.  The

9    questionnaire is a pretty thorough questionnaire, and we're

10   going to allow you to fill out that question here -- that

11   questionnaire here in this courtroom.  We are all going to

12   vacate the courtroom while you do that, so you'll be filling

13   out the questionnaire by yourselves.  And then as soon as you

14   finish filling out the questionnaire, you'll be released for

15   the day.

16             I'm hopeful that we can have those questionnaires

17   completed by each of you and then turned in by, you know,

18   12:00, 12:30, however long it takes.  The most important

19   thing is that you're filling out the questionnaire in a

20   candid and truthful way.

21             Then we're going to look at those questionnaires; I

22   and counsel will look at the questionnaires, try to assess

23   them, and you will then be advised -- remember, you're going

24   to be released after you finish the questionnaire -- you will

25   then be advised when you call in this evening after six

1    o'clock whether you will be required to report tomorrow at 9

2    a.m. -- not here directly to this courtroom but to another

3    courtroom.  I'll tell you a little bit more about that.  It

4    will be in this building.  And the majority of you will be

5    reporting here tomorrow; there's no questioning that.

6           So that's pretty much what our roadmap is for

7    today, ladies and gentlemen.  So without further ado, may I

8    please ask that you each stand and raise your right hand to

9    be sworn as prospective jurors.

10          THE CLERK:  Ladies and gentlemen, you, and each of

11   you, do solemnly swear that you will true answers make to

12   such questions as may be put to you touching upon -- touching

13   upon your qualifications to serve as trial jurors upon the

14   trial of the cause now before this Court?  If so, please say

15   yes.

16       (The jurors answered.)

17          THE COURT:  All right.  Thank you, ladies and

18   gentlemen.  And if you would please be seated at this point.

19   Okay.  I indicated that after you took the oath, I would give

20   you a bit of an indication about what this case is about, and

21   so I have a very brief summary statement about the nature of

22   this case; the attorneys have been good enough to agree on

23   the content of this description, and here it is:

24          This is a criminal case in which the United States

25   has charged four individuals with providing material support,

1    principally in the form of money, to terrorists in Somalia,

2    providing material support to a foreign terrorist

3    organization, al-Shabaab, in Somalia, and conspiracy to do

4    the same.  Somalia is a country in Africa.  These individuals

5    are charged in multiple counts.  They each deny all

6    allegations and are presumed to be innocent.

7            Now, ladies and gentlemen, the question I have for

8    you now that I've told you what the nature of this case is,

9    is as follows:  If there is anyone here who feels that

10   because of the nature of the case, he or she cannot be fair

11   and impartial in this case, or for some personal reasons,

12   some experience you might have had or because of some

13   experience someone very close to you might have had such as

14   an immediate family member or a very close friend, you cannot

15   be fair and impartial, would you please raise your hand

16   indicating that.

17           All right.  I'm going to ask for your names at this

18   point.  I see just a few of you who have raised your hand.

19   Let's take it on my right side of the courtroom.  I saw two

20   or three hands go up.  Sir, we may be able to get you a

21   microphone if that might be helpful.  Everyone should be able

22   to hear you.  On the right side there.  All right.  Sir,

23   would you please state your name.

24           PROSPECTIVE JUROR:  Richard Dicker.

25           THE COURT:  Would you please spell your last name.

1          PROSPECTIVE JUROR:  D-i-c-k-e-r.

2          THE COURT:  Thank you, Mr. Dicker.  And I think

3    there were a few others on the right side of the courtroom.

4    All right.  Please, would you stand, sir.

5          PROSPECTIVE JUROR:  Michael Gerow, G-e-r-o-w.

6          THE COURT:  Anyone else on that -- on my right side

7    of the courtroom whose hand was raised?  I see no other

8    hands.  On my left side of the courtroom, I saw a few hands

9    go up, so if we can pass the microphone to those individuals.

10         PROSPECTIVE JUROR:  Jack Fernandez,

11   F-e-r-n-a-n-d-e-z.

12         THE COURT:  Thank you, sir.

13         PROSPECTIVE JUROR:  Gerardo Ochoa, O-c-h-o-a.

14         THE COURT:  First name, sir?

15         PROSPECTIVE JUROR:  Gerardo.

16         THE COURT:  Spell the first name.

17         PROSPECTIVE JUROR:  Gerardo, G-e-r-a-r-d-o.

18         THE COURT:  Thank you very much.

19         PROSPECTIVE JUROR:  Name is Kevin Travis, your

20   Honor, T-r-a-v-i-s.

21         THE COURT:  T-r-a --

22         PROSPECTIVE JUROR:  -- v-i-s, Travis.

23         THE COURT:  First name, sir?

24         PROSPECTIVE JUROR:  Kevin.

25         THE COURT:  Thank you.  Anyone else on my left

1    side?  There's one -- well, I see another hand go up.  I

2    think there are two more.

3              PROSPECTIVE JUROR:  My name is Patrick Rhamy,

4    R-h-a-m-y.

5              THE COURT:  R-h-a-m-y, Patrick.  Thank you.  I

6    think we have one more hand there, Nancy.

7              PROSPECTIVE JUROR:  Denise Herron, H-e-r-r-o-n.

8              MR. COLE:  Thank you, Ms. Herron.  And I think

9    that's all the hands that I saw.  Very good.  Well, okay.

10   Let me say at this point for the seven of you who raised your

11   hand, I'd like to briefly speak with each one of you here at

12   the side of the bench just to see what your particular

13   concern is.  I'll be doing that with counsel.  And anytime we

14   have a little conference here at the side of this bench or

15   when the trial gets going, please feel free to just relax

16   where you are, you can chat amongst yourselves as long as you

17   don't talk about the case; do not discuss this case or any

18   subject related to the case.  And then we'll always be back

19   with you just as soon as we can.

20             So with that, Mr. Dicker, may I ask you to come

21   forward please.  Mr. Gerow, you'll be on deck, Mr. Fernandez

22   after that.  For those who are waiting, the seven of you, you

23   can just wait right behind that bar, and then we'll bring you

24   back one at a time over here.

25        (Following is a sidebar conference.)

```
 1              THE COURT:  What is the nature of your concern, Mr.
 2   Dicker?  Mr. Dicker?
 3              PROSPECTIVE JUROR:  Well, given my religious
 4   background and my political orientation, I don't think I
 5   would be objective in this case.
 6              THE COURT:  Okay.  Let me say this.  The most
 7   important thing you just said is you don't think you can be
 8   objective in the case.  I don't want you to assume that
 9   because of your religious background or your political
10   orientation -- I dare say we'll have jurors of all political
11   persuasions on this jury and with different religious
12   backgrounds, so don't assume --
13              PROSPECTIVE JUROR:  Okay.
14              THE COURT:  -- for a moment that because you have a
15   particular point of view, political or whatever, that you're
16   ineligible to be a juror.
17              PROSPECTIVE JUROR:  Okay.
18              THE COURT:  However, that being said, do you feel
19   you could be fair and impartial in this case or do you
20   already find yourself leaning one way or the other because of
21   the nature of the charges?
22              PROSPECTIVE JUROR:  I'm not certain I could be
23   impartial in the case.
24              THE COURT:  This is as you're looking through the
25   lens of your political and/or religious views?
```

1          PROSPECTIVE JUROR:  I'm a psychologist.  I mean I

2     really have a sense of where am I and that there's some bias

3     here.

4          THE COURT:  Well, if that's the way you feel, I'm

5     going to excuse you for cause.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  Thank you for you time and service.

8     We'll ask that you return to the jury lounge at this time,

9     and --

10          PROSPECTIVE JUROR:  In the other building?

11          THE COURT:  Yeah, and they'll have further

12     information for you.  Thank you, Mr. Dicker.  Mr. Gerow?

13     Come on in, Mr. Gerow.  I know this is a little intimidating

14     here, but come on forward --

15          PROSPECTIVE JUROR:  Just a little.

16          THE COURT:  That's okay.  You're talking to me at

17     this point.

18          PROSPECTIVE JUROR:  All right.

19          THE COURT:  What's the nature of your concern?

20          PROSPECTIVE JUROR:  I do not feel that I could be

21     impartial in this case because of my political beliefs that

22     these people are possibly funneling money as to terrorist

23     organizations that are directly responsible for the murder of

24     innocent children, women, and men.  As a veteran --

25          THE COURT:  Go ahead, sir.

1          PROSPECTIVE JUROR:  -- I just -- I despise the

2    religion of Islam, the radical elements of it, which are --

3    these people are since there'd be al-Qaeda type of, you know,

4    fundamental --

5          THE COURT:  You just assume that all Muslims are --

6    sounds like you're saying all Muslims are terrorists, or most

7    of them?

8          PROSPECTIVE JUROR:  No, no, I'm not saying that.

9    This particular case -- I don't know.  Seems I guess I do

10   have a prejudice against it.

11         THE COURT:  Just the charges are enough for you,

12   just hearing the charges --

13         PROSPECTIVE JUROR:  Yes, just enrages me.

14         THE COURT:  Okay.  I'm going to excuse you for

15   cause.  Thank you for your time and service.  I'll ask that

16   you return to the jury lounge at this time.

17         PROSPECTIVE JUROR:  Certainly.

18         THE COURT:  They'll have more information for you

19   over there.  All right.

20         PROSPECTIVE JUROR:  All right.  Thank you.

21         THE COURT:  Thank you, Mr. Gerow.  Mr. Fernandez,

22   please.  Good morning, sir.

23         PROSPECTIVE JUROR:  Good morning.

24         THE COURT:  What's the nature of your concern, Mr.

25   Fernandez?

1              PROSPECTIVE JUROR:  Well, I work for a defense

2     contractor, and I've got a secret clearance, and I take oaths

3     there.  And anything related to our military or terrorism --

4     I am patriotic, so my feelings are strong, strongly held

5     towards -- I want to say -- I just don't feel I can be

6     impartial amongst the -- you follow me?

