1                    United States District Court

2                  Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )
                                      )
6       vs.                           ) Case No. 10-CR-4246 JM
                                      ) Jury Trial/Day 4
7    BASAALY SAEED MOALIN,            ) Thursday, January 31, 2013
     MOHAMAD MOHAMAD MOHAMUD          )
8    ISSA DOREH,                      ) Volume 4
     AHMED NASIR TAALIL MOHAMUD,      )
9                                     )
                     Defendants.      )
10   _____  )

11

12                Before the Honorable Jeffrey T. Miller
                     United States District Judge

13

14

15

16

17

18

19

20   Official Interpreters:   Ayderus Ali, CCI
                              Fanik Jama, CCI
21

22   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
                              221 W. Broadway, Suite 5190
23                            San Diego, CA  92101
                              (619) 238-4538
24

25                Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:      Laura E. Duffy
                              UNITED STATES ATTORNEY
 3                           William P. Cole
                              Caroline P. Han
 4                           ASSISTANT U.S. ATTORNEYS
                              Steven P. Ward, Trial Attorney
 5                           U.S. DEPARTMENT OF JUSTICE
                              880 Front Street, Suite 6293
 6                           San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)            Joshua L. Dratel, Esq.
 8                           Alice Fontier, Esq.
                              OFFICE OF JOSHUA L. DRATEL
 9                           2 Wall Street, Third Floor
                              New York, NY  10005
10
     (Mr. M. Mohamud)        Linda Moreno, Esq.
11                           LINDA MORENO, P.A.
                              P.O. Box 10985
12                           Tampa, FL  33679

13   (Mr. Doreh)             Ahmed Ghappour, Esq.
                              LAW OFFICES OF AHMED GHAPPOUR
14                           P.O. Box 20367
                              Seattle, WA  98102
15
     (Mr. A. Mohamud)        Thomas A. Durkin, Esq.
16                           Janis Roberts, Esq.
                              DURKIN & ROBERTS
17                           2446 N. Clark Street
                              Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1        San Diego, California - Thursday, January 31, 2013

2        (Defendant Mr. A. Mohamud is being assisted by a Somali

3   interpreter.)

4        THE COURT:  Good morning, ladies and gentlemen.

5   Counsel wanted to address a matter?

6        MR. DRATEL:  Yes, your Honor.  Having this morning

7   read the Court's order with respect to defense's Brady

8   motion, I just wanted to clear up a misunderstanding with

9   respect to the last part of that, which is that it was -- it

10  was -- I believe that we had made a motion early on in our

11  pretrial motions for specific disclosure of the underlying

12  information with respect to the -- to compel the government

13  to disclose the underlying information, what was behind that

14  field assessment report.  And if I misunderstood the Court's

15  ruling, I thought that we had asked for specific information

16  that was neither denied nor granted, but if that was part of

17  the Court's continuing order for the government's Brady, I

18  apologize for the misunderstanding.

19       THE COURT:  You can assume the government's always,

20  always under the import of a Brady order.

21       MR. DRATEL:  I understand that, and I --

22       THE COURT:  The government has an obligation, a

23  lawful obligation over and above any order this Court may

24  make.  As you know, they're obligated --

25       MR. DRATEL:  I understand, your Honor, but at the

1   same time it always is good to have the influence of the

2   Court with respect to specific documents, and that's all we

3   were trying to do.

4           THE COURT:  Okay.  Well, as I said, I hope you're

5   comforted by the last part of that.

6           MS. MORENO:  Yes, your Honor.

7           MS. FONTIER:  Thank you, your Honor.

8           MS. HAN:  Your Honor, and we also --

9           MR. DRATEL:  I just wanted to add that we received

10  additional Brady material within the last day, day and a

11  half, with respect to the telephone conversations and notes

12  on that.

13          MS. HAN:  Your Honor, if we can speak to that.  I

14  believe that that information is actually Jencks material

15  and -- it's not Brady material, it's Jencks material.

16          THE COURT:  Okay.  Well, it can be both

17  technically.

18          MR. DRATEL:  I'll just put on the record what it

19  was.  It's the notes of a linguist about a telephone

20  conversation that he listened to that -- where he says I

21  believe that they are intending or that their intention is to

22  send -- that Moalin's intention is to send money to Somalia

23  for drought relief.

24          MS. HAN:  In any event, your Honor, I believe that

25  that's taken out of context.  There are multiple

1   additional --

2         THE COURT:  That's okay.

3         MS. HAN:  In any event, your Honor, the reason that

4   we wanted to speak with the Court is because in light of the

5   opening statements yesterday in which a couple of defense

6   counsel talked about the Ethiopian troops being occupying

7   forces and, in addition, Mr. Ghappour offered a jury

8   instruction for a necessity defense, we harken back to the

9   Court's ruling on our motion in limine to preclude the

10  necessity defense.  I believe that your Honor's ruling was

11  that you wanted to hear a proffer --

12        THE COURT:  There must be a proffer first before a

13  necessity defense is --

14        MS. HAN:  Your Honor, we anticipate that defense

15  counsel will seek to elicit evidence on that point from

16  Mr. Bryden, and so in light of that, we would like a proffer

17  or we'd ask the Court to seek a proffer from the defense at

18  this point.

19        THE COURT:  Well, I don't know that it's necessary

20  for the defense to justify its cross-examination of your

21  expert, of Mr. Bryden now by fitting it into what may

22  ultimately become part of an affirmative defense.  Mr. Bryden

23  testified pretty widely on a number of different areas, and

24  so if the cross-examination appears to expand beyond what is

25  appropriate, then I assume you'll make the appropriate

1    objection and I'll have an opportunity to deal with it right

2    now.  But it's a little difficult to deal with it

3    theoretically as you've -- as you've suggested.  So you'll

4    reserve your objections and all grounds for your objections.

5              Okay.  Let's see.  I think we're just about ready

6    to -- a minute or two early.  Let's get a reading on our

7    jurors and see if they're all here.

8              MR. DRATEL:  Your Honor, while we're waiting --

9              THE COURT:  I knew I should have left.

10             MR. DRATEL:  I'm sorry?

11             THE COURT:  I knew I should have taken off for two

12   minutes.

13             MR. DRATEL:  The Court security -- the court

14   information computer officer arrived yesterday but the laptop

15   did not because of tornadoes; it's apparently stuck in FedEx.

16   It should be here today.  As soon as we're finished with Mr.

17   Bryden, probably during lunchtime, I'll be able do the

18   Section 5 and get that --

19             THE COURT:  Thank you.  All right.  We may have to

20   be waiting for one or two jurors, so as soon as we have

21   everyone here --

22             MR. COLE:  Do you want our witness to come take the

23   stand again or --

24             THE COURT:  That's fine.

25             MR. COLE:  -- wait?

1          THE COURT:  Why don't you have Mr. Bryden just wait

2    right behind you, and once we have our jurors in place, we'll

3    proceed, okay?  All right.  We'll resume in just a minute or

4    two.

5          (There was a break in the proceedings.)

6          (The jury entered the courtroom.)

7          THE COURT:  Good morning, ladies and gentlemen.  We

8    are ready to proceed with you, and I believe Mr. Bryden will

9    be taking the stand for cross-examination.  Mr. Bryden, if

10   you would please take the stand.  You've been previously

11   sworn, and you are still under oath.

12                       Matthew Bryden

13   was called by the government and, having been previously

14   sworn, testified as follows:

15         JUROR LOPEZ:  Your Honor?

16         THE COURT:  Yes.

17         JUROR LOPEZ:  We were discussing this monitor right

18   here, and the people behind me -- if it could be -- because

19   it's kind of like tilted, and they can't see it as well.

20         THE COURT:  Okay.  Fine.  Do we -- Mr. Cole, do you

21   have your technician available?  Apparently not.

22         MR. COLE:  We'll get our technician down.

23         THE COURT:  Why don't you do that.

24         JUROR LOPEZ:  Thank you.

25         THE COURT:  Okay.  Mr. Dratel, are you ready to

1   proceed?

2           MR. DRATEL:  I will, your Honor.  Thank you.

3                   Cross-Examination

4           BY MR. DRATEL:  Q.  Good morning, Mr. Bryden.

5   A.  Good morning.

6   Q.  During the course of your career, you have worked with

7   the U.S. government, correct?

8   A.  That's correct.

9   Q.  And even for the U.S. government?

10  A.  That's right.

11  Q.  And in the course of your career, either working for or

12  with the U.S. government, also as part of the UN Monitoring

13  Group, you've cooperated with law enforcement, intelligence,

14  diplomatic community from the U.S., correct?

15  A.  That's correct.

16  Q.  And other governments as well?

17  A.  Yes.

18  Q.  And you worked with the USAID, United States Agency for

19  International Development, right?

20  A.  That's correct.

21  Q.  Which is a U.S. government agency, and you've also worked

22  with the Department of Justice before?

23  A.  Yes.

24  Q.  Not just in testifying as an expert but in the course of

25  your career otherwise, you've worked with the Department of

1    Justice?

2    A.   I've cooperated with the department.

3    Q.   And the Department of the Treasury?

4    A.   Yes.

5    Q.   And Department of Defense?

6    A.   Yes.

7    Q.   And you frequently comment on the media or write op-ed

8    pieces about Somalia and the area in the Horn of Africa?

9    A.   That's right.

10   Q.   Now, you've worked with the United States Agency for

11   International Development, which we'll call USAID, I think,

12   USAID is a government agency that essentially contracts to

13   private agencies or NGOs to form development projects in

14   certain countries; is that a fair description?

15   A.   That's part of what it does.  It also gives assistance

16   directly to governments and through the United Nations.

17   Q.   And when you were working for USAID, was your work mainly

18   in the Ogaden area?

19   A.   No, it was mainly in -- in Somalia itself.  That's when I

20   was contracted by Development Alternatives, Incorporated,

21   DAI, based in Nairobi.

22   Q.   It's true though you haven't written much specifically

23   about the Galgaduud region?

24   A.   That's correct.

25   Q.   Or about Guraceel specifically in the Galgaduud region?

1   A.   Not specifically, no.

2   Q.   And you've written reports for USAID, right?

3   A.   That's correct.

4   Q.   And those were confidential reports at the time, right?

5   A.   Some were.

6   Q.   Withdrawn.  They've never been publicly released,

7   correct?

8   A.   Correct.

9   Q.   And they were designed to help shape U.S. policy with

10  respect to Somalia, correct?

11  A.   That's right.

12  Q.   Now, in your -- in your work in the Horn of Africa, you

13  need the cooperation from governmental agencies not just

14  there but also internationally such as the U.S. and UN member

15  countries?

16  A.   That's right.

17  Q.   And you also need protection to a certain extent, whether

18  diplomatically or otherwise, from certain of these countries

19  as well operating in those areas, right?

20  A.   Only from host governments, not from foreign governments.

21  Q.   And you've had some issues with foreign governments from

22  time to time; fair to say?

23  A.   In my work, yes, I've encountered issues with foreign

24  governments.

25  Q.   And, in fact, just after finishing college, you were

1    arrested and detained by the Ugandan government, correct?

2    A.   That's right.

3    Q.   And you were traveling as a tourist at the time?

4    A.   Yes.

5    Q.   Did they tell you why you were detained?

6    A.   For my own protection.

7    Q.   Protection from --

8    A.   It was an unstable area from the -- what was known as the

9    Holy Spirit Movement, which was active in that area.

10   Q.   You obviously did not seek their protection?

11   A.   No, I didn't seek their protection.

12   Q.   But they imposed it on you nonetheless?

13   A.   Yes.

14   Q.   And for a couple of days, you were forced to stay at a

15   Red Cross guest house?

16   A.   That's correct.

17   Q.   And as a westerner do you think that you got an advantage

18   in terms of how you were treated by the Ugandan military, the

19   Ugandan government in that regard?

20   A.   It's hard to say there.  I'm not sure what other kinds of

21   tourists there might have been in that part of Uganda at the

22   time.

23   Q.   And in 1996 you were abducted by a Eritrean rebel group?

24   A.   No, by an Ethiopian rebel group.

25   Q.   An Ethiopian rebel group.  And when you were released,

1    that was about a week or so you -- and when you were

2    released, you were arrested by the Ethiopian authorities?

3    A.  That's right.

4    Q.  And they suspected you of being a trainer or an advisor

5    to the group that had in fact abducted you?

6    A.  That's correct.

7    Q.  And you were detained by Ethiopian authorities for about

8    a week, right?

9    A.  Correct.

10   Q.  And that was a mistake obviously?

11   A.  That was a mistake.

12   Q.  And you were working for the UN at the time --

13   A.  Yes, I was.

14   Q.  -- right?  And you were not training or advising that

15   Ethiopian rebel group?

16   A.  No, not at all.

17   Q.  And did the UN play a part in gaining your release?

18   A.  Yes, they did.  They clarified my status with the

19   Ethiopian government, and a week later I was released.

20   Q.  Did any other government -- did any other government play

21   a part, Canada, the United States?

22   A.  Canada played a role.

23             MS. MORENO:  I'm sorry, your Honor.  I can't hear.

24             THE COURT:  Yes.  You're speaking very softly.  I'm

25   going to ask you to keep your voice up and perhaps pull that

1   microphone a little bit closer to you.

2           BY MR. DRATEL:  Q.  So Canada also played a part in

3   gaining your release?

4   A.  Yes, Canada played a role.

5   Q.  Do you think you fared better as a result than let's say

6   an Ethiopian or a Somali in the same situation?

7   A.  Probably, yes.

8   Q.  Now, in July of 2007 I think you were detained by the TFG

9   at the Mogadishu Airport; is that correct?

10  A.  Yes, although the date is incorrect.

11  Q.  What was the date?

12  A.  It was March 2007.

13  Q.  March 2007.  And you didn't have a visa, correct?

14  A.  That's right.  Visas are available on arrival.

15  Q.  And not your first trip to Somalia, right?

16  A.  No.

17  Q.  And, in fact, you were stationed in Nairobi at the time,

18  right?

19  A.  That's right.

20  Q.  And that's because the U.S. -- one of the reasons is that

21  the U.S. does not have an embassy in Somalia, correct?

22  A.  Correct.

23  Q.  Does not have any diplomatic personnel on a permanent

24  basis in Somalia?

25  A.  Correct.

1   Q.  And another reason for being stationed in Nairobi is that

2   it's not particularly safe in Somalia either?

3   A.  That's correct.

4   Q.  And travel is not safe or easy in Somalia as well?

5   A.  In most of Somalia that's correct.

6   Q.  And in that instance, in March 2007, you were released

7   after one day, right?

8   A.  That's right.

9   Q.  But you were deported --

10  A.  Yes.

11  Q.  -- as well.  They didn't give you the opportunity to get

12  your visa upon arrival?

13  A.  No, they didn't.

14  Q.  And you were working for USAID at the time?

15  A.  That's right.

16  Q.  Not a terrorist?

17  A.  No.

18  Q.  Did the USAID play a role in getting your release?

19  A.  I believe the U.S. Embassy did.

20  Q.  U.S. Embassy.  In Kenya?

21  A.  Yes.

22  Q.  Again, if you were a Somali -- withdrawn.  Do you think

23  you fared better as a westerner with the assistance of the

24  U.S. Embassy than a Somali would have under similar

25  circumstances?

1   A.  I think that's fair.

2   Q.  So you've been arrested by both the Ethiopians and the

3   Somalis?

4   A.  Yes.

5   Q.  And in August 2011, the president of Somalia, Sheik

6   Sharif Ahmed, wrote a letter to the UN declaring you a

7   persona non grata in Somalia?

8   A.  That's correct.

9   Q.  And just to refresh, Sheik Sharif Ahmed is the current

10  president of Somalia?

11  A.  No, he's not.

12  Q.  I mean he was president at the time that this was --

13  that -- back in August of 2011?

14  A.  Yes, he was.

15  Q.  And he initially had been one of the leaders of the

16  Islamic courts, correct, back in 2006, 2005-2006?

17  A.  Yes.

18  Q.  And he was also one of the people who had been in the

19  leadership group of what we called yesterday ARS, the

20  reconciliation -- the reliberation, we'll call it the

21  reliberation movement; is that a fair --

22  A.  Yes.

23  Q.  -- description?

24  A.  That's correct.

25  Q.  Is it hard to keep track of where people are in terms of

1   their affiliations in Somalia?

2           MS. HAN:  Objection.

3           THE COURT:  Sorry?

4           MS. HAN:  Objection.

5           THE COURT:  The ground for the objection, please.

6           MS. HAN:  Vague as to --

7           THE COURT:  -- time?

8           MS. HAN:  Yes.

9           THE COURT:  Sustained.

10          BY MR. DRATEL:  Q.  Over the course of your

11  experience in Somalia, and whether it's from 2005 to 2008,

12  2005 to 2011, 1991 to 2013, is it difficult sometimes to

13  determine precisely people's affiliations at a particular

14  point in time?  When I say people, I mean leadership, I mean

15  people who are public figures.

16  A.  I don't think I'd say it's difficult.  I'd say that

17  Somalia is characterized by fluid allegiances, shifting

18  alliances, and sometimes people have more than one.  It's

19  complex, but it's not really difficult to establish.

20  Q.  Well, is it -- is it difficult to establish when

21  precisely people change?

22  A.  That -- that really depends.  It's hard to answer.

23  Sometimes it's a very public and clear shift of allegiances,

24  sometimes it's something that takes place over time.

25  Q.  Sometimes it's public and sometimes it's not, correct?

1    A.   That's right.

2    Q.   And sometimes you know the reasons why and sometimes

3    they're difficult to determine why someone changes

4    allegiance?

5    A.   That's correct.

6    Q.   It's not always transparent, right?

7    A.   Right.

8    Q.   And certainly not always predictable either at a

9    particular point in time?

10   A.   No, not always.

11   Q.   You've also had problems with al-Shabaab in particular

12   personally, correct?

13   A.   Yes, I have.

14   Q.   And when did that occur?  If you could give us a relative

15   time frame of when your personal difficulties with al-Shabaab

16   were first generated.

17   A.   That would have been 2005-6.

18   Q.   And at the time there would have been problems with you

19   going to Somalia if you were targeted by al-Shabaab, correct?

20   A.   Correct.

21   Q.   It would have been unsafe for you?

22   A.   Yes, but I did travel to Somalia at that time.

23   Q.   But the International Crisis Group decided to sever

24   relationships with you as a result of the situation?

25   A.   No, that's not correct.

1              MR. DRATEL:  May I approach, your Honor?

2              THE COURT:  You may.

3              BY MR. DRATEL:  Q.  Just going to ask you to read

4    what's marked as -- for identification only as Defendants' X.

5              THE COURT:  And has the government seen it?

6              MR. DRATEL:  Oh, I'm sorry.

7              THE COURT:  Is this to refresh memory?

8              MR. DRATEL:  Yes, exactly, your Honor.

9              BY MR. DRATEL:  Q.  Just ask you to read the part

10   that I'm going to point out to you, just that sentence.  Just

11   read it to yourself, not aloud.  Just going to ask you

12   whether that refreshes your recollection as to whether

13   International Crisis Group severed its relationship with you

14   based on the threat by al-Shabaab.

15   A.  I understand what you're getting at.  This is not

16   actually correct.  I left --

17             THE COURT:  Hold on, Mr. Bryden.  That's not the

18   question as to whether or not that particular document or

19   writing says something or the other.  The pending question is

20   whether or not that refreshes your memory as to whether there

21   was a problem with the International Crisis Group as a result

22   of your position vis-a-vis al-Shabaab.

23             THE WITNESS:  Yes.

24             THE COURT:  If that is not your memory, if that

25   does not refresh your memory because it's inconsistent, then

1    just indicate that is the case.  Do you understand what I'm

2    saying?  We're not asking that that -- the content of that

3    paper be read or come into evidence at this point.

4              THE WITNESS:  That refreshes my memory, your Honor.

5              THE COURT:  Okay.  Next question.

6              BY MR. DRATEL:  Q.  It does refresh your

7    recollection?

8    A.  Yes, it does.

9    Q.  Oh.  So the ICG, International Crisis Group, severed its

10   relationship with you as a result of the al-Shabaab threat?

11   A.  The other way around.  I left International Crisis Group.

12   Q.  Oh, okay.  As a result of that?

13   A.  Yes.

14   Q.  And at some point -- and you'll tell us how long just to

15   get a time frame -- but through third parties you reached an

16   accommodation with al-Shabaab, and you were able to return to

17   Somalia without a threat against you?

18   A.  That was a temporary accommodation, but that's correct.

19   Q.  And what do you mean by accommodation?  Please describe

20   it for us.

21   A.  I sent messages to al-Shabaab through the Islamic courts,

22   who took power in Mogadishu at that time, and I sought the

23   assurances of the Islamic courts that if I traveled to

24   Somalia under their auspices, then I would not be targeted by

25   al-Shabaab.  I received the assurance of the court leadership

1    that I would not be targeted, and since the courts did not

2    entirely trust al-Shabaab, they assigned me bodyguards of

3    their own, including members of al-Shabaab, to ensure that

4    I -- I wasn't targeted by any other al-Shabaab members.  And

5    so for one week, I visited Mogadishu under the court's

6    auspices and was safe the duration of my visit.

7    Q.  Now, when you say under the court's auspices, under the

8    auspices of the Islamic courts, what do you mean by that?

9    A.  That they were in control of Mogadishu at the time, so

10   they gave me permission to enter, gave me access to their

11   senior officials so I could interview them, and provided me

12   with security.

13   Q.  And so essentially you had your own mini militia as

14   security?

15   A.  I had two bodyguards.

16   Q.  Well, you said you had court personnel and al-Shabaab

17   personnel --

18   A.  That's right.

19   Q.  -- as bodyguards.  I want to talk a little bit about your

20   testimony yesterday, and yesterday you called Elsha Biyaha,

21   E-l-s-h-a  B-i-y-a-h-a -- you called it a neighborhood,

22   right?

23   A.  No, I said it's a -- it's a location outside Mogadishu.

24   It became a site for internally displaced people like --

25   Q.  It's a refugee camp, right?

1   A.   Yeah.

2   Q.   And it has maybe two million people at one time or

3   another, right?

4   A.   No, that would be an exaggeration.

5   Q.   How many people would you say?

6   A.   Probably at most 500,000, 600,000 people, between Elsha

7   Biyaha and Afgooye; it's a long stretch of road.

8   Q.   But it's a refugee camp, right?  And that's where people

9   from Mogadishu sometimes have to go due to fighting in

10  Mogadishu?

11  A.   That's right.

12  Q.   And is the refugee camp itself outside the realm of

13  combat or fighting?

14  A.   No.  It's not really a camp.  People left Mogadishu and

15  settled along the road all the way to Afgooye, so for about

16  300 meters on each side of the road, there are improvised

17  shelters and thousands of people, and there are militia in

18  the camps, in the settlements, and at times there's fighting

19  into the settlements.  But it's still safer -- at that time

20  it was safer than the real center of gravity of the fighting

21  in Mogadishu.

22  Q.   Yes.  And that's also within the time period of

23  2006-2009, that time period?

24  A.   That's correct.

25  Q.   Now, you've written about -- you've written a lot about

1   the Horn of Africa and Somalia in particular, right?

2   A.  Yes.

3   Q.  And one of the things you've written, and I quote, is

4   that the Horn of Africa, quote, is one of the poorest and

5   most conflict-prone regions of the world, close quote.

6   A.  Yes.

7   Q.  And you wrote that for USAID, right?  If you need to look

8   at any particular documents, I'd be happy to provide them to

9   you.

10  A.  It sounds familiar, but if you need me to confirm that,

11  I'd like to see it, please.

12  Q.  Sure.

13          MR. DRATEL:  If I may approach?

14          THE COURT:  Yeah, just -- you have continuing

15  permission for that, Mr. Dratel.  You don't need to ask.  But

16  the government -- if you're showing something to --

17          MR. DRATEL:  Oh, I'm sorry.

18          THE COURT:  Yeah.

19          BY MR. DRATEL:  Q.  Give me time and I'll identify

20  the documents for you --

21  A.  Okay.

22  Q.  -- as we go through them.  So if you look -- and if you

23  look at the bottom right-hand corner, there's a Bates stamp,

24  right?  You see that, the GA-MB?

25  A.  Yes, I do.

1    Q.  Okay.  So if you go to page 12 --

2            THE COURT:  Have we marked this as an exhibit?

3            MR. DRATEL:  I'm sorry, your Honor.  I apologize.

4    It's --

5            THE COURT:  You're not --

6            MR. DRATEL:  -- Defendant's P for identification.

7            THE COURT:  Okay.  Thank you.  How would you like

8    to have it described?

9            MR. DRATEL:  Maybe I'll just ask Mr. Bryden.

10           BY MR. DRATEL:  Q.  And you wrote a report for

11   USAID October 17, 2007, right?

12   A.  Yes.

13   Q.  Called The Regional Implications of the Conflict in

14   Somalia?

15   A.  Yes.

16   Q.  And, again, this is not a public report; this was private

17   for -- confidential for USAID?

18   A.  That's correct.

19   Q.  So if you look at page 12 --

20           MS. HAN:  Objection.  Your Honor I don't believe

21   this is proper impeachment.  What I understand is that the

22   witness wanted to see the document in order to confirm that

23   he'd written the statement; he wanted his recollection to be

24   refreshed.

25           THE COURT:  Well, I don't know if that's the

 1   purpose of this.  I think the witness wanted to take a look

 2   at this as I recall.  And I don't know what is contained at

 3   that point, but if it's a writing of this witness on a

 4   particular subject that relates to direct testimony and

 5   there's going to be a prefatory question or two to open up a

 6   line of inquiry, I think that's appropriate.

 7              MR. DRATEL:  Thank you, your Honor.

 8              BY MR. DRATEL:  Q.  So if you look at -- there's a

 9   2.1.  You see that?  If you look at that first sentence --

10   A.  Yes.

11   Q.  So you wrote that the Horn of African is one of the

12   poorest and most conflict-prone regions of the world.

13   A.  Yes.

14              MS. HAN:  Objection.

15              THE COURT:  Well, if you're going to object, I

16   would appreciate stating a ground.

17              MS. HAN:  I apologize.  This is improper

18   impeachment, your Honor.

19              THE COURT:  The objection is overruled.  You'll

20   reserve a motion to strike.

21              BY MR. DRATEL:  Q.  Now, in Somalia in particular

22   there are cycles of drought, correct --

23   A.  Yes.

24   Q.  -- which are followed inexorably by famine, right?

25   A.  Often, yes.

1  Q.  And in the most recent famine in Somalia, are you

2  familiar with the figures on that?

3  A.  That was the famine last year?

4  Q.  Yes.

5  A.  Yes, I am.

6  Q.  Tens of thousands of people died?

7  A.  Correct.

8  Q.  Half of the children in Somalia were considered acutely

9  malnourished?

10           MS. HAN:  Objection, relevance.

11           THE COURT:  Sustained as to both time and region.

12  We need to confine the inquiry at this point, Mr. Dratel, to

13  the area we're talking about, Somalia, and the general time

14  frame we're talking about that the charges relate to.

15           BY MR. DRATEL:  Q.  So in Somalia in 2006-2008

16  period, there was also a drought as well, right?

17  A.  There was also a drought.

18           MS. HAN:  Objection.

19           THE COURT:  Sorry?

20           MS. HAN:  Your Honor, I'll withdraw the objection.

21           THE COURT:  All right.  And if your plan is to

22  continue objecting to this line of inquiry, I would continue

23  to --

24           MS. HAN:  No, your Honor.

25           THE COURT:  -- sustain the -- overrule the

1    objections.

2            MS. HAN:  No, your Honor.  That's obviously not my

3    plan.

4            THE COURT:  All right.  All right.

5            BY MR. DRATEL:  Q.  And the droughts in Somalia, to

6    the extent that they cause famine, have a particular impact,

7    a negative impact on children's nourishment, right?

8    A.  When they do, yes.

9    Q.  And that included the 2006 to 2008 drought, right?

10   A.  That's correct.

11   Q.  And Somalia has also suffered from 1991 through 2006 and

12   then 2006 to 2008, but that whole period suffered a

13   significant number of deaths from the armed conflict itself?

14   A.  That's right.

15   Q.  And the armed conflict, as you noted in 1993 and again

16   later on as well, it is correct that sometimes the armed

17   conflict prevented humanitarian aid from reaching its

18   intended recipient?

19   A.  That's correct.

20   Q.  And all of this conflict in Somalia and the

21   famine/drought issue creates a lot of orphans, right?

22   A.  Yes, that's right, although the Somali definition of

23   orphan is somewhat different possibly from the western.

24   Q.  Right.  And is it based somewhat on the Islamic

25   definition of orphan?

1   A.   I'd say it's more of a cultural definition than a

2   religious one.

3   Q.   Okay.   And what's the cultural definition?

4   A.   It can be a child who's lost only one parent.

5   Q.   And in Islam orphans have a special position, correct?

6   A.   That's correct.

7   Q.   Because Mohammed was an orphan, right?   And it's a

8   particular --

9            THE COURT:   I didn't hear an answer to that.   Was

10   the answer affirmative or not?

11            THE WITNESS:   That's affirmative.

12            BY MR. DRATEL:   Q.   And it's a particularly

13   important element of the charitable obligation of a Muslim to

14   care for orphans, correct?

15   A.   Correct.

16   Q.   Sometimes you've -- and here yesterday you didn't refer

17   to it that much, but you did talk about what -- well, if we

18   can call the Ethiopian/Somali regional state, right?

19   A.   Yes.

20   Q.   And that is a portion of Ethiopia in which Somalis live,

21   ethnic Somalis, right?

22   A.   That's right.

23   Q.   And to a certain extent, that has created issues in the

24   Horn of Africa, correct?

25   A.   That's a -- has been a contested region, yes.

1   Q.  And I just wanted to lay that out because when you wrote

2   that October 17 report to USAID, you took the position,

3   quote, by mid September 2007, all three crises -- Somalia,

4   the Ethiopian/Somali regional state, and Ethiopia/Eritrea --

5   appeared to be in escalatory phases threatening a general

6   increase in tension and violence across the Horn of Africa.

7   Do you need to see that or do you --

8   A.  No, I recall that.

9   Q.  And just with respect to Ethiopia/Eritrea, they also have

10  had tension between those two countries, correct?

11  A.  Correct.

12  Q.  Historically?

13  A.  Yes.

14  Q.  In fact, essentially Eritrea was essentially carved out

15  of Ethiopia through a war of rebellion --

16  A.  That's right.

17  Q.  -- about 30, 35 years ago?

18  A.  And gained independence in 1993.

19  Q.  We talked -- you talked yesterday about the Somali

20  diaspora, right?

21  A.  Yes.

22  Q.  And it's not a Somali word, right?

23  A.  No.

24  Q.  It's been used to describe other communities that have

25  been spread across the globe essentially?

1    A.  Yes.

2    Q.  And you told USAID in 2007, right, in that report, quote,

3    members of the Somali diaspora tend to identify closely with

4    events in the homeland and are amongst the most active

5    Internet communities.

6           MS. HAN:  Objection.

7           THE COURT:  All right.  Let me see counsel at the

8    side of the bench here just so we can get this one issue

9    cleared up and then hopefully move along smoothly.

10          (Following is a sidebar conference.)

11          THE COURT:  Okay.  We got everybody here.  Let me

12   allay any concerns.  I don't have the flu, it's just --

13          MR. DURKIN:  Very happy to hear that.

14          THE COURT:  I don't, so we can gather a little bit

15   closer.  I'm just fighting a little something else, so I'm

16   sure you're fine.  On the point here, I understand -- I

17   understand the spirit of your objection here that this is

18   improper cross-examination because prior writings are being

19   used before there's any inconsistency that's been developed

20   in the testimony.  Technically Ms. Han is correct.  What I

21   would suggest you do -- so we don't have a number of

22   objections and nobody gets too much heartburn here -- is ask

23   the question.  In other words, if there's a piece of

24   information in the report that you want to have the witness

25   testify, ask the question.  Just don't refer to the report.

1    Ask the same question.  If the answer is in any way different

2    than what's in the report, then you can use the report.

3          MR. DRATEL:  Here's my purpose and my methodology,

4    which is -- I think I eliminated two questions from every

5    series, so -- to make it faster.  In other words, to say do

6    you agree with this.  Essentially it's an expert; I'm getting

7    his opinion.  He's already expressed his opinion.  All I'm

8    just doing is confirming it.  I would also like to be able to

9    say -- which I believe I am with an expert -- that you have

10   rendered this opinion before in writing.  So I'm just trying

11   to cut all the -- all the other questions.

12         THE COURT:  That's why technically Ms. Han is

13   correct.  I think just for purposes of just the fluidity of

14   the examination, the approach you've taken is a very

15   practical approach.  I don't see any abuse of the witness or

16   problems with the substance of the cross-examination.  So

17   unless you truly have a problem and want to be absolutely

18   technically correct according to Hoyle, then I think we can

19   allow Mr. Dratel to continue on and in the approach he's

20   using.

21         MS. HAN:  Of course, your Honor.

22         MR. DRATEL:  Okay.  Thank you.

23     (Sidebar conference concludes.)

24         MR. DRATEL:  May I proceed, your Honor?  Thank you.

25         BY MR. DRATEL:  Q.  Just read it again.  Members of

1   the Somali diaspora tend to identify closely with events in

2   the homeland and are among the most active Internet

3   communities.  The diaspora is also a critical source of

4   political and financial support for activities in Somalia,

5   sending between $500 million and $1 billion every year back

6   to their homeland.

7   A.   Yes.

8   Q.   Correct?  And you wrote that to USAID?

9   A.   Yes.

10   Q.   And you've also -- and it's also true that the

11   distinction between Somalis in Somalia and Somalis in the

12   diaspora is exceptionally blurred?

13   A.   I think that's fair, yes.

14   Q.   And you said that as well in a separate report to the

15   UN --

16   A.   Yes.

17   Q.   -- right?  And also that links between the diaspora and

18   Somalia itself are very active?

19   A.   Correct.

20   Q.   You testified to that --

21   A.   Yes.

22   Q.   -- right?  You talked about some websites yesterday from

23   your testimony.  There are other websites as well, correct,

24   that are used by Somalis; they use a variety of different

25   websites, correct?

