1                      United States District Court

2                    Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                    Plaintiff,      )
                                     )
6      vs.                           ) Case No. 10-CR-4246 JM
                                     ) Jury Trial/Day 7
7   BASAALY SAEED MOALIN,            ) Wednesday, February 6, 2013
    MOHAMAD MOHAMAD MOHAMUD          )
8   ISSA DOREH,                      ) Volume 7
    AHMED NASIR TAALIL MOHAMUD,      )
9                                    )
                     Defendants.     )
10  _____ )

11

12              Before the Honorable Jeffrey T. Miller
                    United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25
                Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:        Laura E. Duffy
                                UNITED STATES ATTORNEY
 3                              William P. Cole
                                Caroline P. Han
 4                              ASSISTANT U.S. ATTORNEYS
                                Steven P. Ward, Trial Attorney
 5                              U.S. DEPARTMENT OF JUSTICE
                                880 Front Street, Suite 6293
 6                              San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
 8                              Alice Fontier, Esq.
                                OFFICE OF JOSHUA L. DRATEL
 9                              2 Wall Street, Third Floor
                                New York, NY  10005
10
     (Mr. M. Mohamud)          Linda Moreno, Esq.
11                              LINDA MORENO, P.A.
                                P.O. Box 10985
12                              Tampa, FL  33679

13   (Mr. Doreh)               Ahmed Ghappour, Esq.
                                LAW OFFICES OF AHMED GHAPPOUR
14                              P.O. Box 20367
                                Seattle, WA  98102
15
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
16                              Janis Roberts, Esq.
                                DURKIN & ROBERTS
17                              2446 N. Clark Street
                                Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1          San Diego, California - Wednesday, February 6, 2013

2          (Defendant A. Mohamud is being assisted by a Somali

3    interpreter.)

4               THE COURT:  Good morning, ladies and gentlemen.

5    Good to see everyone.  We have all jurors present, counsel

6    and the parties are present.  Are we ready to proceed?

7               MR. COLE:  Yes, your Honor.  We at this time have a

8    few very brief lay witnesses before Agent O'Very retakes the

9    stand.

10              THE COURT:  Okay.

11              MS. HAN:  Your Honor, the United States is calling

12   Don Willow.

13              THE CLERK:  Can you please raise your right hand.

14   Do you solemnly swear that the evidence you shall give in the

15   cause now before the Court shall be the truth, the whole

16   truth, and nothing but the truth?

17              THE WITNESS:  I do.

18                          Donald Willow

19   was called by the government and testified as follows:

20              THE CLERK:  Can you please state and spell your

21   first and last name for the record.

22              THE WITNESS:  Donald Willow, D-o-n-a-l-d, Willow,

23   W-i-l-l-o-w.

24              MS. HAN:  Thank you, your Honor.

25   ...........

Direct Examination

1

2          BY MS. HAN:  Q.  Good morning, Mr. Willow.

3  A.  Good morning.

4  Q.  How is it that you're employed?

5  A.  I work for Verizon.

6  Q.  And what is it that you do for Verizon?

7  A.  I'm an operations manager.

8  Q.  And I wanted to turn to -- let me ask you this.  Does

9  Verizon keep records on the phone numbers that are owned by

10  Verizon, that belong to Verizon?

11  A.  Yes, they do.

12  Q.  Okay.  And is one of those phone numbers (619)319-4578?

13  A.  That's correct.

14  Q.  And I'm going to show you Government's Exhibit 39, and

15  you have a screen right next to you.  And do you see the

16  (619)319-4578 number there in about the middle of the page?

17  A.  I do.

18  Q.  Okay.  And is that -- does that -- did that phone number

19  have anybody subscribed to it between December of 2007 and

20  August of 2008?

21  A.  It did not.

22  Q.  Okay.

23          MS. HAN:  I have no further questions.  Thank you.

24          THE COURT:  Any cross-examination?

25          MR. DRATEL:  No, your Honor.

1          THE COURT:  Apparently not.  Okay.  Thank you,

2    Mr. Willow.  You're excused.  Next witness, please.

3          MR. WARD:  The government calls Shannon Jenkinson.

4          THE CLERK:  Can you please raise your right hand.

5    Do you solemnly swear that the evidence you shall give in the

6    cause now before the Court shall be the truth, the whole

7    truth, and nothing but the truth?

8          THE WITNESS:  I do.

9                          Shannon Jenkinson

10   was called by the government and testified as follows:

11         THE CLERK:  Can you please state and spell your

12   first and last name for the record.

13         THE WITNESS:  Shannon Jenkinson, S-h-a-n-n-o-n

14   J-e-n-k-i-n-s-o-n.

15                      Direct Examination

16         BY MR. WARD:  Q.  Good morning, Ms. Jenkinson.

17   A.  Good morning.

18   Q.  Where do you work?

19   A.  I work at AT&T.

20   Q.  And what do you do for AT&T?

21   A.  I'm an operations manager.

22   Q.  And, Ms. Jenkinson, in the course of your work at AT&T,

23   are you familiar with the records that AT&T keeps on its

24   customers and the telephone numbers?

25   A.  I am.

1  Q.  And in preparation for your testimony today were you

2  asked to check customer information for four telephone

3  numbers?

4  A.  I was.

5          MR. WARD:  And if we could have Government's

6  Exhibit 39, which is in evidence, and if we could go to the

7  February 13, 2008 transaction.

8          BY MR. WARD:  Q.  There's a monitor right there

9  next to you, Ms. Jenkinson.  Do you see the transactions on

10  February 13, 2008?

11  A.  Yes.

12  Q.  And is the telephone number there (619)746-9342?

13  A.  Yes.

14  Q.  Is that a telephone number that AT&T owns?

15  A.  Check.  I don't know off the top of my head.  I'll have

16  to --

17  Q.  Okay.  Do you have a piece of paper that would help you

18  remember?

19  A.  Yes.

20  Q.  Okay.  And when you say yes, having looked at the piece

21  of paper can you tell whether (619)746-9342 is a number that

22  AT&T owns?

23  A.  Yes, it is an AT&T number.

24  Q.  And did you check to see if there was a customer number

25  that was assigned to that during the year 2008?

1   A.  No, it was not assigned to a customer during that

2   requested time frame.

3   Q.  Okay.  If you could go to the next line in Government's

4   39, which is an April 23 transaction, April 23, 2008, it says

5   Dhunkaal Mohammed Yusuf.  Is the telephone number there,

6   (619)853-4875 --

7   A.  Yes.

8   Q.  -- also another AT&T number that you own?

9   A.  Yes.

10  Q.  And did you check to see if that was assigned to a

11  customer?

12  A.  There were no results found in our database.

13  Q.  Okay.  And continuing further down to the next

14  transaction, which is April 25, 2008, and is there another

15  number there, (619)284-5674?

16  A.  Yes.

17  Q.  And is that another AT&T number?

18  A.  Yes.

19  Q.  And was it assigned to a customer during that time frame?

20  A.  No.

21  Q.  And finally, ma'am, all the way at the bottom of the

22  chart, there's an August 5, 2008 transaction; do you see

23  where it says Omer Mataan?

24  A.  Yes.

25  Q.  And there's a number, (619)464-8250, did you check to see

1   if that's another AT&T number?

2   A.  Yes, it is an AT&T number.

3   Q.  And what were the results of your check as to whether

4   that was assigned to a particular customer?

5   A.  There was no subscriber information available during the

6   requested time frame.

7          MR. WARD:  I have no further questions, your Honor.

8          THE COURT:  Any cross-examination?  Apparently not.

9   Thank you, Ms. Jenkinson.  You are excused.  Next witness,

10  please.

11         MR. WARD:  The government calls Steven Carrillo.

12         THE CLERK:  Can you please raise your right hand.

13  Do you solemnly swear that the evidence you shall give in the

14  cause now before the Court shall be the truth, the whole

15  truth, and nothing but the truth?

16         THE WITNESS:  I do.

17                     Steven Carrillo

18  was called by the government and testified as follows:

19         THE CLERK:  Can you please state and spell your

20  first and last name for the record.

21         THE WITNESS:  Steven Carrillo.  Last name?

22         THE CLERK:  First and last name.

23         THE WITNESS:  S-t-e-v-e-n  C-a-r-r-i-l-l-o.

24         THE COURT:  Thank you, Mr. Carrillo.  It is

25  important for you to speak up, so if you could make the

1  effort and keep that mike a little bit closer to you.  Thank

2  you, sir.

3          THE WITNESS:  Okay.

4                      Direct Examination

5          BY MR. WARD:  Q.  Good morning, Mr. Carrillo.

6  A.  Good morning.

7  Q.  And where do you work, sir?

8  A.  TelePacific Communications, Los Angeles, California.

9  Q.  And is that a telephone service provider for wireless

10  telephones?

11  A.  Yes, for landline and business.  We do cell phones too on

12  the side with Verizon.

13  Q.  Okay.  Does TelePacific keep records of what customers

14  are assigned which account numbers or telephone numbers?

15  A.  Yes, sir.

16  Q.  And in preparation for coming to court today, were you

17  asked to check whether or not there was a customer assigned

18  to a particular telephone number --

19  A.  Yes, sir.

20  Q.  -- that is owned by TelePacific?

21  A.  Yes, sir.

22  Q.  Okay.

23          MR. WARD:  If we could have Government's

24  Exhibit 39, which is in evidence.

25          BY MR. WARD:  Q.  Sir, I wanted to direct your

1   attention to a line on the form -- and there's a monitor next

2   to you if it's easier to read it there -- and the line is

3   dated 7-23-2008.  The sender Isse Guled, and the telephone

4   number is (619)345-8765.  Do you recognize that as a

5   telephone number that TelePacific owns?

6   A.  Yes, sir.

7   Q.  And did you check to see whether or not there was a

8   customer that was assigned to (619)345-8765?

9   A.  Yes, sir.

10  Q.  And what were the results of that check?

11  A.  That number was in our inventory at the time, it was with

12  TelePacific, and it was not assigned to any customers.

13              MR. WARD:  No further questions.

14              THE COURT:  Any cross-examination, counsel?

15              MS. MORENO:  No.

16              THE COURT:  Apparently not.  All right.  Thank you,

17  Mr. Carrillo.  You are excused.

18              MS. HAN:  Your Honor, the United States is next

19  calling Barry Trent.

20              THE CLERK:  Can you please raise your right hand.

21  Do you solemnly swear that the evidence you shall give in the

22  cause now before the Court shall be the truth, the whole

23  truth, and nothing but the truth?

24              THE WITNESS:  I do.

25                           Barry Trent

 1  was called by the government and testified as follows:

 2          THE CLERK:  Please state and spell your first and

 3  last name for the record.

 4          THE WITNESS:  Barry Trent, B-a-r-r-y  T-r-e-n-t.

 5          THE COURT:  Mr. Trent, you're going to have to

 6  speak up and speak directly into the microphone there.  Thank

 7  you, sir.

 8          THE WITNESS:  Okay.

 9                  Direct Examination

10          BY MS. HAN:  Q.  Good morning, Mr. Trent.

11  A.  Morning.

12  Q.  Mr. Trent, how is it that you're employed?

13  A.  I'm self-employed.

14  Q.  And do you run your business out of an office or out of

15  your home?

16  A.  I run it out of my home.

17  Q.  And how is it that you're self-employed?

18  A.  I provide IT services to small businesses.

19  Q.  And as part of your business, do you maintain a fax

20  machine?

21  A.  Yes.

22  Q.  And what is the phone number for that fax machine?

23  A.  (619)465-8968.

24  Q.  And how long have you maintained that phone number as a

25  phone number that you use --

1   A.   Since --

2   Q.   -- for your business?

3   A.   Since July of 1996.

4   Q.   I'm sorry?

5   A.   Since July of 1996.

6   Q.   Okay.  I'd like to show you Government's Exhibit 39,

7   please.  And you have a screen right next to you.  And I'd

8   like to refer you to the second line from the bottom where it

9   states that the sender is Hafsa Mohamed.  Do you see there?

10  A.   Yes.

11  Q.   And do you see your fax number next to Hafsa Mohamed's

12  name as the sender/telephone number?

13  A.   Yes.

14  Q.   Mr. Trent, have you ever been to the Shidaal Express, a

15  money remitting business here in San Diego?

16  A.   No.

17  Q.   Okay.  And do you see there right next to your phone

18  number under a column that says receiver, it says the name

19  Farah Yare?

20  A.   Yes.

21  Q.   Have you ever sent money to Farah Yare?

22  A.   No.

23  Q.   And have you ever sent money to Somalia?

24  A.   No.

25            MS. HAN:  Okay.  I have no further questions.

1           MS. MORENO:  No questions.

2           THE COURT:  All right.  There being no

3   cross-examination, this witness may be excused.  Thank you,

4   Mr. Trent.  You are excused.

5           MR. COLE:  Your Honor, the United States recalls

6   Special Agent Colby O'Very.

7           THE COURT:  All right, sir.  You have been

8   previously sworn and you are still under oath.

9           THE WITNESS:  Yes, sir.

10                          Colby O'Very

11  was recalled by the government, and having been previously

12  sworn, testified as follows:

13                   Direct Examination, cont'd

14          BY MR. COLE:  Q.  Good morning, Agent O'Very.

15  A.  Good morning.

16  Q.  I believe when last we left off, we had finished

17  reviewing Government's Exhibit 171, which was a call

18  transcript dated May 1st, 2008.

19  A.  Yes, sir.

20  Q.  And do you recall that was one of a series of transcripts

21  dated May 1st regarding the missile strike in Somalia?

22  A.  Yes, sir.

23  Q.  If we could now turn to Government's Exhibit 172.  What

24  is the date on this transcript?

25  A.  May 4, 2008.

1              MR. COLE:  And, your Honor, at this time counsel

2     would like to stipulate that although it lists the other

3     speaker as a UM or unidentified male, that speaker is Beefaq,

4     B-e-e-f-a-q.

5              THE COURT:  Agreed, counsel?

6              MS. FONTIER:  Yes, your Honor.

7              THE COURT:  Okay.  Very good.

8              BY MR. COLE:  Q.  Now, so this call on May 4, 2008,

9     do they discuss surveillance and technology?

10    A.  Yes, sir.

11             MR. COLE:  If we could publish this call.

12        (The audio recording was played.)

13             BY MR. COLE:  Q.  Now, if we could turn to

14    Government's Exhibit 173.  Agent O'Very, what's the date on

15    this transcript?

16    A.  May 8, 2008.

17    Q.  And are the speakers identified as Basaaly and Ali?

18    A.  Yes, sir.

19    Q.  If you could look at page 1.  At 4:27 to 4:37, does it

20    state, the speaker being Ali, I understood that you were

21    asking if I can find someone who could replace the man, to

22    replace the man who is gone?

23    A.  Yes, sir.

24             MR. COLE:  If we could publish this.

25        (The audio recording was played.)

1          BY MR. COLE:  Q.  Now, if we can turn to the next

2    exhibit, Government's Exhibit 174.  Is this transcript also

3    dated May 8, 2008?

4    A.  Yes, sir.

5    Q.  And are the speakers again identified as Basaaly and Ali?

6    A.  Yes, sir.

7          MR. COLE:  If we could publish.

8       (The audio recording was played.)

9          BY MR. COLE:  Q.  If we could turn to Government's

10   Exhibit 175.  Agent O'Very, what's the date on this

11   transcript?

12   A.  May 31, 2008.

13   Q.  And if we could -- do you see the reference at the first

14   line of this, 4:22, the reference to Majadhub?

15   A.  Yes, sir.

16   Q.  And is that the name that we've heard earlier as we've

17   been reviewing these transcripts?

18   A.  Yes, sir.

19          MR. COLE:  If we could publish.

20       (The audio recording was played.)

21          BY MR. COLE:  Q.  Now, if we could turn to

22   Government's Exhibit 176.  What's the date on this

23   transcript, Agent O'Very?

24   A.  June 2, 2008.

25   Q.  And the speakers are identified as who?

1  A.  Najib and Basaaly.

2  Q.  And do they discuss Roobow on this call?

3  A.  Yes, sir.

4          MR. COLE:  If we could publish.

5      (The audio recording was played.)

6          BY MR. COLE:  Q.  Agent O'Very, let's turn to

7  Government's Exhibit 177.  What's the date on this

8  transcript?

9  A.  June 16, 2008.

10 Q.  And are the speakers identified as Basaaly and Hassan?

11 A.  Yes, sir.

12 Q.  Before we publish this, if we could look back at

13 Government's Exhibit 175.  Were the same speakers identified

14 on Government's 175 that being or those being Hassan and

15 Basaaly?

16 A.  Yes, sir.

17 Q.  And Government's Exhibit 175, was that the transcript we

18 listened to where there was the reference to the donkeys and

19 the brushwood and the corn?

20 A.  Yes, sir.

21         MR. COLE:  Okay.  If we could now play government's

22 exhibit -- or publish Government's Exhibit 177.

23     (The audio recording was played.)

24         BY MR. COLE:  Q.  Now, Agent O'Very, do you see the

25 reference at line at :54 to you make references about birds?

1   A.  Yes, sir.

2            BY MR. COLE:  Q.  If we could look back at

3   Government's Exhibit 168, and was this also a call where on

4   the transcript the speakers are identified as Basaaly and

5   Hassan?

6   A.  Yes, sir.

7   Q.  And can you read from :24 to :34, identifying the

8   speaker.

9   A.  Sure.  Hassan:  Man, I just heard some news that I am not

10  sure about.  Hum.  There is a rumor that birds targeted the

11  house where Sheikalow, Small Legs, used to stay one hour ago.

12  Q.  Agent O'Very, if we would turn to Government's Exhibit

13  178.  What's the date on this transcript?

14  A.  June 17, 2008.

15  Q.  And the speakers are identified on the transcript as who?

16  A.  Basaaly Moalin and Mohamed Abdi Hassan.

17            MR. COLE:  And if we could publish.

18      (The audio recording was played.)

19            BY MR. COLE:  Q.  And do they go on on this call

20  later, Agent O'Very, to discuss the slingshot?

21  A.  Yes, sir.

22            MR. COLE:  Publish the next clip.

23      (The audio recording was played.)

24  Q.  Turn to Government's Exhibit 179.  What is the date on

25  this transcript, Agent O'Very?

1  A.  June 21, 2008.

2  Q.  And the speakers are identified as -- on the transcript

3  as Hassan and Issa?

4  A.  Yes, sir.

5        MR. COLE:  If we would publish this.

6    (The audio recording was played.)

7        BY MR. COLE:  Q.  Now, if we could turn to

8  Government's Exhibit 180.  Agent O'Very, what's the date on

9  this transcript?

10  A.  July 1st, 2008.

11  Q.  And are the speakers in this transcript identified once

12  again as Basaaly and Hassan?

13  A.  Yes, sir.

14  Q.  And if you could look at page 1 at about :36 to :41,

15  could you identify the speaker and read what's written there.

16  A.  Yes, sir.  Hassan:  Do you believe or you do not that

17  there is eavesdropping and listening going on?

18        MR. COLE:  If we could publish this.

19    (The audio recording was played.)

20        BY MR. COLE:  Q.  If we could turn to Government's

21  Exhibit 181.  Agent O'Very, what's the date of this

22  transcript?

23  A.  July 1st, 2008.

24  Q.  And are the speakers identified as Basaaly and Kay?

25  A.  Yes, sir.

1    Q.  And in the transcript do these speakers discuss someone

2    named Karate?

3    A.  Yes.

4            MR. COLE:  If we could publish.

5        (The audio recording was played.)

6            BY MR. COLE:  Q.  Agent O'Very, if we can look back

7    at page 5 of this transcript, I want to look at -- in a

8    moment I want to look at Government's Exhibit 39 again, but

9    before we do that, page 5 at line 7:03 to 7:13, can you read

10   7:03 to 7:13, identifying the speaker as you go.

11   A.  Yes, sir.  Basaaly:  Yes.  Kay:  He will tell you that

12   name, and when he tells you that name -- Basaaly:  If you

13   want, if you want, you can name me -- I am called Dhunkaal.

14   Do you understand?  Kay:  Yes, I will name you Dhunkaal, yes.

15   Q.  And if you could look at Government's Exhibit 39,

16   looking, for example, at the transaction in February 2013

17   (sic) --

18           MR. COLE:  And if we can highlight those two rows.

19           BY MR. COLE:  Q.  In the sender column, is Dhunkaal

20   -- does Dhunkaal appear in both center columns?

21   A.  Yes.

22   Q.  If we could turn to Government's Exhibit 182.  And what

23   is the date of this call?

24   A.  July 2, 2008.

25   Q.  And is one of the speakers on this transcript identified

1   as Farah?

2   A.  Yes, sir.

3           MR. COLE:  If we could publish.

4       (The audio recording was played.)

5           MR. COLE:  And if we can publish the second clip.

6       (The audio recording was played.)

7           BY MR. COLE:  Q.  If we could turn to Government's

8   Exhibit 183.  What is the date on this transcript?

9   A.  July 8, 2008.

10  Q.  And, Agent O'Very, after a passage listening to Radio

11  Shabelle, is there a notation on page 2 of the transcript

12  where the speakers are identified as Basaaly and Ahmed Nasir?

13  A.  Yes, sir.

14          MR. COLE:  If you could play the first clip.

15      (The audio recording was played.)

16          MR. COLE:  And if we could begin the next clip

17  where it states hey, Ahmed Nasir.

18      (The audio recording was played.)

19          MR. COLE:  Now, if we could publish the next clip.

20      (The audio recording was played.)

21          BY MR. COLE:  Q.  If we could turn to Government's

22  Exhibit 184.  What's the date on this transcript, Agent

23  O'Very?

24  A.  July 8, 2008.

25  Q.  And on this call, as indicated on the transcript, does

1    Hassan speak with Issa, Basaaly, and Mohamed?

2    A.  Yes, sir.

3         MR. COLE:  And if we could publish.

4      (The audio recording was played.)

5         BY MR. COLE:  Q.  Now, Agent O'Very, at this point

6    do you see at line -- on page 6 of the transcript at line --

7    about 5:37 to 5:39 where it says -- Basaaly says hold on, I

8    will pass the phone to Sheik Mohamad?

