1                  United States District Court

2                Southern District of California

3

4  UNITED STATES OF AMERICA,        )
                                    )
5                    Plaintiff,     )
                                    )
6     vs.                           ) Case No. 10-CR-4246 JM
                                    ) Jury Trial/Day 8
7  BASAALY SAEED MOALIN,            ) Thursday, February 7, 2013
   MOHAMAD MOHAMAD MOHAMUD          )
8  ISSA DOREH,                      ) Volume 8
   AHMED NASIR TAALIL MOHAMUD,      )
9                                   )
                     Defendants.    )
10 _____  )

11

12              Before the Honorable Jeffrey T. Miller
                  United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25
                  Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:       Laura E. Duffy
                               UNITED STATES ATTORNEY
 3                             William P. Cole
                               Caroline P. Han
 4                             ASSISTANT U.S. ATTORNEYS
                               Steven P. Ward, Trial Attorney
 5                             U.S. DEPARTMENT OF JUSTICE
                               880 Front Street, Suite 6293
 6                             San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)             Joshua L. Dratel, Esq.
 8                             Alice Fontier, Esq.
                               OFFICE OF JOSHUA L. DRATEL
 9                             2 Wall Street, Third Floor
                               New York, NY  10005
10
     (Mr. M. Mohamud)         Linda Moreno, Esq.
11                             LINDA MORENO, P.A.
                               P.O. Box 10985
12                             Tampa, FL  33679

13   (Mr. Doreh)              Ahmed Ghappour, Esq.
                               LAW OFFICES OF AHMED GHAPPOUR
14                             P.O. Box 20367
                               Seattle, WA  98102
15
     (Mr. A. Mohamud)         Thomas A. Durkin, Esq.
16                             Janis Roberts, Esq.
                               DURKIN & ROBERTS
17                             2446 N. Clark Street
                               Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1           San Diego, California - Thursday February 7, 2013

2       (Defendant A. Mohamud is being assisted by a Somali

3   interpreter.)

4       (The following proceedings were outside the presence of

5   the jury.)

6           THE COURT:  Mr. Dratel, did you wish to -- you had

7   a question apparently.

8           MR. DRATEL:  Yes, your Honor.  I was speaking to

9   Mr. Cole about just how the Court -- we can start with the

10  depositions -- so how the Court would introduce that to the

11  jury.  I understand there's a Ninth Circuit model

12  instruction.

13          THE COURT:  Yeah, it's -- I've given it hundreds of

14  times over the years basically just advising the jury what a

15  deposition is, it's testimony given under oath before trial

16  and preserved in booklet form or in some other way,

17  oftentimes videotaped, and they are to consider the sworn

18  testimony as if it had been given here in court.

19          MR. DRATEL:  Great.  I just wanted to make sure

20  that we were all on the same page.  Thank you, your Honor.

21          THE COURT:  Okay.

22          MR. DRATEL:  We're still working out some technical

23  issues on the equipment that --

24          THE COURT:  All right.  Would you get the green

25  light then, before we bring the jury in, on the technical

1    stuff?

2              MS. FONTIER:  I think we're able to play them from

3    the government's system, so I think we should be okay --

4              THE COURT:  Good, good.

5              MS. FONTIER:  -- other that just I'll have to test

6    it to make sure everything is functioning.  If you can maybe

7    give us another five minutes, and hopefully we'll be okay.

8              THE COURT:  Okay.  How many -- what's the timing of

9    the deposition material you'll be playing?

10             MS. FONTIER:  Well, your Honor, we think -- we have

11   two videos that are shorter, I think an hour, hour and 20

12   minutes each perhaps, which I think we would like to be able

13   to get in this morning before the 11:15 for juror number 1.

14   Obviously may not get through entirely for both, but --

15             THE COURT:  Okay.  So that's our morning then

16   basically, deposition testimony.

17             MS. FONTIER:  Yes.

18             THE COURT:  Okay.  This afternoon more deposition

19   testimony or witnesses?

20             MR. DRATEL:  I think we'll finish the second one,

21   then we can put on a live witness to do the 106s, just to put

22   them in, and then back to another set of depositions.  So

23   probably start the afternoon, finish that second deposition,

24   do the live witness, and then get through whatever we can on

25   the third witness on the deposition.

1          THE COURT:  Okay.  Ms. Moreno, what you filed at

2   11:30 last night, that was just to formalize what had already

3   been --

4          MS. MORENO:  I did not put the Court's ruling, I

5   just put the information.

6          THE COURT:  Okay.  The clerk's office called me at

7   11:30 last night, so I rushed down and --

8          MS. MORENO:  No, you didn't.

9          THE COURT:  Just kidding.

10     (There was a break in the proceedings.)

11         THE COURT:  Okay.  Good morning, everyone.

12  Everyone is present.  We're missing -- Ms. Roberts is the

13  only -- she'll be here, Mr. Durkin, I assume.

14         MR. DURKIN:  She'll be here this afternoon, Judge.

15  She's engaged in something else.

16         THE COURT:  Very good.  Thank you.  Okay.  Ladies

17  and gentlemen, as you know, the government has rested its

18  case, and the defense is now going to present evidence.  I'm

19  informed that this morning and I think at other times you'll

20  be shown videotaped deposition testimony.  I know many of you

21  have heard of the term "deposition" and some of you I'm sure

22  know what depositions are.

23         A deposition basically is testimony given under

24  oath before trial and preserved.  It's always preserved in

25  written form, in booklet form; oftentimes depositions are

1   videotaped, and there have been videotaped depositions of

2   certain individuals in this case, and those depositions

3   occurred in another country.  I'm sure you'll be informed of

4   that.  But the important thing for you to remember is it

5   is -- deposition is sworn testimony.  You are to consider

6   that testimony as if it had been given here in court and

7   under oath.  And then I'll just rely on counsel to advise,

8   perhaps through stipulation, as to who the deponents -- who

9   the deponents are and the date and location of the deposition

10  before it's shown to the jury.

11          You have screens there, you have monitors.  It's my

12  understanding that is videotaped deposition will be shown on

13  the large screen, also shown on the smaller monitors.  Is

14  that correct or is it just on the large screen; do we know?

15          MS. FONTIER:  I believe it's going to be played on

16  all screens.

17          THE COURT:  On the all the screens.

18          MS. FONTIER:  Just like all the other.

19          THE COURT:  Okay.  Very good.  All right.  Then I

20  think we may proceed.  Counsel, do you wish to make a

21  statement as to whose deposition this will be first?

22          MS. FONTIER:  Yes, your Honor.  If I may just

23  confer with Mr. Cole before --

24          THE COURT:  Please, please.

25          MS. FONTIER:  Your Honor, the first witness will be

1    Najib Mohamed.  His deposition was taken during the week of

2    November 11 in Djibouti, which is a country.  Djibouti is

3    also the city, but -- so Djibouti, Djibouti because it's fun

4    to say.

5              THE COURT:  Would you spell -- will the spelling be

6    apparent?

7              MS. FONTIER:  Not even a little bit.  Djibouti is

8    D-j-i-b-o-u-t-i.  Najib Mohamed, Najib is N-a-j-i-b, Mohamed,

9    -- I believe he spells that on the video, but it's

10   M-o-h-a-m-e-d.

11       (The video recording was played.)

12             THE COURT:  Excuse me.  May we have the audio

13   turned up, please.

14             MS. FONTIER:  Is that okay with the volume?

15             THE COURT:  I think it is, and, ladies and

16   gentlemen, obviously the English you're hearing is the

17   English being spoken by the interpreter, the Somali

18   interpreter.

19       (The video recording was played to the end.)

20             THE COURT:  Okay.  Will it take any time to set up

21   the next one?

22             MS. FONTIER:  It will not, your Honor.  May I have

23   just a very brief sidebar to discuss a procedural issue?

24             THE COURT:  Okay.  Just the two of you?

25             MR. DRATEL:  I think --

1           MS. FONTIER:  And the government.

2           MR. DRATEL:  I don't know that any defense counsel

3    are necessary but certainly.

4        (Following is a sidebar conference.)

5           MR. DRATEL:  After the deposition Mr. Mohamed, the

6    witness, asked -- he was concerned about his identity or his

7    face being public.  He was really concerned about al-Shabaab

8    taking reprisals against him, so he asked if that would not

9    be published.  I don't know if it's the court practice to put

10   exhibits on the web or whatever, but I would hope we could

11   find some way to protect --

12          THE COURT:  No, no, these videos --

13          MR. DRATEL:  Okay.  I just wanted to make sure.

14          THE COURT:  No, these won't be made available.  As

15   a matter of fact, this brings up a point -- I should have

16   addressed this earlier or perhaps even last night -- I assume

17   on behalf of all defense counsel -- and of course we have the

18   government here -- that you're stipulating to relieve the

19   court reporter of any obligation --

20          MR. DRATEL:  Yes.

21          THE COURT:  -- to report the videotaped testimony.

22          MR. COLE:  Yes.

23          MS. FONTIER:  Yes.

24          MR. DRATEL:  We mentioned about the tapes but not

25   these.  Right, we're in agreement.

```
 1              MR. COLE:  Yes.

 2              THE COURT:  Okay.

 3              MR. DRATEL:  One other issue, which I don't think

 4   is an issue but I just wanted to raise just to make sure, I'm

 5   okay with whatever the consensus is about whether it's

 6   necessary to identify Judge Gallo or just to say that a

 7   magistrate was there.

 8              THE COURT:  Well, I'll be happy to do that.  I was

 9   actually thinking that might be --

10              MR. DRATEL:  Yes.

11              THE COURT:  -- appropriate to make some reference

12   to that, so I assume there's no objection on that.

13              MR. DRATEL:  Okay.

14              MR. COLE:  No.

15              THE COURT:  So I'll advise the jury.

16              MS. FONTIER:  Your Honor, my procedural issue was

17   just in the next video, which is Sharif Abdi, there's going

18   to be I think three or four exhibits that are being admitted.

19   How do you want us to do that?  Do you want us to pause and

20   actually admit the physical evidence here or just let it play

21   and we can do it at the end or --

22              THE COURT:  What are they, what types of exhibits?

23              MS. FONTIER:  Photos.  There's two photographs, a

24   deed, and I think there's two photographs in the government's

25   cross-examination of him as well.
```

1            THE COURT:  Well, would it be helpful to the jury

2    to understand the deposition testimony to see a photograph as

3    the --

4            MR. COLE:  Yes.

5            THE COURT:  -- testimony is related to that

6    photograph?

