1                UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,      .
                                   .
5                Plaintiff,        . No. 10-cr-04246-JM
                                   .
6                v.                . November 13, 2013
                                   . 1:30 p.m.
7   BASAALY SAEED MOALIN, ET AL., .
                                   .
8                Defendants.       . San Diego, California
    . . . . . . . . . . . . . . . .

9

10                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE JEFFREY T. MILLER
11                 UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:     United States Attorney's Office
                           By: WILLIAM P. COLE, ESQ.
14                             STEVEN PHILIP WARD, ESQ.
                               CAROLINE PINEDA HAN, ESQ.
15                         880 Front Street, Room 6293
                           San Diego, California 92101
16
    For the Defendant BASAALY SAEED MOALIN:
17                         Law Offices of Joshua L. Dratel, P.C.
                           By:  JOSHUA L. DRATEL, ESQ.
18                         29 Broadway, Suite 1412
                           New York, New York 10006
19                         – and –
                           ALICE L. FONTIER, ESQ.
20                         369 Lexington Avenue
                           2d Floor, #224
21                         New York, New York 10017

22
    For the Defendant MOHAMED MOHAMED MOHAMUD:
23                         Linda Moreno, P.A.
                           By:  LINDA MORENO, ESQ.
24                         P.O. Box 10985
                           Tampa, Florida 33679
25  ///

```
 1   APPEARANCES (CONTINUED):

 2

     For the Defendant ISSA DOREH:
 3                               Law Offices of Ahmed Ghappour
                                 By:  AHMED GHAPPOUR, ESQ.
 4                               P.O. Box 20367
                                 Seattle, Washington 98102
 5

     For the Defendant AHMED NASIR TAALIL MOHAMUD:
 6                               Durkin & Roberts
                                 By: THOMAS DURKIN, ESQ.
 7                               2446 North Clark Street
                                 Chicago, Illinois 60614
 8

     Interpreter:                FANIK JAMA
 9                               Certified Somali Interpreter

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:             Chari L. Possell, RPR, CRR
                                 USDC Clerk's Office
23                               333 West Broadway, Suite 420
                                 San Diego, California 92101
24                               chari_possell@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1           SAN DIEGO, CALIFORNIA; NOVEMBER 13, 2013; 1:30 P.M.

 2                                -o0o-

 3           THE COURT:  Good afternoon, everyone.  Please be

 4  seated and make yourselves comfortable.

 5           THE CLERK:  Calling matter 1 on calendar, 10-CR-4246,

 6  U.S.A. v. Basaaly Saeed Moalin, Mohamed Mohamed Mohamud, Issa

 7  Doreh, Ahmed Nasir Taalil Mohamud, set for motion hearing.

 8           THE COURT:  Counsel, would you please state your

 9  appearances.

10           MR. DRATEL:  Good afternoon, Your Honor.  Joshua

11  Dratel for Mr. Moalin, with Alice Fontier from -- not from my

12  office, but she is with me today, and Mr. Moalin is seated with

13  us.

14           MS. FONTIER:  Good afternoon, Your Honor.  Good to

15  see you again.

16           MS. MORENO:  Good afternoon, Your Honor.  Linda

17  Moreno on behalf of Mr. Mohamud, who is present.

18           MR. GHAPPOUR:  Good afternoon, Your Honor.  Ahmed

19  Ghappour, on behalf of Mr. Issa Doreh, who is present.

20           MR. DURKIN:  Good afternoon, Judge.  Tom Durkin on

21  behalf of Mr. Nasir Mohamud, who is also present in custody.

22           MR. COLE:  Good afternoon, Your Honor.  William Cole,

23  Steven Ward, and Caroline Han for the United States.

24           THE COURT:  Thank you all.

25      This is the time set for the hearing on joint motion for
```

1  new trial.  Just a couple of preliminary matters, Counsel.  I

2  have been through the papers.  I am familiar with the issues.

3  I certainly welcome any additional comments or arguments you

4  may have.  If you wish to underscore something, emphasize

5  something, you certainly may.  I am not going to place time

6  limits on your arguments.

7          THE CLERK:  Your Honor, I believe the interpreter is

8  having a hard time.  (Pause.)

9          THE COURT:  Are we okay?

10          THE INTERPRETER:  Yes, sir.

11          THE COURT:  Continuing on, I don't wish to impose any

12  arbitrary time limits, but I am familiar with the issues, and I

13  have spent quite a bit of time already preparing for this

14  hearing.

15      I will take the matter under submission after the

16  arguments today, and it is my present intention to have an

17  order ready for filing by 2:00 p.m. tomorrow.  So that is my

18  current thinking on the matter in terms of procedure.

19      And with that, if you would like to proceed further, you

20  certainly may.

21      Mr. Dratel, would you like to start?

22          MR. DRATEL:  Yes.  Thank you, Your Honor.

23      And from experience, in anticipation of what the Court

24  said, I am not going to go through the papers.  I am going to

25  try to -- this is a situation in which there's ample material

that's not in the papers, not only because the universe of it
is so wide but also because things have been occurring on a
regular basis since we filed the papers and I wanted to
incorporate some of that as well.  There has been a continuing
set of disclosures as well as analysis.  It could be a
full-time job keeping up with this particular issue in the
sense of what academics and journalists have produced even
since we filed our papers, and even what the government has
released as well in terms of previously classified materials.

I want to start with -- just go back to the fundamentals
about FISA, in the sense that FISA was created not to expand
government power; FISA was created to restrict government
power.  FISA is a Congressional statutory mechanism designed to
regulate what had otherwise been treated as an entirely
discretionary act of the executive branch, and that the
U.S. District Court case, which eliminated warrantless domestic
security surveillance, electronic surveillance, nevertheless
explicitly left open the question of foreign surveillance.

So FISA was a reaction to many of the abuses that were
disclosed during the Church Committee process and the report.
And we are facing that again in the context of this particular
motion; however, there are limits as to what this motion seeks
and what it addresses in the sense that I think the timing and
time frame are critical in this sense.  This is not about the
entirety of Section 215 or 861 -- 50 U.S.C. 861, which I may

1    describe as 215; that's the colloquial way it has been treated

2    in the analysis -- but it is not about the entirety of that

3    program.  It's not about how the program exists today after a

4    series of FISA Intelligence Surveillance Corps, or FISC --

5    F-I-S-C -- opinions or protocols instituted by NSA or the

6    F.B.I. or by FISC itself, and not whether or not that's lawful

7    right now in the program itself, but rather, in the latter part

8    of 2007, when this transmission of information occurred from

9    NSA to F.B.I., linking with Moalin, whether at that point the

10   program was operating legally or illegally and, with respect to

11   this particular collection, retention, transmission with

12   respect to Mr. Moalin, whether it conforms with the statute and

13   with the Fourth Amendment.  And we submit, obviously, it does

14   not.

15        Also, while the technological issues and the methodologies

16   are somewhat complex, and they are multiple, regarding -- and I

17   am going to discuss some of them -- the Constitutional analysis

18   is traditional, which is that along the chain of acquisition of

19   evidence, with respect to Mr. Moalin, if there is an

20   illegitimate link anywhere along that chain going forward, the

21   "fruit of the poisonous tree" doctrine applies and would

22   require suppression of anything going forward from that point.

23        And part of what I have attempted to do today is

24   illustrate in many respects the links in that chain as they

25   exist on different -- multiple sides of the equation in terms

1    of the collection of this information, how it's used, and how

2    it's connected to other and compared with other information,

3    other data.

4         Also -- and I understand the Court's intention, but I

5    think that, to a certain extent, a decision is not quite ripe

6    in the sense of denying the motion.  I think to grant the

7    motion, there's sufficient evidence and sufficient information

8    available to the Court, but to deny it may be on incomplete

9    information.  And the reason I say that is there's information

10   that is apparently going to be released in the course of an

11   ACLU lawsuit that's ongoing in the Southern District of

12   New York.  I understand that as early as Monday we may have

13   release of preceding opinions, perhaps from 2006 -- which is

14   the critical time for this particular motion -- and we don't

15   have those yet.  So in that context -- as justification for the

16   program itself.

17        So there's a lot of material, and there's also material

18   that's come out, analysis and other types of material, that's

19   been issued by academics, by former justice department

20   officials, by journalists, that relate to what we are talking

21   about.  And I think some of it is important in the context

22   of -- it is important for me to understand as well, so I think

23   it's important in that sense.  And so, in that context, I am

24   not sure it's ripe in that regard, but I understand the Court's

25   intention.

 1          And the context of what that does to sentencing is not

 2     really an issue because there are technical ways that if the

 3     Court desired to go forward with sentencing it could still go

 4     forward with sentencing and just not issue judgment or

 5     something like that.  That would keep the Court's ability to

 6     incorporate additional information as available.

