1                  United States District Court

2                  Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                      Plaintiff,     )
                                      )
6        vs.                          ) Case No. 10-CR-4246 JM
                                      ) Jury Trial/Day 12, 13, 14
7    BASAALY SAEED MOALIN,            ) Wednesday, February 13, 2013
     MOHAMAD MOHAMAD MOHAMUD          ) Thursday, February 14, 2013
8    ISSA DOREH,                      ) Friday, February 15, 2013
     AHMED NASIR TAALIL MOHAMUD,      )
9                                     ) Volume 12
                       Defendants.    )
10   _____ )

11

12              Before the Honorable Jeffrey T. Miller
                   United States District Judge

13

14

15

16

17

18

19

20   Official Interpreters:   Ayderus Ali, CCI
                              Fanik Jama, CCI
21
     Official Court Reporter: Debra M. Henson, CSR, RPR
22                            U.S. Courthouse
                              221 W. Broadway, Suite 5190
23                            San Diego, CA  92101
                              (619) 238-4538
24

25
                 Record produced by stenographic reporter

1    Appearances

2    For the Government:        Laura E. Duffy
                                UNITED STATES ATTORNEY
3                               William P. Cole
                                Caroline P. Han
4                               ASSISTANT U.S. ATTORNEYS
                                Steven Ward, Trial Attorney
5                               U.S. DEPARTMENT OF JUSTICE
                                880 Front Street, Suite 6293
6                               San Diego, CA  92101

7    For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
8                               Alice Fontier, Esq.
                                OFFICE OF JOSHUA L. DRATEL
9                               2 Wall Street, Third Floor
                                New York, NY  10005
10
     (Mr. M. Mohamud)          Linda Moreno, Esq.
11                              LINDA MORENO, P.A.
                                P.O. Box 10985
12                              Tampa, FL  33679

13   (Mr. Doreh)               Ahmed Ghappour, Esq.
                                LAW OFFICES OF AHMED GHAPPOUR
14                              P.O. Box 20367
                                Seattle, WA  98102
15
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
16                              Janis Roberts, Esq.
                                DURKIN & ROBERTS
17                              2446 N. Clark Street
                                Chicago, IL  60614
18

19

20

21

22

23

24

25

1    San Diego, California - Wednesday, February 13, 2013

2        (Defendant A. Mohamud is being assisted by a Somali

3    interpreter.)

4            THE COURT:  Good morning, everyone.  Looks like we

5    have everyone again on time, and we are ready to proceed.

6    Overheard in the halls this morning was some speculation on

7    why the number of this courtroom was changed from 16 to 5D

8    and right in the middle of a trial, and so I thought I'd take

9    this opportunity to advise you that because of the

10   construction of the courthouse annex that's away in back of

11   us to the west, everything has been renumbered; all the

12   courtrooms in this original courthouse have been renumbered

13   to correspond to the floor and a particular designation on

14   that floor -- for example, 5A through D; we have four

15   courtrooms on this floor.  So it just happened to occur

16   midtrial, and for those of you who were wondering or

17   questioning whether you were in the right courtroom, the

18   right courthouse, yes.  And we're ready to go once again.

19   Okay.  All right.  I think we have some further deposition --

20           MR. DRATEL:  No, your Honor.

21           THE COURT:  -- or transcript material?

22           MR. DRATEL:  We have a witness, your Honor.

23           THE COURT:  That's correct, thank you.

24           MR. DRATEL:  Defense calls Abdisalam Guled.

25           THE CLERK:  Can you please raise your right hand.

1    Do you solemnly swear that the evidence you shall give in the

2    cause now before the Court shall be the truth, the whole

3    truth, and nothing but the truth?

4              THE WITNESS:  Yeah.

5                        Abdisalam Yusuf Guled

6    was called by the defense and testified as follows:

7              THE CLERK:  Speaking into the microphone, can you

8    please state and spell your first and last name for the

9    record.

10             THE WITNESS:  Salam Yusuf Guled.  My first name's

11   Abdisalam, middle name Yusuf, surname Guled.

12             THE CLERK:  Can you please spell it for the record.

13             THE WITNESS:  Starting the first name, Abdisalam is

14   Alpha, Bravo, Delta, India, Sierra, Alpha, Lima, Alpha, Mike;

15   middle name, Yankee, Uniform, Sierra, Uniform, Foxtrot;

16   surname, Golf, Uniform, Lima, Echo, Delta.

17                      Direct Examination

18             BY MR. DRATEL:  Q.  Good morning, Mr. Guled.

19   A.  Good morning, sir.

20   Q.  Where were you born?

21   A.  I was born in Guraceel.

22   Q.  In Somalia?

23   A.  Somalia.

24   Q.  Do you know Basaaly Moalin?

25   A.  I do.

1  Q.  Do you know Farah Shidane, also known as Farah Yare?

2  A.  I do.

3  Q.  Have you met him?

4  A.  Yes.

5  Q.  Did you spend time with him in Guraceel in 2008?

6  A.  Yes, I did.

7  Q.  Did you also spend time with him in Mogadishu?

8  A.  Yes.

9  Q.  Did you spend time with him in Nairobi, Kenya?

10 A.  Yes.

11 Q.  Now, is your -- withdrawn.  Are members of your family

12 still in Guraceel?

13 A.  Yes.

14 Q.  And where did you grow up?

15 A.  I was grown up in Mogadishu.

16 Q.  And did -- at some point did you leave Somalia?

17 A.  I did.

18 Q.  In what year?

19 A.  I left Somalia in 1994.

20 Q.  And ultimately where did you settle?

21 A.  I actually came to Africa and Ethiopia, Kenya, then I --

22 South Africa, then I came to London.

23 Q.  And have you lived in London as your residence since

24 then?

25 A.  Yeah.  Since 2006 -- 1996, sorry.

1    Q.   1996.   Okay.   And how far in education did you get in

2    Somalia before you left?

3    A.   Secondary.

4    Q.   And did you continue your education once you got to the

5    United Kingdom?

6    A.   I did.

7    Q.   And did you -- well, did you go to college in the United

8    Kingdom?

9    A.   Yes, I went to college.

10   Q.   Did you get a degree?

11   A.   I did college, then I did a BA in broadcasting journalism

12   in University of -- Metropolitan University in London, and

13   then I did MA in Migration and Diaspora Anthropology at

14   University of London.

15   Q.   If you could just slow down a bit.   Did you say Migration

16   and Diaspora Anthropology?

17   A.   Yes.

18   Q.   -- at University of London.   And when did you receive

19   that degree, the master's degree?

20   A.   2007.

21   Q.   Okay.   And did you have a thesis project for your

22   master's?

23   A.   Yes, I did.

24   Q.   And what was the title of that?

25   A.   Governing Without Government.

1   Q.  And just give us a subject matter briefly.

2           MR. COLE:  Objection, your Honor; relevance.

3           THE COURT:  Overruled.

4           THE WITNESS:  I was -- when I was doing my thesis,

5   I realized it was very important to recall the lives of the

6   Somalis, who had been without a government for over 17 years.

7   And at that point there was transport, there was

8   telecommunication, university, and schools, and so forth.  So

9   I actually discussed with my supervisor at university and I

10  said I need to do this thesis in Somalia in regard of a

11  governing without government, how teach people to manage to

12  live that long a period of time, 17 years, without any form

13  of government but they had a university, schools, and

14  telecommunications.

15  Q.  And so what period of time were you working on your

16  master's project?

17  A.  Late 2006 and 2007.

18  Q.  Now, have you been employed since you graduated college?

19  A.  Yes, I did.

20  Q.  And can you tell us what employment you've had since

21  college, if you could just sort of summarize for us.

22  A.  What I was doing in college, actually I was doing a

23  part-time security officer, and when I graduated from

24  master -- my MA, then I worked in Somali government, with

25  Somali government.

1    Q.   Okay.  And what was your position with the Somali

2    government.  I -- what was your position with the Somali

3    government?

4    A.   First I worked as a communication advisor and

5    spokesperson for Somali prime minister, Omar Abdirashid, and

6    then I shifted to the Minister of Interior/National Security

7    as the head of a external department on counterterrorism.

8    Q.   And was this for the TFG?

9    A.   TFG, yes.

10   Q.   And was it the TFG, Sheik Ahmed Sharif as the -- Sheik

11   Sharif Ahmed as the president?

12   A.   Sharif Sheik Ahmed is the president, yes.

13   Q.   And in your role as national security advisor for the

14   Somali government during that period, did you have a -- an

15   opportunity to come to the United States?

16   A.   I did.

17   Q.   And could you give us a background of why you came to the

18   United States as part of your role there.

19   A.   When I was working with national security, there was a --

20   U.S. Embassy in Nairobi had a discussion with my ministry,

21   and they said we have a program called Leadership Physics --

22   Physical Leadership -- what name was it -- provided by the

23   State Department, so they said we need you to have someone on

24   that role, and then I was nominated by my ministry, and I was

25   part of that program.

1   Q.  And during that trip did you happen to come to San Diego

2   at some point?

3   A.  I did.

4   Q.  And what was -- as part of the official part of your trip

5   to San Diego, what did you do for the State Department?

6              MR. COLE:  Objection, your Honor.  If we could get

7   the time frame on this.

8              THE COURT:  Yes, I was wondering the same thing.

9   If you could, Mr. Dratel.

10             MR. DRATEL:  Yes.

11             THE COURT:  Thank you.

12             MR. DRATEL:  Thank you, your Honor.

13             BY MR. DRATEL:  Q.  What time -- when -- what year

14  did you come to San Diego?

15  A.  Was August of 2009.

16  Q.  And so --

17             MR. COLE:  Objection, your Honor; irrelevant.

18             MR. DRATEL:  Well, it's just --

19             THE COURT:  I'm going to -- I know the witness has

20  not been called as a expert, he's a the fact witness, so just

21  a brief summary of employment to the present would be

22  acceptable.

23             MR. DRATEL:  I'm literally on the last two

24  questions, your Honor.

25             BY MR. DRATEL:  Q.  So just if you could tell us

1    what happened in your -- terms of your visit here to San

2    Diego, what you did with the State Department here.

3    A.  I was taken to -- me and another group, we were taken to

4    the border, the Mexican border, and were taken to detention

5    facility, where we were shown how border agencies controls

6    security on a borderline.

7    Q.  Do you know Matthew Bryden?

8    A.  I do.

9    Q.  And how do you know Matthew Bryden?

10   A.  He was working with the UN in the desk of Somalia, so

11   when I was working with the government, we were quite often

12   come to meeting where we discussed the security issues in

13   Horn of Africa.

14   Q.  Okay.  And have you ever testified before in court?

15   A.  No.

16   Q.  Okay.  Now, want to take you back to Mogadishu, Somalia,

17   late 2006, early 2007.  Were you there?

18   A.  I was.

19   Q.  Were you working on your master's project at the time?

20   A.  As a field worker, yes.

21   Q.  Okay.  And in late 2006, early 2007 in Mogadishu, who was

22   in control initially when you got there?

23   A.  2006 was controlled by the Union of Islamic Courts called

24   the UIC.

25   Q.  And did something change with respect to the control of

1  Mogadishu in early 2007?

2  A.  In late December, 30th of December, Islamic courts were

3  swept out from Mogadishu and their power, and they fled; and

4  the Ethiopian government, supported by Somali TFG, came to

5  power in Mogadishu.

6  Q.  And did that involve Ethiopian troops in Mogadishu?

7  A.  The whole thing were Ethiopian troops, but the name was

8  the Somali government.

9  Q.  And was there combat, fighting?

10  A.  When they came to Mogadishu, there was no combat, but

11  Islamic courts actually left at that period but actual combat

12  happened later on.

13  Q.  So tell us about the combat later on in 2007.

14  A.  In March or late February 2007, what happened was local

15  resident completely disagreed with the Ethiopians' existence

16  in Somalia and regarded as destroying, an invasion, so they

17  rose against it.

18           MR. COLE:  Objection, your Honor.  This is not a

19  fact witness.  I object as this is expert testimony, or lack

20  of foundation.

21           THE COURT:  Well, it may be mixed; I think you may

22  have a point there.  But if this is all preliminary, once

23  again, if we could get through this area in summary fashion

24  because I know we've had quite a bit of evidence on this

25  already.

1            MR. DRATEL:  And he's also, your Honor -- I'll get

2   to the foundational parts.

3            BY MR. DRATEL:  Q.  You were in Mogadishu

4   witnessing this at the time, right?

5   A.  I was witnessing when this conflict took place, and I

6   documented, documentary when there was a cease-fire in that

7   period where the, you know, the dead bodies was collected by

8   the Somali Red Crescent.

9   Q.  And these were civilians, right --

10  A.  Civilians, yes.

11  Q.  -- who were killed by Ethiopian bombardment?

12  A.  Bomb shellings, yeah.

13  Q.  And this is March 2007?

14  A.  March 2007 to April 2007.

15  Q.  And when you say you documented it, you did a documentary

16  film.

17  A.  A film, yes.

18  Q.  And --

19            THE COURT:  Excuse me.  March of 2007 until when of

20  2007?

21            THE WITNESS:  April.

22            THE COURT:  The remainder of 2007?

23            THE WITNESS:  Yeah, it was continued actually,

24  constant fighting for those two months.

25            BY MR. DRATEL:  Q.  Did you lose any family members

1    at that time?

2    A.   Seven members of my family, including my own brother and

3    his --

4            MR. COLE:  Objection, relevance.

5            THE COURT:  The objection is sustained.

6            BY MR. DRATEL:  Q.  Now, I want to talk to you

7    about something called Ceellasha Biyaha; is that familiar to

8    you?

9    A.   Ceellasha Biyaha, yes.

10   Q.   Is it also known by another name?

11   A.   Kio ketaceen (phonetic), IDP camps.

12   Q.   Okay.  And when you say IDP, you mean internally

13   displaced persons?

14   A.   Indeed.

15   Q.   And is that person who -- is that a sort of a technical

16   international definition?

17   A.   What international community called IDP, international

18   internally displaced, but the Somalis call Ceellasha Biyaha.

19   Q.   And can you explain what that -- is that near or outside

20   Mogadishu?

21   A.   It is in the main route from Mogadishu to Afgooye, and it

22   is I think 13 kilometers from Mogadishu.

23   Q.   And while you were there in that period of late 2006 and

24   2007, is that when that particular area developed with

25   people?

1   A.  The whole displacement started that period, late February

2   to till June, middle of 2007, and people fled to that area.

3   Q.  And tell us what that area is, please.

4   A.  It is --

5           MR. COLE:  Objection, your Honor; this is

6   cumulative of prior testimony.

7           THE COURT:  The objection is sustained.

8           THE WITNESS:  It is complete --

9           THE COURT:  Wait, sir --

10          MR. DRATEL:  Your Honor, I just have to say we have

11  not had direct testimony about it.  We had testimony from

12  Mr. Bryden.  This is an eyewitness to it.

13          THE COURT:  The objection is sustained.

14          MR. DRATEL:  Thank you, your Honor.

15          BY MR. DRATEL:  Q.  So at some point in the spring

16  of 2007, did you return to London?