7              THE COURT:  Well, I think I might be able to.  Are

8     you telling me that just hearing the charges -- and realizing

9     they're just charges -- is enough for you to somehow -- you

10    feel that just puts you over the line and you're already --

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  -- you're already favoring the

13    government?

14             PROSPECTIVE JUROR:  Yes, yes.

15             THE COURT:  And you can't objectively look at the

16    evidence?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  I do appreciate your candor.  I'll ask

19    that you return to the jury lounge at this time.  I thank you

20    for your time and service.  They'll have more information for

21    you over there.  All right.

22             PROSPECTIVE JUROR:  Thank you.

23             THE COURT:  Thank you, Mr. Fernandez.

24             MS. MORENO:  Excused for cause, your Honor?

25             THE COURT:  Yes, all three of them.  Mr. Ochoa,

 1   then if we could have Mr. Travis and Mr. Rhamy and Ms. Herron

 2   waiting behind Mr. Ochoa.  Hello, Mr. Ochoa.  Good morning,

 3   sir.  Would you tell me what your concern is.

 4            PROSPECTIVE JUROR:  I work with -- I'm a supervisor

 5   for Homeland Security Investigations, and I know two of the

 6   prosecutors, Ms. Han and Mr. Cole here.

 7            THE COURT:  Okay.  This case is a little too close

 8   for you, it sounds like.

 9            PROSPECTIVE JUROR:  Right.

10            THE COURT:  I'll excuse you for cause and ask that

11   you go back to the jury lounge.  Thank you for your time and

12   service.

13            PROSPECTIVE JUROR:  Thank you.

14            THE COURT:  Mr. Travis.

15            MS. MORENO:  I think he wants Mr. Ochoa, your

16   Honor.

17            THE COURT:  I think he wants them all back so far.

18   How are you, Mr. Travis?

19            PROSPECTIVE JUROR:  Good morning.

20            THE COURT:  Good morning to you.  Would you please

21   tell me what the nature of your concern is.

22            PROSPECTIVE JUROR:  I'm an attorney with the United

23   States Navy, been with them for 15 years.

24            THE COURT:  Keep your voice down.

25            PROSPECTIVE JUROR:  My brother-in-law is a

1   commander with the Navy for over 20 years, field officer with

2   the Navy.  I would like to hold the prosecution to their

3   burden, but I don't know based on the facts that I hear I

4   might be able to do that.

5              THE COURT:  This is just because of the --

6              PROSPECTIVE JUROR:  The nature --

7              THE COURT:  The military --

8              PROSPECTIVE JUROR:  Just the military background

9   and --

10             THE COURT:  Military background and your --

11             PROSPECTIVE JUROR:  I know that -- the significant

12   burden the prosecutor has to provide.  I just don't know if I

13   can, depending upon how emotional the facts are, whatever,

14   I'll be able to hold them to that burden.  I just don't know.

15   I just have that doubt.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR:  There's nothing personal.  I

18   don't know anything about the case.

19             THE COURT:  But you're really doubting your ability

20   to be fair and --

21             PROSPECTIVE JUROR:  The thing is I don't know at

22   this point in time.

23             THE COURT:  Well, do you consider yourself to be a

24   fair person?

25             PROSPECTIVE JUROR:  I consider myself to be a very

 1   fair person.  I consider myself to be an excellent attorney.

 2   I just -- I just don't know.  And I guess part of the reason

 3   I consider myself an excellent attorney is I just don't know.

 4   I can't commit.  I don't know.

 5           THE COURT:  You can't commit to follow the law and

 6   keep --

 7           PROSPECTIVE JUROR:  No, I will absolutely follow

 8   the law.

 9           THE COURT:  And part of the law --

10           PROSPECTIVE JUROR:  But biases come into play,

11   right, depending on --

12           THE COURT:  Well, we all have our view of the

13   world.

14           PROSPECTIVE JUROR:  Your Honor, I've said my piece.

15   You can make your decision.

16           THE COURT:  Well, I'm trying to do so in an

17   informed way.

18           PROSPECTIVE JUROR:  I think I would be an excellent

19   person on the jury panel.  I just -- I just want to make sure

20   that this is something that where I'm at.

21           THE COURT:  This is what I'm trying to gauge here.

22   When you're here giving me this information about the

23   military background, the family and all of that because

24   somewhere in your mind you feel this should be a

25   disqualifier, that if the Court and the parties, knowing

1    this, that this would somehow work against you and that

2    you're kind of falling on your sword.  If that's your

3    mindset, then I want to -- I want to discourage you from

4    thinking that.

5              PROSPECTIVE JUROR:  Okay.

6              THE COURT:  If you feel, even though you're an

7    attorney, even though you understand the government's burden

8    of proof here, that you may not be able to keep the

9    government to its burden of proof because of family ties to

10   the military or because of any personal philosophy you may

11   have or because of any other reason, then that's what we need

12   to know.

13             PROSPECTIVE JUROR:  Right.  To be honest with you,

14   Judge, when I first came here and thought it would be a

15   criminal case, I thought it was, even though I work for the

16   United States government, I'm a defense attorney for them; I

17   do contract law.  So my initial thought would be I was really

18   hold the government to their burden of proof, but the nature

19   of the case, I don't know if I could do it.

20             THE COURT:  So what you're telling me is --

21             PROSPECTIVE JUROR:  I just want to be honest with

22   the Court.

23             THE COURT:  Oh, I appreciate that very much.  You

24   seem to be telling me above and beyond the ties the family

25   has in the military and your own ties, you just feel that you

1  cannot commit yourself to being completely fair and impartial

2  in this case and to holding the government to its burden of

3  proof, come what may.

4          PROSPECTIVE JUROR:  I just say I don't know.  I

5  just -- I don't know.

6          THE COURT:  Okay.  I'll excuse you for cause,

7  Mr. Travis --

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  -- and ask -- hold on, sir.  Ask that

10  you return to the jury lounge.

11          PROSPECTIVE JUROR:  Okay.

12          THE COURT:  And they'll give you further

13  information.  And thank you for your time and service.

14          PROSPECTIVE JUROR:  Thank you.

15          THE COURT:  Mr. Rhamy?  Good morning, Mr. Rhamy.

16          PROSPECTIVE JUROR:  Good morning.

17          THE COURT:  How are you, sir?

18          PROSPECTIVE JUROR:  Good.

19          THE COURT:  Would you tell me what your concern is

20  here.

21          PROSPECTIVE JUROR:  I work with Special Agent

22  Kaiser, who I see in the courtroom.

23          THE COURT:  Okay.  How are you employed?

24          PROSPECTIVE JUROR:  FBI.

25          THE COURT:  Okay.  Sounds like the case is going to

 1   be a little close for you here, so --

 2        PROSPECTIVE JUROR:  Yeah.  Well, I think I could be

 3   fair and impartial, but I just wanted to let you know.

 4        THE COURT:  Well, I appreciate that.  I think it's

 5   a little too close.  I'll excuse you for cause and ask that

 6   you return to the jury lounge.  We thank you for your time

 7   and service.

 8        PROSPECTIVE JUROR:  Across the street or here?

 9        THE COURT:  Unfortunately it's back to -- from

10   whence you came.  Thank you, sir.  Have you stacked this

11   panel with any other people that you work with or --

12        MS. MORENO:  We'd like to talk to Mr. Rhamy though

13   after court, your Honor.

14        THE COURT:  Ms. Herron, please.  Thank you.  Ms.

15   Herron, why don't you come forward, please.  Good morning to

16   you.

17        PROSPECTIVE JUROR:  Good morning.

18        THE COURT:  Why don't you tell us what your concern

19   is, please.

20        PROSPECTIVE JUROR:  Want me to start at the back or

21   the latest?  My son is a Navy SEAL, and --

22        THE COURT:  Very good.

23        PROSPECTIVE JUROR:  And my feeling -- no, I don't

24   believe they deserve a trial here.  No terrorist deserves a

25   trial in federal court.

1        THE COURT:  You understand that --

2        PROSPECTIVE JUROR:  I understand.

3        THE COURT:  -- as these folks are here, they're not

4   terrorists; do you understand that?

5        PROSPECTIVE JUROR:  Well, I have --

6        THE COURT:  So what you're telling me is no

7   suspected terrorist --

8        PROSPECTIVE JUROR:  Exactly.

9        THE COURT:  -- deserves a trial.

10        PROSPECTIVE JUROR:  Exactly.

11        THE COURT:  What do we do, just kind of hang 'em --

12        PROSPECTIVE JUROR:  In 1984 I happened upon a cell.

13        THE COURT:  You happened upon a what?

14        PROSPECTIVE JUROR:  I happened upon a group of men,

15   probably a cell.  They had taken my mother's car, so -- that

16   was at Rees Stealy on Fifth Avenue.

17        THE COURT:  Okay.

18        PROSPECTIVE JUROR:  And then in '86, I had to

19   rescue a babysitter because next door was a group of men and

20   also discovered to be some other than.  In 2001, 9-11, my

21   next door neighbors of my friend were discovered to be

22   Germans who were also -- they had just departed.  They

23   were -- they were suspected terrorists.

24        THE COURT:  Okay.  Well, you've got very strong

25   feelings about the case, and --

1          PROSPECTIVE JUROR:  I do.

2          THE COURT:  -- and I would agree this case is

3     probably not the best for you.

4          PROSPECTIVE JUROR:  I would love to be here, but I

5     don't believe this is my trial.

6          THE COURT:  Okay.  I'll excuse you for cause and

7     ask that you return to the jury lounge in the other

8     courthouse.

9          PROSPECTIVE JUROR:  Okay.

10         THE COURT:  Thank you for your time and service.

11         PROSPECTIVE JUROR:  Okay.  Thanks.

12       (Sidebar conference concludes.)