1   A.   Hundreds.

2   Q.   Somalis are essentially starved for news about Somalia,

3   Somalis in the diaspora, right?

4   A.   I wouldn't --

5   Q.   They'll go wherever they can get it?

6   A.   -- say starved.

7   Q.   Yes.  I'm sorry.

8   A.   Hungry for it.

9   Q.   And there are a whole range of websites, correct?

10  A.   Correct.

11  Q.   And a whole range of why people might be on any

12  particular website?  In other words, there's a whole range of

13  reasons why anyone might access a particular website --

14  A.   Of course.

15  Q.   -- right?  There are also forums, online forums, correct?

16  A.   Correct.

17  Q.   And you monitor some of these forums, right?

18  A.   Correct.

19  Q.   And you monitored them 2006 to 2008?

20  A.   2007-2008.

21  Q.   And Dawatawhiid Paltalk is one that you monitored?

22  A.   Dawatawhiid, yes.

23  Q.   That's d-a-w-a-t-a-w-h-e-e-d  P-a-l-t-a-l-k.  Or would

24  you -- I see that you may have an --

25  A.   It's "ii" instead of "ee."

1    Q.  Okay.  And by the way, just the word "da'wa," just da'wa,

2    d-a-w-a with an apostrophe in the middle, you mentioned the

3    first day.

4    A.  Yes.

5    Q.  You mentioned yesterday about a da'wa wing of al-Shabaab?

6    A.  Right.

7    Q.  And da'wa itself, aside from al-Shabaab, exists in Islam,

8    correct?

9    A.  Yes.

10   Q.  Very important part of Islam?

11   A.  Correct.

12   Q.  One of the five pillars of Islam essentially?

13   A.  Yes.

14   Q.  So all across the entire spectrum of Islamic practice,

15   da'wa exists?

16   A.  Correct.

17   Q.  Now, when you were -- and you mentioned yesterday that

18   al-Shabaab in particular solicits money on these online

19   forums?

20   A.  That's correct.

21   Q.  And you had mentioned that Roobow does as well, right,

22   Mr. Roobow, Mukhtar Roobow, M-u-k-h-t-a-r --

23   A.  Yes.

24   Q.  R-o-b-o-w, right?  And is it also true that someone named

25   Mahad Karate, M-a-h-a-d, last name K-a-r-a-t-e, also

1    solicited funs on Paltalk?

2    A.  That's correct.

3    Q.  Now, do you know a gentleman in Somalia named Abukar

4    Suryare?

5    A.  Suyare.

6    Q.  Abukar Dahir Mohamed is his given name.

7    A.  That doesn't ring a bell.

8    Q.  Showing you what's been marked as Defendant's Y for

9    identification and just ask you if you recognize that.

10   A.  No, I don't recognize this gentleman.

11       (Exhibit No. Y identified.)

12           MR. DRATEL:  One moment, your Honor.

13           BY MR. DRATEL:  Q.  You know the minister of

14   education in Somalia?

15   A.  The current minister?

16   Q.  Yes.

17   A.  I haven't met him, no.

18   Q.  Under Sheik Sharif, under the TFG --

19   A.  I don't recall --

20   Q.  -- recently.

21   A.  -- who it was.

22   Q.  You also testified yesterday a little bit about kunyas,

23   k-u-n-y-a?

24   A.  Yes.

25   Q.  A type of nickname?

1   A.   Yes.

2   Q.   And there's a difference between a kunya and a nickname

3   to a certain extent in the Shabaab context, right?

4   A.   I would say so, yes.

5   Q.   And that an Abu name is essentially a nom du guerre for

6   al-Shabaab?

7   A.   That's right.

8   Q.   Whereas an Abu name generally among persons, either among

9   Muslims or Arabs, could be simply, as you described

10   yesterday, just father of, or Abu, and then something

11   descriptive about the person such as a place where they're

12   from or what they do for their job or things like that?

13   A.   I don't think I'd make any assertions about Arabic

14   culture because it's outside my area of expertise beyond the

15   way it's imported and used in Somali society.

16   Q.   But it can be -- in other words, it's a different concept

17   for al-Shabaab than it is for ordinary Somalis, the Abu

18   names?

19   A.   It's not common practice among Somalis who are not part

20   of Islamist movement.

21   Q.   Now, you're familiar with clans, subclans, right?

22   A.   Up to a point.  Not infinitely, but yes.

23   Q.   You familiar with the Sheekhaal clan?

24   A.   Yes, I am.

25   Q.   And that's a Hawiye clan?

1    A.   Yes.

2    Q.   And the Habar Gidir?

3    A.   It's not Habar Gidir.   The Habar Gidir is a Hawiye clan,

4    yes.

5    Q.   Yes.   But it's on the same level as a Habar Gidir in the

6    sense of a subclan below the --

7    A.   Roughly, yes.

8    Q.   Yeah, the Hawiye.

9    A.   Yes.

10   Q.   In the second level essentially.

11   A.   As part of the hirab (phonetic), yes.

12   Q.   Want to talk about your time line yesterday, Government's

13   Exhibit 28.   Obviously that time line didn't capture a lot of

14   things that happened in Somalia during that period, right,

15   from 1960 to 2008 and --

16            THE COURT:   Well, that -- are you agreeing?   I

17   didn't hear an answer.

18            THE WITNESS:   I would agree, it's not a

19   comprehensive time line.

20            BY MR. DRATEL:   Q.   And one thing that wasn't on

21   there was a prior Ethiopian invasion of Somalia in 1997,

22   correct?

23   A.   '96-'97, yes.

24   Q.   And there was fighting at that time too between Ethiopian

25   troops and Somalis, correct?

1    A.  Yes, although it was very limited; it was just the border

2    region and part of Gedo region.

3    Q.  But it wasn't the government fighting the Ethiopians, it

4    was the local -- the local population fighting?

5    A.  It was al-Itihaad al-Islam.

6    Q.  Right.  But it wasn't the government?

7    A.  But there was no government.

8    Q.  Right.  So essentially irregulars fighting against

9    Ethiopian government --

10   A.  That's right.

11   Q.  -- forces?  And there was a prior war in 1977 I think you

12   referred to --

13   A.  That's right.

14   Q.  -- yesterday just passing through over border issues,

15   correct?

16   A.  No, the '77 war was because Somalia invaded the

17   Ethiopian/Somali region, the Ogaden, in order to annex it.

18   Q.  Right.  I'm saying to gain territory, correct?

19   A.  Yes.

20   Q.  Yes.  And that territory's always been disputed in one

21   form or another between Somalia and Ethiopia?

22   A.  Correct.

23   Q.  And, in fact, because some it is desolate and a desert,

24   there's not a truly demarcated border like there is in many

25   other parts of the world?

1   A.   That's correct.

2   Q.   Now, the Galgaduud region -- a substantial part of the

3   Galgaduud's western -- withdrawn.  The western border of

4   Galgaduud is Ethiopia, correct?  It borders on Ethiopia?

5   A.   That's right.

6   Q.   And also in terms of the time line, just --

7            MR. DRATEL:  Thank you.  I appreciate the

8   government's assistance.  This is 2-A.  If -- may I ask

9   Mr. Bryden to come down, your Honor?

10            THE COURT:  You certainly may.

11            BY MR. DRATEL:  Q.  So I'll hold this.  So this is

12   Galgaduud right here?  I'm pointing to the region.

13   A.   Correct.

14   Q.   Galgaduud, right?  And this line right here with my

15   finger I am pointing to is the border with Ethiopia?

16   A.   It is, as it says here, a provisional administrative

17   line.  It's not actually a border.  It's never been agreed.

18   Q.   Right.  Okay.  But on this side's really Ethiopia --

19   A.   That's right.

20   Q.   -- and as the map indicates.  And Guraceel is in

21   Galgaduud, right?

22   A.   Yes, it is.

23   Q.   But it's not on the government's map?

24   A.   No.

25   Q.   Now, between 1991 and 1999 there were efforts to

1   constitute a central government for Somalia, correct?

2   A.   Correct.

3   Q.   There were about a dozen internationally sponsored

4   conferences designed to achieve national reconciliation?

5   A.   That's about right.

6   Q.   And none produced an accord that lasted?

7   A.   Correct.

8   Q.   You talked yesterday a little bit about 1993 in Somalia,

9   in particular what was described as the Black Hawk Down, and

10  you said there were a thousand Somali casualties.  How many

11  deaths among those casualties?

12  A.   That was -- there was never an official death toll.  The

13  International Committee of the Red Cross made some estimates

14  in the hundreds, but I don't think anyone knows for sure.

15  Q.   And you were asked about this gentleman yesterday,

16  correct?

17  A.   I can't see.

18  Q.   If you look --

19  A.   Yes.

20  Q.   That's Abdi Qeybdiid, right?

21  A.   That's right.

22  Q.   And here he's in a suit and a tie, right?

23  A.   Yes.

24  Q.   In fact though, in that Black Hawk Down incident, he was

25  captured by U.S. forces, correct?

1    A.  That's right.

2    Q.  He was a lieutenant for Aideed, the warlord who the U.S.

3    was trying to capture that day?

4    A.  That's right.

5    Q.  And that's his name, right?

6    A.  Yes, it is.

7           THE COURT:  Which exhibit number was that?

8           MR. DRATEL:  Oh, I'm sorry.  22, your Honor,

9    Government's 22.

10           THE COURT:  Thank you.

11           BY MR. DRATEL:  Q.  Now, he was also -- Mr. Abdi

12    Qeybdiid -- let me put it back so we know what we're talking

13    about.  It's -- well, we'll mark it as Defendants' Z?

14           THE COURT:  What's that, just the name?

15           MR. DRATEL:  It's just the name.

16           THE COURT:  Well, I don't think we need to do that.

17           MR. DRATEL:  I'll just use it.

18           THE COURT:  That's fine.  If you just want to -- if

19    you just want to put the name up, that's fine.

20           MR. DRATEL:  Thank you, your Honor.

21           BY MR. DRATEL:  Q.  And so he was also arrested by

22    and imprisoned by Sweden at one point for war crimes charges?

23    A.  A complaint was made against him.  I don't recall if he

24    was actually arrested.

25    Q.  He was detained in Sweden though?

1   A.  I'm not sure.

2   Q.  Well, you talked about a Swedish journalist being killed

3   in Somalia during 2006.  Wasn't there some discussion about

4   whether -- not yesterday I mean, but at the time -- that the

5   journalist had been killed in retaliation -- by Abdi

6   Qeybdiid's forces in retaliation for the Swedish prosecution?

7   A.  I'm -- I'm aware that that was posted in a few websites.

8   That was never seriously considered, to the best of my

9   knowledge, in Mogadishu because of the circumstances of the

10  killing where there was no -- it was virtually inconceivable

11  that Abdi Qeybdiid's militia would have been present at the

12  time.

13  Q.  Well, isn't it true that militias often farm out work

14  outside their area to other militias?

15  A.  Yes, but this journalist was killed at an event that was

16  purely a Islamic court/al-Shabaab event.

17  Q.  But the answer is yes, that sometimes militias farm out

18  work to other militias?

19  A.  That's correct.

20  Q.  And, in fact, you said the U.S. farmed out work to

21  militias?

22  A.  That's correct.

23  Q.  I go back to Mohammed Farah Aideed.

24  A.  Yes.

25  Q.  Probably the most prominent warlord in 1991, and -- is

1    that fair to say?

2    A.  Yes, it is.

3    Q.  And is it also fair to say that in '92 and '93 in terms

4    of the UN and the U.S.'s efforts to bring humanitarian aid to

5    Somalia and the UN's efforts at state-building, at

6    nation-building, that Aideed was considered the most

7    prominent obstacle?

8    A.  That's right.

9    Q.  And he was not an Islamist, correct?

10   A.  Correct.

11   Q.  Just a warlord, a traditional warlord?

12   A.  Yes.

13   Q.  And he's been dead for some time now?

14   A.  That's right.

15   Q.  Arms, weapons are commonplace in Somalia, right?

16   A.  That's right.

17   Q.  And they have been for a long time?

18   A.  Yes.

19   Q.  And, in fact, Somalia was one of the most -- one of the

20   best-equipped armies when -- in the Barre regime, was one of

21   the best-equipped armies in Africa?

22   A.  That's right.

23   Q.  They in fact have been armed first by the western powers

24   and then they switched and they were armed by the Soviets,

25   correct?

1   A.   First by the Soviets --

2   Q.   First --

3   A.   -- then by western --

4   Q.   -- sorry, first by the Soviets, then -- and so they

5   essentially had the whole marketplace.

6   A.   That's right.

7   Q.   And that has contributed to some extent to the level of

8   violence in Somalia since the collapse of the Barre regime?

9   A.   For the -- probably about the first ten years, but after

10  that it's been new supplies.

11  Q.   But with respect to USAID again, in March of 2007 -- and

12  you have that before you if you want to look at it -- but you

13  wrote to USAID that general and comprehensive disarmament is

14  neither a realistic goal nor necessary for success of the

15  transition.  Do you want to look?  That's at 571.

16  A.   I have 571.  Where on 571?

17  Q.   I'm sorry.  Do you see 2.3 in the middle of the page?

18  A.   Yes, I do.

19  Q.   First sentence.

20  A.   I see.

21  Q.   And if you just -- and you also wrote -- oh, withdrawn.

22  When you say transition, you mean transition to a

23  centralized -- a permanent central government?

24  A.   That's right.

25  Q.   Because it was the TFG, the Transitional Federal

1   Government?

2   A.   Correct.

3   Q.   And you also wrote that, nor is it necessarily --

4   withdrawn.   Nor is it necessarily appropriate or desirable

5   for an interim government with such limited support and so

6   little time remaining in its mandate to design a permanent

7   security sector of the Somali state?

8   A.   Correct.

9   Q.   And part of that -- and just to -- when you say an

10  interim government, obviously transitional, but also it had a

11  specific mandate in terms of time, right?

12  A.   That's right.

13  Q.   And about that time it had about two and a half years

14  left in its mandate, March of 2007, almost three years?

15  A.   It had one and a half years, 2004 to 2008, and it did

16  extend.

17  Q.   And one of the reasons is because it wasn't a popular

18  government, right?

19  A.   That's right.

20  Q.   Another reason is that local authorities could also

21  provide, in some instances, better and more trusted security?

22  A.   That's right.

23  Q.   Now, yesterday you talked about -- you were asked about

24  al-Shabaab's tactics?

25  A.   Yes.

1    Q.  And distinguishing al-Shabaab's tactics from tactics

2    generally.  Now, just so there's no confusing, no confusion,

3    RPGs are not limited to al-Shabaab?

4    A.  No.

5    Q.  Everyone who wants one essentially can get an RPG.  And

6    when I say everyone, I mean militias and anyone -- the

7    regular forces?

8    A.  That's right.

9    Q.  And technicals, those trucks with the heavy weapons

10   mounted, those existed long before al-Shabaab, correct?

11   A.  That's right.

12   Q.  They were a -- probably the most distinctive feature of

13   the early '90s, right?

14   A.  That's right.

15   Q.  Talked about aerial support a little bit yesterday in

16   your direct?

17   A.  Yes.

18   Q.  In fact, the Ethiopians had a monopoly on the air as far

19   as the combatants were concerned, right?

20   A.  I'm sorry?

21   Q.  Somalia does not have an air force?

22   A.  Correct.

23   Q.  Not even helicopters or anything like that.

24   A.  No.

25   Q.  Now, you said combat aircraft were limited to Ethiopia,

1  but in fact other governments had surveillance aircraft?

2  A.  That's correct.

3  Q.  And the U.S. would be one of them?

4  A.  I believe so.

5  Q.  And it's quite an advantage militarily, and, you being

6  someone with military experience, it's quite an advantage

7  militarily to have control of the skies, right?

8  A.  That's right.

9  Q.  Now, also with respect to general level of militarism in

10  Somalia, it's also true that even NGOs, groups providing aid,

11  will sometimes hire their own security forces?

12  A.  That's right.

13  Q.  And they often have to pay people who are not -- they're

14  not people with licenses or licensed security guards, these

15  are irregulars as well in many respects?

16  A.  That's right.

17  Q.  And have you ever hired a militia for your own

18  protection?

19  A.  Yes.

20  Q.  And where was that?

21  A.  Mogadishu principally.

22  Q.  What time frame was that?

23  A.  Well, if -- I'd be a little more precise and say I worked

24  with organizations that hired those militia; I didn't

25  personally hire a militia, then in 1991-92, first in

1    Hargeysa, then in Mogadishu.  In 1993 many organizations were
2    armed, I traveled with many of them while I was with the
3    Canadian government.  I -- really the list is too long, and
4    it's still a common practice among aid agencies in Somalia to
5    have their own militia.
6    Q.  And you said you weren't involved in the actual hiring of
7    them but they were for your benefit obviously?
8    A.  That's right.
9    Q.  And since you didn't hire them, you don't know
10   necessarily the composition of those militia?
11   A.  We would know.  We would be -- one of the most important
12   things in engaging a militia is to know who they are and who
13   they're responsible to or else you can be kidnapped or killed
14   by your own militia.
15   Q.  Now, Somalia, would you have called -- suffers from what
16   you called a state-building dilemma?
17   A.  Yes.
18   Q.  And I want to go through the state of affairs in
19   October 2007 when you wrote your report for USAID, and you
20   wrote, The reconstruction of the Somali state is both the
21   solution to the current crisis and its root cause.
22   A.  Yes.
23   Q.  And you described that as a paradox?
24   A.  Yes.
25   Q.  And you said, A paradox that has repeatedly thwarted

1   international efforts to restore peace and stability to the

2   country.

3   A.   That's right.

4   Q.   And you also told USAID that in your opinion the

5   challenge stems less from cultural resistance to central

6   authority of nefarious colonial legacies, as foreign

7   observers often claim, than from the essentially predatory

8   nature of the state in Somali history.

9   A.   Yes.

10  Q.   And just to break that down a little bit, that sounds

11  like you're saying there that -- and tell me if this is

12  correct -- that foreign observers often claim that there's

13  some sort of cultural resistance to a central state in

14  Somalia or that the legacy of colonialism, there being both

15  Italian and British colonial heritage, that that lies -- that

16  underlies the resistance to a centralized state.  That's what

17  some foreign observers would say, right?

18  A.   That's right.

19  Q.   And your position is that rather than that being the

20  case, it's because the state, the central state in Somali

21  history, has been, in your terms, predatory.  And please

22  describe what you mean by that.

23  A.   Yes.  What I mean is that the Somali state has typically

24  been a source of insecurity and fear for the Somali

25  population, and the abuse of authority and power; and that

1  means that whenever there's an initiative to reestablish a

2  government, Somalis look at it with great caution, often

3  skepticism, to try and identify whether this is going to be

4  another predatory state or whether it's going to be genuinely

5  one that reflects the popular will as far as possible.

6  Q.  And, in fact, you extend that beyond Somalia even to

7  Ethiopia and Kenya, right?

8  A.  That's right.

9  Q.  That the post-colonial state in those three countries in

10 your opinion has been a primary source of insecurity and an

11 instrument of violence against the Somali community.

12 A.  Yes.

13 Q.  And that as a result, revival of state institutions in

14 Somalia is fraught with anxiety, tension, and violence.

15 A.  Yes.

16 Q.  And that's what you told USAID?

17 A.  That's correct.

18 Q.  I want to go back to attempts to form a central

19 government, a state essentially, in Somalia, which wasn't on

20 the time line.  I want to talk about the Transitional

21 National Government, TNG.  You're familiar with that,

22 correct?

23 A.  Yes.

24 Q.  2000-2001 period?

25 A.  Yes.

1    Q.  The result of one of these international conferences,

2    right?

3    A.  Yes.

4    Q.  And it installed -- not in Somalia but abroad -- Abdi

5    Qasim Hassan Salad as president?

6    A.  That's Abdi Qasim Salad Hassan.

7    Q.  Abdi Qasim Salad Hassan --

8    A.  Yes.

9    Q.  -- as president.  And that received some international

10   recognition, correct, in a diplomatic sense?

11   A.  That's correct.

12   Q.  And it also received $50 million from Arab Gulf states to

13   try to get the ball rolling in the right direction?

14   A.  I'm not sure of the figure.

15   Q.  Are you familiar with Ken Menkhaus?

16   A.  Yes, I am.

17   Q.  Would you consider him an expert?

18   A.  Yes, I would.

19   Q.  Have you -- are you familiar with Somalia, State Collapse

20   and the Threat of Terrorism?

21   A.  Yes, I am.

22          MR. DRATEL:  May approach, your Honor?

23          THE COURT:  Yes, you may.

24          BY MR. DRATEL:  Q.  If you could read just that

25   part there.

 1           THE COURT:  Have you had an opportunity to see

 2    this, Mr. Cole?

 3           MR. DRATEL:  It's --

 4           THE COURT:  That's all right.  Mr. Cole, if you

 5    want to take a look -- I'm sorry.  Ms. Han, if you want to

 6    take a look, please.

 7           MS. HAN:  Yes, please.

 8           MR. DRATEL:  I've highlighted it.

 9           THE COURT:  This has not been marked separately as

10    an exhibit, but do you have something there you would like to

11    have marked, a particular page --

12           MR. DRATEL:  I'll -- yes, I'll mark the copy.

13           THE COURT:  -- or you can just follow up with

14    examination.

15           MR. DRATEL:  I think it would be easier.

16           BY MR. DRATEL:  Q.  Would you rely as an expert on

17    Mr. Menkhaus's statement that $50 million from the gulf

18    states was contributed to the TNG?

19    A.  Yes, I would.

20    Q.  And he's an academic, correct?

21    A.  That's right.

22    Q.  Been studying Somalia for an extraordinarily long time?

23    A.  Yes.

24    Q.  But, in fact, the TNG never established itself throughout

25    Somalia, correct?

1   A.   That's correct.

2   Q.   And, in fact, never controlled more than a portion of

3   Mogadishu even?

4   A.   That's right.

5   Q.   It had a two- to three-year mandate through 2002 I

6   believe or, no, 2003, right?

7   A.   It had a mandate until 2004.

8   Q.   And it tried to extend its mandate unilaterally?

9   A.   It didn't really get the chance to try.  It was aborted

10  before it really reached the end of its mandate.

11  Q.   And I want to contrast that with you and talk about

12  Somaliland.

13  A.   Yes.

14  Q.   Somaliland is essentially the former British colony,

15  correct?

16  A.   That's right.

17  Q.   And that has had a functioning government for some time

18  now, right?

19  A.   Correct.

20  Q.   For how long?

21  A.   A stable, functioning government since 1997.

22  Q.   And is that one of the reasons why you lived in Hargeysa?

23  A.   That's correct.

24  Q.   And Somaliland in fact sometimes doesn't want to be part

25  of Somalia at all, right?  It wants to be a separate state?

1   A.   That's right.

2   Q.   And so that demarcation line of the British and Italian

3   is more than just geographical; it's really a significant

4   difference in the way life is lived in those two places?

5   A.   Yes, although the boundary itself, the territories in the

6   eastern part of Somaliland, western Puntland are contested,

7   so the boundary doesn't really obtain.

8   Q.   Now, let's go back to the TFG.   Installed in 2004,

9   correct?

10   A.   Correct.

11   Q.   And the president was Abdullahi Yusuf, correct?

12   A.   Correct.

13   Q.   And he's the gentleman on the upper right?

14   A.   That's correct.

15   Q.   Again, in a suit and a tie, right?

16   A.   Right.

17   Q.   In fact, a former warlord, right?

18   A.   That's correct.

19   Q.   And you testified once that, quote, he had a reputation

20   as a dictator and lived up to it, close quote.

21   A.   Correct.

22   Q.   And then you told the USAID in October of 2007, quote,

23   Opposition to the Ethiopian-backed TFG expressed itself

24   almost immediately after the TFG's inception in 2004, close

25   quote.

1    A.   Yes.

2    Q.   And, quote, first through a dissident group of ministers

3    and members of parliament, close quote.   Right --

4    A.   Yes.

5    Q.   -- you told them.   And then through the Islamic courts --

6    A.   Yes.

7    Q.   -- right?   You wrote -- you told USAID that.   And

8    today -- today being October 2007 when you were writing --

9    through a violent insurgency that involves a broad range of

10   opposition forces motivated by clan, nationalists, and

11   Islamic agendas.   Correct?

12   A.   Correct.

13   Q.   So it wasn't simply al-Shabaab versus the TFG, right?

14   A.   Right.

15   Q.   It was really everyone against the TFG to a certain

16   extent for their own reasons?

17   A.   It was a very broad-based insurgency, yes.

18   Q.   And yesterday you acknowledged that there was criticism

19   of the TFG, right?

20   A.   Correct.

21   Q.   In fact, you've been among the most vocal critics of the

22   TFG?

23   A.   That's probably fair.

24   Q.   You wrote to USAID in March of 2007 that the TFG, quote,

25   seems to perceive political reconciliation -- sorry --

1   reconciliation in terms of persuasion and co-optation, close

2   quote.  Right?

3   A.  Right.

4   Q.  And that while, quote, many civil society actors and

5   academics underscore the need for social reconciliation that

6   addresses the underlying causes of conflict.  Right?

7   A.  Right.

8   Q.  And your opinion was that the TFG was not addressing

9   those?

10  A.  That's right.

11  Q.  And in addition, you have, The TFG has aggressively

12  pursued the agenda of the Somali Restoration and

13  Reconciliation Council rather than functioning as a

14  government of national unity.

15  A.  That's right.

16  Q.  And you -- that's what you told USAID --

17  A.  Yes.

18  Q.  -- in March of 2007.  If you want to check, there's a

19  document called Somali Reconciliation Issues and Options for

20  Engagement.  If you look at page 569, it's --

21          THE COURT:  There is -- Mr. Dratel, I don't think

22  there's any question pending unless it's just the date, and I

23  don't think the witness had an opportunity to agree with you

24  that it was in March of '07.

25          MR. DRATEL:  I'm sorry, your Honor.

 1              THE WITNESS:  I just wanted to confirm that that

 2   was in fact the case, your Honor.

 3              THE COURT:  Okay.  Sure.

 4              MR. DRATEL:  I was operating under eye contact.

 5              BY MR. DRATEL:  Q.  Can you confirm that by looking

 6   at paragraph 3 in 1.1, sort of from the middle down.

 7   A.  Yes, that's correct.

 8   Q.  And I mentioned something that we haven't talked about

 9   before -- it wasn't in your time line -- the Somali

10   Restoration and Reconciliation Council.

11   A.  Yes.

12   Q.  SRRC we'll call it to keep everybody sane.  The SRRC was

13   essentially a vehicle for Abdullahi Yusuf, right, and his

14   cohorts?  Withdrawn.  Are you hesitating because it's

15   really -- it was a vehicle for the Ethiopians?

16   A.  I'm hesitating because Abdullahi Yusuf was officially not

17   a member of it, but unofficially yes, he was one of its

18   key -- key leaders.

19   Q.  And in fact it was Ethiopian-backed as well --

20   A.  That's correct.

21   Q.  -- correct?  In fact, it was created in part by the

22   Ethiopians to undermine the TNG back in the early 2000s?

23   A.  That is correct.

24   Q.  So this is a Somali president who's aligned with an

25   organization that was in part created by the Ethiopian

1  government to undermine the fledgling Somalia government?

2  A.  That's right.

3  Q.  And you described several recent measures that

4  contributed to the unpopularity of the TFG government, right,

5  declaring a state of emergency?

6  A.  Yes.

7  Q.  Replacing a former speaker of parliament with an SRRC

8  loyalist?

9  A.  Correct.

10  Q.  And contested appointments of regional and district

11  officials?

12  A.  Yes.

13          MS. HAN:  Objection, relevance.

14          THE COURT:  Overruled.

15          BY MR. DRATEL:  Q.  And you also told USAID in

16  March of 2007 that, quote, The assessments of President

17  Yusuf's SRRC faction risks further narrowing the popular

18  appeal of the TFG and aggravating its internal divisions.

19  A.  Yes, I did.

20  Q.  So when you say internal divisions, you mean within the

21  TFG itself?

22  A.  Correct.

23  Q.  And you had described some of those yesterday, that there

24  was already a fissure as to where the capital would be?

25  A.  That's right.

1   Q.  Now, the SRRC, the leaders of SRRC, were warlords, right,

2   or former warlords?

3   A.  Many of them, yes.

4   Q.  And going back to the TNG, talk about Ethiopia seeking to

5   undermine the TNG, right?

6   A.  Yes.

7   Q.  And part of that was because of the $50 million in aid

8   from the gulf that it thought might promote Islam in Somalia

9   and the Somalia regional state in Ethiopia?

10  A.  I haven't made that case.

11  Q.  Okay.  Do you still have Mr. Menkhaus's book?

12  A.  Yes, I do.

13  Q.  If you can look at page 46.

14          MS. HAN:  Your Honor, objection as to improper

15  impeachment.

16          MR. DRATEL:  He's an expert, your Honor.  I'm

17  asking about another expert's opinion to see whether he

18  agrees.

19          THE COURT:  Well, yeah.  Given the last answer,

20  that this witness hasn't reached that point yet and he

21  recognizes Menkhaus as a reliable expert in the area, I would

22  permit the question and overrule any objection.  But if you

23  want to show Ms. Han where that's located --

24          MR. DRATEL:  Yes.

25          THE COURT:  -- Mr. Dratel.

1          MR. DRATEL:  Yes.  It's the middle paragraph.

2          BY MR. DRATEL:  Q.  If you look at the middle

3   paragraph, starting ironically I think --

4   A.  Yes.

5   Q.  And that's Mr. Menkhaus's position, right, that the aid

6   from gulf states made Ethiopia anxious about Islam, right?

7   A.  I think I would put this in context.  I'm sure somewhere

8   here Mr. Menkhaus has written about it, but this is not a

9   blanket opposition to Islam; about half of Ethiopia is

10  inhabited by Muslims.  But the TNG, about one quarter of the

11  parliament was believed to represent certain Islamists,

12  Somali Islamist groups, and the group al-Itihaad, against

13  which Ethiopia had fought, was also represented in the

14  parliament.  And so I would take Mr. Menkhaus's assertion

15  here that those groups backed by contributions from the Arab

16  state would represent anti-Ethiopian Islam.

17  Q.  And Ethiopia as a result backed militias in Somalia to

18  limit the control that the T.N.G. could exercise in the

19  country?

20  A.  That's correct.

21  Q.  Going back to the TFG, Transitional Federal Government,

22  Abdullahi Yusuf's government, in March of 2007 --

23  A.  Yes.

24  Q.  -- told USAID, quote, International efforts to bolster

25  the TFG's authority as a government are widely perceived

1  among Somalis as entrenching President Yusuf's faction in

2  power, engendering resentment and resistance.

3  A.  Yes.

4  Q.  Right?  And the reason for that is that among Somalis,

5  because of what you described as the predatory nature of the

6  state, one aspect of that is not only a question of violence

7  against civilians by the state but also that it's a spoils

8  operation, in other words, to divide up power and resources

9  that exist in Somalia among those in power?

10  A.  That's correct.

11  Q.  Now, you also wrote in March of 2007 to USAID, Ethiopia's

12  decisive military victory over the Islamic courts has

13  succeeded in muting the opposition but only temporarily.

14  Correct?

15  A.  Yes.

16  Q.  And you wrote that unless this political imbalance is

17  addressed, the TFG is likely to spend the remaining two and a

18  half years of its mandate consumed with domestic political

19  problems and planning a unilateral extension of office, a

20  high-risk strategy that could result in even greater military

21  and political crises.

22  A.  That's right.

23  Q.  You also said that under present circumstances all TFG --

24  in March of 2007 -- Under present circumstances all TFG

25  security forces are perceived by opposition groups as

1   hostile.

2   A.   Yes.

3   Q.   And that this is manifest in frequent attacks on police

4   forces and installations in the city of Mogadishu and

5   sporadic incidents in other locations.

6   A.   That's correct.

7   Q.   And this opposition that we're talking about is a broad

8   opposition that includes Islamists, clan, right?

9   A.   That's right.  At the time it was referred to generally

10  as Wuqalamudda (phonetic), the resistance without

11  differentiation.

12  Q.   But not limited to al-Shabaab?

13  A.   It included al-Shabaab, but it was the resistance.

14  Q.   Much broader than al-Shabaab?

15  A.   Much broader, yes.

16  Q.   Included elements of the of TFG itself, right?

17  A.   That's right.

18  Q.   Now, the Ethiopians' occupation lasted essentially three

19  years, 2006 to 2009?

20  A.   That's correct.  Two years, 2007 and '8.

21  Q.   Did they withdraw in March of '09?

22  A.   Started to withdraw in January, even sooner.

23  Q.   Now, yesterday you described -- you said that they

24  were -- that they came to Somalia at the invitation of

25  Abdullahi Yusuf?

1  A.  That's right.

2  Q.  Abdullahi Yusuf, whose SRRC had been backed by the

3  Ethiopians in the first place?

4  A.  Correct.

5  Q.  And did you write an op-ed piece that said Yusuf's

6  original appeal for 20,000 foreign troops was widely

7  perceived as an act of ventriloquism engineered from Addis

8  Ababa and aimed at putting Ethiopian boots on the ground in

9  Somalia?

10  A.  Yes, I did.

11  Q.  So in fact "invitation" is really a formal word, right?

12  A.  Yes.

13  Q.  Ethiopia was concerned about the Islamic courts expanding

14  outward from Mogadishu, correct?

15  A.  Correct.

16  Q.  Ethiopia also had its own regional agenda, correct?

17  A.  It had other regional concerns.

18  Q.  Yes.  And one -- and the principal one is checking

19  Eritrea --

20  A.  That's correct.

21  Q.  -- right?  And, in fact, you wrote in October 2007 to

22  USAID that Ethiopia, quote, considers opposition to the TFG

23  to be fueled by Eritrean interference, close quote.

24  A.  Correct.

25  Q.  And, in fact, the reliberation movement met in Asmara,

1  right?

2  A.   That's right.

3  Q.   And another reason for Ethiopia to put troops in Somalia

4  had to do with its own border area, the -- with rebel groups

5  that were not Somali necessarily but were located in areas

6  close to Somalia, correct?

7  A.   That's right.

8  Q.   Ogaden National Front, National Liberation Front --

9  A.   That's --

10 Q.   -- Oromo organizations?

11 A.   Right.

12 Q.   That's O-r-o-m-o.   And also containing the

13 Ethiopian/Somali region state, right?

14 A.   That would be equivalent to managing the Ogaden National

15 Liberation Front.

16 Q.   And you wrote in October of 2007 in your confidential

17 memo to USAID, quote, Ethiopian intervention in Somalia has

18 triggered a persistent and escalating insurgency.

19 A.   Yes.

20 Q.   And that, quote, Ethiopian -- Ethiopia's intervention in

21 Somalia has degenerated into a violent and costly occupation

22 for which the United States is widely held to be responsible.