9    A.  Yes, sir.

10   Q.  And continuing on, is there a point in the conversation

11   where Sheik Mohamad and Hassan discuss that the phones are

12   problematic?

13   A.  Yes, sir.

14        MR. COLE:  If we can continue.

15      (The audio recording was played.)

16        THE COURT:  I think we're at a convenient breaking

17   time for our midmorning recess, ladies and gentlemen, 15

18   minutes.  Remember the admonition.  Thank you.

19      (There was a break in the proceedings.)

20        THE COURT:  Okay.  Everyone is present.  Are you

21   ready to proceed, Mr. Cole?

22        MR. COLE:  Yes, your Honor.

23        THE COURT:  Please.

24        BY MR. COLE:  Q.  Okay.  If we could turn to

25   Government's Exhibit 185.  And on this call, Agent O'Very,

1   are the speakers identified as Basaaly and Issa?

2   A.  Yes, sir.

3           MR. COLE:  If we could publish this.

4           THE COURT:  This is dated July 8?

5           MR. COLE:  Yes, your Honor.

6       (The audio recording was played.)

7           BY MR. COLE:  Q.  Now, Agent O'Very, after this

8   call in which Basaaly and Issa Doreh discuss being not less

9   worthy than the guys fighting, was there a call on July 10,

10  2008?

11  A.  Yes.

12  Q.  And can we turn to Exhibit 186.  And are the speakers

13  identified on the transcript as Basaaly and Ahmed Nasir?

14  A.  Yes, sir.

15          MR. COLE:  If we could publish.

16      (The audio recording was played.)

17          BY MR. COLE:  Q.  Could we turn to Government's

18  Exhibit 187.  Now, what is the date on this transcript?

19  A.  July 11, 2008.

20  Q.  And it looks like there are three speakers identified as

21  Kay, Mahad, and Basaaly, is that right, on the left-hand

22  column identifying the speakers --

23  A.  Yes, sir.

24  Q.  And if we could look at Government's Exhibit 181 -- go

25  back to 181 for a moment.  Was Government's Exhibit 181 a

1   conversation between -- as indicated on the transcript

2   between Basaaly and Kay?

3   A.   Yes, sir.

4   Q.   And turning to page 3 of that transcript at 4:46

5   approximately, was there a reference to a guy by the name of

6   Mahad, Mahad Karate?

7   A.   Yes, sir.

8   Q.   Okay.

9        MR. COLE:   If we could then publish the first

10  portion of Government's Exhibit 187.

11      (The audio recording was played.)

12       MR. COLE:   And if we could play after that greeting

13  if we could play the second clip.

14      (The audio recording was played.)

15       BY MR. COLE:   Q.   Now, Agent O'Very, if you could

16  look back at page 3 of this transcript -- I'm sorry, page 4,

17  Agent O'Very, at about 37:03, do you see where, according to

18  the transcript, Basaaly says, quote, I could send it to him,

19  do not worry Omer Mataan.

20  A.   Yes.

21       MR. COLE:   If we could look at Government's Exhibit

22  39.  If we could highlight the transaction dated July 23,

23  2008, or both transactions on July 23, 2008.

24       BY MR. COLE:   Q.   And do you see the second

25  transaction, Agent O'Very, dated on Government's Exhibit 39,

1    July 23, 2008, where it states Omer Mataan?

2    A.  Yes, sir.

3          MR. COLE:  And if we can come back out, block to

4    the rest of the exhibit.

5          BY MR. COLE:  Q.  According to this exhibit, is

6    that like in the receiver column?

7    A.  Yes, sir.

8    Q.  If we could turn to Government's Exhibit 118.  What's the

9    date of this transcript?  I'm sorry.  Did I say 118?

10   A.  Yes, sir.

11   Q.  I apologize.  Government's Exhibit 188.

12   A.  July 11, 2008.

13   Q.  And on the transcript there in the left-hand column

14   running down the page, how are the speakers identified?

15   A.  Omer and Basaaly.

16         MR. COLE:  And if we could publish this.

17      (The audio recording was played.)

18         BY MR. COLE:  Q.  Now, Agent O'Very, if we could

19   look at Government's Exhibit 39 again, and if we could look

20   at the second transaction on July 23, 2008.  Now, we looked

21   at this a moment ago, and you identified the name Omer Mataan

22   on the exhibit.  What's the city listed next to Omer Mataan's

23   name?

24   A.  Dhusa Mareeb.

25   Q.  And if we can look at the second -- if we can come back

1   out of this exhibit and look at the transaction down -- the

2   last transaction on the exhibit with the date August 5, 2008;

3   do you see that?

4   A.  Yes, sir.

5   Q.  Again, the receiver name on this exhibit?

6   A.  Omer Mataan.

7   Q.  The city?

8   A.  Dhusa Mareeb.

9   Q.  If we could now briefly go back to Government's Exhibit

10  187.

11          MR. COLE:  I failed to publish the last portion of

12  that transcript starting with page 5.  If we could publish

13  that portion.

14      (The audio recording was played.)

15          BY MR. COLE:  Q.  Now, if we could skip ahead to

16  Government's Exhibit 190.  And, Agent O'Very, what is the

17  date listed on this transcript?

18  A.  July 12, 2008.

19  Q.  And are the speakers identified along the left-hand side

20  as Basaaly and Hassan?

21  A.  Yes, sir.

22          MR. COLE:  If we could publish.

23      (The audio recording was played.)

24          BY MR. COLE:  Q.  Now, if we can go to Government's

25  Exhibit 189, does this transcript also indicate a date of

1    July 12, 2008?

2    A.  Yes, sir.

3    Q.  And are the speakers identified on the left-hand column

4    as Basaaly, Hassan, and Ali?

5    A.  Yes, sir.

6              MR. COLE:  And if we could publish.

7         (The audio recording was played.)

8              BY MR. COLE:  Q.  Now, Agent O'Very, after

9    listening to these conversations about an attack on Basaaly's

10   home --

11             MR. COLE:  Can we go back to Exhibit 190 and

12   publish the second portion of that transcript.

13        (The audio recording was played.)

14             MR. COLE:  Your Honor, at this time the government

15   would move to admit Government's Exhibit 141-A, which are

16   bank records, under 902 (11).

17        (Exhibit No. 141-A identified and admitted.)

18             THE COURT:  Exhibit 141-A is admitted.

19             BY MR. COLE:  Q.  Now, Agent O'Very, in the clip we

20   just listened to, starting at page 3 of Exhibit 190, was

21   there a number, a nine-digit number, read off for a car's VIN

22   number?

23   A.  Yes, sir.

24   Q.  And could you state what that number was.

25   A.  166913003.

```
 1              MR. COLE:  And if we could publish -- do it the

 2   fancy way.  If we could publish Exhibit 141-A.  And if we

 3   could go to the second page of this exhibit.  And if we could

 4   zoom in on the account number.

 5              BY MR. COLE:  Q.  Can you see there on this

 6   deposit, copy of the deposit slip, the account number on the

 7   right-hand side?

 8   A.  Yes, sir.

 9   Q.  And can you read the last nine digits of that account

10   number.

11   A.  Yes, it's 166913003.

12              MR. COLE:  And if you could come back out of that

13   to the full screen.

14              BY MR. COLE:  Q.  What is the amount of this

15   cash-in deposit -- or what is the amount stated on this

16   document?

17   A.  $2,000.

18   Q.  And there's reference here to Bridgeton.  Do you see that

19   reference to Bridgeton?

20   A.  Yes, sir.

21   Q.  Do you know where there is a Bridgeton branch or a

22   Bridgeton location near the airport in St. Louis?

23              MR. DRATEL:  Objection, your Honor; that's leading.

24              THE COURT:  The objection is sustained.

25              MR. COLE:  If we can go to page 1, and if we could
```

1    highlight on the top portion of the document.

2           BY MR. COLE:  Q.  What is the name handwritten on

3    the exhibit in this portion?

4    A.  Warsame Saeed Moalin.

5    Q.  If we can go to Government's Exhibit 191.  And what is

6    the date on this exhibit?

7    A.  July 13, 2008.

8           MR. COLE:  And if we could publish the first

9    portion.

10       (The audio recording was played.)

11          MR. COLE:  And if we could publish the second clip.

12       (The audio recording was played.)

13          MR. COLE:  And if we could publish the last portion

14    of this transcript.

15       (The audio recording was played.)

16          BY MR. COLE:  Q.  Agent O'Very, on page 6 of that

17    transcript, down at the bottom at about 34:27 to 34:33

18    approximately, do you see where it states, I mean it will

19    come in -- this is Basaaly:  I mean it will come in, eh, eh

20    installments or small portions if God wills.  It is five

21    cartons?

22    A.  Yes, sir.

23    Q.  If we could look at Government's Exhibit 39.  Do you see

24    the bottom half --

25          MR. COLE:  If we could just zoom to the bottom half

1    of the back, approximately halfway.  Thank you.

2            BY MR. COLE:  Q.  Do you see on Government's

3    Exhibit 39 four different rows involving transactions where

4    the receiver is listed as Farah Yare?

5    A.  Yes, sir.

6    Q.  Now, I'm not going to ask you to -- have you happened

7    to -- I don't know if you have -- have you done the math on

8    those four columns, what they total?

9    A.  I believe I have previously, yes.

10   Q.  Well, I'm not going to ask you to do it now, but --

11   A.  Thank you.

12   Q.  -- let's go on.  Government's Exhibit 192.  What's the

13   date on this transcript?

14   A.  July 17, 2008.

15   Q.  And the speakers are identified on the transcript as --

16   on the left-hand side as Mohamud and Basaaly?

17   A.  Yes, sir.

18   Q.  And if we could look at -- briefly at Government's

19   Exhibit 35, previously admitted, Agent O'Very, do you recall

20   earlier in your testimony when you looked at Government's

21   Exhibit 35?

22   A.  Yes, sir.

23   Q.  And again was that a photograph you took at the Shidaal

24   Express?

25   A.  Yes.

1            MR. COLE:  If we could zoom in on the line that

2   says Mohamud Bossman and highlight that name and number.

3            BY MR. COLE:  Q.  Now, What's the number next to

4   Mohamud Bossman?

5   A.  (619)339-1855.

6   Q.  And looking --

7            MR. DRATEL:  Objection, your Honor; hearsay and 801

8   (d)(2)(E) with respect to Mohamud.

9            THE COURT:  All we have -- well, Exhibit 35 is in

10  evidence.  All we have is a recitation of two pieces --

11           MR. DRATEL:  I'm talking about Government Exhibit

12  192, the tape that the government intends to play in which

13  Mohamud is a -- not Mohamud, the defendant, but another

14  Mohamud is a party to the conversation.

15           THE COURT:  Hold on just for a moment.  The

16  objection is overruled, and 192 is admitted.

17           MR. COLE:  If we can go ahead and publish 192.

18      (The audio recording was played.)

19           BY MR. COLE:  Q.  And if we could turn to

20  Government's Exhibit 193.  What is the date on this

21  transcript?

22  A.  July 18, 2008.

23  Q.  And is it identified as a conversation between Basaaly

24  and an unidentified male?

25  A.  Yes, sir.

1          MR. COLE:  If we could publish.

2       (The audio recording was played.)

3          BY MR. COLE:  Q.  If we could turn to Government's

4   Exhibit 194.  What is the date on this transcript?

5   A.  July 18, 2008.

6   Q.  And, again, is this -- are the speakers identified in the

7   left-hand column as Basaaly and Mohamud?

8   A.  Yes, sir.

9          MR. COLE:  If we could publish.

10      (The audio recording was played.)

11         BY MR. COLE:  Q.  Now, Agent O'Very, looking at the

12  top of page 1 of this transcript we just listened to or just

13  reviewed, is the phone number (619)339-1185 listed?

14  A.  Yes, sir.

15  Q.  Is that the same number we just looked at on Government's

16  Exhibit 35, the Mohamud Bossman number?

17  A.  Yes.

18         MR. COLE:  And, your Honor, for the record the

19  government and defense would like to clarify that this

20  Mohamud identified on this transcript as a speaker is not a

21  defendant in this case, is not one of the defendants.

22         THE COURT:  Okay.  Agreed, counsel?

23         MS. MORENO:  Yes, your Honor.  Thank you.

24         BY MR. COLE:  Q.  And looking at page 2 of the

25  transcript, at the top -- do you see at the top where Basaaly

1    states, Man, another guy and the guys who live in Anaheim?

2    A.  Yes.

3    Q.  See that portion?

4    A.  Yes.

5    Q.  If we could look at Government's Exhibit 61, which I

6    believe was previously admitted.  I'm sorry.

7            MR. COLE:  One second, your Honor.  Let me make

8    sure that was previously admitted before we -- okay.  Yes.

9            BY MR. COLE:  Q.  If we can look at Government's

10   Exhibit 61.  And do you recall Government's Exhibit 61 has

11   subscriber information for a phone in the name of Ahmed

12   Mohamud?

13   A.  Yes, sir.

14   Q.  And what's the -- what city is listed on the address line

15   of this subscriber information?

16   A.  Anaheim.

17   Q.  If we could turn to Government's Exhibit 195.  And what's

18   the date on this transcript?

19   A.  July 18, 2008.

20   Q.  And are the speakers identified on the transcript, the

21   left-hand column, as Basaaly and Ahmed Nasir?

22   A.  Yes, sir.

23            MR. COLE:  If we could publish.

24       (The audio recording was played.)

25            BY MR. COLE:  Q.  Agent O'Very, if you could take a

1   look at page 3 of that transcript at about 2:14 to 2:15

2   approximately, do you see where it indicates that Ahmed Nasir

3   states, Yes, tell him there is five cents with it, it is a

4   thousand and five cents?

5   A.   Yes, sir.

6           MR. COLE:  If we could -- your Honor, at this time

7   the government offers Government's Exhibit 40-A, which is --

8   which are bank records by way of the 902 (11) declaration,

9   Wells Fargo Bank statement.

10          THE COURT:  Exhibit 40-A is admitted.

11        (Exhibit No. 40-A identified and admitted.)

12          MR. COLE:  If we could publish the first page of

13  40-A and highlight on the top half of the document.

14          BY MR. COLE:  Q.  Agent O'Very, can you read the --

15  just name on this account at Wells Fargo.

16  A.   Shidaal Express, Inc.

17  Q.   And the date, the statement end date up on the top right

18  corner?

19  A.   July 31, 2008.

20          MR. COLE:  If we could go to page 3 of Government's

21  Exhibit 40-A and highlight on the transactions on July 18.

22          BY MR. COLE:  Q.  Looking on the July 18 entry, can

23  you tell the jury whether there's a deposit for a thousand

24  and five cents?

25  A.   Yes, sir, there is.

1   Q.  And if we could turn to Government's Exhibit 196.  What's
2   the date on this transcript?
3   A.  July 18, 2008.
4   Q.  And is that the same date that was on the transcript we
5   just reviewed?
6   A.  Yes, sir.
7   Q.  And are the speakers again identified in the left-hand
8   side as Basaaly and Ahmed Nasir?
9   A.  Yes, sir.
10          MR. COLE:  If we could publish.
11      (The audio recording was played.)
12          BY MR. COLE:  Q.  Let's turn to Government's
13  Exhibit 197.  And what is the date on this transaction --
14  excuse me -- the date on this transcript?
15  A.  July 22, 2008.
16          MR. COLE:  And if we could publish.
17      (The audio recording was played.)
18          BY MR. COLE:  Q.  And after this conversation with
19  Omer Mataan -- let's turn to Government's Exhibit 198.  What
20  is the date on Government's Exhibit 198?
21  A.  July 23, 2008.
22  Q.  And are the speakers identified as Basaaly and Issa?
23  A.  Yes, sir.
24          MR. COLE:  If we could publish.
25      (The audio recording was played.)

1           BY MR. COLE:  Q.  Now, Agent O'Very, on this

2    transcript that we just reviewed, there's reference to two

3    cartons allocated for the youngsters; do you recall that?

4    A.  Yes, sir.

5    Q.  And on the previous transcript, 197, there was also

6    reference to two cartons in that transcript?

7    A.  Yes, sir.

8    Q.  If we can look at Government's Exhibit 39 again, bottom

9    quarter of the document.  The two transactions to Omer

10   Mataan, how much do those total?

11   A.  $2,000.

12   Q.  And, finally, if we could look at Government's Exhibit

13   199.  And the date on this is July 24, 2008?

14   A.  Yes, sir.

15   Q.  And again were the speakers identified as Basaaly and --

16   on the transcript as Basaaly and Omer Mataan?

17   A.  Yes, sir.

18           MR. COLE:  If we could publish.

19      (The audio recording was played.)

20           BY MR. COLE:  Q.  Agent O'Very, one last

21   clarification.  I'd like to go back to Government's Exhibit

22   160 for just a moment.  And, Agent O'Very, on page 1 of

23   Government's Exhibit 60 (sic) the speakers are identified as

24   Basaaly and Issa?

25   A.  Exhibit 160, correct?

1  Q.  One-sixty.

2  A.  Yes.

3  Q.  And I just want to clarify.  On page 3 and 4, in addition

4  to Basaaly and Issa, there are references to a speaker named

5  Abdirizak; is that right?

6  A.  Yes, sir.

7          MR. COLE:  No further questions, your Honor.

8          THE COURT:  Okay.  We're just about at noon.

9  Ladies and gentlemen, we'll take our noon recess at this time

10  and resume at 1:30 this afternoon.  Please remember the

11  admonition not to discuss the case or make any decisions at

12  this time.  Thank you.

13      (The jury left the courtroom.)

14          THE COURT:  Counsel, you can allow these gentlemen

15  to take their lunch now?  That's fine.  I just want to talk

16  to counsel for a moment just on scheduling; I assume that

17  that's fine with counsel.

18          MS. FONTIER:  Yes, your Honor.

19          THE COURT:  Okay.

20      (The defendants left the courtroom.)

21          THE COURT:  Okay.  Thank you.  Counsel, I just want

22  to give you an update on getting through the 106 material.

23  Last night and this morning I was able to get through the

24  materials submitted by Mr. Dratel.  I'm still -- I still

25  haven't gotten to Ms. Moreno's material.  Mr. Ghappour, I

1   tried yours last night, and -- I don't know -- I may need to

2   meet with you because I wasn't able to decipher exactly what

3   you were referring to on --

4           MR. GHAPPOUR:  Your Honor, was there not a color

5   copy provided?

6           THE COURT:  Yeah, but it wasn't clear.  Perhaps --

7   I know Mr. Dratel and Ms. Roberts set a pretty high bar in

8   this -- on this particular issue, and what's coming -- what's

9   coming to me, with all due respect, doesn't quite meet that

10  standard.

11          MS. MORENO:  I want Ms. Roberts on my team.

12          MS. FONTIER:  Yes, the color scheme is very, very

13  low.

14          MR. DURKIN:  I just want the record to reflect that

15  I was the one that selected the turquoise.

16          THE COURT:  Well, I candidly am having a little bit

17  of trouble with the others, but, Mr. Ghappour, I may need to

18  defer yours until a little bit later today.  You'll have a --

19  you'll have all of these by the end of the day or early

20  tomorrow morning, okay?

21          MS. FONTIER:  Your Honor, if it may be of

22  assistance and obviously to complete the record as well, we

23  did -- I did submit today an ECF filing.

24          THE COURT:  I saw that.

25          MS. FONTIER:  The PDF there, I actually -- I had it

1    highlighted with -- electronically, so the names are in
2    yellow and red, so it may be easier to discern them.
3             THE COURT:  Yeah, I've been through those already.
4             MS. FONTIER:  Okay.
5             THE COURT:  So there's -- I don't have much of a
6    problem.  I haven't even looked at Ms. Moreno's yet --
7             MS. MORENO:  It's substandard.
8             THE COURT:  -- I'll try to do that over the noon
9    hour, and then I'll --
10            MS. MORENO:  Please don't hold it against me when
11   you're --
12            THE COURT:  No, no.  And then I'll give another
13   shot, Mr. Ghappour, to your submission.  In terms of
14   scheduling --
15            MR. DURKIN:  Judge, could I just -- before we walk
16   away from 106, could I just -- I'm assuming I know the answer
17   to this -- in the government -- one of the tapes that we had
18   offered under 106 was the December 20 tape, and the
19   government had responded to that in their motion and attached
20   it to the -- I think Exhibit A.  And I don't know whether you
21   said this exactly yesterday, but I'm assuming you're denying
22   that one under --
23            THE COURT:  I don't even have it in front of me
24   right now, Mr. Durkin.
25            MR. DURKIN:  If you could just -- again, when

1    you're done with the others, if you could just look at that.

2             THE COURT:  Sure, I'll be happy to revisit yours as

3    well at the next time I go over these --

4             MR. DURKIN:  It wasn't part of what we submitted.

5    It was separately -- we gave it to the government and then

6    the government responded, so it's part of that Exhibit A.  I

7    can give the clerk a copy of it.  It's a separate tape; it's

8    not a portion of one that we already submitted.

9             THE COURT:  Okay.

10            MR. DURKIN:  I'll get --

11            THE COURT:  In other words, you're saying this is a

12   separate -- this is a separate tape that you'd want to come

13   in -- you'd want to introduce in the defense case-in-chief;

14   is that --

15            MR. DURKIN:  Well, I wanted to offer it as 106.

16            THE COURT:  Well, if it's not -- if it's not the

17   same -- if it's not the same tape or the same recording, it

18   wouldn't come in as 106; 106 relates to, you know, the same

19   writing or the same recording.

20            MR. DURKIN:  I don't think so.  There's a --

21   there's an ellipsis in 106 that could include other

22   documents.  I just want to make a record then.

23            THE COURT:  Thank you.

24            MR. DURKIN:  I'll get it to you -- I'll give you

25   the transcript, and then when you're done, we can discuss it

 1   with the third set.

 2           MS. MORENO:  I will alert the Court that out of my

 3   I think four or five 106 submissions, one of them is -- four

 4   of them are parts of government exhibits already.  One of

 5   them is a call that the government is not using, I believe

 6   quite proper under Rule 106, so I'm highlighting that, and

 7   I'd be glad to make a record on that whenever the Court feels

 8   it's appropriate.