7            MR. COLE:  I think we can -- maybe after you lay

8    the foundation for the exhibits and you move to admit them in

9    the deposition, we could pause there and --

10           MS. FONTIER:  Okay.  You know how to do the

11   technological switch from --

12           MR. COLE:  We can find out.

13           MS. FONTIER:  -- video to Elmo?

14           MR. COLE:  We'll find out.

15           THE COURT:  It's always nice finding out these

16   things among the 75 people.  Okay.  Thank you.

17       (Sidebar conference concludes.)

18           THE COURT:  Okay.  Ladies and gentlemen, we're

19   ready to go with the next deposition.  And you heard an

20   individual swearing in, administering the oath to the last

21   individual who was deposed, Mr. Mohamed, and from time to

22   time you'd hear that third voice overruling objections or

23   sustaining objections, reminding the witness the witness was

24   still under oath.  That was Magistrate Judge William Gallo,

25   who is a magistrate judge here in the Southern District of

 1    California.  Magistrate judges and district judges work

 2    together; for every case that comes in that is assigned to a

 3    district judge, a magistrate judge is also assigned.  Judge

 4    Gallo traveled to Djibouti the end of last year, 2012, to

 5    preside over these depositions, so that is the -- that is the

 6    voice that you hear administering the oath and ruling on some

 7    objections.

 8              We're now going to begin the next deposition.  I

 9    don't know that we'll be able to finish it by the time we

10    break; I don't think we will, but that's okay, we'll pick

11    that up at a later time.  During the deposition, as I

12    understand it, there will be three or four exhibits --

13    photographs or documents -- referred to during the course of

14    the deposition.  And what I'm informed now is that when one

15    of these exhibits is referred to, there will be a break

16    momentarily in the videotape, and that particular exhibit,

17    whether it was a photograph or a document, will be admitted

18    into evidence here, will be shown to you because it will

19    relate to the testimony, so that will more or less keep

20    everything together.  Okay.  Ms. Fontier, you ready to

21    proceed then with the next deposition.  This would be the

22    deposition of whom, please?

23              MS. FONTIER:  Your Honor, the next witness for the

24    defense will be Sharif Abdi.  Sharif is S-h-a-r-i-f, Abdi,

25    with the Somali spelling, it would be C-a-b-d-i.  Mr. Abdi

1  was also deposed the week of November 11 of last year in

2  Djibouti.

3          THE COURT:  Thank you.

4      (The video recording was played.)

5      (The video recording was stopped.)

6          THE COURT:  Okay.  What exhibit number is being

7  given to this particular exhibit?

8          MS. FONTIER:  This is Defense Exhibit A, your

9  Honor.

10          THE COURT:  Was this actually the first defense

11  exhibit marked in the defense exhibit list?

12          MS. FONTIER:  Yes, your Honor.

13          THE COURT:  Okay.  Very good.  All right.  Exhibit

14  A is admitted.  So this is the same exhibit, ladies and

15  gentlemen, that was shown to this witness.  And I made an

16  earlier reference to, and it will be displayed on this piece

17  of equipment, which is known as an Elmo -- I think you've

18  heard that term used a few times -- and that is the name of

19  this particular projection system.  Maybe -- well, tell you

20  what.  Why don't you publish it the old-fashioned way.  You

21  can show it to the -- just walk it right down the front of

22  the jury box.

23          MR. COLE:  Oh, wait.  Technology wins again.  What

24  a disappointment.

25          MS. FONTIER:  That's Exhibit A.

 1                THE COURT:  That's -- Exhibit A is now published to

 2      the jury.

 3           (Exhibit No. A identified and admitted.)

 4                THE COURT:  Hopefully you can get back to the

 5      deposition though.

 6                MS. FONTIER:  We'll see.  Thank you.  Thank the

 7      government for their assistance with that.

 8           (The video recording was played.)

 9           (The video recording was stopped.)

10                THE COURT:  All right.  Exhibit B is admitted at

11      this time.  You'll be showing that to the jury?

12                MS. FONTIER:  With the assistance of the

13      government.

14                THE COURT:  Okay.  Defense Exhibit B is also being

15      published.  Thank you.

16           (Exhibit No. B identified and admitted.)

17            (The video recording was played.)

18            (The video recording was stopped.)

19                THE COURT:  I don't know that you need to display

20      it.  This is the deed?

21                MS. FONTIER:  Your Honor, I don't believe Defense

22      Exhibit C needs to be published.  It is, again, a two-page

23      deed that is in Somali.  It's been marked Defense Exhibit C,

24      and for the record I will mark the English translation as

25      Defense Exhibit C-1 and ask they both be admitted into

 1  evidence.

 2           THE COURT:  Any objections?

 3           MR. COLE:  No.  The government may want to publish

 4  it during cross-examination but no objection.

 5           THE COURT:  That's fine.  You're free to publish it

 6  now if you wish, but the government certainly may if it

 7  wishes to.  All right.  This document is admitted as C-1, the

 8  English translation.

 9       (Exhibit Nos. C, C-1 identified and admitted.)

10       (The video recording was played.)

11       (The video recording was stopped.)

12           MS. FONTIER:  Your Honor, I wanted to check in on

13  time and see if your Honor would like us to break or continue

14  straight to --

15           THE COURT:  We can go for approximately ten

16  minutes.  I think that's -- Mr. Bilse, another five minutes?

17           JUROR BILSE:  Another five.

18           THE COURT:  We'll go another five minutes.

19           MS. FONTIER:  If your Honor would tell me when to

20  pause.

21           THE COURT:  No, it's very kind of you to remember

22  and be considerate, but I've been keeping track of time here.

23  We'll go another five.

24           MS. FONTIER:  All right.  Thank you, your Honor.

25       (The video recording was played.)

 1          (The video recording was stopped.)

 2          THE COURT:  Okay.  We'll stop now.  Ladies and

 3    gentlemen, we're going to be breaking from this point until

 4    1:30 this afternoon.  Please remember the admonition.  Let's

 5    give Mr. Bilse a head start, Mr. Bilse, so you don't have to

 6    fight the traffic.  Good luck in your presentation.  We'll

 7    see you at 1:30.  Let's let Mr. Bilse leave before anyone

 8    else.  Okay.  Very good.  Ladies and gentlemen, we'll see you

 9    at 1:30.

10          (The jury left the courtroom.)

11          THE COURT:  All right.  We're outside the presence

12    of all jurors.  When we pick up, we'll continue on with the

13    deposition at 1:30?

14          MR. DRATEL:  Yes.

15          THE COURT:  Okay.  Very good.  This is going to be

16    a bit of a longer deposition?

17          MR. DRATEL:  I don't think so.  It's about the

18    same.  I think this is 1:35 total, so it's about the same

19    as -- the original one was -- the first one, Mr. Mohamed, was

20    1:24.  I think this one is 1:35.

21          THE COURT:  I don't even think we're halfway

22    through it yet.

23          MR. DRATEL:  I think we're about 30 minutes in, so

24    we got about an hour on this one.

25          THE COURT:  Okay.  Very good.  Now, with respect to

1    perfecting, completing the record on these, the DVDs are

2    coming in.  They've been marked as exhibits; is that correct?

3            MS. FONTIER:  Your Honor, our technological black

4    hole that I haven't discussed -- these are -- videos are on a

5    Flash drive at the moment, but we're going to burn -- I will

6    burn them as we have on two DVDs tonight and make them

7    individually for -- as exhibits and then also provide an

8    extra copy to the government.

9            THE COURT:  Okay.  Now, can you put all deposition

10   testimony on two DVDs?

11           MS. FONTIER:  I assume that, but I don't know.

12           THE COURT:  Well, let's reserve some exhibit

13   numbers right now for them.

14           MR. COLE:  Your Honor, we request that they be

15   marked as Court's exhibits just because they're not --

16   they're not exhibits going back to the jury, they're just

17   like court testimony.  So could they just be marked like

18   Court's Exhibit 1, 2, 3?  Would that work?

19           THE COURT:  Well, yes, but they're being offered by

20   the defense.  They won't be going back, but --

21           MR. COLE:  Okay.  That's fine.

22           THE COURT:  -- we don't -- just because they're

23   DVDs doesn't mean they need to be marked as Court exhibits.

24   So let's reserve some -- let's reserve some numbers for

25   these.

 1           MR. DRATEL:  GG, HH, II?  I think we're up to GG,

 2   Golf Golf, HH, II.

 3           THE COURT:  Okay.  Well --

 4           MS. FONTIER:  For the three that may be introduced

 5   today.

 6           THE COURT:  Okay.  And so they'll come in -- those

 7   DVDs will come in with those exhibit designations.

 8   Additionally, I assume you will not -- did you intend on

 9   introducing or just having entered as Court exhibits the

10   deposition transcripts --

11           MS. FONTIER:  Your Honor --

12           THE COURT:  -- just as a backup.

13       (Exhibit Nos. GG, HH, II identified.)

14           MS. FONTIER:  -- our intention was to do that as a

15   court exhibit so that the record would be complete since

16   these are not being recorded by the court reporter.  But that

17   being said, I would like to have a little time to do that so

18   that we can meet with the government and just have an

19   agreement because there are some very substantial

20   misspellings due to just being phonetic by the transcriber.

21   So at a convenient point I would like to just meet with the

22   government and go through those and also deleting all of the

23   objected-to testimony and correcting the spelling errors.  So

24   they're not ready at this point, but yes.

25           THE COURT:  Okay.  But that's something we'll need

 1   to clarify, a loose end we'll have to wrap up --

 2              MS. FONTIER:  Yes.

 3              THE COURT:  -- as to whether or not transcripts are

 4   coming in as separate court exhibits.  The other thing, a

 5   couple days ago I was asked to take judicial notice of the

 6   certification of al-Shabaab as an FTO, which I did.  If you

 7   have a copy of the certification or whatever you were reading

 8   from -- I know it was basically stipulated between the two

 9   sides -- that would be helpful as well.

10              MR. COLE:  I do have a copy of that.  I was going

11   to present that as a document, but Mr. Dratel preferred that

12   I just read what I read, but I will give your Honor the page

13   out of the Federal Register.

14              MR. DRATEL:  Right, yes.

15              THE COURT:  Okay.

16              MR. DRATEL:  And --

17              THE COURT:  I can incorporate that into a jury

18   instruction at the time appropriate time, but there should be

19   some document that --

20              MR. COLE:  Would you like me to mark that now?

21              THE COURT:  Well, it can be a court exhibit as

22   well, just for reference if necessary at some later point.

23   That's the certification you're referring to?

24              MR. COLE:  It's out of the -- that is the page out

25   of the Federal Register.  And it's the middle column.