 7          I think it's important to reiterate one thing that is in

 8     our papers, but I want to reiterate at the outset, because I

 9     think it is important, is that we do distinguish -- rather than

10     characterize the government as an entirety, we do distinguish

11     between different branches of the government.  And here we are

12     talking in many respects -- when we are talking about the

13     collection, retention, comparison, all of the acquisition of

14     evidence, all those issues are really involving the

15     intelligence community and not the prosecutors here, who are

16     given, in many respects, a finished product.  That may very

17     well be the tip of the iceberg and only seeing what is above

18     the surface and only able to provide the Court information

19     about what is above the surface because I am not sure they know

20     themselves what is beneath the surface with respect to the

21     background of some of these intelligence methodologies as it

22     applies particularly to this case.

23          And in that context, when we talk about the FISA, the FISC

24     decisions, and the nature of disclosure that the government has

25     made to the FISC, we find in these cases, one after another,

1    dating back to 2002, that the government has been found to have

2    lied to the FISC on a repeated basis, about not only -- at the

3    time that we filed our initial brief, it was about FISA itself,

4    and the wall, in 2002; then in 2011, there was a decision about

5    702 -- which is also an issue in this case, and I will get to

6    it -- but since we incorporate in our reply a 2009 opinion

7    addressing this very program in the time frame that we are

8    talking about, that misrepresentations made to the FISC not

9    only in the context of misstating facts, but clearly NSA didn't

10   understand what it was doing.  There was no one at NSA that had

11   a full level of appreciation of the whole process.  And I don't

12   understand how that could be Constitutional or even statutorily

13   compliant given that fact and given the fact that the Court,

14   even the FISC in a non-adversarial setting, has found that.

15        The supplemental authority that the government has

16   provided to the Court is a decision in all respects designed to

17   meet rather scathing criticism of a decision that was released

18   in August.  In June, we have disclosures about the programs.

19   In August, the government -- a FISC judge issues an opinion,

20   which the government immediately releases, designed to justify

21   the programs, met with withering criticism from everyone and

22   absent failure to address important legal issues.

23        And back in October, after we filed all our papers in

24   fact, the FISC issues another opinion, which merely says,

25   essentially, that the *Jones* decision doesn't apply until the

 1    Supreme Court says it applies, and *Smith v. Maryland* still

 2    controls, leaving aside a host of other issues.  And that

 3    decision itself is subject to the same criticism that was

 4    leveled against the initial decision by the FISC in August.

 5         And I don't know how to respond to the ability to go to

 6    court and get a decision without an adversary just to meet the

 7    needs of litigation going on around the country and to meet the

 8    political needs to explain to either the Congress or people in

 9    some way -- inadequately, but nevertheless to do that.  And if

10    I had the opportunity to do that, I would be in a different

11    situation all together, and I don't.  And I think that is a

12    question of fairness in terms of the process that has to be

13    addressed here in an Article 3 setting.  And I can't pretend

14    that that emperor has clothing, and all of the scholarly

15    analysis of those opinions confirms that, and it's also not

16    binding on the Court.

17         I want to talk a little bit about factual background so we

18    set a chronology as to what we are talking about and how it

19    fits into the statutory/Constitutional violations that have

20    occurred.  There was, according to the Deputy Director of the

21    F.B.I. and the head of the NSA in public statements, some under

22    oath, since June, that -- and this is the first we heard of

23    this -- there was a 2003 investigation of Mr. Moalin conducted

24    that -- and I am quoting here, and I will start with the

25    quotes -- but that the Deputy Director of the F.B.I. said

1    showed, quote, "No nexus to terrorism," close quote, and,

2    quote, "Did not find any connection to terrorist activity,"

3    close quote.  So we have a 2003 investigation that didn't yield

4    anything.

5         That was started on a tip -- that's all we know --

6    sometime in 2003.  We don't know the legitimacy of that tip.

7    Was that tip the basis of some other illegitimate surveillance

8    program which was ongoing at the time, the Terrorist

9    Surveillance Program, also known as TSP, a warrantless

10   surveillance program that was essentially continued under

11   Congressional authority after 2008?  But in 2003, there was no

12   authority for it.  So we don't know what the nature of that tip

13   is.  And that's one area in which the link in the chain could

14   be defective.

15        And what's also interesting about that is the entire

16   section of the government's response, the public's response,

17   the entire section about the prior investigation is redacted.

18   So that also calls into question the nature of that tip and how

19   that investigation was conducted and what it collected because

20   there's also a First Amendment issue involved here, which we

21   briefed and I won't go into.

22        It's also inconceivable that an investigation in 2003,

23   less than two years after 9/11, given the intensity of what

24   that investigation must have been like, that to conclude there

25   was no connection to terrorist activity, that it did not yield

1   any *Brady* material, that it did not generate any material that

2   we could be provided that is exculpatory.  Because this case is

3   not about one incident.  It is about a course of conduct, and

4   about intent, and knowledge and intent.  And to the extent

5   there was a suspicion of Mr. Moalin back in 2003, based on some

6   tip that yielded nothing, that goes very much to intent across

7   the board.  This is a continuum, not just an isolated incident,

8   and intent is a critical aspect of these offenses.

9        It's inconceivable there's no *Brady* material from

10  interviews, from documents, from surveillance, from all the

11  elements, all the components of investigation within two years

12  of 9/11 about a possible link to terrorist activity, what that

13  must have generated.

14       Then we have a gap from 2003 to 2007.  We don't know

15  anything about 2003 to 2007, whether Mr. Moalin was still under

16  surveillance from the wiretap.  We don't know anything about

17  that.  We don't even know if assistants here know what was the

18  investigative product that was generated between those dates,

19  if any.

20       Then we have the 2007 NSA referral back to the F.B.I. of

21  the information collected subject to Section 215.  The Deputy

22  Director of the F.B.I., Joyce, says, quote, "Indirect contact

23  with known terrorists overseas," close quote.  He also said,

24  "Indirect contact with an extremist outside the United States."

25       The head of the NSA has said, in 2007, "We saw him talking

1    to a facilitator in Somali."  And by "saw," he means

2    colloquially, obviously, records, the business records that

3    were collected pursuant to 215, and "him" is Basaaly Moalin.

4    That's important, too, in the context that it's indirect,

5    indirect, facilitator.

6         The jury had a reasonable doubt that it was Aden Ayrow on

7    those telephone calls that were intercepted pursuant to the

8    FISA.  It could not have convicted Mr. Moalin.  It could not

9    have convicted anyone.

10        Moving on to the legal issues, something that was released

11   at the end of September that I was not aware of until after we

12   had filed our reply.  It's a 67-page analysis, and in many ways

13   a history, a very comprehensive history, of the bulk data

14   collection program, Section 215, by David Kris.  David Kris,

15   who from 2009 to 2011 was the Assistant Attorney General for

16   National Security.  He had also been in DOJ in the 1990s.  And

17   his responsibilities from 2009 to 2011 included responsibility

18   for counterterrorism enforcement and intelligence oversight.

19   And in the 1990's, he was also involved in intelligence and

20   FISA aspects and has been a rather consistent commentator on

21   FISA and is the author of a leading treatise used in law

22   schools on national security these days, a relatively current

23   one in terms of when it was first published.

24        And he -- in his paper, he notes that back in 2006, when

25   Congress was authorizing Section 215, the FISC was not -- we

1   don't have any FISC opinions from there, so we are a little bit

2   in the dark about what the program was essentially supposed to

3   do.  And also he says that -- quoting here from page 56 -- "The

4   briefings and other historical evidence raised a question with

5   Congress's repeated reauthorization of the tangible things

6   provision" -- and that's Section 215 -- "effectively

7   incorporates the FISC's interpretation of the law and leads, as

8   to the authorized scope of collection, such that even if it had

9   been erroneous when first issued, it is now by definition

10  correct."  So that raises a question about -- he is looking at

11  a current -- he is analyzing from the current perspective.

12      But when he says, even if erroneous, it raises a question

13  about whether or not, in 2006 and 2007, when NSA was operating,

14  when it collected this material with respect to Mr. Moalin,

15  whether it in fact was consistent with the statutory mandate

16  and with the Fourth Amendment.

17      People who wrote the Patriot Act -- which is where

18  Section 215 was amended; initially in 1998, but then expanded

19  for all tangible things, business records -- essentially said

20  this is not the intention of that section, this bulk data

21  collection of all calls.

22      There's a question of relevance because it's supposed to

23  be relevant to the investigation, yet the relevance occurs

24  after the collection.  It's collected in bulk.  It's axiomatic,

25  that every record cannot be relevant.  And Mr. Kris notes that

1   as well.  It is a limitless principle if one says that

2   collection itself of bulk data is somehow relevant.  The

3   relevance comes later.  That's when they extract and compare.