17  A.  I did.

18  Q.  And did you remain active in monitoring what was

19  happening in Somalia?

20  A.  Yes.

21  Q.  And did you decide to do something?

22  A.  I did.

23  Q.  And tell us what you decided to do and how that came

24  about.

25  A.  When I came to London, it was a very bad situation on the

1    ground, so the community in London, as well as me, we decided

2    to do something, to do fundraising, to do -- something what's

3    happening on the ground considering there's no government

4    taking care of it.  So I was involved --

5    Q.  When you say -- when you say no government and a bad

6    situation on the ground, are you referring to -- this is in

7    Somalia?

8    A.  In Somalia, yes.  And there was -- so there was a

9    community gathering and conferences, fundraising so forth and

10   so forth to works, helping and contributing to the Somalis

11   and IDP camps as well as other needs.

12   Q.  Did you decide -- did you and others decide to

13   concentrate on a specific area of Somalia?

14   A.  Yes, Galgaduud.

15   Q.  Sorry?  Galgaduud?

16   A.  Yes.

17   Q.  And why Galgaduud?

18   A.  Because that's where I'm from, that's my family are,

19   that's where I have relatives.

20   Q.  And was there a particular need with respect to Galgaduud

21   at that time --

22   A.  There was --

23   Q.  -- mid 2007?

24   A.  There was nothing in place.  When I say nothing, there

25   was no water, no hospitals, no security.  There was nothing

1   in place, and a great number of people who fled from

2   Mogadishu actually went to that place.

3   Q.  And was the government able to -- the government of

4   Somalia providing services to those people?

5   A.  No.

6   Q.  Were the Ethiopian troops or was the Ethiopian government

7   providing anything to those people?

8   A.  No.

9   Q.  Did that area have its own local government at that time?

10  A.  Sorry?

11  Q.  Did that area have its own local government at that time?

12  A.  No.

13  Q.  Now, when you said security, what was the -- what was the

14  security situation in Guraceel and Galgaduud -- withdrawn.

15  Galgaduud is a province, right?

16  A.  Yeah, it's a region.

17  Q.  Yes.  And Guraceel is a city in Galgaduud?

18  A.  It's a district, yeah.

19  Q.  Dhusa Mareeb is in Galgaduud?

20  A.  It's a city in Galgaduud region.

21  Q.  And there are other smaller cities in Galgaduud as well?

22  A.  Yes.

23  Q.  Is Matabaan in Galgaduud?

24  A.  It's in Hiraan side, but it's a borderline between Hiraan

25  and Galgaduud.

1  Q.  What was the security situation that you were concerned

2  about in Galgaduud?  Explain what the problem was.

3  A.  It was very bad.

4            MR. COLE:  Your Honor, can we get a time frame?

5            MR. DRATEL:  Sure.

6            BY MR. DRATEL:  Q.  Mid 2007.

7            THE WITNESS:  It was very bad.  There was road

8  blocks by the militias, there was raping and robbery, and any

9  kind of criminal activities you can call was taking place.

10 Q.  Was there also Ethiopian troops in the area?

11 A.  They were actually before -- around in May they were.

12 Q.  And was al-Shabaab also a security threat in the area?

13 A.  Absolutely.

14 Q.  And there was a need for the community to defend itself

15 from these elements?

16 A.  They did.

17 Q.  And what kind of solution did you and the others with

18 you -- withdrawn.  Was it just in London that people were

19 organizing?

20 A.  No, community in different places in Europe, in

21 Scandinavia, in America, in Africa.

22 Q.  So the whole Somali diaspora?

23 A.  Yes.

24 Q.  And so what was -- take us through the solutions that you

25 and the other diaspora communities tried to implement in

1   Galgaduud.

2   A.   For those of us who actually concentrate on the central

3   regions, we decided to have schools and, you know, some kind

4   of life in there, but, again, we understood there was no --

5   there's nothing we can put in place unless we have security.

6   So we sent some individuals from Mogadishu to central

7   regions, and we said can you just coordinate with someone on

8   the ground and coordinate diaspora and the local community,

9   and they did.   So they formed -- we formed some kind of --

10   call it ILEYS Foundation, and at that point we just education

11   umbrella and doing security for local community, organizing

12   the community to come up with some kind of a local

13   administration.

14   Q.   And I just want to go back a little bit.   You said you

15   sent people to the central region for purposes of forming an

16   administration.

17   A.   Yes.

18   Q.   And can you tell us the names of some of those people who

19   you sent.

20   A.   Abukar Suryare --

21          THE REPORTER:   Excuse me.   Can you slow down on the

22   names, please.

23          BY MR. DRATEL:   Q.   I'll try to spell them, and you

24   tell me --

25   A.   Abukar Suryare.

1    Q.   A-b-u-k-a-r, S-u-r-y-a-r-e?

2    A.   Yeah.  Farah Yare.

3    Q.   F-a-r-a-h, last name Y-a-r-a.

4    A.   "E."

5    Q.   I'm sorry, Y-a-r-e.

6    A.   Mohamad Tahlil, Ahmed Nuva Odeen (phonetic), and, you

7    know, some other members.

8    Q.   So Taalil would be like T-a-a-l-i-l?

9    A.   What's that?

10   Q.   Taalil.

11   A.   Tahlil is actually as it sound; it's T-a-h-l-i-l, Tahlil.

12   Q.   Thank you.  And ILEYS, you mentioned the ILEYS

13   Foundation?

14   A.   Yes.

15   Q.   And ILEYS is I-L-A-Y-S (sic)?

16   A.   Yes.

17   Q.   And what does that mean in Somali?  Is that a word in

18   Somali?

19   A.   Yeah, it's a light or vision.

20   Q.   Okay.  And in terms of Galgaduud as a whole, is it -- is

21   there -- is there an importance in Somalia with respect to

22   Galgaduud geographically?

23   A.   There's -- Galgaduud, actually the main road connected

24   from south to the north, which is called Somaliland, the main

25   road actually run through Galgaduud region.

1    Q.  And did that contribute to the security problems that

2    existed in Galgaduud in mid 2007?

3    A.  Very much actually.  If there's a lack of security in

4    that region, that will affect it in many people, not only the

5    people that reside in that region but the people traveling

6    along the road.

7    Q.  And was also -- was there a demographic importance to

8    Galgaduud as well?

9    A.  It is.

10   Q.  And can you explain that.

11   A.  Many regions in Somalia, as you may know, presided by a

12   particular tribe, which is makes more easier for security in

13   some other regions.  Galgaduud is different than those

14   regions.  It's presided more than six, five different clans,

15   and that makes -- if there's no government, when there's a

16   government, it makes actually difficult to manage security.

17   Q.  Now, you're familiar with the geography of Galgaduud,

18   right?

19   A.  Yes.

20   Q.  And you've been there --

21   A.  Yes.

22   Q.  -- right?  And how far is it from Guraceel to Dhusa

23   Mareeb?

24   A.  Around 40, 50.

25   Q.  What, kilometers?

1    A.   Kilometers.

2    Q.   Forty to 50 kilometers.

3    A.   Yes.

4    Q.   How far from Guraceel to Matabaan?

5    A.   Less, 40, around 30 something to 40.

6    Q.   And you said that's in Hiraan?

7    A.   Guraceel -- Matabaan is in the Hiraan side, yeah.

8    Q.   So from Guraceel to Hiraan is about the same?

9    A.   It's longer than that; it's around 70, 80.

10   Q.   And from Guraceel to Galcaio?

11   A.   It's about -- it's about 150, around that.

12   Q.   Kilometers?

13   A.   Yeah, kilometers, yeah.

14   Q.   And that's to the north?

15   A.   To the south -- to the northeast.

16   Q.   Northeast.

17   A.   Yes.

18   Q.   Okay.  So I want to talk about ILEYS.  And were you one

19   of the founders of ILEYS?

20   A.   Yes.

21   Q.   And what was the purpose of ILEYS?

22   A.   When we decided to have -- to do something in the region,

23   we need, we actually try to come up with something, the name,

24   and some kind of a foundational umbrella.  So ILEYS come up,

25   the name ILEYS come up, and we agreed that's the name we

1   should call the education foundation of that region.

2   Q.  So it was -- so ILEYS itself was dedicated to

3   education --

4   A.  Education --

5   Q.  -- principally?

6   A.  -- yes.

7   Q.  Did it expand into other areas over time?

8   A.  The guys who were actually doing the ILEYS Foundation as

9   a part of education, as education, were involved with

10  humanitarianism and local administration as well.

11  Q.  So what kind of projects in addition to education --

12  well, let's start with education.  What kind of educational

13  projects did ILEYS operate?

14  A.  Before -- before ILEYS actually formed, there was no

15  education whatsoever at any level at that place.

16  Q.  And we're talking about Galgaduud now, right?

17  A.  Galgaduud, yeah.  And so there were -- we formed

18  secondary school and primary school, different genders

19  actually, and different age in Galgaduud, in Dhusa Mareeb,

20  Guraceel, Matabaan, and other remote areas.

21  Q.  And that's in 2007?

22  A.  2007, yes.

23  Q.  And what other -- there are other projects that ILEYS

24  became involved in?

25  A.  There was huge drought which actually happened in the

1    countryside in Galgaduud region where, you know, people lost

2    their livestock, which is a lifeline for them, so they

3    actually informed us what happened on the ground and how

4    people lost the livestock, so we are actually, you know, did

5    a fundraising.  And ILEYS guys, who were the -- who were

6    running on the ground, Farah Yare was the treasureperson for

7    that humanitarian aspect, and, you know --

8    Q.  Okay.  Sure.  And what was -- well, you said livestock.

9    What's the significance of livestock in an area like

10   Galgaduud?

11   A.  I mean the -- mainly people rely on livestock -- I mean

12   camels and cows and goats -- so the -- and rain season is

13   actually, again, is what supplies the life for livestocks, so

14   the -- I think four or three rain seasons were fell -- did

15   not happen, so that's the impact of the drought.

16   Q.  You said there were three or four seasons that went by

17   without any rain?

18   A.  Yeah.

19   Q.  And livestock requires grazing, right?

20   A.  Yes.

21   Q.  And without water, no grazing?

22   A.  Absolutely.

23   Q.  Now, how was ILEYS to be financed?

24   A.  Through diaspora, aided in Kenya, in America, in Europe,

25   in Arabian countries.  We collected money and we send it.

1    Q.  And how was the money sent?

2    A.  Through a hawala.

3    Q.  And have you yourself sent money to Somalia through

4    hawala?

5    A.  Yes.

6    Q.  And when you contribute -- when the hawala money that you

7    send is for a charitable purpose, is there any difference in

8    the fee --

9    A.  Yes.

10   Q.  -- that a hawala will charge you?

11   A.  Yes.

12   Q.  Can you explain?

13   A.  If it was a recognized charity which has an account with

14   the hawala, normally they don't charge you because the

15   charity has account with the hawala.  If it's not recognized

16   as charity and -- but the promise of charity sending of this

17   money, let's say outreach or hospital or so forth, they will

18   minimize the money they charge you, but they still charge you

19   fee.

20   Q.  Okay.  And how was it communicated to the diaspora

21   community that this need existed and that the ILEYS

22   Foundation had been formed to try to meet this need to

23   Galgaduud in 2007?

24   A.  There was various forms actually.  One is a -- we used to

25   call, you know, each other.  And the other thing is like we

1    used to send emails, exchange emails, on a large, you know,

2    scale of e-lists, exchanging documents and so on and so

3    forth.

4    Q.   Now, did you get emails from the people in Somalia?

5    A.   Yes, I did.

6    Q.   Did you get emails from Farah Yare?

7    A.   Yes, I did.

8    Q.   I'd like to show you what's been marked as Defendants' JJ

9    and ask you if you recognize this.

10   A.   Shall I look at the e-list or the written?

11   Q.   You can look at the e-list, yes, and the date and --

12   A.   Yeah, May 2008, Farah Yare.

13   Q.   Do you recognize it?

14   A.   Yeah.

15   Q.   And what is it?

16   A.   The email.

17   Q.   Did you receive this email?

18   A.   Yes.  My email is right there.

19   Q.   Okay.  In fact, are there two email addresses for you on

20   there?

21   A.   Yes.

22        (Exhibit No. JJ identified.)

23            MR. DRATEL:  And I'm moving it in evidence, your

24   Honor.

25            MR. COLE:  Objection; hearsay, it's also only in

 1   Somali.

 2           THE COURT:  Well, at this point -- I know it's an

 3   email that was received in '08 and I don't know what it

 4   contains or what the purpose of it is.  So I'll sustain the

 5   objection at this point without prejudice to you laying a

 6   foundation.

 7           MR. DRATEL:  Your Honor, I'm looking only to admit

 8   the email list on the top, not the content of the email.

 9           THE COURT:  Well, once again, there's nothing in

10   the record indicating -- this would be an email from

11   anyone --

12           MR. DRATEL:  Oh, I'm sorry.

13           THE COURT:  -- to this gentleman concerning any

14   subject at any period of time.  Well, I think '08 has been

15   identified.

16           MR. DRATEL:  Okay.

17           BY MR. DRATEL:  Q.  Is that an email from Farah

18   Yare?

19   A.  Yes.

20   Q.  And it is -- is it about ILEYS or humanitarian projects

21   in Galgaduud at that time, May of 2008?

22   A.  I probably need to read it, but it was the -- if you give

23   me a second.

24   Q.  Yeah.  Don't read it out loud, but read it to yourself.

25   A.  Yeah.

1    Q.   Okay.  And is Mr. Moalin's email also on there?

2    A.   Yeah.

3    Q.   Okay.  So it was sent to him as well?

4    A.   Yes.

5              MR. DRATEL:  I move the email header, your Honor,

6    with the addresses in?

7              THE COURT:  Header only?

8              MR. DRATEL:  Yes, with the addresses.

9              THE COURT:  And you're going to redact that I

10   assume.

11             MR. DRATEL:  Yes.

12             THE COURT:  The header is admitted.

13             MR. DRATEL:  Thank you, your Honor.

14        (Exhibit No. JJ admitted.)

15             BY MR. DRATEL:  Q.  Now, did those emails, and even

16   that email, did they come with attachments?  Emails you would

17   get from Farah Yare about the projects and humanitarian work

18   going on in Galgaduud, would they come with attachments?

19   A.   Yes.

20   Q.   Were some of those attachments photographs?

21   A.   Yes.

22   Q.   And did you receive those photographs?

23   A.   Yes.

24   Q.   I'm going to show you what's marked as Defendants' KK --

25   Kilo Kilo -- and ask you if you recognize that.

1    A.   Yes, I do recognize it.

2    Q.   Okay.  What is it?

3    A.   Pictures of Abukar Suryare on the right.  Next on the

4    right Dugman Gedago (phonetic), the governor of Guraceel.

5    Number 3 from the right -- it's not clear for me; it looks

6    like someone called Bashir Gedago as well.  And far end to

7    the left, Farah Yare.