13         THE COURT:  All right, ladies and gentlemen.  We

14    are ready to proceed further.  What I will now say is

15    intended to serve as an introduction to this case, ladies and

16    gentlemen; it's not a substitute for the detailed

17    instructions that you will receive at the end of the case

18    pertaining to the law if you are selected as a juror in this

19    case.  Nevertheless, I do believe that my comments, my

20    instructions, will be helpful to you at this particular point

21    in time.

22          As I said earlier, this is a criminal case that has

23    been commenced by the government of the United States, who I

24    may sometimes refer to as the prosecution or the government.

25    And at this point what I'm going to do is take a little bit

 1   of a break.  I'm going to ask the members of the U.S.

 2   Attorney's office here who will try the case to introduce

 3   themselves to you and to name any witnesses who they may

 4   intend to call during the course of the trial.

 5            It's important at this point of introduction,

 6   ladies and gentlemen, to observe carefully the participants

 7   in this case and to listen to any names that might be

 8   mentioned to you -- sorry, counsel.  I didn't mean to catch

 9   you a little bit unawares if I'm doing that -- so that if you

10   know anyone or think you know anyone, then you can let us

11   know, and we can follow up on that.  So, Mr. Cole, are you

12   going to be doing the honors for the government?

13            MR. COLE:  Yes, your Honor.

14            THE COURT:  All right.  Thank you.

15            MR. COLE:  Thank you.  My name is William Cole.  I

16   am an Assistant United States Attorney.  This is Caroline

17   Han, an Assistant United States Attorney.  This is Steven

18   Ward, a Department of Justice Trial Attorney.  And the names

19   of witnesses who may be called in this case are Matthew

20   Bryden, Concepcion Flores, Isagani Camangian, Tom Gathman,

21   Donnah Locsin, Victoria Homfeld, Mohamud Ahmed, Colleen

22   Reding, William Via, Catherine Klein, Tami Reis, Kristen

23   Monzon, Colby O'Very, Steven Carrillo, Barry Trent.

24            THE COURT:  All right.  Thank you, Mr. Cole.

25   Ladies and gentlemen, if there is anyone here who knows Mr.

1    Cole or Ms. Han or Mr. Ward or any of the names that were

2    mentioned by Mr. Cole, would you please raise your hand at

3    this time.  And I see no hands.

4         And let me say something about what I just did,

5    what I just asked you to do.  I asked you to affirmatively

6    respond to a question.  It's a general question, and I'm

7    going to proceed that way, and I know counsel to a great

8    extent will proceed in the same manner once we get going,

9    once they actually are participating in this as well.  We try

10   to ask general questions whenever we can rather than asking

11   the same question of you individually, and there are over 70

12   of you here, a little less now.  We try to be efficient in

13   these matters.

14        And at this point I would ask that defense counsel

15   introduce themselves to you as well as their clients.

16   Defense counsel are under no obligation, ladies and

17   gentlemen, to list the names of any witnesses they may call.

18   I'll have more to say about that particular principle in a

19   bit, but, Mr. Dratel, would you please start us out.

20        MR. DRATEL:  Thank you, your Honor.  Good morning.

21   I'm Joshua Dratel.  I represent Basaaly Moalin, who's

22   standing beside me.

23        MS. FONTIER:  Good morning, ladies and gentlemen.

24   I'm Alice Fontier.  I'm also here on behalf of Mr. Moalin.

25        THE COURT:  Okay.  Thank you.  Thank you, counsel.

1    Thank you, Mr. Moalin.  Ms. Moreno?

2              MS. MORENO:  Thank you, your Honor.  Good morning,

3    everyone.  My name is Linda Moreno, and I represent

4    Mr. Mohamud.

5              THE COURT:  Thank you, Ms. Moreno.  Mr. Ghappour?

6              MR. GHAPPOUR:  Good morning, everyone.  My name is

7    Ahmed Ghappour, and I represent Mr. Issa Doreh, who is

8    standing to my right.

9              THE COURT:  Okay.  Thank you, Mr. Ghappour.  Mr.

10   Durkin?

11             MR. DURKIN:  Good morning.  My name is Tom Durkin,

12   and I represent Ahmed Nasir Taalil Mohamud.

13             THE COURT:  Thank you, Mr. Durkin.  Ladies and

14   gentlemen of the jury pool, if any of you know any of the

15   attorneys who just introduced themselves to you who are

16   representing these gentlemen or any of the gentlemen

17   themselves, would you please raise your hand at this time.  I

18   do see one hand raised.  Okay.  Perhaps I can ask this lady

19   to state her name first and then if she would be kind enough

20   to join us up here for just a moment.

21             PROSPECTIVE JUROR:  Vanessa Amedee.

22             THE COURT:  Okay.  Would you spell that, please?

23             PROSPECTIVE JUROR:  A-m-e-d-e-e.

24             THE COURT:  Thank you, Ms. Amedee.  May we see you

25   here at the side of the bench.

 1          (Following is a sidebar conference.)

 2               THE COURT:  Okay.  Who -- okay.  What's the

 3   connection?

 4               PROSPECTIVE JUROR:  I work at Federal Defenders.

 5               THE COURT:  Okay.  What do you do at Federal

 6   Defenders?

 7               PROSPECTIVE JUROR:  Case management coordinator.

 8               THE COURT:  How long have you been there?

 9               PROSPECTIVE JUROR:  Twenty-two years.

10               THE COURT:  And you were actually working with

11   Ms. Fontier at some point?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  Okay.  We'll dismiss you for cause at

14   this point, Ms. Amedee.  Thank you.

15               MS. FONTIER:  Nice to see you though.

16               THE COURT:  Okay.  Well, you deserve one.

17          (Sidebar conference concludes.)

18               THE COURT:  Okay.  All right.  Thank you, ladies

19   and gentlemen.  Moving to another phase of this day, this

20   case is based upon charges contained in an indictment, which

21   is another name for an information or a complaint.  I'm going

22   to read you at this point the pertinent portions of this

23   indictment, but you should distinctly understand that what

24   I'm about to read are simply charges and that they are not in

25   any sense evidence of the -- in this case.

 1          All right.  This indictment -- the operative

 2   indictment reads as follows:  That at all relevant times,

 3   al-Shabaab was a violent and brutal militia group that used

 4   intimidation and violence to undermine Somalia's Transitional

 5   Federal Government, which will be referred to oftentimes as

 6   TFG, Transitional Federal Government, in Somalia and its

 7   supporters.

 8          On or about February 26, 2008, the U.S. Department

 9   of State designated al-Shabaab as a foreign terrorist

10   organization, or an FTO, under federal law.

11          On or about March 18 of 2008, notice of

12   al-Shabaab's designation as an FTO was published in the

13   Federal Register, and the designation has remained in effect

14   continually.

15          Al-Shabaab was also know by the following names,

16   among others:  Al-Shabab, Shabaab, the Youth, Mujahidin

17   al-Shabaab Movement, Mujahideen Youth Movement, Mujahidin

18   Youth Movement spelled in a different way, Harakat Shabaab

19   al-Mujahidin, Hizbul Shabaab, Hisb'ul Shabaab, spelled in a

20   different way, al-Shabaab al-Islamiya, Youth Wing, al-Shabaab

21   al-Islam, al-Shabaab al-Jihaad, and the Unity of Islamic

22   Youth.

23          Throughout al-Shabaab's war against the TFG,

24   Transitional Federal Government, and its Ethiopian and

25   African Union supporters, al-Shabaab used harassment and

1   targeted assassinations of civilians, improvised explosive

2   devices, mines, mortars, automatic weapons, suicide bombings,

3   and general tactics of intimidation and violence.

4            Until his death on or about May 1st, 2008, Aden

5   Hashi Ayrow, also known as "Shikhalow," Shiqalow," or

6   "Sheikalow," spelled in a different way, or "Majadhub," also

7   known as "Slim Limbs," but hereafter referred to as Ayrow,

8   A-y-r-o-w, was a prominent military leader of al-Shabaab.

9   Ayrow called for foreign fighters to join al-Shabaab in a

10  holy war against the Ethiopian and other African forces in

11  Somalia.

12           Defendant Basaaly Saeed Moalin, also known as

13  Basal, also known as "Muse Shekhnor Roble," but referred to

14  as Moalin, was a taxicab driver and a resident of San Diego

15  County.

16           Defendant Mohamad Mohamad Mohamud, also known as

17  "Mohamad Khadar," also known as "Sheik Mohamad," but who will

18  be referred to as Mohamud, was an imam at the al-Ansar

19  mosque, or Masjid al-Ansar, and a resident of San Diego

20  County.

21           Defendant Issa Doreh, also known as "Sheikh Issa,"

22  referred to as Doreh, worked at Shidaal Express, a money

23  transmitting business with offices in San Diego, California.

24           Defendant Ahmed Nasir Taalil Mohamud, referred to

25  as "Nasir," was a taxicab driver and a resident of Orange

1   County, California.

2          Count 1 in the indictment is a conspiracy to

3   provide material support to terrorists, and it's brought

4   against all four defendants, and it states in pertinent part:

5   Beginning on a date unknown and continuing to at least on or

6   about August 5, 2008, within the Southern District of

7   California and elsewhere, defendants did unlawfully and

8   knowingly conspire and agree with each other and with other

9   persons, known and unknown, to provide and to conceal and

10  disguise the nature, source, and ownership of material

11  support and resources, to wit, currency and monetary

12  instruments, knowing and intending that the material support

13  and resources were to be used in preparation for and in

14  carrying out violations of federal law, that is, conspiracy

15  to kill persons in a foreign country and conspiracy to use a

16  weapon of mass destruction outside of the United States.

17         The methods and means by which the defendants

18  sought to accomplish the objects of the conspiracy included,

19  among other -- among others, the following.  A:  Defendant

20  Moalin would communicate with Ayrow via telephone concerning

21  operations and attacks planned and carried out and to be

22  carried out in Somalia by Ayrow and al-Shabaab and concerning

23  funds needed by al-Shabaab.