23 A.   Yes.

24 Q.   And in that context you wrote in October 2007 that

25 Ethiopia, quote, accentuates the threat of terrorism in order

1   to secure international, especially American, support.

2   A.  That's right.

3   Q.  Right?  And that's because in your opinion the U.S. has

4   essentially looked at Somalia for a long time or at the

5   period of time we're talking about, viewed Somalia only in a

6   counterterrorism context, or principally --

7   A.  Principally.

8   Q.  -- predominantly can we say?

9   A.  Yes, I think that's fair.

10  Q.  And you criticized the United States for only

11  contributing $250,000 to the TFG initially?

12  A.  I said other donors criticized the United States for

13  that.

14  Q.  Yes, okay.  Other donors criticized, right.  And you

15  thought the U.S. should have a broader outlook on Somalia in

16  that regard?

17          MS. HAN:  Objection, relevance.

18          THE COURT:  The objection is sustained.

19          MR. DRATEL:  Your Honor, I would just note that

20  yesterday they -- the government elicited the U.S. position

21  on certain aspects of Somali politics and governments.  But

22  I'll move on.

23          THE COURT:  Okay.

24          MR. DRATEL:  Thank you.

25          BY MR. DRATEL:  Q.  And you wrote in October of

1  2007, In both Somalia and the Ethiopian/Somali regional

2  state, Ethiopia has installed narrowly based compliant

3  governments that lack local legitimacy and disenfranchise

4  large segments of the population.

5  A.   That's right.

6  Q.   And also that armed -- quote, Armed opposition to these

7  fragile administrations means that they require Ethiopian

8  military protection and support, deepening resentment and

9  further radicalizing opposition factions.

10  A.   That's right.

11  Q.   Now, you also wrote to USAID in October of 2007,

12  Unfortunately Ethiopia's actions since December 2007 have

13  served neither Ethiopia nor U.S. interests.

14  A.   That's right.

15  Q.   And that's because no one, and particularly Somalis,

16  don't appreciate an occupying military force, right?  Is that

17  one of the reasons?

18  A.   One of the reasons that it didn't serve U.S. interests?

19  Q.   Yes.

20  A.   The main reason -- the point that I was making is that

21  U.S. interests or objectives include stabilization and

22  counterterrorism, and this policy was having the reverse

23  effect of -- in creating radicalization and instability.

24  Q.   But I'm saying one of the reasons why the Ethiopian

25  military's presence in Somalia was not accepted by Somalis is

1    because it was an occupying military force; that's one of the

2    reasons why.

3    A.  It's part of it, although I think at that time the fact

4    that it was in support of the TFG and that particular

5    leadership was a bigger problem.  Ethiopia has at other times

6    had forces in Somalia or in other parts of Somalia at that

7    time which have not been resisted.  It was really the agenda

8    that they were pursuing in support of the TFG that was the

9    problem.

10   Q.  And another reason why it was unpopular is because

11   Ethiopia was blamed for certain civilian deaths as well?

12   A.  That was part of the bigger picture, yes.

13   Q.  And destruction of property?

14   A.  That's right.

15   Q.  Diversion of resources that the population would use in

16   terms of space, buildings, water, things like that?

17   A.  Not so much.

18   Q.  But interference with local administration on a certain

19   level?

20   A.  By supporting the TFG.

21   Q.  And also an historic antagonism between Somalia and

22   Ethiopia, correct?

23   A.  That's correct.

24   Q.  Now, the TFG held a conference in July and August of

25   2007, correct?

1   A.   Yes.

2   Q.   Again, not in your time line from yesterday?

3   A.   Right.

4   Q.   And they called that the National Reconciliation

5   Congress, correct?

6   A.   That's right.

7   Q.   And your report to USAID was that it served mainly as a

8   forum for TFG supporters, correct?

9   A.   That's right.

10   Q.   That no major opposition figures attended?

11   A.   Correct.

12   Q.   That many clan leaders stayed away?

13   A.   That's right.

14   Q.   And that the conference made little progress towards

15   national reconciliation?

16   A.   Correct.

17   Q.   And you wrote to USAID in October of 2007, quote, TFG has

18   so far shown no interest in sharing power or in advancing the

19   transitional process.

20   A.   Correct.

21   Q.   And you envisioned a more broadly based TFG, correct?

22   A.   I argued that the TFG's success depended on it becoming

23   more broadly based.

24   Q.   Right.  And that would include some anti-Ethiopian

25   leaders, right?

1   A.  Correct.

2   Q.  And even including Islamists or Islamists, however you

3   wish to pronounce it?

4   A.  Correct.

5   Q.  That's because not all Islamists are al-Shabaab, right?

6   A.  Correct.

7   Q.  And not all Islamists are terrorists?

8   A.  Correct.

9           THE COURT:  Anytime you're at a convenient breaking

10  point, Mr. Dratel.

11          MR. DRATEL:  One just one more and then we can

12  break.

13          BY MR. DRATEL:  Q.  And, in fact, in your ICG

14  report you wrote on the Islamists in Somalia that they are a

15  diverse community characterized more by competition and

16  contradiction than cooperation, correct?

17  A.  Correct.

18          MR. DRATEL:  Thank you, your Honor.  This would be

19  a good time.

20          THE COURT:  Okay, ladies and gentlemen.  We'll take

21  our midmorning recess at this time.  And please gather back

22  outside the courtroom in 15 minutes and then we'll call you

23  back in.  Remember the admonition.  Thank you.

24      (There was a break in the proceedings.)

25          THE COURT:  All right.  Everyone is present.  Mr.

1    Dratel?

2              MR. DRATEL:  Thank you, your Honor.

3              BY MR. DRATEL:  Q.  Mr. Bryden?

4    A.  Yes.

5    Q.  Again I want to return to something that you touched on

6    yesterday about the formation of what is called the ARS, the

7    Alliance for Reliberation of Somalia, and we'll call it ARS

8    or the reliberation movement.

9              In September 2007 there was a conference in Asmara,

10   Eritrea, for the purpose of forming this alliance, right?

11   A.  That's right.

12   Q.  And there were members of the TFG parliament, right?

13   A.  Yes.

14   Q.  Which is called the Transitional Federal Parliament but

15   it's essentially part of the TFG government, sort of

16   breakaway elements of even the TFG present?

17   A.  Yes.

18   Q.  And political activists from Somalia -- from Somalia

19   itself and from the Somali diaspora?

20   A.  Yes.

21   Q.  And elements of the Islamic courts as well?

22   A.  That's right.

23   Q.  And you described it as an umbrella movement based on a

24   platform of resistance to Ethiopian occupation, right?

25   A.  That's right.

1    Q.   That's what you told USAID in October of 2007?

2    A.   Yes.

3    Q.   And you also said that, quote, Not surprisingly, the ARS

4    insisted upon complete Ethiopian withdrawal from Somalia as a

5    precondition to any political dialog.

6    A.   Yes.

7    Q.   And that, quote, The establishment of the opposition ARS

8    seems likely to attract greater resources and an enhanced

9    military capacity on the ground.

10   A.   Yes.

11   Q.   And by that you meant in opposition to the TFG?

12   A.   That's right.

13   Q.   And opposition to the Ethiopian military?

14   A.   Yes.

15   Q.   You also wrote in October 2007 to USAID, quote, The

16   friction between the TFG president and prime minister could

17   manifest itself through contested political appointments,

18   militia clashes, and unclaimed assassinations.   Right?

19   A.   Yes.

20   Q.   And so that's the TFG fighting itself essentially?

21   A.   That's right.

22   Q.   And the prime minister and the president are two

23   different people we're talking about?

24   A.   Yes.

25   Q.   Each with their own personal militias essentially?

1   A.   The prime minister actually didn't have a militia, but

2   he -- his supporters could have mobilized that kind of

3   support.

4   Q.   And unclaimed assassinations within that -- within that

5   internal TFG dispute itself; that's what you were concerned

6   about?

7   A.   Yes.

8   Q.   We're talking about the two top officials of the TFG

9   there?

10   A.   That's right.

11   Q.   And did there come a time that the Ethiopians were

12   finally of the opinion that there needs to be a dialog, that

13   the government had to talk to particularly some of the clans

14   who were supporting the insurgency, parts of the Hawiye clan?

15   A.   Yes.

16   Q.   And that ultimately -- when was that would you say?

17   A.   It's hard to say.  I don't know when the Ethiopians

18   reached the decision, but they seemed to be leaning that

19   direction during the second half of 2007, and certainly by

20   the beginning of 2008, they passed that decision point.

21   Q.   So they finally withdraw in 2009?

22   A.   That's right.

23   Q.   And in 2009 Abdullahi Yusuf, the president of the TFG,

24   was replaced by Sheik Sharif Ahmed?

25   A.   That's right.

1  Q.  Sheik Sharif Ahmed, who had been the head of the Islamic

2  courts at one point?

3  A.  Yes.

4  Q.  And then had been affiliated with ARS, the reliberation

5  movement?

6  A.  Yes.

7  Q.  He became the head of the Somali central government?

8  A.  That's right.

9  Q.  And not by a violent overthrow, correct?

10 A.  Correct.

11 Q.  And that occurred in collaboration with -- withdrawn.

12 The replacement of Abdullahi Yusuf by Sheik Sharif Ahmed was

13 in collaboration with a number of elements of the opposition,

14 correct?

15 A.  I'm not sure I understand.

16 Q.  The replacement of Abdullahi Yusuf by Sheik Sharif Ahmed

17 was done by the endorsement, let's say, of various elements

18 of the opposition?

19 A.  I wouldn't say that's the case.  The ARS, his wing of the

20 ARS, accompanied Sheik Sharif into the process, but other

21 opposition movements would generally be negative about that,

22 that decision.

23 Q.  Now, yesterday you said that the U.S. welcomed the TFG in

24 2004, right?

25 A.  That's right.

1    Q.   And, in fact, the U.S. didn't formally -- formally --

2    recognize Somalia until only a couple of weeks ago?

3    A.   If I may, my understanding is the U.S. doesn't actually

4    recognize governments, it recognizes states.  It entered into

5    diplomatic relationship with the Somali government for the

6    first time a few weeks ago.  The previous governments were

7    all interim governments.

8    Q.   So it's a yes in terms of recognition, diplomatic

9    recognition?

10   A.   Yes.

11   Q.   You also spoke yesterday about hawalas, right?

12   A.   Yes.

13   Q.   And, again, because the jury is hearing this perhaps for

14   the first time about hawalas --

15   A.   Yes.

16   Q.   -- that's a money exchange business, right?

17   A.   Money transfer.

18   Q.   Money transfer.

19   A.   Yes.

20   Q.   Between principally, in this context, between Somali

21   diaspora and Somalia itself?

22   A.   That's right.

23   Q.   And many people send money to family members, to other

24   institutions in Somalia, correct?

25   A.   Yes.

1    Q.   And you talked about different types of hawalas?

2    A.   Right.

3    Q.   Some of which are large operations, some of which are

4    smaller or which are called informal?

5    A.   Correct.

6    Q.   Amal is a large one, right?

7    A.   That's right.

8    Q.   Multinational operation?

9    A.   Yes.

10   Q.   Based in Dubai --

11   A.   Yes.

12   Q.   -- right?  And offices in various different countries

13   throughout the world?

14   A.   That's right.

15   Q.   Not an informal hawala at all?

16   A.   Actually it's both.  It has a formal side, and it also

17   uses informal agents all over the world where it's not

18   registered.

19   Q.   Where it's not registered, okay.  And there are hawala

20   registration requirements in the United States now, right?

21   A.   That's right.

22   Q.   Strict ones?

23   A.   Yes.

24   Q.   And Global was another one that you mentioned; that's a

25   large one, right?

1  A.  Yes.

2  Q.  Do you know a gentleman by the name of Farah Yare,

3  treasurer of Global, Farah Shidane?

4  A.  I know the name.  I didn't know the gentleman.

5  Q.  Did you know him as the treasurer of Global?

6  A.  Not as the treasurer, as a senior financial officer.

7  Q.  At Global, a multinational hawala?

8  A.  I'm not sure I would -- would have said he worked for

9  Global.  I think I knew him in another capacity, another

10 hawala.

11 Q.  But as a senior financial officer?

12 A.  Yes.

13 Q.  Want to ask about something that wasn't part of your

14 direct and not on your time line, al-Shabaab and an

15 organization called al-Sunns Wal Jamaa.

16 A.  Yes.

17 Q.  And we'll try to create a spelling.  Al-Sunna being

18 al-Sunna, S-u-h-n-a?

19 A.  S-u-n-n-a.

20 Q.  Okay.  S-u-n-n-a.  Wa, w-a or w-a-a?  Which would you

21 prefer?

22 A.  W-a.

23 Q.  Okay.  Jamaa, j-a-m-a-a?

24 A.  I'll go with that, but there's an L missing, wal, w-a-l.

25 Q.  W-a-l.  So al-Sunna wal jamaa, a Somali organization --

1   A.   Yes.

2   Q.   -- right?  And you've described it as an umbrella

3   organization for various elements, right?

4   A.   Sorry.  As a what?

5   Q.   As an umbrella organization for various elements in

6   Somalia.

7   A.   Yes.

8   Q.   Clan interests, Sufis, right?

9   A.   Yes.

10   Q.   Let's stop there because there's a first, we're talking

11   about Sufis.  There are different branches of Islam, right?

12   A.   Correct.

13   Q.   There is -- there are schools of Islam effectively,

14   right?

15   A.   Yes.

16   Q.   And in some ways, not completely analogous but just

17   analogizing it to let's say Christian denominations, right?

18   They're somewhat analogous to different Christian

19   denominations, right?

20   A.   I'd agree with that.

21   Q.   And Sufi is a particular school, right, of Islam or a

22   particular doctrine of Islam?

23   A.   It's a form of practicing.  It's not one of the major

24   schools, but it's a -- in the Somali context, it's a subset

25   of a school.

1  Q.  And there are a fair number of Sufis in Somalia, correct?

2  A.  Traditionally most Somalis are Sufis.

3  Q.  And Sufis are generally -- well, not generally, but let's

4  say Sufis are generally less puritanical than some other

5  Islamists that perhaps people are -- hear more about in the

6  news?

7  A.  Generally but not entirely.  There are some very

8  puritanical Sufi orders.

9  Q.  But -- and what school are the -- is Shabaab?

10  A.  It's not one of the Sufi orders, it's --

11  Q.  Right, but what school, or they separate, if you could

12  identify it.

13  A.  Salafism.

14  Q.  Salafism, which is a stricter form or more puritanical

15  form, right?

16  A.  Yes.

17  Q.  And Shabaab is -- withdrawn.  Shabaab does not tolerate

18  Sufis, correct, or Sufism?

19  A.  Correct.

20  Q.  And does not tolerate Sufism practices?

21  A.  Correct.

22  Q.  And essentially is at war with Sufis and Sufism?

23  A.  Yes.

24  Q.  They're looking to eradicate it from Somalia?

25  A.  I believe so.

1   Q.  Violently, if necessary?

2   A.  Yes.

3   Q.  And in fact al-Sunna -- we'll call it al-Sunna, al-Sunna

4   wal jamaa, for short.  But al-Sunna has a certain Sufi

5   element to it, correct?

6   A.  Al-Sunna is -- its identity is a Sufi organization.

7   Q.  Okay.  So we'll identify it as a Sufi organization.  And

8   as a result it clashes with al-Shabaab on a regular basis?

9   A.  That's right.

10   Q.  And mostly over al-Shabaab's attempts to ban Sufi

11   practices, right, to abolish Sufism essentially in Somalia?

12   A.  Well, they're contesting control over territory, and they

13   have these conflicting idealogies.

14   Q.  And you described al-Sunna's relationship with the TFG --

15   and this is -- want to get a time frame for you -- I think

16   you have my copy.

17            MR. DRATEL:  If I may just ask, your Honor.

18            BY MR. DRATEL:  Q.  The report on Resolution 853?

19   Should be up there.

20   A.  Yes.

21   Q.  When did you -- when was that issued?  That's it.  I

22   think that's it.

23   A.  This is 20 March 2010.

24   Q.  So you described al-Sunna's relationship with the TFG as,

25   quote, difficult and at times ambiguous?

1   A.  Could you --

2   Q.  Oh, sure.  Page 12.  I'm sorry.  Page 13.

3   A.  Just to confirm.  That sounds right.  Page 13?

4   Q.  Yes.

5   A.  Paragraph --

6   Q.  I don't have it in front of me.

7   A.  Okay.  Difficult and at times ambiguous, yes.

8   Q.  Okay.  Thank you.  Right.  And that there have been --

9   that over the course of al-Sunna's existence, by 2009, when

10  you wrote that, it had emerged as the largest and most

11  effective government-aligned fighting force in southern

12  Somalia?

13  A.  That's right.

14  Q.  And it's also true that al-Sunna -- and one of the areas

15  you talked about, contested territory --

16  A.  Yes.

17  Q.  -- between al-Sunna and al-Shabaab, wasn't Galgaduud one

18  of those?

19  A.  Yes, it was.

20  Q.  I want to talk about the killing of Aden Ayrow May 1st,

21  2008, right?

22  A.  Yes.

23  Q.  A U.S. missile strike --

24  A.  Yes.

25  Q.  -- correct, from a seaborne missile essentially, right?

1    A.   I believe so.

2    Q.   And he had been targeted for some time by the U.S.,

3    right?

4    A.   I don't know.

5    Q.   You're unaware of a January 2007 incident where the U.S.

6    believed it had killed him initially?

7    A.   I'm aware of a number of incidents, but at the time I

8    believed that they were targeting the foreigners in his

9    company, not Ayrow himself.

10   Q.   And do you know how he was located?  Do you know how he

11   was located by the U.S. in that strike that ultimately killed

12   him?

13   A.   No, I'm not privy to that information.

14   Q.   Now, you said yesterday that some organizations, even

15   ARS, condemned the air strike, right, the missile strike?

16   A.   That's right.

17   Q.   And was that because they agreed with Aden Ayrow on

18   policy?

19   A.   They condemned -- I'd have to refer to their statements,

20   but many of them wouldn't have agreed with him on policy, but

21   they certainly didn't favor the strike.

22   Q.   Right, because it was essentially a sovereignty issue?

23   A.   No, it's because they were fighting a common enemy.

24   Q.   The Ethiopians?

25   A.   Yes, and the TFG.

1    Q.   I'm sorry?

2    A.   And the TFG.

3    Q.   Now, in the course of all this conflict that exists in

4    Somalia, that's existed for a long time, citizens are often

5    caught in the crossfire, correct?

6    A.   That's --

7    Q.   Ordinary citizens?

8    A.   That's correct.

9    Q.   And it's a constant state of armed conflict that

10   transcends particular areas.  In other words, it leaks into

11   many different areas of Somalia at various times?

12   A.   Yes, that's right.

13   Q.   Even as far north as Hargeysa sometimes?

14   A.   That's right.

15   Q.   And there's a local need for self-protection, right?

16   A.   In many areas, yes.

17   Q.   Because the government, the central government, is not

18   going to be there to protect them, right?

19   A.   In southern Somalia, yes.

20   Q.   Yes.  And in some instances they feel the danger from the

21   central government itself?

22   A.   That's right.

23   Q.   I want to talk about something that I don't think you

24   touched on in your direct; if you did, very briefly.  Local

25   and regional control, decentralized government, in Somalia.

1   And talk about first the Union of Islamic Courts or the

2   Council on Islamic Courts, whichever you prefer.  I don't

3   know which -- I think I guess council is what you called --

4   A.  Council is fine.

5   Q.  Council on Islamic Courts, they were popular in the early

6   2000s, right, as they grew in number, right?

7   A.  They were popular within their clan areas, their

8   neighborhoods.

9   Q.  And one of the reasons they were popular is because they

10  either restored and then maintained some sense of order in

11  those places, right?

12  A.  That's right.

13  Q.  And they were seen as not corrupt, correct?

14  A.  Correct.

15  Q.  And they weren't aligned with predatory warlords in -- in

16  Somalia?

17  A.  That's correct.

18  Q.  And it's more than just a building and a couple of

19  people.  They administered in some sense a civil society to a

20  certain extent, correct?

21  A.  Not until 2006, no.

22  Q.  Okay.  But at some point, right?  And you wrote in an

23  op-ed piece in -- sometime in 2007 that, quote, For the most

24  part, the Council of Islamic Courts has expanded into the

25  vacuum left by the TFG's inability to govern.

1    A.   Yes.

2    Q.   And in terms of the composition of the Council of Islamic

3    Courts -- and by that time it was a formidable organization,

4    although it had already been defeated by the Ethiopians to a

5    certain extent, correct, by mid 2007?

6    A.   By mid --

7    Q.   Withdrawn.  Do you know when you wrote that op-ed piece?

8    A.   It depends which one you're referring to.

9    Q.   I will show you a copy, okay?

10            MR. DRATEL:  Mark it as Defendants' AA.

11            BY MR. DRATEL:  Q.  I apologize.  The one I had did

12   not have a date.  The date is on there.  You wrote it in

13   December 2006, right?

14   A.   That's right, I wrote --

15   Q.   You wrote it for the CSIS?

16   A.   That's right.

17       (Exhibit No. AA identified.)

18   Q.   Is that -- what is their formal name?

19   A.   Center for Strategic and International Studies.

20   Q.   A U.S.-based organization?

21   A.   In Washington, yes.

22   Q.   And you wrote that many mainstream court leaders -- and

23   you mean Islamic courts, right?

24   A.   Yes.

25   Q.   -- are religious traditionalists schooled in the general

1   moderate tenets of Somali Islamic tradition, right?  I think

2   it is probably on page 2.  Yes, the second paragraph.

3   A.   Yes, I see it.  Yes.

4   Q.   And that although they support an explicitly Islamic form

5   of government informed by Sharia law, they are chiefly

6   concerned with the challenges of day-to-day governance and

7   reconstruction and are ill-at-ease with the stridency of the

8   radicals in their midst.

9   A.   That's right.

10  Q.   And you also said that whatever their political attitudes

11  vis-a-vis the Council of Islamic Courts, most ordinary Hawiye

12  are grateful for the peace, security, and social services

13  that the courts have restored after years of anarchy.

14  A.   That's right.

15  Q.   Now, in terms of regional control generally, leaving

16  aside the courts, the Council of Islamic Courts, you have

17  been in favor of regional and local administration, right?

18  A.   Yes.

19  Q.   I think you called it a building block approach to

20  stability, correct?

21  A.   That's one form of it, yes.

22  Q.   And you've written that -- you told USAID in March of

23  2007 that regional and local administrations provide

24  representative governance at the regional and district

25  levels, right, and that it permits broader representation

1  than at the national and can exert an important moderating

2  influence on disaffected clans and communities.

3  A.  That's right.

4  Q.  And that another reason for regional and local

5  administration was, as you wrote, quote, A minimum level of

6  local governance is also necessary in order to provide the

7  minimum conditions (security, administrative capacity, et

8  cetera) for implementation of transitional tasks.  Right?

9  A.  Yes.

10  Q.  So, in other words, security would be on a local level,

11  right?

12  A.  Yes.

13  Q.  And just so we're clear, in terms of security not only

14  from organized groups that are armed but there was also a lot

15  of banditry, right, in Somalia generally in these areas that

16  were not controlled by governments?

17  A.  That's correct.

18  Q.  And ordinary citizens and even police units could be

19  under attack by ordinary criminals, bandits, who were heavily

20  armed?

21  A.  That's right.

22  Q.  And one way to achieve local security, you said, was to

23  create community confidence in local and national

24  authorities, right?

25  A.  That's right.

1    Q.  And, in fact, during the periods of anarchy in the '90s

2    particularly in Somalia and then through towards the end of

3    the '90s into the early 2000s, these local administrations

4    were perhaps the only effective governing mechanisms in

5    Somalia, correct?

6    A.  That's correct.

7    Q.  And the only civic institutions that the local populace

8    could rely on for civil society operations that we take for

9    granted here?

10   A.  Generally yes, but I would have to also add the business

11   community offered a lot of public services that would

12   normally be public were privatized.

13   Q.  And also protection as well, in other words, security

14   protection that we discussed before?

15   A.  In some places, yes.

16   Q.  Now, we talked -- we've talked about drought and famine,

17   and there's a significant humanitarian need in Somalia,

18   correct?

19   A.  That's correct.

20   Q.  And that's regardless of whether there's drought and

21   famine, correct?

22   A.  That's right.

23   Q.  Drought and famine only make it much worse, right?

24   A.  That's right.

25   Q.  And you've seen children in a state of malnutrition?

1    A.  Yes, I have.

2    Q.  Can you describe that for us?

3            MS. HAN:  Objection, relevance.

4            THE COURT:  The objection is sustained.

5            BY MR. DRATEL:  Q.  Breaks your heart, doesn't it?

6            THE COURT:  The description --

7            MS. HAN:  Objection.

8            THE COURT:  Sustained.

9            MR. DRATEL:  To my other question?  I'm sorry.

10           THE COURT:  Yeah, as to that question too.

11           MR. DRATEL:  Nothing further.  Thank you, your

12   Honor.  Oh, one -- may I one just return to one?

13           THE COURT:  Yes.

14           BY MR. DRATEL:  Q.  Have you heard of a website --

15   I'll spell it and then I'll say it.  W-a-r-k-a-d-a-l-k-a dot

16   com, Warkadalka?

17   A.  I'm sorry.  I didn't --

18   Q.  Oh, warkadalka.com.

19   A.  Warkadalka.  I've seen it.  I haven't frequented it.

20   Q.  What do you know it to be?

21   A.  I don't know it to be of any special character.

22   Q.  Did al-Shabaab have hit lists?

23   A.  Apparently they do, yes.

24   Q.  Did they publish them online?

25   A.  I'm not aware.  I haven't seen one online.

 1           MR. DRATEL:  Nothing further, your Honor.  Thank

 2  you.

 3           THE COURT:  Ms. Moreno?

 4                      Cross-Examination

 5           BY MS. MORENO:  Q.  Good morning.

 6  A.  Good morning.

 7  Q.  I only have a couple questions for you.  One of them is

 8  geographic, one is this.  Your two --

 9           MS. MORENO:  May I approach, your Honor?

10           THE COURT:  Sure.  You don't need to ask for that.

11           MS. MORENO:  All right.  Thank you.

12           BY MS. MORENO:  Q.  I just wanted -- if you could

13  come down, sir, please.  I think you were talking earlier

14  both in direct -- certainly in cross and I think in direct

15  about Somaliland.

16  A.  Yes.

17  Q.  And what area in this map would you say is Somaliland?

18  A.  Well, the -- formally speaking Somaliland claims this

19  territory.

20  Q.  Can you see?  Okay.

21  A.  Somaliland claims from all of these regions up to the

22  eastern boundary of Sool and Sanaag.  Effectively, it

23  administers up to this boundary here to the east of Erigavo

24  and to -- really to the west, Laascaanood, including

25  Laascaanood.  This area is contested.

1    Q.   Could you point to a place called Borama on the map?

2    A.   Borama is here.

3    Q.   Borama.  And is Borama considered to be part of

4    Somaliland?

5    A.   That depends who you ask.

6    Q.   And why is that, sir?

7    A.   Because it falls under Somaliland's administration --

8    Q.   Okay.

9    A.   -- Somaliland has de facto authority there.  But there

10   are members of the community there who don't want to be part

11   of Somaliland or at least don't want to secede from the rest

12   of Somalia.

13   Q.   I see.  And Jijiga, do you see --

14   A.   Jijiga is --

15   Q.   And where is that?

16   A.   In Ethiopia.

17   Q.   In Ethiopia.  Is that area also somewhat contested in

18   terms of boundaries?

19   A.   No.

20   Q.   Okay.  All right.  But Borama is administrated by

21   Somaliland?

22   A.   That's right.

23   Q.   All right.  All right.  Thank you, sir.  You said that

24   you had some knowledge of clans, correct?

25   A.   Yes, I did.

1  Q.  Okay.  And do you know the clans that hail from this area

2  in Borama?

3  A.  I have some general knowledge of them, yes.

4  Q.  Gadabuursi?

5  A.  Gadabuursi, also known as Samaroon.

6  Q.  And where -- where does the Gadabuursi clan hail from?

7  A.  It -- they inhabit the southern part of Awdal region on

8  that map.

9  Q.  Okay.

10  A.  Also across the border into adjacent parts of Ethiopia

11  and Djibouti.

12  Q.  Okay.  So when you say the southern part, again, are we

13  talking about the northern part of Somalia?

14  A.  No, I mean there's a region in the corner of that map

15  called Awdal region.

16  Q.  I'm sorry.  Awdal region?

17  A.  This is where it is, says Awdal, and Awdal is this region

18  here.

19  Q.  Okay.

20  A.  And this part of -- the southern part of Awdal, and part

21  of the neighboring region of Woqooyi Galbeed to the east of

22  Hargeysa, to the west of Hargeysa, is also Gadabuursi and

23  across the border into Ethiopia and Djibouti.

24  Q.  Okay.  So, far away from the areas that we've been

25  talking about in terms of Mogadishu and the clans that hail

1    from there, correct?

2    A.   As a home region.

3    Q.   As a home region.

4    A.   Yes, but there are many Somalis who -- from all over

5    Somalia --

6    Q.   Yes.

7    A.   -- who have grown up in Mogadishu --

8    Q.   Okay.

9    A.   -- and consider that home.

10   Q.   All right.   Thank you.   Now, a different subject, a few

11   questions.   You've testified that it's common among the

12   Somalis in the United States -- I'm paraphrasing -- to send

13   alms back to the poor in Somalia; would you agree with that?

14   A.   No, I would say that it's more common for Somalis to send

15   money back to relatives.

16   Q.   Okay.   Right, to poor relatives?

17   A.   Yes.

18   Q.   And what are alms?

19   A.   Alms or -- the Islamic term would be "zakat" -- would be

20   the payment of -- well, alms can also be given on an ad hoc

21   basis, but zakat would be the payment of approximately

22   2 percent of an individual's income to the poor every year.

23   Q.   And this money is sent through hawalas, correct?

24   A.   It can be given any way.   I mean hawala is one form, very

25   common form.

1    Q.  But they're not sent through any real banking system

2    because there's no internationally registered bank

3    functioning in Somalia --

4    A.  That's right.

5    Q.  -- correct?  And that certainly would be true for the

6    time period relevant in this case, 2006-7 to 2009?

7    A.  That's right.

8    Q.  We heard a little bit about drought and famine.  Now,

9    this particular drought, can you -- do you have a time frame

10   for this last drought that has impacted Somalia so viciously?

11              MS. HAN:  Objection, relevance.

12              THE COURT:  What time frame are we talking about,

13   Ms. Moreno?

14              MS. MORENO:  The time frame in the calls, your

15   Honor, 2006 to 2009.  All my questions are in that time

16   frame.

17              THE COURT:  Okay.  Very good.  Are you still

18   objecting?

19              MS. HAN:  No, your Honor.

20              THE COURT:  Okay.

21              THE WITNESS:  I -- I, you know, droughts begin

22   slowly, peak, and decline, and I don't -- and they're

23   constant in the Somali environment, so I can't tell you when

24   it started and when it ended.  I can tell you that although

25   there was a drought through to part of 2006 and into 2007, at

1    the time the assessment of the aid community -- and I would

2    say specifically I worked at that time with the Office of

3    Coordination of Humanitarian Affairs -- was that displacement

4    was a bigger problem than drought, displacement from war.

5    There was a drought, but it wasn't one of the extremely

6    serious droughts like the one we've seen over the last two

7    years or the ones in '92-'93, but it was -- there was a

8    drought.

9            BY MS. MORENO:  Q.  So the one that -- in the last

10   two years was even more severe than the one in the time

11   period of say '06-'07 to '09?

12   A.  That's right.

13   Q.  Although the drought during that two-, three-year period

14   of time was significant?

15   A.  It was, but I would -- in a sense, it was part of

16   building up to what happened later, which was between

17   2010-2012, then it became very serious.

18   Q.  You mentioned displacement.  Can you talk a little bit

19   about the displacement -- again, focusing on this particular

20   period of time -- what was going on.

21   A.  There was massive displacement.  The fighting in

22   Mogadishu -- a lot of people had come back to Mogadishu in

23   particular during the rule of the Islamic courts because of

24   the stability there.  In 2007, when the Ethiopian military

25   came, there was some initial displacement out of fear that

1   violence was going to ensue.  When heavy fighting began in

2   March 2007, I believe the estimates were that from between

3   March and maybe June, about 700,000 people left the city,

4   many of them going to that area we talked about.

5   Q.  The refugee camp, that particular --

6   A.  "Camp" is organized.  This was just people fleeing and

7   settling along the road.

8   Q.  So displacement -- to be displaced by the violence, it

9   doesn't necessarily mean that people can go to another place

10   where there is any sort of structure; is that fair to say?

11   A.  Yes.  The options for someone fleeing the violence were

12   to go to a relatively safe area or to cross the border to a

13   neighboring country and go to a refugee camp or try to settle

14   there temporarily, which many do.

15   Q.  Or, as you -- I think you said, the 500,000 or 600,000

16   people, many of them just were along the road.

17   A.  Many went along the road.  Those who could went to places

18   in northern Somalia where they'd rent houses or settle and

19   try and do some business.  But yes, several hundred thousand

20   found themselves along that stretch of road.

21   Q.  For how long a period of time?

22   A.  Well, some are still there.

23   Q.  Some are still there.  And would you agree with me that

24   the most vulnerable victims of displacement and the violence,

25   the drought, and the famine are children?

1   A.  I think that's fair to say, yes.

2           MS. MORENO:  Thank you.  Nothing further.

3           THE COURT:  Ms. Ghappour, did you have any

4   questions?

5           MR. GHAPPOUR:  No, your Honor.

6           THE COURT:  Mr. Durkin, any questions?

7                         Cross-Examination

8           BY MR. DURKIN:  Q.  Mr. Bryden, do I assume it

9   would be a correct summary of your testimony to say that in

10  your opinion about Somalia that it's a mess?

11  A.  Actually no.

12  Q.  Okay.

13  A.  I'm one of the optimists.

14  Q.  How long have you been trying to make sense out of

15  Somalia?

16  A.  Since I first arrived there about 22 years ago.

17  Q.  And you're still an optimist, right?

18  A.  I'm still an optimist.

19  Q.  Hope springs eternal, correct?

20  A.  That's correct.

21  Q.  Because there's some very decent people there, aren't

22  there?