 9           THE COURT:  Okay.  In terms of scheduling and

10   timing, will there be cross-examination of the last witness,

11   of Agent O'Very?

12           MR. DRATEL:  Oh, yes, your Honor.

13           THE COURT:  Okay.

14           MR. DRATEL:  I don't know how long.  You know, I

15   think over the lunch break I'll think about it.  If I had

16   more time, I'd write a shorter letter.  So I'll probably be

17   able to do some work on it over lunch that might cut it down

18   some.

19           THE COURT:  Is this the last witness or will there

20   be --

21           MR. COLE:  Yes, your Honor.

22           THE COURT:  You want to agree that after the

23   government rests its case, all parties have brought rule --

24   all defendants have brought Rule 29 motions?  Or do you wish

25   to take a break at that point?  It's going to be pretty

1    shortly into the afternoon.

2              MR. DRATEL:  I think -- I don't know how much --

3    one of the advantages of lunch is we'll make sure we're not

4    duplicative in terms of cross-examination; we'll be able to

5    confer and try to streamline so that we do that.

6              I have -- I guess I'd like to make a Rule 29 as

7    soon as they rest.  I don't know why not.

8              THE COURT:  Okay.  Well, what I'm saying is we can

9    go one of different ways here.  We can agree in advance that

10   at the close of the government's case, all defendants have

11   been deemed to have brought a Rule 29 motion on all counts as

12   to all -- as to each and every defendant named in that count.

13             MR. DRATEL:  And all elements.

14             MS. MORENO:  And all elements.

15             THE COURT:  Yes, that's one way we can do it so

16   your Rule 29 is preserved.  If you wanted to go into

17   argument, however, then that would perhaps create a bit of a

18   different bit of scheduling.  That means, depending upon how

19   long the cross-examination of O'Very is, that we might have

20   to break for a period of time.  If you're just looking so

21   that the argument could be heard, if that's what you're

22   anticipating, some lengthy, argument.  But if not, if you're

23   making a Rule 29 motion to preserve the record, then we can

24   just deem that being appropriately done at this point and

25   then just move into the defense case.

 1              MR. DRATEL:  We're not ready this afternoon, your

 2     Honor.  We're talking about Thursday, tomorrow, moving to the

 3     defense case.  I mean I thought that's what we said earlier

 4     in the week, that we would start Thursday.

 5              THE COURT:  Well, what are you anticipating, just

 6     breaking for the rest of the afternoon?

 7              MR. DRATEL:  Well, I think we'll have another -- I

 8     don't know how much cross other people have, but I think we

 9     have another 45 minutes or an hour with this witness.  I mean

10     he was on for a day and a half on direct at least I think --

11              THE COURT:  Okay.

12              MR. DRATEL:  -- and then -- I can't speak for other

13     counsel.  I know they want to argue Rule 29; I'm pretty sure

14     they want to argue.

15              THE COURT:  Okay.  Then we'll just take it as it

16     comes.  And there's nothing that you can do at this point

17     with respect to your presentation of a case?  You're going to

18     be starting off tomorrow; is that the --

19              MS. FONTIER:  The difficulty is, your Honor, that

20     all of our live witnesses are -- purchased plane tickets, and

21     we've tried to --

22              THE COURT:  No, that's fine.

23              MS. FONTIER:  -- so they are coming.  As to the

24     depositions --

25              THE COURT:  Yes, the depositions.

1           MS. FONTIER:  -- they are being edited and sent

2    back to us as it is.  We have at this point a witness that is

3    completed as far as deposition, but none of us have reviewed

4    the final edit, and the video itself is like well over an

5    hour long, so it's sort of difficult for us to I mean --

6           THE COURT:  The video of one witness you're --

7           MS. FONTIER:  Of that witness, yeah, which is

8    really the only thing that we could sort of begin with.  And

9    it's also not necessarily the order in which we would prefer

10   to play the witness.  And I understand that we're going to

11   have to be amenable to adjusting our preferred order for

12   scheduling issues, but it does need to be reviewed before we

13   just push play.

14          MR. DRATEL:  And, your Honor, I am informed we were

15   starting Thursday morning.  What we have is one in pocket

16   already, we have probably a couple more that are going to

17   arrive.  It's a time-consuming process, and I'm not fully

18   conversant with the technology, but my understanding is that

19   the software that is used there is what's called a rendering

20   process and that it takes hours for the actual video to

21   reload itself in the edited portion.  These are video files,

22   which are obviously more -- they're denser in terms of the --

23   the actual fat.  And so we have one, there are more coming as

24   they are finished, as they get rendered and finished.  So we

25   expect to have a full roster for tomorrow, but they were

1    going to come today and we were going to sort out who would

2    go first and all that, but that's why we thought we were

3    going to carry --

4              THE COURT:  I got it.  I got it.  So tomorrow seems

5    like the best time to begin the case.  With respect to the

6    finished product, the video presentations of the -- of

7    deposition testimony, are you planning on sharing that with

8    the prosecution so that if there are any concerns, they can

9    be raised and that will be in advance of them being --

10             MR. DRATEL:  Yes.

11             THE COURT:  -- shown?

12             MS. FONTIER:  Yes, of course, as soon as we are

13   able to.

14             MR. DRATEL:  We can --

15             MS. FONTIER:  As soon as we have them --

16             MR. DRATEL:  We got one probably about eleven

17   o'clock last night.

18             MS. FONTIER:  I work, you know, sort of as the

19   technological --

20             THE COURT:  Right.

21             MS. FONTIER:  -- I don't even know what either --

22   in a black hole of technology living in the Westgate Hotel.

23   But I think that between the table here, we may be able to

24   just at least burn them onto individual DVDs for the

25   government.

1           THE COURT:  Okay.  If you could do that just as

2    soon as you can so that they have a fair chance to review and

3    to express any concerns or requests, that would be

4    appreciated.

5           MS. FONTIER:  Of course.

6           THE COURT:  Okay.  Well, we'll start up again at

7    1:30.  Enjoy your lunch.  See you then.

8           MR. COLE:  Thank you.

9       (There was a break in the proceedings.)

10          THE COURT:  Good afternoon, everyone.  It appears

11   everyone is present, and we are ready to proceed with

12   cross-examination --

13          MR. DRATEL:  Yes, your Honor.

14          THE COURT:  -- of Agent O'Very.

15          MR. DRATEL:  May I proceed?

16          THE COURT:  Yes.

17          MR. DRATEL:  Thank you.

18                    Cross-Examination

19          BY MR. DRATEL:  Q.  Good afternoon, Agent.  How are

20   you?

21   A.  I'm doing well, sir.  Thank you.

22   Q.  Good.  You still have your binder?

23   A.  Yes, sir.

24   Q.  Okay.  Let's go back to the beginning.  Government

25   Exhibit 120, please.  If you look at page 2 at 4:54, do you

1   see that?

2   A.   Yes, sir.

3   Q.   And it says -- it's in italics, it's preceded by an

4   "S.C.," and it says "Curbside Southwest"?

5   A.   Yes, sir.

6   Q.   It's probably a customer, right, getting in or out of the

7   taxicab?

8   A.   Yes, sir.

9   Q.   So Mr. Moalin is on the phone here while he's driving his

10  taxi, right?

11  A.   Yes, sir.

12  Q.   And, in fact, throughout the calls we hear a lot of

13  either side conversation or, for example, the sound of a seat

14  belt alarm, things like that?

15  A.   Yes, sir.

16  Q.   Now, also in that same conversation, Government's Exhibit

17  120, which is what, December 21, 2007, right?

18  A.   Yes, sir.

19  Q.   If you look at the top of page 3, 6:10, there's a

20  reference to someone named Sahal, right?

21  A.   Yes, sir.

22  Q.   S-a-h-a-l.  And if you look at 6:14, Mr. Moalin says,

23  From Sahal, eh, from Sahal's side, I don't have any other

24  problem, but I mean if he can send a detailed -- I mean

25  there's not a problem to help harmed and orphaned people.

1   And if you can read what Sheikalow says next at 6:30.

2   A.   What you want is to send you the number of allocated

3   families with their names and their phone numbers, correct?

4   Q.   Basaaly:  Yes, to send us their names, the family size,

5   and where they're located, eh, so that each person can choose

6   a family and say I will assist this family, you know?  The

7   people are happy with that.  And if you could continue with

8   Sheikalow.

9   A.   Okay.

10  Q.   Basaaly:  And right now this is what the people are very

11  interested about and we can reach them with it.

12            Now, if you go down to 6:56, you see that Basaaly

13  mentions -- he says, Iftin school with ILAYS that.  Right?

14  A.   Yes, sir.

15  Q.   And Iftin is I-f-t-i-n in the transcript, right, and

16  ILAYS is I-L-A-Y-S (sic), right?

17  A.   Yes, sir.

18  Q.   And ILAYS is a Somali charity?  Do you know?

19  A.   I'm not familiar with that.

20  Q.   And continuing on, Basaaly says:  What was it, for the

21  region?  We are setting a management structure from here, and

22  we are involved in setting for the entire area where the clan

23  hails from and lives in.  I just -- do you know what clan

24  he's talking about there?

25  A.   Yes, sir.

1    Q.   What clan?

2    A.   Most likely the Hawiye.

3    Q.   And the Ayr subclan is his subclan?  Do you know?

4    A.   I believe so, yes.

5    Q.   A-y-r, right?

6    A.   Yes.

7    Q.   Continuing as Basaaly:  About the other thing, I talked

8    with the cleric about it.  Okay?  Right?

9    A.   Yes.

10   Q.   Okay.  And that's in the transcript.  Now, do you speak

11   Somali?

12   A.   I do not.

13   Q.   So let's move on to Government's Exhibit 123.  Now,

14   towards the bottom of page 1, do you see a string of

15   asterisks?  Right?

16   A.   Yes, sir.

17   Q.   And that indicates that there's a part of this call

18   that's been taken out and edited, right?

19   A.   Yes, sir.

20   Q.   So it doesn't appear in the transcript --

21   A.   That is correct.

22   Q.   -- in this version of the transcript, right?

23   A.   Yes, sir.

24   Q.   Do you know how long that section is?

25   A.   Approximately four minutes based on the time markings.

1    Q.  So the counter on the left will give us a sense of just

2    how much is cut out?

3    A.  Yes, sir.

4    Q.  Okay.  And did you decide what to -- how to edit these?

5    A.  No, sir.

6    Q.  And have you ever seen the initial verbatim transcripts

7    that were prepared for either -- other parts or the entire

8    conversation that's not in these transcripts?

9    A.  I saw some different variations, but I can't speak to

10   whether or not I saw a different variation of this exact

11   phone call.

12   Q.  And have you seen different versions of these transcripts

13   over time as they are edited?

14   A.  Yes, sir.

15   Q.  Sometimes changing words, sometimes cutting out passages;

16   is that fair to say?  I'm sorry.  Not necessarily this one in

17   particular, I'm talking generally.

18   A.  Yes, sir.

19   Q.  And at the end of the conversation, on page 2 at the

20   bottom, says 6:11, right?

21   A.  Yes.

22   Q.  And then we have another string of asterisks, which means

23   that the conversation continued, right?

24   A.  I'm not sure if it ended right there or if the

25   conversation continued.

1   Q.  Well, let's just -- for a second just assume -- just in

2   terms of the process, there are some calls where the call

3   continues after the transcript, right?

4   A.  Yes, sir.

5   Q.  And there's no way to tell just from the transcript how

6   long that is, right, because we don't have a counter that

7   goes till the end of the call on the transcript, right?

8   A.  Yes, sir.

9   Q.  If we can go to Government's Exhibit 128, please, and if

10  we go to page 2, that's another one that's cut off, right?

11  A.  Yes, sir.

12  Q.  And do you know whether this conversation continues or

13  not?

14  A.  I'm not sure.

15  Q.  You're not sure.  Go to Government's Exhibit 130, and

16  just go to page 4 first, please.  See the asterisks there,

17  right?

18  A.  Yes, sir.

19  Q.  There's another section that's been edited out, right,

20  about two minutes?

21  A.  Yes, sir.

22  Q.  And let's go back to page 1.  Mr. Moalin says he's tired

23  and went to sleep, right, at 3:07?

24  A.  Yes, sir.

25  Q.  And let's go to 825, which is on page 4 of the

1    transcript, has Mr. Moalin, Basaaly, saying, Today it is you,

2    the reliberation, the Shabaab, and the public, all of you

3    need each other, everyone that is shooting these men.  Right?

4    A.  Yes, sir.

5    Q.  And right after the word "you," it says "the

6    reliberation."  Right?

7    A.  Yes, sir.

8    Q.  And then there's a semicolon there, right?

9    A.  In between "you" and "the"?

10   Q.  Yes.

11   A.  Yes, sir.

12   Q.  And that's put there by the linguist, the person who

13   prepared the transcript, right?

14   A.  Yes.

15   Q.  You don't -- do you know whether or not someone in

16   Somalia said "semicolon"?

17   A.  I don't believe so.

18   Q.  So if you read it straight through without a semicolon,

19   it says Today it is you the reliberation.  Right?

20   A.  Yes, sir.

21   Q.  And then at 8:59 -- we'll start at 8:49, Basaaly says:

22   They are people who inhabit that area and the reliberation

23   gets support there and the Shabaab receives their biggest

24   support there as well.  Right?

25   A.  Yes, sir.

1  Q.  Now, he's talking -- that's a conversation with

2  Sheikalow, right --

3  A.  Yes.

4  Q.  -- if you want to go back and check.  Right?  It's a

5  conversation between Basaaly and Sheikalow, right?

6  A.  Yes.

7  Q.  So that's what he's telling Sheikalow?

8  A.  Yes, sir.

9  Q.  Go to Government's 130, please.  I'm sorry.  That was

10  130.  My apologies.  131.  Again, if you go to page 3, we

11  have asterisks, correct --

12  A.  Yes, sir.

13  Q.  -- indicating that there's been some editing, and then

14  again at page 7, right?

15  A.  Yes, sir.

16  Q.  And then there are more asterisks at page 9, right?  So

17  you don't know whether that means there's more to the call or

18  not, right?

19  A.  That is correct.

20  Q.  And in that call Mr. Moalin says he has a cold, right, on

21  2:36 to 2:39?

22  A.  Yes, sir.

23  Q.  And if we go to page 4, please, at -- I'm sorry.

24  Actually it's not 4, it's -- oh, yes, 10:07 on page 6.  If

25  you see that sentence, that's Basaaly saying, Currently

1  everyone, including my children, er, er, is at Eelka Biyaha.

2  Right?

3  A.  Yes, sir.

4  Q.  Do you know what Eelka Biyaha is?

5  A.  I do not.

6  Q.  And if you go to 10:39, this, again, is a conversation

7  with Sheikalow, right?

8  A.  Yes, sir.

9  Q.  And Sheikalow says, No one would know.  How could anyone

10  know if the house is used only during the nights?  Right?

11  That's what Sheikalow says to Basaaly?

12  A.  Yes, sir.

13  Q.  So it's fair to say he feels comfortable at night there?

14  A.  Yes, sir.

15  Q.  Go to Government's 135, please.  Are you there?  Okay.  I

16  still hear some pages; I'll wait in case the jury needs to

17  get there as well.  At the beginning there are asterisks at

18  the top, right, and that means that about four minutes of

19  conversation, right, that's been eliminated from this

20  transcript?

21  A.  Yes, sir.

22  Q.  Okay.  And also in the sense of, you know, we have a call

23  January 18 -- that's Government's Exhibit, you know, 135.

24  Just going back to 1:34 for a second, that's January 15,

25  right?

1   A.  Yes, sir.

2   Q.  But there are many calls in between that aren't in this

3   binder, right?

4   A.  Maybe.  They're -- in between these two calls?  I'm

5   not -- I'm not sure.  There are -- there were many calls that

6   were not included in the binder.

7   Q.  Right.  And what I'm saying is all the calls --

8   withdrawn.  Government's 136, please.

9           THE COURT:  Hold on just for a second.  There's a

10  phone going off on the back.  All right.  Anyone who has a

11  phone, make sure that it is off, please.  Thank you.  Not

12  just vibrate, but off, in the off position.  If there are any

13  further cell phones going off, we're going to have to ask you

14  to remove yourselves from the courtroom.  Thank you.

15          MR. DRATEL:  Thank you, your Honor.

16          THE COURT:  Mr. Dratel?

17          BY MR. DRATEL:  Q.  Okay.  Government's 136, which

18  is January 20, 2008, right?  And this is Mr. Moalin and

19  Sheikalow, right?

20  A.  Yes, sir.

21  Q.  And if we go to 28:27 -- and, again, there are asterisks

22  but -- well, let's go to 28:27.  And Sheikalow says --

23  withdrawn.  We'll start at 28:25.  I'll read Basaaly, and if

24  you could read Sheikalow.  Basaaly:  I'm talking about the

25  one from Asmara.

1    A.   Sheikalow:  Do you know about the previous disagreement,

2    the one that split us in two factions?

3    Q.   Thank you.  And then at 30:07, which is the next page,

4    and the transcript attributes to Sheikalow:  And we, the

5    Shabaab, have a political section, a military section, and a

6    missionary section.  Right, that's what the transcript says?

7    A.   Yes, sir.

8    Q.   But you don't know that's what's actually on the -- in

9    the conversation, right, because it's in Somali?

10   A.   I believe on this call I did hear the sword "Shabaab"

11   from the audio, but don't -- I can't speak to the actual

12   audio --

13   Q.   So you understand --

14   A.   -- because I do not --

15   Q.   So you understand Somali well enough?

16   A.   No, but what I'm saying is I believe in this call I did

17   hear the word "Shabaab" specifically.

18   Q.   Do you know where you heard it?

19   A.   Just when we were following along.  There were a couple

20   of places where "Shabaab" was mentioned, where I could pick

21   out the word "Shabaab."

22   Q.   And you know all the words around it?

23   A.   No, sir.

24   Q.   None of the words around it?

25   A.   None of them.

1   Q.   And you were relied on for your language skills?

2   A.   No, sir.

3   Q.   So as you sit here now, you can say it says, "and we, the

4   Shabaab"?

5   A.   No.   I could -- I could speak to if I could hear

6   "Shabaab," but the words around it, no.

7   Q.   Now, if you go to 33:21 on the next page, please, there

8   Sheikalow says at 33:24, How can we sit with someone who's

9   looking for us, killing us and claiming he is fighting

10  terrorists.   Right?

11  A.   Yes, sir.

12  Q.   And then at 33:21 at the end of the line, it says, I

13  prefer Abdullahi Yusuf because he is a powerful man who is

14  working with the Ethiopians and not with them.   Right?

15  That's what he says, right?

16  A.   Yes, sir.

17  Q.   At 40:29 of this same call, please -- that's page 8 --

18  withdrawn.   Go to 40:40.   Sheikalow says:   We want to support

19  the insurgent with it.   Right?

20  A.   Yes, sir.

21  Q.   And he's talking about money, right.   Referring back to

22  that earlier section of 40:29.   Right?

23  A.   Yes, sir.

24  Q.   Let's go to 141, please.

25  A.   You said 141?

1    Q.  141, yes.  And that's another one where the beginning of

2    the conversation is deleted in the transcript --

3    A.  Yes, sir.

4    Q.  -- right?  And this is between Mr. Moalin and Sahal,

5    right?

6    A.  I'm not sure.

7    Q.  Does it say Sahal as the other person he's talking to in

8    the transcript?

9    A.  Is that one that was stipulated?

10   Q.  Yes, yes.  Well, it might be --

11   A.  In mine it says --

12   Q.  -- in another transcript --

13            THE COURT:  Hold on, hold on, gentlemen.  You're

14   speaking over one another.  I think the witness had a

15   legitimate question, whether that was a stipulation.

16            MR. DRATEL:  I understand.

17            THE COURT:  Was it?

18            MR. COLE:  Yes.

19            MR. DRATEL:  Yes.

20            THE COURT:  Okay.

21            MR. DRATEL:  But I understand it doesn't say so on

22   his copy.

23            THE COURT:  Okay.

24            BY MR. DRATEL:  Q.  And you need to go back to 120

25   or do you remember we talked about Sahal in Government's

1    Exhibit 120, right?

2    A.  Yes, sir.

3    Q.  And the conversation about orphans and wounded people,

4    right?

5    A.  Yes, sir.

6    Q.  And this is a February 10, 2008 conversation with

7    Mr. Moalin, right, and Sahal?

8    A.  Yes, sir.

9    Q.  Go to Government's 144.  February 17, 2008 between

10   Mr. Moalin and someone named Bashir Dini.  Do you have that

11   on the transcript?

12   A.  Yes, sir.

13   Q.  And this covers about 20 seconds of a conversation,

14   right?

15   A.  Yes, sir.

16   Q.  And asterisks at the bottom, right?

17   A.  Yes, sir.

18   Q.  Do you know whether this conversation continues or not?

19   A.  No, sir.

20   Q.  You don't recall ever seeing a different version of this?

21   A.  Not that I can recall.

22   Q.  Or an additional part of the conversation?

23   A.  No, sir.

24   Q.  Now, let's go to 148, please.  This is a March 20, 2008

25   telephone call.  The parties are Mr. Moalin and Mohamed

1   Dhimbil, right?

2   A.   Yes, sir.

3   Q.   And it's essentially a radio broadcast, right?

4   A.   Yes, sir.

5   Q.   And there's -- starting at 2:10, Roobow begins to speak,

6   right?

7   A.   Yes, sir.

8   Q.   And he says, starting at 2:17, We are happy to hear that

9   the Americans added us to the list of international terrorist

10  organizations as you said.   We are happy that the Americans

11  added us to the terrorists, whatever their intention might

12  be.   Right?

13  A.   Yes, sir.

14  Q.   Okay.   Want to take you back to 136 again, and this is

15  again a call between Sheikalow and Mr. Moalin, right?

16  A.   Yes, sir.

17  Q.   Just -- at 33:24, if you can read that sentence that

18  starts with "how can we sit."   This is Sheikalow speaking,

19  right?

20  A.   Yes, sir.

21  Q.   Okay.   If you can just read that sentence.

22  A.   How can we sit with someone who is looking for us,

23  killing us and claiming he is fighting terrorists?