1              THE COURT:  Okay.  All right.  The middle column,

2    which is highlighted.

3              MR. COLE:  Okay.

4              THE COURT:  This document will be received as

5    the -- as a court exhibit next in order, that will be 3; this

6    is Court Exhibit 3.  Okay.  All right.  So, counsel, we'll

7    see you at 1:30 this afternoon and then pick up on the --

8              MR. COLE:  Your Honor, if I could make one -- along

9    the lines of what you've just been covering, if I could just

10   mention that later in this -- this deponent or this witness's

11   testimony that we'll hear after lunch, when the government's

12   exhibits are referenced -- which I think there's like two or

13   three exhibits referenced -- we made a mistake when we got

14   back; we did not reserve those same numbers on our witness

15   list -- on our exhibit list we've been using in court.  We've

16   conferred with -- so now we have, effectively, two

17   government's exhibits 100, for example.

18             I've conferred with counsel, and what we'd propose

19   doing is just simply renumbering these into the 200s in those

20   instances and letting the jury know that they were -- they've

21   been renumbered, with apologies.

22             THE COURT:  No problem.  That's fine.  Okay.  Very

23   good.  We'll see you at 1:30.

24        (Court's Exhibit No. 3 identified.)

25        (There was a break in the proceedings.)

```
 1              THE COURT:  Everyone is present.  Ready to go with
 2    the continuation of the deposition?
 3              MR. DRATEL:  Yes, your Honor.
 4              THE COURT:  Okay.
 5              MR. GHAPPOUR:  Your Honor, we'd request a quick
 6    sidebar with Mr. Cole and myself.
 7              THE COURT:  Does this have to do with this
 8    deposition?
 9              MR. COLE:  No, but it has to do with something
10    that -- I think we have to address it, your Honor, very
11    briefly.  There's someone in the courtroom we think should be
12    excluded.
13         (Following is a sidebar conference.)
14              MR. COLE:  Sorry to spring this on you.  When we
15    came into the courtroom, we saw who we think -- we may be
16    wrong -- I think Abdirizak Hussein -- he's on the defense
17    witness list, and Mary Franklin is here, and she told me that
18    she believes he's being -- she is his lawyer, and he's going
19    to be called this afternoon.  And if that's the case, for
20    one, in the meantime he needs to be excluded until he's
21    called; two, I'm led to believe that he's going to invoke the
22    Fifth Amendment or something, and this is something I wanted
23    to bring to the Court's attention before this all unfolded.
24    We didn't know he was going to be called today.
25              MR. GHAPPOUR:  I didn't know he was in the
```

1    courtroom.  I don't know what he looks like.  And his

2    lawyer's here, and she said when does the afternoon session

3    start, I said 1:30.  And I had no idea, to be honest --

4              THE COURT:  You can tell this to Ms. Fontier.  If

5    she brought somebody into the courtroom knowing --

6              MR. COLE:  Ms. Franklin.

7              THE COURT:  Ms. Fontier?  I'll tell her myself.

8              MR. COLE:  I mean Ms. Franklin.

9              THE COURT:  I know that.  I know that.

10             MS. FONTIER:  Yes, your Honor?

11             MR. GHAPPOUR:  It's my witness, your Honor.

12             THE COURT:  Your witness?  Ms. Fontier doesn't have

13   anything to do with it?  I'm sorry, Ms. Fontier, you can go

14   back to your -- this doesn't concern you at this point.

15             MS. FONTIER:  Okay.

16             THE COURT:  So you've requested a witness to be

17   here?

18             MR. GHAPPOUR:  I put a witness on the witness list,

19   I informed his attorney that we were planning to call him

20   today.  When his attorney showed up towards the end of

21   today's hearing, today's early -- morning session, she told

22   me he would invoke the Fifth, she asked what time he should

23   come to do that, and I said the afternoon session's at 1:30

24   but that it had to be outside the presence of the jury.

25             THE COURT:  Well, as a threshold matter that's

1   absolutely correct.  I mean for her to bring her witness in

2   here under these circumstances is a big disappointment to

3   me --

4           MR. GHAPPOUR:  I understand, your Honor.

5           THE COURT:  -- knowing Ms. Franklin as I do.  She

6   knows that -- was this individual subpoenaed?

7           MR. GHAPPOUR:  Yes, your Honor.

8           THE COURT:  Okay.  Subpoenaed for today?

9           MR. GHAPPOUR:  I don't believe so.  It was just --

10  I would like to add on the record that there was a

11  communication yesterday where I did say that we would plan to

12  call him today.  I got no response.  I just saw Ms. Franklin

13  today.  This was also in the presence of all defense counsel.

14          THE COURT:  Okay.  There's an entire protocol for

15  this.

16          MR. GHAPPOUR:  Yes, your Honor.

17          THE COURT:  You aren't from the Ninth Circuit, but

18  there is an entire protocol for how to handle this kind of a

19  thing, and -- I'm not going to advise you, it wouldn't be

20  appropriate for me to advise you, but it's clear, Ninth

21  Circuit law lays out a path for exactly this kind of issue.

22  And this individual shouldn't be in the courtroom.  Nothing

23  should be happening in front of the jury at this point.  I

24  know that you're aware of that.  Okay.

25          MR. GHAPPOUR:  Yes.

 1               THE COURT:  I'd like Ms. Franklin to -- this is

 2    very awkward, her being here and --

 3               MR. GHAPPOUR:  Yes.

 4               THE COURT:  -- really, this has been brought up

 5    before.  Before you had contact with her, you must have seen

 6    that there was some kind of a reasonable foreseeability that

 7    she would invoke -- or her client would invoke, and we could

 8    have dealt with this in much more appropriate, much less

 9    messy way.

10               MR. GHAPPOUR:  Your Honor, she has never responded

11    to me.

12               THE COURT:  Well, that --

13               MR. GHAPPOUR:  I didn't even know she was going to

14    come today.

15               THE COURT:  Okay.  Well, I tell you that's been my

16    experience too with Ms. Franklin.  There are times when she's

17    very difficult to reach.

18               MR. GHAPPOUR:  In addition to telephone calls for

19    months.

20               THE COURT:  I hear you.  I'm not upset with you,

21    I'm just upset with this circumstance, that this circumstance

22    has gotten to this point.  Gaby?  Gaby, we're going to

23    continue on with the -- with the playing of the deposition.

24               THE CLERK:  Yes, your Honor.

25               THE COURT:  After a while, five, ten minutes into

1    the playing of the deposition, inconspicuously go up to Ms.

2    Franklin and let her know that nothing is happening today

3    that would involve her presence today.  You would agree with

4    that?

5              MR. GHAPPOUR:  Yes.

6              THE COURT:  Okay.  You've got to -- your first step

7    is to file a notice -- a notice of intention to call this

8    individual as a witness and, in that notice, to lay out the

9    questions that you intend to ask that witness; that's the

10   very first step of about five major steps that we need to

11   take, so at least that will, once served upon her, give her a

12   head's up as to what she needs to do.  I want her out of the

13   courtroom.  Tell her it's not appropriate for her to be here,

14   nor her client, ask them both to leave, but do so after a few

15   minutes.

16             MR. GHAPPOUR:  Your Honor, just for the record,

17   after receiving information that Mr. Abdirizak is going to

18   plead the Fifth essentially, I do intend to make an

19   obligation for an order to determine the validity of his

20   invocation and to request immunity, prosecutorial immunity.

21   And if that's denied, then defense immunity.  And also

22   application that he's previously waived his right by --

23   through his interviews with the FBI in the presence of

24   counsel.

25             THE COURT:  You're not hearing what I'm saying, are

1    you?

2            MR. GHAPPOUR:  In addition to your first -- how

3    about this.  I will take it to the drawing board starting

4    with your first then.

5            THE COURT:  You need to do that.  There are some

6    cases that are pretty clear as to what needs to be laid out,

7    okay?

8            MR. GHAPPOUR:  Okay.

9            THE COURT:  There are a couple of paths that you

10   have to negotiate here.  But just -- just bringing a --

11   bringing a witness in here knowing that there's going to be

12   in all probability an invocation and then throwing it into

13   the well just isn't the way to do it.  I'm not saying that's

14   what your plan was, but to -- well, we'll proceed the way

15   that I've outlined for you.  We'll get back to playing the

16   deposition testimony.

17           MR. GHAPPOUR:  Thank you, your Honor.

18           THE COURT:  Okay.

19       (Sidebar conference concludes.)

20           THE COURT:  Okay.  We're going to continue on with

21   the deposition testimony at this point, ladies and gentlemen.

22   This is of Mr. Abdi.

23       (The video recording was played to the end.)

24           THE COURT:  No further depositions at this moment;

25   is that correct, counsel?

1           MR. DRATEL:  That's correct, your Honor.

2           THE COURT:  Okay.  We'll take a recess at this

3    time, ladies and gentlemen, 15 minutes.  Remember the

4    admonition not to discuss the case or make any decisions at

5    this time.  Thank you.

6        (The jury left the courtroom.)

7           THE COURT:  Okay.  We're outside the presence of

8    the jury.  I wanted to finish up on 106 matters.  Is that

9    what you're planning next --

10          MR. DRATEL:  Yes, your Honor.

11          THE COURT:  -- the 106?

12          MR. DRATEL:  May I be excused to see if the witness

13   is out there?

14          THE COURT:  Hold on for a moment if you could.

15          MR. DRATEL:  Okay.

16          MR. DURKIN:  May I just step out, Judge?

17          THE COURT:  Sure.  Mr. Ghappour has been waiting

18   patiently, and this is the last of the 106 issues and with

19   respect -- Mr. Ghappour, are you ready to go on that?

20          MR. GHAPPOUR:  Just a moment.  I'm just opening the

21   files.

22          THE COURT:  Okay.

23          MR. GHAPPOUR:  I had it all ready yesterday.

24          THE COURT:  Maybe you can just write these down.

25          MR. GHAPPOUR:  Okay.

 1            THE COURT:  Are you ready?

 2            MR. GHAPPOUR:  Yes.

 3            THE COURT:  Okay.  Please, be seated.  With respect

 4   to 121, Exhibit 121, that's already been admitted as 106, the

 5   last six lines.  Then you've got Exhibit 124.  The reference

 6   to "the men" is -- on page 8 is okay.

 7            MR. GHAPPOUR:  Meaning there's an addition or not

 8   an addition?