4   And that's where it's relevant.  So it's not relevant when they

5   seize it, when they collect it.  So in that sense, it is

6   contrary to the statutory mandate and in conflict with it.

7       Also, Mr. Kris acknowledges that while the 2006 and 2007

8   standard was supposed to be consistent with grand jury

9   relevance, he acknowledges that no Court has ever endorsed a

10  grand jury subpoena as broad as the metadata bulk collection

11  involved in Section 215 during this time period.

12      And by the way, the two FISC opinions issued -- one in

13  August and again in October -- that seek to justify the program

14  do not address this relevance question.

15      Also, blog posts from Marty Lederman -- L-E-D-E-R-M-A-N --

16  formerly Deputy Assistant Attorney General at OLC, now a

17  professor at Georgetown Law School, who describes the opinion,

18  the August opinion, as inadequate and talks about the relevance

19  issue as well.

20      Also -- and some of these opinions are in our papers.

21  Judge Walton's opinion in 2009 from the FISC, which details the

22  problems that NSA had in implementing this, in compliance with

23  the statute, and the constitution and instituting protocols.

24  That's 2009, two years after the events occurring here.

25      There's also -- this is not in our papers either -- the

1    Electronic Communications Procedures Act, ECPA.  That's 18,

2    2702, subsection (a)(3).  There's a prohibition on what can be

3    obtained from service providers.  And there's an exception in

4    there, specific exceptions, but Section 215 is not among them.

5    And as a result, this collection is in conflict with that

6    statute as well.

7        Also, the government, in its applications, as we know from

8    the authorizing orders by the FISC, which we —— which some have

9    been released, going back years —— that the government told the

10   FISC that the Section 215 program was necessary, indispensable

11   to counterterrorism investigation, yet the government has

12   already begun to back away from that.

13       And this is something, again, that has occurred since we

14   filed our papers; that in the litigation in New York, the *ACLU*

15   *v. Clapper,* C-L-A-P-P-E-R, in that litigation, the government

16   has backed away from the notion of necessity and said, "It's

17   one of our tools.  It might not be feasible if we didn't have

18   this."  And they have —— and also in litigation involving the

19   solicitor general, they have taken the position the

20   authorizations standard is not one of necessity.

21       So even if that's correct today, it still involves a

22   misrepresentation to the FISC at the time that the

23   authorization was provided.  There's also a problem with

24   minimization.  And again, this is something that's not in our

25   papers, about the specifics of this.  We talk about

1   minimization, but we don't talk about the specific issue that I

2   will raise now, which is in March of 2008, the Inspector

3   General for the F.B.I., Glenn Fine -- I am sorry -- DOJ, Glenn

4   Fine, issued a report.  And he notes that, as of December

5   2007 -- which is after this episode occurs -- that the

6   intelligence community had still failed to define, quote, "U.S.

7   person identifying information," close quote, meaning that the

8   ability to identify Mr. Moalin as a "U.S. person," which

9   involves all sorts of other precautionary measures and

10  prohibitions, was not even defined at the time that the

11  transfer of information was made from NSA and the collection

12  was made by NSA to F.B.I.

13       That's at page -- that's footnote 71, page 78 of that

14  report, issued March of 2008.

15       And then page 81 to 83, Inspector General Fine goes on to

16  state that the minimization protocols that had been instituted

17  prior to 2008 -- which again includes the time period we are

18  talking about now relevant to this motion -- were inadequate

19  and did not meet the standards for the Reauthorization Act,

20  which was passed in 2006, and then again -- the 2006 one was

21  the one that he was addressing.  So --

22              THE COURT:  Can we back up just a moment, Mr. Dratel?

23              MR. DRATEL:  Sure.

24              THE COURT:  On the legal front, you began this part

25  of your argument with an analysis on legal issues, and a while

1    back you said any analysis of legal issues must be viewed

2    through the Constitutional lens.  There has to be a

3    Constitutional analysis.

4         And let's assume for a moment, for the sake of our

5    discussion, that you had bulk collection under 215 that swept

6    too broadly pursuant to the enabling statute.  How does that

7    impact the Constitutional analysis and whether or not there was

8    a Fourth Amendment violation here?  Given that one has no

9    reasonable expectation of privacy in metadata, to collecting

10   metadata which pretty much reflects a consistent line of

11   authority from *Smith*, all the way through *Reed*, the *Reed* case,

12   in this circuit.

13        MR. DRATEL:  Well, Your Honor, I think that's

14   changing.  And I don't think that's necessarily -- even *Smith*,

15   footnote 5 of *Smith* said the reasonable expectation of privacy

16   is a normative question and not an absolute question.  And I

17   think that has dramatically changed as the potentially

18   plurality majority of the concurring justices in *Jones* noted

19   that this is a changing --

20        THE COURT:  Well, on an individual level, one has

21   no -- there's no reasonable expectation of privacy with respect

22   to telephone metadata, is there?

23        MR. DRATEL:  No, I think there is.  And I think the

24   courts will find that.  And this Court is duly constituted and

25   empowered to do so based on all the things we have provided,

1  but there is more than that.  There's more than that.

2         THE COURT:  What has changed, then?  What has changed

3  since the seminal case of *Smith* that somehow transposes

4  metadata from not being recognized in terms of Fourth Amendment

5  protection to being recognized irrespective of the 215 program?

6  What is there on the individual level that changes that?

7         MR. DRATEL:  What changes that -- and there are

8  several aspects of it.  One is that you have the Supreme Court

9  cases that establish that if you do things that are outside of

10  the range of the ordinary, such as -- whether it's a thermal

11  sensor, or the drug-sniffing dog or the GPS in *Jones*, if you do

12  things outside of that ordinary context, it becomes different

13  than just simply, as the case in *Smith*, a two-day, one phone

14  number, pen register; very different than the context of what

15  people expect the government will have access to, without any

16  standard whatsoever, without any protection whatsoever, has

17  changed dramatically, not only because of the explosion of

18  technology, not only because we are tethered inextricably

19  and --

20         THE COURT:  What the Fourth Amendment analysis I am

21  asking right now -- you seem to be making an argument -- it's

22  almost an argument which is tantamount to governmental

23  misconduct.  Because you have government engaging in misconduct

24  in the form of the scope of bulk metadata information under 215

25  that in a particular case, the remedy for such an overreach is

1   to invalidate a conviction even where there may not be any

2   Fourth Amendment violation occurring in terms of traditional

3   Fourth Amendment jurisprudence.  That seems to be the argument,

4   but I don't know what authority exists for that if that's the

5   argument.

6              MR. DRATEL:  That is not the argument, Your Honor.  I

7   am not talking about outrageous government conduct, but

8   government conduct that requires something more than was done

9   in this case, and the "something more" is the conformance with

10  the Fourth Amendment.

11      And in *Jones* -- just read Justice Sotomayor's position

12  about expectation of privacy.  "More fundamentally, it may be

13  necessary to reconsider the premise that an individual has no

14  reasonable expectation of privacy in information voluntarily

15  disclosed to third parties.  People disclose the phone numbers

16  that they dial or text to the cellular providers, the URLs they

17  visit and e-mail addresses with which they correspond to

18  internet service providers, and the books, groceries, and

19  medications they purchase to online retailers.  I would not

20  assume all information voluntarily disclosed to some member of

21  the public for a limited purpose is, for that reason alone,

22  disentitled to Fourth Amendment protection."

23      And there's more.  Justice Alito -- it's repeated

24  throughout the decision.

25              THE COURT:  Obviously, that was a concern for certain

members of the Court in *Jones*.  But of course, *Jones* went down

a different path.

          MR. DRATEL:  But it presaged what everyone, I think,

recognizes, which is that it's a different world, and a two-day

pen register with one phone number.  And I think making it a

bulk collection question as opposed to individual doesn't solve

the problem because the fact that there's no probable cause for

the individual doesn't save it.  In other words, exercising a

general warrant doesn't save the warrant because you have a

particular thing; it invalidates the warrant.  So even with a

warrant, something that has no contour does not pass Fourth

Amendment muster.  And here, we don't even have a warrant in

that regard.  We don't even have a specific target.

     There is more to it than that.  There's several layers.

Not just the collection, it's what is done with the collection.

     Let's go back and look at some other aspects of this.  And

I have actually some -- we prepared some slides, essentially.

We don't have the Elmo today.  But I will pass a copy to the

government and, if I may, to the Court.  Thanks.

     The first one, just looking at the FISA application -- and

obviously, we haven't seen it.

          THE COURT:  These appear to be illustrative of your

arguments --

          MR. DRATEL:  Yes.

          THE COURT:  -- your diagrams?

1      If you wish to have them made a part of the record, we

2 certainly may, but these seem to be only illustrative of your

3 arguments; is that correct?