8         (Exhibit No. KK identified.)

9    Q.   Okay.  And is that a photo that you received in an email

10   from Farah Yare in 2008?

11   A.   Yes.

12            MR. DRATEL:  I move it in evidence, your Honor.

13            THE COURT:  KK is admitted.

14        (Exhibit No. KK admitted.)

15            MR. DRATEL:  Put it on the Elmo, publish it.

16            BY MR. DRATEL:  Q.  Okay.  So let's go -- starting

17   here, this is.

18   A.   Abukar Suryare.

19   Q.   This is --

20   A.   Abdul Rahman Geedow Qorow.

21   Q.   So that's Abdul Rahman Geedow Qorow?

22   A.   Geedow Qorow, yeah.

23   Q.   This person you said -- you think it's someone named

24   Bashir?

25   A.   Bashir Gedago, his brother, but it's not clear for me

1    yet.

2    Q.   Abdul Rahman's brother?

3    A.   Yeah.

4    Q.   And this person here on the far left is --

5    A.   Is Farah --

6    Q.   That's Farah Yare?

7    A.   Yes.

8    Q.   Okay.  Thank you.  Do you know -- I'm sorry.  Put it back

9    on there.  Do you know the context of this photograph?

10             MR. COLE:  Objection; lack of foundation.

11             THE WITNESS:  The background?

12             BY MR. DRATEL:  Q.  Yes, the background.  What is

13   the background?

14   A.   They were clearing the roads --

15   Q.   And --

16   A.   -- to supply the waters and food distribution to the area

17   where drought affected.

18   Q.   Okay.  And is that in Galgaduud?

19   A.   Yes.

20   Q.   Did you receive emails from other persons in Galgaduud

21   involved in these projects besides Farah Yare?

22   A.   Abukar Suryare.

23   Q.   And was Mr. Moalin copied on those emails as well?

24   A.   Yes, his was in the e-list.

25   Q.   Did you also receive documents?

1  A.  Yes.

2  Q.  I'm going to show you what is marked -- what's already in

3  evidence as Defendants' E and Defendants' F and ask you if

4  you recognize these documents.

5  A.  Yes, I do recognize these.

6  Q.  Did you receive them in emails from Galgaduud, either

7  Farah Yare or Abukar Suryare?

8  A.  Abukar Suryare and Farah Yare, yeah, the ILEYS Foundation

9  form.

10  Q.  And E is -- going to put E-T, which is in evidence, which

11  is a translation, on the Elmo, and that's a summary report

12  about the agency's performance and province's state of

13  affairs --

14  A.  Yeah.

15  Q.  -- right?  And that's ILEYS.  Is the -- on the original

16  Somali version has ILEYS logo?

17  A.  Yes.

18  Q.  And it's dated September 29, 2007 --

19  A.  Yeah.

20  Q.  -- right?  Dhusa Mareeb, Galgaduud?

21  A.  Yes, yeah.

22  Q.  And what was the purpose of a document like this?

23  A.  To give us some kind of accountability for those who

24  contributing to the cause.

25  Q.  So show them how their money was being spent --

1   A.   Yes.

2   Q.   -- on the project that they were donating?

3   A.   Yes.

4   Q.   And if you look at F, F is in English, right?  It's in

5   English and Somali or is it the English version?  It's a

6   shorter document; it's a --

7   A.   Yes.

8   Q.   -- two-page version.  That's what is that, F?  I'm sorry.

9   F is in evidence.  That's an orphan sponsorship form, right?

10   A.   Yeah.

11   Q.   And that's something else that came from the ILEYS people

12   in Galgaduud?

13   A.   Yes.

14   Q.   It was sent out to the diaspora --

15   A.   Yes.

16   Q.   -- to solicit people to sponsor orphans in Galgaduud?

17   A.   Absolutely.

18   Q.   Show you what's been marked as Defendants' NN, ask you if

19   you recognize it.  Do you recognize that photo?

20   A.   The photo is not clear for me.

21   Q.   Do we have another?

22   A.   It's two heads collided together.

23   Q.   I'm sorry?

24   A.   It's like two heads collided together; it's like two

25   different features.

1    Q.   But you don't recognize the photo?

2    A.   (Witness shakes head.)

3         (Exhibit No. NN identified.)

4    Q.   Okay.  Now I'm going to show you what's already in

5    evidence as Defendants' I.  Actually I'm going to put it on

6    the Elmo, and that way everybody can see it at the same time.

7    Can you see it?

8    A.   Yeah.

9    Q.   And you have a monitor right next to you too so you can

10   see it --

11   A.   Right.

12   Q.   -- closer if you like.  Do you recognize the man in the

13   photograph?

14   A.   Farah Yare.

15   Q.   That's Farah Yare?  Okay.

16   A.   Yes.

17   Q.   And is this the type of photograph you would receive?

18   A.   Yes.

19   Q.   And how many of these types of photographs did you

20   receive?

21   A.   Quite -- I don't have a number, but we get one, two,

22   three, four.

23   Q.   At a time?

24   A.   At a time, yes.

25   Q.   Now, did you visit Galgaduud in July 2008?

1   A.   Yes.

2   Q.   And how did you get to Galgaduud?

3   A.   I landed in Mogadishu, and then I travel by land.

4   Q.   And what was the purpose of your visit?

5   A.   Documenting the fact on the ground, documentary, film

6   documentary.

7   Q.   A film documentary?

8   A.   Yeah.

9   Q.   And how long were you in Galgaduud in July of 2008?

10  A.   About two weeks.

11  Q.   And did you yourself witness Farah Yare's humanitarian

12  work?

13  A.   Yes, me and Bayell (phonetic) we drive from Guraceel,

14  then to the area -- it was like 20 kilometers away, and I

15  filmed abandoned houses and families left with nothing, to

16  females -- I recall woman with a child, another woman who had

17  nothing, and they speak in Somali language to the camera.

18            MR. COLE:  Objection, relevance.

19            THE COURT:  The objection is overruled.  Once

20  again, just --

21            MR. DRATEL:  Yeah, we'll keep moving, your Honor.

22            BY MR. DRATEL:  Q.  Now, you filmed Farah Yare

23  yourself, right?

24  A.   Yes.

25  Q.   Okay.  Going to show you what's marked -- going to show

1   you a series.  We'll go through them in order, and then

2   we'll -- if you'd just look at these three images.

3            THE COURT:  What are they marked?

4            MR. DRATEL:  Oh, I'm sorry.  UU, VV, and WW, your

5   Honor.

6            THE WITNESS:  Yes, I recognize it.

7            BY MR. DRATEL:  Q.  And what are they?

8   A.  Farah Yare talking through the camera showing the

9   evidence of his logbook, how many funds he receive and where

10  he receive it from and when he receive.

11  Q.  And these are screen shots from your documentary --

12  A.  Yes.

13  Q.  -- that you filmed yourself --

14  A.  Yes.

15  Q.  -- in Galgaduud in --

16  A.  In July 2008, in Guraceel.

17           THE COURT:  You're speaking over one another.  Sir,

18  would you please allow counsel to finish his question before

19  you begin your answer, and that way everything can be taken

20  down accurately.

21           THE WITNESS:  Yes.

22           THE COURT:  Thank you.

23           BY MR. DRATEL:  Q.  You -- those are screen shots

24  from your documentary --

25  A.  Yes.

```
 1   Q.   -- of Farah Yare?

 2   A.   Yes.

 3   Q.   In Guraceel?

 4   A.   Yes.

 5   Q.   July 2008?

 6   A.   Yes.

 7        (Exhibit Nos. UU, VV, WW identified.)

 8             MR. DRATEL:  I move them in evidence, your Honor.

 9             MR. COLE:  Objection, your Honor.  Can I look at

10   them again, your Honor?

11             THE COURT:  Certainly.

12             MR. COLE:  No objection, your Honor.

13             THE COURT:  UU, VV, and WW are admitted at this

14   time.

15             MR. DRATEL:  Thank you.

16        (Exhibit Nos. UU, VV, WW admitted.)

17             BY MR. DRATEL:  Q.  Mr. Guled, is that one of those

18   screen shots, this Defendants' UU?

19   A.   Yes.

20   Q.   And is that -- that's Farah Yare?

21   A.   Yes.

22   Q.   And he's got a book that he's pointing to?

23   A.   Yes.

24   Q.   And I'll show VV.  Is that a page from the book --

25   A.   Yes.
```

1   Q.  -- he's showing you?  Is that a closeup?

2   A.  Yes.

3   Q.  And says Warshubo, right?  You see the top right there?

4   A.  Warshubo.

5   Q.  And where is that?

6   A.  Warshubo.

7   Q.  And underneath it says Dhusa Mareeb?

8   A.  Dhusa Mareeb, yes.

9   Q.  Guraceel?

10  A.  Yes.

11  Q.  Matabaan?

12  A.  Yes.

13  Q.  And then there are monetary amounts next to that?

14  A.  Yes.

15          THE COURT:  Hold on, counsel.  Ms. Freni, are you

16  okay?

17          JUROR FRENI:  I'm okay.

18          THE COURT:  You want a minute or so?

19          JUROR FRENI:  I'm okay.  Thank you.

20          BY MR. DRATEL:  Q.  And same here, Dhusa Mareeb,

21  Guraceel, Matabaan, right?

22  A.  Yeah, yes.

23  Q.  And then something underneath that as well, right,

24  Qarash?

25  A.  Qarash.

1   Q.  And what does this book represent?

2   A.  Evidence of the money being sent to ILEYS and reaching

3   and how they use.

4   Q.  When you were there in July of -- withdrawn.  I want to

5   go back for a minute to the emails that you got from Farah

6   Yare and others over time, 2007, 2008 with respect to the

7   work of the ILEYS does.  I just ask you if you recognize any

8   photographs here.

9   A.  Yes, I recognize.

10  Q.  Are they photographs that you received from either Farah

11  Yare or Abukar Suryare --

12  A.  Yes.

13  Q.  -- with respect to the work of ILEYS?

14  A.  Yes.

15          MR. DRATEL:  Sorry.  I didn't identify them.  My

16  apologies, your Honor.  I just want to read them into the

17  record.  This is Defendants' QQ, RR, and PP.

18          THE COURT:  In evidence?

19          MR. DRATEL:  No, I'm moving them in evidence, your

20  Honor.

21          THE COURT:  Have you seen them, Mister --

22          MR. COLE:  No, your Honor.

23          MR. DRATEL:  Oh, I'm sorry.  Some of them are --

24          MR. COLE:  Just objection on relevance, your Honor.

25          MR. DRATEL:  These are from --

1          THE COURT:  May I see them, please?

2          MR. DRATEL:  Yes.  Sorry.  I have one more

3    foundation question, your Honor.

4          THE COURT:  Okay.

5          BY MR. DRATEL:  Q.  Mr. Guled, are these -- reflect

6    work by ILEYS in Galgaduud in 2007 and 2008?

7    A.  Yeah.

8          THE COURT:  Is there an objection, Mr. Cole?

9          MR. COLE:  I'm sorry.  No, your Honor.

10          THE COURT:  All right.  QQ, RR, and PP?

11          MR. DRATEL:  Q, R, and PP, your Honor, yes.

12          THE COURT:  Okay.  They're admitted.

13      (Exhibit QQ previously identified.)

14      (Exhibit QQ admitted.)

15      (Exhibit Nos. PP, RR identified and admitted.)

16          MR. DRATEL:  Thank you, your Honor.

17          BY MR. DRATEL:  Q.  And so -- and so can you tell

18    us what that is -- what that depicts; that's --

19    A.  Road clearing.

20    Q.  And this is QQ.  That was PP -- I'm sorry, that was RR.

21    This is QQ, and this is a sign in Somali?

22    A.  Yeah.

23    Q.  But what does it represent?

24    A.  Water distribution in Guraceel.

25    Q.  And is that a project -- who's involved in the project?

1    Are there other organizations involved in the project?

2    A.   ILEYS.

3    Q.   And any countries outside of Somalia?

4    A.   Not that I know.

5    Q.   Can you read the bottom left?  Can you read that?

6    A.   Yes, it says Denmark.

7    Q.   Denmark.  Okay.  And does it mention the diaspora in

8    this?

9    A.   Yeah, it says the union of youth from no tee tallo

10   (phonetic) the effort they contributed from Denmark in

11   Aalborg.  I don't know what that means.  It says the effort

12   of the union of the youth from Denmark to Somalia.

13   Q.   And is this a photo of part of the same project?  Is that

14   the same sign, if you can tell?  Maybe I'll show you the

15   photo itself and you can tell us.  It's hard to read on the

16   Elmo.

17   A.   It's not clear for me.  I don't know.

18   Q.   Thank you.

19   A.   It's not clear.

20   Q.   But that's another ILEYS --

21   A.   That's the photos I received.

22   Q.   Okay.  Did you get an opportunity to witness ILEYS

23   projects when you were there in Guraceel -- I mean in

24   Galgaduud?

25   A.   Yes.

1   Q.  So what kind of projects did you witness?

2   A.  I witnessed the schools, I filmed, documented the

3   schools, and I documented IDP camps, and I witnessed the

4   humanitarian, where the supplies, some kind of food to the

5   outside at Guraceel district.

6   Q.  And how many schools?

7           MR. COLE:  Objection, your Honor; this is getting

8   cumulative, relevance.

9           THE COURT:  The objection is sustained.

10          BY MR. DRATEL:  Q.  Talking 2007- in Galgaduud,

11  right?  Okay.  And with respect to humanitarian, what kind

12  of -- you mentioned food but also water?

13  A.  Yes.

14          MR. COLE:  Same objection, your Honor.

15          THE COURT:  Well, it is becoming a bit cumulative

16  at this point, Mr. Dratel.

17          BY MR. DRATEL:  Q.  Now, when you were there in

18  July 2008, did you document anything about Ethiopian troops

19  or the Ethiopian army?

20  A.  Yes.

21  Q.  Tell us about that.

22  A.  I filmed three to four long trench, military trench in

23  Guraceel district, in the town itself.  I documented victims

24  who were -- lost member of their family in that conflict by

25  the Ethiopians.

1   Q.  And were you aware of any activity by al-Shabaab in the

2   Galgaduud area during that period of time?

3   A.  Yes.

4   Q.  And was al-Shabaab powerful in the area at that time?

5   A.  They were very threatful, but they were not powerful I

6   was told at the time.

7   Q.  And what kind of threat did they present to Galgaduud?

8               MR. COLE:  Objection; lack of foundation.

9               BY MR. DRATEL:  Q.  When you were there --

10              THE COURT:  The objection is sustained.

11              BY MR. DRATEL:  Q.  In July 2008 when you were

12  there, what kind of threat did al-Shabaab present to the

13  local administration in Guraceel?

14              MR. COLE:  Same objection.

15              THE COURT:  Yeah, it's the same question.  There's

16  a lack of foundation.  The witness indicated he was told --

17              MR. DRATEL:  Okay.

18              THE COURT:  -- in his previous answer about the

19  threat activity.  The objection is sustained.