24         Each of the defendants and others would transmit

25  money from California to Ayrow and al-Shabaab to fund and

1 | support fighters and their operations and attacks, which

2 | included the use of explosives, landmines, and bombs.

3 |      C:  Defendants, each of them, and others would

4 | conceal and disguise the source, amount, nature, and

5 | ownership of the funds transmitted to Somalia and would

6 | structure the money transfers to evade and avoid

7 | recordkeeping requirements.

8 |      D:  When engaging in telephone conversations

9 | discussing Ayrow, al-Shabaab, the attacks, the operations,

10 | and the money transmissions, defendants Moalin, Mohamud,

11 | Doreh, and Nasir, and others would use code names and code

12 | words to disguise references to Ayrow, al-Shabaab, the

13 | operations, and the money transmissions.

14 |      E:  Following Ayrow's death defendants, and each of

15 | them, and others would continue to transmit funds from San

16 | Diego, California, to Somalia to support al-Shabaab.

17 |      Following Ayrow's death defendants, and each of

18 | them, and others would transmit funds to other militias

19 | engaged in violence against the TFG and its supporters.

20 |      G:  The funds transmitted to Somalia would include

21 | the following approximate amounts on or about the following

22 | dates:  January 1, '08, $1,950; January 1, '08, $1,950;

23 | February 13, '08, $1,300; February 13, '08, $700; April 23,

24 | '08, $1,900; February 23, '08, $1,100; July 15, '08, $1,250;

25 | July 15, '08, $1,030; July 23, '08, $1,860; July 23, '08,

1  $1,650; August 5, '08, $860; August 5, '08, $350.

2           In furtherance of said conspiracy and to effect and

3  accomplish the objects thereof, the following overt acts,

4  among others, were committed within the Southern District of

5  California and elsewhere:

6           A:  On or about December 21, 2007, Ayrow advised

7  defendant Moalin by telephone that he urgently needed several

8  thousand dollars.  Defendant Moalin replied that he would

9  take care of the issue swiftly with "the cleric" and with

10  "Sheik Issa."

11           B:  On or about December 21, 2007, defendant Moalin

12  advised defendant Doreh by telephone that "$1 a day per man"

13  was needed for the forces.

14           C:  On or about December 22, 2007, defendant Moalin

15  advised defendant Nasir by telephone that "the young men who

16  are firing the bullets" needed money for the forces in

17  Burhakaba, Somalia, who had "killed 60" and destroyed up to

18  five vehicles in the previous month.

19           D:  On or about January 20, 2008 after telling

20  defendant Moalin that "we planted a landmine" for an

21  individual "who was traveling on that road; he was almost

22  hit."  Ayrow instructed defendant Moalin by telephone to tell

23  Sheik Mohamed that "he must let us know the amount of money

24  we can expect every month even if it is $100."

25           E:  On or about February 13, 2008, defendants

1   Moalin, Doreh, Mohamud caused the transfer of $2,000 from San

2   Diego, California, to Somalia.

3          F:  On or about February 14, 2008, defendant Moalin

4   told Ayrow by telephone that "Yusuf Mohamed Ali" was the

5   recipient name used to transfer a total of $2,000 to Ayrow.

6          G:  On or about April 12, 2008, Ayrow told

7   defendant Moalin by telephone that "it is the time to finance

8   the jihad," and that "if we had bullets for this enemy, we

9   would have destroyed them."

10          H:  On or about April 12, 2008, defendant Moalin

11   told an individual by telephone that "if they are to

12   eliminate those men," then "we must send someone to talk to

13   the people.  We can find 30 men who can pay small amounts."

14          I:  On or about April 17, 2008, defendant Moalin

15   told defendant Mohamud by telephone that "calls are coming

16   from the man," and that defendant Mohamud should hold back 20

17   or 30 trusted people at the mosque to tell them to contribute

18   money.

19          J:  On or about April 23, 2008, defendants Moalin,

20   Doreh, and Mohamud caused the transfer of approximately

21   $3,000 from San Diego, California, to Somalia.

22          K:  On or about April 24, 2008, defendant Moalin

23   advised Ayrow by telephone that the "three bundles," code for

24   $3,000, were sent from San Diego.

25          L:  On or about July 8, 2008 defendant Doreh

1   advised defendant Moalin by telephone that the money had been

2   sent and that Dhunkaal Hersi -- that's in quotes -- "Dhunkaal

3   Hersi," was the code name used as the sender's name.

4           M:  On or about July 13, 2008, after being advised

5   by uncharged co-conspirator number 1 in Somalia that it was

6   difficult to replace ammunition and that each rocket

7   propelled grenade cost $270, defendant Moalin told uncharged

8   co-conspirator number 1 by telephone that "five cartons,"

9   code for $5,000, were on their way but would be broken into

10  several transfers.

11          N "on or about July 15, 2008, defendant Doreh

12  caused the transfer of $2,280 from San Diego, California, to

13  Somalia.

14          O:  On or about July 18, 2008, defendant Moalin and

15  defendant Nasir discussed over the telephone that they would

16  "lay low," and would proceed with the financial support under

17  the "pretense" of helping the poor.

18          P:  On or about July 23, 2008, defendant Moalin

19  caused the transfer of $1,650 from San Diego, California to

20  Somalia, all of this in violation of federal law.

21          Count 2 charging conspiracy to provide material

22  support to a foreign terrorist organization is brought

23  against each of defendants and incorporates the allegations

24  that have been referred to previously, and further states:

25  Beginning on or about March 18, 2008 and continuing to at

1  least on or about August 5, 2008 within the Southern District

2  of California and elsewhere and occurring in and affecting

3  interstate and foreign commerce, the defendants, and each of

4  them, did unlawfully and knowingly conspire and agree with

5  each other and with other persons, known and unknown, to

6  provide material support and resources, to wit, currency and

7  monetary instruments to a foreign terrorist organization,

8  namely al-Shabaab, which has been designated as a foreign

9  terrorist organization since on or about February 26, 2008,

10  knowing that the organization was designated as a terrorist

11  organization as defined in federal law and that the

12  organization had engaged and was engaging in terrorist

13  activity and terrorism.

14       The methods and means by which the defendants

15  sought to accomplish the objects of the conspiracy included,

16  among others, some of the allegations in earlier paragraphs

17  which are incorporated and realleged by reference in this

18  particular count as well as the transfer of funds from the

19  United States to Somalia in the following approximate amounts

20  on the following dates:  April 23, 2008, $1,900; April 23,

21  2008, $1,100; July 23, '08, $1,650; August 5 of '08, $350 in

22  violation of federal law.

23       Count 3 is a count brought against each defendant

24  and is charging conspiracy to launder monetary instruments.

25  Earlier allegations are incorporated into this particular

1    count, which further states that beginning on a date unknown

2    and continuing to at least on or about August 5, 2008, the

3    defendants, and each of them, did unlawfully and knowingly

4    conspire and agree to transmit and transfer monetary

5    instruments and funds from a place in the United States to a

6    place outside the United States, to wit, Somalia, with the

7    intent to promote the carrying on of specified unlawful

8    activities, to wit, providing material support to a foreign

9    terrorist organization in violation of federal law; providing

10   material support to terrorists in violation of federal law;

11   and conspiracy to kill persons in a foreign country in

12   violation of federal law.

13           Count 4 charges Mr. Moalin only with providing

14   material support to terrorists and states:  On or about

15   January 3, 2008 within the Southern District of California

16   and elsewhere, Moalin did unlawfully and knowingly provide

17   and attempt to provide material support and resources, to

18   wit, a house in Somalia, knowing and intending that the

19   material support and resources were to be used in preparation

20   for and in carrying out a violation of federal law,

21   conspiracy to kill persons in a foreign country, all in

22   violation of federal law.

23           Count 5 brought against defendants Moalin, Mohamud,

24   and Doreh only, not defendant Nasir, charges providing

25   material support to foreign terrorists -- to a foreign

1    terrorist organization, incorporates earlier allegations, and

2    then adds:  On or about April 23, 2008, within the Southern

3    District of California and elsewhere, affecting interstate

4    and foreign commerce, defendants Moalin, Mohamud, and Doreh

5    did unlawfully and knowingly provide and attempt to provide

6    material support and resources, to wit, approximately $3,000

7    in currency and monetary instruments to a foreign terrorist

8    organization, namely al-Shabaab, which has been designated as

9    a foreign terrorist organization since on or about

10   February 26, 2008, knowing that the organization was

11   designated as a terrorist organization as defined by federal

12   law, and that the organization had engaged and was engaging

13   in terrorist activity and terrorism in violation of federal

14   law.

15           Ladies and gentlemen, that's a long indictment.  I

16   appreciate your patience.  It needed to be read to you once.

17   The indictment is not handed to you; the indictment is not

18   given to the jurors who will ultimately serve on this case,

19   the indictment does not go in with the jurors during

20   deliberations, so it was important to read the pertinent

21   portions of the indictment to you at this time.  And, once

22   again, I must advise you you must distinctly understand that

23   what I have just read are simply charges and that they are

24   not in any sense evidence of the allegations contained in the

25   charges.  To the charges, to each and every one of them, each

1    defendant who's charged in a particular count has pled not

2    guilty, which is a complete denial of the charges, making it

3    incumbent upon the government, acting through the U.S.

4    Attorney's office, to prove their case beyond a reasonable

5    doubt.  And I'll have more to say about reasonable doubt a

6    little bit later on.

7              At this time, as I indicated previously, I would

8    like to impart to you some general instructions that will be

9    of assistance to you if you are selected as a juror in this

10   case.

11             The right to a trial by a jury, ladies and

12   gentlemen, is a right that is guaranteed by the Constitution

13   of the United States, and it is very important that jurors

14   clearly understand what their obligations are.  First of all,

15   let me add that this right that is guaranteed by the

16   Constitution is a right that is guaranteed to citizens and

17   noncitizens.