23  A.  That's right.

24  Q.  Notwithstanding the warlords and the militia and

25  everything else, correct?

1   A.   Correct.

2   Q.   That's because there's real live human beings there,

3   right?

4   A.   That's right.

5   Q.   When we talk about these settlements along the road --

6   let me make sure I get this correct -- are you telling me

7   that there are somewhere between 500,000 to 600,000 people

8   camped out along the highway going out of Mogadishu?

9   A.   There were.  It's much less now, but yes, that was --

10  Q.   When was that?  When was the peak of that?

11  A.   About beginning to the end of 2007 and into 2008.

12  Q.   So around the time we're talking about here, right?

13  A.   That's right.

14  Q.   And is that on this map here?  Would you mind coming down

15  for a second and showing the ladies and gentlemen and me

16  where that road would be.  Help if I put it this way, right?

17  A.   It's this road, and the settlements would start probably

18  just off the map, maybe about here and continue way towards

19  Afgooye.

20  Q.   So -- thank you.  So we're talking about roughly half the

21  population of the city of San Diego being spread out along

22  the highway kind of like up I-5; am I right?

23  A.   I don't know how many people live in San Diego I'm

24  afraid.

25  Q.   If I told you I checked a little while ago and it was

1    about a million three, 600 close to half of that, right?

2    A.   That would be about right.

3    Q.   You with me?

4    A.   Yes.

5    Q.   Would you agree with me that that's virtually

6    incomprehensible to somebody that grew up in San Diego or New

7    York or Chicago?

8              MS. HAN:   Objection, relevance.

9              THE COURT:   Sustained.

10             BY MR. DURKIN:   Q.   Have you seen anything like

11   that anywhere else that you've either worked or traveled?

12             MS. HAN:   Objection, relevance.

13             THE COURT:   Sustained.

14             BY MR. DURKIN:   Q.   Let me ask you this.   You said

15   that in these settlements or camps -- let me ask this.   When

16   you say that people just built some type of shelter there,

17   what did they use?   What are these settlements built out of?

18             MS. HAN:   Objection, relevance.

19             THE COURT:   Overruled.

20             THE WITNESS:   They vary.   They're everything from

21   some relatively decent structures, a few cinderblock; but for

22   the most part you'd be talking about corrugated iron and

23   plastic tarpaulin handed out by aid agencies and sticks and

24   whatever people could put together.

25             BY MR. DURKIN:   Q.   Kind of like shanties?

1  A.  Yes.

2  Q.  And I take it there's no plumbing?

3  A.  No.  For most of them, no.

4  Q.  No electricity?

5  A.  Electricity for many, no, but -- it's sad to say but

6  after two years of -- two decades of conflict, Somalis are

7  amazingly enterprising and resilient and very quickly

8  generators are installed and people can buy power for a fee,

9  low fee.

10 Q.  Let's talk about that resilience and ingenuity.  That's

11 how the militias pop up in those settlements, correct?

12 A.  They -- they don't pop up in the settlements.  I'm not

13 sure -- maybe I don't understand.

14 Q.  I thought you told us -- maybe I misunderstood.  I

15 thought you told us that there were militia inside these

16 settlements and that they sometimes fought with each other.

17 A.  Well, they are, but they're not linked to the

18 settlements.  These settlements happen in an area that is

19 already inhabited by people and where there was already

20 usually a preexisting militia -- again, the war's been going

21 on a long time -- but these militia will be linked to

22 different interests, different leaders, sometimes different

23 clans, and will compete for control particularly of things

24 like the road running through the settlement.

25 Q.  How would you define or explain these militia?  What do

1   you mean when you say a militia?

2   A.   Very heavily armed gang, anywhere between several dozen

3   or several hundred fighters, usually from the same subclan,

4   and under control of a leader who is -- who may be a

5   businessperson, a political figure, an idealogue, a clan

6   elder, maybe all of those things at once.  And that -- these

7   militia may be nominally to provide security, and sometimes

8   they do when there's a threat from another militia, but

9   sometimes they're just -- they're a threat themselves to

10  their own people.  A lot of ordinary people are fed up with

11  these militia, young men with guns sitting by the side of the

12  road, waving down buses, demanding money.

13  Q.   I take it that they don't have a Second Amendment to the

14  constitution in Somalia, right?

15  A.   I missed that.

16  Q.   You familiar with our Second Amendment with the right to

17  bear arms?

18  A.   Yes.

19  Q.   They don't -- that's not an issue in Somalia these days,

20  right?

21  A.   No, that's not an issue.

22  Q.   Okay.  And would I be correct in assuming that the

23  militia would have like guys like this with weapons and

24  things like that?

25            THE COURT:  What exhibit number is that, please?

1               MR. DURKIN:  I'm sorry.  25-B.

2               THE COURT:  Okay.

3               THE WITNESS:  Well, actually most militias would

4    have men like that with weapons, but they probably wouldn't

5    have such complete uniforms, and they wouldn't be wearing the

6    red 'immama and hiding their faces.

7               BY MR. DURKIN:  Q.  Right.  But do they -- do

8    people wear other kinds of bandanas there?

9    A.  Yes, all kinds.

10   Q.  So all kinds of different colors, right?

11   A.  Yes.

12   Q.  And those guys had uniforms, but most militias don't have

13   uniforms, right?

14   A.  That's true.

15   Q.  But they'd be carrying those kind of weapons, right?

16   A.  That's right.

17   Q.  In fact, you said earlier I think in response to some of

18   Mr. Dratel's questions that you yourself had hired militia to

19   take you around, correct?

20   A.  Organizations I worked for hired militia.

21   Q.  Right, that's what I meant.

22   A.  Yes.

23   Q.  And they had weapons like that too, right?

24   A.  That's right.

25   Q.  Okay.  And that's very -- that's very common in

1    Mogadishu, in Somalia, correct?

2    A.   Absolutely.

3    Q.   Mogadishu in particular, correct?

4    A.   Yes.

5    Q.   Now, let me ask you this.  You talked about this time

6    line, and one of the periods you talked -- I want to -- you

7    talked about this period that's up on the board now, right,

8    from roughly -- well, we can see '93 to 2002, correct?

9    A.   Correct.

10   Q.   And I believe you said that it was in -- right there

11   where that ugly finger is, 1995, that the UN peacekeeping

12   efforts failed and forces had to leave Somalia, correct?

13   A.   Correct.

14   Q.   And I take it between 1995 for quite a number of years,

15   there was no law or any type of government support or safety

16   at all, correct?

17   A.   In southern Somalia.

18   Q.   Okay.  And is that where Mogadishu is?

19   A.   Yes.

20   Q.   Okay.  And I take it you would agree with me that if you

21   were a 24-year-old Somali living in Somalia around 1999, that

22   if you could get out of there and go to Cairo, that would be

23   prudent, correct?

24             MS. HAN:  Objection, relevance --

25             THE COURT:  Well --

1          MS. HAN:  -- calls for speculation.

2          THE COURT:  Yeah, it is speculative.  It would

3    really depend on the circumstances of the individual if it's

4    a hypothetical.  If you feel you're able to answer that,

5    Mr. Bryden, you can answer it if you have sufficient

6    information.

7          THE WITNESS:  I think a lot of people from Somalia

8    did take the decision to leave the country during those years

9    and look for better prospects elsewhere; others stayed, but

10   many did leave.

11         BY MR. DURKIN:  Q.  And those are the people you

12   discussed when you talked about the diaspora, right?  At

13   least part of that diaspora is made up of people like that,

14   correct?

15   A.  That's correct.

16   Q.  Okay.  And you're familiar with the economics of Somalia

17   as well, aren't you?

18   A.  I'm not an economist, but yes, up to a point.

19   Q.  You would agree with me that someone who could get out of

20   Somalia in this time period, 1999 let's say through 2006,

21   could make quite a bit of money -- could make quite a bit

22   more money driving a taxi in either St. Louis or San Diego

23   than they could in Mogadishu, correct?

24         MS. HAN:  Objection; relevance, speculation.

25         THE COURT:  The objection is sustained on relevance

1    grounds.

2              BY MR. DURKIN:  Q.  So you talked about the money

3    that goes back; remember that?

4    A.  Yes.

5    Q.  I think you said the diaspora sends something like -- was

6    it almost a billion dollars a year back?

7    A.  That's right.  That's the estimate.

8    Q.  Okay.  And I think you said it was to families mostly,

9    correct?

10   A.  Correct.

11   Q.  And you don't have any interest in the outcome of this

12   case, do you?

13   A.  No, I don't.

14   Q.  And you don't know my client, Mr. Ahmed Nasir Taalil

15   Mohamud, do you?

16   A.  No, I don't.

17             MR. DURKIN:  That's all I have.

18             THE COURT:  Anything further, Ms. Han?

19             MS. HAN:  Yes, your Honor.

20             THE COURT:  About how long will you be on redirect?

21             MS. HAN:  I think about 20 minutes or so.

22             THE COURT:  Twenty minutes.  Well, okay.  Let's --

23   sounds like we can finish the witness by noon hopefully in

24   any event.

25             MS. HAN:  Certainly, your Honor.

1          THE COURT:  And I wanted to clarify one thing with

2    Mr. Dratel on just the last couple of questions that were

3    asked.  I can do that from the bench.  Mr. Dratel, you were

4    into the area of malnutrition.  You can certainly ask any

5    questions on recross if you'd like relative to the nature and

6    extent of malnutrition areas.  I didn't mean to foreclose you

7    from that.  It was a physical description of the individual

8    process I was staying away from.

9          MR. DRATEL:  Thank you, your Honor.

10          THE COURT:  All right, Ms. Han, please.

11                    Redirect Examination

12          BY MS. HAN:  Q.  Mr. Bryden, on cross-examination

13    you were asked about having had militias support you while

14    working for nongovernmental organizations; do you recall

15    that?

16    A.  Yes, I do.

17    Q.  And can you describe why is it that you needed that kind

18    of support?

19    A.  Nongovernmental organizations in Somalia handle

20    resources, different forms; they issue contracts to

21    personnel, they may be handling food, medicines, fuel for

22    their vehicle fleets, all of which are high-value assets and

23    attract the attention of bandits and some clan militias as

24    well at different times.  So aid agencies, in the absence of

25    a government, require protection.

1              Now, in some parts of Somalia where there is local

2     governance mainly, in parts of the north, there are special

3     police units that are established to look after aid agencies;

4     that's mainly in Somaliland and Puntland.  But further south,

5     and particularly the time that we've been talking about,

6     there was no police force, no duly constituted authority, and

7     the only way to protect house, assets, and personnel --

8     because kidnapping has become increasingly a problem in

9     Somalia -- was to have armed security.

10    Q.  And were aid agencies actually a target of al-Shabaab in

11    2007 and 2008?

12    A.  Yes, they were.

13    Q.  And did al-Shabaab actually have a section of its entity

14    that worked on specifically that?

15    A.  They -- they had various parts.  There was what they

16    called OSAFA, the Office for the Supervision of

17    Administration of Foreign Assistance I think, that engaged

18    with aid agencies, mainly banning them and denying them

19    access to areas under al-Shabaab control.  There was another

20    part of the organization that had been involved actually in

21    attacks on some aid agencies.

22    Q.  And what was that section called?

23    A.  Well, it didn't have a name at the time of the first

24    attacks, but later on became known as amniyat.

25    Q.  And was that the -- like internal security force?  Is

1  that what you testified to, that it was an internal security

2  force?

3  A.  Was more like intelligence and counterintelligence.

4  Q.  And speaking about clan militias, in talking about the

5  time period of 2007 and 2008, did clan militias also fight

6  alongside al-Shabaab?

7  A.  They -- clan militias, court militias, many different

8  militias fought -- side by side is maybe not entirely

9  correct.  They had a common enemy, they often fought in the

10  same areas; sometimes they cooperated, sometimes they didn't.

11  Q.  And another entity that sometimes cooperated with

12  al-Shabaab was the ARS, right, the Alliance for Reliberation

13  of Somalia?

14  A.  That's correct.

15  Q.  But in some ways the ARS and al-Shabaab -- well, let me

16  ask you this:  Is ARS -- were there two different sections in

17  ARS, essentially two different wings of ARS?

18  A.  I would say more than two factions within ARS.

19  Eventually they split into the Asmara group and the Djibouti

20  group.

21  Q.  And what were the differences between the Asmara group

22  and the Djibouti group?

23  A.  The Djibouti group entered dialog with the Transitional

24  Federal Government in order to reach a peace settlement, and

25  that settlement involved the replacement of the president,

1  Abdullahi Yusuf, with a new president, Sheik Sharif, who had
2  been with the Islamic courts.  The Asmara wing, which did not
3  travel to Djibouti to take part in the peace talks, advocated
4  continuing the armed struggle, and that wing -- the leader of
5  that wing after the split became Sheik Hassan Dahir Aweys.
6  Q.  And what was al-Shabaab's view of the Djibouti group?
7  A.  Al-Shabaab opposed the Djibouti group.
8  Q.  And why is that?
9  A.  Because al-Shabaab rejected any dialog with the
10  Transitional Federal Government.  Already al-Shabaab was
11  fairly disparaging about the Asmara group for removing itself
12  from Somalia and not being in the front lines.  The Djibouti
13  group went one step even further, engaging in political
14  dialog, and al-Shabaab condemned that.
15  Q.  And you were also asked about an entity called al-Sunna
16  wal jamaa -- I'm sorry.  Can you pronounce that for me?
17  A.  Al-Sunna wal jamaa.
18  Q.  Al-Sunna wal jamaa.  You were also asked about that on
19  cross-examination; do you remember that?
20  A.  Yes, I do.
21  Q.  Okay.  And they were an entity that came in -- and when
22  is it that they became an -- well, let me ask it --
23  withdrawn.  Where were they -- where were they based, if you
24  know?
25  A.  Al-Sunna had different wings, but the group that I've

1    been asked about is principally the group that was based in

2    Galgaduud region, and they were a combination.  They were a

3    regional alliance of clan militias but sharing a common

4    ideology; that was the defense of their version of Islam and

5    their enmity to al-Shabaab.

6    Q.  And when did they become a force against al-Shabaab in

7    2008?

8    A.  Well, they started to emerge I believe late 2007, and

9    then in 2008 they actually really started to make progress as

10   a fighting force.

11   Q.  And do you know when in 2008 they actually started to

12   develop as a fighting force?

13   A.  The exact date I couldn't tell you.  They were already in

14   existence early in the year.

15   Q.  You were also asked about fundraising use -- al-Shabaab's

16   fundraising using Paltalk; do you remember that?

17   A.  Yes, I do.

18   Q.  What is Paltalk?

19   A.  Paltalk is an online chat room.

20   Q.  And was that -- could anybody enter a Paltalk chat room

21   that was a fundraising chat room for al-Shabaab?

22   A.  Initially yes, but quite quickly al-Shabaab developed

23   suspicions that they were being infiltrated, and so

24   invitation -- access to chat rooms was often by invitation

25   only; you had to be endorsed by another member.

1    Q.  And were Paltalk and other forums, were those

2    al-Shabaab's only methods of fundraising?

3    A.  No, there were other forms of fundraising.

4    Q.  And speaking specifically about 2007 and 2008, you were

5    asked about a person named Mahad Karate; do you remember

6    that?

7    A.  Yes, I do.

8    Q.  And speaking specifically about 2007 and 2008, what was

9    Mahad Karate's role in al-Shabaab?

10   A.  Mahad Karate was -- he was already acknowledged as a

11   fairly senior figure, an operational commander in al-Shabaab

12   in -- in 2007.  He was at the time -- I should explain that

13   there are things that were not known at the time but were

14   speculation which then later have become confirmed.  At the

15   time he was generally described as someone responsible for

16   targeted killings and assassinations.  Later on it became

17   known that he was a senior figure in the amniyat, and so that

18   confirmed what had been believed at the time.

19          In 2008, after the killing of Aden Hashi Ayrow,

20   Mahad Karate was one of the Shabaab leaders that then emerged

21   as the next generation of senior commanders, more visible,

22   and seems to have had an on-and-off presence in the

23   al-Shabaab shura.

24   Q.  And you remember that you were also asked about the

25   Ethiopians and that they had engaged in killing civilians?

1   A.   Yes.

2   Q.   Did al-Shabaab also engage in killing civilians?

3   A.   Yes, they did.

4   Q.   And did they also engage in destroying property?

5   A.   Yes, they did.

6   Q.   And you were also asked about the Council of Islamic

7   Courts; do you remember that?

8   A.   Yes.

9   Q.   And I believe that you were asked about a portion of your

10  writing that talked about the Islamic Courts Union and its

11  relative stability but also their concerns about the

12  extremist elements within the Islamic Courts Union; do you

13  remember that?

14  A.   Yes, I do.

15  Q.   What was that extremist element within the Islamic Courts

16  Union?

17  A.   The extremists -- the main extremist element within the

18  Islamic Courts Union was al-Shabaab.  There were also some

19  members of what I would call al-Itihaad, the remnants of

20  al-Itihaad, who were ideologically close to the courts who

21  were also extreme and seem -- close to al-Shabaab, excuse

22  me -- and used to move in and out of al-Shabaab circles; but

23  that was the extreme -- al-Shabaab was the extremist fringe

24  of the courts.

25  Q.   I'm sorry.  I don't think I understand that.  So was

1   al-Itihaad, or AIAI, were they aligned with al-Shabaab as

2   extremists within the Islamic Courts Union?

3   A.  There were other former members of al-Itihaad in the

4   courts, some of whom were quite moderate, sort of holding the

5   political center in the court alliance, and some of whom

6   moved closer to al-Shabaab and cooperated with them.

7   Q.  You were also asked about some of the weapons that

8   al-Shabaab used; do you remember that?

9   A.  Yes, I do.

10  Q.  And you were asked about the commonality of the use of

11  rocket-propelled grenades in Somalia?

12  A.  Yes.

13  Q.  Speaking about other tactics that al-Shabaab used, were

14  suicide bombings exclusive to al-Shabaab?

15          MR. DRATEL:  Objection; not part of cross.

16          THE COURT:  Well, this area has been covered on

17  direct.  I think the witness went through all the areas of

18  tactics utilized here.  This question is different how, Ms.

19  Han?

20          MS. HAN:  Your Honor, on cross-examination he was

21  asked about sort of the commonality of some of the tactics

22  that he was asked about on direct.

23          THE COURT:  In that context the objection is

24  overruled.

25          BY MS. HAN:  Q.  Was -- as far as suicide bombings,

1  was al-Shabaab the only entity in Somalia that engaged in

2  those in 2007 and 2008?

3  A.  Yes, it was.

4  Q.  And you were also asked about the Ethiopians and their

5  engagement with the Hawiye clan; do you remember that?

6  A.  Yes, I do.

7  Q.  And in what time period were you talking about that they

8  started to negotiate with the Hawiye clan?

9  A.  They started to negotiate during the course of 2007, mid

10  2007, until -- well, until the end of the year.

11  Q.  And the Hawiye clan, it's large, right?

12  A.  That's right.

13  Q.  Approximately -- do you have any sense of approximately

14  how many people?

15  A.  I don't.  I wouldn't want to speculate, I'm not sure, but

16  probably well over a million, more.

17  Q.  And among those million people, there were different

18  opinions about the Ethiopians, about al-Shabaab, about

19  generally what was happening in Somalia, correct?

20  A.  That's correct.

21  Q.  Some of them supported al-Shabaab and some of them

22  didn't?

23  A.  That's right.

24  Q.  And I believe you were also shown Government's Exhibit

25  25-B during cross-examination, and you were asked about the

1  red and white scarves that the individuals are wearing; do

2  you remember that?

3  A.  I commented on it.  I don't remember being asked about

4  it.

5  Q.  Okay.  Who -- what are those red and white scarves

6  called?

7  A.  Well, the Somali term would be 'immama.

8  Q.  Can you spell that for us, please.

9  A.  Apostrophe i-m-m-a-m-a.

10  Q.  And you were asked about clan militias and whether or not

11  they would wear those scarves, right?

12  A.  Yes.

13  Q.  And -- I'm sorry.  What was your answer to that?

14  A.  My answer was that -- my answer was that they would wear

15  a similar cloth, they'd wear 'immamas of different colors.

16  Q.  And are those particular scarves of the red and white

17  color distinct to any group?

18  A.  Well, they -- I should say they're available on the

19  market and people will wear them as a matter of preference;

20  but systematically wearing them as part of a militia uniform

21  became first the hallmark of -- first al-Itihaad, then

22  Islamic courts, and more recently al-Shabaab -- not always

23  red but the covering of the face was a distinctly al-Shabaab

24  trait.

25  Q.  And finally you were asked about how it is that you

1  departed or stopped working for ICG; do you remember that?

2  A.  Yes, I do.

3  Q.  And ICG -- what does that stand for again?

4  A.  The International Crisis Group.

5  Q.  And you had written reports for them?

6  A.  Yes, I had.

7  Q.  And how is it -- why is it that you ended up leaving ICG?

8  A.  Because my life had been threatened by al-Shabaab.  ICG

9  as a precaution relocated me and my family to South Africa.

10  South Africa was too far away for me to do my job, and I

11  wanted to return to the region and to continue to work in

12  Somalia.  ICG felt that was too dangerous, and so I resigned

13  and came back to work.

14  Q.  And what led to you being threatened by al-Shabaab?

15  A.  I'm not entirely sure, they didn't tell me, but probably

16  the fact that we had published the first -- first report,

17  first public report ever written on Aden Hashi Ayrow and on

18  what became known as al-Shabaab.  At the time it didn't have

19  that name.

20           MS. HAN:  Okay.  Thank you.

21           THE COURT:  Mr. Dratel, anything further?

22           MR. DRATEL:  Yes, your Honor.  Thank you.

23                    Recross-Examination

24           BY MR. DRATEL:  Q.  With respect to the

25  organizations that hired militias to protect you and your

1   colleagues, you had mentioned with respect to your

2   accommodation with al-Shabaab that allowed you -- well, not

3   allowed you, but that at least gave you some comfort about

4   coming back into Somalia without the same level of fear with

5   respect to your safety, that you would be protected; you had

6   said that one was -- one of your bodyguards was actually

7   al-Shabaab?

8   A.  That's right.

9   Q.  But you weren't a supporter of al-Shabaab, right?

10  A.  That's right.

11  Q.  And you weren't working with al-Shabaab in your -- in

12  your opinion, right?

13  A.  That's right.

14  Q.  It was not your intention to provide any support to

15  al-Shabaab, correct?

16  A.  I didn't provide any support to al-Shabaab.

17  Q.  Right.  But it wasn't your intention to work with them in

18  any way?

19  A.  I didn't work with them.  This was a security detail

20  provided by the Islamic courts, and I didn't pay for it.

21  Q.  And it included an al-Shabaab member?

22  A.  It did for the reason that he would recognize other

23  members of al-Shabaab and ensure that I wasn't approached or

24  harmed by them.

25  Q.  You mentioned on redirect that al-Shabaab denied aid to

1  certain areas of Somalia in 2007-2008, right?

2  A.  That's right.

3  Q.  And it's true as well that in those areas that al-Shabaab

4  didn't -- withdrawn -- denied aid, we mean the ability of

5  international NGOs, nongovernmental organizations, for

6  example, like CARE, which you had worked for at one point, to

7  get to the public, to get to the populace directly and

8  provided the kind of aid that they were committed to do,

9  right?

10  A.  That's correct.

11  Q.  And it's true in turn that in those areas, the need for

12  humanitarian aid became more acute because those NGOs

13  couldn't get access, right?

14  A.  That's true.

15  Q.  And that would make remittances that much more important

16  in that regard, right?

17  A.  It could, yes.

18  Q.  It would also add to the malnutrition in those areas,

19  right?

20  A.  I think there's no question that it did.

21  Q.  And for a parent in that situation in one of those areas,

22  what's their recourse?

23         MS. HAN:  Objection; relevance, speculation.

24         THE COURT:  I'm a little unclear about the --

25         BY MR. DRATEL:  Q.  What were the options for --

```
 1              THE COURT:  Are you talking about the diaspora, you
 2   talking about --
 3              MR. DRATEL:  No, no, somebody --
 4              THE COURT:  -- in the country --
 5              BY MR. DRATEL:  Q. In Somalia, what are their
 6   options in a situation with a child who's malnourished?
 7              THE COURT:  The objection is overruled.
 8              THE WITNESS:  Well, if I may, to --
 9              BY MR. DRATEL:  Q.  Certainly.
10   A.  -- put it in context is that al-Shabaab -- part of what
11   was happening was that al-Shabaab was also levying its own
12   taxes on families, taking food, taking money, so that was --
13   the options -- in the sense they were very few.  If you had
14   money, it could be taken away from you; if you grew food, it
15   could be taken away from you.  So you could ask for more
16   money, you could ask relatives to send it to you.  If you
17   were lucky, you got to keep it, all of it; if you were
18   unlucky, then you had to pay some of it to the militias in
19   your area.
20   Q.  But it wasn't coming from the TFG?
21   A.  Wasn't -- no one else was in a position to provide
22   assistance to people in those areas.
23   Q.  Okay.  And you talked about something during your
24   redirect in terms of the timing of your knowledge.  So your
25   knowledge here today is an accumulation in many respects of
```

1  what you've learned over the entire course of time, right?

2  A.  That's correct.

3  Q.  And some of it has been since 2008, like you said, that

4  either confirmed speculation -- that at the time may have

5  been speculation or allegation, now you find yourself

6  comfortable confirming it, correct?

7  A.  Correct.

8  Q.  2008 may not have been the same, correct, your level of

9  comfort with certain facts?

10  A.  Correct.

11  Q.  Now, you also on redirect were asked about al-Shabaab

12  killing civilians, right?

13  A.  Yes.

14  Q.  And, in fact, that's one of the reasons for local

15  administrations to have self-protection, right, was the

16  predations of al-Shabaab itself?

17  A.  I'm -- I don't think that was the reason for any local

18  administrations.  They usually were a product of a community

19  wanting to organize itself.  If al-Shabaab then became a

20  threat, they might organize another -- you know, their

21  militia against it or strengthen it.

22  Q.  How about al-Sunna?

23  A.  Al-Sunna was a very special case.

24  Q.  But it was -- but it was an armed organization that

25  protected itself from al-Shabaab and protected its members

1    and its members' families, the Sufi community, from

2    al-Shabaab?

3    A.   That's correct.

4    Q.   You were asked about the Hawiye clan, and it's fair to

5    say that the Hawiye clan is on every side of the issues in

6    Somalia?

7    A.   It brings a Hawiye orientation to every issue in Somalia.

8    Q.   And even Ayr as a subclan, there are Ayr on all sides of

9    the issues, right, TFG, ARS, al-Shabaab --

10   A.   That's --

11   Q.   -- al-Sunna?

12   A.   These are all very complicated issues.  Often much of a

13   clan or community shares an orientation, but there will

14   always be parts of it that take other positions, and there

15   will always be differences within the community.

16   Q.   But there were Ayr in TFG?

17   A.   There were Ayr in TFG.

18   Q.   There were Ayr in ARS?

19   A.   That's correct.

20   Q.   There were Ayr in al-Shabaab?

21   A.   That's correct.

22   Q.   There were Ayr in al-Sunna?

23   A.   That's correct.

24            MR. DRATEL:  Nothing further, your Honor.  Thank

25   you.

1          THE COURT:  Okay.  Ms. Moreno, anything further?

2          MS. MORENO:  No, your Honor.

3          THE COURT:  Mr. Ghappour?

4          MR. GHAPPOUR:  No, your Honor.

5          THE COURT:  Mr. Durkin?

6          MR. DURKIN:  No, Judge.

7          THE COURT:  Okay.  And --

8          MS. HAN:  No, your Honor.  We have nothing further.

9          THE COURT:  Okay.  Very good.  All right,

10   Mr. Bryden.  Thank you.  You are excused.

11          THE WITNESS:  Thank you, your Honor.

12          MR. COLE:  I'd like him subject to recall.

13          THE COURT:  Fine, subject to recall.  All right.

14   Thank you, sir.

15          THE WITNESS:  Thank you, your Honor.

16          THE COURT:  And, ladies and gentlemen, we're just a

17   few minutes away from noon, so we'll take our noon recess at

18   this time and ask that you be ready to go outside at 1:30

19   this afternoon.  Remember the admonition not to discuss the

20   case or make any decisions at this time.  Thank you.

21      (The jury left the courtroom.)

22          THE COURT:  All right, counsel.  We're outside the

23   presence of all jurors.  Just a few administrative -- Mr.

24   Dratel, I know you've got some business ahead of you.

25          MR. DRATEL:  I'm waiting for the --

1          THE COURT:  Okay.  Very good.  Just a few things,

2    short list of loose ends I wanted to ask counsel to do.

3    First of all, on the pages of Exhibit 28, there are several

4    pages there; I'd like you to alphabetize those pages 28-A

5    through whatever, because I imagine in the future if they're

6    referred to by either side, it will be better to indicate

7    what page is going up on the screen.

8          Okay.  25-A and -C are out.  I did have -- I did

9    have a question for the government.  I should have asked this

10   yesterday.  -B is in obviously.  I don't seem to have my --

11   can't locate it right away.  Yes, on -A, is Ayrow even in

12   that photograph?

13         MR. COLE:  Your Honor, there was -- one of the

14   defense attorneys I think in opening referred to that as a

15   picture of Ayrow, but that's a picture of Mukhtar Roobow that

16   was identified both in the depositions in Djibouti and by

17   Mr. Bryden.

18         THE COURT:  Who's in the middle of that, seated?

19         MR. COLE:  Which -- are you talking about -B, your

20   Honor?

21         THE COURT:  No, -A.

22         MR. COLE:  Oh, -A.  Seated at the microphones as if

23   speaking is Mukhtar Roobow, the public spokesperson of

24   al-Shabaab.

25         THE COURT:  Right.

1              MR. COLE:  The same person in -B.

2              THE COURT:  Who's in the middle with the white

3    headpiece?

4              MR. COLE:  Yeah, that's Mukhtar Roobow.

5              THE COURT:  Okay.  All right.  I think -- we don't

6    have to revisit this.  I think just one photograph was enough

7    to drive home that point.  With respect to exhibits, I think

8    that they're spread out all over counsel table, and I'm going

9    to ask all counsel to maintain the exhibits, the actual

10   exhibits, the marked exhibits, either on the exhibit table

11   here, if you would, or on the witness stand.  But to the

12   extent we're now starting to get spread out all over the

13   courtroom, I'm concerned about that.  I try to be as informal

14   as possible, but I just don't want to have a case of exhibits

15   inadvertently being placed in briefcases or left anywhere we

16   can't -- we can't retain them.

17             MR. COLE:  And, your Honor, just to help on that

18   score, we gave counsel color copies of these exhibits.

19             THE COURT:  Great.

20             MR. COLE:  I think they're copies instead of the

21   real ones, so --

22             THE COURT:  As long as the marked exhibits are in

23   one of two locations, on the exhibit table or on the witness

24   stand.  Courtroom 15, I'm advised that no one's in there

25   today.  And furthermore, I've seen several open seats here in

1   the courtroom.  So I certainly don't want to leave that

2   courtroom open at this point, particularly because it has to

3   be monitored, there needs to be someone in there.  So I've

4   indicated that courtroom can be closed at this time.  But

5   counsel, anytime you're aware that there's going to be a

6   significant number of people, that overflow is needed, let us

7   know because everything is all set up and we can, with a

8   little bit of notice, unlock that and make it available as

9   we've already done.  But until we get that notice from you,

10  we'll leave it closed.  That's all I had.  We'll see you at

11  1:30.

12          MS. FONTIER:  Thank you, your Honor.

13          MR. DRATEL:  Thank you, your Honor.

14      (There was a break in the proceedings.)

15          THE COURT:  Okay.  Good afternoon, ladies and

16  gentlemen.  We are ready to proceed.  Everyone is present.

17  Mr. Cole, Ms. Han?

18          MS. HAN:  Your Honor, the United States calls

19  Citizenship and Immigration Services Officer Concepcion

20  Flores.

21          THE CLERK:  Would you raise your right hand to be

22  sworn, please.  Do you solemnly swear that the evidence you

23  shall give in the cause now before the Court shall be the

24  truth, the whole truth, and nothing but the truth?

25          THE WITNESS:  I do.

1                        Concepcion Flores

2   was called by the government and testified as follows:

3              THE CLERK:  Can you please state and spell your

4   first and last name for the record.

5              THE WITNESS:  Sure.  Concepcion Flores,

6   C-o-n-c-e-p-c-i-o-n, Flores, F-l-o-r-e-s.

7              THE COURT:  You're going to have to speak up, and

8   you might want to get a little closer to the microphone

9   there.  Everyone in the courtroom needs to hear you.  Thank

10  you.

11             THE WITNESS:  Sure.

12             MS. HAN:  Your Honor, may I inquire?

13             THE COURT:  Certainly.

14             MS. HAN:  Thank you, your Honor.

15                      Direct Examination

16             BY MS. HAN:  Q.  Good afternoon, Ms. Flores.

17  A.  Hello.

18  Q.  Can you please tell us how you're employed.

19  A.  I am an Immigration Services officer with U.S.

20  Citizenship and Immigration Service.

21  Q.  And what is U.S. Citizenship and Immigration Services?

22  A.  It's an agency within the Department of Justice -- I'm

23  sorry -- the Department of Homeland Security, and

24  interviewing applicants for certain immigration benefits.

25  Q.  And how long have you worked there?

1    A.  Since 2002.

2    Q.  And what is it that you do there?

3    A.  I review cases and I interview applicants on pending

4    applications to determine if they're eligible for that

5    benefit.

6    Q.  And the applications that we're talking about, they're

7    immigration applications?

8    A.  Yes.

9    Q.  And are you familiar with what an I-485 application is?

10   A.  Yes, I am.

11   Q.  What is an I-485 application?

12   A.  It's an application for a permanent residency card.

13   Q.  And I'm going to direct your attention to October 13 of

14   2010.  Did you interview a person named Mohamed Mohamad

15   Mohamud on that date?

16   A.  Yes.

17   Q.  And did you interview him regarding an I-485 application?

18   A.  Yes.

19   Q.  I'm going to show you Exhibits 29-A through -G -- I'm

20   sorry -- yes 29-A through -G and exhibits 9-A through 9-T.

21   So first taking Exhibits 29-A through -G, what is 29-A

22   through -G?

23   A.  This is a copy of the form I-485.

24       (Exhibit No. 29 identified.)