24  Q.   Thank you.   At Government's 49 -- 149, at :30, bottom of

25  the page, Sheikalow says, You have disappeared these days, to

1  Mr. Moalin?

2  A.  Yes.

3  Q.  Right.  Then on the next page -- sorry, this -- I'm

4  sorry.  150, now we're on to 150.  Look at page 2.

5  Withdrawn.  This is again -- this is an April 12, 2008

6  conversation between Sheikalow and Mr. Moalin, right?

7  A.  Yes, sir.

8  Q.  And if we look at page 2, 1:04, if you could read what

9  Basaaly says there, and I'll be Sheikalow on this one.

10  A.  I am doing very well except the drought and the

11  difficulties that people are facing, and the fighting.

12  Q.  Yes. And Basaaly continues.

13  A.  Which affected me financially and mentally.  Other than

14  that, it is beautiful.  I am doing great.

15  Q.  Now, let's go to 1:56.  Sheikalow says, The help for the

16  drought is over, so now it is the time to finance the jihad.

17  Right?

18  A.  Yes, sir.

19  Q.  Do you know whether "finance the jihad" is a correct

20  translation or not?

21  A.  No, sir.

22  Q.  But it says now -- but the transcript says "now is the

23  time," right?

24  A.  Yes, sir.

25  Q.  This is April 12, 2008, right?

1   A.   Yes, sir.

2   Q.   And that's Sheikalow speaking to Mr. Moalin.  Let's go to

3   4:50.  This is Sheikalow talking to Mr. Moalin still, right?

4   A.   Yes, sir.

5   Q.   And Sheikalow says, starting at 4:55, you did not join

6   the jihad and now you started building a mosque?  Right?

7   A.   Yes, sir.

8   Q.   That's the past tense, right?  "You did not join the

9   jihad."  Right?

10  A.   Yes, sir.

11  Q.   Let's go to 6:04 in that same call, please.  Now, it's

12  still Sheikalow, but he's actually talking to someone named

13  Mohamud, right?

14  A.   Yes, sir.

15  Q.   And just to be clear, it is not the defendant Mohamad

16  Mohamud, right?  It's a different Mohamud?

17  A.   Yes, sir.

18  Q.   And at 6:04 he says, Why do you not come and join the

19  jihad and do your -- and do your part in killing the

20  non-Muslims?  Right?

21  A.   Yes, sir.

22  Q.   Let's go to 161, please.  April 24, 2008, right?

23  A.   Yes, sir.

24  Q.   And it's Mr. Moalin and Sheikalow again, right?

25  A.   Yes, sir.

1   Q.  And at 1:50, which is page 2 -- and just as a -- as a

2   prefatory question there, they're talking about the hawala

3   transfers, right?

4   A.  Yes.

5   Q.  And Mr. Moalin says, They will break it because they do

6   not want to show the -- I'm sorry.  Withdrawn.  Let me start

7   again.  They will break it because they do not want to show

8   that the transfer was one, so it is possible that they broke

9   it into transfers of 1,000, but the name of the recipient is

10  the same.  Right, he says that?

11  A.  Yes, sir.

12  Q.  And let's go now to 164, Government's Exhibit 164.  At

13  1:37, Basaaly says, Yes, naturally -- withdrawn.  He also was

14  talking about transfers here, right?  Go ahead and look.  You

15  can look back.  I just want to set it so that there's

16  context.

17  A.  Yes, sir.

18  Q.  And Basaaly says, Yes, naturally, one place, even when I

19  am sending money personally, which is more than one stone.

20  Right?

21  A.  Yes, sir.

22  Q.  And then Sheik Mohamad says, It was sent in installments,

23  that is what they did.  Right?

24  A.  Yes, sir.

25  Q.  And Basaaly answers, Yes, it is like that, so the

1  situation is like that, it is like that.  Right, that's

2  what's in the transcript?

3  A.  Yes, sir.

4  Q.  And at 165, Government Exhibit 165, it's at the very

5  bottom of page 2 beginning with line 3 and at :10, and it's

6  Basaaly again speaking to Sheikalow, right?

7  A.  Yes, sir.

8  Q.  And I'm sorry.  It's April 25, 2008, right?

9  A.  Yes, sir.

10 Q.  Okay.  And they're still talking about transfers; fair to

11 say?  You can look at the rest of the conversation if you

12 like.

13 A.  Yes, sir.

14 Q.  Okay.  And at 3:10 he says -- Basaaly says, I mean they

15 do not charge us the fee that they normally charge people.

16 Right?

17 A.  Yes, sir.

18 Q.  Now, let's go to Government's 167, please.  This is a --

19 this is an April 27, 2008 conversation, right?

20 A.  Yes, sir.

21 Q.  The parties are Mr. Moalin and Mohamad Mohamad Mohamud,

22 right?

23 A.  Yes, sir.

24 Q.  And there's a couple of mentions here -- and I can point

25 them out to you on 3:47, which is page 2 -- where Basaaly

1  says, starting at 3:42, Man, listen, we did not understand

2  each other since everyone uses codes.  Right?

3  A.  Yes, sir.

4  Q.  And then down at the bottom at 4:21, Basaaly says, So I

5  told him naturally we didn't understand each other.  Every

6  group uses a different code.  Right?

7  A.  Yes, sir.

8  Q.  And also in this conversation from the very beginning,

9  there's a lot of laughter indicated in the transcript between

10 Mr. Mohamud and Mr. Moalin, right?

11 A.  Yes, sir.

12 Q.  And if we can just -- let's start at 3:07, right?  Right?

13 A.  Yes.

14 Q.  Laughing?  And then at 3:23 at the end of the line,

15 laughing?

16 A.  Uh-huh.

17 Q.  Then 3:29, right?

18 A.  Yes, sir.

19 Q.  3:32, right?

20 A.  Yes, sir.

21 Q.  3:40 -- I'm sorry -- 3:36?

22 A.  Yes.

23 Q.  3:48?

24 A.  Yes, sir.

25 Q.  Four minutes?

1    A.   Yes.

2    Q.   And then 4:07?

3    A.   Yes, sir.

4    Q.   And then finally 4:31 at the top of the next page,

5    page 3, right?

6    A.   Yes, sir.

7    Q.   Let's go to 168, please, Government's 168.  Now, this

8    conversation is May 1st, 2008, right?

9    A.   Yes, sir.

10   Q.   It's the first conversation in evidence with respect to

11   any notification with Mr. Moalin that Sheikalow, someone said

12   Sheikalow may be in a house that was -- that there was an

13   explosion, right?

14   A.   Yes, sir.

15   Q.   And so if you read just at 1:08 at the end of the

16   conversation what Mr. Moalin says.

17   A.   All right.  If God wills.

18   Q.   Let's go to 177.  Now, this is a conversation between

19   Mr. Moalin and we'll call the other party Hassan, okay,

20   because that's what's in quotes there, right?  This is

21   June 16, 2008, right?

22   A.   Yes, sir.

23   Q.   And at :59 Mr. Moalin says, So give people

24   straightforward information.  Right?

25   A.   Yes, sir.

1    Q.  And there's a series of conversations in which Mr. Hassan
2    doesn't want Mr. Moalin to speak, right?  Sorry, speak
3    straightforward.
4    A.  Yes, sir.
5    Q.  And Mr. Moalin's response is, Give people straightforward
6    information, man.  Right?
7    A.  Yes.
8    Q.  In this conversation?
9    A.  Yes, sir.
10   Q.  Let's go to 178, please.  This is again Hassan and
11   Mr. Moalin, right?
12   A.  Yes, sir.
13   Q.  June 17, 2008, at 1029, which is page 3.  And after the
14   asterisks they're talking about someone named Omer, right?
15   A.  Yes, sir.
16   Q.  After the asterisks in the middle of page 3 --
17   A.  Yes, sir.
18   Q.  -- right?  And so Basaaly asks, So Omer is from the elder
19   group.  Right?
20   A.  Yes, sir.
21   Q.  And Hassan answers, Yes, he is from the elder group, but
22   he is one of the people who firmly believe in continuing
23   carrying a slingshot and not -- and then there's a -- it's
24   not clear, but then there's -- I guess Basaaly talks over
25   him, right?

1  A.  Yes, sir.

2  Q.  But he says, Yes, he is from the elder group?

3  A.  Yes, sir.

4  Q.  Now, let's go to 180, please, Government's 180.  And

5  again, Hassan and Mr. Moalin, right?

6  A.  Yes, sir.

7  Q.  July 12, 2008.  At :36 Hassan asks, do you believe or do

8  you not that there is eavesdropping and listening going on?

9  And Basaaly answers, I -- I know it, yes.  Right?

10 A.  Yes, sir.

11 Q.  Then he asked, Why are you talking to me?  I'm sorry.

12 Hassan asks, Why are you talking to me as if we're in Adaado

13 and Guraceel, respectively.  Right?

14 A.  Yes, sir.

15 Q.  And Basaaly says, Um, it is okay.  Right?

16 A.  Yes, sir.

17 Q.  Let's go to 181, please, at 3:18, which is the bottom of

18 page 1.  Well, let's start at 3:11.  This is July 1st, 2008.

19 Basaaly's speaking to someone named Kay, right?

20 A.  Yes, sir.

21 Q.  Basaaly says, It has not been possible for me, man.  I

22 was not able to make contact with anyone.  One person is

23 unavailable, a call with no answer, change telephone numbers,

24 they even changed the telephones.  And Kay says, It is so.

25 Right?

1   A.  Yes, sir.

2   Q.  Now, on 4:15, top of page 3, same call.  Okay.  He's

3   asked about whether -- withdrawn.  Kay asked Basaaly whether

4   Basaaly knows a guy, Karate, right?

5   A.  Yes, sir.

6   Q.  And Basaaly says, Yes.  Right?

7   A.  Yes, sir.

8   Q.  But then he says, Karate Abdi Gab, at 4:22.  Right?

9   A.  Yes, sir.

10  Q.  And clearly that's not the same one that Kay is talking

11  about, correct?

12  A.  Yes, sir.

13  Q.  And Kay tries to explain to him who he's talking about,

14  Mahad Karate, right?

15  A.  Yes, sir.

16  Q.  And then Basaaly goes, No man, another Karate, at 4:52.

17  Right?

18  A.  Yes, sir.

19  Q.  And finally, the next page, he explains to Basaaly who he

20  is, right?

21  A.  Yes, sir.

22  Q.  Let's go to 182, please, Government's 182, July 2, 2008.

23  And Farah Yare is on this call, right?

24  A.  Yes, sir.

25  Q.  And let's go to -- sorry.  One second.  Okay, 1:39.  All

1  right.  This is Farah speaking.  All right?

2  A.  Yes, sir.

3  Q.  And see at 1:44 towards the end of the line, sentence,

4  The enemy, the enemy who came to our area had 1,000 men and

5  30 vehicles.  They were the type of military brigade that

6  moves around in different areas.  Right?

7  A.  Yes, sir.

8  Q.  And then he describes some areas including, at 2:09,

9  Guraceel and Dhusa Mareeb, right?

10  A.  Yes, sir.

11  Q.  And then he says they are a mobile brigade that moves

12  around, they are well-known military platoon.  Right?

13  A.  Yes, sir.

14  Q.  And then let's go to 3:40.  And this is still Farah

15  speaking, right?

16  A.  Yes, sir.

17  Q.  Recall that these are the same people who used to stay in

18  Guraceel for six months and live as they wished and used to

19  behave in a bad manner.  So that stopped happening.  The

20  chief's phone was switched off, and he went to the

21  countryside, and none of the elders went to them.  So we made

22  a decision to wage war against the men.  That's what --

23  right, that's what's in this transcript?

24  A.  Yes, sir.

25  Q.  If you go to the next page at 4:42.  Farah Yare still,

1    and he says, And we warned the people in town to sleep that

2    night and then in the morning purchase anything they could

3    and then leave the town with their children.  Everyone had to

4    flee and vacate the town.  We warned the people in the town

5    that they should leave within two days.  We gave them a

6    maximum of three days and a minimum of one day.  Right?

7    A.  Yes, sir.

8    Q.  And then further down, 5:19, at the end of the line

9    starting with "the," Farah Yare says, The youth who weren't

10   in our control attacked them in the first day.  Right?

11   A.  Yes, sir.

12   Q.  Then he continues, They made a mistake because they

13   attacked while the enemy was on guard and before

14   reconnaissance was conducted.  Right?

15   A.  Yes, sir.

16   Q.  And then further down, 5:47, it says, They shelled the

17   town during that night, and in the morning people started

18   fleeing, people started fleeing in the morning.  Right?

19   A.  Yes, sir.

20   Q.  Now, at 6:19, Also we requested the religious men,

21   originally from this region, whom we sent and were currently

22   engaged in the fighting at Buulobarde.  Right?  Well, trying

23   on the pronunciation of one word.  Go with mine for a while,

24   is that all right, since everybody has a transcript?

25   A.  Yes, sir.

1    Q.   Okay.  B-u-u-l-o-b-a-r-d (sic) for the court reporter.

2    And then dash, dash Hiiraan, H-i-r-a-a-n (sic), right?

3    A.   Yes.

4    Q.   Right?  Says that?

5    A.   Yes, sir.

6    Q.   Okay.  Go to on the bottom of the next page, page 5.

7    Let's go to the middle -- I'm sorry -- let's go to 8:06, the

8    middle of that page.  At the end of that line it says, They

9    settled down very well, so we assumed that they wanted to

10   shell the town.  Therefore, we decided to attack them from

11   three fronts far away from the town, to attack them from the

12   Matabaan side by going around them.  Right?

13   A.   Yes, sir.

14   Q.   And then at the bottom, if you look at 9:17, he says, The

15   situation changed and our army was forced to follow them and

16   attack the Ethiopians from the rear.  Right?

17   A.   Yes, sir.

18   Q.   Go to the next page, page 6.  If I look at -- starting

19   with 10:07, right?  We caught up with them -- and again, this

20   is Farah Yare speaking, right?

21   A.   Yes, sir.

22   Q.   Okay.  We caught up with them and we truly destroyed

23   them.  The youth that were here with us also hit them from

24   another side, and we trusted to hold their side.  We were

25   more than the youth, and we covered both most of lines.  The

1   youth fought for three minutes and left.  That resulted in

2   some of our brothers being exposed to danger, and the enemy

3   came around and killed some of our men like Professor Asporo

4   and others, although they fought well.  Right, that's what it

5   says?

6   A.  Well, in the transcript it says young guys, and you said

7   youth.  But other than that, yes.

8           THE COURT:  What does your transcript say, Mr.

9   Dratel?

10          MR. DRATEL:  It says youth.

11          THE COURT:  Okay.  Mine says young guys as well.  I

12  imagine the others do too.  That's fine.  I just wanted to

13  make that clear.  I didn't clarify that or ask for

14  clarification earlier, but I believe the witness is correct.

15          MR. DRATEL:  I'm working off a book given to me by

16  the government three days ago, your Honor --

17          THE COURT:  Fine.

18          MR. DRATEL:  -- or a week -- whenever trial

19  started.

20          BY MR. DRATEL:  Q.  So this has been edited since

21  the trial started?

22  A.  I don't know, sir.

23  Q.  Were you here in court when Mr. Bryden -- yesterday when

24  Mr. Bryden testified, when he interrupted your testimony and

25  testified about someone named Asporo and his death?

1    A.   No, sir.

2    Q.   Now, just go back to 10:50.  Farah Yare says, Killed some

3    of our men like Professor Asporo.  Right?

4    A.   Yes, sir.

5    Q.   Go to 15:40.  I'm sorry.  Let's start at 15:30, 15:30,

6    page 7.

7           MS. MORENO:  Excuse me, your Honor.  There's a

8    juror with her hand up.

9           THE COURT:  Yes, Ms. Freni?

10          JUROR NO. 9:  I'm missing page 7.

11          THE COURT:  You're missing page 7?  We'll get a

12   page 7 to you.  Thank you.

13          MR. DRATEL:  Thank you, your Honor.

14          BY MR. DRATEL:  Q.  15:30, Sheik Mohamad says, I

15   think they are called the Somali Islamic Liberation

16   Organization.  Were those men a part of it?  Right?

17   A.   Yes, sir.

18   Q.   And Farah Yare answers, Those men and we are the same,

19   eh, the men who belong to that group are in that region are

20   with us in this.  The men who are in the region are well

21   known.  Right?

22   A.   Yes, sir.

23   Q.   Now, at 184, Government's Exhibit 184, I'm sorry, the

24   conversation July 8, 2008 involving Mr. Moalin, right?

25   A.   Yes, sir.

1   Q.  And Mr. Hassan is also on the call, right?

2   A.  Yes, sir.

3   Q.  Okay.  Now at 3:38, which is page 3 -- I'm sorry, page 4,

4   top of page 4 -- Hassan says Basaaly, right -- man, I don't.

5   I'm sorry.  I'll wait.  To Basaaly:  Man, I don't like that.

6   Man, talk to me like the others do.  Right, that's what

7   Hassan says?

8   A.  Yes, sir.

9   Q.  And then in Basaaly's response he's laughing, right?

10  A.  Yes, sir.

11  Q.  Okay.  Now, let's go to 6:37, which is page 7.  There's a

12  reference to slingshooting, right?  Right?  I'm sorry.

13  Withdrawn.  At 6:37 Hassan says, Therefore the guy who is

14  responsible in the area for the slingshooting related

15  operations.  Right?

16  A.  Yes, sir.

17  Q.  And if we go back to 178, Government's 178, the reference

18  to slingshot, right, is page 4, sling -- sorry.  Go back one,

19  page 3.  At 10:29 Basaaly says, So, Omer is from the elder

20  group.  Right?

21  A.  Yes, sir.

22  Q.  Correct?  And Hassan says, Yes, he is from the elder

23  group, but he's one of the people who firmly believe in

24  continuing carrying the slingshot, right?

25  A.  Yes, sir.

1   Q.  And then at 184 Hassan says the guy who is responsible in

2   the area for the support slingshooting related operations.

3   Right?

4   A.  Yes, sir.

5   Q.  Let's go to 187, please.  That's July 11, 2008.

6   A.  Yes, sir.

7   Q.  Okay.  And it's Mr. Moalin and someone identified as

8   Mahad Karate, right?

9   A.  Yes, sir.

10  Q.  See 34:47, bottom of page 2.  Let's start at 34:33.

11  There's Mr. Moalin speaking, right?

12  A.  Yes, sir.

13  Q.  You know, when the man went away without first giving us

14  another contact, the whole link was almost lost, you know.  I

15  mean we did not have a way to contact people.  Also, they

16  changed their phone numbers for security reasons, so not much

17  could be done about the issue.  Right?

18  A.  Yes, sir.

19  Q.  And at 37 -- withdrawn.  This is July 11, 2008, right?

20  A.  We're still on Exhibit 187; is that correct?

21  Q.  I'm sorry.  We'll go to 188.  I'm sorry.  188, July 11,

22  2008?

23  A.  Yes, sir.

24  Q.  Mr. Moalin and Omer Mataan?

25  A.  Yes, sir.

1    Q.   Go to page 2, 1:59.   This is Omer speaking, right?

2    A.   Yes, sir.

3    Q.   And he says, Man, I'm mostly in town.   I travel sometimes

4    and go to the brothers from the liberation front, who are in

5    the woods.   Right?

6    A.   Yes, sir.

7    Q.   Now, at 189, Exhibit 189, Mr. Moalin talks about his

8    house being attacked, right?

9    A.   Yes, sir.

10   Q.   And he's asked at the bottom of that page, at 4:12, Was

11   this done by Somalis.   Right?

12   A.   Yes, sir.

13   Q.   And he answered at 4:14 at page 2, At first it was the

14   Somalis and later the Ethiopians launched the attack.   Right?

15   A.   Yes.

16   Q.   And 190, the next exhibit, July 12, 2008, that's also

17   about his house, right?

18   A.   Yes, sir.

19   Q.   Now, let's go to 191, please, Government's 191.   This is

20   Mr. Moalin and Farah Yare on July 13, 2008, right?

21   A.   Yes, sir.

22   Q.   Go to 10:45, Farah -- Basaaly speaking, rather, says, I

23   mean -- I'm sorry.   I'll wait.   Basaaly at 10:45 says, I mean

24   the Ethiopians there, eh, over there, what do you say, eh, in

25   Hiraan, and also with the talks being held in Yemen.   I spoke

1  to Abukar last night, who told me we are in the first day of

2  meetings and we have one more day left to conclude the talks,

3  and because there has been no outcome announced yet -- I mean

4  I don't want to speak hastily about it, but the talks are

5  proceeding well for us.  He told me that.  Right?

6  A.  Yes, sir.

7  Q.  That's Basaaly speaking, right?

8  A.  Yes, sir.

9  Q.  Let's go to 27:59, please, on page 4.  Start at 27:52.

10  This is Farah Yare, right?

11  A.  Yes, sir.

12  Q.  He says, This program, their presence here and their

13  movements in which their troops are being exterminated and

14  they are exterminating the population is a program for which

15  they are being paid for.  Right?

16  A.  Yes, sir.

17  Q.  And 28:08, just a little further down the page, Farah

18  Yare again:  The other issue is that, brother, these men have

19  new weapons that we can say are being tested on us.  Right?

20  A.  Yes, sir.

21  Q.  And he continues at 28:21, When a shell from a well-known

22  type of gun hits or goes by near you, you cannot imagine the

23  stench and damage it causes.  If you see it, you'll ask

24  yourself what is this.  I mean it is nothing like what you

25  know.  Although you know the exact kind of weapon that fired

1  the shot, nevertheless when it passes you by and you

2  recognize it as the kind we know of, yet it is not, it is

3  different.  And the Basaaly says, Okay.  Right?

4  A.  Yes.  Yes, sir.

5  Q.  And then Farah Yare continues, When they use a type of

6  weaponry we don't know about, it has such a devastating

7  effect.  For example now, the arm.  I told you about an

8  individual who lost an arm in Matabaan.  She was a girl.  I

9  was involved in that fight.  We were there.  An artillery

10  shell, a shell passed by in my estimate at a distance of more

11  than approximately one meter and yet it cut off her arm.