 9            THE COURT:  I'm sorry.

10            MR. GHAPPOUR:  When you say the reference to "the

11   men" is okay --

12            THE COURT:  That it's admitted, yeah.  That

13   particular request is granted -- is granted; that would come

14   in.  The next bit of highlighted portion is next to the next

15   bullet point, second bullet point under 124, is not really

16   106.  I don't see it as clearing up distortion or anything

17   that's misleading, but it does add some context and I think

18   it's appropriate under an expanded view of 106.  And the

19   same -- the same ruling, Mr. Ghappour, for the third bullet

20   point there.

21            MR. GHAPPOUR:  Okay.

22            THE COURT:  Okay.  That takes care of Exhibit 124.

23   And 140, Exhibit 140, it's not -- first bullet point -- as to

24   each bullet point, I would say, it's not 106 material per se,

25   but it's admissible as it provides some additional context

1   and in fairness should be included, but its omission wasn't

2   in any way -- didn't in any way mislead or distort what the

3   government's submission was.

4          And then on Exhibit 156, once again, the same

5   observation.  This is not really 106.  I would -- I would

6   admit it as additional context, but it's just a long

7   recitation of a battlefield report.  Basically these are

8   battle accounts from the front, as I understand them, and

9   they can come in under that rationale.

10         And I would also have the same ruling for Exhibit

11  171.  Not truly 106, the requested material isn't per se 106

12  and what's been admitted isn't distorting or misleading, but

13  this does additional context.  So there you have it.

14         Now, how long -- Mr. Dratel, how long do you think

15  your next witness will be?  Are we going --

16         MR. DRATEL:  I don't --

17         THE COURT:  -- to fill up the afternoon?  Probably

18  not.

19         MR. DRATEL:  No, no.  I think it will be -- you

20  know, it's hard to know how long it takes to read some of

21  these, but I think 35 to 45 minutes probably --

22         THE COURT:  That'll be for all the 106 material

23  across the board?

24         MR. DRATEL:  No, because that doesn't include what

25  the Court just did, and we're not doing Mr. Durkin's, we're

1   just doing ours and Ms. Moreno's.  Mr. Durkin wants to do it

2   his way, and it's not enough time to incorporate because we

3   have transcripts prepared.

4          THE COURT:  Okay.  Well, sooner or later --

5   probably as soon as possible -- there should be one -- if you

6   can create one integrated system, one group of transcripts

7   that can come in as additional material, that would be very

8   helpful to the jury.

9          MR. DRATEL:  Okay.

10         THE COURT:  And in a standardized way.

11         MR. DRATEL:  Just to give the Court a little

12  advance notice, the government, while we decided to just

13  denominate them for purposes of exhibits as TT -- because

14  we've run out of T already for the defense -- it's TT, double

15  T -- and then we will give it whatever exhibit number it

16  corresponds to from the government so that it would match.

17  In other words, TT-130, TT-131, that each transcript matches

18  a government exhibit.

19         THE COURT:  Okay.  That's fine.  You'll have a few

20  -- probably have a few additional transcripts though that

21  don't line up.

22         MR. DRATEL:  Right.  Later, yeah, but we'll just

23  assign other numbers or perhaps a different --

24         THE COURT:  All right.

25         MR. COLE:  And just so you know, Mr. Durkin's

1    already ready.  He worked with us and we made copies -- this

2    can be done later -- but to be given to the binders or

3    whatever later at some point.  His -- we worked these out

4    during the lunch break before I heard what Mr. Durkin said,

5    so his are going to be denominated with a T after our exhibit

6    number, so it's close to the same convention, but they're

7    already marked and ready to go.

8                 THE COURT:  Okay.  If you can get them just as

9    close as possible in a uniform way, that would be appreciated

10   I'm sure by the jury ultimately.

11                After the witness does the reading -- well, Mr.

12   Durkin, were you going to have your additional material come

13   in then at the same time or later or do you know?

14                 MR. DURKIN:  Well, what we were going to do is I

15   was just going to have Ms. Roberts read them, Judge.  Or I

16   could just put them on the Elmo, whatever.  We've already

17   agreed that it --

18                 THE COURT:  Okay.

19                 MR. DURKIN:  We have the exhibits I mean, so

20   it's --

21                 THE COURT:  But there should be -- either -- yeah,

22   there's different ways you want to handle that and you can

23   handle it, so you picked the best way that suits you.

24                 MR. DURKIN:  I think what would be the easiest --

25   and I think the government's in agreement -- Ms. Roberts will

 1    read it, I'll just keep it on the Elmo, and then I'll flip

 2    it.  Is that okay with the government?  They're short, Judge.

 3    They're only -- this is the whole lot of them, this is all

 4    three.  There's only three, six -- there's only about eight

 5    pages.

 6              THE COURT:  Okay.  Any objection to that, Mr. Cole?

 7              MR. COLE:  No.

 8              THE COURT:  Okay.  And then, Mr. Ghappour, when

 9    would you like to do yours?  Have you given that any thought?

10              MR. GHAPPOUR:  I can do them -- I haven't given it

11    any thought, quite honestly, but I can do them tomorrow or

12    Monday.

13              THE COURT:  Okay.

14              MR. GHAPPOUR:  I'll talk to --

15              THE COURT:  Whenever it's convenient.  And, once

16    again, if you can maybe reformat what you've got because just

17    about everything you submitted is coming in.

18              MR. GHAPPOUR:  Absolutely.

19              THE COURT:  Couple of them are a little bit

20    lengthy, couple of the additions are a little lengthy is what

21    I'm saying, so whatever you can do.

22              MR. GHAPPOUR:  Just to clarify, everything is

23    coming in under 106?  Because there were some portions where

24    you said they're not per se 106, but --

25              THE COURT:  You know, if you take a look at the

1    rule, the rule basically gets to adding material to eliminate

2    a misleading or distorted reading.  I think what these

3    additions do more than anything else is just provide

4    additional context.  I don't think that what the government

5    has submitted without the material, the added material, is

6    misleading or distorts a conversation, but I think what's

7    coming in is coming in under the spirit of 106, and I think

8    the Court -- and I've already said enough about that, my own

9    view how 106 should be applied in this case.

10             MR. GHAPPOUR:  Yes.  Thank you.

11             THE COURT:  All right.  All right.  And then after

12   we have any readings, what else do we have to fill the day?

13             MR. DRATEL:  We'll start on the next deposition,

14   your Honor.  We got four to go, so --

15             THE COURT:  Okay.

16             MR. DRATEL:  -- we'll probably get -- well, we'll

17   see how much we get out today.

18             THE COURT:  All right.  And then toward the end of

19   the day, I want to work with counsel -- not in open court,

20   but I want to work with counsel on the record about a matter

21   that came up that I discussed at the side of the bench with

22   Mr. Ghappour.  I have a feeling Mr. Ghappour has been able to

23   utilize some of the time since we spoke to do a little

24   research on this issue.

25             MR. GHAPPOUR:  We're getting there.

1            THE COURT:  Take your time on that because we're

2   still obviously -- we've got several more days to go.  But

3   we'll discuss that at a later time and on the record but not

4   in an open-court setting.  Okay?

5            MR. DRATEL:  When will be back?

6            THE COURT:  Well, we've been -- how long have we

7   been out, 15 minutes now almost?  Why don't we take ten

8   minutes, okay?

9            MR. DRATEL:  Okay.  Thank you, your Honor.

10        (There was a break in the proceedings.)

11           THE COURT:  Everyone is present ready to proceed.

12   Mr. Dratel?

13           MR. DRATEL:  Yes, your Honor.  Mr. Moalin calls

14   Christopher Chang, your Honor.

15           THE CLERK:  Can you please raise your right hand.

16   Do you solemnly swear that the evidence you shall give in the

17   cause now before the Court shall be the truth, the whole

18   truth, and nothing but the truth?

19           THE WITNESS:  I do.

20                    Christopher Chang

21   was called by the defense and testified as follows:

22           THE CLERK:  Can you please state and spell your

23   first and last name for the record.

24           THE WITNESS:  Christopher, C-h-r-i-s-t-o-p-h-e-r,

25   Chang, C-h-a-n-g.

1              MR. DRATEL:  May I proceed, your Honor?

2              THE COURT:  Sure.

3              MR. DRATEL:  Thank you.

4                        Direct Examination

5              BY MR. DRATEL:  Q.  Good afternoon, Mr. Chang.

6    A.  Good afternoon.

7    Q.  Where do you live?

8    A.  I live in London, in the U.K.

9    Q.  And how are you employed?

10   A.  I'm self-employed.

11   Q.  As?

12   A.  As an investigator/researcher.

13   Q.  Have you played any role for the defense in this case?

14   A.  Yes, I've been assisting the defense team.  I've been

15   doing some paralegal duties, some research and some

16   investigation.

17   Q.  Tell us your level of education, please.

18   A.  I have a bachelor's degree from the University of the

19   West of England in modern languages and European studies.

20   Q.  Do you speak other languages besides English?

21   A.  I do.

22   Q.  Are you studying other languages besides English?

23   A.  I am, yes, currently.

24   Q.  And have you received any awards in the past with respect

25   to your language studies or your language capability?

1   A.  I received the European Institute of Education and Social

2   Policy prize for the best interpreter of the year 2000.

3   Q.  And have you had any role in preparing transcripts in

4   this case?

5   A.  No.

6   Q.  Mr. Chang, I'm going to hand you a sheaf of papers, and

7   we'll go through them, just hang on to them.  Mr. Chang, do

8   you recognize what you have before you?

9   A.  Yes.

10  Q.  And what are they?

11  A.  They are called transcripts.

12  Q.  And -- one moment.  I'm also giving you a binder.  That

13  binder is already in evidence, and that is the government's

14  set of transcripts, right?

15  A.  Okay.  Yeah.

16  Q.  And I'd like to go to Government's Exhibit 130, please.

17  And if you could just sort refresh us on the date of that

18  transcript or the date of the conversation that the

19  transcript reflects.

20  A.  Date of this conversation the 1st of January, 2008.

21  Q.  And who are the parties to the conversation?

22  A.  Parties are Basaaly Moalin and Mohamed Yusuf.

23  Q.  The Government's 130?

24  A.  All right.  Sorry.  Sorry.  My apologies.  130, yes.

25  It's the 1st of January, 2008, conversation between Basaaly

1    Moalin and Sheikalow.

2    Q.  Okay.  And do you see on page 4 of that transcript after

3    6:19 in the left margin?

4    A.  Yes.

5    Q.  You see asterisks?

6    A.  I do, yes.

7    Q.  And if you look on your other pile, you'll see something

8    that's marked Defense Exhibit TT as in Thomas Thomas or

9    TT-130; do you see that?

10   A.  I do, yes.

11       (Exhibit No. TT-130 identified and admitted.)