4          MR. DRATEL:  That's correct.  And if they could be

5 made part of the record, Your Honor, that would be -- I would

6 appreciate that simply because I will be speaking of them in a

7 way that you and the government can view them, so I don't have

8 to do orally what is texturally supplied or illustrated by the

9 diagram.

10         THE COURT:  We will make it Exhibit A.

11         MR. DRATEL:  Thank you, Your Honor.

12     (Defendants' Exhibit A received into evidence.)

13         MR. DRATEL:  Looking just at the FISA application

14 first -- as I said, which we haven't seen -- but the question

15 is what contributed to that FISA application?  You could have

16 other FISA's; you could have 215; you could have Section 702;

17 you could have executive order 2333; human intelligence -- this

18 may not even be everything.  There may be other things as well

19 that contributed.

20     But the point is that along -- all along this chain,

21 there's a Fourth Amendment question of what goes into the FISA

22 application.  And the 215 -- and go to the next slide, which we

23 will call B, Your Honor, if we may.

24     (Defendants' Exhibit B received into evidence.)

25         MR. DRATEL:  On the right, we have terrorist

1    facilitator.  That's the person whom Mr. Moalin allegedly

2    had -- or at least in the 215 collection, according to NSA,

3    connected him indirectly to a terrorist facilitator.

4        So, first question is how is that person identified as a

5    terrorist facilitator?  Again, the same possible sources that

6    generate that information occur on the left side of the

7    diagram.  But we don't know the validity of any particular

8    piece of that as to whether or not it meets either statutory or

9    Constitutional muster, leaving completely aside the question of

10   215.

11       If we go to C, we work in the opposite direction.  We have

12   a terrorist facilitator.  And then we don't know -- what they

13   call hops; meaning the contact chain -- we don't know how many

14   hops it took to get to Mr. Moalin, but it could use up to three

15   hops.  So what was used to establish Mr. Moalin's connection

16   with the terrorist facilitator?  And again, under the same

17   elements and same components could go in there, so the FISA

18   application is derived from elements that require a

19   Constitutional analysis as to whether they are legitimate or

20   not.

21       And -- if we could make that Exhibit C, Your Honor,

22   please.

23       (Defendants' Exhibit C received into evidence.)

24            MR. DRATEL:  And then the Exhibit D is a quote from

25   the primary bulk order, issued by the FISC, said, "The Court

1    understands that NSA may apply the full range of SIGINT" -- in

2    caps; that's signal intelligence -- "analytic tradecraft to the

3    results of intelligence analysis queries of the collected BR

4    metadata."  "BR" being business records.

5        And the importance of that is essentially confirming what

6    we have seen in the first few slides, but also noting that

7    these records are not just simply transferred on their own.

8    It's not like they pulled out a number and gave it to the

9    F.B.I.  They subjected it to comparative analysis with all

10   sorts of other information.  We don't know how that was

11   acquired.  We don't know whether it was legitimate or not.

12       And that's one of the problems.  That's one of the

13   problems of this whole opaque -- this completely opaque

14   process, at least for us.  And to me, that's what is important,

15   is to have a process by which both sides get to analyze the

16   facts.

17       And then the next one, which I would like to make -- did I

18   make the other one D?  If that's D, was the quotation, and then

19   E would be the next slide, which talks about automated

20   evaluative analytics, which all of these components are mixed

21   together, coming and going, essentially to reinforce each

22   other, and that's how this process occurs.

23       (Defendants' Exhibits D and E received into evidence.)

24           MR. DRATEL:  And they couldn't have gotten to FISA

25   based purely on the 215 collection information on that phone

1    number.  There had to be more.  And the "more" could very well

2    be this.  And we ask the Court to go back over the FISA.  We

3    would like to see it, too, but I don't know that we are going

4    to get it, but we renew our motion for that purpose, and we

5    have done that.

6        But even the Court itself has to go back over this whole

7    process to determine the legitimacy of how this was done.  If

8    the Court wasn't told, it needs to know because that's

9    essentially what is under the surface.  There is the tip of the

10   iceberg and then there's 90 percent of the iceberg underneath

11   the surface.

12       And if I could go to F, another illustration of the same

13   concept, which is either FISA or 215 is also the product of all

14   of these other -- so the analysis that led to the pulling of

15   that information from 215 about terrorist facilitator and

16   Mr. Moalin has to come from comparison with other information.

17   It doesn't exist out there on its own.  Someone didn't see this

18   and say, "This is who it is," and give it to the F.B.I.  It's

19   done in this holistic way.  And the problem with the holistic

20   way is each of the components has to be legitimate.

21       Another issue that I just want to raise but is not in our

22   papers that some commentators have raised since we filed, is

23   the concept of the rule of lenity applying to 215.  And

24   applying the rule of lenity to 215 would be construed obviously

25   against the government, that it's -- rather, it's an overly

1    expansive interpretation of 215.

2         And also, in the context of what we were just discussing

3    in terms of the slides, a case that we don't cite -- but we do

4    cite other cases for the same principle -- it's *United*

5    *States v. Barton*, 995 F.2d 931, Ninth Circuit, 1993, that it is

6    a due process violation to deny the defendant information with

7    respect to a suppression hearing that could have enabled the

8    defendant to challenge the truthfulness of allegations for a

9    search warrant.  And I think that applies here in this context

10   as well, not necessarily only because of truthfulness, because

11   they talk about *Brady*.  It's really a question of impeaching

12   it.  And so, *Brady* must apply to the suppression hearing in

13   that context.  That's what *Barton* stands for.

14        I wanted to shift to 702, and the government's argument is

15   categorical on 702, which is essentially that, well, it is not

16   used, so therefore, there's no issue to resolve.

17        Couple of things.  One is that the slides apply to 702 the

18   same way they apply here.  We do not know to what extent 702

19   contributed or other things contributed to 702 in this regard,

20   so the question of "derived from" is really far more complex

21   than where the government put a particular conversation in

22   evidence.  The question is what went into the FISA, what went

23   into the components of the FISA, how that was all mixed

24   together.

25        Also Section 702, which is 50 U.S.C. 1881a, has certain

1    limitations, in subsection (b) -- and we didn't get into this

2    in too much detail in the papers, so I wanted to cover it

3    here -- which is that one of the limitations, you can't have

4    known targeting of U.S. persons in the U.S. known at the time

5    of the acquisition of the communication.  So if you know

6    someone is in the U.S. when you are acquiring a communication,

7    you can't acquire that communication.

8        Well, we know from the January 28th e-mails that they were

9    acquiring communications of Mr. Moalin's, knowing full well

10   there was already a FISA on him, that another agency was doing

11   that.  So I don't see how there was not knowledge by the

12   intelligence community that he was in the U.S.

13       And the same thing is if the purpose was to target a

14   particularly known person in the U.S., it's also not

15   permitted -- 702 is not permitted.

16       And there are issues about 702 that I think require

17   scrutiny.  One, the government has not said there were no

18   interceptions or no other interceptions other than the one

19   referred to in the January 28, which is just an incompleted

20   phone call.  But we haven't heard that there weren't other

21   interceptions pursuant to the same monitoring done by the,

22   quote, "other agency" that's referred to in the e-mail.

23       The government has not said there was no content

24   interception under this -- by that other agency under the same

25   monitoring.  We don't know what the nature of that -- if there

1  was content interception, we don't know what the nature of it

2  was.  It could have been exculpatory.  We don't know.  The

3  caller could have identified themselves as someone other than

4  Ayrow.  And again, this is about distinguishing between the

5  prosecutors here and the intelligence community.  The

6  intelligence community has no clue what *Brady* is.

7      I was in a case in which the agency that was doing an

8  intelligence operation, back when they had cassettes,

9  repeatedly taped over the cassettes because they made their own

10 notes of what they needed, so lost to us was the entire range

11 of conversations.  They don't know *Brady*.  They are not trained

12 in *Brady*.  That's not their job.

13     And whether they provide it -- whether they keep it or

14 provide it to prosecutors is a very serious question, and

15 repeated over and over again in these cases.

16     And the question also is how did the government conclude

17 that it was Ayrow -- in the January 20 e-mail, that he was the

18 person trying to reach Mr. Moalin?  How did it conclude that?

19 Did it have a phone number?  Some other evidence?  Was the

20 conclusion viable?

21     And if it's mistaken -- which we should have the

22 opportunity to test because no one came in here and said that

23 was Ayrow on the call.  It's all circumstantial.  If we are not

24 allowed to test that conclusion, it is not fair.  That is what

25 exculpatory evidence, we could -- if it's a mistaken

28

1    conclusion, that breaks this case apart.

2         With respect to standing -- and I know the Court talked

3    about *Smith*.  That only addresses the 215 issue.  It doesn't

4    address the other issues that are involved in interception,

5    other things that -- it is not necessarily metadata that's

6    used.  Even though I think *Smith* has been overcome by the

7    series of Supreme Court cases, *Jardines* and *Kyllo* and *Jones*.