20              BY MR. DRATEL:  Q.  Did the local administrative

21  council take action with respect to defending itself against

22  al-Shabaab during the period you were there?

23  A.  They organized themselves to defend themselves.

24  Q.  Did they have a police force?

25  A.  They had police personnel in district.

1   Q.   Did they have uniforms?

2   A.   They had a uniform, yes.

3   Q.   Now, did there come a time when al-Shabaab attacked the

4   local administration in Galgaduud?

5   A.   Yes.

6           MR. COLE:  Objection; lack of foundation.  Time

7   frame.

8           THE COURT:  The objection is sustained; the answer

9   is stricken, ladies and gentlemen; you are admonished to

10  disregard it at this time.

11          BY MR. DRATEL:  Q.   In later 2008 did there come a

12  time when al-Shabaab attacked the local administration in

13  Guraceel?

14  A.   Yes.

15          THE COURT:  That's the same -- that's the same

16  question.

17          THE WITNESS:  -- they did --

18          THE COURT:  Hold off.  If the objection's coming,

19  why don't you begin to at least stand so the witness doesn't

20  jump the gun with an answer, Mr. Cole.  It's the same

21  question.  The objection is sustained.  Lack of foundation.

22          BY MR. DRATEL:  Q.  Did you assist, personally

23  assist -- withdrawn.  Did you speak to Abukar Suryare when he

24  was in Hargeysa later in 2008?

25          MR. COLE:  Objection, relevance.  And we need more

1    of a time frame I think.

2           THE COURT:  I don't know if it's relevant or not.

3    The question is just whether they spoke, so you may answer

4    that, sir.  The objection is overruled.

5           BY MR. DRATEL:  Q.  Did you speak to Farah Yare

6    when he was in Hargeysa later on in 2008?

7    A.  Yes.

8    Q.  Now, did you also see Abukar Suryare in Djibouti --

9    A.  Yes.

10   Q.  -- later -- in August of 2008?

11   A.  Yes.

12   Q.  And why were you in Djibouti?

13   A.  I was documenting the peace process between TFG and the

14   alliance of -- Asmara Alliance for Liberation.

15   Q.  And was Abukar Suryare there for the same reason?

16   A.  He was in Djibouti on part of a reconciliation.

17   Q.  So he was part of a delegation for which group?

18   A.  The UIC side.  It's the Asmara -- Asmara Reliberation of

19   Somalia group and the Somali government, so it was two sides.

20   He was not with the government; he was on the other side.

21   Q.  Right.  And the UIC was one of the elements of this

22   reliberation group?

23   A.  Yeah.

24   Q.  And the purpose was to try to reach some reconciliation

25   between the sides for the future of Somalia?

1   A.   Yes.

2   Q.   And ultimately did those negotiations prove successful?

3   A.   Yes.

4   Q.   And did that result in a change in the government in

5   Somalia?

6   A.   Yes.

7   Q.   And that's when Sheik Sharif became president of the TFG?

8   A.   Yes.

9   Q.   And that also coincided with the departure of Ethiopian

10  troops --

11  A.   Yes.

12  Q.   -- from Somalia?  Was that part of the conference, the

13  negotiation?

14  A.   It was part of negotiation, yes.

15  Q.   Now, later on did you personally assist Abukar Suryare

16  and Farah Yare from leaving Somalia when their lives were

17  threatened?

18          MR. COLE:  Objection, relevance.

19          THE COURT:  Well --

20          MR. DRATEL:  I'll make it more -- by al-Shabaab?

21          THE COURT:  Well, the objection is sustained on the

22  basis of foundation at this point, relevance.  We don't have

23  a time frame.  Would you get --

24          BY MR. DRATEL:  Q.  Well, what's the time frame?

25          THE COURT:  Well, you pose the question.

```
 1              MR. DRATEL:  I'm sorry.

 2              BY MR. DRATEL:  Q.  Was there a time when Abukar

 3   Suryare and Farah Yare had to leave Somalia because of

 4   threats by al-Shabaab?

 5   A.  Yes.  Abukar Suryare was working for the government, but

 6   Farah Yare and others, they were -- they have to leave from

 7   Somalia for the first time.

 8   Q.  And what time frame was that?

 9   A.  That was 2009.

10              MR. COLE:  Objection, relevance.  There was no

11   foundation for that.

12              THE COURT:  The objection is sustained; the answer

13   is stricken, ladies and gentlemen; you're admonished to

14   disregard it.

15              MR. DRATEL:  Well, if I may, your Honor, just --

16              BY MR. DRATEL:  Q.  If I may take it back for

17   relevance, which is was that related to their work in

18   Galgaduud in 2008 and 2007?

19   A.  Yes.

20              MR. COLE:  Objection; lack of foundation.

21              THE COURT:  The objection is sustained; the answer

22   is stricken; you are admonished to disregard it, ladies and

23   gentlemen.

24              BY MR. DRATEL:  Q.  Now, Basaaly Moalin, when you

25   came to San Diego, did you meet Mr. Moalin?
```

1   A.   Yes.

2   Q.   Why?

3   A.   Because I was -- I knew his name, and I was -- I was very

4   eager to meet him.

5   Q.   You knew his name as a contributor to ILEYS?

6   A.   Yes, he was -- when I was in Guraceel in 2008, I was

7   showing what his did -- what he did for the local people.  I

8   was shown a house, and I was told --

9          MR. COLE:  Objection, your Honor.

10          THE COURT:  It's going to be very important for you

11   during this part of the questioning to listen very carefully

12   to the question and answer just the question that's posed.

13   The question was did you know him as a contributor to ILEYS.

14   That was the question.

15          THE WITNESS:  Yes.

16          BY MR. DRATEL:  Q.  Was he a major contributor to

17   ILEYS?

18   A.   Yes.

19          MR. COLE:  Objection; lack of foundation.

20          THE COURT:  The objection is sustained; the answer

21   is stricken; you're admonished to disregard it, ladies and

22   gentlemen.

23          BY MR. DRATEL:  Q.  And did you meet with him when

24   you came to San Diego?

25   A.   Yes.

```
 1            MR. COLE:  Your Honor, if we could get a time frame
 2   of when that was.
 3            BY MR. DRATEL:  Q.  When was that meeting?  When
 4   did you come to San Diego?
 5   A.  When did I came?
 6   Q.  Yes.
 7   A.  That was 2009.
 8            MR. COLE:  Objection, irrelevant.
 9            MR. DRATEL:  Well, your Honor --
10            THE COURT:  The objection is overruled.
11            MR. DRATEL:  Thank you.
12            BY MR. DRATEL:  Q.  So you met with Mr. Moalin here
13   in San Diego?
14   A.  Yes.
15   Q.  And Mr. Moalin was someone who was on all of these
16   emails, receiving all these materials; he was on email lists.
17   Of all the materials and photographs we put in, he's on those
18   same emails as you were?
19   A.  Yes.
20   Q.  Just one second.
21            MR. DRATEL:  I have nothing further.
22            THE COURT:  Cross-examination?
23            MR. COLE:  Yes.  Thank you, your Honor.  Just one
24   moment, your Honor, while I look through the defense
25   exhibits.
```

1            THE COURT:  Sure.

2                        Cross-Examination

3            BY MR. COLE:  Q.  Good morning, sir.

4    A.  Good morning, sir.

5    Q.  You've testified today quite a bit about ILEYS, right?

6    A.  Yes.

7    Q.  And you agree, schools are good?

8    A.  Sorry?

9    Q.  Schools are a good thing?

10   A.  Yes.

11   Q.  It's good to support education?

12   A.  Yes.

13   Q.  And it's good to help people who are struggling?

14   A.  Yes.

15   Q.  And terrorism is bad?

16   A.  Yes, it is.

17   Q.  Al-Shabaab's bad?

18   A.  Yes.

19   Q.  And when you joined the government of Somalia, that was

20   in 2009?

21   A.  Yes.

22   Q.  And that was when Sheik Sharif had become the leader,

23   right?

24   A.  Yes.

25   Q.  So that was after Abdullahi Yusuf was no longer the

1   president of Somalia?

2   A.   Yes.

3   Q.   And you are from the Guraceel area yourself?

4   A.   Yes.

5   Q.   And so you're Ayr subclan?

6   A.   Yes.

7   Q.   And that's part of the Habar Gidir?

8   A.   Yes.

9   Q.   Hawiye?

10  A.   Yes.

11  Q.   And Sheik Sharif, that's his clan, Hawiye?

12  A.   He's Hawiye, yes.

13  Q.   And he's -- so when your clan assumed the presidency,

14  Sheik Sharif, you worked for the government?

15  A.   I work for the government.

16  Q.   Right.  And you were asked a lot of questions about

17  someone named Farah Yare, right?

18  A.   Right.

19  Q.   ILEYS I take it was involved with humanitarian projects

20  only, right?

21  A.   Sorry?

22  Q.   ILEYS was involved with humanitarian projects?

23  A.   Education and humanitarian and administration, local

24  administration.

25  Q.   Right, but it wasn't involved in attacking people, was

1    it?

2    A.   No.

3    Q.   And it wasn't involved in fighting?

4    A.   No.

5    Q.   And it wasn't involved in purchasing RPGs, right?

6    A.   No.

7    Q.   And so I'd like to show you -- well, let me ask you this:

8    Your involvement with Farah Yare then was with respect to his

9    connection to ILEYS, right?

10   A.   Yes.

11   Q.   And if he was connected with things apart from ILEYS,

12   other activities of his own, you were not involved in those,

13   right?

14   A.   I didn't know anything about it.

15   Q.   So, for example, did Farah Yare ever tell you -- actually

16   like to hand up Government's Exhibits 120 through 199, and,

17   sir, you'll notice in this binder that these exhibits are

18   tabbed by number.  And if you could go to Exhibit 182.

19            MR. DRATEL:  Your Honor, I'm going to object to

20   this form of questioning.  This witness is not familiar with

21   these.

22            THE COURT:  Well, the objection may be a little

23   premature.  Let's see how it develops, counsel.

24            BY MR. COLE:  Q.  Did you find Exhibit 182, sir?

25   A.   182?

1    Q.  Yes.  And if you'd go to page 5 of that exhibit.

2    A.  Which page?

3    Q.  Page 5.  And if you look on the left-hand column, sir,

4    there is some time-stamping on the left-hand column, which

5    will help me focus you on a certain portion.  If you look

6    at -- we're at 7:24 on the left-hand column.  My question for

7    you, sir, is did Farah Yare ever tell you --

8              MR. DRATEL:  Objection, your Honor.  Just in terms

9    of -- you know, if the jury is following this, it's in

10   evidence, it's not proper just to go through the tapes with

11   this witness.

12             THE COURT:  Well, it provides context.  The witness

13   is not adopting this.  It provides context for the question

14   and --

15             MR. DRATEL:  Okay.

16             THE COURT:  -- it makes it easier for the trier of

17   fact at this point.  The objection is overruled.  Mr. Cole,

18   you may phrase your question.

19             BY MR. COLE:  Q.  Yes.  The question is, sir, did

20   Farah Yare ever tell you that the fighting lasted about 40

21   minutes and we fired more than ten rounds from the weapon

22   known as 7?

23   A.  No.

24   Q.  And if you look down at the very bottom of this page at

25   9:27, did Farah Yare ever tell you, this was the first time

1    in one year of fighting that we attacked them from behind

2    while they were in retreat.  They were used to being attacked

3    while in their camps and ambushed on the road, but they never

4    experienced an attack from the rear.  The military uses

5    ambush, but it's not common to attack a retreating enemy.

6    This was a new tactic in our fighting.  Did he ever tell you

7    that?

8    A.  No.

9    Q.  And if I could have you look at -- a little bit down on

10   that page, at 10:10 -- or, excuse me, 10:07 -- did Farah Yare

11   ever tell you, We caught up with them and we truly destroyed

12   them.  The young guys who were here with us also hit them

13   from the other side, and we trusted them to hold their side.

14   We were more than the young guys, and we covered most of the

15   lines.  The young guys fought for three minutes and left.

16   Did he ever tell you that?

17   A.  No.

18   Q.  And if I could show you defense exhibit -- well, let me

19   just ask you this:  Did Farah Yare ever tell you that we

20   destroyed a bakery store who tried to sell bread to them, the

21   Ethiopians?

22   A.  No.

23   Q.  And ILEYS had nothing to do with destroying bakeries,

24   right?

25   A.  That's right, they don't.

1          MR. COLE:  Nothing further, your Honor.

2          THE COURT:  Anything further?

3          MR. DRATEL:  Yes, your Honor.

4                    Redirect Examination

5          BY MR. DRATEL:  Q.  You were just asked on

6    cross-examination about Farah Yare and whether he told you

7    certain things, right?  Whether Farah Yare had told you

8    certain things or not, right?

9          Now, when you were in Galgaduud in July of 2008,

10   the Ethiopians -- had there been -- withdrawn.  Had there

11   been fighting between the local forces in Guraceel and

12   Galgaduud and the Ethiopians just before you got there?

13   A.  Local residents and the Ethiopians.

14   Q.  And they told you about that, right?

15   A.  Yes.

16   Q.  And you witnessed certain effects of the Ethiopian

17   conflict, right?  You were there, you saw it, right?  You

18   talked to victims, right?

19   A.  Yes.

20   Q.  Talked to people whose families, civilians, had been

21   killed by Ethiopians, right?

22   A.  Yes.

23   Q.  And you know that the people in Guraceel defended

24   themselves against the Ethiopians, right?

25          MR. COLE:  Objection; calls for hearsay, lack of

1    foundation.

2              MR. DRATEL:  He opened the door, your Honor.

3              THE COURT:  You know, I was waiting for the

4    objection on the first question, which basically was the same

5    question, what he had been informed of, and then two or three

6    questions came in.  And so the objection is overruled, but

7    that doesn't open the door for protracted examination on --

8              MR. DRATEL:  No, I'm -- this is very tight, your

9    Honor.

10             BY MR. DRATEL:  Q.  So the residents of Guraceel

11   defended themselves against the Ethiopians, right, and every

12   able-bodied man was involved in that, right?

13   A.  Should be.

14             MR. COLE:  Objection; lack of foundation.

15             THE COURT:  The objection is sustained; the answer

16   is stricken; the jury admonished to disregard it.

17             BY MR. DRATEL:  Q.  To your knowledge was --

18             THE COURT:  That's the --

19             MR. COLE:  Same question.

20             THE COURT:  -- same question.  Without laying a

21   foundation, it's the same question.

22             MR. COLE:  Same objection.

23             BY MR. DRATEL:  Q.  Does everybody in Somalia, in

24   Guraceel, carry a weapon?

25             MR. COLE:  Objection; same objection.

1            THE COURT:  The objection is sustained.

2            MR. DRATEL:  I'm talking about his personal

3   knowledge, your Honor.

4            THE COURT:  Well, ask it -- then the way to ask

5   that is to ask whether or not he personally observed --

6   personally observed -- every individual carrying a weapon.