18             It will be the obligation of the jurors during the

19   course of the trial to determine the facts of the case as the

20   facts are submitted to them, as the facts are developed from

21   the evidentiary record here in court and not from any other

22   source whatsoever.

23             In fulfilling your responsibility as judges of the

24   facts, you will have to determine what the facts are and also

25   what weight you should give to the facts that you find from

1    the evidence.  It is also your responsibility to determine

2    the credibility or believability of witnesses who testify in

3    this case, and you must utilize the same standards in

4    assessing a witness's believability regardless of who that

5    witness is; regardless of whether that witness is affiliated

6    with one side of the case or another or not, regardless of

7    whether that witness is someone in law enforcement or not,

8    regardless of whether that witness is an expert witness or

9    not, you must apply the same standards in assessing a

10   witness's believability.

11          Now, obviously you can weight those standards

12   differently as you are the judges of the facts, and that will

13   be your obligation to do so, to look at the testimony in this

14   case critically, to weigh the credibility of witnesses who

15   testify.  But the standards don't change; the criteria don't

16   change for making that determination of witness credibility

17   or believability.

18          Among the standards would be the manner in which a

19   witness testifies, the character and quality of that

20   testimony, the demeanor of the witness, that is, the manner

21   of the witness as the witness testifies, and the attitude of

22   the witness in terms of giving testimony.  Any bias,

23   interest, or other motive a witness may have may also be

24   considered by you; any prior inconsistent statements that may

25   have been made, that is, a statement made by a witness before

1    trial that is inconsistent with the testimony given by the

2    witness at the time of trial; prior consistent statements

3    that may come in during the course of the trial; and any

4    other matters that may bear on the reasonableness of a

5    witness's testimony.  Those are just some of the factors that

6    you may take into account but by no means an exhaustive list,

7    and I will fully instruct the jury on this particular subject

8    as well as all other matters the jury needs to be instructed

9    on at the end of the case.

10         There is an important limitation, ladies and

11   gentlemen, upon the power of jurors to decide questions of

12   fact.  All questions of fact must be decided in conformity

13   with the rules of law that will be given to the jury by the

14   trial judge, by the Court.  It will be the obligation of all

15   jurors to follow the law that is given to the jury and to

16   determine what evidence shall be heard and how that law will

17   apply to the evidence that is developed from the record.

18         At the end of the case, you will receive

19   instructions as to the law stating the principles involved in

20   a case such as this to be applied by you to the facts of the

21   law as you find those facts to be from the evidence.  It will

22   be your absolutely obligation to follow the law in that

23   regard, ladies and gentlemen; even though you may question

24   the wisdom of the law or have some other reservation about

25   it, it is your duty to follow it.

1           It would not be appropriate for the attorneys to

2     instruct you on the law; that is the Court's responsibility,

3     and as I said, I will do that at the end of the case and at

4     other times that seem appropriate.

5           The Court regulates the conduct of the trial.  I

6     also have the responsibility of determining whether or not

7     evidence is admissible.  We do have rules of evidence that

8     govern the admissibility of evidence during a trial.  These

9     rules of evidence guide us in the way we conduct a trial.

10          If an attorney makes an objection to the

11    introduction of testimony or, more accurately, to a

12    particular question, he or she is telling me that he or she

13    does not believe that the proffered testimony falls within

14    the rules of evidence.  When I overrule the objection and the

15    evidence comes in, all that I am saying, in effect, is that

16    the jury has a right to hear that evidence in accordance with

17    the rules of evidence.  You may give that evidence a great

18    deal of weight, very little weight, or no weight at all; that

19    will be your prerogative as judges of the facts.

20          Now, in the event that I sustain an objection to a

21    question, that means you must completely disregard the

22    question because the mere asking of a question to which there

23    is no answer may not be considered by you as evidence in this

24    case regardless of how suggestive the question might have

25    been.

1             And also bear in mind, ladies and gentlemen, that

2    there may be times that testimony is given, a question is

3    answered, then there is a motion to strike by one side or the

4    other, strike the testimony in whole or in part, and when

5    that happens -- and there are times when it happens and for

6    good reason -- then I will certainly work with the jurors,

7    explain what part of a statement may remain in evidence, what

8    part of a statement has been stricken.  And there are times

9    when in all probability I'm going to admit evidence for a

10   limited purpose, and if the purpose of that evidence is

11   limited, then I will attempt to advise you at that particular

12   point in time that evidence has been admitted for a limited

13   purpose.

14            The end result of a jury trial is that jurors

15   render a verdict which is fair and impartial and represents a

16   careful weighing of the facts as established by the evidence

17   to which have been applied the principles of law given to the

18   jury.  The attainment of such a result does depend upon

19   coordination between the Court and the jury.  I can assure

20   you that at no time will I suggest directly or indirectly

21   what your decision should be in this case nor will I indicate

22   my opinion in that regard.

23            Another very, very, very vital matter, especially

24   in a case like this, given the charges, ladies and gentlemen,

25   is that every juror keep an open-minded attitude toward this

1  case and that you not decide this case until all of the

2  evidence is in, the instructions have been given to you, and

3  also bear in mind the right of the litigants to have their

4  attorneys argue their respective cases to you at the end of

5  the case.  Only when all of these things is the case ready

6  for submission to the jury and its ultimate decision.

7         It's also very important that you remember that as

8  jurors you may not discuss this case with anyone, and this

9  admonition, this instruction, applies now and at all times

10  forward.  You simply may not discuss this case amongst

11  yourselves or with anyone else or form or express any

12  opinions on the case until the case has been submitted to you

13  and obviously you are a juror on the case.

14         Now, this admonition, as I indicated, not to

15  discuss the case includes, as I say, fellow jurors, it

16  includes the participants in this case, the attorneys,

17  parties, witnesses, spectators, people in and about the

18  courtroom, people in your personal lives, your family, your

19  friends, work associates, everyone.  You may not discuss this

20  case in any way, shape, or form.

21         I strongly urge you not to engage in any

22  conversation with any of the participants in this case on any

23  subject that may not even be connected with the trial because

24  that creates a bit of an appearance problem that I in all

25  probability would have to delve into, and so please keep your

1   respectful distance in that way.  At the same time, we try to

2   be civil when we're in and about the courthouse; a good

3   morning, a hello, a wave of the hand, a nod, a smile is not

4   forbidden, but any communication beyond that is forbidden.

5         At each recess or adjournment of the court, you

6   will be admonished as follows, that it is the duty of the

7   jurors during the recess or adjournment not to converse among

8   themselves on any subject connected with the trial and not to

9   allow anyone to converse with them on any subject connected

10  with the trial; and it is the duty of jurors not to form or

11  express any opinions until the case has been given to the

12  jury for its decision.

13        That's the long form of the admonition; I just gave

14  it to you.  At times I may just say "Remember the

15  admonition"; that's what I have reference to.  Or I may just

16  say "Please do not discuss the case or make any decisions at

17  this time."  I'm referring to the admonition, the long form

18  of the admonition, ladies and gentlemen.

19        If I neglect to give you this admonition at any

20  time, it applies at all times.  If any person attempts to

21  discuss the case with you, even though we may presume that he

22  or she is doing so inadvertently, you must immediately advise

23  that individual that you are a juror and have no right to

24  discuss the case.  If the person were to persist in efforts

25  to discuss the case with you, then it would be your

1    obligation to bring that matter to my attention, and I would

2    try to address it myself.

3          No statement, ruling, remark, or comment which I

4    may make during the course of the trial is intended to

5    indicate my opinion on what your verdict should be or to in

6    any way influence in your determination of the facts.

7          Now, at times it is conceivable that I might ask a

8    witness a question, although doubtful.  If I do so, it is for

9    the purpose of bringing out something that I feel in fairness

10   to all parties must be brought out or perhaps an answer, a

11   bit of testimony was given and I'm not sure everyone heard

12   it, and I want to make sure that everyone did hear it; I

13   might ask a witness to repeat an answer.  In any event, if I

14   ever ask a question, it will never be an indication of the

15   weight that I feel you should give to that witness's

16   testimony; it will just be for the stated purpose.

17         Ladies and gentlemen, a defendant in a criminal

18   case is presumed to be innocent until the contrary is proved,

19   until and unless the contrary is proved, and the burden of

20   proof is on the government to prove its case beyond a

21   reasonable doubt.

22         Reasonable doubt is defined essentially as follows:

23   It is a doubt based upon reason and common sense and may

24   arise from a careful and impartial consideration of all the

25   evidence or from lack of evidence.  Proof beyond a reasonable

1    doubt is proof that leaves you firmly convinced a defendant

2    is guilty as to a particular charge.  You'll be further

3    instructed on the definition of reasonable doubt at the end

4    of this case when you receive all of your instructions.

5              The fact that the defendants and each of them here

6    are in court -- the mere fact they are here in court, the

7    mere fact that charges have been brought against them is no

8    evidence of any wrongdoing in this case.  You are to consider

9    in this case only evidence properly received during this

10   particular trial in determining whether or not the defendants

11   are guilty or not guilty of the charges.  Each defendant, as

12   I've indicated, has entered a not guilty plea as to all

13   charges brought against that defendant, which is a complete

14   denial, as I said earlier -- you know, some of these

15   principles are so important, they bear repeating -- making it

16   incumbent upon the government to prove its case.  And until

17   and unless this is done, until and unless the government

18   carries its burden, the presumption of innocence does

19   prevail.

20             Both the government and the defendants are entitled

21   to have the individual opinions of each juror, which means

22   that each of you, if chosen to sit in this case, must decide

23   for yourself the question of whether a defendant is guilty or

24   not guilty.  However, you should do this only after a

25   discussion of the evidence and the instructions with the

1    other jurors.