25   Q.  And is that for Mohamad Mohamad Mohamud?

1  A.  Yes.

2  Q.  And do you see your signature on the front page?

3  A.  Yes, I do.

4  Q.  And taking 9-A through 9-T, the other packet that I gave

5  you, what is that?

6  A.  This is the record of sworn statement.

7      (Exhibit No. 9 identified.)

8  Q.  And was that also for Mohamad Mohamad Mohamud?

9  A.  Yes.

10  Q.  And do you see your handwriting there as well as the

11  handwriting of your colleague?

12  A.  Yes.

13          MS. HAN:  The United States offers Exhibits 29-A,

14  -B, -C, -D, -E, -F, and -G, as well as Exhibits 9-A, -C, -D,

15  and -E.

16          THE COURT:  A through what now, 9-A --

17          MS. HAN:  9-A, -C, -D, and -E.

18          THE COURT:  Okay.  -A through -E.  All right.

19  Those exhibits are admitted.

20      (Exhibit Nos. 29, 9 admitted.)

21          BY MS. HAN:  Q.  And first taking 29-A -- I'm

22  sorry -- 29, if I could refer you to 29-B specifically, which

23  is the front page of the I-485 application for -- I'm

24  sorry -- 29-C I believe, which is the front page of the I-485

25  application; is that right?

1  A.  Yes.

2  Q.  The marking at the bottom is 29-B?

3  A.  Yes.

4  Q.  Okay.  And you had testified that you saw your signature

5  on that application; is that right?

6  A.  Yes.

7  Q.  Okay.  And on what side do you see your signature?

8  A.  On the right column under applicants interviewed.

9  Q.  Okay.  And is it there highlighted on this screen now on

10  the right side?

11  A.  Yes.

12  Q.  And do you also see the applicant's name, Mohamad Mohamad

13  Mohamud?

14  A.  Yes.

15  Q.  And prior to interviewing Mohamad Mohamad Mohamud, did

16  you confirm that the person in front of you was the person

17  who had submitted the application?

18  A.  Yes.

19  Q.  And how is it that you did that?

20  A.  I asked for identification, and he provided a driver's

21  license and I believe his form I-94.

22  Q.  Are those included as Exhibits 29-F and -G?

23  A.  Yes, 29-F.  I don't see the other.

24  Q.  Okay.  We're going to call that -G, that last one.

25  A.  Okay.

1    Q.   So 29-F is what?

2    A.   29-F is photographs.

3    Q.   Photographs of who?

4    A.   Of Mr. Mohamud.

5    Q.   And what is 29-G?  That would be the last page after

6    29-F.

7    A.   On this copy 29-F is the driver's license, and the last

8    page, it's again marked 29-F and it's a photograph.

9    Q.   Okay.  And you compared -- I'm sorry -- you compared the

10   driver's license to those photographs?

11   A.   Yes.

12   Q.   Okay.  And once you had then done so, did you proceed

13   with the interview about the application?

14   A.   Yes.

15   Q.   Okay.  And what is it that you do when you interview

16   somebody about an I-485 application?

17   A.   We basically go through the application to make sure all

18   the information is updated and current.

19   Q.   So do you go through the applicant's answers and then

20   make corrections as they change their answers, if they do?

21   A.   Yes.

22   Q.   Okay.  And how do you note those changes in answers?

23   A.   It's in red inkpen.

24   Q.   Okay.  And -- and is that reflected here on the first

25   page as well that you made corrections?

1   A.   Yes.

2   Q.   Okay.  And if we could go to the next page, the second

3   page of the I-485 application.  And among the questions that

4   you asked him on the I-485 application, did you ask him about

5   part 3, about what his current employment was?

6   A.   Yes.

7   Q.   And what was his answer that he had provided before when

8   he submitted the application?

9   A.   At the time of filing, he wrote down "student."

10  Q.   And then at the time that you interviewed him, was his

11  answer different?

12  A.   Yes.

13  Q.   Okay.  And did you note that?

14  A.   Yes.

15  Q.   And is that highlighted on the top right corner of the

16  page that's up on the screen?

17  A.   Yes.

18  Q.   Okay.  And what are the corrections that you made?

19  A.   He stated that he was an imam at a mosque.

20  Q.   Okay.  And when you make corrections to an application,

21  does someone have an opportunity to go through those

22  corrections and agree or disagree with the corrections that

23  you've made?

24  A.   Yes.

25  Q.   Okay.  And turning to the last page of the application,

1   did Mohamad Mohamad Mohamud have the opportunity to do that

2   in this case as well?

3   A.   Yes.

4   Q.   Okay.  And how is that indicated on the application?  I

5   believe that we are on 9-D; is that right?

6   A.   Yes.

7   Q.   Okay.  So looking at 9-D, how is that indicated on the

8   screen for the jurors?

9   A.   He initialed.

10   Q.   Okay.  And can you please indicate what initials you're

11   talking about.  There are several initials there.

12   A.   Right.

13   Q.   You have a pointer there right there if you wanted to

14   point -- use the pointer for the jury.

15   A.   Right there.

16   Q.   Okay.  So in the lower middle part of the page?

17   A.   Yes.

18   Q.   Do you also see your initials or signature above that?

19   A.   Yes.

20   Q.   Okay.  And in addition to going over that application

21   with him, did you also go over a record of sworn statement?

22   A.   Yes.

23   Q.   And on the record of sworn statement, were there also

24   several questions?

25   A.   Yes.

1    Q.  And how did the interview about the record of sworn

2    statement, how did that go?

3    A.  That part, a co-worker and I, another immigration officer

4    from the Fraud Detection and National Security was also

5    interviewing him; both the other officer and I were

6    interviewing Mr. Mohamud, and I would ask the questions, and

7    she would write down the answer.

8    Q.  Okay.  And looking at Exhibit 9-A I believe -- yes,

9    Exhibit 9-A -- do you see that there?

10   A.  Yes.

11   Q.  Okay.  Which is the first page of the record of sworn

12   statement.  So among the questions that you asked

13   Mr. Mohamud, did you ask him about any nicknames?

14   A.  Yes.

15   Q.  Okay.  And is that reflected in question 2?

16   A.  Yes.

17   Q.  And what was his answer?

18   A.  Khadar is a nickname.  I have -- I have never used it

19   legally.  I started using it in Pakistan in 1994 to 2000.

20   And there's a reverse side to that.

21   Q.  Okay.  So the page that we're talking about is 9-A, and

22   then the reverse side, is that 9-B?

23   A.  Yes.

24   Q.  Okay.  So turning to 9-B, which is the back side of that

25   page, and -- I'm sorry -- what you just read, is that

1  highlighted up there on the screen for the jury?

2  A.  Yes.

3  Q.  Okay.  So turning to 9-B, which is the continuation of

4  the second answer or the answer for question number 2, what

5  was the continuation?

6  A.  I used it since I lived in Somalia.  The only legal name

7  I have used is Mohamad Mohamad Mohamud.

8  Q.  And was Mr. Mohamud given an opportunity to review that

9  application and also make additions?

10  A.  Yes.

11  Q.  Okay.  And did he do so in this instance as well?

12  A.  Yes.

13  Q.  And how -- and what additions did he make?

14  A.  He stated my mother gave me this name Khadar, so when I

15  was in Somalia, some people, including my mother, used to

16  call me Khadar.  However, my legal name, which was written in

17  documents, was Mohamad.  When I came to Pakistan, my friends

18  started to call me Mohamad Khadar, so I consider this Mohamad

19  Khadar is nickname.

20  Q.  And did he also initial and sign under those notations

21  that he made?

22  A.  Yes.

23  Q.  And the highlighted portion that you read, is that

24  highlighted for the jury on the screen?

25  A.  Yes.

1   Q.   And are -- and where are his initials and his date?

2   A.   The lower right corner.

3   Q.   Okay.  And going back to the Exhibits 29-F and -G -- or

4   -F and the form after that that we're calling -G now --

5   A.   Uh-huh.

6   Q.   -- those are the -- those are the items that you saw --

7   that you used to verify the identification of the person in

8   front of you?

9   A.   Yes.

10  Q.   -- right?  That you interviewed on October 13?

11  A.   Yes.

12  Q.   Do you think that you would recognize Mr. Mohamud if you

13  saw him today?

14  A.   Maybe.

15  Q.   Okay.  Do you want to take a look around the room and see

16  if you recognize him?

17  A.   I believe so.

18  Q.   Okay.  Do you want to point to him and indicate an

19  article of clothing that he's wearing.

20  A.   I believe it's the gentleman straight here in the corner

21  with the black suit and tie, black and white stripes --

22          MS. HAN:  Okay.  Thank you.

23          THE WITNESS:  -- and glasses.

24          MS. HAN:  I have no further questions.  Thank you.

25          THE COURT:  Well, would you like the record to

1    reflect --

2              MS. HAN:  Yes, your Honor.  I apologize.  If the

3    record could reflect that the witness has identified

4    defendant Mohamud -- or Mohamad Mohamad Mohamud.

5              THE COURT:  I think that's agreed to.

6              MS. MORENO:  Yes, your Honor.  So stipulated.

7              THE COURT:  Okay.  And furthermore, I assume --

8    these are not -- this is not 801 (d)(2)(E) evidence and that

9    there should be a limiting instruction here.

10             MS. HAN:  Yes, your Honor.

11             THE COURT:  That would be appreciated in the future

12   if you're calling a witness where there's going to be -- I

13   don't know if there are any more such witnesses, but if there

14   are other witnesses, then give me a bit of a head's up.

15   Ladies and gentlemen, all of the testimony you've just heard

16   from this witness pertains only to defendant Mohamad Mohamad

17   Mohamud.  You may not consider it with respect to the other

18   three defendants in the case.

19             MS. HAN:  I have no further questions.

20             THE COURT:  Okay.  All right.  Very good.  Ms.

21   Moreno?

22             MS. MORENO:  Just a few questions, your Honor.  I

23   have a specific request because -- would it be possible for

24   me to use the exhibit that's been admitted into evidence on

25   the Elmo because I don't have it.

1              THE COURT:  Certainly.  Please.

2              MS. MORENO:  May I approach?

3              THE COURT:  Please.

4              MS. MORENO:  May I have a quick moment, your Honor?

5              THE COURT:  If there are any extra copies of the

6    Exhibit 9-A through -E, I'd appreciate getting copies of

7    those as well.  They weren't originally in the notebook here.

8              MS. HAN:  Yes, your Honor.

9              THE COURT:  Take your time on those.

10             MS. HAN:  Yes, your Honor.

11             THE COURT:  All right.

12                        Cross-Examination

13             BY MS. MORENO:  Q.  I think -- can you see that on

14   the screen?

15   A.  Yes.

16   Q.  I don't know if this is 9-A.  Looking at what's been

17   marked and admitted as 9-A, do I understand you correctly

18   that you said that the script that we see on these pages is

19   from your co-worker?

20   A.  Yes.

21   Q.  And so your co-worker was writing down answers that my

22   client was giving?

23   A.  Yes.

24   Q.  Okay.  And with respect to the nickname, he then told

25   your co-worker more information about how he got the

1  nickname --

2  A.  Yes.

3  Q.  -- correct?

4  A.  Uh-huh.

5  Q.  All right.  And this is a lengthy application form, maybe

6  15 or 20 pages; would you agree?

7  A.  Yes.

8  Q.  And is it fair to say that these pages were all filled

9  out at the same time?

10  A.  Yes.

11  Q.  All right.  And looking at 9-B, also admitted into

12  evidence, it indicates that Mr. Mohamud told you or your

13  co-worker or together that he hailed from -- for a period of

14  time, he hailed from Borama, correct?  Do you see that?

15  Right here.

16  A.  Yes.

17  Q.  Do you see that?

18  A.  Yes.

19  Q.  And he then told you that he was in a refugee camp from

20  1992 to 1994, correct?

21  A.  Yes.

22  Q.  He also told you that he supports his mother and his

23  sisters and sends them money each month through a hawala; do

24  you see that?

25  A.  Yes.

1  Q.  And the next page he in fact told you he went to high

2  school in Borama, Somalia, from 1988 to 1992, correct?

3  A.  Yes.

4  Q.  Do you see that?

5  A.  Yes.

6  Q.  He then broke down who he sent money to in terms of

7  family members; do you see that?

8  A.  Yes.

9  Q.  What did he tell you?  Do you remember?

10  A.  I recall he mentioned two family members.

11  Q.  Okay.  Family members in Somalia, correct?

12  A.  I don't recall where.

13  Q.  He told you that he was a refugee in Pakistan, correct?

14  A.  Yes.

15  Q.  And that -- he said we were looking for a country and

16  we're grateful to the United States for taking us; he told

17  you that, right?

18  A.  Yes.

19           MS. MORENO:  May I have a moment, your Honor?

20           THE COURT:  Okay.

21           BY MS. MORENO:  Q.  He then where he was -- in

22  giving you more information about where he was born, he told

23  you that this was, this "jig a jig" (phonetic) is a disputed

24  land area; he told you that, right?

25  A.  Yes.

1    Q.  That some people consider their land, correct?

2    A.  Yes.

3    Q.  And then in more detail -- he gave you lots of details

4    about what he was doing during different periods of time.  Do

5    you see that?

6    A.  Yes.

7            MS. MORENO:  Nothing further, your Honor.  Thank

8    you.

9            THE COURT:  Okay.  Ms. Han, anything further?  I

10   assume no one else has any examination from the defense.

11           MS. FONTIER:  No.  Thank you, your Honor.

12           THE COURT:  Okay.  Very good.  Ms. Han, do you have

13   anything further?

14           MS. HAN:  No, your Honor.

15           THE COURT:  All right.  Thank you, Ms. Flores.  You

16   are excused.  And the government may call its next witness.

17           MS. HAN:  Your Honor, the United States calls

18   Citizenship and Immigration Officer Isagani Camangian.

19           THE CLERK:  Can you please raise your right hand.

20   Do you solemnly swear that the evidence you shall give in the

21   cause now before the Court shall be the truth, the whole

22   truth, and nothing but the truth?

23           THE WITNESS:  I do.

24                        Isagani Camangian

25   was called by the government and testified as follows:

1              THE CLERK:  Please state your first and last

2    name -- state and spell your first and last name for the

3    record.

4              THE WITNESS:  Okay.  My first name is spelled

5    Isagani, spelled I-s-a-g-a-n i, last name is Camangian; it's

6    spelled C-a-m-a-n-g-i-a-n.

7                        <u>Direct Examination</u>

8              BY MS. HAN:  Q.  Good afternoon, Officer Camangian.

9    A.  Good afternoon, Ms. Han.

10   Q.  How is it that you're employed?

11   A.  Well, I'm employed as Immigration Service officer under

12   United States Citizenship and Immigration Service.

13   Q.  And how long have you worked for the Citizenship and

14   Immigration Service?

15   A.  I been work as a adjudicator for, since October of 2001.

16   Q.  And what is it that you do as an adjudicator?

17   A.  Mainly I do interviews on in form N-400 or application

18   for naturalization.

19   Q.  And what are those N-400 applications?  What are those?

20   A.  These are the forms submitted by an applicant for

21   citizenship.

22   Q.  I'm sorry.  They're a form submitted by an applicant for

23   citizenship?

24   A.  For citizenship, yes.

25   Q.  Okay.  And I'm going to direct your attention to

1    September 8, 2008.  Did you interview a person named Ahmed

2    Nasir Taalil Mohamud about his N-400 application?

3    A.  Yes, I did.

4    Q.  Okay.  I'm showing you Government's Exhibit 11.  Officer

5    Camangian, what is Government's Exhibit 11?

6    A.  It's N-400 application for naturalization.

7        (Exhibit No. 11 identified.)

8    Q.  And looking at the first page of the actual N-400

9    application, do you see your signature there?

10   A.  Yes, I do.

11          MS. HAN:  The United States offers Government's

12   Exhibit 11 in evidence.

13          MR. DURKIN:  No objection.

14          THE COURT:  Okay.  Exhibit 11 is admitted.

15      (Exhibit No. 11 admitted.)

16          BY MS. HAN:  Q.  Okay.  Can I -- and looking at the

17   first page of Government's Exhibit 11, you said that you saw

18   your signature; is that highlighted there for the jurors on

19   the screen?

20   A.  Yes, it is.  Yeah, the yellow highlight.

21   Q.  And is it -- it's on the right side column in the lower

22   part of that column?

23   A.  Yeah, it's on the right side, yes.

24   Q.  And when you interviewed Ahmed Nasir Taalil Mohamud, did

25   you also verify that he was the person who had submitted the

1   application?

2   A.  I should have asked his driver's license, permanent

3   resident card, or if he has a passport.

4            THE COURT:  I assume, counsel, we're dealing with

5   the same circumstances here; this is not an 801 (d)(2)(E) and

6   that a limiting instruction would be appropriate.

7            MS. HAN:  No, your Honor.  Your Honor, we would

8   need to be heard on that matter.

9            THE COURT:  All right.

10           BY MS. HAN:  Q.  Okay.  And as part of reviewing

11  this application with Mr. Ahmed Nasir Taalil Mohamud, did you

12  review part 4 of this application with him?

13  A.  Yes, I did.

14  Q.  And you are on the second page of the N-400 application

15  in part 4, right?

16  A.  Yes, I am.

17  Q.  Okay.  And we're going to get to the second page of part

18  4 in one second.  And where -- using that pointer that you

19  have up there, can you show the jurors where that part 4 is

20  that we're talking about.

21  A.  It should --

22  Q.  Is that in the lower section of the application or on

23  that page?

24  A.  That one there is part 4.

25  Q.  Okay.  And as part of part 4, did you ask him about his

1   address?

2   A.   Yes, I did.

3   Q.   Okay.   And did he correct his address?

4   A.   That's what he provided me the address that I wrote

5   there.

6   Q.   And what is the address that you wrote there?

7   A.   It should be 2230 South Loera Street, Apartment number

8   105, Anaheim, California, 92802.

9   Q.   And turning to part 4-C, did you also ask him about his

10   phone number?

11   A.   Yes, I did.

12   Q.   And did he also -- what answer did he provide to you

13   about his phone number?

14   A.   He provided area code (714) 400-1464.

15   Q.   And finally, was he also -- did he also have an

16   opportunity to review those corrections and sign saying that

17   he agreed with the corrections that you had made?

18   A.   Before -- it should be -- I should have asked him if he

19   wants -- on part 13, before he signed a sworn statement, I

20   give him a chance to review those corrections.

21   Q.   So if I understand your answer correctly, that is -- that

22   is addressed in part 13; is that right?

23   A.   Right.

24   Q.   Okay.   And so turning to part 13, the last page of the

25   N-400 application, and where is -- I think we're going to get

1  a highlight of part 13 of that application.  Okay.  And so

2  there -- what is part 13 there?

3  A.  It's his sworn statement about his application and all

4  the corrections he provided me.

5  Q.  Okay.  And did he sign under -- in that section in part

6  13?

7  A.  Yes, he did.

8  Q.  And can you just use the pointer there to show the jurors

9  where that is.

10  A.  That one there.

11  Q.  And did you also sign there as well?

12  A.  Yes, I did that.

13  Q.  Okay.

14        MS. HAN:  Thank you.  I have no further questions.

15        THE COURT:  Okay.  Mr. Durkin?

16        MS. FONTIER:  Your Honor, can we approach just to

17  discuss the elements of this and to relevance to any of the

18  other defendants?

19        THE COURT:  Well, I think that's what being

20  reserved at this point, so let's finish with the examination

21  at this time.  Mr. Durkin, why don't you proceed with your

22  examination.

23                    Cross-Examination

24        BY MR. DURKIN:  Q.  How do you pronounce your name

25  again?

1    A.  My first name is Isagani, last name is Camangian.

2    Q.  Mr. Camangian, is that -- did I get it right, Camangian?

3    A.  That should be correct, sir.

4    Q.  This -- this is an important application, isn't it?

5    A.  It is, sir, very important.

6    Q.  Because this is a application in which your service

7    determines whether or not someone has sufficient good

8    character to become an American citizen, correct?

9    A.  Yes, sir, yeah.

10   Q.  And it's your specialty to interview people who want to

11   become citizens, correct?

12   A.  It's my -- yeah, it's my -- my -- part of my duty to

13   determine that all the requirements were met to become a

14   citizen, yes.

15   Q.  And -- right.  And you take your job seriously, don't

16   you?

17   A.  Yes, sir, I do.

18   Q.  And you actually approved this application --

19   A.  Yes, I did.

20   Q.  -- for my client's citizenship, didn't you?

21   A.  Yes, I did.

22   Q.  That's what that yellow mark is up there, right?

23   A.  I recommended it for approval, sir.

24   Q.  Okay.  And one of the things you used to recommend that

25   is the application itself because it's sworn under oath, as

1   Ms. Han asked you, correct?

2   A.   Yes, sir, yes.

3   Q.   And, in fact, this application -- if I could go to 11-K,

4   there's actually two spots on that last page, page 11-K,

5   where the person certifies or swears and affirms under the

6   penalty of perjury, correct?

7   A.   Yeah, the first part there when -- the initial signature

8   when he applied on the top portion.

9   Q.   And -- and that date -- he originally applied April 20,

10  2007, correct?

11  A.   Yes, it looks like.

12  Q.   Okay.  And then -- and he swore then that it was all true

13  under penalty of perjury, correct?

14  A.   Yes, he did, yeah.

15  Q.   And then the second time he did it was in the middle

16  there on September 8 where the red line is where you're

17  showing us now, correct?

18  A.   Yes.

19  Q.   Okay.  And there's also something he has to swear to at

20  the very bottom of that page, correct?

21  A.   Yes, sir.  That's the oath allegiance that he intend to

22  take that with the judge who will swear him as a citizen,

23  yes.

24  Q.   Right.  And that's what anybody who gets approved has to

25  do; they have to be able to swear to those things, correct?

1   A.   Yeah, he has to sign that before he goes to the judge.

2   Q.   And those are things like supporting the constitution,

3   bear arms on behalf the United States, perform noncombatant

4   service in the armed forces, correct?   Perform work of

5   national importance under civilian direction when required,

6   correct?

7   A.   Yes.

8   Q.   Okay.   Now, this is a very detailed application, is it

9   not?

10  A.   It is, sir, yeah.

11  Q.   Let's take a look at page 11-B if we could.   I don't

12  think this is --

13              THE COURT:   Is this part B or page 11-B?

14              MR. DURKIN:   Page 11-B, Judge.   It's the second

15  page of the document.

16              THE COURT:   I don't have a copy of that either.

17              MR. DURKIN:   It's the next --

18              THE COURT:   At some point I'll need to see it.

19              MR. DURKIN:   It's the next page.

20              THE COURT:   Okay.

21              MS. HAN:   That's it.   No, that's -- I'm sorry.   I'm

22  sorry.   I was wrong.   You were right.   It's the one with the

23  yellow marker on it.   I apologize.

24              BY MR. DURKIN:   Q.   At the part 2 at the bottom

25  there, the first question, it says I've been a lawful

1  permanent resident in the United States for at least five

2  years.  Correct?

3  A.  Yes, sir.

4  Q.  That's a minimum requirement before you can apply for

5  naturalization, correct?

6  A.  Yes.

7  Q.  So he came from this -- based on this record, you found

8  out he came to this country legally, correct?

9  A.  Based on this record, he was admitted as a legal resident

10 in March of 2001.

11 Q.  Okay.  And was that -- do you know whether that was as a

12 refugee?

13 A.  It's a refugee, sir, yeah.

14 Q.  A refugee from Somalia?

15 A.  A refugee from Somalia.

16 Q.  And now if we could look at page 11-D, which is the

17 fourth page.  That's it.  That -- that sets out the places

18 he's lived in the United States since he came here, correct?

19 Right in the middle.

20 A.  Yeah, those are the addresses he provided me and he

21 indicate on this application.

22 Q.  And that was Arlington, Virginia, Columbus, Ohio, and St.

23 Louis, correct?

24 A.  Looks like St. Louis --

25 Q.  So St. Louis is crossed out and something like Santa Ana

1  is put in, right?

2  A.  Looks like, sir, yeah.

3  Q.  Okay.  And then underneath that it talks about what he's

4  done since he's been here, correct?

5  A.  That was his, yeah, job description.

6  Q.  He was first a houseman in Alexandria, Virginia, right?

7  A.  Right.

8  Q.  Then he worked in the shipping department at PetSmart in

9  Ohio, right?

10  A.  Yes.

11  Q.  And then he was a driver in St. Louis?

12  A.  Right.

13  Q.  And then he was a driver in Anaheim, correct?

14  A.  Right, sir, yeah.

15  Q.  -- for Yellow Cab.  Okay.  And if we could look at the

16  next page, it mentions who his wife is, correct?

17  A.  The bottom page, yes.

18  Q.  He has a wife named Asma Abdul Salaam Moosa, correct?

19  A.  Yes.

20  Q.  And he was married on December 21, 2005, correct?

21  A.  Yes.

22  Q.  And then if we could go to the next page, he said his

23  wife at that time was residing in Djibouti, correct?

24  A.  Yes.

25  Q.  And then on the very next page, it talks about a son,

1   correct?

2   A.   Yeah, he has a child.

3   Q.   Okay.  And then there's a bunch of general questions

4   below there, correct?

5   A.   Right.

6   Q.   And these are important questions for the application,

7   are they not?

8   A.   They are.

9   Q.   These are questions you pay attention to, correct?

10  A.   Indicates, yeah, good moral character, sir, yes.

11  Q.   Yes.  And it says specifically in number 4, number --

12  yeah, number 4, since becoming a lawful permanent resident,

13  have you ever failed to file a required federal, state, or

14  local income tax return?  He says no, he never failed to do

15  that.  Right?

16  A.   Right.

17  Q.   Do you owe any federal, state, or local taxes that are

18  overdue?  No.  Right?

19  A.   Right.

20  Q.   And he also said he doesn't have any title to nobility in

21  a foreign country, right?

22  A.   That's what he indicated on this application.

23  Q.   Do you ever get -- anybody ever answer yes on that?  Did

24  you ever have anybody answer yes on that question?

25  A.   I think one time -- I heard about it -- it's something

1    from Middle Eastern country to -- he married a service

2    member.  She married a service member.

3    Q.  All right.  By the way, he was a nice man, isn't he?

4            MS. HAN:  Objection, relevance.

5            THE COURT:  Sustained.

6            BY MR. DURKIN:  Q.  Let's look at the next page.

7    Now -- and specifically I want to direct your attention to

8    paragraph 9.  This too is an important question, correct?

9    A.  Right.

10   Q.  And it specifically asked whether he's been a member or

11   in any way associated with a terrorist organization, doesn't

12   it?

13   A.  Yes, it is.

14   Q.  And can you point that one out with your clicker for me.

15   A.  Should be the 9-C.

16   Q.  9-C.  There it is, right.  Okay.  And then the next one

17   is number 10:  Have you ever advocated either directly or

18   indirectly the overthrow of any government by force or

19   violence, right?

20   A.  Right.

21   Q.  And he said no.  Correct?

22   A.  Right.

23   Q.  Now, let's look at the next page, particularly questions

24   15 through 21.  Do you see those?

25   A.  Yes.

1   Q.   Now -- and these are under the heading -- if you would,

2   could we go back up a little bit.   These are questions that

3   are all under the heading of good moral character, correct?

4   A.   Right, yeah.

5   Q.   And number 15 is have you ever committed a crime or an

6   offense for which you were not arrested, correct?   And he

7   said no.   Right?

8   A.   That's correct.

9   Q.   He'd never been arrested, he'd never been charged with an

10  offense, number 17, convicted of an offense, 18, placed in

11  any alternative sentencing or rehab program.   Correct?

12  A.   Correct.

13  Q.   Never received a suspended sentence or ever been in a

14  jail or a prison.   Correct?

15  A.   Correct.

16  Q.   And then there's a bunch of other questions down on

17  number 22 there about being a drunk or -- and things like

18  that.   He answered no to all that.   Right?

19  A.   Right.

20  Q.   Number 23, have you ever given false or misleading

21  information to any U.S. government official while applying

22  for any immigration benefit to prevent deportation,

23  exclusion, removal.   Correct?

24  A.   Yeah, he answered no.

25  Q.   And have you ever lied to anybody to gain admission, and

1  he said no.  Correct?

2  A.  Correct.

3  Q.  Then the very last part, the next page, under -- at the

4  bottom where it says oath requirements, those are the same

5  questions that we talked about before that was on the very

6  last page with respect to the things he has to -- anybody

7  wanting to be a citizen has to swear or affirm that they'll

8  do like serve in the military, bear arms, perform

9  noncombatant services, and the like, correct?

10  A.  With a judge, yes.

11  Q.  And based on all that, you approved him for citizenship,

12  didn't you?

13  A.  Yes, I did.

14          MR. DURKIN:  Thank you.

15          MS. FONTIER:  Sorry, your Honor.  If I may just

16  have a couple of questions.

17          THE COURT:  Okay.

18                        Cross-Examination

19          BY MS. FONTIER:  Q.  Officer, good afternoon.

20  A.  Good afternoon.

21  Q.  Officer, what you're looking at in Exhibit 11 is an N-400

22  form?

23  A.  Yes.

24  Q.  And as you stated, that is a form that needs to be

25  completed in the process of gaining naturalization for

1   citizenship, correct?

2   A.  Yes.

3   Q.  And so anyone who was a -- is a naturalized citizen

4   necessarily filled out that form, correct?

5   A.  Right.

6   Q.  And was approved by you or your office similar to how

7   Mr. Ahmed Nasir Mohamud was approved, correct?

8   A.  I recommended for approval.

9   Q.  So anyone who actually gains citizenship through

10  naturalization then was approved and then later actually

11  became a citizen, correct?

12  A.  Yeah, it will be approved and later on goes to the judge

13  to take their oath.

14  Q.  And so anyone then who's a naturalized citizen naturally

15  had to answer all of the questions that Mr. Durkin just went

16  through on that form as well, correct?

17  A.  Yes.

18          MS. FONTIER:  Thank you.  No further questions.

19          THE COURT:  Ms. Han, anything further?

20          MS. HAN:  Yes, your Honor, briefly.

21                    Redirect Examination

22          BY MS. HAN:  Q.  Officer Camangian, you interviewed

23  Mr. Ahmed Nasir Taalil Mohamud about this application in

24  September of 2008, right?

25  A.  Yes, I did.

1   Q.  And did he ever tell you that he funded al-Shabaab during

2   that interview?

3          MR. DURKIN:  Objection.

4          THE COURT:  Basis for the objection?

5          MR. DURKIN:  Assumes a fact not in evidence.

6          THE COURT:  No, the question is whether or not he

7   mentioned -- he said that to this individual.  The objection

8   is overruled.

9          BY MS. HAN:  Q.  Did he ever tell you that he had

10  funded al-Shabaab?

11  A.  No.

12  Q.  And did he ever tell you that he had wanted to overthrow

13  the Transitional Federal Government?

14         MR. DURKIN:  Same objection.

15         THE COURT:  The objection is overruled.  There's no

16  evidence in the case at this point, ladies and gentlemen, of

17  either the witness, Mister -- excuse me -- the defendant, Mr.

18  Nasir, being a member of al-Shabaab or advocating the

19  overthrow; there's no evidence of that thus far.  But the

20  question is still a proper question.  The question is whether

21  or not defendant Nasir indicated an affirmative response or

22  volunteered that type of information.

23         BY MS. HAN:  Q.  And Mr. Durkin showed you a whole

24  bunch of sections of the application; do you remember that?

25  A.  Yes, he did.

1   Q.  And to each of those sections defendant Ahmed Nasir

2   Taalil Mohamud responded "no," right, to a lot of those

3   sections, specifically section 9 about if he had been

4   associated with a terrorist organization, any of those kinds

5   of questions?

6   A.  All this indicated the checkmark; I asked these questions

7   and he --

8   Q.  If he had answered yes, could you approve the

9   application?

10  A.  No.

11  Q.  And you did approve this application, right?

12  A.  I recommended it for approval, yes.

13  Q.  And do you know whether or not Mr. Ahmed Nasir Taalil

14  Mohamud ever actually naturalized?

15          MR. DURKIN:  Objection.  I'd like to be heard.

16          THE COURT:  What's the basis for the objection,

17  just the reason, relevance, 403, anything of that nature?

18          THE REPORTER:  I'm sorry.  I can't hear him.

19          MR. DURKIN:  Both.

20          THE COURT:  The objection is overruled.  You may

21  answer.

22          BY MS. HAN:  Q.  If you know, do you know whether

23  or not Mr. Ahmed Nasir Taalil Mohamud ever actually

24  naturalized?

25  A.  No.

1              THE COURT:  When you say no, do you mean you do not

2     know --

3              THE WITNESS:  I do not know that he was

4     naturalized.

5              THE COURT:  Okay.  Very good.

6              MS. HAN:  Thank you.

7              THE COURT:  Anything further?

8              MS. FONTIER:  Not from me, your Honor.

9              THE COURT:  Okay.  Thank you, sir.  You are

10    excused.

11             THE WITNESS:  Thank you.

12             MR. COLE:  Your Honor, the United States calls

13    Donnah Locsin.

14             MS. FONTIER:  Your Honor, I apologize for doing

15    this late, but I would request a limiting instruction as to

16    the prior witness as well.

17             THE COURT:  We'll take that up -- is this an

18    individual with any 801 (d)(2)(E) --

19             MR. COLE:  No.

20             THE COURT:  -- or Bruton issues?

21             MR. COLE:  No, no issues.

22             THE COURT:  Okay.  All right.  We'll deal with that

23    at a recess, not take the time of the jury at this point.

24             THE CLERK:  Can you please raise your right hand to

25    be sworn.  Do you solemnly swear that the evidence you shall

1   give in the cause now before the Court shall be the truth,

2   the whole truth, and nothing but the truth?

3            THE WITNESS:  Yes.

4                         Donnah Locsin

5   was called by the government and testified as follows:

6            THE CLERK:  Thank you.  Can you please state and

7   spell your first and last name for the record.

8            THE WITNESS:  Donnah Locsin, D-o-n-n-a-h

9   L-o-c-s-i-n.

10                    Direct Examination

11           BY MR. COLE:  Q.  Good afternoon, Ms. Locsin.

12  A.  Hello.

13  Q.  Could you tell the jury what you do for a living.

14  A.  I have a travel agency, and I also have a home for the

15  elderly.

16  Q.  I'm sorry.  Can you speak up a little bit.

17  A.  Is this better?

18  Q.  Yes, that's better.  Thank you.  When was the last -- you

19  said travel agent.  What was the next thing you said?

20  A.  I have a facility, a home for the elderly.

21  Q.  And prior to being involved in the home for the elderly,

22  what were you doing?