12  Basaaly says, Okay.  Right?

13  A.  Yes, sir.

14  Q.  Farah continues at 29:19, I am estimating for you.  The

15  number of these men is 1,000, 1,000 men with full complete

16  gear.  Right?

17  A.  Yes, sir.

18  Q.  Let's go to 192, please.  That's a July 17, 2008 call

19  between Mr. Moalin and Mohamud Ahmed, right?

20  A.  Yes, sir.

21  Q.  And just to be clear, not Mohamud, this defendant here,

22  right?  Different person altogether?

23  A.  That is correct.

24  Q.  In fact, this Mohamud is the person on the chart with

25  "Bossman," right, at the Shidaal?

1  A.  Yes, sir.

2  Q.  One of the owners of the Shidaal, right?

3  A.  Yes, sir.

4  Q.  And, in fact, he pleaded guilty to defrauding his

5  investors in the Shidaal, right?

6  A.  I believe so, yes.

7  Q.  And those investors were Somalis, right?

8  A.  I believe so, yes.

9  Q.  And it was millions of dollars, right?

10  A.  Yes, sir.

11          MR. DRATEL:  I have nothing further, your Honor.

12  Thank you.

13          THE COURT:  Ms. Moreno, any questions?

14          MS. MORENO:  Yes.

15                    Cross-Examination

16          BY MS. MORENO:  Q.  Good afternoon.  I want to go

17  back to Government's Exhibit 182 where we had that

18  translation issue if I may.  Now on 182, let me ask you this:

19  At line 10:10, page 6 of 7, do you have -- in the second

20  sentence does it start, The youth that were here with us?

21  What does your copy say, sir?

22  A.  My copy says, The young guys that were here with us.

23  Q.  Okay.  And at line 10:35, where now "the youth" is

24  capitalized -- you see that sentence?  The youth fought for

25  three minutes and left.  Your copy doesn't say the youth,

1    does it?

2    A.   No, ma'am.

3    Q.   It says young men, right?

4    A.   Young guys.

5    Q.   Young guys.  And that's because the translator a couple

6    of days ago changed the translation in this conversation,

7    right?  Correct?

8    A.   I guess so.

9    Q.   And he changed other translations as well, correct?

10   A.   I'm not sure.

11              THE COURT:  Ms. Moreno, would you pull your sheet,

12   please?

13              MS. MORENO:  Yes, your Honor.

14              THE COURT:  That will be page 6.

15              MS. MORENO:  Would you like to see it?

16              THE COURT:  Yes.  I'm not attaching any particular

17   significance by asking though.  I just wanted to check one

18   thing.  Thank you.

19              MS. MORENO:  Certainly.  Your Honor, I guess I

20   would request if the jurors have a different translation,

21   perhaps their pages need to be swapped out as well.

22              THE COURT:  Be swapped out did you say?

23              MS. MORENO:  Well, whatever the current --

24              THE COURT:  No, no, no.  We've been through -- no,

25   we've been through, I don't know, over a hundred or

1  approximately a hundred exhibits, and there's one -- there's

2  one issue that's been pointed out -- it's not an issue, but

3  there's one discrepancy where young guys were -- the term

4  "young guys" were substituted for the youth in the transcript

5  you have.  So with the understanding that has already come

6  out in the testimony, I don't think anything more needs to be

7  done.

8          MS. MORENO:  All right.

9          BY MS. MORENO:  Q.  Let's start on the first

10  conversation where my client's voice is heard in this book,

11  Exhibit 124, on December 28.  Are you there, sir?

12  A.  Yes, ma'am.

13  Q.  All right.  Now, that's a two-page conversation, correct?

14  A.  Yes, ma'am.

15  Q.  And the linguist says or indicated that Mr. Mohamad said,

16  I will complete the task comma which pertains to the man

17  comma tomorrow, God willing.  Right?  Is that in your

18  transcript?

19  A.  Yes, ma'am.

20  Q.  Okay.  And then we have a series of asterisks, correct?

21  A.  Yes, ma'am.

22  Q.  So do you know if there's more to this conversation?

23  A.  I'm not sure.

24  Q.  Six weeks later on February 13, Exhibit 142, is the next

25  time we hear from -- a conversation with my client,

1   Mr. Mohamud.  Do you see that?

2   A.  Yes, ma'am.

3   Q.  And on page -- how many pages is this conversation, sir?

4   A.  Two pages.

5   Q.  All right.  And on page 2 you agree with me that there

6   are two sets -- separate sets of asterisks, correct?

7   A.  Yes, ma'am.

8   Q.  And so certainly we know that the first set of asterisks

9   where the preceding number is a 1:00 and the next number is

10  4:45 that three -- about three and a half minutes or so are

11  missing, correct?

12  A.  Yes, ma'am.

13  Q.  That's fair, right?  And then at the bottom of page 2, we

14  have more asterisks, correct, sir?

15  A.  Yes, ma'am.

16  Q.  And we don't know how many more minutes or pages of

17  conversation, according to this transcript, are there --

18  A.  No.

19  Q.  -- fair?  Is that right?

20  A.  No, I do not know if there's more, additional on here.

21  Q.  You don't, okay.  Two months later, April 12, Exhibit

22  153, is the next time Mr. Mohamud's voice is heard, correct?

23  You see that?

24  A.  I see the transcript, yes.

25  Q.  Okay.  And that's a three page-conversation, right?

1    A.  Yes, ma'am.

2    Q.  And you don't know if there's more to the conversation

3    after three minutes, 42 seconds, correct?

4    A.  I'm not sure.

5    Q.  Right.  But on the first page, we know that a minute of

6    conversation is missing, right?

7    A.  Yes, ma'am.

8    Q.  Okay.  Now, in the month of April, there are a few

9    conversations with Mr. Mohamud, correct, my client,

10   Mr. Mohamud; do you know?

11   A.  I'm not sure how many conversations there were.

12   Q.  Let's go to Exhibit 155.  Do you have that?

13   A.  Yes, ma'am.

14   Q.  All right.  So on page 3 you agree that there's almost

15   two minutes of conversation in the middle of the conversation

16   that's missing, correct?

17   A.  Yes, ma'am.

18   Q.  And the same would be true for Exhibit 158 on page 3,

19   correct?

20   A.  Possibly, yes.

21   Q.  Possibly.  You just viewed that.  Do you know if the --

22   what the asterisk -- what these asterisks stand for?

23   A.  Well, based on what we're looking at, it would appear as

24   though the asterisks at the end of the transcript means that

25   there's additional audio.  If there are no asterisks, it

1   would appear that that means there is no additional audio.

2   Q.  Right.

3   A.  That's --

4   Q.  So you disagree with the linguist who testified that when

5   there are no asterisks, there still could be further

6   conversation?

7   A.  I don't disagree.  I was not present for that testimony.

8   Q.  So you don't know, right?

9   A.  I'm not sure, no.

10  Q.  Now, on May 1st there's a conversation, Exhibit 170, with

11  Mr. Mohamud, and that's about the death of this guy, Aden

12  Ayrow, correct?

13  A.  Yes, ma'am.

14  Q.  And that's a one-page conversation, fair?

15  A.  Yes, ma'am.

16  Q.  Two months later, in July 2 of '08, we have Exhibit 182,

17  which is the next time Mr. Mohamud's voice is heard, correct?

18  A.  I'm not sure if that's the next time, but --

19  Q.  By all means, go through the conversations between May

20  1st and July 2 if you want to see if there are any more of

21  Mr. Mohamud.

22  A.  If you want me to, I can --

23  Q.  Do you accept my representation that there are none in

24  between?

25  A.  Okay.  Sure.

1    Q.   Okay.  And that Exhibit 182, on page 7, which is the last

2    page, the translation, or the transcript, is Mister -- or

3    Sheik Mohamad's conversation was cut off, correct?  In other

4    words, he says, for example, and there's nothing further --

5    A.   Yes, ma'am.

6    Q.   -- translated, submitted, correct?

7    A.   Yes, ma'am.

8    Q.   And then finally Exhibit 184, I think Mr. Cole had you

9    read some of this.  I want to go back to page 6 of Exhibit

10   184.  Are you there, sir?

11   A.   Yes, ma'am.

12   Q.   And line five -- 5:54, that's Mr. Hassan, correct --

13   A.   Yes, ma'am.

14   Q.   -- according to the transcript?  And he says -- and he's

15   speaking to Mr. Mohamud, correct?

16   A.   Yes, ma'am.

17   Q.   And he says, Brother, thanks to God, brother, we know

18   each other by name, but we don't know each other in person.

19   I don't know.  That's what he says to Mr. Mohamud, correct?

20   A.   Yes, ma'am.

21            MS. MORENO:  I have nothing further.

22            THE COURT:  Okay.  We can take our midafternoon

23   recess at this time, ladies and gentlemen, 15 minutes.

24   Remember the admonition.

25            MR. DRATEL:  Your Honor, may we be heard at

1    sidebar?

2              THE COURT:  We're taking our recess at this point.

3              MR. DRATEL:  Yes, after the jury.

4              THE COURT:  May we let the jury go?

5              MR. DRATEL:  Absolutely, your Honor.

6         (The jury left the courtroom.)

7              THE COURT:  All right.  We're outside the presence

8    of the jury.  Do we need -- we are outside the presence of

9    the jury.

10             MR. DRATEL:  Okay.  Just --

11             THE COURT:  Do you need to be seen at the side of

12   the bench?

13             MR. DRATEL:  No.  Just the witness -- he's on

14   cross.  I don't know what the protocols are here.  The

15   witness is on cross, so he's not going to engage in

16   discussions with the prosecution team, right, during that

17   period?

18             THE COURT:  I don't -- we don't have that --

19   there's no protocol, as you call it.  I don't think I can bar

20   a witness from -- well, under certain circumstances, yes, but

21   I don't see that as being necessary.  So far you're just

22   taking -- you and Ms. Moreno have just taken the witness

23   through a number of different transcripts and essentially had

24   him read or emphasize certain parts of text, so, you know, I

25   think that's the -- you're highlighting certain things that

 1    are favorable.  I mean it's not -- it's not a surprise to

 2    anyone, so that seems to be the tenor of the

 3    cross-examination.  I see no reason to instruct this witness

 4    not to confer with the -- with the government if he wishes to

 5    do so.

 6              MR. COLE:  Well, I don't plan to anyways.  If it

 7    makes him feel better, I don't plan to.

 8              THE COURT:  Well, maybe it does.  Okay.  Fifteen

 9    minutes?

10              MR. DRATEL:  Thank you, your Honor.

11         (There was a break in the proceedings.)

12              THE COURT:  Okay.  Everyone is present.  Mr.

13    Ghappour?

14              MR. GHAPPOUR:  Thank you, your Honor.

15                        Cross-Examination

16              BY MR. GHAPPOUR:  Q.  Hello, Agent.

17    A.  Hello.

18    Q.  Good afternoon.

19    A.  Good afternoon.

20    Q.  I would like to start by directing you to call 157,

21    please.  About a minute and four seconds into the call, let's

22    read from 1:04 to 1:09.  Abdirizak says, Is it money you

23    sent?  And Basaaly says -- you be Basaaly, I'll be Abdirizak.

24    A.  Basaaly:  Yes.

25    Q.  Abdirizak:  Is it yesterday's thousand?

1    A.  Basaaly:  Yes, yes.  It is 2,000 that was split.  It is

2    split.  It is 2,000.

3    Q.  Okay.  And now I'm going to direct you to call 159, right

4    at two minutes and six seconds.  I'll be Basaaly in this

5    case.

6    A.  Okay.

7    Q.  Basaaly:  Tell me the name of the sender, for whom it was

8    sent.

9    A.  Issa:  Well, he is not here now.  He is the one who sent

10   it.  I can't log into the website.  I don't have an account.

11   I don't send money, you know.

12   Q.  Okay.  And let's move on to call 160, right at two

13   minutes and 20 seconds.  I'll be Basaaly again.  Actually

14   let's start at two minutes and 21 seconds.

15   A.  You want me to be Issa?

16   Q.  Yes.

17   A.  Issa:  The person it was sent to is Dhunkaal Mohamed

18   Yusuf.

19   Q.  Basaaly:  The person to whom it was sent?

20   A.  Issa:  Yes.

21   Q.  Basaaly:  Hmm.  And then it says Abdirizak speaking in

22   the background.  Correct?

23   A.  Yes.

24   Q.  And I guess I'll be Abdirizak as well:  It can be

25   changed -- excuse me.  Abdirizak:  It can be changed to

1   another person.  And then Issa's talking on the phone to

2   Basaaly again, correct?

3   A.  Yes, sir.  Issa:  However, Abdirizak is now telling you

4   that it can be changed now.  It is not a problem.

5   Q.  Okay.  Let's move on to 161.  And if you would, read from

6   one minute and 48 seconds all the way down to two minutes.

7   A.  Basaaly:  You will say that it was sent from San Diego

8   directed to Dhunkaal.  They will break it because they do not

9   want to show that the transfer was one, so it is possible

10  that they broke it into transfers of 1,000 but the name of

11  the recipient is the same.

12  Q.  And let's move on to 164.  Right at one minute and 14

13  seconds, just from 1:14 to 1:16, please.

14  A.  Okay.  Basaaly:  Yes, naturally they sent it in

15  installments I believe.

16  Q.  And in the past two passages, in 164 and in 161, when

17  Mr. Moalin says they, he's referring to Abdullahi Hussein,

18  correct, also known as Abdirizak?

19  A.  Yes, sir.

20  Q.  And Abdirizak was an employee at the Shidaal, correct?

21  A.  Yes, sir.

22  Q.  He was the manager?

23  A.  I believe so, yes.

24  Q.  And he processed transactions, correct?

25  A.  Yes, sir.

1   Q.   And he broke them up into smaller transactions, correct?

2   A.   Yes, sir.

3   Q.   He changed names?

4   A.   Yes, sir.

5   Q.   He faked numbers?

6   A.   Yes, sir.

7   Q.   And you were directed to review other calls in this case,

8   correct?

9   A.   Yes, sir.

10  Q.   And you were directed to review other calls that are not

11  in this binder?

12  A.   Yes, sir.

13  Q.   And they were related to Abdirizak?

14  A.   Yes, sir.

15  Q.   And from those calls you learned that he had regular

16  contact with Mr. Moalin regarding money transfers?

17          MR. COLE:  Objection; irrelevant, calls for

18  hearsay.

19          THE COURT:  The objection is sustained.

20          MR. GHAPPOUR:  Your Honor, there's an 804 (b)(3)

21  and an 804 (a)(2) exception that was --

22          THE COURT:  Well, I'm keeping it out under 403.

23          BY MR. GHAPPOUR:  Q.  You reviewed 44 calls related

24  to Abdirizak?

25  A.   I'm not sure what the number is.

1    Q.   You reviewed a number of calls related to Abdirizak?

2    A.   Yes, sir.

3    Q.   How many were there, if that document refreshes your

4    recollection?

5    A.   This -- this document doesn't contain all conversations

6    between Abdirizak and Basaaly.  This I -- based on reviewing

7    this document --

8    Q.   Would you count the number of calls on that document.

9    A.   I counted 31 on here.  I'm not sure if any -- any of

10   these calls were repeated as they're laid out on here, but I

11   counted 31.

12   Q.   And I misspoke earlier.  What I meant to ask was are

13   those 31 calls related to 44 transactions?

14   A.   Again, I'm not sure exactly how many transactions there

15   are, but these calls do pertain to transactions that were

16   conducted by Abdirizak.

17   Q.   Could you count the number of transactions, please.

18   A.   There are 44.  Again, I'm not sure if they're repeated at

19   any point, but 44.

20   Q.   Thank you.

21        MR. GHAPPOUR:  With the assistance of Mr. Cole, I'd

22   like to introduce Government Exhibit 39, which is already in

23   evidence.

24        BY MR. GHAPPOUR:  Q.  Now, I'd like to direct you

25   to the transactions at -- or the transaction on April 23,

```
 1  2008.

 2  A.  Okay.

 3  Q.  And is that one of the transactions that was conducted by

 4  Abdirizak?

 5          MR. COLE:  Objection; lack of foundation, calls for

 6  hearsay.

 7          THE COURT:  Well, which transaction are you

 8  referring to, counsel?

 9          MR. GHAPPOUR:  Your Honor, the -- well, your Honor,

10  the witness just stated that --

11          THE COURT:  No, which transaction?

12          MR. GHAPPOUR:  I'm sorry.  The April 23

13  transaction, five down from the top --

14          THE COURT:  Okay.

15          MR. GHAPPOUR:  -- on the government's exhibit.

16          THE COURT:  Okay.  That's a bit far for me to see,

17  but it's one of the transactions in the case?

18          MR. GHAPPOUR:  Yes, your Honor.

19          THE COURT:  The objection's overruled.

20          THE WITNESS:  To clarify --

21          BY MR. GHAPPOUR:  Q.Yes or no.

22  A.  Yes.

23  Q.  And is the transaction just underneath that, was that

24  also conducted by Mister -- by Abdirizak, also known as

25  Mr. Hussein?
```

1                 MR. COLE:  Your Honor, objection as to vague

2    transaction.

3                 THE COURT:  The objection is sustained.  I think

4    you need a bit more of a foundation for this witness to

5    respond.

6                 MR. GHAPPOUR:  I'll move on.

7                 BY MR. GHAPPOUR:  Q.  Special Agent, you took this

8    picture, correct?

9    A.  Yes, sir, I believe so.

10   Q.  And that's a desk.  And I'm pointing to a piece of paper,

11   correct, on the wall?

12   A.  Yes, sir.

13   Q.  And that is a zoom shot of that piece of paper?

14   A.  Yes, sir.

15   Q.  And I believe it's labeled Government Exhibit 35,

16   correct?

17   A.  It appears so.

18   Q.  And so anyone that was sitting at that desk could see

19   that piece of paper, correct?

20   A.  Yes, sir.

21                MR. GHAPPOUR:  Thank you.  No further questions.

22                THE COURT:  All right.  Thank you, counsel.  Mr.

23   Durkin, any questions?

24                MR. DURKIN:  One second, Judge.

25                THE COURT:  Sure.

1          MR. DURKIN:  We don't have any questions.

2          THE COURT:  Any further direct examination?  Any

3    redirect?

4          MR. COLE:  No, your Honor.

5          THE COURT:  All right.  Thank you, Agent O'Very.

6    You are excused.

7          THE WITNESS:  Thank you, sir.

8          MR. COLE:  Your Honor, the United States rests.

9          THE COURT:  All right.  Ladies and gentlemen, I

10   think this is a good time to recess for the day.  The United

11   States government has rested its case-in-chief.  I need to

12   confer with counsel on matters properly discussed outside

13   your presence, and so we will call it a day for your purposes

14   and ask that you return at nine o'clock tomorrow morning.

15   Please remember the admonition not to discuss the case or

16   make any decisions until the case has been submitted to you.

17   Mr. Bilse, yes, I haven't forgotten.  Are there any changes

18   in your status?

19         JUROR BILSE:  No.  I'd just like to know what time

20   I can set up a -- from the carpool there, so you haven't

21   finalized what time we would be getting out tomorrow.

22         THE COURT:  You're in a carpool tomorrow.  And I

23   think you need to leave at 11:30.

24         JUROR BILSE:  I need -- I was hoping if we could

25   get dismissed at 11:00 or 11:15, that would help me get

1    across the street into my carpool, maybe 11:15.

2         THE COURT:  So 11:15 and then you'll be back at

3    1:30 did you say?

4         JUROR BILSE:  I should be back before then, but

5    yeah, if we did 1:30, I think I could meet that.

6         THE COURT:  Okay.  I see no problem with that.  Why

7    don't we do that.  Perhaps we can go from 9:00 straight

8    through to sometime between 11:00 and 11:15 in the morning

9    without taking a recess and then take that -- take that break

10   at 11:15 to accommodate you Mr. Bilse.  And then do you think

11   you'd be back before 1:30 or would 1:30 be --

12        JUROR BILSE:  Again, I'm carpooling, but I think

13   1:30 would work.

14        THE COURT:  Okay.  All right.  Then we'll adjust

15   the schedule a little bit for that and pick up most of the

16   time that's lost, okay?

17        JUROR BILSE:  I appreciate that, your Honor.

18        THE COURT:  Sure.  So we'll see you at nine o'clock

19   tomorrow morning, everyone.  Have a good evening.  Oh, by the

20   way, ladies and gentlemen, I don't know what the latest

21   forecast is for weather.  I heard we might have rain tomorrow

22   in the forecast, so if that be the case, give yourselves a

23   little extra traveling time, please, so that we can get

24   started promptly at nine o'clock.  Thank you.

25        (The jury left the courtroom.)

 1              THE COURT:  All right.  We are outside the presence

 2    of the jury.  Okay.  Counsel -- we're outside the presence of

 3    the jury.  Mr. Dratel?

 4              MR. DRATEL:  Move for judgment of acquittal on all

 5    counts, all elements, your Honor.

 6              MS. MORENO:  Move of judgment of acquittal on all

 7    counts and all elements with respect to Mr. Mohamud.

 8              MR. GHAPPOUR:  I move for judgment of acquittal on

 9    all elements, all counts with respect to Mr. Doreh.

10              MR. DURKIN:  Judge, I also move for judgment of

11    acquittal under Rule 29 (a).  I have a written copy of -- I

12    say I have a written copy, but it doesn't contain any --

13              THE COURT:  That's fine.  If you'd like to file it,

14    that's fine.

15              MR. DURKIN:  And it's also -- and what I'd like to

16    particularly point out is -- at this point is that with

17    respect to Count 3, conspiracy to launder monetary

18    instruments, I don't know what evidence whatsoever was

19    presented against my client on that, those elements.

20              THE COURT:  Okay.  Thank you, Mr. Durkin.

21              MR. DURKIN:  Also, Judge, it's my understanding --

22    and if I'm wrong, forgive me -- but I'd like to reraise my

23    motion for severance under Rule 14.  It's my understanding

24    that Ninth Circuit law requires me to restate it.