12   Q.  Okay.  And if you could look at that and go to page 3.

13   A.  Yes.

14   Q.  And that's a transcript, right?

15   A.  That is, correct.

16   Q.  Of the same conversation, correct?

17   A.  Yes, that's correct.

18           MR. DRATEL:  I would move Defendant's TT-130 in

19   evidence, your Honor.

20           THE COURT:  Let me see counsel for just a moment

21   here.

22       (Following is a sidebar conference.)

23           THE COURT:  I think these are already in.  The jury

24   doesn't know that, but I think probably the most appropriate

25   way for me to handle this, or for you to handle it all, would

1    just be to advise the jury that I've been submitted

2    additional transcripts and have admitted additional --

3              MR. DRATEL:  Portions.

4              THE COURT:  -- portions of transcripts which will

5    be read by this gentleman now because they don't know he's

6    not --

7              MR. DRATEL:  Right.

8              THE COURT:  -- he's not a linguist, he's a reader,

9    so it will really help them.

10             MR. DRATEL:  That's -- that's fine.

11             MR. COLE:  We didn't know that he was going to read

12   it; we didn't know.  There needs to be a statement that they

13   will be subject to cross-examination when the linguist

14   testifies.

15             MR. DRATEL:  I will do that.

16             THE COURT:  That's fine.

17             MR. COLE:  Will you do that --

18             THE COURT:  Counsel, please.  You're talking over

19   one another.  I'll be happy to do that; it's probably better

20   coming from the Court.

21             MR. DRATEL:  Okay.

22         (Sidebar conference concludes.)

23             THE COURT:  Ladies and gentlemen of the jury, with

24   the concurrence, the agreement, of counsel, let me just

25   advise you of something.  First of all, for the next period

1   of time, you're going to be hearing and perhaps even seeing

2   additional transcript material that involves the transcripts

3   that are already in evidence.  Over the last few days, I've

4   been working with counsel, and additional material is coming

5   in with respect to these transcripts.  You've heard that

6   there were portions of the transcripts that were not included

7   initially.  Well, additional portions will be coming in.

8   They'll be coming in through this gentleman, Mr. Chang.  Mr.

9   Chang is not a linguist, he's a reader, and we appreciate him

10  assisting us in the presentation of the additional material

11  at this time.  There'll be additional excerpts that will

12  involve several transcripts and will be submitted by the

13  different defendants; I think that will become apparent to

14  you.  So I just wanted to give you a little bit of a head's

15  up as to what we're doing right now.

16          Now, these additions have been preadmitted by the

17  Court.  They are subject to cross-examination, however, and

18  it is very possible that there will be a witness called by

19  the government at a later point who may testify as to the

20  meaning of certain of these words in these additional

21  materials.  So I think that pretty much brings you up to

22  speed.  Do you concur, counsel, in what I've just advised the

23  jury?

24          MR. DRATEL:  Essentially, yes, your Honor.

25          MR. COLE:  The only thing I would mention is there

1    may be a witness called by the defense later about these

2    transcripts.

3              THE COURT:  That's true, that is absolutely true,

4    yes.  It's foreseeable that each side will call a linguist,

5    and there may be some additional testimony as to the meaning

6    of one or more of these words or phrases or passages.  Okay?

7              MR. DRATEL:  Yes, your Honor.  May I publish these

8    to the jury, your Honor?  We have one for each.

9              THE COURT:  Yes.  I assume you have no objection,

10   Mr. Cole.

11             MR. COLE:  No.

12             THE COURT:  I mean they're in evidence, and I think

13   it's -- I think the jury would appreciate this; they could

14   follow along.  Do we need to address a point?

15             MR. DRATEL:  Your Honor, they're not -- I think the

16   copies that the jury has are not individually marked with the

17   exhibit numbers.  I'll read them out so that the jurors

18   taking notes that they -- and maybe we'll take them back

19   afterwards and then mark them because it's a glitch in the

20   program.

21             THE COURT:  I assume they're going to be read in

22   the order in which they --

23             MR. DRATEL:  Yes.

24             THE COURT:  -- in which they're --

25             MR. DRATEL:  Yes.

1          THE COURT:  -- presented at this point.

2          MR. DRATEL:  Yes, your Honor, very much so.

3          THE COURT:  Okay.

4          MR. DRATEL:  May I proceed your Honor?

5          THE COURT:  Yes.

6          MR. DRATEL:  Okay.  Thank you.

7          BY MR. DRATEL:  Q.  So, Mr. Chang, going back to

8   page 4 of the Government's Exhibit 130, where the asterisks

9   are after 6:19, right?  If you go to page 3 of the first

10  transcript in the defense section, which is Defense TT-130,

11  it's a January 1st, 2008 conversation.  All right?

12  A.  I have that.

13  Q.  And page 3 -- wait for everybody to get there -- you see

14  about four up from the bottom, it says Basaaly:  Do you have

15  any news from the other side?  Right?

16  A.  Yes.

17  Q.  And what's this conversation about?  If you could give us

18  maybe a one-sentence summary about what the nature of

19  conversation that's already in evidence was about rather than

20  going through the whole thing.

21          MR. WARD:  Objection, your Honor; you can read the

22  transcript.

23          THE COURT:  The objection is overruled.  I think

24  that -- I think that the government did the same thing in

25  some of its examination.

1          THE WITNESS:  This conversation is about a

2    transfer, and then it goes on to speaking about just the

3    general situation in Somalia at the time.

4          BY MR. DRATEL:  Q.  And at that part where we

5    start -- where it says Basaaly:  Do you have any news, it

6    says unknown male, but that's Sheikalow, right?

7    A.  Yes.

8    Q.  It's not another person on the call.  Okay.  I'll read

9    the part of Mr. Moalin, Basaaly, and if you could read the

10   part of Sheikalow, we'll go through the part that is being

11   added, okay?

12   A.  Yes, that's fine.

13   Q.  Okay.  Basaaly:  Do you have any news from the other

14   side, the central regions?  I know it is late time for you

15   and you are tired and want to go to bed.

16   A.  Sheikalow:  No, those regions are okay.

17          THE COURT:  All right.  Hold on.  We're having --

18   Mr. Bilse?

19          JUROR BILSE:  If you could tell us where we're

20   supposed to be at because I'm lost.

21          THE COURT:  Okay.  Why don't we do that again.

22          MR. DRATEL:  Okay.  On the first transcript

23   provided by the defense, which is a January 1st, 2008

24   conversation, and it says afterwards -- where it says CD

25   Exhibit on page 1, it says Government Exhibit 130 after the

1   '01 Jan. 2008.

2          THE COURT:  You know, I have a suggestion here.  We

3   could have perhaps --

4          MR. DRATEL:  The Elmo?

5          THE COURT:  Yeah.  I think that will be a lot

6   better, and we can collect the transcripts and you can get

7   the individual additions highlighted in some way if you'd

8   like to do that; I think that would be the best way.  So

9   we'll do it page by page.  You can read responsively -- I

10  know you know what that is.  So we'll be reading

11  responsively.  You can play the role of anyone you'd like and

12  have Mr. Chang play the role of someone else.

13         MR. DRATEL:  Okay.

14         MS. FONTIER:  I'll play the role of page turner if

15  that's okay with you, your Honor.

16         THE COURT:  That's fine.  That's fine.  So let's

17  collect that.  Ladies and gentlemen, we're getting your

18  transcripts back.  Put them back in the original order they

19  were in.  Thank you for working with us.  You have the screen

20  there if you wish to use that.

21         BY MR. DRATEL:  Q.  Really ready?  Okay.  So

22  great -- okay.  We'll start again.

23      (The transcription was read.)

24         BY MR. DRATEL:  Q.  Okay.  Let's move to the next

25  page, page 5 of the -- of Defendant's TT-130 and, we'll read

1    the part that's added, which just for looking at the

2    transcript, it starts with the entry that says Basaaly:  Main

3    purpose, and I'll read Basaaly again, if you could read

4    Sheikalow.

5         (The transcription was read.)

6              BY MR. DRATEL:  Q.  Then it returns to the

7    government's transcript, right?

8    A.  That's correct.

9    Q.  All right.  I'd like you to move on now to Government's

10   Exhibit 131 and the corresponding marked TT-131.  Do you see

11   that?

12   A.  Yes, I can.

13        (Exhibit No. TT-131 identified and admitted.)

14              THE COURT:  Counsel, may we have a stipulation that

15   the court reporter is relieved of any obligation to report

16   these readings?

17              MR. DRATEL:  Yes, your Honor.  The actual

18   transcript readings, sure.

19              THE COURT:  The actual transcript reading because

20   the transcripts are in evidence.

21              MR. DRATEL:  Yes.  Just as long as we have the

22   numbers so that we know where to go back to for particular

23   passages.  Thank you.

24              THE COURT:  Okay.  Well --

25              MR. WARD:  Your Honor, though that's typically what

1   we would do in this situation, but I want the Court to be

2   aware that the transcript that is in evidence is not being

3   read verbatim; it's being edited as we read along.

4           THE COURT:  I noticed a few very minor things that

5   may have been inadvertent.  I tell you what, Mr. Ward.  Do

6   you wish to point out any of these just so that we can get

7   some clarity if there was a misreading that was in any way

8   significant?

9           MR. DRATEL:  Your Honor, may I proceed?

10          THE COURT:  Let's give Mr. Ward one moment here.

11          MR. WARD:  For instance, on page 4, four blocks

12  down it says Shabaab --

13          THE COURT:  Hold on now.  Let me get with you.

14  Four blocks down?

15          MR. WARD:  Right.  Anyway, there was a little

16  disagreement in now it's settled down, the last sentence is

17  Shabaab guys.

18          THE COURT:  Page 4, I'm still looking for the

19  fourth -- oh, it says Shabaab guys?