8    But also, the standing issue, for 215, 50 U.S.C. 1801(f)(2)

9    says acquisition.  And content includes metadata in the context

10   of what acquisition -- not acquisition, but what an

11   interception means.  Metadata is included under the statute.

12   And acquisition covers a much broader context than

13   interceptions.  Acquisition is acquisition by the 215 orders.

14        In *Jewel*, in the Ninth Circuit, 673 F.3d 902, at 906,

15   Ninth Circuit, 2011, they provided the defendants in a

16   declaratory judgment action standing for bulk metadata

17   collection.

18        With respect to 702, the government again says -- the

19   government takes a categorial position; we didn't use it

20   because it wasn't in evidence.  But at the same time, agrees a

21   person is someone subject to electronic surveillance, not

22   interception, but subject to electronic surveillance.  It is a

23   much broader concept.

24        And Title 3 does have language that includes what we are

25   talking about, and I submit that that's in order that it be

1    consistent with the Fourth Amendment.

2        And the concept of taint that we are talking about is also

3    illustrated by the Court's decision in the Southern District of

4    New York, in the *Ghailani* case --

5            THE COURT:  What is your argument with respect to

6    Title 3 again?

7            MR. DRATEL:  Just --

8            THE COURT:  What is the parity of reading --

9            MR. DRATEL:  An aggrieved person is not

10   necessarily -- it is a broader concept than just what is used

11   at trial against him.

12           THE COURT:  So you are limiting that to standing?

13           MR. DRATEL:  Yes, just talking about standing.

14       But in terms of the taint issue, the *Ghailani*,

15   G-H-A-I-L-A-N-I, in the Southern District of New York -- we

16   have cited that in our papers -- but the concept that

17   information derived from the torture of the defendant then

18   leads to a witness who is then interrogated and becomes -- and

19   is called as a witness at trial, was precluded by the Court.

20   And that demonstrates that the question of taint is -- does

21   not -- is not based solely on what the character of the

22   evidence is, in the sense that a witness usually is not

23   precludable.  But here, because of the fruit of the poisonous

24   tree, this witness was identified solely by the illegal conduct

25   of torture, that wound up being suppressible.

         And in the context of derived from, whether something is
used in the 702 context for purpose of giving the Court --
giving the -- giving Mr. Moalin essentially standing and also
for the purpose of, of course, remedy, again the slides show
this is not just a question derived from putting in evidence.
It's truly about the holistic way that these intelligence tools
are used in conjunction with each other.

         So we are asking for a remedy that is within the Court's
province to grant.  One is suppression; another, short of that,
would be discovery, to find out, finally, what this case is
built on in terms of the acquisition of evidence and the chain
of acquisition; for the Court to revisit the materials provided
by the government, ex parte, in regard to the FISA, to analyze
that in the context of what has been disclosed since June; and
also, to demand more from the government to the extent it
wasn't provided initially; and again, to defer until we have a
full record of this, including the 2006 opinion, that
apparently will be -- that may very well be disclosed Monday.

         There's a schedule for disclosure.  It's been put back
many times.  And I am not suggesting about any delay, because a
substantial amount was due to the government shutdown.  And
it's been revised from time to time, and that happens in
litigation anyway.  But the fact is it's coming soon and could
have an impact on the Court's decision.

         Thank you very much for your time.

```
 1              THE COURT:  Thank you very much Mr. Dratel.

 2         Ms. Moreno?

 3              MS. MORENO:  Your Honor, I would submit and join with

 4    respect -- on behalf of Mr. Mohamud and incorporate

 5    Mr. Dratel's very thoughtful arguments on behalf of my client.

 6              THE COURT:  Thank you.

 7         Mr. Ghappour?

 8              MR. GHAPPOUR:  Your Honor, one quick addition.

 9         Drawing your attention to Exhibit C, I would just like to

10    point out that an assertion that Mr. Moalin is in indirect

11    contact with a terrorist facilitator -- in other words,

12    something like that could be interpreted by Mr. Moalin being

13    the second or third hop on the contact chain shown on the

14    right; however, a statement Mr. Moalin is talking to a

15    terrorist facilitator implies that there is something missing

16    that we are not seeing here.

17         And just to underscore Mr. Dratel's point, that we believe

18    that this gap is what the automated analytics fills in, whether

19    they are automated or not.  We believe that this gap

20    necessarily derives from other intelligence, whether it be

21    human intelligence, 702 intelligence, other 215 intelligence,

22    and Your Honor would have to rule on the legality of that in

23    order to reach a conclusion that the application, in and of

24    itself, was not derived from unlawful evidence.

25              THE COURT:  Thank you, Mr. Ghappour.
```

1          Mr. Durkin?

2                  MR. DURKIN:  Judge, I would adopt Mr. Dratel's

3    argument.  I have only a brief comment on one small section,

4    and that would be my issue.

5                  THE COURT:  Sure.

6                  MR. DURKIN:  It's with respect to the final argument.

7    I make reference to it in our reply, on page 21.  The court

8    should order disclosure to clear counsel of FISA applications

9    and the CIPA 4 motions.

10        And my comment goes to this effect, that I think what we

11   have witnessed and what we are witnessing is a real paradigm

12   shift in the way cases are being prosecuted in Title 3 courts

13   now and in the district courts, and I will put this in

14   perspective.

15        I am teaching a class on national security at Loyola

16   Chicago law school, and last night we were talking about secret

17   evidence, of all things.  And I sent the government's response

18   to my class last night, while I was on the airplane --

19   wonderful world we live in; you can now have wifi in the

20   airplane -- and I said, "No matter how many times I see these,

21   and I have seen a lot of them, I am stunned, always, that I am

22   in an American courtroom, with pleadings that look like this."

23   (Indicating.)

24        I get it.  I understand.  But I have a visceral --

25                  THE COURT:  That doesn't convert very well on the

```
 1    record.  You are talking about a heavily redacted --
 2            MR. DURKIN:  I am talking about the government's
 3    public filing that -- at least on our number, it's
 4    document 355.  And I am referring to -- what I was just showing
 5    you was pages 8 through 12 -- I am sorry -- 8 through 11, that
 6    are completely redacted.  There's other redactions, significant
 7    redactions throughout.
 8        And I say this respectfully because, I think you know, I
 9    was an assistant U.S. attorney longer than I want to talk
10    about.  But I have been doing this for 40 years.  I was a
11    prosecutor from '78 to '84, and I have always been very proud
12    of that.  And my only real contribution to this reply that
13    Mr. Dratel wrote -- which I think is excellent -- is footnote 1
14    on page 4, which talks about the fact that we are talking about
15    the government -- when we use the term "government," we are
16    talking about the intelligence agencies now, big G.  And when
17    we talk about these gentlemen, we are talking about
18    prosecutors, and that is the paradigm shift I have seen.
19        I first saw it in the Guantanamo, in the military
20    commissions.
21        One of things you may be accustomed to -- and I think all
22    lawyers who have done this on either side -- is the ability to
23    trust each other and to talk to each other lawyer to lawyer.
24    And I think that's what our system is built upon because I
25    think -- I don't know how judges think, but I have watched
```

1  judges think long enough to know I think they come to trust

2  people.  And when people say things, they can rely on it.  And

3  I think that's how our system has worked up until recently

4  because we don't any longer have a system in which criminal

5  investigative agencies are prosecuting cases.  We have

6  intelligence-gathering agencies dictating prosecutions.

7      And I don't mean that critically of these people.

8  (Indicating.)

9      What I noticed happening is when you try to talk lawyer to

10  lawyer now, and I first saw this in the military commissions in

11  Guantanamo, and you try to talk lawyer to lawyer, and normally

12  the lawyers will talk back to you and say what you know and we

13  all honor each other's secrets and so forth; what you get now

14  is, "We will have to get back to you."  And this started

15  gnawing at me four years ago.

16      It's now, I think, getting clearer -- and you see it in

17  the FISC opinions, these disclosed FISC opinions, that the

18  information that the intelligence agencies are dribbling out to

19  the government is not accurate.  We even have Mr. Clapper, in

20  his famous Congressional testimony, saying he had to tell the

21  least untruth or whatever he said.

22      And I only say that in the sense that that's a significant

23  paradigm shift.  Because I trust William Cole and these people

24  I have always trusted the U.S. attorney's office.  I have

25  fought with them a lot, but I was always trust them.

        I am not sure that you can trust them -- I think you can
still trust them as individuals.  But I don't think they have
the information anymore.  I think they are operating on only
what's given to them.