7            MR. DRATEL:  I'll rephrase it.

8            THE COURT:  And there was no reference as to time.

9   I assume it's when he returned to Guraceel.

10           BY MR. DRATEL:  Q.  Talking about during the time

11   period of July of 2008, was it common for men in Guraceel,

12   able-bodied men, to carry weapons?

13   A.  Many people carry weapon.

14   Q.  And for self-defense purposes?

15           MR. COLE:  Objection; lack of foundation.

16           BY MR. DRATEL:  Q.  It's the same.  To your

17   personal knowledge.

18   A.  Yes.

19   Q.  Now, you were asked about Farah Yare and ILEYS and what

20   ILEYS was involved in; you were asked on cross-examination.

21   Ask you with respect to Farah Yare or anyone else, is it

22   possible for someone to be for ILEYS and al-Shabaab at the

23   same time?

24           MR. COLE:  Objection; calls for speculation.

25           THE COURT:  The objection is sustained.

1              BY MR. DRATEL:  Q.  Have you ever met anyone --

2    A.  No.

3    Q.  -- who's for -- let me finish the question.  Have you

4    ever met anyone who was for ILEYS and al-Shabaab at the same

5    time?

6              MR. COLE:  Objection; calls for speculation.

7              THE WITNESS:  No.

8              THE COURT:  All right.  Now, sir, I've asked you to

9    hold off on answering a question, and so I'll ask you in a

10   different way.  After the question is completed, just wait a

11   couple of seconds, okay, to see if Mr. Cole's going to

12   object.  That gives me an opportunity to rule on the

13   objection before you answer.

14             THE WITNESS:  Yes.

15             THE COURT:  Okay.  Thank you.

16             BY MR. DRATEL:  Q.  Have you?

17             THE COURT:  The objection is sustained; the answer

18   is stricken; the jury is admonished to disregard the answer.

19             BY MR. DRATEL:  Q.  Now, this is to your personal

20   knowledge; have you ever met anyone who was for both ILEYS

21   and al-Shabaab?

22             MR. COLE:  Same objection; would call for

23   speculation.

24             THE COURT:  Well, there's a lack of foundation

25   here.  If you can establish the foundation for that, then you

1    may proceed.

2             BY MR. DRATEL:  Q.  Okay.  During this period

3    2007-2008 with respect to something going on in Guraceel and

4    Galgaduud, did you ever meet anyone in your experience, from

5    your personal knowledge, who was for ILEYS and al-Shabaab at

6    the same time?

7    A.  No.

8             MR. DRATEL:  Nothing further, your Honor.

9             THE COURT:  Mr. Cole?

10                        Recross-Examination

11            BY MR. COLE:  Q.  His question was about 2007-2008,

12   whether you met somebody like that, right?  Is that a yes?

13   You met Mr. Moalin in 2009, didn't you?

14            MR. DRATEL:  Objection, your Honor.

15            THE WITNESS:  Yes.

16            MR. DRATEL:  We've limited it to the 2008-2009 --

17   2007-2008 time frame.  I would --

18            THE COURT:  The objection is sustained.

19            BY MR. COLE:  Q.  Well, sir, you know Mr. Moalin,

20   don't you?

21   A.  I do.

22   Q.  Then you have met somebody who supported al-Shabaab and

23   ILEYS, haven't you?

24            MR. DRATEL:  Objection, your Honor.

25            THE COURT:  The objection is sustained.  That's

1   argumentative, it's improper.  The jury is admonished to

2   disregard any implication in the question.

3            MR. COLE:  Nothing further, your Honor.

4            THE COURT:  Okay, sir.  Thank you for coming in.

5   You are excused.  Okay.  Next we have --

6            MR. DRATEL:  A deposition, your Honor.

7            THE COURT:  Okay.  Why don't we take --

8            MR. DRATEL:  One second, your Honor.  You want to

9   take a break now?  That's not a bad idea.

10            THE COURT:  Well, I know we have a couple of

11   transcripts left, and if -- Mr. Durkin and Ms. Roberts, I

12   think we have two of your transcripts, and are they

13   relatively short, aren't they?

14            MS. ROBERTS:  They're short, your Honor.

15            THE COURT:  Okay.  Well, why don't you proceed with

16   those, and then after those transcripts, we'll take our

17   break.

18            MR. DURKIN:  That's fine.

19            MS. ROBERTS:  This is defendant Ahmed Nasir Taalil

20   Mohamud Exhibit Number AN-186-T, which corresponds to

21   Government Exhibit Transcript number 186, beginning with a

22   portion that was not included in the exhibit previously

23   admitted.

24            MR. DURKIN:  Judge, could I have a second?

25            THE COURT:  Certainly.  This is AN-186-T.

1            MR. DURKIN:  Thank you.

2        (The transcription was read.)

3            MS. ROBERTS:  And then it goes on to the part that

4    had been previously admitted.  And the last transcript was

5    AN-2-T.  It is a call that had not previously been admitted

6    into evidence.  It is dated July 29, 2008.  It is between a

7    person Abdirizak, last name unknown, and Basaaly Moalin.

8        (The transcription was read.)

9            MS. ROBERTS:  And, Judge, there were two defense

10   exhibits entered by stipulation.  One is Defendants'

11   AN-53-S1, which is one page from a spreadsheet that was

12   prepared off of the Government's Exhibit 53, transfers from

13   Mr. Moalin made during the period that is on Government's

14   Exhibit 53.  There's a single page which we admitted as

15   AN-53-S1 that includes and entry on July 30, 2008 to Abdi --

16   Mohamed Abdi Qorey for the thousand dollars.

17           MR. DURKIN:  Can we publish that now?

18           THE COURT:  Yes.  I thought -S1 and -S2, that is,

19   AN-53-S1 and -2 were previously --

20           MS. ROBERTS:  They were, Judge.

21           THE COURT:  -- admitted.

22           MS. ROBERTS:  We just wanted to publish them to the

23   jury.

24           THE COURT:  Okay.  Very good.  Thank you.

25           MR. DURKIN:  The reference that she makes is four

 1   lines down.

 2          MS. ROBERTS:  And finally, AN-53-S2, also a

 3   spreadsheet from the Government's Exhibit 53, the Shidaal

 4   records, which is a three-page spreadsheet of all transfers

 5   done by Ahmed Nasir Taalil Mohamud during the period in

 6   question.

 7          THE COURT:  Thank you.  That does it?

 8          MR. DURKIN:  And they have that in their notebooks,

 9   don't --

10          THE COURT:  They, yes do.

11          MR. DURKIN:  Then there's no need for us to publish

12   it.

13          THE COURT:  I don't think it's necessary.  Okay.  I

14   think that does it for all the transcript reading, does it

15   not?

16          MR. DURKIN:  I think so.

17          THE COURT:  Mr. Cole, you don't have any further

18   transcripts.  I think we're basically done with transcripts

19   in the case, ladies and gentlemen.  You're obviously going to

20   keep all of those notebooks; you've got three different

21   notebooks regarding transcripts, so they're yours.  And we

22   will take our midmorning recess at this time and resume in 15

23   minutes.  Please remember the admonition.  Thank you.

24      (The jury left the courtroom.)

25          THE COURT:  We're outside the presence of all

1    jurors.  How did it go with jury instructions last night,

2    counsel?

3                MR. COLE:  We made a lot of progress.  We're done

4    going through it.  We're going to -- I think we've narrowed

5    it down to very few disputes, and we are going to send them a

6    revised version based on all the comments last night, and

7    they'll give us some final feedback, and we'll get it to your

8    Honor -- I guess we're supposed to see you about that

9    tomorrow morning.  Should we try to get that to you this

10   afternoon, later this afternoon?

11               THE COURT:  Well, as soon as you can.  As you

12   probably know, it's my custom and practice to do my own jury

13   instructions.  I have a certain font that I like to use.

14   It's easy for jurors I think; it's a large-size print.  And

15   I'm -- we already have many -- all of the general

16   instructions, obviously, prepared.  The substantive

17   instructions that are to be given could be converted from

18   whatever you have, or you could contact my assistant and just

19   make it a compatible with what she has and provide her a

20   disk.  That might -- I don't know if that's going to be

21   workable; that's one possible suggestion.  Or it may just

22   take old fashioned copying and --

23               MR. COLE:  We have ours in electronic version, and

24   so we'll send whatever -- whatever we're submitting.  And to

25   the extent we're disagreeing, I'm sure both sides can give

1   the electronic version to your Honor.

2           THE COURT:  How many substantive disagreements are

3   there?  How many --

4           MR. COLE:  Let me count them.

5           MR. DRATEL:  Probably -- my just from memory is

6   probably about six or eight, and some of them are merely a

7   sentence, you know, some of them -- there are only a couple

8   of structural ones, and by structural I mean sort of how that

9   instruction is given and what time in the -- and I don't know

10  because the government was going to look back and we were

11  going to look back at some of the competing suggestions that

12  we had as to whether certain things were acceptable.  So when

13  we get the government's version, we'll be able to identify

14  those that involve -- there are no wholesale disagreements,

15  your Honor; that I can tell you.

16          THE COURT:  Okay.  Then we'll need to carve out

17  some time tomorrow when we can work on this together.  I

18  would assume you're still on track for finishing today.

19          MR. DRATEL:  Yes.

20          THE COURT:  And so we can use tomorrow for that

21  time available tomorrow.

22          MR. DRATEL:  Right.

23          THE COURT:  Your arguments, do you think they'll be

24  completed in a day or do you think you'll need more than a

25  day for arguments?

1          MR. DRATEL:  I think -- given our discussion I

2     think a day, we can do it -- you know, they may --

3          THE COURT:  About a day.

4          MR. DRATEL:  You know, well -- and this --

5     obviously we'll work together to the extent we can obviously

6     to schedule and get a time frame that works.  I spoke with

7     Mr. Cole.  You know, his projected -- he's not obviously held

8     to it -- but I have sort of a sense of where's he's going to

9     be and I have a sense where I am in talking to counsel.  It's

10    our strong preference in terms of fairness that we do all the

11    summations, including a rebuttal, in one day rather than have

12    the prosecutor's rebuttal the following morning.  And so even

13    if we go over 15 minutes or something like that, I hope the

14    Court would be -- would indulge us with that with respect to

15    that.  Also, does the Court charge before or after argument?

16         THE COURT:  I give the instructions before except

17    the concluding instructions.  Obviously the instructions have

18    been given, you can refer to them; I think it puts everything

19    in context, gives me a chance to come back and correct

20    anything I need to correct that might have been a

21    misinterpretation.

22         MR. DRATEL:  Perhaps if the Court can -- maybe

23    Thursday, tomorrow, we can get a sense of how much is going

24    to be before so we can sort of build in -- so we can get all

25    that done in a day.

```
 1              THE COURT:  How much of what now?

 2              MR. DRATEL:  In other words, I'm just trying to

 3    scope out in my mind the length of summations so we get it

 4    all done in one day.

 5              THE COURT:  Yeah.  Well, if you're asking how long

 6    it will take me to instruct, it takes me -- on a case like

 7    this, it'll probably be something on the order of 30 minutes,

 8    30 to 35 minutes --

 9              MR. DRATEL:  Great.

10              THE COURT:  -- of instructions.  And so, you know,

11    if we need to create a little extra time -- and I assume this

12    is going to be happening next Tuesday, the 19th -- so if we

13    need to create a little extra time, we'll do that.  Keep in

14    mind, you know, the saturation point of the jury, and --

15              MR. COLE:  I think we've reached it.

16              THE COURT:  Well, no, no.  That may be true in

17    terms of the evidence, yeah.  I would tend to degree with

18    that.

19              MR. DRATEL:  I agree.

20              THE COURT:  But in terms of the argument, I don't

21    want to impose too much.  We may be able to go a little bit

22    beyond normal closing, but I wouldn't want to extend into the

23    evening, for example --

24              MR. DRATEL:  No.

25              THE COURT:  -- just so that everything is finished
```

 1  in one day.

 2          MR. DRATEL:  Yes, I'm -- we're cognizant of that.

 3  I agree with the Court with respect to saturation points.

 4  And it's always been my practice to be as concise as

 5  possible.

 6          THE COURT:  All right.  Well, then after all the

 7  evidence is completed, we'll -- you need another session

 8  obviously to --

 9          MR. DRATEL:  Yes.

10          THE COURT:  -- take a look what's been submitted,

11  Mr. Dratel; you need another session there.  Then I'll be

12  happy to meet with you at a convenient time tomorrow where we

13  can go over this and get things finalized.

14          MR. DRATEL:  Great.

15          THE COURT:  Okay.  All right.

16      (There was a break in the proceedings.)

17          THE COURT:  All right.  We have everyone present.

18  And we're ready to proceed with our next videotaped

19  deposition.

20          MS. FONTIER:  Yes, your Honor.  Your Honor, the

21  next witness for the defense will be Hassan Guled, Hassan is

22  H-a-s-s-a-n, Guled, G-u-l-e-d.  Mr. Guled was deposed during

23  the week of November 11 of 2012 in Djibouti.

24          THE COURT:  Okay.  Ladies and gentlemen, I

25  understand this one is a bit lengthy.  I believe we've had

```
1   one other that was pretty lengthy, Mr. Mohamed's, and so we
2   won't finish this before we break for our noon recess, and
3   we'll continue it after lunch.  Okay.
4           MS. FONTIER:  Thank you, your Honor.
5       (The video recording was played.)
6           MS. FONTIER:  Sorry, your Honor, one moment.  I
7   need just need to switch to the next session.
8           THE COURT:  Okay.
9       (The video recording was played.)
10          THE COURT:  I think this is a convenient time for
11  our noon recess, ladies and gentlemen.  We'll resume at 1:30.
12  Remember the admonition not to discuss the case or make any
13  decisions at this time.  Thank you.
14      (There was a break in the proceedings.)
15          THE COURT:  Okay.  We have everyone present once
16  again, and we are ready to proceed with the Hassan Guled
17  deposition.
18          MS. FONTIER:  Yes, your Honor.
19          THE COURT: All right.
20      (The video recording was played.)
21          MS. FONTIER:  One moment, your Honor.
22          THE COURT:  Okay.
23          MS. FONTIER:  Sorry, your Honor.
24          THE COURT:  That's okay.
25      (The video recording was played.)
```

1             MS. FONTIER:  I'm going to -- Ms. Han knows how

2    this is formatted.  I'm going to cede my seat to the --

3             MS. HAN:  Your Honor, I apologize for this first

4    clip.  We have clips separately for the other tapes, and we

5    should be able to play them all in a row.

6             THE COURT:  Okay.

7         (The video recording was played.)

8             THE COURT:  Is there redirect, Ms. Han?

9             MS. HAN:  There is.

10            THE COURT:  Okay.  We'll take our midafternoon

11   recess at this time, ladies and gentlemen, and resume at

12   three o'clock.  Please remember the admonition.  Thank you.

13        (The jury left the courtroom.)

14            THE COURT:  Okay.  We're outside the presence of

15   jurors.  Counsel, how does it look for the rest of the

16   afternoon?  Is this going to be it?