2             Ladies and gentlemen, I want to stop at this

3    particular point in time before I get to the next phase of

4    what I'd like to do this morning, and I want to once again

5    ask that most important question I asked previously:  Knowing

6    the nature of the case, knowing the allegations contained in

7    the charges, if there is anyone here who feels that he or she

8    cannot sit as a fair and impartial juror for any reason,

9    would you please raise your hand at this time.  I see three

10   hands raised.  I'll do what I did the first time around and

11   ask each of the two individuals on my right side to state

12   their names, please.

13             PROSPECTIVE JUROR:  I'm Jafer Kazem.

14             THE COURT:  Would you spell your last name, please.

15             PROSPECTIVE JUROR:  K-a-z-e-m.

16             THE COURT:  First name, sir?

17             PROSPECTIVE JUROR:  J-a-f-e-r.

18             THE COURT:  Thank you, sir.  There was one other

19   person on -- yes, sir.

20             PROSPECTIVE JUROR:  My name is Eric Amundsen,

21   A-m-u-n-d-s-e-n.

22             THE COURT:  Thank you, sir.  We have one further

23   hand raised on this side of the courtroom.

24             PROSPECTIVE JUROR:  Estrellita Tan, T-a-n.

25             THE COURT:  Would your spell last name, please.

1            PROSPECTIVE JUROR:  T as in Tom, a-n.

2            THE COURT:  And first name?

3            PROSPECTIVE JUROR:  Estrellita.

4            THE COURT:  Okay.  May I see Mr. Kazem first with

5    Mr. Amundsen and Ms. Tan waiting for us just behind the bar

6    there.  Thank you.

7         (Following is a sidebar conference.)

8            THE COURT:  What is the nature of your concern,

9    sir?

10           PROSPECTIVE JUROR:  Being from Afghanistan and

11   being exposed to terrorism activities, I have a hatred for

12   some groups.

13           THE COURT:  You have a what now?

14           PROSPECTIVE JUROR:  A hatred to some particular

15   groups.  I think my judgment might be bad.

16           THE COURT:  Okay.  You feel that based on what

17   you've heard thus far, particularly all the allegations --

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  -- it just might be too difficult --

20           PROSPECTIVE JUROR:  Al-Shabaab is a terrorist group

21   similar to Afghan mujahedin.

22           THE COURT:  Well, I'm going to -- I'm going to

23   excuse you for cause and ask that you return to the jury

24   lounge in the other courthouse, okay.  Thanks for your time

25   and service.

 1              PROSPECTIVE JUROR:  Sure.

 2              THE COURT:  And they'll have more information for

 3    you over there, okay?

 4              PROSPECTIVE JUROR:  Thanks, your Honor.

 5              THE COURT:  Thank you for your time and service,

 6    sir.  Counsel, gather around, please.  You know, there's no

 7    question that al-Shabaab is a terrorist organization, so -- I

 8    almost said to this gentleman as he was venting against

 9    al-Shabaab being a terrorist organization -- that's not the

10    issue in this case.  Everybody agrees al-Shabaab is a

11    terrorist organization.  There may be a need for me at some

12    point with another individual in some context to state that

13    that -- just to clarify -- that there's no disagreement here

14    on this accord.  Does anyone have any concern about that?

15              MR. DRATEL:  Just that --

16              THE COURT:  If you do, I won't say anything.  I

17    just want --

18              MR. DRATEL:  No, no.

19              THE COURT:  -- to keep moving on here.

20              MR. DRATEL:  Just more about -- as long as it's

21    explored that when you say a terrorist organization, they may

22    not be a foreign terrorist organization in terms of what

23    you're talking about --

24              THE COURT:  Well, if anybody --

25              MR. DRATEL:  -- my kind of association.  So I

1    just -- if you explore it that way, I think it's --

2              THE COURT:  That's parsing it pretty carefully.

3    You know, there may be a need to let somebody know that if

4    they understand al-Shabaab to be a terrorist organization,

5    that does not disqualify them.

6              MS. MORENO:  That's fine.

7              MR. DRATEL:  No, I agree with that.

8              THE COURT:  You can save your argument as to how

9    everything may be stacked up for you, but it may allay

10   someone's concern if at some point they're advised that

11   there's no issue here with respect to the nature of

12   al-Shabaab.  I think there's agreement here that if it's

13   appropriate that that can be mentioned.  All right.

14   Mr. Amundsen, please.  Good morning, sir.  What's the nature

15   of your concern?

16             PROSPECTIVE JUROR:  I work in the motion picture

17   industry; I do large movies.  Lot of the times we work with

18   current and former Navy SEALs, and I really don't believe

19   I'll give defendants a fair shake.  I believe I'm biased on

20   an issue like this.

21             THE COURT:  Okay.  Well, only you know what's in

22   your heart.  If you feel you're already leaning toward the

23   government here, that you're -- the defendants are not

24   playing on a level playing field with you, then we need to

25   know that.  Is that the case with you?

1          PROSPECTIVE JUROR:  It is, sir.

2          THE COURT:  Okay.  I'll excuse you for cause.  I

3   appreciate your candor.  I'll ask that you return to the jury

4   lounge, and they'll have more information for you over there.

5          PROSPECTIVE JUROR:  Thanks.

6          THE COURT:  Okay.  Thank you.  Ms. Tan?  Hello, Ms.

7   Tan.  Good morning.  Why don't you come a little bit closer

8   and tell -- that's fine right there, just so that everybody

9   can hear you.  I know, you're surrounded.

10          PROSPECTIVE JUROR:  Good-looking.

11          THE COURT:  Well, we'll take that.

12          MS. MORENO:  Why is it all the men are going.  What

13   about the women here?

14          THE COURT:  Those of us who need that will

15   certainly accept it.  Tell us what your concern is, please.

16          PROSPECTIVE JUROR:  When you were reading the

17   charges, you kept saying violation of federal law.  My job is

18   in law enforcement.

19          THE COURT:  Your job is in law enforcement?

20          PROSPECTIVE JUROR:  Law enforcement.  I am a state

21   inspector, state investigator with the State of California.

22   And I would say 90, 95 percent of my job goes with regulatory

23   enforcement, local law enforcement, but under federal and

24   state law.

25          THE COURT:  Okay.  Well --

1              PROSPECTIVE JUROR:  And I truly believe the nature

2    of my job might have a significant influence.

3              THE COURT:  What do you do?

4              PROSPECTIVE JUROR:  In fact I investigate hospitals

5    and healthcare facilities.

6              THE COURT:  On what -- for what agency, the

7    Department of Health.

8              PROSPECTIVE JUROR:  Department of Health.

9              THE COURT:  Okay.  That doesn't disqualify you

10   from -- anybody in law enforcement is enforcing some law.

11   When I was reading the allegations, the charges here, they're

12   just statutory references to what federal law has been

13   allegedly violated here, so that's all that means.

14             PROSPECTIVE JUROR:  But this is something I've done

15   the past 20 years of my life.  It's law enforcement.

16             THE COURT:  That's okay.  But what are you -- I

17   don't know quite what you're telling us.  If you're telling

18   us because you consider yourself to be a law enforcement

19   officer --

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  -- that that somehow is going to cause

22   you to favor one side or the other in this case, then that's

23   something we need to know.  If you feel that all of a sudden

24   you're leaning in favor of one side or the other simply

25   because of your job, then you need to tell us that.  But just

1   because you're in law enforcement doesn't disqualify you from

2   sitting on this case, especially the kind of law enforcement

3   you're in.  You're not a peace officer, you're not enforcing

4   military law, you're not enforcing statutes that have

5   anything to do with the charges in this case, and so unless

6   you're telling me that as a law enforcement officer that

7   causes you some --

8           PROSPECTIVE JUROR:  Some of my job activities

9   include coordination with the Department of Justice and also

10  the Attorney General, particularly allegations of abuse,

11  sexual misconduct --

12          THE COURT:  In hospitals?

13          PROSPECTIVE JUROR:  Not only hospitals but the

14  public when there's allegation from hospital regarding

15  allegations against a family member --

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  -- I might -- I have two cases

18  right now that's going on.

19          THE COURT:  Okay.  Can you be fair and impartial in

20  this case?

21          PROSPECTIVE JUROR:  I really don't know.  That's

22  the reason why I came here.

23          THE COURT:  Only you can answer that question.

24          PROSPECTIVE JUROR:  I wouldn't be affected really

25  honestly only because of the nature.  And first of all, I

1    took an oath --

2              THE COURT:  You took an oath.

3              PROSPECTIVE JUROR:  An oath when I took this job

4    that I will uphold both federal law and state law --

5              THE COURT:  Well, you know, something?

6              PROSPECTIVE JUROR:  -- so I don't know.

7              THE COURT:  I'm going to let you to go for cause,

8    Ms. Tan, only because in my view you don't want to be on this

9    jury, and you're somehow rationalizing because of your job --

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  -- you're just not -- you're not a good

12   juror or you're not -- I don't know if you're somehow

13   inclined to favor law enforcement or identify with law

14   enforcement.  I can't see how that's going to matter in this

15   case.  I just wanted you to know that even though I'm

16   excusing you for cause, I really have some doubt about what

17   you're telling me is the basis for your reason not to be on

18   this jury.  I've heard enough to know that it's probably not

19   an appropriate case for you, however.

20             PROSPECTIVE JUROR:  And with the experience, yeah,

21   that's a concern I have.

22             THE COURT:  Well, thank you for your time and

23   service.  We have other cases --

24             PROSPECTIVE JUROR:  Okay.

25             THE COURT:  -- going out, and so you'll go over to

1   the jury commissioner's lounge area, and they'll tell you

2   what your future will be.

3          PROSPECTIVE JUROR:  Okay.  Thank you.

4          THE COURT:  Thank you.  Okay.  Let's carry on.

5      (Sidebar conference concludes.)