23  A.  I also had Dollar America Exchange; it was a money

24  transmittal business.

25  Q.  Okay.  So when you said you had -- Dollar America

1  Exchange?

2  A.  Correct.

3  Q.  And that was a money transmittal business?

4  A.  Yes.

5  Q.  And was Dollar America Exchange known by a nickname?

6  A.  DAX.

7  Q.  DAX?

8  A.  Uh-huh.

9  Q.  Is that D-A-X?

10  A.  D-A-X.

11  Q.  What type of a business was DAX?  I mean you said money

12  transmittal, but could you explain what that means for the

13  jury?

14  A.  People send money to different parts of the world, mostly

15  in the Philippines.  We had a license -- right now I'm an

16  agent, but when we were a licensee, we could have agents.

17  Q.  Okay.  Now, let me back up and ask you, do you know when

18  DAX started as a business?

19  A.  1983.

20  Q.  So was this a family business?

21  A.  Yes.

22  Q.  And when did you yourself first become involved; was it

23  in 1983 or later?

24  A.  Later.

25  Q.  At what point did you get involved in DAX?

1    A.  Me personally?

2    Q.  Yes.

3    A.  I think it was 2001.

4    Q.  2001?  And was -- I think you indicated that DAX was a

5    money transmittal business that served principally the

6    Philippines?

7    A.  Correct.

8    Q.  And so people in San Diego, for example, could send money

9    to the Philippines through DAX?

10   A.  Correct.

11   Q.  Now, what was your position when you were at DAX?  When

12   you were actually working at DAX yourself, what was your

13   position?

14   A.  I was the compliance officer.

15   Q.  Compliance officer.  And were you also vice-president?

16   A.  Correct.

17   Q.  And you mentioned something called a license.

18   A.  Yes.

19   Q.  Actually before we get to a license, let's talk about the

20   geographic scope of DAX.  Where was DAX?  Where were the

21   headquarters located?

22   A.  National City.

23   Q.  That's National City here in San Diego County?

24   A.  Yes.

25   Q.  And did DAX have other offices?

1   A.   Agents.

2   Q.   Okay.

3   A.   We would have agents.  In the past we would have other

4   offices, but it was closed long time ago.

5   Q.   What do you mean by agents?

6   A.   We could have agents.  Like Western Union, for example,

7   they can have agents; they could have convenience store carry

8   their name, and they would act as agents.

9   Q.   And what would those agents do?

10   A.   They could accept money from people and to send to other

11   countries --

12   Q.   So DAX --

13   A.   -- in behalf of DAX.

14   Q.   I'm sorry.  So DAX had a business that would transmit

15   money to other places such as the Philippines?

16   A.   Correct.

17   Q.   And agents of DAX would use the DAX name to accept that

18   money at various locations around San Diego County?

19   A.   San Diego County, we would have some agents in Northern

20   California, Los Angeles, but just in California.

21   Q.   Now, you referred to being a licenseholder earlier in

22   your testimony?

23   A.   Yes.

24   Q.   What do you mean by that?

25   A.   It means that you're authorized and licensed by the State

1    of California, the Department of Financial Institution, to

2    transmit money to other parts of the world.

3    Q.  So to operate -- in order for DAX to operate as a

4    business in California, was it required to have that type of

5    a license?

6    A.  Yes.

7    Q.  And was that license an easy thing to acquire?

8    A.  When it was acquired in 1983, I don't know, but I guess

9    it was very, very easy, but now it is not easy; there's a lot

10   of requirements.

11   Q.  And why is it not easy?

12   A.  Because you're strictly regulated by the state, and

13   there's a lot of paperwork; there's a lot of things involved.

14   Q.  And is there a capital requirement?

15   A.  Yes.

16   Q.  And by capital requirement, what does that mean?

17   A.  You need to have the funds reserved to be able to be

18   approved.

19   Q.  So in order to be a licenseholder, you have to have a

20   certain amount of money set aside in reserve to prove to the

21   state that you could make good on the money remittances if

22   something goes wrong?

23   A.  Right, or now you can have a bond as well.

24   Q.  Now, in order for DAX to function, you were DAX's

25   compliance officer?

1   A.   Correct.

2   Q.   And what does that mean to be a compliance officer?

3   A.   At that time I was checking, making sure that all the

4   requirements as far as ID that was required by the -- not

5   only the state but OFAC to -- and there was an OFAC list;

6   there was a list of names of people that were not allowed

7   to -- not to send but to -- some names on that list cannot --

8   I don't know how to explain it, but --

9   Q.   Well, let's back up for a minute and maybe just start

10  with -- before we talk about that list or about compliance,

11  perhaps we should just start with what happens when someone

12  walks into a DAX agent.  If someone walks in -- while you

13  were working as the compliance officer, if someone walked

14  into a DAX agent at a convenience store or other location in

15  San Diego, for example, with money to send, what would happen

16  actually -- what is the process when a person comes to the

17  agent?

18  A.   They were required to get identification.

19  Q.   Who was required to get identification?

20  A.   The agent, of the sender -- for example, the California

21  ID or U.S. passport, legal identification -- and then we

22  would make a photocopy of that and keep it on our file.  If

23  they send more than a certain amount -- let's say $3,000 --

24  they -- we are required to get more information, reason for

25  sending, more -- two pieces of ID -- I think it's two -- I'm

1  recalling because it's been a while -- and then we make

2  photocopies of all those, their names, telephone number,

3  address of the sender and the beneficiary --

4  Q.  So --

5  A.  -- and then we keep it in our file.

6  Q.  So when someone would walk into a DAX agent to send a

7  money transfer, the person would provide not only the money

8  but the sender's name?

9  A.  Correct.

10  Q.  The sender's phone number?

11  A.  Phone number, ID.

12  Q.  Identification?

13  A.  Correct.

14  Q.  And you said the beneficiary.  Is that the recipient on

15  the other end --

16  A.  Correct.

17  Q.  -- who's going to get the money?

18  A.  Yes.

19  Q.  And so they also provide the recipient's name?

20  A.  Yes.

21  Q.  And then of course they provide the money?

22  A.  Correct.

23  Q.  And was a record kept by DAX agents of that information

24  being provided about the transaction?

25  A.  Was a record kept?

1    Q.   Yes.

2    A.   Yes.

3    Q.   And why was it important for DAX to have those records

4    maintained?

5    A.   It's a requirement.

6    Q.   So it was a legal requirement?

7    A.   It was a legal requirement.

8    Q.   And were there other business purposes as well for

9    maintaining records of what money was being deposited and

10   sent?

11   A.   Because if there's any questions about it, I will have

12   everything in my file.

13   Q.   And how is DAX compensated for sending money?

14   A.   We get commissions.

15   Q.   And so was it important also to have records of the

16   transactions to know what commission was owed to DAX?

17   A.   Correct.

18   Q.   Now, you referred as -- when you were talking about

19   compliance, you referred to something called the OFAC list.

20   A.   Yes.

21   Q.   And is that the Office of Foreign Asset Control?

22   A.   Correct.

23   Q.   And what did you mean when you were referring to the OFAC

24   list?  Can you explain that more?

25   A.   There was a list, which we call OFAC list, of people who

1  were not allowed to send money, or if their name was there,

2  we would be more careful, you know, if -- make sure it's not

3  a suspicious transaction and, if it was, decline the

4  transaction.  But we would get more ID, reasons, you know,

5  just feel comfortable about the transaction.

6  Q.  And as a licensed money remitter, DAX was required to run

7  the transaction names against the OFAC list?

8  A.  Yes.  There would be filter in our system, as I recall,

9  that if you put in a name on our system, it would know if

10  it -- if it -- that name is -- has a similar name on the

11  list.

12  Q.  And have you heard of a Suspicious Activity Report?

13  A.  Yes.

14  Q.  And can you tell the jury what a Suspicious Activity

15  Report was in the context of DAX.

16  A.  It was a report -- in fact, there was a form that was

17  called Suspicious Activity Report wherein if there was a

18  transaction, a transaction that was suspicious, you would

19  have to fill out that form and send it -- I remember sending

20  it electronically to -- I forgot what department it was.

21  Q.  But it to a government department?

22  A.  Yeah, it was a government department.

23  Q.  And I believe you referred earlier to special

24  recordkeeping requirements if a transaction was 3,000 or

25  more?  Actually let me back up.  If someone walked in to the

1    DAX agent with 3,000 or more dollars, were there special

2    additional recordkeeping requirements for that transaction?

3    A.   Yes.

4    Q.   And have you ever heard of the phrase "structuring"?

5    A.   Yes.

6    Q.   And what is structuring, if you can tell the jury.

7    A.   From my knowledge structuring was when, you know, you

8    send let's say $100 dollars now and then you send $500 later

9    and then send $1,000 dollars tomorrow, you know, you're

10   keeping it low so that you don't go over the threshold.

11   Q.   So if someone had $3,000 to send through DAX but decided

12   to break it into smaller amounts so it wouldn't appear to be

13   over the $3,000 limit, is that what you would consider

14   structuring?

15   A.   Yes.

16   Q.   Was structuring, in your training and work as a

17   compliance officer, was structuring something that you were

18   required to look out for and eliminate if you detected it?

19   A.   Yes.

20   Q.   Now, have you ever heard of a business named the Shidaal

21   Express?

22   A.   Yes.

23   Q.   How did you come to first have contact with a business

24   named the Shidaal Express?

25   A.   We had the same consultant.

1   Q.  And what do you mean the same consultant?

2   A.  They were introduced by one of our consultants, Dr. Jaja

3   (phonetic), and I think they were also a client of his.

4   Q.  And why were they introduced to you by Dr. Jaja?

5   A.  We were trying to expand and get more agents and trying

6   to expand to other countries, and I think they were agents of

7   another transmittal company, and I don't know what happened

8   that they were looking for a licensee, and they were also

9   based in San Diego.

10  Q.  So Shidaal Express was also in the money transmitting

11  business but did not have its own license?

12  A.  Yes.

13  Q.  And it was based in San Diego?

14  A.  Correct.

15  Q.  And you were looking for another agent?

16  A.  Correct.

17  Q.  And did in fact -- did in fact Shidaal Express become an

18  agent of DAX?

19  A.  Yes.

20  Q.  And so it assumed this relationship where it, Shidaal

21  Express here in San Diego, could transmit money to other

22  countries under your license?

23  A.  Correct.  And they were approved by the Department of

24  Financial Institution.

25  Q.  And did DAX do paperwork to have them approved as an

1  agent by the Department of Financial Institutions?

2  A.  Correct.

3  Q.  I'd like to show you what's been marked as Government's

4  Exhibit 14.  Do you recognize that?

5  A.  Yes.

6  Q.  What is that?

7  A.  That is Shidaal's office in San Diego.

8       (Exhibit No. 14 identified.)

9  Q.  That's a picture of Shidaal Express's office here in San

10 Diego.

11 A.  Correct.

12 Q.  And have you been there before?

13 A.  Yes.

14       MR. COLE:  Your Honor, the government moves to

15 admit Exhibit 14.

16       MS. FONTIER:  No objection.

17       THE COURT:  Exhibit 14 is admitted.

18     (Exhibit No. 14 admitted.)

19       MR. COLE:  Can we publish?

20       THE COURT:  Yes.

21       MR. COLE:  And, Ms. Alejandre, could you just zoom

22 into the left-hand side just below the clock.

23       BY MR. COLE:  Q.  Do you see there where it says

24 Shidaal Express, Inc., an authorized agent of DAX?

25 A.  Correct.

1  Q.  So that was a sign that was put outside Shidaal Express

2  when they became your agent?

3  A.  Correct.

4  Q.  And once Shidaal Express came an agent of DAX, can you

5  explain how you would do -- how you would conduct the

6  business with the Shidaal Express generally; how did it

7  operate as your agent?

8  A.  They would accept money from people to send to the

9  countries where they were sending money, and Shidaal would

10  deposit the money to a DAX account -- and I believe at that

11  time it was Wells Fargo -- and we would transmit or wire the

12  money to Dubai, who will then deliver the money to the

13  beneficiaries.

14  Q.  And so when the money was deposited -- collected at the

15  Shidaal Express from the customers, deposited in DAX's Wells

16  Fargo account, it would then be wired to Dubai?

17  A.  Correct.

18  Q.  And was it wired to Dubai because Shidaal Express itself

19  was part of an international network known as Amal?

20  A.  I'm not sure if they were part of Amal, but Amal was its

21  own entity I believe, and they were our delivery agents --

22  Q.  I see.  So --

23  A.  -- for Shidaal.

24  Q.  So in order for the money to be delivered to the

25  beneficiaries of the money in the countries it was to go to,

1   the money would go from DAX to Amal?

2   A.   Directly.

3   Q.   And that was Amal in Dubai?

4   A.   Yes.

5   Q.   And as you described -- well, was it important then once

6   Shidaal Express was -- became a licensee or -- excuse me, not

7   a licensee -- when Shidaal Express became an agent of DAX,

8   was it important for DAX to have access to the transmittal

9   records for money being sent through Shidaal Express?

10   A.   Correct, yes.

11   Q.   And was that important for all reasons you've already

12   explained with regards to compliance?

13   A.   Yes.

14   Q.   And was that also important in regards to determining the

15   proper commissions?

16   A.   Yes.

17   Q.   And how were the commissions divided between DAX and

18   Shidaal Express, if you recall?

19   A.   With Shidaal I think we would get 20 percent of the

20   transaction fee, and they would get 80 percent.

21   Q.   So whatever the transaction commission fee was, it was

22   split 80/20 with Shidaal?

23   A.   Correct.

24   Q.   And as compliance officer was it your job then to have

25   access to Shidaal's remittance transaction records to do your

1    compliance checks as you previously described?

2    A.  Yes.

3    Q.  And that included special recordkeeping requirements if a

4    transaction exceeded $3,000?

5    A.  Yes.

6    Q.  And in order to do that work, were you relying on the

7    information as being -- well, let me back up.  Were you

8    yourself in Shidaal Express accepting the money from

9    customers?

10   A.  No, I was not accepting money, but I would go there to --

11   to review records.

12   Q.  And so you relied on the records that were being

13   maintained by the Shidaal Express --

14   A.  Correct.

15   Q.  -- in order to do your compliance checks?

16   A.  Yes.

17   Q.  And that was a regular part of your work?

18   A.  It was a regular part of my work.  They were trained

19   before they started accepting money in our behalf as our

20   agent; they were trained to do exactly what has to be done.

21   They know all the requirements as far as the IDs and knowing

22   the people, you know, and transactions and being comfortable.

23   They know all the forms that is required by the government.

24   So they know all that.  They go through training before they

25   start.

1    Q.  Now, did the United States a year or so ago ask you to

2    provide a copy of the Shidaal transactions spreadsheet that

3    you had through your work at DAX?  I'll actually withdraw it.

4    Let me show you Government's Exhibit 53.  Do you recognize

5    that?

6    A.  Yes.

7    Q.  And what is Government's Exhibit 53?

8    A.  This is a CD of some transactions I think for several

9    months of Shidaal.

10        (Exhibit No. 53 identified.)

11   Q.  And did you provide that CD to the United States, to the

12   government?

13   A.  To you, yes.

14   Q.  Okay.  And are your initials on there?

15   A.  Yes.

16   Q.  And does that CD contain transaction records from the

17   Shidaal Express that you obtained while Shidaal Express was

18   an agent of DAX?

19   A.  Yes.

20        MR. COLE:  Your Honor, the government moves

21   Exhibit 53 into evidence.

22        MS. FONTIER:  Objection, your Honor, as to the

23   information that's contained on this disk as to foundation.

24        THE COURT:  You're admitting them under -- seeking

25   to have them admitted under 803 (6)?

1          MR. COLE:  Uh-huh.

2          THE COURT:  The objection is overruled.

3          BY MR. COLE:  Q.  Now, Ms. Locsin, I'd like to also

4   show you what's been marked as Government's Exhibit 58.

5          MR. DURKIN:  Judge, excuse me.  Could we be heard

6   briefly on this?

7          THE COURT:  Okay.  Well, we'll take our -- we'll

8   take our noon recess -- afternoon recess at this time, ladies

9   and gentlemen.  Remember the admonition not to discuss the

10  case or make any decisions at this time.  Thank you, counsel.

11  Why don't you come on over here.

12         (Following is a sidebar conference.)

13         THE COURT:  Who asked --

14         MS. FONTIER:  Can I -- can I always make -- your

15  Honor, my objection was what is on this disk is Shidaal

16  Express records.  And I understand that it doesn't

17  necessarily need to be an agent of Shidaal Express, but she

18  hasn't laid the foundations as to what these records are, if

19  they were made contemporaneously -- especially if these were

20  made contemporaneously with the records as they're indicated.

21  I don't think she has the ability to do that; that's why --

22         THE COURT:  She doesn't have to sit there; you

23  understand that.

24         MS. FONTIER:  I understand that, but she --

25         THE COURT:  And if Shidaal is her agent and she's

1    instructed Shidaal on how to keep records and she's been

2    there -- I think the evidence already was that she was there

3    for a period of time.

4              MR. DRATEL:  No, not at Shidaal.

5              MR. COLE:  If you want me to lay the exact --

6              THE COURT:  Well, I thought that's what the

7    testimony was.

8              MR. COLE:  No, she covered Shidaal -- those records

9    are only when she had a relationship with Shidaal.

10              THE COURT:  Right, couple months, and that's all

11    that's on the CD.

12              MR. COLE:  No, it was more than a couple months,

13    but she obviously doesn't have any records of Shidaal when

14    she wasn't involved with it; it was when they were an agent

15    of DAX.

16              THE COURT:  That's my understanding.  That's what's

17    on the CD.

18              MR. COLE:  Yes.

19              MS. FONTIER:  But what she can't -- what I'm

20    objecting to, I don't think she can testify as to when those

21    records were made that they were made contemporaneously with

22    what is recorded, which is one of the elements of a business

23    order foundation.

24              MR. COLE:  My response would be that she doesn't

25    have to.  They became part of her records, DAX's.  If you

1      take records and make them the regular part of your business

2      records, which they were, it doesn't matter.

3              THE COURT:  You need to -- you need to elicit some

4      testimony regarding the reliability of the records, that is,

5      that they were made by the DAX agent reflecting what they

6      purport to reflect.  I mean it's my understanding that she

7      indicated -- I might have -- I might have gone too far in my

8      assumption -- that she indicated that she had actually

9      trained these individuals --

10             MR. COLE:  She did.

11             THE COURT:  -- and that she was there monitoring

12     that process and that somehow, by implication, she satisfied

13     herself that they would -- that they would keep records in

14     the manner in which she had trained them --

15             MR. COLE:  I could --

16             THE COURT:  -- in the ordinary course of business.

17     Get that straightened out.  I'm going -- I think you need a

18     little bit more foundation then.

19             MR. COLE:  Okay.  But the one point I just want to

20     make, your Honor, is we're not vouching for the accuracy of

21     the records.  Our evidence is that they would sometimes lie

22     on their records --

23             THE COURT:  I understand.

24             MR. COLE:  -- and that goes to the weight, not

25     to --

1          MS. MORENO:  Goes to admissibility.

2          THE COURT:  She was saying that she relied on it.

3          MR. COLE:  Yes, yes.

4          THE COURT:  Okay.  That's -- I think you need a

5   little bit more foundation that at least what's on there is

6   the type of information that she trained these people on --

7          MR. COLE:  Okay.

8          THE COURT:  -- the kind information she relied on.

9   Not that they're accurate.  Obviously they may not be

10  accurate.

11         MR. DRATEL:  Your Honor, I think the whole purpose

12  of hearsay rules and the exceptions is not a question of to

13  allow wholesale unreliable records in, the whole purpose of

14  them is if there's indicia of reliability from the way

15  they're prepared, who prepared them, and who vouched them.

16         THE COURT:  These aren't being offered for the

17  truth of the matter necessarily.

18         MR. DRATEL:  They are if they're not hearsay.

19         THE COURT:  Then they're not hearsay --

20         MR. DRATEL:  No, no, no, that's not what I'm

21  saying.

22         THE COURT:  If they're not being offered for the

23  truth of the matter, if they're -- if they're being offered

24  for the mere fact that these records --

25         MR. COLE:  Yes.

```
 1              THE COURT:  -- were made, then they have

 2   independent --

 3              MR. GHAPPOUR:  One thing on the fact that they were

 4   made, I believe, yeah, that the CD contains one or two

 5   spreadsheets.  There's known indication of a contemporaneous.

 6              MS. FONTIER:  Contemporaneous.

 7              MR. GHAPPOUR:  -- that they were conducted in any

 8   form of --

 9              THE COURT:  Spreadsheets or records made from

10   records are covered as long as you have --

11              MR. COLE:  I can ask more questions.

12              THE COURT:  Go ahead, lay a better foundation.  I

13   think we need the better foundation.  Let's --

14              MR. COLE:  The reason -- sorry.

15              THE COURT:  Go ahead.  All right.

16              MR. COLE:  The reason -- the reason, your Honor,

17   that the issue about limiting instructions, you know, the

18   phone numbers, the reasons for the nickname and phone numbers

19   is what we really were going for.  They can turn into of

20   course a lot of other things on cross.  The nicknames and

21   phone numbers are just to tie the phone calls, which are

22   relevant to everything to show who has what phone number and

23   who has what nicknames.  That's why we were doing that.  It's

24   generally applicable.  All the stuff that happened in

25   cross-examination is fine, but it wasn't the purpose.
```

1              THE COURT:  It would have been nice to get a little
2    bit of a head's up on that.
3              MS. HAN:  Okay.
4              MR. DRATEL:  Your Honor, it's still a statement by
5    co-defendant benefit that's being used against me.
6              THE COURT:  It's interesting that nobody objected
7    to that before I raised it myself, but it can be
8    conditionally admitted.  I'll --
9              MR. COLE:  Okay.
10             THE COURT:  -- modify that -- that instruction.
11   Not everything can be -- there's got to be some statement --
12   the initial statement made under 801 (d)(2)(E) comes in at
13   some point in time.  You can always say wait a minute, you
14   know, how can that relate to -- there's no other evidence,
15   how can that relate to my client.  So typically initial
16   statements under 801 (d)(2)(E) are admitted.  If they're not
17   connected and you don't have independent corroboration of the
18   existence of a conspiracy, you've got to deal with that
19   later.
20             MR. DRATEL:  I'm not talking about corroboration.
21   I'm talking about furtherance.
22             THE COURT:  Well, I understand.  Well --
23             MR. GHAPPOUR:  And no indicia of trustworthiness
24   because they were prepared by, I'm assuming --
25             MR. DRATEL:  We're talking about records --

```
 1          (Simultaneous speakers.)

 2               THE COURT:  No, we can't all --

 3               MS. FONTIER:  Off the record.

 4               THE COURT:  No, we're not off the record.

 5               MS. FONTIER:  Back on.

 6               THE COURT:  Okay.  Take a couple of minutes for

 7   yourselves.

 8          (Sidebar conference concludes.)

 9               THE COURT:  On the amounts that were allegedly sent

10   through the hawala through Shidaal -- and they're listed --

11   obviously they're listed in the indictment -- I assume that

12   even though you're not going to take it up with this witness,

13   that the intercepts make reference to each and every one of

14   those transitions, those amounts, and that -- in other words,

15   they're connected up to what's on the CD.

16               MR. COLE:  That's the goal, yes, your Honor.

17               THE COURT:  But you -- assuming those records come

18   in, the dates and amounts and people indicated would

19   correspond to what is going to be reflected on these records?

20               MR. COLE:  Yes, although they don't always read --

21   it's not going to read every column call on the record.  I

22   mean on the phone they talk more globally and maybe use like

23   a round dollar amount of whatever, but we find each

24   transaction that we're going to focus on in the phone calls

25   in our opinion.  They may disagree.
```

1          THE COURT:  All right.

2          MR. COLE:  And I can -- I can lay plenty more

3    foundation with her.  I'll ask her.

4          THE COURT:  That's fine.  I just had a question

5    about that.  I assume the amounts and the dates tracked with

6    what's reflected on these records.  Perhaps, perhaps not.  It

7    just a question I'm asking at this point.  Okay.

8          MS. FONTIER:  Sorry, your Honor.  I do just want to

9    follow up on --

10         THE COURT:  No, no, no follow-up at this point.

11   We're going to take a recess, allow people to take a recess.

12   We'll deal with that later on if we need to.  But for now the

13   ruling is what it is, and any other instructions or limiting

14   constraints will come later.  I mean is there anything else

15   that could conceivably be objected to on the basis of what we

16   heard here at the side of the bench?

17         MS. FONTIER:  I just wanted to note out loud that,

18   you know, the government is saying they're putting these

19   records in because they're going to tie these records to the

20   transactions --

21         THE COURT:  No.

22         MS. FONTIER:  -- that are in the indictment but

23   then they said they're not putting in -- they're arguing that

24   they're not reliable, so I'm totally confused about what the

25   purpose of these records is.

1           MR. COLE:  Well, your Honor, the records -- it's

2    like bank records; they go on and on for pages.  But there

3    are certain ones and entries that we care about.

4           THE COURT:  That's fine.  I shouldn't have even

5    asked the question.

6           MR. COLE:  Oh, I'm sorry.

7           THE COURT:  I didn't mean to open up a can of worms

8    here.  I was just curious as to how -- what other evidence

9    would do by way of corroboration of certain alleged

10   transactions on the CD.  That's all.  We don't need to get

11   into that again.

12          MR. DURKIN:  Judge --

13          THE COURT:  Hold on, Mr. Durkin.  Is it on this

14   subject?

15          MR. DURKIN:  Yes.

16          THE COURT:  Okay.  Go ahead.

17          MR. DURKIN:  Maybe this got said, but I just want

18   to make my position clear here.  I don't believe the

19   government is going to be able to show that the person that

20   created the records that Locsin is talking about was under an

21   obligation to do so accurately as the rules requires.  I just

22   don't think that's going to be --

23          MR. COLE:  The rule doesn't require that.

24          THE COURT:  That's not a proper foundation.  Once

25   again, your foundation is based on ultimately what your

1    perception of the proof may be, what the ultimate proof, what

2    the ultimate facts may be.  As long as there's sufficient

3    evidence to allow a reasonable jury to conclude that the

4    transactions were reflected in the manner in which the

5    employees were instructed, that's fine.  You may punch holes

6    in that in cross-examination, but at least --

7              MR. COLE:  Your Honor, I just want to say on that

8    one point, I don't even think the foundation requires that

9    because it could be the transactions were not done right.

10   The point is were these in fact the regularly maintained

11   records of the business.  If you have an employee that's

12   embezzling at a bank, for example, it's still the regularly

13   maintained records of the business.  That's --

14             THE COURT:  Lay your further foundation, okay, and

15   we'll proceed from there.  And take a few minutes because the

16   jury's coming back in literally about five --

17             MR. DRATEL:  Your Honor, can I literally take ten

18   seconds just to articulate my -- based on that you can't

19   enter -- you can't introduce something as a business record

20   if it's -- if you're also conceding that it's not reliable.

21   The whole purpose of the hearsay exceptions are to permit

22   records that have an indicia of reliability.

23             THE COURT:  That I understand.

24             MR. DRATEL:  Okay.

25             THE COURT:  Thank you.

1          MR. DRATEL:  Thank you.

2        (There was a break in the proceedings.)

3          THE COURT:  Okay.  Thank you, ladies and gentlemen.

4    Couple of things.  First of all, with respect to Exhibits 29

5    and 9, I'm being informed that they may not be organized in

6    the way in which they were intended in the notebooks, so we

7    need to look into that, Ms. Han.

8          MS. HAN:  Yes, your Honor.

9          THE COURT:  Okay.  And I think the defense may have

10   a question about that as well, so we just need to make sure

11   that we're all on the same page, so to speak.

12         MS. HAN:  Yes, your Honor.

13         THE COURT:  All right.  Ladies and gentlemen of the

14   jury, I want to modify an earlier instruction that I gave

15   you.  When Ms. Flores, Concepcion Flores, the first

16   Citizenship and Immigration Services officer was testifying,

17   she was testifying as to the forms that were filled out by

18   defendant Mohamud, Mohamad Mohamad Mohamud, and you heard a

19   lot of information and saw a lot of information contained on

20   those forms.  And after the witness completed her testimony,

21   I told you that you could consider the testimony only as to

22   the case concerning defendant Mohamud.  I'm going to modify

23   that a bit -- and I may have further instruction for you on

24   this -- on this issue -- but I want to get to it now so it's

25   fresh in your mind if you want to make any changes in your

1    notes, reflections in your notes, you can do that.

2            The information on the forms and the testimony that

3    related to telephone numbers and nicknames are not the

4    subject of the limiting instruction.  So telephone numbers

5    and nicknames may be considered beyond just the case

6    concerning Mr. Mohamud for whatever consideration you deem it

7    deserving of.  With respect to all the other personal

8    information aside from telephone numbers and nicknames, I

9    believe at this point that's relevant only to defendant

10   Mohamud, so the limiting instruction would still apply.

11   Okay.

12           So you've returned, and Ms. Locsin is going to

13   continue her examination.  We're still going to hear some

14   additional testimony on direct examination concerning this CD

15   that earlier reference was made to, so.

16           MR. DRATEL:  Your Honor, just wanted to make sure

17   my objection with respect to the instruction --

18           THE COURT:  Mr. Cole, are you ready to proceed?

19           MR. COLE:  Yes, your Honor.

20           BY MR. COLE:  Q.  Ms. Locsin, we were talking about

21   Exhibit 53, which I think is still in front of you.  Do you

22   see that there?

23   A.  Right.

24   Q.  Is that that purple disk?

25   A.  The CD?

1   Q.   Yes.   I'm going to ask some more questions about that,

2   but first let me ask you, do you recall approximately when

3   DAX -- excuse me -- approximately when Shidaal Express became

4   an agent of DAX?

5   A.   I think it was March of -- was it 2009?

6   Q.   So it was March of the year, you don't recall exactly the

7   year?

8   A.   No.

9   Q.   Do you recall when they stopped being your agent?

10   A.   It was November, November 20, '09.

11   Q.   Okay.

12   A.   I don't recall the years, but I remember it was November.

13   Q.   So in November -- your best recollection is in November

14   of 2009 they became -- they stopped being your agent?

15   A.   I'm not so sure about '09.

16   Q.   Okay.   Okay.   So they began on a March date, and they

17   ended on a November date?

18   A.   November.

19   Q.   Okay.   Would it -- well, let me ask a few more questions.

20   How would you -- when they were your agent, how would you get

21   access to their records, the transmittal records?

22   A.   We would have access on the computer, the actual

23   transactions.

24   Q.   And what do you mean by that?   Explain.

25   A.   We could actually go in the system and look at each

1    transaction.

2    Q.   And did you have to go to DAX -- excuse me.  Would you

3    have to go to Shidaal's office every time to look at the

4    records?

5    A.   No.

6    Q.   You could do that from DAX's office?

7    A.   From my office.

8    Q.   And so would you log into a web-based --

9    A.   Right.

10   Q.   Excuse me.  We have to -- let me finish the question.

11   A.   Sorry.

12   Q.   No, that's okay.  Would you log into a web-based database

13   to access the transmittal records for Shidaal Express?

14   A.   Yes.

15   Q.   And was that actually a web-based system maintained by

16   Amal?

17   A.   Yes.

18   Q.   And so -- and that Amal you stated was this international

19   transmittal organization that you would wire the money to

20   at -- that was deposited into your account for the Shidaal

21   records; is that right?

22   A.   Correct.

23   Q.   And so would the employees at Shidaal then enter the

24   transaction records into the Amal web-based system?

25   A.   Yes.

1    Q.  And then you as the agent could access those records

2    directly anytime you wanted to?

3    A.  As a licensee.

4    Q.  Sorry, as the licenseholder?

5    A.  Yes.

6    Q.  You could assess those records anytime you wanted to to

7    see exactly what transmittal records -- exactly what

8    transmittances -- or remittances were being made from Shidaal

9    Express?

10   A.  Correct.

11   Q.  And would you in fact routinely access the Amal records

12   to review the transactions that were taking place at your

13   agent, Shidaal Express?

14   A.  Yes.

15   Q.  And how often were you doing that?  Were you doing that

16   monthly, weekly, daily?

17   A.  We have to do it daily.

18   Q.  So daily you were accessing the Amal database to see the

19   Shidaal transactions?

20   A.  Correct.

21   Q.  And did you use those records to balance the books, to

22   balance the money being deposited from Shidaal Express into

23   DAX's account with the money that was to be sent to Dubai for

24   transmittal?

25   A.  Correct.

1  Q.  And did you use those records also to calculate the

2  commissions?

3  A.  Yes.

4  Q.  And did you in fact balance the books by using those

5  records?

6  A.  Yes.

7  Q.  And how were the agents of DAX -- excuse me -- how were

8  the agents of Shidaal Express trained in records.  Were they

9  supposed to enter transmittal records two months after the

10 transaction or when the transaction is taking place for the

11 money to be sent?

12         MS. FONTIER:  Objection, leading.

13         THE WITNESS:  Point of transaction.

14         THE COURT:  Well, the question "or" makes it okay.

15 You can answer that.

16         THE WITNESS:  When the transaction --

17         THE COURT:  You want to repeat the question, Mr.

18 Cole, just so --

19         MR. COLE:  Yeah.

20         BY MR. COLE:  Q.  Did you train the Shidaal Express

21 employees to enter transactions months later whenever they

22 wanted or when the money was being received for

23 transmittance?

24 A.  When the money was being received.

25 Q.  And was it important that the records be entered

1  contemporaneously with the transaction?

2  A.  Right away.

3  Q.  And why is that?

4  A.  Because you receive money from a customer.  It has to be

5  entered on the computer.  It has to be sent.

6  Q.  And how then did you obtain the spreadsheets that are on

7  the disk?  Was that from the Amal website?

8  A.  From the Amal website.

9  Q.  And how would that process take place?  Would you or

10  someone, your secretary do that?

11  A.  Yes.

12  Q.  How did that --

13  A.  I did not do it myself, but I have someone at my office

14  at that time who would transfer it to an Excel spreadsheet.

15  Q.  And that was so that you could do your routine work on

16  daily basis with the records of the Shidaal Express?

17  A.  Correct.

18          MR. COLE:  Your Honor, the government moves

19  Exhibit 53 into evidence.

20          MS. FONTIER:  Objection, foundation as to who

21  created them.  2009 is not relevant.