25              THE COURT:  Well, that's what I advised you of.  I

1    indicated to you that there is some case law authority to

2    that --

3              MR. DURKIN:  That's right.

4              THE COURT:  -- to that fact in the Ninth Circuit.

5    And I also indicated that you could be deemed to have raised

6    your Rule 14 motion at all appropriate times.  I would deem

7    that you had -- you had raised it at all necessary times --

8              MR. DURKIN:  And I have --

9              THE COURT:  -- just to preserve the issue, but

10   you're certainly free to expressly --

11             MR. DURKIN:  I have a one-paragraph written motion

12   I can file ECF if that's better for the record.

13             THE COURT:  It's really -- no, you don't need to --

14   you don't need to do it in written form; an oral motion is --

15             MR. DURKIN:  That's fine.

16             THE COURT:  -- is sufficient.

17             MR. DURKIN:  Thank you.

18             THE COURT:  Okay.  Thank you, sir.  Mr. Cole?

19             MR. COLE:  I think -- we obviously oppose all those

20   motions.  The only argument I guess that was made was about

21   the money laundering.  Is your Honor asking for argument on

22   all defendants or just the response to the money

23   laundering --

24             THE COURT:  I'm not soliciting.  I'm just saying

25   motions have been made, and if you wish to respond, you

1    certainly may.  And there's been one specific --

2            MR. COLE:  No, we believe that the Court -- the

3    trial hasn't been that long, the evidence is all in front of

4    the Court, and so we will not argue other than just knowing

5    the Court's aware of the evidence, the state of the evidence,

6    and we oppose all those motions.

7            The only thing with respect to money laundering is

8    the type of money laundering we allege requires nothing more

9    than transmitting money from in the U.S. to outside the U.S.

10   to promote the predicate unlawful activity.  And with that we

11   submit to the Court.

12           THE COURT:  Okay.  The motions for judgment of

13   acquittal under Rule 29 are denied with respect to each

14   defendant and each count for each defendant.  And with

15   respect to the motion for severance, I'll deny that as well,

16   the Rule 14 motion made by defendant Nasir.

17           Okay.  I have -- I can address some of these 106

18   issues at this point.  I can -- I'm at your disposal for a

19   bit.  There are other issues that we may want to address

20   pertaining to logistics, and so that's where we are.  I

21   assume counsel are happy to go ahead with the 106.

22           MS. FONTIER:  That's my request, your Honor.

23           THE COURT:  Okay.  Good.  Okay.  What I'd like to

24   do then is turn to the requests for -- let me back up a

25   little bit and say this.  All of these submissions have come

1    to me in different formats; I hope you can appreciate that.

2    I was trying to get one standardized format.  Once again,

3    turning to the submission made by defendant Nasir, that

4    was -- that was very, very helpful.

5             I've done my best to decipher what some of these

6    requests are.  I've had some difficulties; I hope you can

7    understand that.  Much of the material that's been submitted

8    to me has not been color-coded in a way that is helpful.

9    There's -- some of the material that was not color-coded.

10   I'm not making this observation specifically with respect to

11   defendant Moalin's submission.

12            Part of my difficulty was lining up transcripts.

13   By that I mean I think on one or more occasions, counsel

14   tried to give me the English translation of the Somali that

15   was prepared for the defense on a particular transcript, and

16   when I compared transcript material provided by the defense

17   to the verbatim provided by the government, there was some

18   significant discrepancies such that I found it very hard to

19   figure out exactly what the defense translation was or where

20   the 106 material fit in.  That's the point I'm trying to

21   make.  So you've got to bear with me on this.  I've spent

22   several hours, and I think that this could have been done in

23   a fashion that was -- that was more standardized and could

24   have been more helpful to me.

25            Looking at defendant Moalin's request, the first

1    deals with Exhibit 123.  Ms. Fontier, let me ask you this.

2    Originally you submitted that grid that you ultimately

3    included in the motion.

4              MS. FONTIER:  Yes, your Honor.

5              THE COURT:  Yes.  And in your grid, underneath the

6    box there, you had yellow equals government transcript, but

7    you had yellow designated in pink, and then you had orange

8    equals defense request and you had orange designated in blue.

9    Was there any particular significance of that or was that

10   just to throw me off the trail?

11             MS. MORENO:  Now I don't feel so bad.

12             MS. FONTIER:  There is, your Honor, and I was

13   hoping to have --

14             THE COURT:  Wait, wait.

15             MS. FONTIER:  I was hoping to have the opportunity

16   to explain this to you perhaps off the record, but as long as

17   we're here now, what this is, for lack complete lack of

18   technology --

19             THE COURT:  You just didn't have the right-colored

20   crayons?

21             MS. FONTIER:  Exactly.  I bought like a container

22   of mixed highlighters at CVS, which apparently is not the

23   place to buy highlighters because about halfway through they

24   ran out of ink and I only had one of each color.  So what

25   started as yellow, I then -- I tried to do it all in yellow,

1    but it's obviously very faint, and -- which were the

2    government's portions, and then our portions were all orange

3    in the first pass-through and then that became very faint.

4    So I went over the yellow with pink, and I went over the

5    original with blue.  So you have a bit of -- anywhere where

6    it's yellow and/or pink is government, and anywhere where

7    it's orange and/or blue is the defense.

8                THE COURT:  Thank you for clarifying that.

9                MS. FONTIER:  I don't know that it's any more

10   clear, but that is what occurred.  See, I'm sort of a

11   kindergarten project, but hopefully we can work through it.

12               THE COURT:  Okay.  Thank you.  I couldn't resist.

13   Sometimes I can resist anything but temptation.  Okay.  On

14   Exhibit 123, I've gone over the material.  I think I

15   understand what was done here.  And the request is not 106;

16   it's not 106 material, but a separate matter.  It's relating

17   to money to orphans.  So if you look to the original 123

18   transcript, which I haven't turned to yet -- if I need to, I

19   will -- the submitted 106 material doesn't deal with that.

20   However, it does have independent evidentiary value; let me

21   put it that way.  It could be 803 (3), it could be -- as I

22   recall it now, relating back to the motions in limine, it

23   could be one of those areas that comes in just for -- well,

24   it's almost a 404 (b) kind of analysis relating to knowledge,

25   intent.  And so it's not 106, but it may well be admissible,

1    and more than that I won't say at this point.  I certainly

2    want to give the government an opportunity to be heard with

3    respect to specifics if it wished to be heard.

4            That raises another point.  You know, I spent quite

5    a bit of time going over these submissions, Mr. Cole.  At

6    this point I don't -- and given what's occurred during the

7    course of the trial and given earlier statements I think made

8    by counsel suggesting there had been some dialog between

9    counsel, defense counsel and perhaps Mr. Ward, I don't know

10   if all of these submissions are even objected to at this

11   point, if there's even any resistance to these submissions.

12           MR. COLE:  I will defer to Mr. Ward; he's closest

13   to this issue, your Honor.

14           THE COURT:  All right.  Before I go further, Mr.

15   Ward, you know, I got a 106 memorandum from the government

16   and I don't know whether that related to what's been

17   submitted to me at the present time or whether the ultimate

18   submissions here are still relevant or whether your 106 memo

19   was still relevant given ultimate submissions and,

20   overarching all of that, are there agreements or lack of

21   objection?

22           MR. WARD:  Your Honor, with respect to the 106

23   submissions, I think our memo probably is -- has become

24   mooted except to the extent that we advise the Court that --

25           THE COURT:  Except for --

1          MR. WARD:  There will be issues as to disputed

2     transcripts that were received as late as last week.

3          THE COURT:  Okay.  You mean as to the meaning of --

4          MR. WARD:  Right.

5          THE COURT:  -- the language spoken?

6          MR. WARD:  Right.  But with the way the trial has

7     developed, we won't have a foundational issue because it

8     being whatever it is, 106 or 803 or whatever basis it would

9     be coming in in the defendants' case, they'd have to lay that

10    foundation.

11         THE COURT:  Okay.  Well -- and that raises even

12    another issue, and that is when I'm making rulings, I'm not

13    passing on the accuracy of the translations that have been

14    provided.  I realize that there may be some differences that

15    need to be ironed out and perhaps ironed out ultimately by

16    the jury as the jury is getting this information and

17    assessing it and assessing the credibility of the linguists

18    who have testified.  Okay?

19         MS. FONTIER:  Your Honor, I think that that's --

20    all those points are very well taken.  The reason I kept

21    standing up is because the -- what we've submitted as 106, if

22    the Court doesn't feel it's 106, we will be making a motion

23    to admit much of it pursuant to other evidentiary rules as

24    your Honor has sort of outlined.  For instance, in

25    Government's Exhibit 123, we will make a motion under 803

```
1   (3).   Just --
2              THE COURT:  Well, you don't need to make motions --
3              MS. FONTIER:  -- for the Court's --
4              THE COURT:  Please don't impose any of that --
5              MS. FONTIER:  Okay.
6              THE COURT:  -- on me where you know that there's
7   not going to be any objection.  So what I would suggest is
8   you -- if you have 803 -- if you have other material, you
9   have other transcripts, you have other evidence that you feel
10  you're going to be submitting under 803 (3) and that the
11  government has no objection or there's some kind of an
12  agreement that out of fairness is the kind of thing that
13  should come in, especially given the earlier rulings on
14  motions in limine, then you don't need to load me up --
15             MS. FONTIER:  Okay.
16             THE COURT:  -- okay?  So I would ask that you meet
17  and confer ahead of time and join the issue, if there is an
18  issue; and if not, then let these -- let these additional
19  calls come in and the linguists testify and the arguments
20  that prevail.  Okay.
21             MS. FONTIER:  Yes, your Honor.
22             THE COURT:  All right.  So that's 123.  And then on
23  Exhibit 128, my assessment is that this is not 106 per se; it
24  is a continuation of a discussion about the personalities and
25  leaders and roles and certain events that were referred to in
```

1    the earlier part of the discussion, but it is not per se 106.

2    In other words, the first part of what's come in with the

3    government is independent, standalone stuff, and it's not --

4    it's not misleading, it doesn't need to be cured by this

5    additional material.  But under 803 (3) it may be it may be

6    admissible.  I have this down, quite frankly, as minimal

7    probative value.  It reflects Mr. Moalin's knowledge of the

8    people and their roles in the area.  There is certainly an

9    awful lot of that in so many of these transcripts.  Also, as

10   I noted earlier, I note that the translation was unclear in

11   many places.  It was unclear to me.  It was very difficult to

12   make anything out of it.  So that's what I would have with

13   respect to 128.

14          With respect to Exhibit 130, the requested excerpt,

15   pages 5 to 6, is admissible as 106.  It is the same subject,

16   it provides context, and just using -- being a bit liberal in

17   the -- in the interpretation of 106 and not narrowly

18   construing it so harshly, as some of the cases do, I would

19   find that a broad interpretation of 106 would support this

20   coming in, pages 5 and 6.

21          I have the same ruling with respect to pages 8 and

22   9 and pages 13 to 14 on the same ground.  Page 4 -- okay, so

23   that does it for Exhibit 130.

24          Let's get to 131, which is the next exhibit.  And

25   under page 4 you have six more lines in quotes -- that's the

1    material -- and you've identified that adequately, and I

2    would find that that is admissible under 106.  But I want to

3    say that it's admissible not because I'm finding that what

4    was already admitted would be misleading or deceptive or in

5    any way imply that the government improperly omitted this

6    material; I think it does provide, however, added context on

7    the same subject and because it reads on that prior testimony

8    is admissible under 106 under a broad interpretation.

9              At pages 8 to 10, which is the next request, I

10   would -- I would okay that under 106.  I think that does it

11   with respect to Exhibit 131.

12             Next we have Exhibit 135, page 5.  You note

13   additional lines in your request.  I would okay that under

14   106.  Okay.

15             Next, you have Exhibit 141.  You've designated

16   pages 2 through 5 as your submission.  My ruling would be

17   that it is not 106 per se but ultimately admissible I would

18   think pursuant to the Court's prior rulings, the in-limine

19   parameters that were earlier discussed before trial began, so

20   I hope that's helpful.

21             MR. COLE:  Your Honor, that was Exhibit 141?

22             THE COURT:  Yes.  Are you there?

23             MR. COLE:  Yeah.  I'm sorry.  We fell behind for a

24   second, but I think we've caught back up.

25             THE COURT:  If you feel you need to be heard on any

1   of these, just let me know and I'll stop and wait for you.

2   You okay so far?

3          MR. COLE:  Yes, your Honor, we're okay.

4          THE COURT:  Okay.  So that was Exhibit 141.  Next

5   we have Exhibit 143, and that would be pages 3 through 6.  I

6   would find this not to be 106 material, not admissible under

7   106, but along the lines of the prior ruling with respect to

8   Exhibit 141, I think it's a -- it's a separate subject, and

9   it deals with different subject areas, but I think it comes

10  in, I think it ultimately comes in for reasons previously

11  noted.

12         Next we have Exhibit 144, and what I have on this

13  is -- first of all, with respect to page 1, it is not

14  admissible under Rule 106, and the rest of it I would not

15  find is admissible under 106.

16         MS. FONTIER:  Your Honor, may I just be heard on

17  that issue?

18         THE COURT:  Yes.

19         MS. FONTIER:  Your Honor, the portion -- I, just

20  for continuity's sake I sort of continued, but the portion

21  that was admitted by the government is essentially Bashir

22  Dini saying to Basaaly, the man, your friend, Aden Hashi

23  Ayrow, is in Dhusa Mareeb.  And then he -- it's in the

24  context of a -- this Bashir Dini providing news to Basaaly

25  Moalin and talking about Aden Hashi Ayrow.  And then Basaaly

1    responds on page 3 of this -- Bashir Dini says, Did you hear

2    any of that news?  And Basaaly responds, first of all,

3    Bashir, I didn't hear any of that news.  And then he

4    continues:  But based on the knowledge that I have with

5    regard to that man -- which is in regards to Aden Hashi

6    Ayrow -- let alone the Ayr in Habar Gidir that you are

7    talking about, which other people previously referenced, he,

8    Aden Hashi Ayrow, that even beyond identifying himself as a

9    Somali, he identifies himself as a Muslim, that is where he

10   stands.  And then he continues four lines later:  So he's not

11   a person who's interested in clan affiliations.

12          It directly contradicts what the government has

13   introduced as your friend, Aden Hashi Ayrow.  So I do think

14   that this is a very -- an actual -- this very much falls

15   within the parameters of 106 because the statement, "your

16   friend, Aden Hashi Ayrow," is very misleading in the context

17   of this particular conversation.

18          MR. COLE:  Well, actually, if anything, it just

19   shows that he knows his friend better than Bashir, and he

20   knows exactly what Ayrow is all about and he knows him well.

21   In any event, whatever the Court decides --

22          THE COURT:  Well, hold on.  Yeah.  Give me a chance

23   to get back in here.  Well, okay.  So, you know, you have

24   about a half a page, which is the government's original

25   position, 144.  It refers -- this is Bashir speaking to

1    defendant Moalin.  He says, Your friend, Aden Hashi Ayrow, is

2    in Dhusa Mareeb.  And Mr. Moalin says, Go on.

3            So he's just basically asking, that is Mr. Moalin

4    is just asking for Bashir to continue, asking for

5    information.  So the information that's provided is Ayrow is

6    in Dhusa Mareeb, he's taking part in fighting, he's pleading

7    for support, while saying, quote, men like Aweys and Indha

8    Adde sold me off and signed on to an agreement at my expense.

9    So that's the end of that.

10           Mr. Moalin's getting a report on Ayrow.  Ayrow is

11   described by Bashir as Mr. Moalin's friend.  Then you go

12   to -- you go to page 1 of what's submitted here, and page 1

13   has nothing to do with -- this is Mr. Moalin saying, Well,

14   today I went to LA and a place near there, I went to Anaheim,

15   I went to visit some guys who live there, talking about an

16   issue, talking about Galgaduud, I went there for that reason,

17   I talked to men, I delivered information.  So there's a --

18   that's a new subject.

19           MS. FONTIER:  But, your Honor, if I may, I would

20   withdraw then my 106 request as to the portion before the

21   government's section of the translation.  If -- and just

22   focus the Court on the portion that responds to Bashir Dini

23   saying to Mr. Moalin "your friend, Aden Hashi Ayrow."  That's

24   the portion that is truly --

25           THE COURT:  Well, here's -- and this is where I had

 1    trouble following the color-coding because now on page 2 I've

 2    got brown, blue, yellow, orange, and pink.

 3            MS. FONTIER:  So, your Honor, the portion that is

 4    the government's quote starts with "Go on" and, you know, "I

 5    heard that," "Go on," "your friend, Aden Hashi Ayrow," and

 6    continues for one, two, three, four --

 7            THE COURT:  So you weren't even submitting page 1?

 8            MS. FONTIER:  Yes, I was, just --

 9            THE COURT:  What did page 1 have to do with -- what

10    did page 1 in your submission have to do with what the

11    government played on Exhibit 144?

12            MS. FONTIER:  Your Honor, I only submitted that so

13    that our submission would not also be confusing because I

14    wanted --

15            THE COURT:  But you do agree it's not 106.

16            MS. FONTIER:  I want to put context to where "I

17    didn't hear that news."

18            THE COURT:  But you do agree it's not 106 material.

19            MS. FONTIER:  That's fine, I'll withdraw it, I'll

20    withdraw that request.  But I am very much making the request

21    regarding the following page 2 to page 3 where Basaaly Moalin

22    responds that I didn't hear the news, that man that you're

23    talking about doesn't even identify as Somali.

24            THE COURT:  Where are we talking about now?

25            MS. FONTIER:  So basically --

1          THE COURT:  Page 2 --

2          MS. FONTIER:  -- we're looking at page 2 where --

3          THE COURT:  Please, Ms. Fontier, we're trying to

4   make a record here.

5          MS. FONTIER:  I apologize.

6          THE COURT:  Page 2.  Where are you starting?

7          MS. FONTIER:  Page 2 -- the government ends at --

8   where does it end? -- Bashir, halfway down -- sorry -- but a

9   few lines --

10          THE COURT:  Hold on.  Get your thoughts together,

11   okay?  Just tell me exactly where -- approximately how far

12   down the page -- the page isn't lined -- and just give me

13   who's speaking and what's being said, and that will be the

14   starting point.

15          MS. FONTIER:  Okay.  So five lines up from the

16   bottom which starts with Basaaly, go on.

17          THE COURT:  Okay.  Hold on.  And to what point?

18          MS. FONTIER:  My request then would be through

19   page 3, one, two, three, four lines from the bottom.  Basaaly

20   says So he is not a person who is interested in clan

21   affiliations.

22          THE COURT:  Okay.  Give me a moment and I'll review

23   that.  I'd ask the government to look at -- well, first of

24   all, where you started on page 2 beginning with "go on" and

25   down to the bottom of the page, that's not 106, so that would

1   not come in under 106.  But now I'll ask the government to

2   take a look at page 3, at the top of page 3 and down through

3   where counsel indicated she was requesting with the last line

4   being Basaaly, So he is not a person who is interested in

5   clan affiliations.  Do you see that?

6           MR. COLE:  Yes, your Honor.

7           THE COURT:  Okay.  The reference -- the third-party

8   reference there to "he," is it agreed that that's a reference

9   to Ayrow?

10          MR. COLE:  Yes.

11          THE COURT:  Okay.  That part can come in under 106.

12          MS. FONTIER:  Thank you, your Honor.  I apologize

13  for talking over the Court.

14          MR. WARD:  Your Honor, from the top of page 3 down

15  to "so he is not a person has affiliated with clan

16  affiliations"?

17          THE COURT:  Yes.

18          MR. WARD:  Thank you, your Honor.

19          THE COURT:  Down to there.  And then page 4 is

20  withdrawn.  Okay.  That was all that was submitted on that

21  particular exhibit.  Next we have 177, and I would rule that

22  the entire call is not 106; it's not admissible under 106.

23  At this point it appears that Bashir is merely scolding

24  Mr. Moalin for talking directly.  Okay.  That would be --

25  that's 177.

1              Then there was a request for 191, and I would find

2     that that is admissible under 106.  It does continue the same

3     subject; the submission continues the same subject and adds

4     context.  Okay.

5              MS. FONTIER:  Thank you, your Honor.  I think that

6     is all for Mr. Moalin; is that correct?

7              THE COURT:  Yeah, that's all you had on behalf of

8     Mr. Moalin.

9              MS. FONTIER:  Thank you very much.

10             THE COURT:  You're welcome.  Okay.  Ms. Moreno --

11             MS. MORENO:  Yes, your Honor.

12             THE COURT:  -- you're next.

13             MS. MORENO:  I'm glad your Honor is smiling.

14             THE COURT:  I'm sorry?

15             MS. MORENO:  I said I'm glad your Honor is smiling.

16             THE COURT:  Okay.  Exhibit 124, okay.  The

17    proffered material is not 106, it's not admissible under 106

18    because pages 7 through 9 of the submission do not deal with,

19    quote, the guys, end quote -- let me restart that.  The

20    submitted material does not deal with, quote, the guys, end

21    quote, that defendant Mohamud and defendant Moalin will do

22    something for, as referred to on page 1.  Pages 7 through 9

23    deal with different subjects and do not refer to the

24    transcript content already in evidence.  However, it may have

25    independent evidentiary value, but it's not 106.  So I

1    leave -- I leave to your discretion whether you wish to have

2    it proffered, and if so, I suggest that this be something

3    that you confer with Mr. Ward on.

4        MS. MORENO:  If I may be briefly heard, your Honor?

5    I believe there's no doubt that in this conversation in this

6    transcript that the government will argue is that my client,

7    when he said "I will complete the task which pertains to the

8    men tomorrow, God willing," that the men, the only reference

9    that makes sense is that the men are about al-Shabaab.

10   Otherwise it's not relevant at all, and it shouldn't come in.

11       In the same conversation, my client, midway on

12   page 7, your Honor, where -- actually it's towards the bottom

13   where Mr. Mohamud says "these guys, the youth, they slaughter

14   anyone they capture and that is not good policy to begin

15   with."  And then Mr. Moalin says something.  Then on page 8

16   Mr. Mohamud continues and comments on that.  And this is in

17   direct contrast because within the transcript, your Honor,

18   these words -- and I think the government must agree in all

19   honesty -- the words "the men," "the youth," they will argue

20   to the jury that this is al-Shabaab; there's no question in

21   my mind that that is their argument.  That's fine.  But my

22   client is repudiating that notion within the very same

23   conversation when he says "these guys, the youth, they

24   slaughter anyone they capture, and that is not good policy to

25   begin with."  Again, that's on page 7, your Honor.  And they

1    talk more about slaughtering suspects, and there's no

2    question that Mr. Mohamud is condemning that on pages 8 and

3    9.