20          MR. WARD:  Yes.  That was corrected.

21          THE COURT:  I'm sorry?

22          MR. WARD:  That was corrected.  I think my notes

23  show in the --

24          THE COURT:  Oh, you mean from what you -- the same

25  kind of issue that --

```
 1              MR. DRATEL:  No, that was --

 2              MR. WARD:  Your Honor --

 3              MR. DRATEL:  No, no.

 4              MR. WARD:  Your Honor, all I'm saying is that

 5    whatever errors in the transcript right now are what should

 6    be read to the jury.

 7              THE COURT:  Okay.

 8              MR. WARD:  And that's not what's happening.

 9              MR. DRATEL:  I think --

10              MR. WARD:  On both sides, both the witness and Mr.

11    Dratel are editing the transcript on the fly --

12              THE COURT:  I see.

13              MR. WARD:  -- trying to clean up the English.

14              MR. DRATEL:  And the one he's talking about, your

15    Honor, it says s-h-a-b-a, so it doesn't have an a-b at the

16    end.

17              MR. WARD:  Well, there's actually another example,

18    your Honor.  They didn't even read it, and it's in the last

19    block --

20              THE COURT:  Let's read from the -- see --

21              MR. DRATEL:  Okay.

22              THE COURT:  -- this is -- remember the point I was

23    making earlier, a day or so ago, where, you know, you get --

24    you begin to object on something, you open up a door that the

25    other side is going to walk through for the exact same
```

1   reason, and ultimately there's no intent here, it's just
2   these things will occur.
3            Read the transcript, if you will, as it was
4   originally created, and then if there's a request to have
5   anything edited, then it can be edited.
6            MR. DRATEL:  Yeah, and when the linguist testifies,
7   I'm sure --
8            THE COURT:  That's fine.
9            MR. DRATEL:  -- we'll have to deal with that.
10           THE COURT:  Okay.
11           MR. DRATEL:  We'll have to grapple with other kinds
12   of errors like that.
13           THE COURT:  Thank you, Mr. Ward.
14           MR. DRATEL:  Okay.  Thank you.  Okay.  We're at
15   131, right?  All right.  What's the date on that call,
16   Mr. Chang?
17   A.   Date is the 3rd of January, 2008.
18   Q.   Okay.  And who are the participants in the call?
19   A.   It's Basaaly Moalin and Sheikalow.
20   Q.   Okay.  And if we go to the government's transcript, 131,
21   and we go to page 3, you see at 4:45, right, the last line is
22   Sheikalow, they are not people who are relying on roadblocks,
23   they even use tanks, right?
24   A.   I can see that.
25   Q.   And then there are asterisks thereafter, right?

1   A.  Correct.

2   Q.  Okay.  Now, the part we're going to read is the part that

3   comes after 4:45, and so --

4           THE COURT:  Ladies and gentlemen of the jury, you

5   know, you might -- if you wish to do this, only if you wish

6   to do this -- where there's something that's being added

7   through additional transcripts, you want to make a note of

8   that in your own book of original transcripts, you can make a

9   note of that, and it might make it easy for you to join

10  things up.

11          BY MR. DRATEL:  Q.  All right.  So the third block

12  down, it says unknown male, and that's Sheikalow, right?

13  A.  Right.

14  Q.  According to the government's transcript.  But I'm

15  looking at the defense transcript right now, and it says even

16  they are using tanks, right?

17  A.  Correct.

18  Q.  Okay.  So the part right after we'll read.  I'll read

19  Basaaly and you'll be Sheikalow.

20      (The transcription was read.)

21          BY MR. DRATEL:  Q.  And that is -- that's the end

22  of that insert, right, on 130, on that insert, right?

23  A.  That's correct.  Not -- hold on a second.

24  Q.  Right.  Later on in the same call, if we go to page 7 of

25  the government's transcript, and we have asterisks again

1   after 12:03, right?

2   A.   That's correct.

3   Q.   Now we'll read what follows from there, all right, and

4   you'll start with -- I'm sorry.  I'm sorry.  Page 4 of the

5   defense transcript, right?  You there?

6   A.   Yes.

7   Q.   Page 7 of the government's transcripts.  Okay.  Let's

8   start with Sheikalow.

9        (The transcription was read.)

10            BY MR. DRATEL:   Q.   And that goes back to the

11   government's transcript, right?  That's actually part of

12   the -- after 14:31 that's already starting --

13   A.   Correct.

14   Q.   -- right?  Okay.  So the government transcript begins in

15   the middle of that section from Basaaly, right?

16   A.   Correct.

17   Q.   And that finishes Defense TT-131.  So let's move on to

18   Government's Exhibit 135, please.  What's the date of that

19   conversation?

20   A.   Date of that is 18th of January, 2008.

21        (Exhibit No. TT-135 identified and admitted.)

22   Q.   And the participants?

23   A.   Participants are Basaaly Moalin and an unknown male.

24   Q.   And let's go to page 2 of the government's transcript at

25   5:31, and the government's transcript ends there, right?

1    A.  Correct.

2    Q.  Okay.  And we're going to read an additional section that

3    comes after 5:31, and it starts at the bottom of page 2 of

4    the defense transcript, which the jury doesn't have yet but

5    Ms. Fontier is -- okay.

6         (The transcription was read.)

7    Q.  And that finishes that insert for 135, right?

8    A.  Correct.

9    Q.  Move on to Government's 142.  And the date of that

10   conversation is?

11   A.  Date is 13th of February, 2008.

12        (Exhibit No. TT-142 identified and admitted.)

13   Q.  And the participants are?

14   A.  Basaaly Moalin and Mohamad Mohamud.

15   Q.  And let's go to page 2 of the government's transcript.

16   At 1:00 we have asterisks, right?

17   A.  Correct.

18   Q.  And we're going to read a section that goes after that

19   and comes before the government section -- the government's

20   transcript resumes.  And I'll be Basaaly you'll be

21   Mr. Mohamud, okay?  You ready?

22   A.  Yes.

23        (The transcription was read.)

24   Q.  And that ends that insert, right?

25   A.  Correct.

1    Q.  And then the government's transcript resumes later on,

2    right?

3    A.  Correct.

4    Q.  Yeah.  And what was the general nature of that

5    conversation, 135 -- I'm sorry, yes, 135 -- I'm sorry, 142.

6    A.  Sorry.  It was basically about --

7            MR. WARD:  Objection, your Honor.  We just read the

8    entire transcript.

9            THE COURT:  The objection's sustained.

10           MR. DRATEL:  I wasn't talking about the insert,

11   your Honor, I was talking about the rest of the transcript

12   just a contextual --

13           THE COURT:  Well, along the lines that the

14   government was permitted to give a one-sentence neutral

15   explanation as to the subject matter, then if you wish to

16   elicit that, but nothing beyond that.

17           MR. DRATEL:  That's all I intend to do, your Honor,

18   and I did not do it for two others I should go back and do,

19   but I'll start with 142.

20           THE WITNESS:  I think this call is -- it's between

21   Mr. Moalin and Mr. Mohamud.  They're basically talking about

22   phone calls that they've had with other individuals.

23           MR. DRATEL:  Thank you.

24           BY MR. DRATEL:  Q.  And let's go back to 135 for a

25   second, and just give us a one-sentence synopsis on the

1   general subject matter of that call.

2   A.  This is a call that's about a transfer, and also just

3   some general stuff about the situation in Somalia.

4   Q.  Thank you.  Okay.  Let's move to Government's 144, and

5   what's the date of that call?

6   A.  Date of this call is 17th of February, 2008.

7       (Exhibit No. TT-144 identified and admitted.)

8   Q.  And who are the participants on the call?

9   A.  Call is between Basaaly Moalin and a Mr. Bashir Dini.

10  Q.  And you see the government's transcript is one page,

11  right?

12  A.  Correct.

13  Q.  And at the bottom after 1:44 there are asterisks, right?

14  A.  Correct.

15  Q.  Okay.  Now, we will begin after the government transcript

16  ends -- oh, and what's this conversation about?

17  A.  This is a conversation that they have regarding Aden

18  Ayrow.

19  Q.  And is this the conversation in which Mr. Dini starts off

20  essentially saying the man, your friend, Aden Hashi Ayrow?

21  A.  Correct.

22  Q.  All right.  We'll start before the government transcript

23  leaves off.

24      (The transcription was read.)

25  Q.  And does that conclude that excerpt, that insert?

1    A.   Yes, it does.

2    Q.   Okay.  Let's move on to Government's 155.  And the date

3    of that call, please?

4    A.   Date of that call is 17th of April, 2008.

5         (Exhibit No. TT-155 identified and admitted.)

6    Q.   And the participants, please?

7    A.   It's Basaaly Moalin and Mohamad Mohamud.

8    Q.   Okay.  And if you look at the government's transcript at

9    page 3, after 2:44, bottom third of the page, there are

10   asterisks, right?

11   A.   Correct.

12   Q.   Okay.  And what's the general subject matter of this

13   call?

14   A.   This call is about fundraising.

15   Q.   Okay.  Now, if we go to the defense exhibit, TT-155,

16   page 3, if you see -- okay.  So we'll start where it says

17   Sheik Mohamad, when have you received the messages and why

18   don't you be Sheik Mohamad and I'll still be Basaaly.

19        (The transcription was read.)

20   Q.   And that ends that, and then the government transcript

21   resumes, right?

22   A.   Correct.

23   Q.   Move to Government's 191, please.  Okay.  What's the date

24   of this call, please?

25   A.   Date of this call is 13th of July, 2008.

1    (Exhibit No. TT-191 identified and admitted.)

2  Q.  And the participants?

3  A.  Participants are Basaaly Moalin, Farah, last name

4  unknown, there is several other participants.

5  Q.  But is it also Farah Yare it says in the government's

6  transcript?

7  A.  It does say that, yeah, Farah Yare.

8  Q.  Okay.  And if we go to page 3 of the government's -- yes,

9  page 3 of the government's transcript at 12:12, after Basaaly

10  says okay, there are asterisks, right?

11  A.  Correct.

12  Q.  Okay.  So now let's read the part that goes in there or

13  some of the part that goes in there, and I'll start with

14  Basaaly, and you will be Farah Yare, okay?

15  A.  Okay.

16    (The transcription was read.)

17  Q.  And that concludes that particular insert, right, for

18  that insert.  But then we have another one later in the same

19  conversation, right?

20  A.  Yes, correct.

21  Q.  So if you look at the government's transcript again at

22  page 6 -- this is 191 -- after 31:03 there's another set of

23  asterisks, right?

24  A.  Correct.

25  Q.  And if you look to page 8 of the Defense Exhibit

1   TT-191 -- let me know when you're there and we'll read the --

2   A.  Yes.

3   Q.  -- additional section not in the government's transcript,

4   okay.  I'll start with Issa.

5       (The transcription was read.)

6   Q.  And that concludes that section as well, right, Mr.

7   Chang?

8   A.  That's correct.

9           MR. DRATEL:  I have nothing further, your Honor.

10          THE COURT:  Why don't we break for the day; this

11  is -- I think it would be appropriate to break at this point.

12  Ladies and gentlemen, we'll stop for your purposes today,

13  recess for the evening, then resume tomorrow at nine o'clock.