        And the reason I say this is significant -- and it really
comes up in this Kris article that Mr. Dratel referenced.  I
thought we had it in our papers, but in case it's not -- I
don't think it is.  But it's on the -- it's -- the author is
David S. Kris.  It's titled, "On the Bulk Collection of
Tangible Things."  And it's a Lawfare research paper series,
Volume 1, Number 4, September 29 of this year.  And he makes
reference to a point about a lawyer's obligation in ex parte
proceedings.  And this is what in effect the government is
asking you to do, is to just have these things ex parte.

        And he cites the ABA model rule 3.3D, and talks about, "In
an ex parte proceeding, the lawyer shall inform the tribunal of
all material facts known to the lawyer that will enable the
tribunal to make an informed decision whether or not the facts
are adverse."

        Now, I don't doubt that the U.S. attorneys and Department
of Justice lawyers will relate to you what they know.  It's
what they don't know, is the problem.  And I would ask you to
consider that.

        I think, you know -- as a result of that, I don't think
what we are asking for is so extraordinary.  We are cleared

     1    counsel.  I think what has happened -- and you see this in a

     2    lot of the scholarly comments about what is wrong with the FISC

     3    Court, and should there be an adversary put into the FISC.  And

     4    I don't want to get into that debate, but the principle is the

     5    same.

     6         I don't know that you can rely anymore on what they know.

     7    Because I think they are deliberately kept in the dark, and

     8    that's not criticism of them, by any means (indicating.)  But I

     9    think it is happening, and I ask you to take that into account

    10    because it's -- I just don't think you can read these FISC

    11    opinions and come away with too many different conclusions.

    12         I mean, how many times did those government prosecutors --

    13    were they really lying to the FISC Court or were they just

    14    given bad information?

    15         I don't know what happened here.  I think we should know.

    16    And I don't think it would hurt the system if we were permitted

    17    that.  I think we have a different paradigm going on, and I'd

    18    ask you to consider that because it took me a long time to see

    19    it.  It started bothering me down in Guantanamo, and it's

    20    bothered me ever since.  I have handled a lot of these cases,

    21    and you just can't have lawyer-to-lawyer conversations anymore

    22    because everything has to get cleared, somewhere, up wherever

    23    that may be.  I don't know.  That's my two cents.

    24              THE COURT:  Thank you, Mr. Durkin.

    25              MR. DRATEL:  Your Honor, may I clarify one thing?

                THE COURT:  Yes.

                MR. DRATEL:  If it's not clear to my colleagues, then
I want to clarify it.  That is with respect to the Electronic
Communications Procedures Act, ECPA, 18 U.S.C. 2702(b)(3), and
the limitations on what can be obtained from a service
provider, and the fact that Section 215 collection is not
included, that's not a standing issue; that's a substantive
issue, that it would preclude the acquisition of this bulk data
as a matter of substance and not as just a standing issue.

        Thank you, Your Honor.

                THE COURT:  Mr. Cole?

                MR. COLE:  Thank you, Your Honor.

        Well, there's a vigorous debate going on in this courtroom
as well today, I guess, about the intelligence community, about
FISA, about Section 215, about rights of privacy, and that's a
good debate.  It's going on in Congress and the media for sure,
and the public debates it.  But the issue here is not so much
that debate and where it will come out and how it will impact
our society; the issue is this is a criminal case and whether
new trial ought to be granted.  And I want to briefly respond
to points made by Mr. Dratel.

        I understand that because classified information is
involved, defense counsel are forced -- and I am not
criticizing them for this -- but they are forced to speculate
as to what may or may not be because there are things redacted

1    from certain papers or some things are done under the law,

2    through CIPA.  But, even if we assume for a moment that all

3    their speculation was correct -- and it isn't.  And the Court

4    has seen the FISA applications, reply; the Court has seen the

5    CIPA submissions.  And so even though the speculation is

6    incorrect, in many particulars, even if it was, even if they

7    are right about something that's been said, there would still

8    be no basis for a new trial, and that would not be based on the

9    ongoing debate about privacy; it would be based on established

10   law.

11       First -- I won't belabor this point -- but there is no

12   case law recognizing a Fourth Amendment interest in metadata.

13   There just isn't.  And the *Jones* case came out in 2012.  That

14   was years after the defense says metadata was collected on

15   Mr. Moalin that they take issue with.  The *Jones* case itself is

16   tea leaves, the defense says, to what may be coming.  Even if

17   the *Jones* case had addressed the issue -- which it didn't --

18   even if it addressed metadata, it would have addressed it five

19   years after the collection in this case.

20       There would be a good-faith exception even if there was a

21   Fourth Amendment interest because not only has the FISC

22   issued -- repeatedly upheld the present orders authorizing the

23   telecommunication metadata collection, but there is a statute

24   that authorizes it, there are Court opinions that authorize it,

25   and there have been no Supreme Court or other opinions

 1   invaliding it.

 2        So not only is there no Fourth Amendment interest, even if

 3   one was emerging, as Mr. Dratel states -- which we take issue

 4   with -- but even if one did emerge, or was emerging, or even if

 5   *Jones* was leaning in that direction somehow in a concurrence,

 6   there still would not be a basis for suppression or new trial.

 7        Also, he referenced the ECPA, also sometimes called the

 8   Stored Communications Act.  Again, the problem with that is

 9   there is no suppression relief either.  That's established

10   under Ninth Circuit law.  Your Honor has written about it in

11   the *Qing Li* case.  There is no suppression remedy.

12        And analogously, there is no suppression remedy under the

13   215 program if there's a statutory violation.  There has been

14   no citation of any authority suggesting that if there were a

15   statutory violation that there would be a suppression remedy

16   because none is provided in the statute.  Congress did not

17   provide it.  And Congress knew how to provide suppression

18   remedies because it provided it for other portions of FISA, but

19   it did not provide it for the 215, just like it didn't provide

20   it for the Stored Communications Act.  And one can guess why,

21   because Congress recognized no Fourth Amendment interest in

22   those type of records.  Also, there has been no identification

23   of a statutory violation anyways.

24        And in fact, the FISA Court keeps issuing orders approving

25   the program.  And those are real courts and real judges

1   although there's been assertions today and other places that

2   somehow their opinions don't matter.  The government relies on

3   them, certainly.

4        With respect to 702, again, counsel speculates about 702,

5   and I understand why.  It's not a criticism.  But this Court

6   already has seen the FISA applications.  And we have explained

7   again in the papers, our response, that the United States

8   cannot enter into evidence or otherwise use or disclose in the

9   course of prosecution of Moalin or his codefendants any 702

10  information that they obtained or derived in foreign

11  intelligence collection as to which either Moalin or his

12  codefendants were aggrieved.  And that's just the case.  We

13  have stated it to the Court and provided the Court with the

14  information.

15       The charts about analytics and what could or could not

16  have been used, or was used, or may have been used, the Court

17  has seen the FISA applications and knows what was relied upon

18  in seeking authorization to collect the FISA calls that were

19  used in this case.

20       I also want to mention just briefly the fact that the

21  government's case was based on the calls collected.  We argued

22  to the jury that the calls, the FISA calls, established that

23  the defendants were providing and intend to provide support to

24  Al-Shabaab and terrorists.  We weren't relying -- in our case

25  in chief, there was no one who came in and testified that was

1    Ayrow on the telephone from some intelligence agency.  We

2    didn't rely on some analytics.  We played the calls.  And the

3    jury had to decide based on argument from all sides whether

4    they believed the calls showed intent to support Al-Shabaab.

5        The jury could have concluded that they weren't sure it

6    was Ayrow, but they were dang sure it was someone from

7    Al-Shabaab on the other end of the line.  We, of course,

8    strongly believe and argue that it was Aden Ayrow, but that was

9    for the jury to decide upon the calls themselves.  That what we

10   relied upon.  And the Court knows how we got those calls

11   because the Court has seen the FISA application.

12       One moment, Your Honor.

13       For all those reasons, we believe that a new trial motion

14   should be denied, and submit.  Thank you.

15           THE COURT:  Thank you.

16       Mr. Dratel, anything further?

17           MR. DRATEL:  Thank you, Your Honor.

18       This is a criminal case.  This is not a broad, abstract

19   argument.  This is about a human being -- four of them --

20   convicted based on the illegal acquisition of evidence used

21   against them.  And the fact that the calls were played and that

22   was the evidence is like saying if a search warrant is based on

23   a series of lies or illegal conduct by the government such as

24   an illegal wiretap, the fact that you just put the evidence

25   in -- we are not talking about that.  That stands the Fourth

1    Amendment completely on its head; stands the whole system on

2    its head.

3         You know, the government talks about *Jones* being five

4    years after the collection of this metadata.  Maybe this case

5    would have been in front of the Supreme Court five years before

6    *Jones* if we had only known this occurred.  But this has all

7    been secret.  We don't get to know this until it comes out

8    inadvertently, not from the government disclosure, no.  But by

9    disclosure made by a whistleblower, and the government's

10   response, the government's justification of the case.