17            MR. DRATEL:  Yes.  Well, we have a stipulation to

18   read, your Honor.

19            THE COURT:  Okay.  About how long do we have of

20   redirect on this?

21            MR. DRATEL:  I would guess it's less than 15

22   minutes.

23            THE COURT:  Okay.

24            MS. FONTIER:  I would say less.

25            MR. DRATEL:  Yeah, I think it's less.

 1                    THE COURT:  Okay.  And then a stipulation or two to

 2      read?

 3                    MR. DRATEL:  I think just one.

 4                    THE COURT:  Mr. Cole, anything further from the

 5      government?

 6                    MR. COLE:  We're going to kibbitz during this

 7      recess right now about that, and we'll let you know.

 8                    THE COURT:  Okay.  I still need to advise the jury

 9      that one of the transcripts -- I think it was 134 -- comes in

10      for limited purposes as you will recall -- I think it's

11      134 -- and that's with respect to Mr. Moalin only.  Yes, 134.

12      That's it.  Okay.  Then we'll resume at three o'clock.

13                    MS. FONTIER:  Thank you, your Honor.

14          (There was a break in the proceedings.)

15                    THE COURT:  Okay.  Everyone is present.  And we'll

16      continue on then with this last bit of videotaped deposition

17      testimony.

18          (The video recording was played.)

19                    THE COURT:  That concludes the testimony?

20                    MS. HAN:  Yes, your Honor.

21                    THE COURT:  All right.  Thank you.  Any further

22      witnesses or evidence, Mr. Dratel?

23                    MR. DRATEL:  No, no further witnesses, your Honor,

24      but we do have a stipulation.

25                    THE COURT:  Are you going to read it?

1           MR. DRATEL:  Yes.

2           THE COURT:  Is it a stipulation as to testimony or

3    fact?

4           MR. DRATEL:  Facts.

5           THE COURT:  Okay.  Well, ladies and gentlemen,

6    you're about ready to hear a stipulation as to fact.  You've

7    heard stipulations as to testimony before.  You may recall

8    that the parties had earlier stipulated or agreed that if

9    certain witnesses were called, they would have testified as

10   to certain things; that's a stipulation as to testimony.

11   This is a stipulation or agreement as to fact, and so the

12   facts contained within this stipulation or agreement are to

13   be considered by you as proven in the case.

14          MR. DRATEL:  Does the Court wish to mark it as any

15   particular type of --

16          THE COURT:  If you read slowly, I don't think we'll

17   need to mark it, but we'll see.  Why don't you proceed at

18   this time.

19          MR. DRATEL:  I suppose I can.  The parties

20   stipulate and agree that in early to mid 2008, one, money

21   collected for the Ayr subclan was given to individuals,

22   including Abukar Suryare, AKA Abukar Mohamed, and Farah Yare,

23   who were associated with the ILEYS charity; two, money

24   collected by men in Guraceel on behalf of the Ayr subclan was

25   given to a group that was not al-Shabaab; three, there was a

1    dispute between al-Shabaab, the Ayr clan, and ILEYS over the

2    administration of the Galgaduud region; four, members of the

3    ILEYS charity and the Ayr subclan, including Abukar Suryare,

4    were opposed to al-Shabaab and were Ayrow's enemies.  Your

5    Honor, may I provide to this the Court?

6            THE COURT:  You can.  It will be accepted as a

7    court exhibit at this time, but what -- actually would you

8    read it once again and more slowly than you did the first

9    time; just pause between the different points.

10           MR. DRATEL:  Okay.  Thank you, your Honor.  The

11   parties stipulate and agree that in early to mid 2008, one,

12   money collected for the Ayr subclan was given to individuals,

13   including Abukar Suryare -- that's A-b-u-k-a-r

14   S-u-r-y-a-r-e -- AKA Abukar Mohamed, and Farah Yare, who were

15   associated with the ILEYS charity; two, money collected by

16   men in Guraceel on behalf of the Ayr subclan was given to a

17   group that was not al-Shabaab; three, there was a dispute

18   between al-Shabaab, the Ayr clan, and ILEYS over the

19   administration of the Galgaduud region; four, members of the

20   ILEYS charity and the Ayr subclan, including Abukar Suryare,

21   were opposed to al-Shabaab and were Ayrow's enemies.

22           THE COURT:  So stipulated, Mr. Cole?

23           MR. COLE:  Yes, your Honor.

24           THE COURT:  Okay.  Very good.

25           MR. DRATEL:  Thank you, your Honor.

1          THE COURT:  You can bring that forward, and we'll

2     mark it as a court exhibit at this time, court exhibit next

3     in order.

4          (Exhibit No. Court's 4 identified.)

5          MR. DRATEL:  Can we approach for just a moment,

6     your Honor, just I think Mr. Cole and I, just a technical

7     question.

8          (Following is a sidebar conference.)

9          MR. DRATEL:  Because -- partially because we

10    reedited the Sheikalow and the government's, can we just

11    defer the actual provision of the DVDs to the Court till

12    tomorrow and we get those straightened out so we don't have

13    to worry -- we can all rest and don't have to worry about

14    that particular thing.  We can put it in on a thumb drive,

15    but it won't be what the government has.

16         MR. COLE:  We can put in that record later, okay?

17    We can --

18         THE COURT:  Absolutely.  What you're asking is can

19    both sides completely rest subject to there being some

20    editing, agreed-upon editing to these last DVDs --

21         MR. DRATEL:  Yes, so that we can --

22         THE COURT:  Sure.  You've all worked together so

23    well on this, that shouldn't be a problem.  Is there going to

24    be any rebuttal, Mr. Cole?

25         MR. COLE:  No.

1          THE COURT:  I'll let the jury go then and let them

2    know to come back next Tuesday, so I'll spend a few minutes

3    with them on that.  We also need to -- I haven't mentioned

4    134 to them yet, so we'll have to do that as well.  Okay.

5          (Sidebar conference concludes.)

6          THE COURT:  Do all defendants rest at this time?

7          MR. DRATEL:  Your Honor, Mr. Moalin rests.

8          MS. MORENO:  Your Honor, on behalf of Mr. Mohamud,

9    the defense rests.

10         MR. GHAPPOUR:  Your Honor, on behalf of Mr. Doreh,

11   the defense rests.

12         MR. DURKIN:  We rest as well.

13         THE COURT:  Okay.  Mr. Cole, any rebuttal?

14         MR. COLE:  No, your Honor.  Thank you.

15         THE COURT:  All right.  Very good.  Well, ladies

16   and gentlemen of the jury, we have concluded the evidence in

17   this case, so let me take just a few minutes and tell you

18   what our schedule is immediately ahead.

19         First of all, before I do that, let me tell you

20   about one transcript that was introduced into evidence some

21   time ago, and if you'd like to take your transcript book up

22   just so that you can mark a note -- you're not required to

23   but if you wish to -- on transcript 134.  I'll give you a

24   moment to get that notebook or get your notepad out.

25         Okay.  It's a limiting instruction, ladies and

1    gentlemen, regarding Exhibit 134, and this transcript, this

2    exhibit, is admissible only as to defendant Basaaly Moalin

3    and may not be considered as evidence as to any of the

4    remaining defendants in this case, and that limiting

5    instruction applies only to Exhibit 134.  And that's all I

6    wanted to say on that subject --

7         Now, on scheduling.  Both sides have rested, as you

8    just heard.  It will be necessary for the attorneys and the

9    Court to get together on some matters that are properly

10   discussed outside your presence so that we can get the case

11   into final form to be argued to you.  Before that happens

12   obviously -- well, I shouldn't say obviously -- but before

13   that happens, you will be instructed on the law that applies

14   to this case.  So that's the next thing that will happen for

15   your purposes is you will receive your instructions as to the

16   law.  I actually read those instructions to you, and you're

17   furnished a set of instructions -- so you're going to have a

18   lot of paper on this case ultimately when you retire -- and

19   then you'll hear the arguments in the case.

20        Now, the arguments are estimated to be about a day

21   in length, give or take.  Now, tomorrow counsel and I will be

22   working on these other matters, as I mentioned to you, so

23   it's going to be an open day for you; we will not be in

24   session in this case tomorrow for your purposes.  And

25   remember that Friday, the 15th, was going to be a day that we

1    would not be in session on this case because of the calendar

2    that is already prepared and must be addressed; many other

3    cases are coming in for consideration on Friday.  Monday is a

4    holiday.  So the next time we're all together on this case is

5    going to be Tuesday, which ultimately works to our advantage

6    in this sense.  I wouldn't want to break up the deliberations

7    on this case.  For example, if the attorneys were forced to

8    argue this case tomorrow, they might not all be available

9    here for Friday because some of them may be involved with

10   other matters on Friday because we're not in session here,

11   and then the arguments might continue on until next Tuesday.

12   Or if we were to get the case to you before, let's say by

13   Friday so you could be deliberating on Friday, that would

14   break up deliberations.  So even though we have a long

15   weekend ahead of us and you're going to be away from this

16   case for a number of days, it's better that you hear the

17   instructions and the argument or arguments all at once and

18   that you begin your deliberations right after that without

19   any limitations as to -- as to timing.

20          So that's the schedule from this point forward.

21   Any questions on the scheduling?  Yes, Mr. Bilse?

22          JUROR BILSE:  Not on scheduling, but I haven't been

23   through this before and I'm not sure I know witness -- or the

24   evidence we get -- we can ask for questions about that, but

25   closing statements and your directions, are we going to be

 1   able to get transcripts of what you say in the next couple of

 2   days?  Are those --

 3          THE COURT:  Well, like I said, the instructions are

 4   in written form, so I'll be -- I'll be actually reading the

 5   instructions or the charge, I'll be giving you the law by

 6   reading it to you, and then you will each have your own

 7   packet of instructions, the very same instructions that I

 8   read.  And so you're going to hear it -- you may see it at

 9   the same time, I don't know; it might be easier in this case

10   for you to actually have the instructions before you in

11   written form as I'm reading them to you; I'll think about

12   that.  But in any event, you'll hear them and then you will

13   have your own set of instructions, which will track word for

14   word what was read to you.

15          JUROR BILSE:  Well, what about the closing

16   statements?  Are those -- those aren't evidence, so we don't

17   get --

18          THE COURT:  No.

19          JUROR BILSE:  Can we ask for a transcript of what

20   was said?

21          THE COURT:  No.  That is not evidence.  And

22   remember, arguments by the attorneys are not evidence, just

23   as opening statements were not evidence and at other times

24   when the attorneys spoke, addressed you, those times -- those

25   statements are not evidence; those are opportunities for the

1    attorneys to, in the form of voir dire ultimately, when we

2    were doing jury selection, to participate in that process,

3    opening statements were to tell you where the case is going,

4    and final arguments are for the purpose of marshaling all of

5    the evidence before you, telling you what reasonable

6    inferences you can draw from the evidence, and trying to

7    persuade you to a particular point of view.  But arguments

8    are not evidence, and we do not -- we do not transcribe and

9    send those arguments in with the jury.  But a logical

10   question for sure.  Mr. Adams?

11          ALTERNATE JUROR ADAMS:   So those of us that are

12   alternates, do we come to all of this?  And when the others

13   deliberate, do we --

14          THE COURT:  You're jumping the gun just a little

15   bit on that one.  Obviously the alternates, all three

16   alternates, have been here for all sessions of court, you've

17   all been very, very attentive, taking notes, following all of

18   the evidence very carefully; I've made those observations.

19   Obviously you'll be here for the jury instructions and for

20   the arguments, and I'll confer with counsel on whether we're

21   going to hold you in the jury lounge or make other

22   arrangements for you.  The alternates do not deliberate on

23   the case unless an alternate is substituted in for a regular

24   member of the jury who has been excused for some significant

25   reason, so it is still entirely conceivable, possible, that

1    one or, for that matter, all three alternates could be asked

2    to step in and deliberate on this case.  One of the reasons

3    we had three alternates on the case was that it was a fairly

4    lengthy case, a bit longer than typical, we're coming through

5    the flu season -- I think you were all able to dodge that

6    bullet, present company excluded here, but you all remained

7    very healthy.  And so we will have more for you on that

8    score, Mr. Adams, on Tuesday when we're back again, and

9    Mr. Brenzel, Ms. Clark, we'll obviously -- the information we

10   provide will be for your benefit as well.  If you are asked

11   to substitute for an excused member of the jury, the

12   substitution process is an orderly process; it takes -- it

13   takes the -- you are substituted in the order in which you

14   were selected as alternates, so Mr. Brenzel is our first

15   alternate; you, Mr. Adams, are second; and Ms. Clark, our

16   third.  I hope that answers your question.

17              ALTERNATE JUROR ADAMS:  Yes.  Thank you.

18              THE COURT:  Okay.  Well, I'll work with the

19   attorneys on exactly where you will be asked to wait and

20   whether you can resume some semblance of normal activity

21   while you are waiting.  If you do -- if we do excuse you, it

22   will be with certain conditions, and I'll go into those at

23   that time.

24              Okay.  Any other questions before we say goodbye

25   for a period of some days here?  Okay.  Well, remember --

1    once again, remember the admonition.  Please do not discuss

2    this case amongst yourselves or with anyone else or allow

3    yourselves to form or express any opinions until the case has

4    been submitted to you.  And also -- very important -- that

5    you not in any way expose yourself to any reporting in the

6    media or in any other fashion on the case or any subject

7    matter that has anything to do with the case.

8              So have a very pleasant four days or so, however

9    long it is, maybe a little bit longer.  We'll see you next

10   Tuesday -- next Tuesday -- at 9 a.m.  Thank you.

11        (The jury left the courtroom.)

12             THE COURT:  Okay.  We are outside the presence of

13   all jurors.  Counsel, did you wish to renew your Rule 29

14   motions?

15             MR. DRATEL:  Yes, your Honor.

16             THE COURT:  I assume all attorneys on behalf of the

17   respective defendants are doing so.

18             MS. MORENO:  Yes, your Honor, on behalf of Mr.

19   Mohamud.

20             MR. GHAPPOUR:  On behalf of Mr. Doreh as well.

21             MR. DURKIN:  On behalf of Mr. Ahmed Nasir Taalil

22   Mohamud.  I also obligated am obligated to renew my Rule 14

23   motion to sever.

24             THE COURT:  Okay.  Thank you, Mr. Durkin.

25   Mr. Cole?

1           MR. COLE:  We oppose all motions.

2           THE COURT:  Okay.  The Rule 29 motions, and each of

3    them, would be denied at this time, as would the Rule 14

4    severance motion of Mr. Durkin.

5           I'm going to -- well, I can do this at a later

6    time, perhaps at the side of the bench.  Jury instructions,

7    what's the latest on that?

8           MR. DRATEL:  Well, we're waiting for the

9    government's version that -- based on our conference last --

10   yesterday.

11          MR. COLE:  We emailed them at lunch, but they

12   probably were already back in court, so they -- they have

13   another set, and I think we're ready to set a time to see you

14   tomorrow probably.