6          THE COURT:  Ladies and gentlemen, we may go

7   until -- well, I think we're going go into the noon hour

8   here.  I've already received word that a few of you may need

9   to take a bit of a comfort break at this point.  How many

10  would like -- how many would like a break at this time?  All

11  right.  There's several of you.  What we're going to do is

12  we're going go take a very short break.  There are a lot of

13  you.  I'd like to have you take a ten-minute break, no more

14  than that.  We'll get you back into the courtroom as quickly

15  as we can.  But during recesses, everybody is asked to leave

16  the courtroom, and we'll bring you back in all at once.  And

17  please take your seats when you get back here quickly.

18  They're not assigned seats; you can sit anywhere.  Remember

19  the admonition not to discuss the case or make any decisions

20  at this time.  Thank you.

21      (There was a break in the proceedings.)

22          THE COURT:  Okay, ladies and gentlemen.  Thank you

23  for promptly returning.  There may be one or two of you

24  additionally I need to discuss with counsel to address a

25  matter of concern not related to the merits of the case at

1   all but other matters.  Okay.  Pretty shortly, ladies and

2   gentlemen, we're going to have these questionnaires passed

3   out for you.  You're going to start them at about 11:30 or

4   so.

5          We've covered a lot of business this morning early,

6   at least preliminarily.  There are a couple of things I'd

7   like to -- I'd like to emphasize, however, before we go

8   further and while you're filling out these questionnaires.  I

9   want to talk about the presumption of innocence.  I've

10  already done so a couple three times, but I want to emphasize

11  in this case the presumption.

12         Every defendant in every criminal case throughout

13  the entire country, whether in federal court or state court,

14  ladies and gentlemen, is presumed to be innocent until the

15  contrary is proven, until and unless, and that would be until

16  and unless the government proves its case.  You've already

17  been told that several times, but it bears repeating.

18         What I want to emphasize right now is that the

19  presumption of innocence is a term that we have all heard and

20  we assume applies in every criminal case.  I dare say every

21  one of you would be familiar with that -- with that

22  principle.  But this is a presumption, ladies and gentlemen,

23  that has meaning, it really has meaning, and it has

24  consequences in this and every other criminal case.  It's not

25  merely the recitation of words, for example; that's not what

1   it's all about.  The burden is always on the government to

2   prove its case, and until and unless that happens, the

3   presumption of innocence prevails.  The presumption of

4   innocence never shifts to a defendant in a criminal case, and

5   the burden that the government has can only be met by

6   evidence brought out during the course of this trial -- I've

7   already mentioned that to you -- and not from any other

8   source whatsoever.

9           As a corollary to the presumption of innocence, a

10  defendant has an absolute constitutional right not to

11  testify.  The decision as to whether or not a defendant will

12  testify is the defendant's decision, and no one else can make

13  that decision.  That decision must be respected.  If a

14  defendant decides not to testify, then the presumption of

15  innocence is so strong that a juror may not draw any negative

16  inference from a defendant's decision not to testify.  A

17  juror may not even consider or discuss a decision not to

18  testify, which decision, by the way, is constitutionally

19  protected for all persons, citizens and noncitizens alike.

20          Now, it might be natural for a juror, or anyone,

21  for that matter, to wonder or to speculate how a defendant

22  would have testified if a defendant had elected to testify,

23  but that kind of curiosity, that kind of speculation, that

24  kind of surmise must be set aside in this case.  It's that

25  simple.  It cannot be entertained or considered in any way,

1    shape, or form.  No negative inferences may be drawn from a

2    defendant's decision not to testify.  Okay.  Enough said on

3    that particular principle at this point in time.

4            Another matter I wanted to address with each and

5    every one of you is the following.  You have heard the name

6    of the organization identified, alleged to be a foreign

7    terrorist organization as al-Shabaab.  It is that

8    organization that will be the focus of this case.  Now, at

9    this particular point in time, I cannot say what all the

10   evidence will be in the case.  I am informed that there may

11   be a reference at one point to another -- or another about or

12   to al-Qaeda.  If there is any reference to al-Qaeda, it will

13   be only for a very limited purpose; I will tell you what that

14   purpose would be at the time there is any mention of

15   al-Qaeda.  But I want to tell you what this case is not.  It

16   is not a case about al-Qaeda.  If there is a reference to

17   al-Qaeda, as I say, it will only be for a limited purpose.

18   The charges in this case do not involve al-Qaeda, and they do

19   not involve any activity of al-Qaeda.  I'm talking about the

20   charges now in this case.

21           There will be no evidence in this case that the

22   defendants, or any of them, were members of al-Qaeda or

23   sponsored al-Qaeda activity.  So there will be no evidence

24   that the defendants, or any of them, support al-Qaeda in any

25   way, shape, or form.  This case involves the organization

1    known as al-Shabaab.  I need to make that absolutely clear.

2    I think it's more effective if you hear it from me than if

3    you hear it from counsel because I can drive home this point,

4    and it's in the form of a legal instruction.  It's in the

5    form of trying to frame a particular piece of evidence that

6    may or may not come in.  It's a form of diffusing what many

7    of you feel or may feel around these two words, "al-Qaeda."

8    I don't want any reference to those words to in any way

9    create anything other than a level playing field for both

10   sides in this case.  If there is a mention of al-Qaeda, you

11   should be able to fairly and objectively consider that

12   reference along with all the other evidence in the case.

13          I'll say no more about that.  Counsel may want to

14   follow up with some of you at another point in the

15   proceedings here.  My instruction to you would be, as it is

16   in every case, to deal with the evidence fairly, objectively,

17   give both sides a fair shake, and we can ask no more of those

18   people who actually fill the seats on this case.

19          If you feel you cannot fairly and impartially serve

20   on this case, then it would be your obligation, once again,

21   to raise your hand at this time or to indicate that on the

22   questionnaire upon further thought and reflection.  That's

23   pretty much what I wanted to say before I wrap up these

24   remarks and we hand out questionnaires.

25          I want to tell you a little bit about a couple of

1    admonitions here.  You know, I've told you that the evidence

2    in the case is the only basis upon which you can decide the

3    case.  There may be -- there may be some media coverage of

4    this case.  Quite frankly, I think if there is any media

5    coverage, I think it would be very, very limited.  There may

6    have been in the past one or two articles that may have had

7    something to do with this particular case.  It's the duty of

8    every juror to absolutely insulate themselves from any

9    case -- from any media reports or accounts of any case they

10   may be sitting on.  I would go further, and I would say in a

11   case such as this, have nothing to do -- insulate yourselves

12   completely to any newspaper accounts -- assuming newspapers

13   are read by anyone anymore -- but news accounts, Internet

14   reports, television accounts, radio accounts, any other --

15   any other media accounts in whatever form having anything to

16   do with this case, with the subject of terrorism generally,

17   with the subject of politics in Africa.  You see an article

18   in your medium of choice, whether it's a newspaper or some

19   other article, having anything to do with any subject in

20   these areas I've talked about.  Put it aside.  If you're

21   watching television and something begins to come up having

22   something to do, anything to do, just even on the periphery

23   of what we're dealing with, what's charged in this case, turn

24   the channel, turn off the radio, turn to another site.

25           Do not, please, do not do any independent research

1    or investigation into this case, the facts of the case, or

2    any of the participants in this case.  Please do not Google

3    any of us, do not Google any subject having anything to do

4    with this -- with this case.  You know, in the old days when

5    I tried cases, couple of centuries ago, you know, all we had

6    basically was newspaper accounts.  You were told not to, you

7    know, not to read anything in the newspaper.  You couldn't

8    investigate individuals.  An admonition not to -- not to

9    perform any independent investigation meant, you know, if a

10   particular scene was involved, a particular location, don't

11   go to that location and make your own independent

12   observation, don't consult dictionaries for the meaning of

13   words and don't talk to your friends who may have expertise

14   in a given area, don't talk to any lawyers.  That was it.

15   But now in this information age, there's so much out there

16   that it is so important for us to advise all of you in this

17   and every other case, do not perform any independent

18   investigation into the facts, the law having to do with this

19   case, personalities, participants, or any subject connected

20   with the trial.  Okay.  I beat that drum enough I hope.

21           What I'd like to do is pass out these

22   questionnaires, get you started on the questionnaires.  I've

23   got a little bit of a checklist here -- up here, so because

24   it's up here, I may forget one or two things, but essentially

25   while you're doing the questionnaires, we're going to vacate

1   this room; all of us, all the participants in this case,

2   we're going to vacate this room.  You have this room to

3   yourselves.  Do your thing, fill out those questionnaires

4   honestly, truthfully, and then turn them in to Gaby.  Gee, I

5   forgot to introduce Gaby, my courtroom deputy, Gabriela

6   Cazares, and Debra Henson, my court reporter, been working

7   together -- been working together as team forever.  Debbie

8   was with me on superior court as well as here; we've been

9   working over 20 years together now.  So we do work as a team,

10  and they'll be assisting you, as well as other staff members

11  and court attache.

12          So when you drop your -- your filled-out

13  questionnaire off with Gaby, she's going to validate your

14  parking; she's actually got a parking validation machine

15  here -- don't tell anybody about that outside this courtroom.

16  But she actually has a parking validation machine here, true?

17  For these folks -- Gaby does not have a parking validation

18  machine.  Just listen to Gaby.  See, I got into an area where

19  I don't know anything.  And so you're going to fill out the

20  questionnaires, you're going to leave the questionnaires off,

21  and then we're going to look them over a little bit later in

22  the afternoon.  And then remember to call in after six

23  o'clock, and you'll be given the appropriate message.

24          Most of you will be coming back, and you're going

25  to be coming back not -- well, let's see.  You'll be coming

 1   back actually to Courtroom 15, which is on the fifth floor,

 2   tomorrow morning at 8:45 -- just giving you a little bit of a

 3   preview -- it's going to be Courtroom 15, 8:45.  We're not

 4   going to be there with you.  You're just going to assemble

 5   there, and then you're all going to be brought down here

 6   again to this courtroom.  No?  Anyway, we'll get back to you

 7   on that one as well.  I think you're going to be in Courtroom

 8   15 -- we'll check with jury.  I think I'm batting 500 on this

 9   one now.  I think you're going to be up on the fifth floor in

10   Courtroom 15 at 8:45, then brought down here, and then we'll

11   proceed further with jury selection.  So that is it.