22          THE COURT:  The objection is sustained only on the

23  basis of the context of time.  If we can get it clarified

24  that this was the --

25          BY MR. COLE:  Q.  Would it refresh your

1   recollection to actually open the disk and look at it on the

2   computer for a moment to remind yourself -- would that

3   refresh your recollection as to the time period covered?

4   A.   Sure.

5           THE COURT:   Yeah, if you could speak up, once

6   again, that would be appreciated.   Thank you.

7           THE WITNESS:   All right.

8           BY MR. COLE:   Q.   And could you come down off the

9   stand for a moment to come and look at the spreadsheets.   Ms.

10  Locsin, if you'll not say anything yet, but just take a

11  moment to look at where the spreadsheets begin and end if

12  that would refresh your recollection, and then I'll ask you

13  another question.   Does that in fact refresh your

14  recollection?

15  A.   Yes.

16  Q.   And has it been several years since these things

17  happened?

18  A.   Several years.

19  Q.   And when did the records begin then that -- when Shidaal

20  Express was operating as an agent of DAX?

21  A.   March of 2008.

22  Q.   March 2008.   And when did they end?

23  A.   November of 2009.

24  Q.   Okay.   Thank you.

25           MR. COLE:   Your Honor, the government moves

1   Exhibit 53.

2         MS. FONTIER:  I still object as to who created and

3   the trustworthiness.

4         THE COURT:  The objection is overruled, and Exhibit

5   53 is admitted.

6      (Exhibit No. 53 admitted.)

7         MR. COLE:  Thank you, your Honor.

8         BY MR. COLE:  Q.  Now, I'd like to show you what's

9   been marked as Government's Exhibit 58.  Showing you what's

10  marked as Government's Exhibit 58, can you take a look at

11  those pages.  Have you had a chance to do that, to look that

12  over?

13  A.  Yes.

14  Q.  And do you recognize what type of document this is?

15  A.  This is a transaction record log.

16     (Exhibit No. 58 identified.)

17  Q.  And what is a transaction -- without describing what's on

18  this particular example, what is a transaction record log?

19  A.  It involves transactions that are $3,000 or more.

20  Q.  And was this a special record, a record log that was kept

21  by DAX for transactions that its agents took in for 3,000 or

22  more?

23  A.  Yes.

24  Q.  And is what's marked as Exhibit 53 in fact one of those

25  transaction record logs but with the personal's -- with the

1   individual's personal information redacted or blacked out?

2   A.   I don't --

3   Q.   Bad question.   That particular exhibit in front of you

4   has the personal information blacked out; do you see that?

5   A.   Correct.

6   Q.   But apart from the blacking out of the personal

7   information, is that in fact a true and correct copy of a

8   transaction record log maintained by DAX?

9   A.   Yes.

10  Q.   And you said this was the type of record that would be

11  kept by DAX for transactions of 3,000 or more?

12  A.   Correct.

13  Q.   And was that what DAX trained all of its agents to do?

14  A.   Yes.

15  Q.   Including the Shidaal Express?

16  A.   Yes.

17  Q.   And in fact is this example --

18           MR. COLE:   Well, your Honor, the government moves

19  Exhibit 58 into evidence.

20           MS. FONTIER:   Your Honor, if I may just review the

21  redactions.   We have an unredacted copy and much of it is

22  irrelevant, so I just want to make sure what is actually

23  redacted and what --

24           MR. COLE:   It was personal information about a

25  third party, name, date of birth.

1          THE COURT:  Do you have a copy you could quickly

2    show counsel?

3          MS. FONTIER:  My only objection is to relevance.

4          THE COURT:  The objection is overruled conditioned

5    upon a motion to strike if it turns out not to be relevant.

6    You may -- it's admitted at this time.

7          (Exhibit No. 58 admitted.)

8          BY MR. COLE:  Q.  So I'd like to show you then the

9    first page of Exhibit 58.  Try to zoom.  Can you read --

10   well, looking right where it says transaction record log,

11   does it say "this log must be used to record transactions

12   that involve $3,000 or more regardless of the method of

13   payment as required by the Department of the U.S. Treasury."

14   Does it say that?

15   A.  Yes.

16   Q.  And it follows by saying "We must keep this form for five

17   years from the date of transaction"?

18   A.  Yes.

19   Q.  And in the top right-hand corner, it indicates that the

20   location of this particular transaction was Shidaal?

21   A.  Correct.

22   Q.  And looking at page 2 -- I'm sorry -- page 4, the last

23   page of the exhibit, I see that attached to this transaction

24   record log was a remittance application form; is that right?

25   A.  Yes.

1  Q.  What is a remittance application form?  What is this

2  document?

3  A.  That should -- that should be a receipt.

4  Q.  So what do you mean by receipt?

5  A.  Receipt is what you give to the sender, that they had in

6  fact given you that money.

7  Q.  So when someone comes into the Shidaal Express or another

8  DAX agent, in addition to inputting information into the

9  computer, a paper receipt is created?

10 A.  Correct.

11 Q.  And a copy of the paper receipt is maintained by the

12 agent and also given to the customer?

13 A.  Correct.

14 Q.  And so if a transaction is $3,000 or more, DAX has to

15 keep a copy of the receipt as well?

16 A.  Correct.

17 Q.  And was -- was that something that the agents of the

18 Shidaal were trained to do?

19 A.  Yes.

20        MR. DURKIN:  Judge -- Judge, can I have a second to

21 speak to Mr. Cole?

22        MR. COLE:  Your Honor, we wanted to stipulate the

23 parties -- just to make it perfectly clear -- this is an

24 example of a log.  It has nothing to could with these four

25 clients.

1          THE COURT:  I was going to ask if this was an

2   exemplar --

3          MR. COLE:  It's an exemplar.

4          THE COURT:  -- used as an exemplar, hence the

5   reaction of personal information.  Okay.

6          MR. COLE:  Nothing further, your Honor.

7          THE COURT:  Any cross-examination?

8          MS. FONTIER:  Please, your Honor.

9                    Cross-Examination

10         BY MS. FONTIER:  Q.  Good afternoon, Ms. Locsin.

11   A.  Hello.

12   Q.  I'm a little bit shorter than Mr. Cole.  Ms. Locsin, you

13   said that DAX, the Dollar American Exchange, had been a

14   family business, correct?

15   A.  Right.

16   Q.  And that the business was started by your family in 1983?

17   A.  Correct.

18   Q.  And who started the business?

19   A.  My mother-in-law.

20   Q.  And so -- I'm horrible at math, but by 2007, fair to say

21   that that company had been in your family for a couple of

22   decades?

23   A.  Correct.

24   Q.  And it was family run and operated for all of those 20

25   some years?

1  A.  We were involved just later.  I don't know who was

2  managing before us.

3  Q.  But from 1983 until 2007, your family had been

4  operating --

5  A.  My mother-in-law was always involved.

6  Q.  Right.  And you were personally involved starting when?

7  A.  I think it was 2001 when I started working part time at

8  the bank.

9  Q.  And your husband also was working for DAX; is that

10  correct?

11  A.  Correct.

12  Q.  And in 2007 -- sorry, withdrawn.  You also stated on

13  direct that it was becoming -- is now more difficult to have

14  a license, a money remitting license, correct?

15  A.  Correct.

16  Q.  And the requirements for that have changed and become

17  more strict over time, correct?

18  A.  Correct.

19  Q.  Now, in 2007 the requirements for maintaining that

20  license also changed, had changed, correct?

21  A.  I don't know what year it changed, but it constantly

22  changes.

23  Q.  There did come a point in time where they increased --

24  the auditors for -- the people that are -- the authority that

25  maintains these licenses increased the amount of capital from

1  500,000 to $1 million or -- I'm sorry -- increased the amount

2  of capital that that company needed to have to $500,000; is

3  that correct?

4  A.  To 500?

5  Q.  Yes.

6  A.  I'm not sure exactly the amount, but I remember they had

7  to increase it.

8  Q.  So it was a very high amount of capital that the company

9  needed to maintain, right?

10  A.  Yes.

11  Q.  And in and around 2007, DAX was having trouble

12  maintaining that amount of capital, correct?

13  A.  I don't know if we were having trouble, but we were -- we

14  would lose our license if we would not comply; but we did

15  not, so I guess we were complying.

16  Q.  And you'd said you were trying to expand to bring in

17  other agents and to expand into other countries, correct?

18  A.  Correct.

19  Q.  And by bringing in other agents, some of that would be to

20  increase your capital, correct?

21  A.  I don't believe so.

22  Q.  Now, when you -- speaking specifically about Shidaal

23  Express, are you familiar with how they became one of your

24  agents?

25  A.  Can you say that, can you ask that again?

1   Q.  Are you familiar -- do you remember the time when you

2   took them on as an agent?

3   A.  I believe so.

4   Q.  Were you part of the negotiations for that deal, for

5   bringing them on as an agent?

6   A.  As an agent, yes.

7   Q.  And did you meet personally with the people from Shidaal

8   Express that eventually entered into an agreement with DAX?

9   A.  Yes.

10  Q.  And a Mohamed Ahmed was one of those people, correct?

11  A.  Mohamed who?

12  Q.  Mohamud Ahmed.  Sorry.

13  A.  Mohamud.

14  Q.  Mohamud Ahmed?

15  A.  Ahmed, yes.

16  Q.  Yes.  He was one of the people from Shidaal Express that

17  you made an agreement with, correct?

18  A.  Yes.

19  Q.  And was an Abdi Hussein the other person?

20  A.  Abdi?

21  Q.  Abdi.

22  A.  Yes.

23  Q.  Yes.  Okay.  And now you made an agreement with

24  Mr. Mohamud Ahmed that he would provide $500,000 in capital

25  to DAX, correct?

1    A.  We were trying to make them -- they were trying to get

2    their own license, and so we were -- we had to apply to the

3    Department of Financial Institution for them to be part of --

4    for them to put in money to the company, and they would have

5    to be approved as part of the company.

6    Q.  And wasn't the agreement that Mohamud would provide

7    $500,000 in order to become an agent of DAX?

8    A.  Not agent.  He was already an agent.  To become an agent

9    you don't need to provide any money.  But to be a partner --

10   he wanted to be a licensee, part of the company.

11   Q.  Okay.  And the agreement for him do that was to provide

12   $500,000, correct?

13   A.  I can't recall the exact amount, but it was a amount that

14   was required by the Department of Financial Institution.

15   Q.  And now, do you recall in June of 2010 being interviewed

16   by the FBI?

17   A.  I don't recall the date, but I remember being interviewed

18   by the FBI.

19   Q.  Do you remember being asked questions about Mr. Mohamud

20   as you call him?

21   A.  Yes.

22   Q.  I'm just going to show you a document.

23            THE COURT:  Did you see that, counsel?

24            MR. COLE:  I did.

25            THE COURT:  Okay.

 1            BY MS. FONTIER:  Q.  Now, without actually reading
 2  out loud, if you can look at the bottom paragraph on the
 3  first page, if you can just read that over.
 4  A.  Okay.
 5  Q.  That was the first -- now that you've read that, does it
 6  refresh your recollection as to the nature of the agreement
 7  between DAX and Mohamud?
 8  A.  If they became partners of DAX, the DFI required $1
 9  million as a capital requirement, but it was a DFI
10  requirement.
11  Q.  And that was going to be difficult, so Mr. Mohamud agreed
12  to provide $500,000 to be a 49 percent shareholder, correct?
13            MR. COLE:  Objection, relevance.
14            THE COURT:  Overruled.  You may answer if you can
15  recall, if you're --
16            THE WITNESS:  I don't know if --
17            THE COURT:  -- aware of how difficult it was or was
18  not.
19            THE WITNESS:  I don't know if it was difficult for
20  him.  He was -- the only thing we did at that time was to
21  make sure that it was approved by the Department of Financial
22  Institution.  The application alone is a lot, and the
23  requirements was tremendous, and so if it was difficult for
24  him to obtain that -- that requirement from the department, I
25  wasn't sure, but he did not comply with it.  He was approved

1    though by the department.

2              BY MS. FONTIER:  Q.  Well, when you were speaking

3    to the FBI agent in June of 2010, didn't you tell them that

4    Mohamud said it was going to be difficult to provide a

5    million dollars but that for a 49 percent share, he would

6    provide $500,000?

7              MR. COLE:  Objection; calls for hearsay.

8              THE COURT:  The objection is sustained.

9              BY MS. FONTIER:  Q.  I'm asking what you said

10   specifically to the FBI.

11             MR. COLE:  Same objection.

12             THE COURT:  It contains hearsay within the

13   statement.

14             BY MS. FONTIER:  Q.  Now, moving on, you did enter

15   into an agreement, DAX and Mohamud, regarding Shidaal

16   Express, correct?

17   A.  If they get approved by the department.  Everything was

18   relied on the approval of the department.

19   Q.  At some point you entered into an agreement with Mohamud,

20   correct?

21   A.  What kind of agreement?

22   Q.  Between Shidaal Express and DAX.

23   A.  As an agent?

24   Q.  Yes.

25   A.  Yes.

1   Q.  And then you had a specific agreement with Mr. Mohamud,

2   correct?

3   A.  Correct.

4   Q.  And Abdi Hussein was the vice-president of Shidaal?

5   A.  Adbi, yes.

6   Q.  Abdi, yes.

7   A.  Yes.

8   Q.  And they acted as your agents, correct?

9   A.  Correct.

10  Q.  And isn't it also true that Mr. Mohamud kept telling you

11  that he was going to give you the $500,000?

12          MR. COLE:  Objection; relevance, hearsay.

13          THE COURT:  It's not hearsay.  The objection is

14  overruled.

15          THE WITNESS:  It was a requirement by the

16  department for him to inject that money.

17          THE COURT:  Ma'am, that wasn't the question.  The

18  question --

19          THE WITNESS:  Can you repeat the question, please.

20          THE COURT:  Hold on, hold on.  It's a lot easier if

21  there's only one person speaking at a time, okay?  All right.

22  The question is a simple question:  Did Mr. Mohamud keep

23  telling you that he would be able to raise 500,000 or not be

24  able to raise 500,000?

25          THE WITNESS:  He would be able to.

1              THE COURT:  He told you that?

2              THE WITNESS:  He told us and he told the

3     department.

4              BY MS. FONTIER:  Q.  And he never actually provided

5     you that money, right?

6     A.  No.

7     Q.  You extended the time period for him to give it to you,

8     and he didn't do it, correct?

9     A.  Correct.

10    Q.  And that ultimately meant that he was not going to be

11    licensed in your business, correct?

12    A.  I did not extend.  It the Department of Financial

13    Institution did.

14    Q.  And despite his promises that he was going to provide

15    $500,000, he never provided that money, correct?

16             MR. COLE:  Objection; relevance, your Honor.

17             THE COURT:  I don't see what the relevance of that

18    is, Ms. Fontier.

19             MS. FONTIER:  If you give me a couple of more

20    questions, it will become apparent I believe, your Honor.

21             THE COURT:  Okay.

22             THE WITNESS:  Can you repeat your question, please.

23             BY MS. FONTIER:  Q.  Despite Mr. Mohamud telling

24    you repeatedly that he was going to provide the money and

25    telling the department to provide the money, he didn't do it,

1   correct?

2   A.   No.

3   Q.   So in fact when he said that, it was not truthful,

4   correct?

5           MR. COLE:   Objection, relevance.

6           THE COURT:   The objection is sustained.

7           MS. FONTIER:   I'll come back to this in a moment

8   then, your Honor, if I can.

9           BY MS. FONTIER:   Q.   The records that you've

10  testified about, the Shidaal Express records, those were

11  provided to you or you received them from the Shidaal

12  computers, correct?

13  A.   Correct.

14  Q.   But you weren't there when the entries were made into the

15  system, correct?

16  A.   No.

17  Q.   So you don't know what information was provided to the

18  person who entered the information, right?

19  A.   No.

20  Q.   So when the entries into the Shidaal computers are made,

21  you were not present, right?

22  A.   No.

23  Q.   So you don't know who's standing in front of the person

24  that enters the information, right?

25  A.   No.

1    Q.  You don't know what is actually given to that person,

2    correct?

3    A.  No.

4    Q.  You don't know what is said to that person?

5    A.  No.

6    Q.  You don't know if they checked IDs, correct?

7    A.  I would know that because they have to provide it to me

8    if I ask.

9    Q.  But when that is actually happening, you don't see the

10   actual identification that is provided, correct?

11   A.  No, only a fax or a copy.

12   Q.  And you don't know -- if somebody walks in with $1,000,

13   and they say please send this $1,000 to person X, you don't

14   know what precisely the person entering the information types

15   down, correct?

16   A.  No.

17   Q.  So you have no way of verifying whether the information

18   in the computer is what the person talking to them said,

19   right?  All you know is that it was entered in the computer.

20   A.  Correct.

21   Q.  And you are, again, not the person who did that, right?

22   A.  Who did what?

23   Q.  Enter the information into the record.

24   A.  No.

25   Q.  And your -- now, Mr. Mohamud, however, was one of the

1  people that may have done that, right?

2  A.  I don't know.

3  Q.  He was your agent at the Shidaal Express?

4  A.  Correct.

5  Q.  And Abdi Hussein was an agent of the Shidaal Express?

6  A.  He was part of the Shidaal.

7  Q.  And when you said you trained people to enter in

8  information, Mohamud and Abdi were two of those people

9  correct?

10  A.  I did not train them to enter the information on the

11  computer.  I trained them to get the requirements, the

12  regulations, and all that.  But as far as the computer and

13  how the system works in entering, I didn't train them because

14  they knew the system.

15  Q.  All right.  So the process of actually entering this

16  information you did not train them on?

17  A.  No.

18  Q.  You trained them on DAX policies?

19  A.  Not only DAX policy but the Department of Financial

20  Institution, OFAC, and all those.

21  Q.  So you told them the rules --

22  A.  Compliance.

23  Q.  -- that they're supposed to follow.

24  A.  Correct.

25  Q.  But you don't have any way of knowing if they were

1    actually following the rules, correct?

2    A.   No.

3    Q.   All you do -- you know the rules, and you know what you

4    saw in the computer, correct?

5    A.   Yes.

6    Q.   And now, Mr. Mohamud, or Mohamad, in your dealings with

7    him, did you find him trustworthy?

8                MR. COLE:   Objection, relevance.

9                THE COURT:   The objection is overruled.   You may

10   answer.

11               THE WITNESS:   At that time yes.

12               BY MS. FONTIER:   Q.   And was he trustworthy when he

13   promised $500,000 capital to your company?

14   A.   Very hard to answer that question because he did not

15   comply.

16   Q.   So he made a promise but didn't keep it; is that correct?

17   A.   He did not.   And it was a requirement by the department.

18   In fact, that's the reason why the department had to repeal

19   or take back the approval; they canceled it.

20   Q.   So approval was initially given because he promised that

21   money, and then it was taken away, correct?

22   A.   Yes.

23   Q.   And it was extended because he promised he would give

24   that money at a later date, correct?

25   A.   Correct.

1   Q.  And none of those promises turned out to be true,

2   correct?

3   A.  No.

4   Q.  So in your experiences with Mr. Mohamud, would you say

5   that he's trustworthy?

6   A.  After everything that happened, no.

7   Q.  One moment, please.  And, again, Mohamud and Abdi were

8   the owners of the Shidaal Express, right?

9   A.  Yes.

10  Q.  So they are the people that are responsible for Shidaal's

11  records?

12  A.  Correct.

13  Q.  And they're the people that are responsible for

14  maintaining them?

15  A.  Correct.

16  Q.  And they're the people that are responsible for whether

17  or not those are accurate, correct?

18  A.  Yes.

19          MS. FONTIER:  I have nothing further, your Honor.

20          THE COURT:  Anything further from defense?

21          MS. MORENO:  No questions.

22          THE COURT:  Okay.  Anything further?  Mr. Ghappour,

23  did you have any questions?

24          MR. GHAPPOUR:  Yes.

25          THE COURT:  Please.

1                          Cross-Examination

2              BY MR. GHAPPOUR:  Q.  Ms. Locsin, hello.

3     A.  Hi.

4     Q.  You said that when you -- you said that you checked on

5     the Shidaal Express records daily; is that correct?

6     A.  Correct.

7     Q.  And in doing that you logged into to a website, correct?

8     A.  Not me personally, but -- the reason why we have to check

9     it every day, because we have to find out exactly the amount

10    of the transactions because we have -- we need to deposit and

11    also we needed to make sure right away if there were any

12    transactions more than 3,000 because we had more

13    requirements.  So yes, we did check it every day.

14    Q.  And when you said it wasn't you but it was we, who

15    checked it?

16    A.  People in my office.

17    Q.  And the --

18    A.  Ultimately it was me.

19    Q.  Ultimately it was you?

20    A.  I had to approve everything.

21    Q.  Did you ever try to check the records for a particular

22    day?

23    A.  Every day.

24    Q.  Every day you would check it?

25    A.  Yeah.

1    Q.   Okay.  In checking it, you logged into some website,

2    correct?

3    A.   Yes.

4    Q.   And in logging in to the website, you provided a

5    username?

6    A.   We would only have one username in my office.

7    Q.   Okay.  And you would also provide a password?

8    A.   A password I believe.

9    Q.   Okay.  And you talked about spreadsheets at some point

10   earlier?

11   A.   Yes.

12   Q.   It wasn't you that made those spreadsheets, correct?

13   A.   No, not me personally.  I approved it.

14   Q.   You approved the spreadsheets.

15   A.   Yeah, I have to go to, yeah, each transaction and approve

16   it.

17   Q.   And so you would log in the Amal website and check over

18   that data with the data on the spreadsheet?

19   A.   It has to balance, yes.

20   Q.   It has to balance.  And you would check over the transfer

21   number for every transaction?

22   A.   Transfer number is -- I don't know what that is.

23   Q.   Okay.  Did you check over the sender name for every

24   transaction?

25   A.   Yes.

1   Q.   Okay.  And you checked over the recipient name?

2   A.   Yes.

3   Q.   And you checked over the recipient city?

4   A.   The city has to be there, yes.

5   Q.   Okay.  And the phone numbers for the sender as well as

6   the receiver, correct?

7   A.   I don't believe there was always a phone number for the

8   receiver.

9   Q.   Okay.  You checked over the date obviously, correct?

10  A.   Yes.

11  Q.   And the amount?

12  A.   Yes.

13  Q.   And the username of the sender?

14  A.   Username of the sender?

15  Q.   Yes.

16  A.   I don't know what that is.

17  Q.   Okay.

18          MR. GHAPPOUR:  If I may, your Honor.

19          THE COURT:  Has that been marked, counsel?

20          MR. GHAPPOUR:  Your Honor, that's Government

21  Exhibit 46 or -- I guess what exhibit number are we up to,

22  the defense.

23          THE COURT:  Well, if it's already been premarked as

24  a government exhibit, that's fine.

25          MR. GHAPPOUR:  Okay.

1          BY MR. GHAPPOUR:  Q.  Do you recognize the document

2    I've shown you?

3    A.  Yes.

4    Q.  And what is that?

5    A.  This is the transactions of Shidaal.  This is the

6    computer based --

7    Q.  That's the screen that you looked at every day, correct?

8    A.  Yes.

9       (Exhibit No. 46 identified.)

10   Q.  And the column all the way on the right --

11   A.  Oh, user.

12   Q.  Yeah.

13   A.  I got it, Shidaal.

14   Q.  Did you check that every day?

15   A.  It's all Shidaal, yeah.  Well, I see it.  It's not that I

16   check it, but I see it.

17   Q.  So did you check the screenshot, the data on the website

18   with the data on the spreadsheet every day?  Isn't that what

19   you just said?

20   A.  We -- we -- what we do is that -- to transfer this to

21   Excel, so whatever is on the computer, we transfer it to

22   Excel --

23   Q.  Okay.

24   A.  -- for our reports.

25   Q.  And so you transfered all the data on that?

1    A.   Yes.

2    Q.   Every day?

3    A.   Every day.

4    Q.   Every piece of data on every column, correct?

5    A.   I'm not sure if it's every piece of data that we

6    transfer, but we do transfer what we need.

7    Q.   And you said that you were the compliance officer for

8    DAX; is that correct?

9    A.   Correct.

10           MR. GHAPPOUR:  Actually, your Honor, I'd like to

11   move this into evidence if possible, Exhibit 46.

12           MR. COLE:  No objection.

13           THE COURT:  Exhibit 46 is admitted.

14        (Exhibit No. 46 admitted.)

15           BY MR. GHAPPOUR:  Q.  You said that you were the

16   compliance officer for DAX; is that correct?

17   A.   Yes.

18   Q.   And you trained employees at the Shidaal; is that

19   correct?

20   A.   Correct.

21   Q.   And you trained them to adhere by DAX policy, correct?

22   A.   It's actually only Abdi and Mohamud.

23   Q.   Just Abdi and Mohamud?

24   A.   Correct.

25   Q.   And you said --

1  A.   Managers.

2  Q.   The managers.

3  A.   Uh-huh.

4  Q.   Were they the owners as well?

5  A.   I believe so.  Abdi was their compliance officer.

6  Q.   Abdi was their compliance officer?

7  A.   Uh-huh.

8  Q.   And did you require them to take any courses in order to

9  serve as the compliance officers for your agents?

10  A.   No.

11  Q.   You did not?  Did you require them to sign any paperwork

12  that they would adhere to your policies?

13  A.   I believe so.

14  Q.   You didn't require that from any of their employees

15  though, correct?

16  A.   Not the actual employees.

17  Q.   If there was an issue with a transaction, who was your

18  point of contact?

19  A.   Abdi.

20  Q.   And occasionally Mohamud, Abdi Ahmed, correct?

21  A.   Usually Abdi.

22          MR. GHAPPOUR:  I'm just going to show this to Ms.

23  Locsin again.  This is Government Exhibit 46.

24          BY MR. GHAPPOUR:  Q.  And so the column all the way

25  on the right, all the way at the top over here, you just read

1    it.  What did it say?  It's a little -- a little darked out

2    over here.

3    A.   Shidaal.

4    Q.   This column all the way on the right, what does that

5    represent?

6    A.   Oh, it says user ID.

7    Q.   User ID, correct.

8    A.   Yes.

9    Q.   And there are multiple user IDs over here?

10   A.   Okay.

11   Q.   Is that correct?

12   A.   I just saw Shidaal --

13   Q.   And -- okay.

14   A.   -- when you showed it to me.

15   Q.   How about the one right on top of Shidaal; what does that

16   one say?

17   A.   I can't read it from here.

18   Q.   Okay.  I'll bring it closer.

19            THE COURT:  You can just blow that up on there.

20            MR. GHAPPOUR:  I wish I could use that thing.

21            MR. DRATEL:  You've got to zoom in.

22            BY MR. GHAPPOUR:  Q.  You've got a monitor right

23   next to you as well.

24   A.   Oh.

25   Q.   Excellent.

1    A.  I see it.

2    Q.  Okay.  So the username right on top of Shidaal, it says

3    Shidaal400, correct?

4    A.  Correct.

5    Q.  So would you -- would you agree that there are multiple

6    usernames in that column?

7    A.  I don't know.  I wouldn't know what that is.  I wouldn't

8    know if there are others, the other multiple user ID.  I

9    don't know.

10   Q.  Okay.

11            MR. GHAPPOUR:  No further questions.

12            THE COURT:  Anything further, Mr. Cole?

13            MR. COLE:  Nothing, your Honor.

14            THE COURT:  Anything further?  Okay.  Thank you,

15   Ms. Locsin.  You are excused.

16            THE WITNESS:  Thank you.

17            MR. WARD:  Your Honor, the government calls William

18   Via.

19            MS. FONTIER:  Your Honor, I would like to renew my

20   objection to Government's Exhibit 53 and move to strike that

21   exhibit.

22            THE COURT:  The objection is overruled.  The motion

23   to strike is denied.

24            THE CLERK:  Can you please raise your right hand.

25   Do you solemnly swear that the evidence you shall give in the

1    cause now before the Court shall be the truth, the whole

2    truth, and nothing but the truth?

3              THE WITNESS:  Yes.

4                           William T. Via

5    was called by the government and testified as follows:

6              THE CLERK:  Can you please state and spell your

7    first and last name for the record.

8              THE WITNESS:  Yes, my name is William T. Via,

9    V-i-a, first name is spelled W-i-l-l-i-a-m.

10                        Direct Examination

11             BY MR. WARD:  Q.  Good afternoon, Agent Via.

12   A.  Good afternoon.

13   Q.  Where do you work, sir?

14   A.  I'm employed with the Federal Bureau of Investigation,

15   also known as the FBI.

16   Q.  And what unit within the FBI do you work for?

17   A.  I work for the Operational Technology Division, and the

18   unit that I'm responsible for is known as the

19   Telecommunications, Intercept, and Collection Technology

20   Unit; we also use the acronym TICTU, t-i-c-t-u.

21   Q.  And what does TICTU do?

22   A.  TICTU has the responsibility to provide for the FBI the

23   equipment and the services in order to conduct -- to collect

24   intelligence by acquisition, deployment, set up the equipment

25   in field offices.  We also do training, we do life-cycle

1    support for that equipment -- we recycle the equipment

2    between three and five years -- and we ensure that our

3    equipment is working 24 by 7, it's on all the time, and also

4    we provide a 24/7 help desk for that equipment.

5    Q.  And what's the purpose of the equipment?  Is it

6    essentially for audio collection?

7    A.  Yes, the equipment is used to gather intelligence when

8    provided with a court order for FISA intercept.

9    Q.  Then, sir, how long have you been with TICTU?

10   A.  I've been in TICTU since 1999.

11   Q.  And you used an acronym, "FISA"; can you explain to us

12   what that is.

13   A.  That is the Foreign Intelligence Surveillance Act, and

14   that is for intelligence-gathering for the FBI.

15   Q.  And is that just the authority under which you -- one of

16   the authorities under which you can collect audio recordings?

17   A.  Yes, sir.

18   Q.  All right.  Phone calls.  I'm sorry.  You collect phone

19   calls?

20   A.  Yes, sir.

21   Q.  And prior to the time that you were with TICTU, can you

22   tell us a little bit about your experience.

23   A.  Yes, sir.  Before then, from 19 -- 1993 to 1999, I was

24   assigned to the Los Angeles field office as a full-time

25   technical trained agent.  From 1988 to 1993, I was assigned

1   to the Pittsburgh field office, where I worked

2   investigations, and then I became a technical trained agent

3   in the Pittsburgh office.

4   Q.  And, Agent Via, when you say you were a technically

5   trained agent, can you describe to the jury what those

6   responsibilities entailed.

7   A.  Yes, sir.  A technical trained agent is a special agent

8   within the FBI who has chosen to work technical matters

9   for -- to further investigations or to assist a case agent.

10  So as a technically trained agent, I would have to get

11  qualified, and then my role would be to manage and to deploy

12  equipment to further investigations for a case agent.

13  Q.  So would that include helping other agents working cases

14  to collect telephone calls?

15  A.  Yes, sir.

16  Q.  And so in the course of your career, have you become

17  familiar with the hardware that the FBI and the telephone

18  companies use to intercept telephone calls?

19  A.  Yes, sir.

20  Q.  And with -- specifically with respect to wireless

21  telephones, do you have knowledge of how that -- the

22  equipment works to intercept a wireless telephone call?

23  A.  Yes, sir.

24  Q.  And now I'm using the terms.  When we talk about

25  wireless, aren't we just talking about a cell phone?

1    A.   Okay.

2    Q.   In preparation for your testimony today, Agent Via, did

3    you prepare an exhibit that would help explain your

4    testimony?

5    A.   Yes, sir, I did.

6    Q.   And Government's Exhibit 50 -- 65, I'm sorry,

7    Government's Exhibit 65, could you take a look at that, Agent

8    Via, and tell me if you recognize it.

9    A.   Yes, sir, I do.

10   Q.   And is that the chart that you prepared to help explain

11   your testimony to the jury today?

12   A.   Yes, sir.

13        (Exhibit No. 65 identified.)

14            MR. WARD:  Okay.  I'd offer Government's 65, your

15   Honor.

16            MS. FONTIER:  No objection.

17            THE COURT:  Sixty-five is admitted.

18        (Exhibit No. 65 admitted.)

19            MR. WARD:  Can we go ahead and publish 65 to the

20   jury.

21            BY MR. WARD:  Q.  Agent Via, at the top, the chart

22   you've brought here today, Government's 65, is labeled a

23   wireless CALEA intercept.  Is CALEA just the acronym for the

24   law that requires a telephone service provider to assist the

25   FBI in collecting phone calls?

1   A.  Yes, sir, it is.

2   Q.  Okay.  And directing your attention to the center of that

3   chart, do you see the spot where it is called or labeled

4   "telephone company switch"?

5   A.  Yes, sir.

6   Q.  Can you explain to the jury what that is.

7   A.  Yes.  On the CALEA intercept, which is the Communication

8   Assistance to Law Enforcement Act, the box that you see in

9   the center that says telephone company switch, that means

10  that the telephone company, once it receives a court order,

11  is going to provision the actual intercept.  Another term we

12  use is going to set up the intercept, so you --

13  Q.  Can I stop you there for a just a minute?

14  A.  Yes.

15  Q.  Do I understand you correctly that provisioning is just a

16  term you use in your job to describe setting up the

17  intercept --

18  A.  Yes, sir.

19  Q.  -- at the telephone company?

20  A.  Yes, sir.

21  Q.  Okay.  Please continue.

22  A.  Okay.  So at the bottom where you see "carrier

23  provisioning function," once a court order is provided to the

24  telephone carrier and their legal department says that court

25  order is sufficient, then a employee of that carrier will

1  actually sit at a terminal and will provision the intercept.

2  Q.  Okay.  So at this point then, the telephone company is in

3  position to use the hardware that you've indicated is the

4  telephone company switch to do the intercept; is that

5  correct?

6  A.  That is correct.

7  Q.  Okay.  And how is that activated?

8  A.  We provide a cover sheet along with the court order --

9  Q.  Sir, please answer my question.  Just tell the ladies and

10  gentlemen of the jury how it is that the hardware, the

11  switch, actually functions to collect a call.  Is it fair to

12  say that when the phone -- either a phone call is placed or a

13  phone call is answered by the phone that's being intercepted,

14  the switch is activated?

15  A.  Yes, sir, that is correct.

16  Q.  Okay.  Could you describe that process to the jury,

17  please.

18  A.  Okay.  When a target makes a telephone call, it actually

19  goes to the telephone company, and then it goes to the person

20  that's being called.  Because the switch has provisioned the

21  call, it will send to the FBI field office as a bridge so

22  that we get the audio.  Want me to continue?