4              And so my argument under 106 is not only does it

5    provide context, that without it just those first two pages

6    deliberately -- not deliberately but mislead the jury about

7    what the conversation was about because there is a

8    contrasting critical philosophy that Mr. Mohamud is

9    discussing in this very conversation of December 28, 2007,

10   and the only reason the government wants to use this

11   conversation is for that line when Mr. Mohamud says "I will

12   complete the task which pertains to the men tomorrow" in

13   response to Mr. Moalin saying "the men have been crying out

14   to me," this is al-Shabaab, it's nobody else.

15             THE COURT:  You know, this may be one of those

16   things where we were just on different wavelengths, I mean

17   the two -- the parties were on different wavelengths.  You

18   see -- you see where in your translation -- your translation

19   does not track with what the government has for Exhibit 123.

20             If you take a look at page 2, after the greetings,

21   about almost halfway down Basaaly is quoted as stating "the

22   guys are calling me continuously."

23             MS. MORENO:  Right.

24             THE COURT:  Where is that in the government's --

25             MS. MORENO:  Right, that's a dispute, and that has

1  been given to the government that our linguist -- as you can

2  see, your Honor --

3            THE COURT:  And then --

4            MS. MORENO:  -- that is --

5            THE COURT:  Excuse me, Ms. Moreno.  And then -- it

6  starts out "the guys are calling me continuously," and then

7  your client states "We will do something for the guys

8  tomorrow by the will of God."  So that's what you're claiming

9  is already in, and I'm looking at 123 and I don't see that; I

10  don't see that kind of a --

11           MR. COLE:  In our transcripts, your Honor, it's

12  Exhibit 124.  Sorry.

13           MS. MORENO:  I'm talking about 124, your Honor.

14           THE COURT:  Okay.  My --

15           MR. COLE:  The second page of ours.

16           THE COURT:  Thank you.

17           MS. MORENO:  Am I off?

18           THE COURT:  No, no.  That was my error.  I'm sorry.

19  Okay.  Yes.  "The men have been crying out to me over the

20  phone, and I will complete the task which pertains to the men

21  tomorrow."  It's a little bit of a different translation

22  here.  The guys are calling me continuously," "We will do

23  something for the guys tomorrow by the will of God."

24           MS. MORENO:  Yes, your Honor.

25           THE COURT:  And so as I read this the first time

1    through, I was looking at pages 7 through 9.  And, you know,

2    the only -- the only basis for this transcript coming in,

3    124, was "the guys are reaching out, they're crying over the

4    phone," et cetera, and your client saying we'll do something

5    tomorrow.  Then I'm looking at pages 7 through 9 and it looks

6    to be different subjects.  Let me just look at this again --

7              MS. MORENO:  And, your Honor --

8              THE COURT:  May I just look at this again?

9              MS. MORENO:  Yes.

10             THE COURT:  Thank you.  So somebody's playing a

11   mental game, Ethiopians are searching for a particular

12   individual, somebody is mentally ill, the youth did not catch

13   somebody, they won't kill him, these guys, the youth, they

14   slaughter anyone they capture, someone else may do, you

15   should reach a stage that we can differentiate the people,

16   sometimes what happens there is a person that is pretending

17   he's your friend but he's spying on you.  That's the end of

18   page 7, nothing having to do so far with what I see on 124.

19             Now to page 8.  Policy of slaughtering suspects,

20   slaughtering, the guy wasn't interviewed, talking about an

21   interview of a man, the guy being captured and transfered,

22   someone's in the hands of the resistance, what we need is

23   unity, they were defeated only because of unity, unity is

24   important.  Nothing -- that's the end of page 8, nothing

25   having to do with reaching out and crying out and Sheik

1    Mohamud stating a task will be completed.

2            All right.  On to page 9 now.  The unity, the guys

3    are more lenient, they are not fighting against them, change

4    their position, you can be with anyone without taking

5    beliefs, their beliefs and principles, there must be

6    cooperation for the future of the country, foreigners will

7    leave, great, great, the country is for all of us, that is

8    right.  And then I'm at the bottom of page 9.  So there's

9    nothing -- there's nothing really that relates, in my view.

10   It's not 106.

11           Now, as I said initially, it may come in -- it may

12   have -- it may be coming in possibly, if you submit it, under

13   some other theory, but it is not 106, completely different

14   subjects.  Okay.  That's Exhibit 124.

15           Submission number 2.  The question I have, as

16   you've submitted this draft, Ms. Moreno -- and this is

17   submission number 2 from your client -- it relates apparently

18   to -- it references Exhibit 140 in evidence.

19           MS. MORENO:  Your Honor, it doesn't reference.  I

20   asked -- this is a separate conversation --

21           THE COURT:  This is a separate conversation?

22           MS. MORENO:  -- that the government is not using.

23           THE COURT:  Where do you indicate it's a separate

24   conversation?

25           MS. MORENO:  I said it is just to precede

1    Government Exhibit 140, to precede it.  In other words, the

2    because Government Exhibit 140 in time and date is subsequent

3    to the submission to the Court on behalf of my client, so I

4    was just trying to acquaint the Court in time.

5             THE COURT:  The question I had for myself here that

6    I've written down is is the second submission, this one,

7    related to the government's portion of Exhibit 124.

8             MS. MORENO:  To 124, no.

9             THE COURT:  We've already gone through that.

10            MS. MORENO:  Yes, your Honor.

11            THE COURT:  This appears -- now this appears to be

12   responsive to 124.

13            MS. MORENO:  I'll do that then.

14            THE COURT:  No, no, no.  I'm serious because I

15   have -- I have this coming in.  I was really very confused as

16   to what it was.  I think ultimately I realized that this is

17   something that you wanted, an additional conversation you

18   wanted submitted.

19            MS. MORENO:  Yes.

20            THE COURT:  But it does appear to be 106 if in fact

21   it is related to 124.  What you submitted with respect to

22   124, initially those additional pages, 7 through 9, in my

23   view had nothing to do with what that one excerpt dealt with

24   submitted by the government.

25            MS. MORENO:  I understand.

 1              THE COURT:  But this appears to relate to what the

 2     men are reaching out for.

 3              MS. MORENO:  Thank you.

 4              THE COURT:  I don't know if the government saw it

 5     that way.  Mr. Ward, were you -- were you tracking with what

 6     was being done here, what was being submitted?

 7              MR. WARD:  No, your Honor.  The submission that

 8     came to us is it relates to Exhibit 140.  Now, that's a call

 9     a day later than this call, and Mohamad Mohamad Mohamud's not

10     even a participant in the call.

11              THE COURT:  Right, right.  Exhibit 140 doesn't

12     involve -- doesn't -- I think the reference to 140 was just

13     to a particular place in the order of -- in the order of

14     calls.  But I saw this as being responsive, finally something

15     being responsive or reading on what had been submitted in

16     124.  Going back to 124, the men crying out to Mr. Moalin and

17     Mr. Mohamud saying I will complete the task which pertains to

18     the men tomorrow.

19              Take a look -- let's look at this together here.

20     And Mohamud:  The men caused me a problem because 35 men are

21     after me.  So this seems to relate to the pressure he's

22     getting from a group of men.  Asking Mr. Moalin if he

23     understands, and he says yes.  So this is apparently men

24     waiting for money, things being on hold.  So this is what

25     appeared to be 106 material vis-a-vis Exhibit 124.

1          Now, the business of Mr. Mohamud doing his taxes

2    toward the end of this, I don't see the relevance of that.

3    He's just talking about his daily, what he has on tap for

4    personal reasons the rest of the day.  Do you see this as

5    related to 124?

6          MR. WARD:  Your Honor, we think it's temporally

7    related.  It's over a month later from 124, but I suppose

8    that's an inference that somebody might want to argue.

9          THE COURT:  Well, it makes some sense.  It

10   certainly makes more sense than pages 7 through 9 of Exhibit

11   123.

12         MR. COLE:  Your Honor, our -- I mean it's fine.  If

13   that's the inference that she wants to argue, perhaps

14   that's -- if it's the Court's ruling, we're fine with that.

15   But our -- the point is is those 35 men, that's the stuff

16   about the -- Sahal and the group of orphans and there's men

17   in town, if you need more information about the families

18   they're going to support.  It's a totally different matter

19   because that of course is our interpretation.  So if the

20   Court's ruling is that well, it comes in, that's -- so be it.

21   That's fine.

22         THE COURT:  What's your theory?  What's your theory

23   here, Ms. Moreno?

24         MS. MORENO:  I'm not telling, your Honor.  I'm

25   sorry.

1              THE COURT:  You agree with the government?  Well, I

2    tried to put these things together, but this appeared to make

3    more sense than pages 7 through 9.  It's responsive to the

4    pressure apparently that your client is feeling at the time

5    to supply money to men.  You know, given the concerns of the

6    government and your commendable retrenchment at this point, I

7    won't -- I won't find that it's 106, but I'll find that it's

8    relevant under 804 (b), things we discussed previously with

9    respect to other activities of about this point if time, just

10   giving context -- a little bit more context to what was

11   happening here.

12             Okay.  Page -- let's see.  Let's get to the third

13   submission.  This dealt with a particular transcript.  Ms.

14   Moreno, can you recall?

15             MS. MORENO:  I'm sorry, your Honor?

16             THE COURT:  Was this -- this dealt with an existing

17   transcript.

18             MS. MORENO:  Yes, your Honor.  It is exhibit --

19             MR. WARD:  Exhibit 142.

20             MS. MORENO:  Yes, 142.  It's Government's Exhibit

21   142.

22             THE COURT:  Okay.  Thank you.  And I have page --

23   page 3 of your submission appears to be 106.

24             MS. MORENO:  Yes, your Honor.  That is the only

25   page on this one.

```
 1              THE COURT:  Okay.  Page 3 is admissible under 106.
 2   Then on page -- the fourth submission, this is where I really
 3   did get confused.
 4              MS. MORENO:  Your Honor, I think you already ruled
 5   on that with Ms. Fontier if that's Exhibit 143.
 6              THE COURT:  Okay.
 7              MS. MORENO:  Your Honor, it was just duplicative.
 8   I apologize.
 9              THE COURT:  Very good.  Okay.
10              MS. MORENO:  I withdraw it.
11              THE COURT:  Okay.  I did note that your client was
12   not a party to this conversation if I'm correct.  That's I
13   think where some of the confusion came up.  Transcript 143
14   was a discussion between Mr. Moalin and Sheikalow.
15              MS. MORENO:  Correct.
16              THE COURT:  I'd like to use this particular
17   transcript, however, as a -- as an opportunity to underscore
18   a point, a concern.  I realize that during the course of the
19   cross-examination of Agent O'Very, there was this point being
20   made about "young guys" appearing in one transcript and "the
21   youth" in another transcript.  And, you know, people can
22   score points, but once again, taking a macro view of what has
23   been submitted by the government by way of transcripts, the
24   hundreds and hundreds of pages of transcripts, and there's
25   one discrepancy that's been pointed out in all of the reading
```

```
 1    I think just needs to be seen in context.  And what I wanted
 2    to mention here with respect to what's been submitted on this
 3    last submission that is now mooted out is something I noted.
 4    At the top of the page, the top of the first page submitted,
 5    page 2, you'll see a greeting attributed to Mr. Moalin, Peace
 6    be --
 7              MS. MORENO:  Which exhibit?
 8              THE COURT:  Well, this is -- this was your -- your
 9    fourth submission, which is now moot apparently, so I wasn't
10    even going to deal with the merits of the submission; it's
11    already been dealt with with respect to Ms. Fontier's
12    submission.  But take a look at the top of the page there.
13    What was said in original language in Somali, there's a
14    reference to Sheikalow.  See that?
15              MS. FONTIER:  Yes, your Honor.
16              THE COURT:  Okay.  So Sheikalow, the word
17    "Sheikalow," the name "Sheikalow" was spoken in Somali, yet
18    it was not interpreted, it was not attributed to Mr. Moalin
19    in the translation, in the English translation.  It's just
20    "Peace be upon you too."
21              There may be differences from time to time, I mean
22    these guys apparently are under a lot of pressure and there
23    are going to be some differences.  It's really up to you to
24    determine how much you want to hammer away at something that
25    could have been very innocent as opposed to just, as I say,
```

1    taking the larger view.

2              My sense is that both sides are probably vulnerable

3    here.  I just point out something that came to my attention

4    here that's a fairly glaring omission, and that is not -- not

5    carrying over "Sheikalow" from Somali to English in the

6    original greeting.

7              MS. MORENO:  If I may, your Honor.

8              THE COURT:  Sure.

9              MS. MORENO:  I appreciated your comments in front

10   of the jury.  And actually they did concern me because I

11   agree with your Honor that this is a prodigious effort on the

12   part of both sides.  But, frankly, these are important points

13   for the defense.  This is a fight about words sometimes.  And

14   when the linguist in the middle of trial is editing a

15   transcript not about he didn't put in Sheikalow as a

16   greeting, if I may, your Honor, but "the youth," how much

17   have we heard about "the youth" and "young men" is

18   al-Shabaab, and he changed that.  So to me anyway it was a

19   very important point with respect to --

20             THE COURT:  That's fine.

21             MS. MORENO:  -- Mr. Mohamud.

22             THE COURT:  I'm not getting in the way of that.

23   I'm not getting in the way of that.  All I'm saying is that

24   is something that could cut both ways.  I'm informed that

25   there has been some interpretation that's taken place on the

1  part of the linguist for the defense.  All I'm asking is

2  this, that -- I'm not even asking anything, I'm just making

3  an observation.

4          MS. MORENO:  I appreciate it.

5          THE COURT:  -- that there are points to be scored

6  that sometimes don't yield results ultimately in the mind of

7  jurors.

8          MR. COLE:  Just briefly, your Honor.  Perhaps there

9  was some misunderstanding about that one issue that came up.

10  We sent -- Mr. Ward sent specific notice to counsel about

11  that change being made, specifically notified them of that,

12  and the ironic thing is that we thought it was a change they

13  would welcome because it was a change from "the youth" to

14  "the young guys."  It wasn't interpreted that way in court,

15  and there was no intention of hiding the ball on the

16  government's part.

17          THE COURT:  Yeah, I just -- I became a little bit

18  concerned with that.  You make what you will of what's

19  available and the points you want to score.  I just made my

20  observation, and I've said enough on that point.  Okay.  The

21  fourth submission is mooted out here.

22          MS. MORENO:  Yes, your Honor.  I think I have one

23  left.

24          THE COURT:  Pardon me?

25          MS. MORENO:  I think I have one left.

1          THE COURT:  Yes, you do.  And that submission was a

2     bit confusing as well.  My notes indicate -- first, the

3     participant are listed as Basaaly and Moalin, so if we take a

4     look there as to the participants, obviously they're the same

5     person.

6          MS. FONTIER:  No, your Honor.  On this

7     particular -- I'm standing because I spoke to our linguist

8     about this, your Honor, because the person self-identifies in

9     the call after -- if you look at page 2, which is the

10    beginning, where it says Peace be upon you, Basaaly, peace be

11    upon you, Moalin, hey, Basal, and then it says Moalin.  So

12    Moalin in Somali means teacher, and because they just were

13    saying -- Basaaly was referring to the person as Moalin, it

14    was placed in the transcript as Moalin.  In time, after this,

15    our linguist doesn't -- never put another name there because

16    I went back and asked him about this, and he said I put that

17    because that's how the person was addressed in the call, but

18    from now on I will respond, just put everyone is unidentified

19    when it's not Mr. Moalin.

20         THE COURT:  Okay.

21         MS. FONTIER:  But that's why it is listed as Moalin

22    in this call.

23         THE COURT:  Okay.  Well, that was my initial issue.

24    I hadn't -- the only times I had ever seen "Basaaly" and

25    "Moalin" were when defendant Moalin was being referred to, so

1    that was my initial confusion.  And I also note there's no

2    mention of defendant Mohamud, your client, Ms. Moreno.  Why

3    are you submitting this?

4              MS. MORENO:  This is his conversation.

5              THE COURT:  I'm sorry?

6              MS. MORENO:  This is his conversation.

7              THE COURT:  So is "Moalin" here defendant Mohamud?

8              MS. FONTIER:  Yes, your Honor.

9              THE COURT:  Okay.

10             MS. FONTIER:  Mr. Moalin refers to Sheik Mohamad as

11   teacher.

12             THE COURT:  Okay.

13             MS. FONTIER:  And then we just want to make

14   everything as confusing as possible I think, your Honor.

15   This conversation confused me for a very long time too but --

16   and I had to have a conversation with the linguist in order

17   to understand what was occurring.

18             THE COURT:  Okay.  Well, on this one, beyond the

19   initial problems I've mentioned to you, I was thoroughly

20   unclear as to what goes where, difficult to find common

21   points of reference in the government's translation to what I

22   have before me from the defense.  So this being the last

23   submission, I just stopped and I wrote a note to myself to

24   ask you, Ms. Moreno, just to do it as has been done by either

25   defendant Moalin or defendant Nasir, color-code what has

1    already come in, relate it a particular point of reference in

2    the transcript that's already in, and then let me know what

3    you're proffering.

4              MS. MORENO:  If I may, your Honor, this is the last

5    106 submission, and the reason why you can't find it in the

6    government's transcript is because they end, and I wanted --

7    my only 106 request was one sentence or two sentences from

8    Mr. Moalin.  So if the Court --

9              THE COURT:  What transcript does this relate to?

10             MS. MORENO:  I'm sorry, your Honor?

11             THE COURT:  What transcript does this relate to?

12             MS. MORENO:  This is the --

13             MR. WARD:  It's the 155, your Honor.

14             MS. MORENO:  This is a government exhibit --

15   Exhibit 155, your Honor --

16             THE COURT:  Thank you.

17             MS. MORENO:  -- same exhibit.  And the government's

18   transcript ends on page 4.  It ends on page 4.

19             THE COURT:  Okay.

20             MS. MORENO:  And our translation -- the only 106

21   requirement I am claiming --

22             THE COURT:  So this is a continuation of the same

23   call?

24             MS. MORENO:  Same call, your Honor.

25             THE COURT:  Okay.

1            MS. MORENO:  And the only thing I'm asking for is

2     the very top of page 5 where -- it starts on page 4 --

3     Basaaly:  So it will have no effect on us at all.  And then

4     Basaaly Moalin says we don't care for those who have

5     political or clans agenda.  Our intention is to provide help.

6     That is the only 106 request I am making on the Government's

7     Exhibit 155.

8            THE COURT:  Where did that -- does that come in

9     immediately after page 4 ends on Exhibit 155?

10            MS. MORENO:  That's what we're saying, yes, your

11     Honor.  So they stop on page 4 --

12            THE COURT:  So line this up for me.  At that

13     particular location, I've got your client and Mr. Moalin, oh,

14     from 5:07 to the end as follows:  Moalin:  Thirty people or

15     20 that you trust will be enough.  You tell them to pay this

16     much, something they can afford.  Mohamud:  God willing, it

17     will be all right.

18            MS. MORENO:  Right.

19            THE COURT:  Moalin:  Yes.  Mohamud:  It will be all

20     right.  Yes.  Don't worry.  Okay.

21            MS. MORENO:  It's right before that.

22            THE COURT:  How does -- well, what I'm seeing right

23     before what you want to add would be Moalin saying, I told

24     him that we are not the people in charge and we consider them

25     that they are working on our interest, I told him people are

1   equal for us and we pray wherever we want to pray regardless

2   of who it is.

3           MS. MORENO:  Your Honor, what I am saying is on

4   page 3 of the government's transcript, if the Court sees,

5   there are asterisks.

6           THE COURT:  Oh, I was going to the end.  I thought

7   you said page 4.

8           MS. MORENO:  And within those asterisks is this --

9           THE COURT:  Is this the only thing that was left

10  off?

11          MS. MORENO:  No, but I'm not asking for everything;

12  I'm only asking for that.

13          THE COURT:  Any objection from the government?

14          MR. WARD:  Your Honor, it really is about three

15  sentences.  If I understand Ms. Moreno correctly though, she

16  wants to drop it into the blank space in between 22 -- excuse

17  me -- 2:44 and 4:31, which ends with "if you call them and

18  say come to me, no one will refuse your request."  So this is

19  Basaaly telling Sheik Mohamad to do the fundraising.  The

20  next thing is -- that would be added under this proposal is

21  so it will have no effect on us at all.  We don't care for

22  those who have political or clan agenda, our intention is to

23  provide help.

24          THE COURT:  Well, you know what I suggest just on

25  this one occasion?  Why don't you just slip in what is -- was

1    not provided between 2:44 and 4:31.

2            MR. COLE:  Okay.

3            MR. WARD:  Thank you, your Honor.

4            THE COURT:  Ms. Moreno, I assume that's acceptable.

5            MS. MORENO:  Yes, if it contains that phrase.

6    Thank you, your Honor.

7            THE COURT:  Okay.  Gosh, that was a lot of fun.

8            MS. FONTIER:  Sorry, your Honor.  On that exhibit,

9    which is 155, for the Court's -- when we reformat these to go

10   to the jury -- I just spoke to Mr. Cole about this -- I will

11   switch "Moalin" to "Sheik Mohamad" so that it matches the

12   government's transcript and makes a lot more sense.

13           THE COURT:  Good.  Okay.  All right.  Next, I had

14   Mr. Durkin on the -- on the -- this is a new call; is that

15   correct?

16           MR. DURKIN:  Yes, sir.

17           THE COURT:  It was unclear to me as to what calls

18   this relates to, and I assume it's just the highlighted -- in

19   other words, if you're submitting it under 106, tell me what

20   calls this relates to if you can --

21           MR. DURKIN:  It relates to the very next -- the

22   very first call that my client is involved in, which I think

23   is December 22.