14          I may have been a day early with that forecast for

15  that rain and stormy weather; I think it's expected tonight

16  and perhaps tomorrow morning, so give yourselves a little

17  extra time.  Thanks for the flexibility in scheduling.  We'll

18  see you in the morning at 9 a.m.  Remember the admonition not

19  to discuss the case or make any decisions at this time.

20  Thank you.

21      (The jury left the courtroom.)

22          THE COURT:  All right, counsel.  On this issue that

23  came up at the beginning of the afternoon, I certainly would

24  have appreciated a head's up that that was coming down the

25  pike rather than to be confronted with that without any

 1    indication of what the issue was.  So apparently -- have you

 2    picked up the laboring oar on this one, Mr. Ghappour?

 3              MR. GHAPPOUR:  Yes, your Honor.

 4              THE COURT:  Okay.  So we're dealing with an

 5    individual that you've subpoenaed; is that correct?

 6              MR. GHAPPOUR:  Yes, your Honor.

 7              THE COURT:  And what is this individual's name?

 8              MR. GHAPPOUR:  His name is Abdirizak Hussein.

 9              THE COURT:  Would you spell it, please.

10              MR. COLE:  It's actually Abdiaziz Hussein.

11    Abdirizak is his nickname, but it's Abdiaziz Hussein.

12              THE COURT:  Abdi, A-b-d-i.

13              MR. COLE:  A-b-d-i-a-z-i-z.

14              MR. GHAPPOUR:  Hussein is H-u-s-s-e-i-n.

15              THE COURT:  Okay.  Abdiaziz, okay.  That's his

16    first name, last name, what?

17              MR. COLE:  I believe that's first and last name,

18    Abdiaziz Hussein.

19              THE COURT:  Okay.  And apparently he's represented

20    by counsel?

21              MR. GHAPPOUR:  Yes, your Honor.

22              THE COURT:  And how did that happen; do you know?

23    Does anybody know how Ms. Franklin gets into the picture?

24              MR. COLE:  Yes, we do, your Honor.  He was

25    represented by counsel -- one second.  Your Honor, I have to

1    talk to you about ex parte I think briefly.

2            MR. GHAPPOUR:  Your Honor, Abdiaziz Hussein is the

3    compliance manager of the Shidaal Express.  He's also,

4    according to the records in this case, the majority

5    shareholder of the Shidaal Express before it went under and

6    the compliance manager.

7            THE COURT:  Is this the guy that pled guilty?

8            MR. COLE:  No.

9            MR. GHAPPOUR:  No, your Honor.  He is on

10   conversations that have been introduced into evidence.  He

11   was the subject of part of my cross-examination of Special

12   Agent Colby O'Very yesterday.

13           THE COURT:  And that was -- I notice that there was

14   no objection to that.  It wasn't related to anything that

15   O'Very was doing.  O'Very was a reader; he was just reading

16   transcripts.  I was wondering why that even happened.

17           MR. GHAPPOUR:  Well, your Honor, he was directed to

18   investigate Mr. Abdiaziz Hussein in relation to transactions,

19   many of which are on the indictment.

20           MR. COLE:  Yes.

21           THE COURT:  Go ahead.  I'm sorry.

22           MR. GHAPPOUR:  And so I asked him if he was the one

23   that conducted a particular transaction, and the response was

24   in the affirmative.  And so I thought I'd get to it a bit

25   until there was an objection and your Honor sustained it.

1           THE COURT:  Mr. Cole?

2           MR. COLE:  Your Honor, this man was in fact

3   associated with the Shidaal Express.  He is -- his name's

4   Abdiaziz Hussein, but he's heard on some of the calls as

5   Abdirizak, a handful of the calls, maybe two or three calls.

6   He came -- he has been interviewed by the government quite

7   some time ago -- I can't remember how long ago, last year

8   probably, probably the beginning of 2011.  That's

9   approximate.  And he had counsel at the time he was

10  interviewed.  And first it was Kerry Bader, and then she was

11  replaced by Mary Franklin.  I don't know that we ever met

12  with him with Ms. Franklin; I can't recall that.  But after

13  Kerry Bader stopped the representation, we heard she was --

14  he was represented by Mary Franklin.

15          So when I saw Mary Franklin in court and then was

16  told by somebody that they saw him sitting in the back,

17  that's why I immediately requested the sidebar anticipating

18  where this might be leading.

19          THE COURT:  Well, I don't think -- I don't know

20  that you were anticipating or should have anticipated what

21  happened here, but Mr. Ghappour knew what was going on, the

22  defense apparently knew what was going on, and that's why it

23  would have been nice to have a bit, you know, a warning on

24  this because to the extent you can anticipate and probably

25  with a fair degree of probability that he's going to invoke,

1   then that obviously raises the specter of some proceeding

2   that has to take place.

3           MR. GHAPPOUR:  Yes, your Honor.  Well, as soon as I

4   was informed of this, I communicated to Ms. Franklin, whose

5   last name I found out today.

6           THE COURT:  Okay.

7           MR. GHAPPOUR:  She has not responded to any of my

8   communications even before the subpoena had been issued.

9   I've been trying to get in touch with Ms. Franklin for months

10  now through the telephone and email, and I've not had one

11  response.  Yesterday I sent her another email saying that the

12  government's closed its case and we'd like to call Mr.

13  Abdiaziz Hussein, and she showed up today.  She heard the

14  first -- the morning session and introduced herself to me in

15  the afternoon.  I told her that court was back in session

16  around 1:30.  I believe we made an attempt to inquire with

17  your Honor about the proceeding and how it should be handled.

18          There may have been a miscommunication.  There

19  certainly was a miscommunication with Ms. Franklin because

20  she brought her client in.  I'd never seen her client before,

21  so I had no idea he was in the courtroom.  In fact, Mr. Cole

22  was good enough to point that out for me, and that's when I

23  called the sidebar.

24          THE COURT:  Okay.  Well, we are where we are on

25  this, and if you're intending on calling him -- obviously we

 1   need to do this in an orderly way.  It's anticipated he's

 2   going to invoke I would assume.

 3          MR. GHAPPOUR:  Yes, your Honor.

 4          THE COURT:  And he'll invoke across the board I

 5   would assume.

 6          MR. GHAPPOUR:  I'm assuming so, your Honor.

 7          THE COURT:  Okay.  Well, in the Ninth Circuit

 8   blanket invocations are generally disfavored.  There's one

 9   line of cases that provides that a blanket invocation may be

10   made, there are some other cases that indicate that the Court

11   should make an inquiry.  I'm inclined to make an inquiry if

12   it's your intention to call him Mr. Ghappour or the defense's

13   intention to call him, but we need to get started off on the

14   proper footing here.

15          I would suggest that you file with the -- as a

16   filing a notice of intention to examine this individual and

17   you set forth the questions that you intend to ask him.

18   That's important; that gives us a start here.

19          MR. GHAPPOUR:  Yes, your Honor.

20          THE COURT:  And you don't have to set forth every

21   question, Mr. Ghappour, that you're intending on asking him,

22   but you've got to be pretty specific as to -- as to areas of

23   examination.

24          MR. GHAPPOUR:  Okay.

25          THE COURT:  That way when Franklin and this

1    gentleman appear, I have some indication -- I'll wait until

2    you're done here, Mr. Cole and Mr. Durkin.

3            MR. COLE:  I'm sorry, your Honor.

4            THE COURT:  I know.  It's not you.

5            MR. COLE:  I'm sorry.  That's okay.

6            THE COURT:  It's -- well, what you've got to do is

7    set forth generally the questions.  That way when Franklin

8    and her client come here, I've got some kind of a roadmap; I

9    can ask Ms. Franklin whether she's going to permit her client

10   to answer these questions, and, if necessary, it may be

11   appropriate to put this gentleman on the stand to see if he

12   will answer questions.

13           Now, that's the approach that I intend to follow

14   here.  If there are some areas where he will answer

15   questions, then it may be satisfactory to everyone that

16   that's acceptable?  If he's going to answer some questions

17   but not answer others or not be subject to cross-examination

18   by the government or, for that matter, by the defense, then

19   that creates other issues; we have to go down another path.

20   But that's -- that's the way we need to start.  So I don't

21   know if you two gentlemen want to get together and confer on

22   what you'd like to have this gentleman respond to.

23           MR. GHAPPOUR:  I think, your Honor, not to be too

24   broad but just the subject of his 302s would be a good

25   starting place, but I'll take it up with Mr. Cole.

1          MR. COLE:  I'm happy to meet with Mr. Ghappour

2   anytime.  I don't really know that we will have much role in

3   this frankly, your Honor, other than responding to what will

4   inevitably probably be at some point a demand that we

5   immunize somebody because unless -- and this -- I have had no

6   contact with Ms. Franklin about this or her client.  So this

7   is -- this is just predicting for the Court what may happen.

8          It will be very surprising if counsel allows him to

9   answer questions, and so I think a proffer is the right place

10  to start with Mr. Ghappour as to what he wants to inquire

11  into, and I don't know that me conferring with him will help

12  much because beyond what the person's name is, I'm not even

13  sure if they'll be able to get to what he did for a living,

14  but that's between him and Ms. Franklin I guess.

15         THE COURT:  You may not get beyond the name.

16         MR. COLE:  Right.  And so I don't know what my

17  conferring will do, but I will -- I'm available to Mr.

18  Ghappour whenever he wants this evening or tomorrow morning.

19  And also -- well, we can go in that order.  It may be useful

20  too with that -- just to keep things moving, with that

21  anticipation in mind, it might be helpful in his initial

22  filing -- we don't know yet for certain if the witness will

23  make a blanket invocation, but it might keep things moving

24  along if Mr. Ghappour outlined not only what he expects the

25  witness to testify to but how it would directly contradict

1    something that a government -- that an immunized government

2    witness testified to and there hasn't been an immunized

3    government witness, and so --

4            THE COURT:  But that raises the second part of

5    this, that to compel use immunity for a defense witness, the

6    defendant is going to have to make a showing, and it's

7    essentially a three-part showing, first of all, relevance;

8    you've got to proffer a showing with respect to relevance,

9    and either the prosecution intentionally caused the defense

10   witness to invoke the Fifth Amendment against

11   self-incrimination or -- well, with the purpose of distorting

12   the fact-finding process, or the prosecution granted immunity

13   to a government witness in order to obtain that witness's

14   testimony but denied immunity to this witness whose testimony

15   would have directly contradicted the testimony of the witness

16   who was granted immunity.

17           So there's a very specific process that has to be

18   followed, and I think it's going to depend upon, at least at

19   the threshold, a little coordination between you, Mr.