11        It's not good enough -- we are not good enough to get it

12   to defend them, to defend Mr. Moalin -- I am sorry.  I am

13   exercised not by what the government has said, but by the whole

14   process we have gone through.  Because for three years,

15   preparing this case, three years, I am not permitted to see

16   what is necessary to defend him, but the minute someone comes

17   out and tells the truth about what the government is doing in

18   this country, the government says, "Oh, now we can disclose it,

19   to justify what we have done."  That's the only reason we know.

20        So to say *Jones* is five years after is to say yeah, five

21   years after the government has hidden it for a decade.

22        Let's talk about good faith.  Let's have a good-faith

23   hearing.  Let's have witnesses on the stand.  Let's get to the

24   facts, and let's talk about good faith.  I am perfectly willing

25   to do that.  And then we will see if it applies as a legal

1    matter.  But if they want to assert a good-faith defense, they

2    better have a basis for it in fact, and we get to

3    cross-examine.

4        And as I noted in my presentation, there are many other

5    levels of Fourth Amendment analysis beyond just the *Smith*

6    metadata question.  And *Jewel* says metadata is covered in

7    standing.  It's a whole range of things that are collected in

8    the course of these communications.  That's not even a criminal

9    case; that's a declaratory judgment action.

10        The government relies on the FISC opinion.  Indeed, not

11    only a secret body of facts, a secret body of law.  Disclosed

12    only because the government has been held to account, at least

13    in the media, for what it's done the past 12 years.

14        The FISA application the Court has seen.  That's just the

15    application.  Just like an ordinary warrant, the Court has the

16    authority -- really, I think, the obligation -- to go beyond it

17    to see what makes up that FISA application.  If the FISA

18    application is based on illegally or unlawfully obtained

19    evidence, it is invalid.  The Court must go beyond that based

20    on the nature of how this process occurs.

21        And again, it's in our papers; something called Special

22    Operation Division of the DEA, the concept of parallel

23    construction.  The intelligence agencies have instructed law

24    enforcement agencies not to reveal certain conduct by the

25    intelligence agencies in making cases.  So what you do is you

 1   build a parallel, sanitized pathway to the evidence leaving out

 2   the authentic origins, which are illegitimate.

 3       I think the Court has to go beyond just the four corners

 4   of the FISA application, just as the Court would go beyond if

 5   someone came in with a warrant that talked about an informant,

 6   and you would ask, "Is he reliable?"  You would ask things that

 7   are not in the warrant.  "How did this happen?  How did that

 8   happen?"  You would do that.  And I think it is incumbent upon

 9   the Court to do that here.

10       Thank you, Your Honor.

11           THE COURT:  Thank you, Counsel, for your arguments.

12   I do appreciate them.

13       And as I indicated previously, unless you are otherwise

14   advised, I am taking the matter under submission now, and my

15   intention is to consider your arguments and further points that

16   were raised and issue an order by 2:00 p.m. tomorrow, which,

17   obviously, assuming that the motion is denied, would call for

18   the sentencings to go forward on Monday as already scheduled.

19       If there's any change in that, we have your contact

20   information, and we will advise you immediately.

21       Mr. Dratel, assuming the sentencing goes forward on

22   Monday, we will not be seeing you nor your client, because your

23   matter has been continued to another date.

24           MR. DRATEL:  No, that's Mr. Durkin, Your Honor.

25           THE COURT:  I am sorry.  I am looking at Mr. Durkin.

 1          Mr. Durkin, so you know that your matter is scheduled for

 2     another time on behalf of Mr. Nasir?

 3          MR. DURKIN:  That's right.

 4          THE COURT:  The only reason we have an interpreter

 5     here is to aid Mr. Nasir -- your client, Mr. Durkin.  So if the

 6     sentencings do go forward on Monday, I am not anticipating any

 7     need for interpreter services, and I just wanted to make that

 8     clear at this point.

 9          MR. DURKIN:  That's fine, Judge.  I mean, could I

10     have just one second?

11        (Counsel confers with defendant.)

12          MS. FONTIER:  Your Honor, I am standing for another

13     reason, on the interpreter issue as well but --

14          MR. DURKIN:  Judge, he would just as soon be excused

15     on Monday.

16          THE COURT:  Yes.  There is no need for you to be

17     here.  There is no need for your client be here on Monday, if

18     the matter goes forward on Monday.

19          MR. DURKIN:  Thank you.

20          THE COURT:  Ms. Fontier?

21          MS. FONTIER:  Mr. Moalin and Mr. Doreh have been

22     transferred out of GEO and are currently being housed in

23     Arizona.  I raised this point on a prior conference call.  If

24     it's possible for Your Honor -- I know you can't necessarily

25     order the marshals where to hold them or where they should be

1   placed or --

2          THE COURT:  You remember your experience in this

3   district.  That's good.

4          MS. FONTIER:  -- but if it's possible to make a very

5   forceful recommendation that Mr. Moalin and Mr. Doreh remain in

6   San Diego at either facility that would be --

7          THE COURT:  I think that would be entirely

8   reasonable.  I think that would be entirely reasonable.  In the

9   past, the marshal has always cooperated.  And I think there is

10  a loose understanding, if not written in stone, that to the

11  extent possible people in custody, awaiting sentencing, should

12  be brought for local housing in sufficient advance of a

13  scheduled sentencing hearing so that counsel have reasonable

14  access to their clients.  So I am not anticipating any

15  difficulty with that request.

16      If there is anyone here, representatives of the marshals'

17  office or otherwise, who has any concern about the request that

18  was made or my response, I would like to give the marshal an

19  opportunity to be heard while everyone is still here.

20      Would you like to be seen at the side of the bench with

21  counsel?

22          THE MARSHAL:  That would be fine, Your Honor.

23      (The following proceedings were heard at sidebar:)

24          THE MARSHAL:  When is sentencing?  Assuming --

25          THE COURT:  Sentencing is set for Monday, next

1    Monday, and I would like to have everybody remain here locally;

2    that is, the defendants remain here locally, not to return to

3    Arizona.  Do you think that will be an issue?

4            THE MARSHAL:  I would like to say it won't.

5    Typically, they would need to go back and be processed out of

6    the facility they are being held at.  And right now, the way it

7    works in the district is once they are awaiting sentencing,

8    that is when we put them in the facilities that are further

9    away because there's a two- to three-month period, usually,

10   waiting on PSR or whatnot.  So that's why they were housed

11   there.

12       I am -- I can make a phone call to the supervisor that

13   actually oversees our facilities and see if it's going to be an

14   issue.  I don't foresee there being an issue with having them

15   in the district.  I don't know if they are going to have to go

16   back and be outprocessed.

17           THE COURT:  Why can't that be done administratively?

18   We have people appearing remotely, and for arraignment purposes

19   and other purposes.  Why can't we have that done?

20           THE MARSHAL:  Again, I don't think there will be an

21   issue.

22           THE COURT:  I don't want to put you on the spot.  I

23   want to give you an opportunity to contact the marshal staff;

24   if necessary, contact Nellie Klein at MCC.

25           THE MARSHAL:  And the only other issue would be,

1    assuming we have space, we have to have somewhere -- at one of

2    the three facilities, there should be.  That was pretty much

3    it, as long as there's bed space.

4              THE COURT:  If you want to make a call, or if

5    necessary, I will call, talk to Nellie Klein.

6              THE MARSHAL:  I can make a call and see where we

7    stand, and if we need to have judicial -- actual minute order

8    done.

9              THE COURT:  Why don't we do this.  We have been at

10   it, gosh, just about an hour and a half.  We will take a

11   15-minute recess at this point for purposes of allowing you to

12   contact whomever you need to contact.  We can have -- rather

13   than having the defendants here in the courtroom, they can be

14   taken back.

15       You can waive their presence for any further discussion on

16   this particular issue, which is administrative and scheduling,

17   and then we will reconvene in 15 minutes.  You can let us know

18   whether we need to do something further.  Give Nellie a call.

19             MR. DRATEL:  May I ask one other thing?  If you

20   could, to the extent that something is different than what we

21   are hoping for, and even if it is, if there's a phone number or

22   anything we could call to find out which of the facilities they

23   might be at?  And also -- and also, if they get taken back to

24   Arizona to get processed, when they come back, to see them

25   right away?

1          THE MARSHAL:  I will make sure we have those answers

2     and you know where your clients are.

3          THE COURT:  And that is Corey Miller on behalf of the

4     marshal service.

5          MR. COLE:  If we go back on the record, we have one

6     small administrative matter about the record we wanted to raise

7     briefly to be sure it's cleared up, if we can do that before we

8     break.

9          THE COURT:  Let's hold up on miscellaneous matters,

10    take a 15-minute recess at this point, and allow you to make

11    that inquiry, and we will wrap up everything in 15.