15          MR. DRATEL:  I think, your Honor, because we're

16   going to have to go print it, review it, discuss it, get back

17   to the government, how about 11:00 or 11:30 if that makes

18   sense.  That gives us time in the morning to hammer out, you

19   know, any final issues we have with the government.

20          THE COURT:  Yeah.  Things are really starting to

21   fill in a little bit here, knowing that we weren't going to

22   be in session in this case.  I've a special set coming in at

23   11:30 in a significant matter; it won't take more than a half

24   hour.  I think our time, however, may be a little bit longer

25   than just a short matter.  I'm happy to meet you at one

1    o'clock and we can proceed --

2         MR. DRATEL:  Fine.

3         THE COURT:  -- at that time.  And I assume you'd be

4    waiving the appearance of your clients.

5         MR. DRATEL:  I think so, your Honor.

6         MS. MORENO:  Yes, your Honor.

7         MR. GHAPPOUR:  Yes.

8         MR. DURKIN:  Yes.

9         THE COURT:  It's a lot easier that way.  And, quite

10   frankly, I know there's been a very efficient division of

11   labor amongst defense counsel obviously along functional

12   lines, and if we can meet with just a couple of emissaries or

13   representatives of the defense, that might really speed

14   things along.  Everybody's certainly willing -- I mean free

15   to be there, to participate, but it's been my experience if

16   we can get the attorneys who are primarily involved in the

17   jury instructions from the defense side and Mr. Cole, I don't

18   know that everybody is required to be here.  I'll leave that

19   up to you.  The smaller the working group, the better.  Just

20   want to make sure that whoever we have here is able to

21   authorize -- is a representative of all parties so that we

22   get this done once and for all, okay?

23        MR. DRATEL:  Your Honor, just have one

24   additional --

25        THE COURT:  Yes.

```
 1            MR. DRATEL:  Based on the question from Juror No. 1
 2   with respect to closing arguments --
 3            THE COURT:  Yes.
 4            MR. DRATEL:  -- it just occurred to me -- and I
 5   didn't think this -- this needs to be done now, but Tuesday
 6   that they can take notes certainly.
 7            THE COURT:  Oh, absolutely.
 8            MR. DRATEL:  That they should be reminded to --
 9            THE COURT:  You know, I encourage them to take
10   notes -- I encourage them to take notes during the
11   instructions if they wish to do that, knowing that they're
12   going to have their own set.  As a matter of fact, as I
13   mentioned to the jury, I may just have them -- I always
14   provide them with a set for deliberations.  I might provide
15   them with a set while I'm actually instructing them unless
16   there are any real concerns about that.
17            MR. COLE:  No, your Honor.
18            MR. DRATEL:  And be reading along?
19            THE COURT:  Yeah.  It's a very conscientious jury.
20            MR. DRATEL:  Very much.
21            THE COURT:  Okay.  So if we break now, that will
22   give you an opportunity to meet and confer perhaps further on
23   the matter of jury instructions, and then we can finish up
24   tomorrow let's say one o'clock and get all that done.  Can I
25   see counsel over here the side of the bench for just a moment
```

1   on another matter.

2        MS. MORENO:  All counsel, your Honor?

3        THE COURT:  No, it's not necessary.  Ms. Moreno,

4   you come up.  I know you're liaison with the community.

5        (Following is a sidebar conference.)

6        THE COURT:  You know, the spectators, the Somali

7   community, has been very, very respectful, very, very well

8   behaved, no problems there.  But toward the end of the trial,

9   I noticed that more and more of them -- you couldn't see this

10  as much; Mr. Durkin, you may have been able to see it -- but

11  more and more of the people were coming and going and coming

12  and going.  They're very quiet, but they're getting a little

13  restless now as to getting up and leaving and coming back and

14  up and back.  And so during argument, during the instructions

15  and arguments, perhaps you can let them know that once

16  they're here, be in their seats and don't leave unless they

17  really need to leave for their own comfort until we have a

18  recess.  We'll be recessing from time to time, but I don't

19  want a lot of movement.

20       MS. MORENO:  I'm sure that the closing arguments

21  will be so compelling, your Honor, that no one will want to

22  budge.  But I will communicate the message to the community.

23       MR. DRATEL:  They were only reflecting what the

24  rest of us would of like do have done in the last couple of

25  days.

```
 1              THE COURT:  Well, respectfully, just let them know.
 2    I'm not in any way concerned or upset.  They've been
 3    wonderful --
 4              MS. MORENO:  Of course.
 5              THE COURT:  -- they're very quiet, and -- but it's
 6    a lot of coming and going.
 7              MS. MORENO:  I will deliver that message.
 8              THE COURT:  That's all I wanted to say.
 9              MR. DRATEL:  Thank you, your Honor.
10              THE COURT:  All right.  So we'll see you at one
11    o'clock.
12              MR. DURKIN:  Judge, do we have to be dressed
13    tomorrow if we come?
14              THE COURT:  I expect --
15              MS. MORENO:  In something.
16              MR. COLE:  Please, Tom.
17              THE COURT:  Expect to wear your big ten-gallon hat
18    and hear your spurs jingling down the hall?
19         (Sidebar conference concludes.)
20              THE COURT:  Counsel, just to follow up -- Gaby was
21    just asking me a question -- it's my practice -- and maybe
22    you should know this -- it's my practice when I'm charging
23    the jury, once, I start, the doors are locked, and then
24    they're unlocked as soon as I'm done, and that's when the
25    other -- hopefully -- okay.  Have a good evening.
```

1          (There was a break in the proceedings for the evening

2     recess.)

1          San Diego, California - Thursday, February 14, 2013

2          (The following proceedings were outside the presence of

3     the jury.)

4          (The defendants were outside the presence of the

5     defendants.)

6          THE COURT:  Okay.  We are on the record with the

7     following counsel present:  Messrs. Cole and Ward for the

8     government and Dratel and Ghappour for the defense, with

9     Messrs. Dratel and Ghappour being authorized to speak for all

10    defense counsel on behalf of all defendants.

11         We have just completed a three-hour-and-15-minute

12    conference on jury instructions off the record, and it is our

13    purpose now to state on the record the instructions that will

14    be given to the jury, for me to identify those instructions

15    initially and hopefully to accurately summarize any

16    objections or issues with jury instructions and thereafter to

17    give all counsel an opportunity to be heard, to augment the

18    record in the event I did not completely summarize the

19    instructions and issues related to instructions.

20         The following instructions will be given.  All

21    references will be to the Ninth Circuit pattern instructions

22    unless otherwise indicated, and if there is a significant

23    modification of a Ninth Circuit jury instruction, I will so

24    indicate.

25         First, Section 3.1, duty to follow the law; next,

1   3.2, charge against defendant not evidence, presumption of

2   innocence, and burden of proof; next, 3.3, defendant's

3   decision not to testify; next, 3.5, reasonable doubt defined;

4   next, 3.6, what is evidence; next, 3.7, what is not evidence;

5   next, 3.8, direct and circumstantial evidence; next, 3.9,

6   credibility of witnesses; next, 2.4, stipulations of fact.

7           Next, 3.10, activities not charged; next, 3.13,

8   separate consideration of multiple counts, multiple

9   defendants; next, jury to be guided by official English

10  interpretation with any references to translation or

11  translators redacted; next, 2.8A, consideration of

12  transcripts, with minor edits or modifications; next, 4.1 --

13  no, we've eliminated 4.1, have we not, counsel, defendant has

14  made a statement?

15          MR. GHAPPOUR:  That is my understanding, yes.

16          THE COURT:  Next, 4.14, opinion evidence.

17          MR. COLE:  Your Honor, actually, just to make sure,

18  I thought that that was the one you suggested eliminating; it

19  was one that Mr. Durkin in particular wanted --

20          MR. GHAPPOUR:  Oh, that's correct.

21          MR. COLE:  -- and we agreed you'd give it -- you

22  agreed it would be given even though it wasn't --

23          MR. WARD:  Didn't seem --

24          MR. COLE:  Yeah.

25          THE COURT:  Okay.  So 4.1, defendant's statement,

1   will be given.  Next, 4.14, opinion evidence/expert witnesses

2   or expert witness; next, 4.15, summaries not received in

3   evidence; next, 4.16, charts and summaries in evidence; next,

4   the substantive instructions will come for each count.

5           With respect to Count 1, an instruction entitled

6   Conspiracy to Provide Material Support to Terrorists.  It is

7   adopted from 18 USC Section 2339A (a), and the parties are in

8   agreement, with minor edits having been made.

9           Next would be from the Ninth Circuit model

10  instructions an amalgamation of 8.20 and 8.23, conspiracy

11  elements.

12          Next, an instruction entitled Additional

13  Definitions, which defines the following phrases or terms:

14  "Conspiracy to kill persons in a foreign country"; "Malice

15  aforethought"; "Conspiracy to use a weapon of mass

16  destruction outside the United States"; next, "Weapon of mass

17  destruction"; next, "Provide"; next, "Material support or

18  resources."  Next, definition of knowingly, entitled

19  Knowingly, 5.6; next, with respect to Count 2 -- off the

20  record for a moment.

21      (Off-the-record discussion between the Court and

22  counsel.)

23          THE COURT:  Back on the record.  The next jury

24  instruction is entitled, Conspiracy to Provide Material

25  Support to a Foreign Terrorist Organization, Count 2.  It's

1  agreed upon with the modifications or edits that have been

2  made.  Next, an instruction -- I should say that the last

3  instruction is based on 18 USC Section 2939B (a).

4          Next, we have an instruction entitled Providing

5  Material Support to a Foreign Terrorist Organization,

6  elements.  And that's also based on 2339B.

7          Next is an instruction with respect to Count 3

8  entitled, Transporting Funds to Promote Unlawful Activity;

9  it's Ninth Circuit instruction 8.148, and it will be given as

10 modified.  The defense objects -- has a limited objection to

11 this; the defense objects to a lack of a connection in this

12 instruction to Counts 2 and/or 5.  Other than that, the

13 defense is satisfied with the content of the instruction but

14 they'll have an opportunity to raise any other concerns.

15         Next are instructions related to Count 4.  The

16 first is entitled Providing Material Support to Terrorists,

17 elements.  It's based on 2339A.  It applies only to defendant

18 Moalin.

19         Next, also with respect to Count 4, is an

20 instruction entitled Attempt, predicated upon pattern

21 instruction 5.3.  There was a defense addition or supplement

22 to this particular instruction, which I would decline.

23 Counsel, did you want to be heard at this point with respect

24 to this issue?

25         MR. DRATEL:  Which -- I can just do it; I can

1    capsulize it, your Honor, which is that we do not believe

2    that you can aid and abet and attempt that --

3              THE COURT:  This isn't aiding and abetting.  I

4    thought there was --

5              MR. DRATEL:  Oh, I'm sorry.

6              THE COURT:  I thought there was an issue -- we may

7    have cleared it up, but I thought you might have had a

8    concern or an objection to the present version of the attempt

9    statute -- excuse me -- the attempt instruction irrespective

10   of --

11             MR. DRATEL:  Oh, yes, yes.  I'm sorry, your Honor.

12   Yes.  We would add two --

13             MR. GHAPPOUR:  Just two lines, your Honor.

14             MR. DRATEL:  Yeah, two sentences.  I have them

15   here.

16             MR. GHAPPOUR:  The first sentence is Mere intention

17   to commit the crime does not amount to an attempt, and the

18   second sentence is Nor is a verbal agreement without more

19   sufficient to establish an attempt.

20             THE COURT:  Okay.  And I think the jury is

21   adequately instructed on attempt through the pattern

22   instructions; I would decline to give that.  And I think that

23   was the defense issue with respect to 5.3.

24             Okay.  Next, an instruction related to Count 5,

25   Providing Material Support to a Designated Foreign Terrorist

1    Organization, predicated upon 18 USC Section 2339B (a)(1) and

2    (d)(1), and there's no issue with respect to this particular

3    instruction.

4            Then there is a separate attempt instruction; it's

5    entitled Attempt to Violate 18 USC 2339B, and I would -- I

6    would suggest that rather than just having the statutory

7    reference in the heading, it should be Attempt to Provide

8    Material Support to a Foreign Terrorist Organization.  Would

9    you agree, counsel?

10           MR. DRATEL:  That's fine.

11           MR. GHAPPOUR:  Yes, your Honor.

12           THE COURT:  It's based on 5.3, once again, and

13   that's agreed upon.  Next will be an instruction pursuant to

14   the request of the government; it's entitled Aiding and

15   Abetting.  And it's the government's position that aiding and

16   abetting applies to the substantive offense of providing

17   material support or resources to a foreign terrorist

18   organization or attempting to do so; in other words, one can

19   aid and abet the attempt to do so.

20           I'm going to give the instruction over the

21   objection of the defense.  The defense has objected to the

22   instruction on the basis that one cannot aid and abet an

23   attempt.  I'll let the government in a bit -- well, I'll let

24   all counsel state their positions on that, but I think that

25   fairly summarizes the objection here.  I will give this

1    instruction, aiding and abetting once rather than giving it

2    twice, and it will read as follows:  A defendant may be found

3    guilty of providing material support to the designated -- to

4    a designated -- well, to the designated foreign terrorist

5    organization al-Shabaab as charged in Count 5 of the

6    indictment even if the defendant personally did not commit

7    the act or acts constituting the crime but aided and abetted

8    its commission.

9            Actually I neglected to add "or attempting to do

10   so," so the first sentence should read:  A defendant may be

11   found guilty of providing material support to the designated

12   foreign terrorist organization al-Shabaab, or attempting to

13   do so, as charged in Count 5 of the indictment.  Actually the

14   phrase "or attempting to do so" should be following the

15   phrase "as charged in Count 5 of the indictment" even if the

16   defendant personally did not commit the act or acts

17   constituting the crime but aided and abetted in its

18   commission.

19           Continuing on, In order for the defendant you are

20   considering to be found guilty of aiding and abetting, the

21   government must prove each of the following elements beyond a

22   reasonable doubt:  On or about April 23, 2008, the crime of

23   providing material support or resources to a foreign

24   terrorist organization, or attempting to do so, was committed

25   by someone; the defendant knowingly aided and counseled,

 1   commanded, induced, and procured that person to commit each

 2   element of providing material support to a foreign terrorist

 3   organization, or attempted to do so; and the defendant acted

 4   before the crime was committed, with all of you unanimously

 5   agreeing that the defendant aided and abetted the completion

 6   of material support, or the attempt to do so, or both.  And

 7   then if it follows the standard language:  It is not enough

 8   that defendant merely associated with the person committing

 9   the crime, et cetera, et cetera, and the following remaining

10   language is agreed to if the instruction is to be given.

11             MR. COLE:  Your Honor, could I ask just one

12   question?  Did you say -- when you added the "attempted to do

13   so" at the end of the second element, did you say "or

14   attempting" or "attempted"?  Do you have it written down as

15   "attempting" or "attempted."  It should be "or attempting to

16   do so."