12          We're going to pass out these questionnaires now.

13   Remember, as you're filling out these questionnaires, you're

14   filling them out under oath.  That oath you took applies.

15   Nancy?  Nancy Prewitt's in the back here, and she's been

16   assisting as well.  Aren't these folks, the ones who are

17   coming back, going to be in Courtroom 15 at 8:45?

18          MS. PREWITT:  And there will be a parking thing

19   there tomorrow.

20          THE COURT:  Tomorrow?

21          MS. PREWITT:  They don't have to go to the --

22          THE COURT:  So they've already been validated for

23   today.  Okay.  All right.  So courtroom 15 tomorrow, fifth

24   floor, and your parking will be validated at that point

25   because Gaby will have a machine tomorrow morning.  Okay.  I

1     need to see two -- I'm going to -- you're going to take one

2     more recess, and then you're going to come in -- we're going

3     to have the questionnaires ready for you to go.

4              I do need to see, however, two of you, Mr. Moran

5     and Prospective Juror Hanmer.  If the two of you could stay

6     behind for just a moment, the rest of you are on a recess.

7     We'll see you back in ten minutes, and you'll be filling out

8     your questionnaires.  Remember the admonition.

9          (Following is a sidebar conference.)

10             THE COURT:  Mr. Moran, will you please come

11    forward, then Mr. Hanmer.  All right.  Mr. Moran, I

12    understand something came up for you in terms of time.  You

13    were prequalified, time-screened.  What --

14             PROSPECTIVE JUROR:  Yeah, I didn't understand.

15    When I received my notice for the long-term trial, I thought

16    the only way to get out of it was a medical disability or a

17    hospitalization.  A month-long trial for me -- I support my

18    custom application for my company, Knox Attorney Service, in

19    five different offices I'm their only guy, so a month-long

20    trial would very much hurt my company at this point.

21             THE COURT:  Is there any particular reason you

22    didn't take that up with the jury clerks this morning or at

23    any other time?

24             PROSPECTIVE JUROR:  I asked her, but she said since

25    I had already answered yes, that she couldn't do anything.

1          THE COURT:  Are your in business for yourself?

2          PROSPECTIVE JUROR:  No, no.  I'm just the sole

3  programmer/developer for the company.

4          THE COURT:  There's nobody there to --

5          PROSPECTIVE JUROR:  To take my job, no.  We just

6  put in a website this month that's integrated with my

7  database, so there's some amount of support, but it's just

8  very important for me to be there.

9          THE COURT:  What's the longest you could be away

10  without --

11          PROSPECTIVE JUROR:  Oh, a week or two.  I think --

12  I think it would --

13          THE COURT:  Okay.  All right.  I'm going to excuse

14  you just for hardship on this case --

15          PROSPECTIVE JUROR:  I'm sorry.

16          THE COURT:  -- not for all cases.  I'll ask you to

17  go back to the jury lounge.  It may be that you'd be back on

18  another case of a shorter estimate.

19          PROSPECTIVE JUROR:  Okay.  So I should call tonight

20  then again or --

21          THE COURT:  No, no you don't need to do that.  Just

22  go back over to the jury lounge and tell them -- we'll

23  communicate with them as well.  Just tell them that I've

24  excused you on this case only for hardship.

25          PROSPECTIVE JUROR:  Thank you, your Honor.

1              THE COURT:  All right.  Thank you, sir.

2     Mr. Hanmer.  This is the gentleman with the hearing issue.

3     Hello, Mr. Hanmer.  Good morning to you, sir.

4              PROSPECTIVE JUROR:  Good morning.

5              THE COURT:  And I understand that you're using a

6     listening assistive device.

7              PROSPECTIVE JUROR:  Yes, sir.

8              THE COURT:  But that you've had a lot of difficulty

9     hearing what was said.

10             PROSPECTIVE JUROR:  I could hear every word that

11    you said crystal clear, but I haven't the slightest idea what

12    oath I took when she read the oath.  And when the -- when the

13    attorneys were introduced, I couldn't understand what they

14    were saying.

15             THE COURT:  Because they were away from a

16    microphone.

17             PROSPECTIVE JUROR:  No, there was some kind of

18    interference, feedback.

19             THE COURT:  I see.

20             PROSPECTIVE JUROR:  But I honestly don't think that

21    I'm going to be able to follow this.

22             THE COURT:  Well, what do --

23             PROSPECTIVE JUROR:  Well, I have a hard time at the

24    movies, and sometimes when people are talking to me, I

25    pretend that I understand what they're saying because I'm

1   embarrassed to not understand.

2           THE COURT:  Let me stop you for just a moment.  I

3   know I've been speaking into the microphone, so apparently

4   that's been pretty clear to you today.  I'm concerned,

5   however, that you haven't been able to hear everything

6   counsel has said.  Counsel won't be speaking directly into

7   the microphone as I have this morning, and I'm concerned you

8   may lose some of that, and I certainly don't want to create a

9   hardship for you here.  The trial is going to be somewhat

10  lengthy, and I don't want you to feel as though you have to

11  strain, and I don't want you to miss anything.  You've

12  already missed the oath apparently; that's not a good start.

13  Can you ask you to wait with Nancy over there by the bar?  I

14  just want to discuss your case with counsel.

15          PROSPECTIVE JUROR:  Sure.

16          THE COURT:  Thank you.  Okay.  I'm happy to excuse

17  him just for hardship purposes, okay?

18          MR. DRATEL:  Yes, your Honor.

19          THE COURT:  All right.  Okay.  We're going to clear

20  out at this point, and then -- Nancy, Mr. Hanmer has been

21  excused for hardship from this case.  Thank you, Mr. Hanmer.

22  So when the jurors come back -- well, we still got a pretty

23  good number; you've got a good net group of --

24          MS. FONTIER:  Sixty-one at this point.

25          THE COURT:  Yeah, yeah.  We'll let them -- it's

1   quarter to 12:00 now.  We'll let them do their

2   questionnaires.  I've got that meeting until about two

3   o'clock.  I can be back here at 2:00.  You can certainly --

4   how are you going to get the questionnaires?

5            MR. COLE:  I can pick them up, but I guess I just

6   won't know when they're done.  I guess I can either hang

7   around or I can wait for a phone call from Gaby.

8            THE COURT:  You're all going to be to together, is

9   that -- at some location where you --

10           MR. COLE:  Yes.  And I told them I would -- I told

11  them that once we receive them and have the copies, we would

12  contact -- I think I have a cell phone number for

13  Mr. Ghappour -- they're going to send someone over to pick up

14  their sets at my office; they'll come to my office, and

15  we'll --

16           THE COURT:  Okay.  I'll let you organize what you

17  need to organize.  Just do it on your own --

18           MR. COLE:  Yes.

19           THE COURT:  I'll be back here at about two o'clock,

20  and we'll proceed with the questionnaires at that point.  I

21  may -- you can tell me what questionnaires you've agreed or

22  what individuals can be released from further service on the

23  case, and we'll come up with a net group.  I may have to make

24  a few decisions on a couple of these if there's no agreement,

25  we can talk about any red flags that need to be discussed,

```
 1   and I think we've got plenty of time to do that.  Okay.

 2              MS. MORENO:  Your Honor, I'm sorry.  Does the Court

 3   want us back here at two o'clock?

 4              THE COURT:  Yeah.

 5              MS. MORENO:  Okay.  Would the Court entertain

 6   giving us another 45 minutes or so because we believe that

 7   that's not enough time.  They still have to fill them out --

 8              THE COURT:  Okay.  How much time --

 9              MS. MORENO:  -- they have to copy them, we have to

10   get them --

11              THE COURT:  What's a good --

12              MS. MORENO:  -- and we think -- I've already spoken

13   to Mr. Cole, and he and I are going to be talking about those

14   areas that either we can agree --

15              THE COURT:  Tell me what you think --

16              MS. MORENO:  I think three o'clock.

17              MR. DRATEL:  It will reduce the job that you have

18   to do --

19              MS. MORENO:  Yes.

20              MR. DRATEL:  -- to a manageable number.  I'm sorry.

21   It will reduce what the Court will be asked to decide as

22   opposed to those which we'll agree on so that I think we can

23   do everything between 3:00 and 5:00 and we won't have a

24   problem.

25              MS. MORENO:  I think you're being optimistic.
```

1          THE COURT:  All right.  Give it your best shot.

2          MS. MORENO:  Thank you, your Honor.

3          THE COURT:  Okay.  So if everybody would vacate the

4    courtroom, we'll bring the jurors back and, you know.

5    Counsel, if you don't want to leave from here, defense

6    counsel want to leave from another floor, you can do that so

7    they don't see you leaving without your clients.

8          MS. MORENO:  The clients will be back at three

9    o'clock, your Honor, or no?

10         THE COURT:  Back here at 3:00, I think that's the

11   plan.

12         MS. MORENO:  Yes.

13         THE COURT:  So, you know, you can take them out

14   that way.  Nancy, there will be a lot of jurors out there

15   though, so --

16         MS. PREWITT:  I was just going to take them down

17   the elevator.  Should we -- we'll wait out in the hallway,

18   and you can give us a sign when they're back; when jurors are

19   back, just give us a sign.

20         (There was a break in the proceedings.)

21         (The following proceedings were sealed by the Court.)

22

23

24

25

<u>Certificate of Reporter</u>

I hereby certify that I am a duly appointed, qualified, and acting Official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

Dated January 7, 2014 at San Diego, California.

/s/ Debra M. Henson  (electronic)
Debra M. Henson
Official Court Reporter