23  Q.  No.  Let me just ask the questions.  We'll break it down

24  because some of the information is very technical, and we

25  just want to go step by step.

1  A.  Yes, sir.

2  Q.  So if a call is intercepted, regardless of which

3  direction it's placed, your chart indicates that there's two

4  different types of information that are intercepted.  Can you

5  indicate on the chart down at the lower right-hand portion

6  the call content channel.

7  A.  Yes, sir.

8  Q.  What's call content?

9  A.  Call content is the actual voices that are being spoken

10 on the intercept.

11 Q.  Okay.  So that's the audio?

12 A.  Yes, sir.

13 Q.  Okay.  Now, up above that, Agent Via, you indicated that

14 there's a call data channel; and does the call data channel

15 have information other than the audio?

16 A.  Yes, sir.

17 Q.  And, for example, does it have the phone number -- excuse

18 me -- the time of the call?

19 A.  Yes, sir.

20 Q.  The date of the call?

21 A.  Yes, sir.

22 Q.  Does it also have the length or the duration of the call?

23 A.  Yes, sir.

24 Q.  And I suppose that if you're doing an intercept, you know

25 what phone number you're trying to intercept; is that

1    correct?

2    A.   That is correct.

3    Q.   Okay.  Well, but does the call data also pick up who the

4    other party is to the call?

5    A.   Yes, sir, it can.

6    Q.   Okay.  And does the call data then contain that number?

7    A.   Yes, sir.

8    Q.   All right.  Now, you're showing these on two different

9    paths.  Can you describe what happens with the data in the

10    call content, the audio, and then the call data channel, what

11    happens to them?

12    A.   Okay.  The audio, or the call content channel, that goes

13    directly to the field office that has the collections system.

14    We provide a phone number for the telephone company to send

15    that audio straight to them.  The call data channel will go

16    to the engineering research facility, also known as the

17    Operation Technology Division, where I work, it comes into my

18    lab, and from my lab we send it down to the field office

19    where the two come together at the collection box.

20    Q.   So although they're separately routed, do they eventually

21    get married back up?

22    A.   Yes, sir.

23    Q.   And when you say a field office, what are you talking

24    about?

25    A.   There are 56 field offices within the United States that

1  are managed by the FBI.  All of the collections are done at

2  the field office.  The field office is where the collection

3  equipment is.

4  Q.  Okay.  And, Agent Via, does the San Diego FBI have a

5  field office?

6  A.  Yes, sir.

7  Q.  And during the time that we're talking about here, which

8  would be the end of 2007 through July of 2008, was there the

9  capacity within the San Diego field office to collect the

10 phone data, the audio data, and the call data --

11 A.  Yes, sir.

12 Q.  -- within that office?  And was there a particular name

13 for the system on that -- on which that data was recorded?

14 A.  Yes, sir.  The name of the system was the Red Wolf

15 digital collection system.

16 Q.  Okay.  And was Red Wolf just a, for lack of a better

17 term, a server?

18 A.  Yes, sir.

19 Q.  And was the collection system, the Red Wolf system,

20 located within a security area?

21 A.  Yes, sir.  More detail?

22 Q.  That's fine, no.  Just if you'd answer my question.

23 A.  Yes, sir.

24 Q.  So when you say it's a security area, what are we talking

25 about?

1    A.  Within the FBI space there's a central monitoring plant.
2    It's a secure plant that is locked down through some type of
3    electronics means with limited access to get to the
4    collections system.
5    Q.  Okay.  And when the call data or -- excuse me.  When this
6    data, both the content, the audio, and the call data, hit the
7    collection system and they get matched back up, what happens
8    next?
9    A.  Then it would go to a database that validates that these
10   two should be together, and then it's sent to a magneto
11   optical disk at the end of the call.
12   Q.  Okay.  And can you spell magneto, please?  Is that
13   m-a-g-n-e-t-o?
14   A.  Yes, sir.  Thank you.
15   Q.  And is that just a big removable storage device for
16   storage media?
17   A.  Yes, sir, it is.
18   Q.  Okay.  And how soon after a call has been intercepted are
19   the two packets of information here, the audio and the call
20   data, written to what you've described as a magneto optical
21   disk?
22   A.  The call, the data and the audio, are matched together
23   within approximately three to five seconds.
24   Q.  Okay.  Now, what happens when the magneto optical disk is
25   filled up?

1   A.  When the magneto optical disk is filled, the

2   administrator of the system is notified to remove that media.

3   That person would not eject that disk from the system until

4   the case agent or his or her designee came to the CMP and

5   actually removed that data and put it into an evidence

6   envelope, starting the chain of command to go into Elsher

7   (phonetic), the system will import a new disk to start

8   collecting the data and audio.

9   Q.  Okay.  Agent Via, when you were talking about the -- you

10  used an abbreviation; was it for the central processing

11  facility?

12  A.  Yeah, central monitoring plant.

13  Q.  Okay.  Central monitoring plant?  Okay.  Is that the

14  secure area where the Red Wolf -- is that the secure area

15  where the Red Wolf system is located within the field office?

16  A.  Yes, sir.

17  Q.  Okay.  Now, so the -- when it's full, who comes to claim

18  the disk?

19  A.  The case agent or his designee.

20  Q.  Okay.  And is there any feature within the Red Wolf

21  system that prevents the calls from being altered, the calls

22  or the data related to those calls from being altered or

23  manipulated?

24  A.  Yes, it is.

25  Q.  So is it possible to manipulate or alter those calls?

1    A.   No, sir.

2    Q.   And is this similar to a read-only file like we

3    experience in our day-to-day lives in using computers?

4    A.   Yes, sir, it is.

5              MR. WARD:  Okay.  I have no further questions.

6              THE COURT:  Cross-examination?

7              MR. DRATEL:  Thank you, your Honor.

8                        Cross-Examination

9              BY MR. DRATEL:  Q.  Good afternoon, Agent Via.

10   A.   Good afternoon.

11   Q.   Now, we're talking about FISA intercepts?

12   A.   Yes, sir.

13   Q.   And that's a 'round-the-clock process, right?

14   A.   Yes, sir.

15   Q.   It's a 24/7, 365, collect every call, doesn't get shut

16   off, right?

17   A.   Yes, sir.

18   Q.   And not what we call -- and we'll explain for the jury --

19   not what we call minimizing.  Do you know what I mean when I

20   say minimization?

21   A.   Yes, sir.

22   Q.   Where someone might ---

23             MR. WARD:  Objection, relevance.

24             THE COURT:  Well, the objection is overruled.  I

25   know you didn't get into minimization per se, but it does

1   relate to how the system mechanically operates.

2            MR. DRATEL:  Thank you, your Honor.

3            BY MR. DRATEL:  Q.  And by minimization, I mean

4   someone might break in and listen to a call, see if it's

5   about the subject matter that's being investigated, and then

6   hang up and only tape the calls that are what are called

7   pertinent, right?  That's minimization?  Generally, not FISA

8   but generally.

9            MR. WARD:  Objection.  Can we approach, your Honor?

10           THE COURT:  Well, no.  I'm going to sustain the

11  objection at this point.  Continue on, Mr. Dratel.

12           MR. DRATEL:  Okay.

13           BY MR. DRATEL:  Q.  But you never turn the machine

14  off, right, basically?  Captures all the calls?

15  A.  Can you repeat the question?

16  Q.  Sure.  It captures all the calls made during the period

17  that the court order is in effect, correct?

18  A.  Yes, sir.

19  Q.  Now, you don't listen to these calls, you yourself,

20  right?

21  A.  That's correct.

22  Q.  And you don't monitor the calls on a real-time basis,

23  pick up a headset or anything like that or check out what's

24  on the phone, right?

25  A.  No, sir.

1   Q.   That's someone else's responsibility?

2   A.   Yes, sir.

3   Q.   Now, the person whose phone is being -- whose calls are

4   being intercepted, the phone number, that person is not told

5   that there's a wiretap on their phone, right?

6   A.   That's correct.

7   Q.   And there's no -- this is very sophisticated technology,

8   right?

9   A.   Yes, sir.

10   Q.   So that they have no way of telling from the audio or

11   anything like that that they're being overheard, right?

12   A.   That's correct.

13   Q.   It's all being done by the phone company in a digital

14   manner that doesn't affect the quality of the conversation or

15   anything like that?

16   A.   That's correct.

17   Q.   And are you familiar also with cell site technology,

18   cellular site technology?  I see on there you have on the

19   bottom left it says "cell site."

20   A.   Yes, sir.

21   Q.   There's also a way to tell where calls are being made,

22   right?

23   A.   Yes, sir.

24   Q.   Because they're -- because you can essentially figure out

25   from a -- from a cell phone what tower it's using for its

1    signal, right?

2    A.  That is correct.

3    Q.  Okay.  Do you know if that was used in this instance?

4    A.  No, sir, I do not.

5            MR. DRATEL:  Okay.  Thanks very much.  No further

6    questions.

7            THE COURT:  Any further examination?

8            MS. MORENO:  No, your Honor.

9            THE COURT:  Mr. Dratel -- excuse me -- Mr. Durkin?

10                      Cross-Examination

11           BY MR. DURKIN:  Q.  Agent Via, did I understand you

12   to say that in this case you used the Red Wolf collection

13   system?

14   A.  Yes, sir.

15   Q.  That's an older system, correct?

16   A.  Yes, sir.

17   Q.  You now have a newer system called Red Tiger, correct?

18   A.  That is correct.

19   Q.  And that's a more efficient system, isn't it?

20   A.  It's a newer technology, yes, sir.

21   Q.  And the Red Tiger replaced Red Wolf because there had

22   been problems with Red Wolf, correct?

23   A.  No, sir.

24   Q.  Why did they have to switch then from Red Wolf to Red

25   Tiger?

1    A.  I think a change in technology.  We always work towards

2    more efficient equipment; we always want to do more with the

3    collection equipment.  The Red Wolf system had been around

4    for nine years, so it was time for a change.

5    Q.  And do you know what the change consisted of?

6    A.  I would not want to go into details about --

7                MR. WARD:  Objection, relevance.

8                THE COURT:  The objection is sustained.

9                BY MR. DURKIN:  Q.  I'm a little confused, but I

10   confuse easily, so don't -- there's two different things that

11   get reported; there's call data and call content?

12   A.  Yes, sir.

13   Q.  What's the difference?

14   A.  The call content is the actual audio; it's the voices

15   speaking.  The call data would be information about the call.

16   Q.  What kind of information about the call?

17   A.  It would be the number dialed, the number dialed to, the

18   start time of the call, the stop time of the call, the

19   duration of the call.

20   Q.  And how do you get that information; where does that come

21   from?

22   A.  That information comes from the telephone carrier.

23   Q.  And how does the carrier give you the call data

24   information, the timing and all that; how does that work?

25   A.  Comes in on a file right into the Red Wolf system.

1  Q.  So you don't have any control over that; is that it?

2  A.  That's correct.

3  Q.  You have to take whatever the phone company gives you on

4  that, right?

5  A.  That is correct.

6  Q.  Okay.

7  A.  Excuse me.

8  Q.  And then you don't have any way of verifying the accuracy

9  of that, do you?

10 A.  We can.  After the call is complete, the case agent would

11 have the ability to go back and get what we call a data dump

12 and put the two together to validate --

13 Q.  I understand.  Do you know whether they did that in this

14 case?

15 A.  No, sir, I do not.

16 Q.  Who would know that, the agent?

17 A.  Yes, sir, the investigator would say if that took place.

18 Q.  But that's how they'd have to do it; they'd have to go

19 back and get that information specifically.  Your own Red

20 Wolf system doesn't get that, correct?

21 A.  That is correct.

22 Q.  Okay.  Now, let's talk about the call content.  You say

23 that's the audio part, correct?

24 A.  That is correct.

25 Q.  So that would be like what you'd listen to; that would

1  be -- you'd hear the speakers, correct?

2  A.  That is correct.

3  Q.  What's that box underneath with the person over

4  somebody's shoulder at a computer, the carrier provisioning

5  function?  What's that?

6  A.  That box just gives you a good indication that the

7  carrier will actually set the telephone call up.  So I just

8  wanted you to see that the telephone company actually at the

9  terminal use -- provision the intercept, so that's a good way

10 to just to see it.

11 Q.  I'm sorry.  Like I said, I confuse easily.  What -- can

12 you say that again?  That's for the -- that means that the

13 telephone company does what?

14 A.  Actually sets the intercept up for the FBI.

15 Q.  And how do they do that?

16 A.  They would go to a terminal, take the information that's

17 been received, and they would type that information to their

18 system in order to effect an intercept.

19 Q.  So a human being has to do that?

20 A.  Yes, sir.

21 Q.  So how do you know that the human beings at the telephone

22 company did that every time?

23 A.  We have a relationship with the carriers through

24 communications, and so we have discussed different ways

25 that -- or this particular way that a clear intercept would

1   be done so it would be a standard.

2   Q.  So you rely on the phone company people to do that for

3   you; is that what you're saying?

4   A.  Yes, sir.

5   Q.  Okay.  And do you know what kind of people the phone

6   company uses to do that?

7   A.  Technical personnel would be the term I would --

8   Q.  They're not -- they're not trained by the FBI, correct?

9   A.  No, sir.

10  Q.  And they're not FBI employees, correct?

11  A.  No, sir, that's correct.

12  Q.  Okay.  Now, Mr. Dratel -- and the reason I asked that is

13  Mr. Dratel just asked you, this is a 24/7 or 24-hour-a-day,

14  seven-day-a-week operation, correct?

15  A.  For the FBI, yes, sir.

16  Q.  Okay.  And so I take it the phone company then has to

17  have somebody there 24/7 as well, correct?

18  A.  Some of the telephone companies may have someone there 24

19  hours.

20  Q.  Well, how else would they know how to get it going, what

21  you just said?

22  A.  I would tend to think that we would notify the carrier

23  that we have a intercept, and I think there are so many days

24  before the intercept has to actually start, so if it's not

25  done that first day, it's done within so many days.

1    Q.  But -- so you don't really know though whether you have

2    every call during that 24/7 operation, do you?

3    A.  We have every call that's provided by the telephone

4    carrier.

5    Q.  I understand.  Okay.  Well --

6                THE COURT:  Anything further, Mr. Durkin?

7                MR. DURKIN:  Just one.

8                BY MR. DURKIN:  Q.  And did you say how many FBI

9    field offices are there, 56 or 52?

10   A.  Fifty-six field offices.

11   Q.  Fifty-six.  Okay.

12               MR. DURKIN:  Thank you.

13               THE COURT:  Mr. Ward, anything further?

14               MR. WARD:  Just a little -- few question or two,

15   your Honor.

16                         Redirect Examination

17               BY MR. WARD:  Q.  Agent Via, on cross-examination

18   Mr. Durkin asked you a little bit about the personnel at the

19   telephone company and how this switch worked.  Is it the case

20   that when you first set up an intercept, the switch is just

21   turned on by the provider?

22   A.  Repeat the question.

23   Q.  When you do what you called provisioning --

24   A.  Yes, sir.

25   Q.  -- you've got the authority to do the intercept?

1    A.  That is correct.

2    Q.  The telephone carrier, you know, the service carrier then

3    sets up the switch to intercept that number; is that correct?

4    A.  That is correct.

5    Q.  Okay.  And that's a one-shot deal, isn't it?

6    A.  Yes, sir.

7    Q.  Okay.  And how long does this switch remain in effect?

8    A.  Until the court order expires.

9    Q.  Okay.  And are the calls automatically intercepted either

10   when the call -- a call is placed to that number or the

11   caller that owns that number calls out?

12   A.  Automatically intercepted.

13          MR. WARD:  Okay.  Thank you.  I have no further

14   questions, your Honor.

15          THE COURT:  Anything further?

16          MR. DRATEL:  Yes, your Honor.

17                      Recross-Examination

18          BY MR. DRATEL:  Q.  So as you sit here, you're

19   confident that you got every call, right?

20   A.  Every call that's provided by the carrier is what we

21   receive, yes, sir.

22   Q.  And you have no reason to believe they didn't capture all

23   the calls?

24   A.  No, sir.

25   Q.  Do you know how long the process was on this particular

1   case?

2   A.   No, sir.

3   Q.   Were you involved personally in setting up the equipment

4   on this case?

5   A.   No, sir.  My responsibility is to provide the equipment

6   to the field offices.  The intercepts -- the investigation's

7   all done at the local level.

8   Q.   Then you just pick it up when it's finished?

9   A.   Pick it up?

10  Q.   In other words, the equipment --

11  A.   No, sir.  The equipment is -- stays in the central

12  monitoring plant at the field office.

13  Q.   So you just essentially set up the equipment to do the

14  intercepts --

15  A.   Yes, sir.

16  Q.   Okay.  Do the collections rather, right?

17  A.   Yes, sir.

18          MR. DRATEL:  Okay.  Thank you.

19          THE WITNESS:  You're welcome.

20          THE COURT:  Anything further, Mr. Ward?

21          MR. WARD:  We ask the witness be excused, your

22  Honor.

23          THE COURT:  The witness may be excused.  Thank you,

24  sir.

25          THE WITNESS:  Thank you, sir.

1          THE COURT:  You have a ten-minute witness?

2          MR. COLE:  Yes.

3          MR. WARD:  I think so, your Honor.  The government

4   calls Victoria Homfeld.

5          THE CLERK:  Can you please raise your right hand.

6   Do you solemnly swear that the evidence you shall give in the

7   cause now before the Court shall be the truth, the whole

8   truth, and nothing but the truth?

9          THE WITNESS:  I do.

10                     Victoria Homfeld

11  was called by the government and testified as follows:

12         THE CLERK:  Can you please state and spell your

13  first and last name for the record.

14         THE WITNESS:  Victoria Homfeld, V-i-c-t-o-r-i-a,

15  Homfeld, H-o-m-f-e-l-d.

16                   Direct Examination

17         BY MR. WARD:  Q.  Good afternoon, Ms. Homfeld.

18  Where do you work?

19  A.  I work for Naval Criminal Investigative Service, and I'm

20  detailed over at the San Diego Regional Computer Forensic

21  Lab.

22  Q.  And what does the Regional Computer Forensic Lab do?

23  A.  They accept digital evidence from various law enforcement

24  agencies, and we do exams or imaging of the digital evidence

25  that's submitted to the RCFL and then do a presentation for

1  court.

2  Q.  Okay.  And what is your position within the RCFL?

3  A.  I'm an investigative computer specialist, a forensic

4  examiner.

5  Q.  Okay.  And do those duties involve actually supporting

6  search warrants and other imaging of computers?

7  A.  Yes.  When we get evidence that's submitted and it's -- a

8  case is assigned to us, we have to review the legal authority

9  on it.

10 Q.  Okay.  And how do you -- how long have you been in this

11 position?

12 A.  I joined -- well, actually got detailed over to the RCFL

13 in 2005, started off as part time, and towards the end of

14 2005 became full time.

15 Q.  And you used the term "imaging."  Can you explain to the

16 jury what that means.

17 A.  Imaging actually is an exact duplicate.  If you have a

18 hard drive, we make a copy of it, and it's a bit-by-bit copy.

19 It has a hash value on it, which is like a digital

20 fingerprint.  It's a math function that's like a logarithm

21 and it assigns about a 32-character hash value.  And it shows

22 that -- the evidence that was on the hard drive, and once

23 it's been imaged and put on staging media, if the hash values

24 match, then nothing's been changed on it, so it's an exact

25 duplicate.

1    Q.  Ms. Homfeld, can we back up just a bit.  I want to talk a

2    little bit up here, and you're into the really technical

3    aspects of this.  What's the goal of imaging computer data?

4    A.  To make a copy, an exact duplicate copy of a hard drive

5    or a cell phone or whatever you're in the process of imaging.

6    Q.  Okay.  And when you started talking about hash values --

7    and maybe we'll talk about those in a little bit more

8    detail -- is that, you know, a part of the process or

9    procedure to preserve the information in an unaltered state?

10   A.  Yes, it is.

11   Q.  Thank you.  How much training do you have in imaging

12   computers and preserving the data in an unaltered state?

13   A.  In order to be certified by the FBI through their CART

14   program, which is Computer Analysis Response Team, you have

15   to go through a series of about five searches.  You have to

16   go through over four or 500 hours worth of training, you do

17   exams with a mentor and the mentor would look over your exam

18   work and your imaging, and then you have to go through like a

19   moot court that the CART puts on, and then once you pass

20   that, you're certified by the FBI.

21   Q.  Okay.  And have you been certified by the FBI; is that

22   what you're telling us?

23   A.  Yes, I have.

24   Q.  Okay.  How many computer searches have you assisted in or

25   supported?

1   A.  As of today from the time I've started --

2   Q.  Sure.

3   A.  -- probably hundreds.

4   Q.  Okay.  And directing your attention to April 8, 2008, did

5   you participate -- I'm sorry.  I actually have a mistake in

6   my notes.  April 8, 2009.

7   A.  Yes, I did.

8   Q.  Did you participate in a search warrant at the Shidaal

9   Express?

10  A.  Yes, I did.

11  Q.  And do you recall the location of that Shidaal Express?

12  Was it the 54th Street location?

13  A.  Yes, it was.

14  Q.  Okay.  And do you recall what Shidaal Express was?

15  A.  I believe it was like in the Safari Market and it was I

16  think Number A, and it's a -- some sort of money cashing

17  exchange.

18  Q.  Okay.  And when you went to the Shidaal Express, did you

19  assist the FBI in their conduct of a search warrant that day?

20  A.  Yes, I did.

21  Q.  And how did you support the FBI's search that day?

22  A.  When we arrived at the Safari Market, we were met by the

23  case agents.  Which was Mike Kaiser and FBI agent Lovely,

24  Jason Lovely, and they explained the search warrant over to

25  us, and what they wanted was a live capture.

1          MS. FONTIER:  Objection, hearsay.

2          THE COURT:  Objection is overruled.

3          THE WITNESS:  What they wanted was a live capture

4   of some data that was on the Internet.

5          BY MR. WARD:  Q.  When you say a live capture, can

6   you describe to the jury what that means.

7   A.  The computer that was in the office, in the main office

8   there, once it's connected to the Internet, the user would

9   have to go to a website and then they log into that website

10  and then you're presented with a menu.  And we needed to get

11  data remittance between two dates; I believe it was July 1st

12  of 2009 -- '7 -- I'm sorry -- and then on April 9 of.

13  Q.  Ms. Homfeld, I know it's been a long time.  If you could

14  just -- and I'm not asking you to recall all the specific

15  dates, but if you could describe to the jury how it is you do

16  a live capture of data from the Internet just in general.

17  A.  In general?  Okay.  The user logs into the website, we

18  get the report and export it out to an Excel spreadsheet.  I

19  have a staging media that's attached to the subject machine,

20  and I have a thumb drive that's attached to the subject

21  machine.  The thumb drive has my software on it.  The hard

22  drive is where I'm going to put the data that I'm going to

23  take from the Excel spreadsheet, copy it over to there, and

24  then I'm going to do an image, and from there I'll get a hash

25  value.  And that's basically how I do a live capture.

1  Q.  Okay.  What's the difference between a live capture and

2  creating an image of a hard drive?

3  A.  Creating an image of a hard drive, I'm actually going to

4  pull the hard arrive out of the computer.  I can image it on

5  site or I can take it back to the lab and do an image back at

6  the lab.  On a live capture the machine is not turned off, it

7  is running at the time, and I'm just probably pulling files

8  out and not doing a full image.

9  Q.  Okay.  So on the day that you were at the Shidaal

10 Express, you did a live -- did you a live capture of a

11 remittance list?

12 A.  Yes, I did.

13 Q.  And was the remittance list -- remittance list -- from

14 the Amal Commercial Brokerage Service?

15 A.  Yes, it was.

16 Q.  And how did you gain access to the Internet website where

17 that -- where that -- where that record was located?

18 A.  The two case agents, Special Agent Lovely and Special

19 Agent Kaiser, had the subject go to his computer, log into

20 the website, type in the website address, and then the user

21 was prompted to put in a user name and a password.  And from

22 there I was able to either print or do an Excel spreadsheet

23 and copy the file down to my staging media.

24 Q.  Okay.  Handing you what's been marked for identification

25 as Government's Exhibit 50, I'll ask you if you recognize

1  that, Ms. Homfeld.

2  A.  Yes, I do.

3  Q.  And what is Government's Exhibit 50?

4  A.  This looks like one of the main menus that you would see

5  when the user had logged in, and this was doing a remittance

6  types of reports that you could do, and the one that we did

7  was --

8  Q.  Ms. Homfeld, stay with me.  It's not in evidence yet.  Is

9  that a picture --

10  A.  Yes.

11  Q.  -- of one of the screen shots of the Amal Commercial

12  Brokerage server?

13  A.  Yes, it is.

14  Q.  And that's the website you were at doing the live capture

15  that day; is that correct?

16  A.  Yes.

17      (Exhibit No. 50 identified.)

18          MR. WARD:  Okay.  I offer Government's 50, your

19  Honor.

20          MS. FONTIER:  No objection.

21          THE COURT:  Exhibit 50 is admitted.

22      (Exhibit No. 50 admitted.

23          BY MR. WARD:  Q.  So that the record's clear, you

24  took a picture of that with a camera, right?

25  A.  Yes, I did.

1    Q.   Okay.  And that was part of your report afterwards?

2    A.   Yes, it was.

3    Q.   Okay.  And up on the left-hand side, it says remittance?

4    A.   Yes.

5    Q.   Okay.  And is there also an entry that talks about

6    remittance list?

7    A.   Yes.  It's about the third bullet down.

8    Q.   Okay.  Do you have the pointer right there?  Could we

9    blow that up?  Okay.  So the remittance list, was that the

10   function that you accessed in order to do the live capture?

11   A.   Yes, it was.

12   Q.   Okay.  And going to Government's Exhibit 46, which is in

13   evidence -- I think it's up here --

14          MR. WARD:  Oh, I'm sorry.  It's already in

15   evidence.  If we could publish that to the jury.

16          BY MR. WARD:  Q.  Okay.  Now, do you recognize this

17   document here?

18   A.   Yes, I do.

19   Q.   Okay.  And you're the person who took the picture of

20   that?

21   A.   Yes, I am.

22   Q.   Is that another screen shot of the Amal Commercial

23   Brokerage Service website that you were doing the live

24   capture on?

25   A.   Yes, it is.

1  Q.  And what is the difference between this one and the one

2  that was depicted in Government's 50?

3  A.  In Government's Exhibit 50, this is like the menu, the

4  report menu.  And once you pick the remittance list, you are

5  prompted to put in date range, which I did, and that would be

6  the screen that -- shot that I see once the date range was

7  put in.

8  Q.  Okay.  And what was the date range on the -- that you

9  used that day at Shidaal Express?

10 A.  I believe it was July 1st or 2nd of 2007.

11 Q.  Okay.  And is it recorded in that picture there?

12 A.  Yes, it is.

13         MR. WARD:  If we could enlarge the top center.

14 Okay.

15         BY MR. WARD:  Q.  Okay.  And so once you entered

16 that date range, what happened next?

17 A.  Your -- you can either print it or you can make an Excel

18 spreadsheet out of it.

19 Q.  Okay.

20         MR. WARD:  So if you can pan back out, can you

21 focus on the tool bar up above the ledger entries that say

22 print and Excel.

23         BY MR. WARD:  Q.  And which option did you choose

24 for your live capture?

25 A.  I did the Excel spreadsheet.

1  Q.  Okay.  And you have a lot of technical knowledge but, Ms.

2  Homfeld, is there anything in your experience that you --

3  that this is similar to that the jurors might understand?

4  A.  Sure.  It would be like when you're balancing your

5  checkbook and you go online and you can -- like if you're

6  paying bills online with your checking account, you can

7  either download your account activity to like Quicken or to

8  an Excel spreadsheet, that's basically what we're doing here.

9  Q.  Okay.  And did I understand you correctly that you chose

10 the -- the Excel function?

11 A.  Yes, I did.

12 Q.  And then what did you do?

13 A.  Then it prompts you to save the file.  I saved it out and

14 saved it as an Excel spreadsheet.  Then I also saved it as a

15 CSV, which is just like a spreadsheet also.  Since this is

16 like a database, CSV is really a copy of records and the

17 records are divided by fields, and those fields are divided

18 either by like a tab or a comma semicolon.

19 Q.  Okay.  So you had two different copies of the remittance

20 list?

21 A.  Correct.

22 Q.  Okay.  And what did you do after that?

23         THE COURT:  Mr. Ward, I'm going to stop you here.

24 I know you anticipated finishing in ten minutes, but we're

25 already beyond that, and I don't want to keep the jury any

1   longer, there may be some cross-examination, so we'll stop.

2   Ms. Homfeld, if we can ask you to return Monday or at another

3   time to be arranged by counsel to finish up your --

4           THE WITNESS:  Certainly.

5           THE COURT:  -- testimony.  I'm sorry we weren't

6   able to do it today, but you're excused for now, okay?

7           THE WITNESS:  Okay.

8           THE COURT:  All right.  Ladies and gentlemen of the

9   jury, we're going to stop for today obviously; it's that

10  time.  And remember that we are not in session tomorrow on

11  this case, so if you find yourselves driving toward the

12  courthouse and you realize what you're doing, turn around; we

13  won't be here for you.

14          You're going to be away from the case, as I say,

15  three days.  Don't give the case thought, don't make any

16  decisions, obviously don't discuss the case amongst

17  yourselves or with anyone else.  Remember the admonition to

18  stay away from all reporting in any shape or form not only on

19  this case but any other case or story that has anything to do

20  with the types of issues involved in this case.

21          You can leave your notebooks right there on the

22  seats; they'll be fine.  I want to thank you on behalf of all

23  the attorneys.  I want to thank you for your promptness; it's

24  really important that we get started on time, and you've been

25  very prompt with us.  So we will bid you adieu until next

1   Monday at nine o'clock.

2           Any questions on any of the mechanics,

3   administrative matters, housekeeping?  Okay.  Apparently not.

4   Thank you.  Have a good weekend.

5       (The jury left the courtroom.)

6           THE COURT:  All right.  Just a couple of quick

7   matters, counsel.  We have a full calendar tomorrow, a full

8   criminal calendar, and so you're going to need to pack things

9   up.  And, you know, if you'd like to -- well, you'll probably

10  want to take your stuff with you, sure, it's the weekend, but

11  if there's anything you'd like to leave that will lighten

12  your burden, feel free to do that.  You can put those things

13  up against the wall; they'll be secure.  If you have any

14  concerns about security, then please feel free to take

15  everything out.  I think we'll probably leave the equipment

16  where it is.  Mr. Cole, are you going to file a response to

17  the Section 5 --

18          MR. COLE:  Yeah.  I got it in court, so I haven't

19  even opened it yet, but we will go look at it right now and

20  file a response as soon as we know what it is.

21          THE COURT:  Okay.  Take your time.

22          MR. COLE:  I'll get it this weekend.

23          THE COURT:  No, be thoughtful.  Give it some

24  thought, and then we'll proceed from there.

25          MR. COLE:  Okay.

 1          THE COURT:  Okay.

 2          MR. COLE:  And should we also contact chambers -- I

 3   don't know if the -- do you want to see it in camera?  The

 4   order that came out today -- should we set up a time for that

 5   or --

 6          THE COURT:  Sure.

 7          MR. COLE:  Okay.  Thank you, your Honor.

 8          MR. DRATEL:  Your Honor, just logistics, and

 9   however the Court wants to handle it.  Because of the nature

10   of a CIPA filing, other counsel have not seen what I filed on

11   everyone's behalf, so at some point I'm going to --

12          THE COURT:  What was that?  What is that sound?

13   Wow.  Sounded almost like a gunshot going off.  Finally after

14   two days I figured out what it was.  You know, every time it

15   happens -- that's okay.  We were trying to figure out what

16   that was.  If you can hold off on that for just a bit.

17          MR. DRATEL:  I don't know whether the Court has the

18   capacity or whether we have to deal with the U.S. Attorney's

19   in terms of a secure area.

20          THE COURT:  Well, why don't you two -- why don't

21   you two get together.

22          MR. COLE:  We'll take care of it.

23          THE COURT:  Okay.  You can talk to this gentleman

24   and then we'll have -- I know the government wants to look at

25   what's been filed here.  Okay.  Then that will do it until

1    nine o'clock Monday morning for us.  Thank you.  You all have

2    a good weekend.  Safe travels.  Anybody going back?  All

3    right.

4         (There was a break in the proceedings for the weekend

5    recess.)

1                              I n d e x

2     <u>Witnesses</u>                                           <u>Page</u>

3     **Matthew Bryden**
      Cross-Examination by Mr. Dratel                    559
4     Cross-Examination by Ms. Moreno                    639
      Cross-Examination by Mr. Durkin                    646
5     Redirect Examination by Ms. Han                    655
      Recross-Examination by Mr. Dratel                  665
6
7     **Concepcion Flores**
      Direct Examination by Ms. Han                      675
      Cross-Examination by Ms. Moreno                    686
8
9     **Isagani Camangian**
      Direct Examination by Ms. Han                      690
      Cross-Examination by Mr. Durkin                    694
10    Cross-Examination by Ms. Fontier                   703
      Redirect Examination by Ms. Han                    704
11
12    **Donnah Locsin**
      Direct Examination by Mr. Cole                     708
      Cross-Examination by Ms. Fontier                   746
13    Cross-Examination by Mr. Ghappour                  760
14    **William T. Via**
      Direct Examination by Mr. Ward                     768
15    Cross-Examination by Mr. Dratel                    779
      Cross-Examination by Mr. Durkin                    782
16    Redirect Examination by Mr. Ward                   787
      Recross-Examination by Mr. Dratel                  788
17
18    **Victora Homfeld**
      Direct Examination by Mr. Ward                     790

19

20

21

22

23

24

25

1                            E x h i b i t s

2       Exhibits            Description              For ID    In Evd
        Y                   Photograph              585
3       AA                  Article (Bryden)        634
        29                  I-485                   676       677
4       9                   Record of Sworn Statement  677    677
        11                  N-400                   691       691
5       14                  Photograph              719       719
        53                  CD (Shidaal)            723       742
6       58                  Transaction record log  742       744
        46                  Shidaal transactions    763       764
7       65                  Chart                   771       771
        50                  Screen shot             796       796

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>Certificate of Reporter</u>

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated January 13, 2014 at San Diego, California.

12               *Debra M. Henson*

13                         /s/ Debra M. Henson  (electronic)
                           Debra M. Henson
14                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25