24           THE COURT:  Can you give me an exhibit number?

25           MR. DURKIN:  It's 122.

1          THE COURT:  Exhibit 126 did you say?

2          MR. DURKIN:  No, 122.

3          THE COURT:  Thank you.  Let me take a look here.

4    And what you -- you have color-coded on page 7 of your

5    submission starting with the second box, If God wishes,

6    through Mr. Moalin stating Today, yes, all the guys were

7    there, on page 8?

8          MR. DURKIN:  Right.  That's what I pointed out to

9    you, Judge.  It's where Mr. Moalin discusses that he's going

10   to start a nonprofit and the donation -- have an account and

11   it would be a legal way to make the contributions.

12         THE COURT:  All right.  Well, let me take a look at

13   123 because that's the starting point for this.  Let me --

14         MR. DURKIN:  It's 122, Judge.

15         THE COURT:  Yes, I've got 122.  Thank you.  Is

16   there an objection?

17         MR. WARD:  There is, your Honor.  122 is the call

18   between Moalin and Ahmed Nasir about the young men who are

19   firing the bullets.

20         THE COURT:  Yes.

21         MR. DURKIN:  That's exactly the point, Judge.

22         THE COURT:  I just want to get clarity here.

23   You're objecting to that?

24         MR. WARD:  Yes, your Honor.

25         THE COURT:  So what you're submitting, Mr. Durkin,

1   is a conversation two days before the conversation which is

2   123?

3            MR. DURKIN:  Yes, sir.  I'm sorry.  It's 122.

4            THE COURT:  Yes.  Thank you.  I think that's

5   understood at this point.  I just have 123 in my mind.

6            MR. DURKIN:  That's fine.  It's December -- the

7   call I'm requesting is on December 20, and the call in

8   Exhibit 122 is on December 22.

9            THE COURT:  Thank you.  Yes, I went through this,

10  and this is -- it's not 106, but I think it -- it's something

11  that could very well be admissible under either 803 (3) or

12  804 (b), but I don't see it as 106 because I see the subjects

13  as different subjects.  I think in what's been submitted

14  here, it's discussing the mechanics of setting up a bank

15  account and a website that will go public, hopefully have the

16  effect of attracting funds that can be utilized for

17  certain -- certain purposes.  There's nothing in here about

18  fighting, the results of any battle, throats being cut, or

19  any of that.

20           MR. DURKIN:  Judge, that's -- with all due respect,

21  that's exactly my point.  The government -- you know, 106

22  says it can be any other -- or any other writing or recorded

23  statement that in fairness ought to be considered.

24           THE COURT:  Well, I know that.  Yeah, I'm not

25  limiting it to -- I'm not saying because it's not part of

 1  122, it's out.  I mean if it involved the same subject or if

 2  122 was misleading or distorted without this, I would agree

 3  with you completely; it wouldn't be kept out simply because

 4  it's a different call.  But I see this as two distinct

 5  subjects.  At the same time, I'm saying I think it's -- I

 6  think it's in all probability admissible if you wish to

 7  ultimately proffer it on another ground.

 8         MR. DURKIN:  I'll quit while I'm ahead.

 9         MR. COLE:  Well, your Honor, we're sort of assuming

10  that all we're talking about is 106 here.  We haven't been

11  making objections on other grounds --

12         THE COURT:  I understand.

13         MR. COLE:  Okay.  There's -- to my knowledge

14  there's never been a discussion of a website or a nonprofit

15  organization, again, and so we don't think it -- I mean state

16  of mind under Hillman has to go to a specific action to be

17  proved or disproved, and we don't see the relevance under 803

18  (3) either.  But we'll preserve that I guess when it comes

19  up.

20         THE COURT:  Well, but you'll recall some of the

21  conversations we had at the motions in limine, 804 (b).  You

22  wanted to get in an awful lot of stuff related to

23  conversations, activities, before al-Shabaab ever was

24  certified as a terrorist organization.  The defense didn't

25  want that in, they said no, that's not relevant at all.  I

1    said well, it shows a general period of continuity.  You

2    remember all of that, I'm sure.

3              MR. COLE:  I'm sorry, your Honor.  You know what?

4    I do remember that, I think you -- so I apologize.  You've

5    been saying 804 (b).  Is that 404 (b) you're talking about?

6              THE COURT:  Yes.

7              MR. COLE:  Okay.  I'm sorry.  Because I looked at

8    804 (b), and I was --

9              THE COURT:  No, no.

10             MR. COLE:  I'm sorry.  My apologies.

11             THE COURT:  Thank you for the correction, 404 (b).

12   It's been a long couple of days here --

13             MR. COLE:  It has.

14             THE COURT:  -- a little bit of sponginess.  I

15   probably made references to 804 (b) earlier today --

16             MS. MORENO:  You did both, Judge.  You said 404 (b)

17   and --

18             THE COURT:  And I'm so sorry.  I'm talking about

19   404 (b).  I'm talking about evidence of other acts during

20   this period of time.  I'm not -- you know, we went through

21   this, and I told both sides that I wasn't going to hamstring

22   them when it came to their ability to fairly present their

23   case and support their theories.  And in my view, we're

24   talking about a period of time, just a two-day difference

25   between Exhibit 122 and what's been proffered here.  As I

1    say, I don't see it as 106, but I think there's a strong

2    argument to be made that it comes in as 404 (b).

3              And I really -- by that I don't really want to

4    invite a whole bunch of individual issues on -- I don't need

5    to sanitize evidence or go over evidence ahead of time.  If

6    there are issues -- I don't know if the defense has hit the

7    point where it wants to submit to the government, if it

8    hasn't already, or share with the government other calls or

9    bits of evidence relating to, you know, activities at about

10   the relevant point in time that weren't -- that are

11   rehabilitative.  I'm talking about additional calls.  I don't

12   know how many you have.  Have you done that?  Have you hit

13   that point in the proceedings yet?

14             MR. DRATEL:  We've been doing that all along, your

15   Honor, because of translation issues, so as we find some that

16   are -- in other words, as they become relevant or as they

17   become probative of a particular issue, we have -- we do -- I

18   would say except for a couple, we've had all of them done

19   before the trial started -- but we keep getting stuff from

20   the translator because of the -- just the density of trying

21   to get through this stuff for the translator, but we've been

22   doing that all along.

23             We haven't -- initially we did not distinguish,

24   when we gave the government translations, which were 106 and

25   which would be -- which we were designating for the defense

1  case.  Obviously after the discussions a few weeks ago, we

2  began to hone in on 106 because of obviously the time issue,

3  so we distinguished those, but we've also been giving other

4  calls that either are partials from calls that the government

5  has played that we didn't think were 106 but were admissible

6  on other grounds or whole calls that the government had not

7  put in at all.  I think that applies to all defendants on an

8  ongoing process.

9            MR. COLE:  What might be helpful then at this point

10 is if we just had one -- 106 is done now it sounds like

11 except for Mr. Ghappour --

12            MR. GHAPPOUR:  Yes.

13            MR. COLE:  Well, except for Mr. Ghappour's.

14            THE COURT:  Yeah, I need to --

15            MR. COLE:  So once the 106 is done and we all know

16 what that is, it would be helpful if we just got an email,

17 just -- or a document with one list for each defendant of

18 what non-106 calls they anticipate offering that we haven't

19 offered, that would just help us because they have been

20 sending us stuff in sort of rolling waves, and we have no

21 idea at this point exactly what it is they're going to offer

22 on grounds other than 106.  If they'd just send us a list by

23 each defendant in one place we could look at, that would be

24 very helpful.

25            THE COURT:  Well, I know what the logistics have

1    been; I mean both sides have told me what they've been.  I

2    appreciate that.  I will tell you I've never had an

3    experience like this before where things have come in,

4    rolling in so late, and just in a way that was -- that was so

5    unorderly -- I'll put it that way -- and I don't mean to be

6    critical by that, but just I'm getting -- I'm getting -- you

7    know what I'm getting.  I've not seen this in another case,

8    any kind of a case.  And it's a tough way to stay ahead of

9    the curve.  But you've got to keep doing it.  You've just got

10   to keep rolling through this stuff and getting it to the

11   government just as soon as you can.  If there are issues,

12   hopefully I'll have time to deal with them ahead of time

13   without unduly burdening what I've got to do in this case.

14   And I just emphasize that for whatever good it may ultimately

15   yield.  Okay?

16           MR. DURKIN:  Judge --

17           THE COURT:  Yes?

18           MR. DURKIN:  If I could -- again, this is not

19   criticism either.  You may recall there was a long time ago I

20   started telling you about the digital discovery age that

21   we're entering?

22           THE COURT:  I hadn't heard that.

23           MR. DURKIN:  I think I mentioned it at a status

24   hearing once.  I really think that you're going to see a lot

25   more of this.  I mean this could be off the record.  I'm not

1    complaining for the record, but I'm telling you, one of the

2    things that's happening -- and it's happening all over the

3    country -- is the digital discovery is imposing an incredible

4    burden in terms of organization.  It becomes very hard to

5    deal with.  Now, we're into translation issues and all kinds

6    of other things, but it's getting -- it's a different -- in

7    the last two or three years -- and I think it's really since

8    this Stevens case -- the Justice Department seems to be doing

9    all digital discovery, and it's becoming very difficult.  So

10   I only predict that you'll see a lot more.

11            THE COURT:  Well, Mr. Durkin, I've been seeing it

12   for years, and we've been discussing it -- I was being a

13   little facetious when I said gee, I hadn't heard anything

14   about digital discovery.  We've been -- we've been dealing

15   for years with presentations, panel discussions, Inns of

16   Court, digital discovery, electronic storage of information,

17   ECI.  So believe me, we're aware of what's happening, what

18   the trends are.  But what's different in this case and why

19   I'm not being critical is I know what the practical problems

20   have been for both sides here in getting their hands around

21   an awful lot of information and getting it organized and

22   identified in terms of what's important, what's not

23   important, translated, shared, all of that.  And, you know,

24   it's happening right up to the time of trial and into trial.

25   Believe me, we've all had cases involving -- that reflect the

1      digital age we live in and reflect the massive discovery that

2      is capable of being generated now.  But it all gets

3      organized.

4              You know, it's funny.  Those are the cases

5      ultimately that are the easiest to try, number 1, because

6      there is so much to manage, and everybody knows it in

7      advance; number 2, it draws the best of the trial lawyers;

8      number 3, the trial lawyers know that they've got to present

9      an organized case so that the jury can understand it, so they

10     can educate the jury.  And if they're flopping around in the

11     well with stuff that's disorganized or they can't run their

12     equipment or the technology in the courtroom, it's never lost

13     on the jury.  So those are the cases -- those are the cases

14     that really seem to draw the attention and the talent that

15     need to be drawn.

16              This is a -- this is a special case, and it's --

17     I'm sure it's not the only type of case that falls into a

18     special category.  So we've identified the reasons why that's

19     so.  I'm trying to work with both sides.  I appreciate all of

20     your efforts.  I think that it's apparent -- well, it's

21     apparent to me that you've been working hard, all of you, on

22     doing what you need to do to keep this train moving and the

23     trial is as seamless as it can, and I for one are really

24     appreciative of the efforts.

25              So that being said, Mr. Ghappour, I still haven't

1    gotten to you.  Can I ask you to do something?  I know you've

2    just got a couple.  Would it be too much to ask for -- to

3    have you color-code those things and submit them.  We're

4    already -- oh, my gosh, we're pushing five o'clock.  Have --

5    bring those back to me in the morning if you would, okay?

6              MR. GHAPPOUR:  My understanding is they are

7    color-coded and there is yellow highlighter, and I printed

8    them in color, and, in fact, I believe I had some assistance

9    from Gaby over here for a second copy, and a copy was

10   provided to the government.

11             THE COURT:  I got -- first of all, I got a bunch of

12   material from you that -- well, maybe I just need some --

13   maybe I just need a little bit more help from you as to what

14   you're doing here, what you're requesting.  But I got an

15   awful lot of paper from you.  Is your first request 124?

16             MR. GHAPPOUR:  No -- yes -- no.  It's actually

17   Exhibit 121, just the last six lines.

18             THE COURT:  I got as far as saying yes, the last

19   six lines of 121 may come in as 106.

20             MR. WARD:  Your Honor, we agree with that.

21             THE COURT:  Thank you.  And then I went to Exhibit

22   124.

23             MR. GHAPPOUR:  There's an explanation for that one.

24             THE COURT:  I'm sorry?

25             MR. GHAPPOUR:  There's an explanation for that one.

1          THE COURT:  An explanation?

2          MR. GHAPPOUR:  Specifically my exhibits 124 and 123

3   in the binder were flopped, so it's actually Exhibit 123.

4   And I realized this when we were going through the actual

5   audio yesterday.  I should have made a note.  It was my

6   mistake.

7          THE COURT:  Okay.  I've got Exhibit 124, and I've

8   got some of this blocked off in yellow.  Are you saying 124

9   doesn't relate to 124 in the binder?

10         MR. GHAPPOUR:  Yes.  It's 123.

11         THE COURT:  Okay.  I'll make that change and -- I'm

12  looking at your page -- bottom of page 2 in yellow, pages 3

13  and 4, 5, 6, then I go beyond that -- I got a little at 8 --

14         MR. GHAPPOUR:  And then you pick up --

15         THE COURT:  Let me take a crack at it either

16  tonight or in the morning, okay?

17         MR. GHAPPOUR:  Okay.

18         THE COURT:  I mean you'll get it in plenty of time.

19  So 124 is 123, and then we go to 140; is that correct?

20         MR. GHAPPOUR:  That is correct, yes.

21         THE COURT:  And then 156?

22         MR. GHAPPOUR:  That's correct as well.

23         THE COURT:  And that's it?

24         MR. GHAPPOUR:  And then 171.  Exhibit 171 is a very

25  long call; that's why there's a lot of paper.

1           THE COURT:  Tell you what --

2           MR. GHAPPOUR:  I don't know if you've ruled on it

3   already.

4           THE COURT:  Mr. Ghappour, I've already ruled on it?

5           MR. DRATEL:  We didn't do the whole thing.

6           MS. FONTIER:  I don't know what you requested.

7           THE COURT:  Tell you what.  Work with Gaby for a

8   few minutes; just let her know what you're submitting here

9   when we wrap it up here.  And, Mr. Ward, did you get a chance

10  to look at any of these for Mr. Ghappour?  Do you have any

11  issues on any of these.

12          MR. WARD:  I do, your Honor, on several.

13          THE COURT:  Okay.

14          MR. WARD:  I can submit something this evening that

15  the government had issues with, your Honor.

16          THE COURT:  It would -- this material, because it

17  comes out of an existing call, would either seem to be

18  totally irrelevant or it deals with the same subject, so even

19  though it may not be 106, it's of the type presumptively that

20  comes in under either 404 (b) or 803 (3).  If you look at

21  it -- tell you what.  Just look at it, give it one more look,

22  and then we'll have chance to talk about it tomorrow.  How's

23  that?

24          MR. WARD:  Thank you, your Honor.

25          THE COURT:  And then you can -- so why don't you

1    take this back --

2          MR. GHAPPOUR:  Absolutely.

3          THE COURT:  -- Mr. Ghappour.  Believe me, I know

4    you put some work into this with creating these grids and

5    all.  It would be appreciated though to just add the 171 to

6    it and I'll get to it as soon as possible.  Okay.  Reach out

7    issues.  Any -- Ms. Moreno, have you had a chance to talk to

8    the group?

9          MS. MORENO:  Actually the gentleman is here.  I

10   could speak to him right now.

11         THE COURT:  That would be appreciated.  If there

12   are -- if there are vacant seats anywhere in the courtroom

13   behind the bar, any of the defendants' supporters or Somali

14   community members are welcome to be there.  Please emphasize

15   with your liaison that it's really important for cell phones

16   to be off, that there be no texting or communication with the

17   outside world.  I know there was one issue that arose, and

18   someone had to be asked to leave.  So we just need to get a

19   little bit of that squared away.  And let me know if there

20   are any concerns or issues that we -- you know, if we have

21   smaller numbers, we can rotate hopefully with the cooperation

22   of all people.  If it gets to be a larger number, of course

23   we can get that courtroom open up on pretty quick notice now,

24   I'm informed.  Okay?

25         MS. FONTIER:  Your Honor, sorry, if I just may, I

1    was approached today by some members of the community because

2    there were many open seats, but that was because the court

3    security officers were telling them they were not allowed to

4    sit there.  The court security officers were under the

5    mistaken impression that your Honor had made that a rule and

6    that -- and then they requested to have the other room opened

7    and also were informed by the court security officers that

8    your Honor had said that was not allowed either.  And then

9    when they approached me in court -- the person who approached

10   me in court, the court security officer took much offense to

11   him going around him and told him that he had to leave the

12   building for doing that.

13          So I do bring that to the Court's attention because

14   I think there's a miscommunication between the Court and the

15   court security officers and which is why there were many

16   empty seats.

17          THE COURT:  No, I -- well, let's just get right to

18   the bottom line here.  And something may have been

19   misinterpreted.  I may not have couched things properly.

20   What I wanted to always do was to reserve basically half the

21   courtroom for the supporters of the defendants, and so I

22   wanted to set that aside.  But I didn't mean to imply that

23   that was the only place they could sit.  If there are other

24   seats -- if there's other seating available, if there are

25   vacant seats on the other side of the courtroom, then they're

1      free to sit in those locations.

2              I also indicated it's important -- and I didn't

3      know, you know, how much media coverage would be generated or

4      whatever -- but it's also important to keep in mind that

5      there are from time to time some media representatives

6      here -- not too many, a few I see -- but also that other

7      members of the public should have the opportunity to come in

8      and see this if they find it interesting.  I know other

9      attorneys have come in from time to time.  Also support

10     people from the U.S. Attorney's Office might find it helpful,

11     and other AUSAs I'm sure would find it interesting from time

12     to time.

13             So there are a lot of different things to balance

14     here, but obviously if we have open seats on the right side

15     of the courtroom behind the bar, additional seating may be

16     had for the defendants' supporters.

17             Now, with respect to opening up the other

18     courtroom, what I've indicated is I'd rather not do that

19     because it takes staff to do that and then we have to have

20     somebody there at all times, and the demands on the -- on the

21     CSOs and the marshals are tremendous, not as a result of this

22     case per se, although that doesn't help because we have a lot

23     of personnel here, we've got two buildings now, we've got two

24     courthouses that are being covered with the same staff, and

25     it's put a tremendous stretch on people and resources.

1            So as indicated earlier, if we're dealing with

2    numbers of overflow less than 20, it seems that with

3    cooperation amongst the defense supporters, we can have some

4    rotation of people and everybody having an opportunity to

5    view the proceedings.  And once we get to a figure of 20 or

6    above, I think it's -- I think it's warranted that we open up

7    that courtroom.  So that' as a very general guideline I was

8    laying down, those thoughts.  So that's pretty much it.  Do

9    you have any difficulty with any of those --

10            MS. FONTIER:  Absolutely not, your Honor.  I think

11    that this table and the Court were all in that understanding,

12    that there was just a miscommunication within the new -- when

13    the court security officers, the group that is in here,

14    rotated, the new shift that came in I believe starting either

15    today or yesterday, just the Court's requirements were

16    miscommunicated somehow.  So just so long as it's clear and

17    everybody knows, I think -- and the community I think has

18    been trying -- they prefer to be in this courtroom and have

19    been trying to sort of come in shifts and make it work for

20    everybody.  I think the community very much -- and certainly

21    the defense -- does very much appreciate the Court's concern

22    and assistance in these matters.

23            THE COURT:  Okay.  Very good.  Then why don't we

24    call it a wrap for today, and we'll pick up at nine o'clock

25    tomorrow.  What do we have -- well, to the extent you'd like

1     to give everyone a bit of a heads up, do you have any

2     thoughts about -- are we going to be doing depositions

3     tomorrow; is that what we're going to start with?

4              MS. FONTIER:  Your Honor, given the morning is

5     rather short, I think that we'll probably just begin with --

6              THE COURT:  What's today.  Is today Wednesday?

7              MS. FONTIER:  Tomorrow's Thursday, the short day.

8              THE COURT:  Yeah, it's the short day, okay.

9              MS. FONTIER:  We'll probably just at least begin

10    the morning with depositions, and as soon as -- once we get

11    back and know how many we have and what else is available

12    with flights and things, we'll alert the government as soon

13    as we know what we're doing tomorrow.

14             THE COURT:  Very good.  So what do you figure,

15    about two days of depos?

16             MS. FONTIER:  Yes, but it's our preference to not

17    make the jury watch TV for two straight days.  We'll

18    hopefully be able to break that up a bit so we keep them

19    awake.

20             THE COURT:  Okay.  All right.  Well, have a very

21    good evening, and we'll see everyone at nine o'clock tomorrow

22    morning.

23         (There was a break in the proceedings for the evening

24    recess.)

25

1

I n d e x

2
Witnesses                                          Page

3
**Donald Willow**
Direct Examination by Ms. Han                      1156

4
**Shannon Jenkinson**
5  Direct Examination by Mr. Ward                    1157

6  **Steven Carrillo**
Direct Examination by Mr. Ward                     1161

7
**Barry Trent**
8  Direct Examination by Ms. Han                     1163

9  **Colby O'Very**
Direct Examination, cont'd by Mr. Cole             1165
10  Cross-Examination by Mr. Dratel                   1197
Cross-Examination by Ms. Moreno                    1231
11  Cross-Examination by Mr. Ghappour                 1239

12

13

E x h i b i t s

14
| Exhibits | Description | For ID | In Evd |
|----------|-------------|--------|--------|
| 141-A    | Bank records | 1178  | 1178   |
| 40-A     | Bank records | 1185  | 1185   |

16

17

18

19

20

21

22

23

24

25

<u>Certificate of Reporter</u>

I hereby certify that I am a duly appointed, qualified, and
acting Official Court Reporter for the United States District
Court; that the foregoing is a true and correct transcript of
the proceedings had in the mentioned cause on the date or
dates listed on the title page of the transcript; and that
the format used herein complies with the rules and
requirements of the United States Judicial Conference.


Dated January 16, 2014 at San Diego, California.

*Debra M. Henson*
                    /s/ Debra M. Henson  (electronic)
                    Debra M. Henson
                    Official Court Reporter