20   Ghappour, if you're taking the laboring oar here, and Mr.

21   Cole or someone from the U.S. Attorney's Office.

22           MR. GHAPPOUR:  Certainly.  So I'll confer with Mr.

23   Cole.  I will also get to work on the motion of intention to

24   examine Mr. Abdiaziz Hussein --

25           THE COURT:  Okay.

1          MR. GHAPPOUR:  -- as well as the other points that

2    you've outlined, and the issue of waiver as well.

3          THE COURT:  All right.  In terms of the timing on

4    this, I don't want to lose any jury time on this.  And I

5    assume you have -- you have a full day tomorrow.

6          MR. DRATEL:  Oh, yeah, no problem.

7          THE COURT:  But we may break a little early.  I

8    don't know if you'll have -- you have a lot of moving parts

9    here.  Now you got to get ahold of Ms. Franklin.  I had Ms.

10   Franklin informed -- it took you a couple of months to do it

11   the first time, but I had Ms. Franklin informed that she is

12   -- her client is still under the power of that subpoena, so

13   you shouldn't have -- you shouldn't have much difficulty.  I

14   wish you the best of luck in that regard.

15         MR. DRATEL:  Your Honor, if I could just give you

16   sort of a head's up for scheduling purposes --

17         MR. DURKIN:  Judge, could I just add one thing?

18         THE COURT:  Yeah.

19         MR. DURKIN:  I didn't mean to interrupt, but the

20   reason I did is --

21         THE COURT:  It's been a long day.

22         MR. DURKIN:  No, I -- the reason I did is that we

23   have a tape that we're going to seek admission in which

24   Abdirizak is a participant, that the government is not

25   objecting to.

 1                THE COURT:  You think that might eliminate some of

 2   this?

 3                MR. DURKIN:  No, no.  Well, I thought I might have

 4   to join in it because I thought I might have to use him for

 5   foundation, but the government and I agreed that there's no

 6   foundational problem.

 7                THE COURT:  Okay.

 8                MR. DURKIN:  That's the reason why I --

 9                THE COURT:  All right.

10                MR. DRATEL:  Your Honor, our intention tomorrow,

11   once Mr. Chang is concluded, once his testimony is concluded,

12   to resume with the Rule 15s.  There's a long witness, Abukar

13   Suryare, who will take us -- who will take a good portion of

14   the day, and --

15                THE COURT:  Abukar's -- oh, the deposition?

16                MR. DRATEL:  Yes.  That's a long one; that will

17   take us probably till midafternoon.  We have a couple of

18   other shorter ones that we can do to fill out the day.  The

19   only thing I would ask the Court is because our intention for

20   scheduling purposes is to have some live witnesses start

21   Monday, people who have -- who are here for a limited period

22   of time, and we would like to get them out and back to where

23   they need to be, that we'd like to start Monday with the live

24   witnesses.  So the only thing we're asking is just tomorrow

25   we'll see -- and we'll be able to calibrate this much better

1    tomorrow afternoon; we're just sort of alerting the Court

2    now -- is that we may ask the Court not to start one of the

3    short ones and end in the middle and then come back to it two

4    or three days later, just seeing where we are.

5              THE COURT:  You're the masters of your scheduling

6    of witnesses and depositions and all of that.

7              MR. DRATEL:  I'm saying that may leave us, you

8    know, at four o'clock or something, and we can take this up

9    again too at that point.

10             THE COURT:  Well, hopefully we can take it up.  I

11   mean look, I've had these where they've been resolved one way

12   or the other literally in two or three minutes, no

13   exaggeration.  And there have been other cases that have gone

14   longer.

15             So one of the big question marks here is getting

16   Franklin and her client back, back, back within our midst,

17   our embrace, and giving you, Mr. Ghappour, and you, Mr. Cole,

18   an opportunity to see what, if anything, can be worked out.

19   I don't know if anything can be worked out.  I don't know

20   what the government's position is with respect to this guy.

21   And we march on.  But, Mr. Ghappour, the first thing is

22   getting from you that notice and the questions so that I have

23   something I can deal with when we see Ms. Franklin.

24             MR. GHAPPOUR:  And, your Honor, you would prefer I

25   file that, correct, just --

 1          THE COURT:  Yes.  And it doesn't have to be -- it

 2    doesn't have to be sealed.

 3          MR. GHAPPOUR:  Okay.

 4          THE COURT:  I mean you can seal it if you want,

 5    but --

 6          MR. GHAPPOUR:  I don't think it's necessary.

 7          THE COURT:  -- I don't think it's necessary for you

 8    to do that, so -- okay, we've got that to look forward to.

 9    This is pretty tedious stuff.  I mean, you know, we're asking

10    a lot of this jury, both sides are asking a lot of this jury,

11    and so I wanted to knock it down a little bit early today,

12    and I knew we needed to talk about this.

13          Oh, the additional witnesses you're talking about.

14    I assume we're not going to have any character witness issues

15    that need to be addressed ahead of time.

16          MR. DRATEL:  If we do, we will -- I will discuss

17    with counsel whether there are, and we'll be giving the Court

18    whatever needs to be done in advance -- there may be one

19    issue like that that I'm working on right now, but I'll be

20    able to do a filing with you tomorrow.

21          THE COURT:  Well, keep this in mind that, you know,

22    the qualities that are permissible for character testimony

23    laid out in the rules of evidence, we know that, but the

24    Ninth Circuit is also pretty stringent on some areas here,

25    and so --

```
 1            MR. DRATEL:  Right.

 2            THE COURT:  -- I don't know what other circuits

 3    provide for, but the Ninth Circuit has some real limitations

 4    here.

 5            MR. DRATEL:  Then I know where we are.

 6            THE COURT:  All right.  Okay.  So nine o'clock

 7    tomorrow morning.  Anything else we need to discuss before we

 8    break?  Okay.  Thank you.  Oh, counsel, on these additional

 9    excerpts, are you going to put them all together --

10            MR. DRATEL:  Yes.

11            THE COURT:  -- in like a binder as the government

12    did --

13            MR. DRATEL:  Yes.

14            THE COURT:  -- or loose-leaf or what?

15            MR. DRATEL:  Yes.  And there's a couple of clean-up

16    things that need to be done with it just in terms of

17    procedurally I noticed.  I thought we had taken out some

18    things -- there was some bracketing material that needs to be

19    taken out again.  So we have to work on it and clean it up,

20    get it in shape so when it goes to the jury, it's good.

21            MR. COLE:  Yes, just -- and I'm not suggesting

22    they're going to do otherwise -- we just want to make sure

23    it's only the bracketed things like the explanation words in

24    brackets but that otherwise they stay in the same way they've

25    been read to the jury because they've already been read.
```

1          MR. DRATEL:  Yeah, I'm not talking about syntax.

2          THE COURT:  All right.

3          MR. DRATEL:  Which is not easy to read for all the

4     syntax.

5          THE COURT:  Are we going to beat one another up on

6     late editing or are you going to continue to --

7          MR. DRATEL:  No, I'm just talking -- we discussed

8     the brackets.  They understand what the bracketing is that

9     we're talking about.

10         MR. COLE:  Yeah, we --

11         MR. DRATEL:  That's all we're talking about.

12         THE COURT:  The thing that Mr. Ward mentioned that

13    he raised --

14         MR. DRATEL:  Knock yourself out.

15         THE COURT:  Well, you know, it just -- you know

16    something?  The jury's not going to decide the case on that

17    kind of a -- that's small --

18         MR. COLE:  Well, we --

19         THE COURT:  Well, look.  You know the case better

20    than I do.  Most juries go for the jugular and the main

21    vessels and they stay away from the capillaries.  But if you

22    got something here that appears to be a capillary but it's

23    really a jugular, that's fine.

24         MR. COLE:  No.  The only reason we were raising

25    that point is we think that there's going to be a lot of

1  shots at our linguist's abilities, and I think therefore it's

2  important the jury see --

3          THE COURT:  I'm not talking about that.  Have at

4  it.  Have at it on your linguist.  I'm talking about the fact

5  that something may have been -- there may have been a late

6  editing change --

7          MR. COLE:  Oh, no, they didn't make any -- oh, no,

8  no, no.  Our problem today was -- they weren't making late

9  editing changes, they were not reading the translation as it

10 was written on the page.  They weren't editing as they spoke

11 in court because it was written in pidgeon English or in

12 broken English and they were correcting it, and that's what

13 we had a problem with.

14         THE COURT:  Oh, I thought they were reading from

15 another -- a later version of the transcript.

16         MR. COLE:  No, no.

17         MR. DRATEL:  I was just having trouble reading the

18 syntax, and I had to slow down and not --

19         THE COURT:  Okay.  No, no, I'm not talking about

20 linguists, linguist versus linguist.  I was talking about --

21         MR. COLE:  And that's all we suggested.  That's

22 all.  He did not late-edit the transcripts.

23         THE COURT:  All right.  You all have a good

24 evening.  See you at nine o'clock.

25      (There was a break in the proceedings for the evening

```
 1    recess.)

 2                              I n d e x

 3    Witnesses                                         Page

 4    Najib Mohamed (Video)                             1309

 5    Sharif Abdi (Video)                               1314

 6    Christopher Chang
      Direct Examination by Mr. Dratel                  1336
 7

 8                           E x h i b i t s

 9    Exhibits          Description              For ID    In Evd
      A                 Photo                    1315      1315
10    B                 Photo                    1315      1315
      C                 Deed (Somali)            1316      1316
11    C-1               Deed (English)           1316      1316
      GG                DVD                       1319
12    HH                DVD                       1319
      II                DVD                       1319
13    Court's 3         FTO designation          1322
      TT-130            Transcript               1338      1338
14    TT-131            Transcript               1345      1345
      TT-135            Transcript               1350      1350
15    TT-142            Transcript               1351      1351
      TT-144            Transcript               1353      1353
16    TT-155            Transcript               1354      1354
      TT-191            Transcript               1355      1355
17

18

19

20

21

22

23

24

25
```

1                          Certificate of Reporter

2

3     I hereby certify that I am a duly appointed, qualified, and

4     acting Official Court Reporter for the United States District

5     Court; that the foregoing is a true and correct transcript of

6     the proceedings had in the mentioned cause on the date or

7     dates listed on the title page of the transcript; and that

8     the format used herein complies with the rules and

9     requirements of the United States Judicial Conference.

10

11    Dated January 20, 2014 at San Diego, California.

12

13                              /s/ Debra M. Henson   (electronic)
                                Debra M. Henson
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25