12         THE MARSHAL:  And the defendants aren't needed beyond

13    that point?

14         THE COURT:  Their appearance is waived from that

15    point forward.  If you wish to take them back to holding, you

16    may do that.

17         THE MARSHAL:  Thank you.

18         THE COURT:  Thank you.

19      (The following proceedings were held in open court:)

20         THE COURT:  Ladies and gentlemen, we will be in

21    recess for approximately 15 minutes.  Thank you.

22      (Recess taken from 2:55 p.m. to 3:12 p.m.)

23         THE COURT:  I will inquire of the marshal what the

24    good news is.

25         THE MARSHAL:  Your Honor, Corey Miller on behalf of

1  the marshal service.

2      I spoke with our supervisor that takes care of our

3  detention facilities.  What we are going to do is the two

4  clients in question are going to be sent back to San Luis this

5  evening so they can be responsible for their personal effects

6  or whatnot.  They will be transferred back and come back on a

7  bus in the morning and be transferred to a local facility.

8          THE COURT:  Pending the sentencing hearings?

9          THE MARSHAL:  Correct.

10         THE COURT:  Is that acceptable, Counsel?

11         MS. FONTIER:  It is, Your Honor.

12         THE MARSHAL:  And I have given counsel my card so

13 they can call me in the morning to get their location as to

14 where they are being housed tomorrow morning.

15         THE COURT:  Very good.  I think we have agreement of

16 all counsel here, Mr. Dratel, and Ms. Moreno, and Mr. Ghappour,

17 that that would be a satisfactory resolution of this.

18         MS. MORENO:  Your Honor, my client has not been

19 moved.  And this gentleman and I have had a conversation

20 requesting that he not be moved, but if by some blip in the

21 system --

22         THE COURT:  Not even a field trip to Arizona?

23         MS. MORENO:  No, please, Your Honor.  And that I was

24 actually staying here until Monday in order to work with him,

25 so I am hoping that he will not be moved.

```
 1              THE COURT:  Very good.

 2              THE MARSHAL:  I am going to send a message and have

 3    it noted in our system to make sure the other two clients

 4    aren't moved pending sentencing.

 5              THE COURT:  Very good.  I thank you very much for

 6    your time and effort in that regard.  If anything comes up, any

 7    change that you are concerned about, please let me know right

 8    away so we can get anything -- any issue resolved quickly.

 9    Okay?

10              THE MARSHAL:  Absolutely.

11              MS. FONTIER:  Sorry, Your Honor.  I just have one

12    final issue.  You raised the question of the interpreter.  As

13    you are aware, Mr. Moalin has not used the interpreter in any

14    of the proceedings.  He understands English very well and also,

15    obviously, can communicate with us without difficulty.

16        When I met with him briefly earlier today, he said he's

17    hoping -- intending to address the Court at the time of his

18    sentencing, and he does feel more comfortable expressing

19    himself fully in the Somali language.

20        I indicated to him it was my preference he speak in

21    English.

22              THE COURT:  I would prefer that.  It's his choice,

23    but I would prefer that.  Obviously, I can better understand

24    what he is saying without the intervening interpretation.  So

25    much is lost, sometimes, just in interpretation.
```

```
 1            MS. FONTIER:  That was the exact sentiment I
 2   expressed to him, Your Honor.  I only raise it because -- I
 3   will address it with him tomorrow afternoon, when he is back in
 4   the fine state of California, and if he says that he would be
 5   much more comfortable, I will just alert the Court through a
 6   phone call to your chambers so the Court is aware he is
 7   requesting an interpreter; otherwise, you can assume he is not.
 8            MR. DRATEL:  And we will work with him on his remarks
 9   so that he is comfortable in English the best we can.
10            THE COURT:  I believe our interpreter has traveled
11   from Minneapolis?
12            THE INTERPRETER:  No, Your Honor.  I am locally here.
13            THE COURT:  You will be available, then, Monday if
14   needed?
15            THE INTERPRETER:  Yes, Your Honor.
16            THE COURT:  Very good.  We need to let you know for
17   your planning.  So I would only ask that counsel keep our
18   interpreter in the loop at this point.  After you have had an
19   opportunity to speak with Mr. Moalin, please let the
20   interpreter know so his schedule can be appropriately adjusted.
21            THE INTERPRETER:  Thank you, Your Honor.
22            MS. FONTIER:  Again, it is my assumption and
23   preference that Mr. Moalin speak in English, and if that is
24   different, I will alert the Court and the interpreter tomorrow
25   so everyone is aware.
```

1          THE COURT:  Very good.

2      Ms. Moreno, anything from you on that score?

3          MS. MORENO:  No.

4          THE COURT:  Mr. Ghappour?

5          MR. GHAPPOUR:  No, Your Honor.  Thank you.

6          THE COURT:  And Mr. Cole, you had one matter you

7  wanted to discuss administratively?

8          MR. COLE:  Just a small matter, make sure the Court

9  is aware.  You recall in the trial, there was a lot of

10  videotape that was played, of the depositions.  And one loose

11  end was perfecting the record for appeal, make sure that there

12  was an exhibit containing the portions that were played at

13  trial.  And counsel has been working with us on that, and my

14  understanding is they are on the verge of having that

15  finalized.  But we are just concerned that we are a few days

16  out of sentencing -- at least sentencing for three of the

17  defendants -- without yet the record having the disk of what

18  was played at trial.  And we just wanted to be sure everyone

19  was on the same page, that that still needs to be done, and the

20  record perfected in that way.

21          THE COURT:  Without the disks that were played?

22          MR. COLE:  Well, the issue was, when we left trial,

23  Your Honor -- and this is my recollection, and counsel can

24  chime in if I have it wrong -- I think we are going to -- there

25  were all these depositions, but we only played portions of them

1   at trial.  So a disk was going to be created for the record

2   that the parties would agree was the portions played at the

3   trial.  And that was going to become part of the record,

4   essentially, of what --

5           THE COURT:  Weren't you working from a disk or

6   perhaps more than one disk with only those excerpts that were

7   played before the jury?  I know you were using the Sanction

8   software, but I thought that had been ultimately converted.

9           MR. DRATEL:  What happened was we -- I think towards

10  the end of trial, we began to shave off pieces of the

11  deposition to try to get finished faster, and in a certain

12  period of time, and we had agreed on certain -- basically, to

13  edit out some parts of it that ended up being different.  And

14  you would have to go to a certain spot; play; go to a certain

15  spot; play.  Even though we had a disk of the testimony that,

16  after the Court's ruling on admissibility, had been created;

17  nevertheless, that was in fact different than what was played

18  to the jury at least for the last couple of witnesses.  I think

19  for the first few witnesses, it was not a problem, but the last

20  two or three witnesses, we did more editing during the trial.

21          THE COURT:  You feel you can get together and perfect

22  that?

23          MR. COLE:  I don't think there is any dispute at all

24  over what needs to be done; just the logistical issue of having

25  it finished by the defense.  They have the deposition disks and

1    they know what they want to have on the disks, so it is a

2    matter of making sure Your Honor was aware.

3        We feel that they are working on it.  I don't think it is

4    an issue.  But sentencing is just around the corner now, and we

5    just want to make sure those are finished so it will be

6    available for future review.

7            THE COURT:  Well, right.  They should be finished in

8    any event, either for future review, or if the matter were to

9    result in a retrial, you would have to have that record as

10   well.  So you really do need to quicken the pace on getting

11   that last loose end tied up.

12       Are there any other matters at this time before we adjourn

13   for the day?

14           MR. COLE:  No, Your Honor.

15           MR. DRATEL:  No, Your Honor.

16           MS. FONTIER:  No, Your Honor.

17           MS. MORENO:  No, Your Honor.

18           THE COURT:  Again, thank you, Counsel, for your

19   arguments today.  The schedule will be as I described it

20   earlier unless there's a change.  We have all your contact

21   information.  We will keep you immediately advised if there is

22   any change in scheduling.  Okay?

23           MR. DRATEL:  Thank you, Your Honor.

24           THE COURT:  Thank you.

25       (End of proceedings at 3:20 p.m.)  –o0o–

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4   qualified and acting official Court Reporter for the United

5   States District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with rules and requirements of the United States Judicial

10  Conference.

11              DATED:  January 31, 2014, at San Diego,

12  California.

13

14                         /s/  Chari L. Possell

15                         _____
                           Chari L. Possell
16                         CSR No. 9944, RPR, CRR

17

18

19

20

21

22

23

24

25

I N D E X

EXHIBITS ADMITTED INTO EVIDENCE:

DEFENDANT'S EXHIBITS:                              PAGE

A        .........................................22

B        .........................................22

C        .........................................23

D        .........................................24

E        .........................................24