17             THE COURT:  I have "or attempting to do so."

18             MR. COLE:  Okay.  I just misheard it.  Sorry.

19             THE COURT:  Next, an instruction entitled

20   Definitions of Foreign Terrorist Organization and Terrorist

21   Activity; relates to Counts 2, 3, and 5 and defines the term

22   "foreign terrorist organization," for our purposes, the term

23   "terrorist activity," and the term "engage in terrorist

24   activity," and finally, the term "terrorism."  It's agreed

25   upon.

1           The closing instructions will be given; they're

2    Ninth Circuit pattern instructions 7.1, 7.2, 7.3, 7.4, and

3    7.6.

4           There are some special instructions that have been

5    provided by the defense.  First of all, it's my understanding

6    that the parties are going to be working on a special

7    instruction which advises -- it's not a special instruction;

8    it's an affirmative defense -- which advises the jury that --

9    well, of the First Amendment rights of association and speech

10   but placed in context with this case with references to what

11   is permitted under the First Amendment and advising the jury

12   that the First Amendment would not protect speech, which

13   consists of providing material support to terrorists, a

14   terrorist organization, or a 956 violation.  So counsel are

15   going to be working on that.

16          There was also submitted an affirmative defense or

17   theory of defense instruction related to defense of others.

18   The defense concern was that it could have relevance if the

19   government argues a certain theory of the case under the 956

20   count.  The government has indicated that it does not intend

21   to make such an argument which could conceivably trigger the

22   defense of others instruction.  I've told counsel that I will

23   hold this instruction in abeyance; I will not -- I'm not

24   inclined to give it at this point.

25          Additionally, there are three other theory of

 1   defense instructions that have been agreed upon by the

 2   parties as appropriate for Counts 1 and 3, 2 and 4, and then

 3   5.  I think each of the --

 4            MR. DRATEL:  And 2 and 5 and then 4.

 5            THE COURT:  Thank you.  There's one instruction for

 6   Counts 1 and 3, one instruction for Counts 2 and 5, then a

 7   separate instruction for Count 4.  The parties seem to have

 8   agreed on the content of each of those instructions.

 9            The only other issue I think is pending right now

10   is the defense request that the term "willfully" be defined

11   for the jury by separate instruction and/or the term itself

12   included in one or more of the instructions, the pattern

13   instructions, where it does not appear at this time.

14            With that, Mr. Cole, any further observations,

15   objections, points to be made?

16            MR. COLE:  No, your Honor.

17            THE COURT:  Okay.  Messrs. Ghappour and Dratel?

18            MR. GHAPPOUR:  Your Honor, as a preliminary matter,

19   just the defense theory or defense contention instructions.

20   There are actually four, and that is because Count 2 and

21   Count 5 each have their own contention due to the fact that

22   defendant Nasir, defendant number 4, is not charged in Count

23   5.

24            THE COURT:  Okay.  I'm counting on the two sides to

25   work together just as soon as possible so that the

1    agreed-upon language in these separate theory of defense

2    instructions can be provided to me and I can get them typed

3    up in a manner consist with all the other instructions, so

4    I'd appreciate your cooperation in that regard.

5              MR. DRATEL:  Go ahead.

6              MR. GHAPPOUR:  Your Honor, just one more note on

7    the triggering theory by the government of the self-defense

8    instruction.  It's the defense's position that any argument

9    that provision of support to a non-al-Shabaab entity for the

10   purpose of carrying out -- carrying on furthering a

11   conspiracy to kill in violation of 18 USC Section 956 would

12   trigger the self-defense instruction.  That is a work in

13   progress at the moment.

14             THE COURT:  Okay.

15             MR. DRATEL:  Well, your Honor, just briefly.  With

16   respect to willfully, the term appears in the conspiracy and

17   also with respect to malice aforethought, and we don't

18   believe it's superfluous.  We think it needs to be identified

19   and defined and particularly with respect to 2339A, many

20   courts have recognized it as having a higher scienter

21   requirement, and that -- so we think that that's why it needs

22   to be separately defined in this case.

23             With respect to Count 3, tracking the indictment,

24   we believe that to essentially if the government is permitted

25   to -- if it's not tracked and those predicates are sort of

1    free-floating, in a way that would amend the indictment.

2         With respect to the -- also with respect to defense

3    of others instruction that we've requested, I don't believe

4    the government can foreclose an avenue of defense simply by

5    saying that we are -- that the defense is restricted to

6    arguing humanitarian aid when the evidence is ambiguous with

7    respect to certain aspects and also with respect to the fact

8    that several witnesses have testified, in our view, to the

9    need for self-defense in Somalia by individuals and

10   localities.

11        THE COURT:  I don't think any individual -- now you

12   -- when we were discussing this informally, I think you

13   indicated that Mr. Bryden, the expert witness called by the

14   government, had given testimony in support of defense of

15   others.  I don't believe Mr. Bryden's evidence establishes

16   the defense of others affirmative defense.  I know that Mr.

17   Cole spoke earlier on that.  I think Mr. Cole should state

18   his position with respect to that and specifically whether he

19   feels that Bryden's testimony would -- would qualify as a

20   predicate for this particular instruction.  In my view,

21   self-defense or defense of others just -- or I should say the

22   evidence in this case just falls leagues short of the

23   elements of self-defense or defense of others.  There's no --

24   there's no evidentiary basis for giving that theory of

25   defense, which really amounts to an affirmative defense.  Mr.

1  Cole?

2      MR. COLE:  The government agrees with what the

3  Court has just stated.  We don't think there's been any prima

4  facie showing that would remotely justify a self-defense or

5  defense of others instruction.  There has been, at best,

6  general statements that there's a conflict, and there was

7  conflict.  None of that was ever tied remotely to any

8  provision of money by the defendants to -- in other words,

9  there was never anything, any testimony provided the

10 defendant -- that the defendants intended when they sent

11 money to Somalia, that they were defending someone in

12 particular, lawfully defending someone in particular from a

13 violent attack.  And so we just would agree with what the

14 Court just stated on the record.

15      THE COURT:  Okay.  Once again, I'm going to ask

16 counsel to get these last few instructions to me, these

17 theory of defense instructions to me so that we can start

18 working on them as soon as possible.  And what I'd like to

19 do -- I understand, Mr. Dratel, you're not going to be

20 available tomorrow, you're going to be --

21      MR. DRATEL:  Correct.

22      THE COURT:  -- leaving tomorrow, Friday, and not

23 available.  Mr. Ghappour, you will be here.  It's my

24 understanding you will be here with full authority on behalf

25 of the entire defense community to make any final decisions

1  with respect to jury instructions.  Also, I would go over the

2  form of verdict, the verdict form that will be used.  It will

3  be a general verdict form with respect to each of the

4  defendants, but I'd like you to see that as well.

5          MR. GHAPPOUR:  Yes, your Honor.

6          THE COURT:  Okay.  Do you have something,

7  Mr. Ghappour?

8          MR. GHAPPOUR:  Yeah, I had a question on the aiding

9  and abetting and attempt.  I can't find it.  There it is.

10  Okay.  Just on page 53, 52 going on to 53, the second

11  element --

12          THE COURT:  We moved those pages, didn't we?  Yeah.

13          MR. COLE:  So the aiding and abetting instruction

14  is -- jumped behind the attempt instruction.

15          THE COURT:  What's your question --

16          MR. GHAPPOUR:  Well, your Honor --

17          THE COURT:  -- on aiding and abetting?

18          MR. GHAPPOUR:  Yeah.  The element number 2 as it's

19  currently stated states the defendant knowingly and

20  intentionally aided, counseled, commanded, induced, or

21  produced that person --

22          THE COURT:  -- to commit each element of providing

23  material support to a foreign terrorist organization or

24  attempting to do so.

25          MR. GHAPPOUR:  Yes.  Okay.  I just wanted to make

1    sure.

2            THE COURT:  Okay.  So I've got a special

3    instruction for Counts 1 and 3, a special instruction for

4    Count 2, a special instruction for Count 4, a special

5    instruction for Count 5, all agreed upon.

6            MR. COLE:  If I could just see it real quickly,

7    your Honor.

8            THE COURT:  Yes.

9            MR. COLE:  Your Honor, with the exception of a

10   couple minor typos we corrected that I saw there, we have no

11   objection to those contentions.

12           THE COURT:  Okay.  Well, we'll get busy on them.

13   And when can I see you, Mr. Ghappour?

14           MR. GHAPPOUR:  Tomorrow?

15           THE COURT:  Yes.  What I'd like to do is have a --

16   have everything ready for you, a packet to give to you

17   sometime in the early to midafternoon, and then have you

18   provide to me what you've worked out with the government on

19   the First Amendment matter.

20           MR. GHAPPOUR:  Okay.

21           THE COURT:  I think that's the only thing that's

22   left at this point.

23           MR. GHAPPOUR:  And so does the government need to

24   come as well, do we need to confer and come up with a time

25   for you guys --

1            MR. COLE:  Just tell me when you want us here, and

2    we'll --

3            THE COURT:  Well, I've got a -- I tell you.  Would

4    you like to work here?  You're certainly -- or maybe in your

5    office.  I've got a full calendar.  I'm going to have a

6    courtroom full of lawyers --

7            MR. COLE:  All we need to do is bring you an agreed

8    First Amendment instruction?

9            THE COURT:  Yeah.  You can do it.

10            MR. COLE:  That's all we need to do, right?

11            THE COURT:  You can do it.

12            MR. COLE:  We're going to work on it this evening.

13            MR. DRATEL:  We'll have a draft to the government

14    to see --

15            THE COURT:  Yeah.  Tell you what, work on a verdict

16    form as well.

17            MR. COLE:  Okay.

18            THE COURT:  I've already got one kind of fisted out

19    but, you know, work on a verdict form.

20            MR. COLE:  Okay.

21            THE COURT:  You're going to have to provide for a

22    couple of alternatives with respect to the attempt, you know,

23    because if they find on the substantive, guilty on the

24    substantive, they don't move to the attempt.

25            MR. COLE:  Right, yes.

 1               THE COURT:  And then, you know, they may --

 2               MR. COLE:  Okay.

 3               THE COURT:  -- they may not have to move to aiding

 4    and abetting.

 5               MR. COLE:  Do your verdicts tend to look similar in

 6    all your cases?  If I go back and pull one of your old

 7    verdict forms -- or do you each -- let the parties each time

 8    kind of -- I just want to go with what you use --

 9               THE COURT:  No, no.  I've got --

10               MR. COLE:  So I'll go pull some Judge Miller case

11    and just --

12               THE COURT:  Must be a thick file by now.

13               MR. COLE:  Yeah.  Let's see here.  Do I have --

14               THE COURT:  I know this head looks like it's worn

15    out two bodies, but don't -- don't be misled by that.

16               MR. COLE:  No, no.

17               THE COURT:  Okay.  Thank you.

18          (There was a break in the proceedings for the evening

19    recess.)

20

21

22

23

24

25

 1          San Diego, California - Friday, February 15, 2013

 2          (The following proceedings were outside the presence of

 3     the jury.)

 4          (The following proceedings were outside the presence of

 5     the defendants.)

 6          THE COURT:  Okay.  We are together here on the

 7     record after having met once again informally on jury

 8     instructions just to finalize the jury instructions.  The

 9     final version of jury instructions has been prepared by the

10     Court, provided to counsel.  They conform to what was agreed

11     upon yesterday.  Any issues regarding jury instructions were

12     placed on the record yesterday and are still extant.

13          One additional jury instruction was agreed upon by

14     all parties.  It is a special instruction.  It will be

15     entitled Conspiracy-Expression of Political Views, and it

16     will be placed between the jury instruction which is a

17     combination of 8.20 and 8.23 of the Ninth Circuit pattern

18     instructions, conspiracy elements and a special instruction

19     entitled Additional definitions.

20          The new instruction, entitled Conspiracy-Expression

21     of Political Views, will read as follows:  Proof that people

22     simply met together from time to time and talked about common

23     interests, such as political views or religious beliefs, or

24     engaged in similar conduct is not sufficient to establish a

25     criminal agreement.  New paragraph -- no, same paragraph.

1    Such association or speech, standing alone, is protected by

2    the First Amendment.  However, forming an agreement to engage

3    in criminal activity -- in contrast with talking about

4    religious or political beliefs or events -- is not protected

5    speech.  Moreover, in determining whether the government has

6    proven its case beyond a reasonable doubt, you may consider

7    speech for whatever evidentiary value you find it deserves.

8    End of instruction.  And that is -- will be given with the

9    concurrence of all parties.  Correct, counsel?

10            MS. MORENO:  Yes, your Honor.

11            MR. GHAPPOUR:  Yes, your Honor.

12            MR. COLE:  Yes.

13            THE COURT:  Very good.  We have also -- and I

14    should say that any other special instructions submitted by

15    defense counsel relative to the First Amendment are

16    withdrawn; is that correct?

17            MR. GHAPPOUR:  That is correct, your Honor.

18            THE COURT:  Okay.  Ms. Moreno?

19            MS. MORENO:  Yes, your Honor.

20            THE COURT:  Okay.  We have also agreed on a verdict

21    form; it need not be recited here, but the verdict form that

22    will be utilized is acceptable to all parties in the case.

23    And I think that that is it.

24            MR. COLE:  Okay.  Thank you very much, your Honor.

25            THE COURT:  Okay.  I will -- as indicated, I will

1    furnish the jury instructions to the jury while I'm reading

2    the jury instructions.  I will tell them that they are free

3    to follow along as I'm reading -- not to read ahead but to

4    stay up with me -- if they wish to follow along in writing as

5    I'm reading the instructions.  However, if they prefer to

6    just listen to the instructions as I'm giving them, they're

7    free to do that as well and just set the written instructions

8    aside.  Okay.  All right.  Well, you all get plenty of sleep

9    and other rest, and we will see you on Tuesday --

10            MR. COLE:  Yes.

11            THE COURT:  -- at about 9 a.m.  Thank you, counsel.

12        (There was a break in the proceedings for the weekend

13    recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1                              I n d e x

2       Witnesses                                        Page
        **Abdisalam Yusuf Guled**
3       Direct Examination by Mr. Dratel                 1667
        Cross-Examination by Mr. Cole                    1711
4       Redirect Examination by Mr. Dratel               1716
        Recross-Examination by Mr. Cole                  1720

5
        Hassan Guled (Video)                             1729

6

7                          E x h i b i t s

8       Exhibits         Description           For ID    In Evd
        JJ               Email (Header only)   1688      1690
9       KK               Photograph            1691      1691
        NN               Photo                 1695
10      UU               Photograph            1698      1698
        VV               Photograph            1698      1698
11      WW               Photograph            1698      1698
        RR               Photograph            1701      1701
12      PP               Photograph            1701      1701
        QQ                                               1701
13      Court's 4        Stipulation           1734

14

15

16

17

18

19

20

21

22

23

24

25

1                    Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated January 22, 2014 at San Diego, California.

12

13                         /s/ Debra M. Henson  (electronic)
                           Debra M. Henson
14                         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25