1                    United States District Court

2                  Southern District of California

3    UNITED STATES OF AMERICA,      ) Case No. 10-CR-4246 JM
                                    )
4                    Plaintiff,     ) San Diego, California
                                    )
5         v.                        ) Tuesday, February 22, 2011
                                    ) 2:35 p.m.
6    BASAALY SAEED MOALIN,          ) Status/Discovery Hearing
     MOHAMED MOHAMED MOHAMUD,       )
7    ISSA DOREH,                    )
     AHMED NASIR TAALIL MOHAMUD,    )
8                                   )
                     Defendants     )
9    _____)

10

11               Before the Honorable William V. Gallo
                      United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21   Transcriber:    Debra M. Henson, CSR, RPR
                     U.S. Courthouse Annex
22                   333 W. Broadway, Suite 420
                     San Diego, CA  92101
23                   (619) 238-4538

24

25   Proceedings recorded by electronic sound recording;
     Transcript produced by Official Court Reporter

```
 1   Appearances:

 2   For the Plaintiff:  Laura E. Duffy
                         UNITED STATES ATTORNEY
 3                       By:  William P. Cole
                              Caroline P. Han
 4                       ASSISTANT U.S. ATTORNEYS
                         880 Front Street, Suite 6293
 5                       San Diego, CA  92101

 6   For the Defendants:
     (Mr. Moalin)        Marc B. Geller, Esq.
 7                       LAW OFFICES OF MARC B. GELLER
                         1010 Second Avenue, Suite 1820
 8                       San Diego, CA  92101

 9   (Mr. M. Mohamud)    Mahir T. Sherif, Esq.
                         LAW OFFICES OF MAHIR T. SHERIF
10                       3376 30th Street
                         San Diego, CA  92104
11
     (Mr. A. Mohamud)    Holly S. Hanover, Esq.
12                       LAW OFFICES OF HOLLY S. HANOVER
                         1016 La Mesa Avenue
13                       Spring Valley, CA  91977

14

15

16

17

18

19

20

21

22

23

24

25
```

1  San Diego, California - Tuesday, February 22, 2011, 2:35 p.m.

2         (Defendants Mr. Moalin, Mr. Doreh, and Mr. A. Mohamud

3  are not present.)

4         THE CLERK:  Calling matter 2 on calendar,

5  10-CR-4246, the United States of America versus Mohamed

6  Mohamed Mohamud.

7         MR. SHERIF:  Good afternoon, your Honor.  Mahir

8  Sherif on behalf of Mr. Mohamed Mohamed Mohamud, who is

9  present before you, Judge.  And I guess for the purposes of

10  this hearing, we're probably going to have to waive the

11  presence of the Somali interpreter.  I think my client will

12  be fine for now.

13         THE COURT:  Well, I seem to recall that the Somali

14  interpreter we had last time was -- was not very good.

15         MR. SHERIF:  No, no, no.  And I think the

16  interpreter's office agreed with you because we haven't seen

17  that interpreter since.

18         THE COURT:  No, I don't think you will.

19         MR. SHERIF:  No.

20         THE COURT:  But, Mr. Sherif, your client, Mr.

21  Mohamud, as I recall, his understanding of English was pretty

22  good --

23         MR. SHERIF:  That's correct.

24         THE COURT:  -- and -- but if you or he, Mr.

25  Mohamud, don't feel comfortable conducting this hearing

1   without the presence of a qualified and certified -- I don't

2   even know if there's a certified Somali interpreter within

3   the federal system -- but if you don't feel comfortable

4   proceeding, we won't proceed until we -- we get one.

5           MR. SHERIF:  No, your Honor, we're comfortable in

6   proceeding.

7           DEFENDANT MR. MOHAMUD:  I am comfortable.

8           THE COURT:  You're comfortable, Mr. Mohamud?

9           DEFENDANT MR. MOHAMUD:  Yes, yes.

10          THE COURT:  You're understanding everything I'm --

11          DEFENDANT MR. MOHAMUD:  Yes, yes.

12          THE COURT:  -- I've said so far?

13          DEFENDANT MR. MOHAMUD:  I understand you.

14          THE COURT:  All right.  Okay.  We're here on a

15  status regarding counsel.

16          MR. SHERIF:  That's correct, your Honor.  May I

17  approach, your Honor?

18          THE COURT:  Yes.  I'm sorry.  Did you all get an

19  opportunity to --

20          MR. COLE:  Not --

21          THE COURT:  -- make your appearances?

22          MR. COLE:  Your Honor, William Cole and Caroline

23  Han for the United States.  Thank you.

24          THE COURT:  Okay.

25          MR. SHERIF:  Your Honor, I guess there was a

1    misunderstanding that I was -- and I think Judge Miller's

2    chambers may have called you on that issue, on the issue of

3    being retained; I am not retained.

4              THE COURT:  Right.  I seem to recall when this

5    first came about a couple months ago, back in November -- I

6    think it was the beginning of November -- that you had

7    requested appointment.  There was some discussion that you

8    may be retained.  I seem to recall -- and I could be wrong on

9    this -- my recollection is that you were provisionally

10   appointed or conditionally appointed, whatever we want to

11   call it, and we never -- never resolved that.

12             MR. SHERIF:  That's correct.

13             THE COURT:  Is that my recollection?  I see Ms.

14   Geckos back -- were you in court at the time, Ms. Geckos?

15             MS. GECKOS:  Yes, your Honor.  I was on duty at the

16   time the case came in, and that's my recollection as well.

17             THE COURT:  Okay.  Because I haven't reviewed the

18   transcript for that day, so I could be wrong, but is that

19   your recollection?

20             MR. SHERIF:  That is, your Honor, and the Court --

21   yes.

22             THE COURT:  And, Ms. Han or Mr. Cole, were either

23   of you in court when we discussed that and --

24             MR. COLE:  Yes, your Honor, and, in fact, I -- my

25   only recollection is that I thought you actually had decided

 1    to simply appoint him.  Perhaps it was provisional, but I

 2    remember at the time I took the position --

 3              THE COURT:  Yours was contrary.

 4              MR. COLE:  I took the position that if you were

 5    going to appoint someone, you should go to the wheel or the

 6    list, not to --

 7              THE COURT:  Oh, that's right.  That's right.

 8              MR. COLE:  -- and you said no, and you appointed

 9    him I thought.

10              THE COURT:  That --

11              MR. COLE:  And I thought it was just an

12    appointment, but perhaps it was still provisional in case --

13    maybe there had been an affidavit.  I don't remember --

14              THE COURT:  Yeah, that's right.  I recall that that

15    was your -- yeah.  Okay.  All right.  I'm looking at the

16    financial affidavit that's been provided to me now by Mr.

17    Sherif on behalf of his client, and in reviewing the

18    financial affidavit, it appears, Mr. Mohamud, that you do not

19    have the financial ability to afford an attorney on your own;

20    is that correct?

21              DEFENDANT MR. MOHAMUD:  Yes, suppose.

22              THE COURT:  And you are requesting --

23              DEFENDANT MR. MOHAMUD:  Yes.

24              THE COURT:  -- counsel to be appointed for you.

25              DEFENDANT MR. MOHAMUD:  Yes.

1           THE COURT:  All right.  Mr. Sherif, for whatever

2    it's worth then, you're hereby appointed.

3           MR. SHERIF:  Thank you, Judge.

4           THE COURT:  And if you were provisionally

5    appointed, I'm removing that characterization at this time,

6    and you are appointed.

7           MR. SHERIF:  Could the record also show that I was

8    appointed from the date that you provisionally appointed me?

9           THE COURT:  Sure.

10           MR. SHERIF:  Thank you, Judge.

11           THE COURT:  Because I seem to recall it was that I

12    did.  It was either a full-out appointment or a provisional

13    appointment.  Either way, you were appointed.

14           MR. SHERIF:  All right.

15           THE COURT:  All right.

16           MR. SHERIF:  On another issue, your Honor --

17           THE COURT:  I think we resolved that.

18           MR. SHERIF:  We did.

19           THE COURT:  You got another issue for me?

20           MR. SHERIF:  Yes, Judge, and that's on the -- I'm

21    ready to submit a bail package.  Now, does the Court want me

22    to address it to you or do -- should I address it to Judge

23    Miller first?  However the Court chooses.

24           THE COURT:  I -- I would think that you ought to

25    ask Judge Miller first and he may refer down here to me.  Now

1   that the case is, you know, in front of Judge Miller, I think

2   he should have the opportunity to weigh in on that or have

3   the first right of refusal I would say.

4            MR. SHERIF:  Fair enough.  I'll do that this

5   afternoon.

6            THE COURT:  All right.

7            MR. SHERIF:  Thank you, your Honor.

8            THE COURT:  All right.  Do we have all the

9   attorneys here now?

10           THE CLERK:  We do.

11           THE COURT:  We do?

12           MR. GELLER:  Except for Mr. Troiano, but I've been

13  in touch with his investigator, and I can either represent

14  his interests or I can relate to the Court what we've

15  learned, so we -- we can proceed in that regard.

16           MR. COLE:  He was actually put on the calendar for

17  Thursday.  He called me today and said that this matter is on

18  your calendar -- Mr. Troiano's matter's on your calendar for

19  Thursday at two o'clock.

20           THE COURT:  What do I have on Thursday?

21      (Off-the-record discussion between the Court and the

22  clerk.)

23           MR. GELLER:  That's fine.  But I can -- I'd like to

24  address --

25           THE COURT:  He can't be here this afternoon?

 1          (Off-the-record discussion between the Court and the

 2     clerk.)

 3               THE COURT:  So how do we resolve -- I understand

 4     there's a discovery issue that Judge Miller has referred down

 5     to me, and I have a superficial understanding of that

 6     discovery issue --

 7               MR. GELLER:  Maybe we should start off by putting

 8     it on the record --

 9               THE COURT:  -- and I just want to make sure that we

10     need to -- is it wise to do this with three of the four

11     attorneys here but not everyone because we're going to have

12     to cover the same ground, I would think, when Mr. Troiano's

13     present, or should we just do all this at the same time?

14               MR. COLE:  Your Honor, I -- I guess I'd largely

15     defer to you and defense counsel because I'm not even sure

16     exactly -- I don't even think it's a discovery issue; I think

17     it's more of a prisoner -- or a inmates' detention facility

18     issues, and I'm not sure exactly what the extent of it is.

19     And I -- I defer to Mr. Geller and Mr. Sherif.

20               MR. GELLER:  Well, maybe -- maybe --

21               THE COURT:  Well, why don't we do this.  Why don't

22     you make -- state your appearances for the record.  Mr.

23     Mohamud, you can have a seat.

24               MR. GELLER:  Marc Geller, your Honor, on behalf of

25     Mr. Moalin.  I assume that he's not going to be present this

1    afternoon.

2              THE COURT:  That's right.

3              MS. HANOVER:  And Holly Hanover on behalf of Ahmed

4    Nasir Mohamud.  He's also not present, your Honor.

5              THE COURT:  All right.  Now --

6              MR. GELLER:  The issue --

7              THE COURT:  -- do you want your clients present?  I

8    mean we're -- we're talking about procedural issues, not

9    necessarily legal or factual issues, but if you want your

10   clients present, then we will schedule this for another time.

11             MR. GELLER:  Well, maybe it would be good to have

12   everyone here.  One of -- one of the things we want to

13   address -- maybe we can explain to the Court -- it's not

14   simply having the -- trying to get the Court involved in

15   having my client removed from segregation -- and I'd just as

16   soon put this on the record, and then Mr. Cole might look

17   into this and maybe we'd take it off calendar if he can help

18   us out.

19             There's a proposed protective order that Mr. Cole

20   has -- and I think he's made good efforts to try and deal

21   with this -- but he told me that he was going to provide both

22   the MCC and Geo with a full set of CDs that have all of the

23   1100 hours, more or less, of intercepted telephone calls,

24   most of which pertain to my client, provided to all

25   defendants through the appropriate law libraries at Geo and

1  at MCC.

2           The problem that we've encountered -- and we

3  verified this through Mr. Troiano's investigator; he's

4  present in court, and he went today to speak with the law

5  librarian at Geo because we -- I learned this from the

6  warden, and he wanted to simply verify it to make sure that

7  this was in fact the case.  And what --

8           THE COURT:  Can I interrupt?  Are all the

9  defendants in Geo?

10          MR. GELLER:  No.

11          MS. HANOVER:  No.

12          MR. SHERIF:  No, your Honor.

13          THE COURT:  They're all --

14          MS. HANOVER:  Two are in MCC and two are in Geo

15  from my understanding.

16          THE COURT:  Okay.

17          MR. GELLER:  And so Mr. Troiano's client and my

18  client are both in Geo.  Ironically, they're in segregation

19  together in the same room.  So I -- to me that seems

20  preposterous.  That said --

21          THE COURT:  That they're in segregation or

22  segregation in the same room?

23          MR. GELLER:  They're in segregation in the same

24  room.  I don't know what the purpose of segregation --

25          THE COURT:  You don't find it preposterous that

1   they're maybe in segregation --

2            MR. GELLER:  Well --

3            THE COURT:  -- but that they're together?

4            MR. GELLER:  -- according to all of the sources

5   I've spoken with, including the government -- but I don't

6   want to put words in Mr. Cole's mouth -- and the lawyer at

7   MCC, they don't feel they need to be in segregation either.

8   They put them in segregation because -- and the marshal

9   doesn't either -- because the Geo does think they should be

10  in segregation.

11           That said, that creates a real problem.  They would

12  be able to go to the law library for approximately 45 minutes

13  of actual time.  Since they're in shackles, they have to be

14  walked to the law library in shackles, and then they take off

15  the shackles.  And because they have requested prayer time,

16  they have to go to the law library between 4:00 and 5:00 in

17  the morning, at which time they'll have somewhere between a

18  half hour and 40 minutes four times a week at most to listen

19  to these intercepted calls.

20           Additionally, the government has provided us by way

21  of discovery somewhere around 500 pages of text that the

22  government has interpreted into English as verbatim --

23  alleged verbatim translations.  Of course, we haven't gotten

24  to the point where we've been able to verify or confirm that

25  we think they are the actual verbatim translations, but we

1  have been able to do enough investigation in discovery to

2  learn that -- and I think Mr. Cole will agree -- that they

3  aren't complete conversations.  For example, the verbatims

4  take up -- the verbatims aren't the total conversation; parts

5  are redacted, parts aren't that important, parts they haven't

6  interpreted.

7        In order for us to prepare to properly represent

8  our clients, we need them to be able to hear the intercepted

9  telephone calls, and we need them to be able to view the

10 government's version of what they allegedly said, and we need

11 to be able to talk to them about whether or not in fact they

12 did say what the government alleges they said.

13       If they remain in segregation and they can have

14 maybe three and a half hours a week to do this, we would ask

15 the Court to set the trial in 2015.  Maybe we'd continue it

16 further.  There's a few different ways we could deal with

17 this.  One way would be to change the protective order so we

18 can give each of our clients in confinement, in

19 segregation -- which would be fine; they could remain in

20 segregation -- they get a full copy of the verbatims -- I've

21 already photocopied it at my expense, and I can provide it to

22 my client -- and either -- they can't have the CDs because

23 the CDs -- they'd have to have computers.  My client has

24 indicated to me that he would like to have an interpreter be

25 with him.  We would ask the Court to approve an extra 50 or

1    80 or $180,000 in costs so we can have an interpreter go down

2    there at 4:00 in the morning, which I don't think we could

3    ever get; we're going to have to deal with that issue in the

4    future.

5              But the immediate issue is if the government could

6    provide my client at least -- and I don't want to speak for

7    Mr. Troiano -- with an MP3 player so he would be able to at

8    least listen to the taped telephone conversations and also

9    allow me to provide him with a hard copy of the verbatims so

10   he can listen to the Somalian conversations and have the

11   English, which he reads, in front of him and see if he thinks

12   that then he needs to have an interpreter help him with it.

13             He's asked me if we could get an interpreter, and

14   I'm -- you know, I haven't asked Budgeting at the Ninth

15   Circuit and Judge Miller for an extra several thousand

16   dollars or -- actually it would be a lot more than that -- to

17   do that.  I think that it would be better for me to at least

18   have him be able to listen to the Somali conversations and

19   look at the English and then we'd go to the next step if in

20   fact we need to do that.

21             All that said, your Honor, if the Court feels that

22   we should put this matter over and let the defendants all be

23   here and have all of us defense attorneys be here and have a

24   full hearing and have the Court decide whether the Court's

25   going to order the government to do certain things or the

1    government's going to say they can't do certain things

2    because of security issues or they don't have approval from

3    Washington, I don't know.  So maybe -- maybe Mr. Cole ought

4    to weigh in before the Court decides whether or not to

5    continue this or decide.

6           THE COURT:  Well, yeah.  Thank you for the

7    suggestion.  You don't think I should just make a decision

8    based on what you told me right now?

9           MR. GELLER:  Oh, happy to do that.

10          MS. HANOVER:  Well, your Honor, my issue is similar

11   but slightly different --

12          THE COURT:  Okay.

13          MS. HANOVER:  -- as to Mr. Ahmed Nasir Mohamud.

14   He's being housed at the MCC, and his ability to review the

15   CDs in this particular case, the audio CDs, is a little bit

16   better.  He's not in segregation, and he's allotted, from, my

17   investigator's telling me, discussion with Nellie, the

18   attorney there, his hours are up to 24 hours a week to at

19   least listen to the CDs.  But the problem that I'm coming

20   across as well is that at first I understood that we would be

21   able to allow him -- allow my client to have a copy of the

22   verbatim so he could review it along with the actual audio

23   conversations to compare them, and that doesn't seem to be

24   the case with the new protective order.  So the challenge

25   that I have is getting a copy available to him so he can

1    review all of that with the audiotapes together.

2            I've just recently learned today that I have at

3    least 100 hours so far approved by the Ninth Circuit to allow

4    an interpreter to go in to discuss the case with him and to

5    review things, at least initially.  I'm not sure that that's

6    going to be enough for the -- you know, the long haul, but at

7    least for now it's enough to get us started.

8            But the main issue for us was just being able to

9    get the verbatims in so he could compare what the

10   government's alleging versus what's actually on the audio

11   conversations.

12           THE COURT:  All right.

13           MR. COLE:  Thank you, your Honor.  Well, let me

14   just -- I want to, first of all -- not that this is the most

15   important point -- but it isn't 1100 hours.  There aren't

16   even 1100 calls yet.  There will be ultimately probably about

17   1100 calls turned over, but the calls are not all an hour

18   long; most of them are much shorter.  So there's not 1100

19   hours of audio, nowhere even close unless a lot of those

20   calls are five or six hours long, and they're not.  So that's

21   one point.

22           Second, we have -- as to the issue of segregation,

23   we haven't taken any position as to whether they should be

24   segregated.  What I've told defense counsel, Mr. Geller

25   specifically, is that we didn't ask them to be segregated.  I

1   wanted to make clear to defense counsel that the fact that

2   they're in segregation was a determination made by the

3   facilities under their own policies, and it's not really a

4   business that I'm an expert in or want to get involved in

5   directly.  And so if they're not segregated, I'm fine with

6   that; if they are segregated, I'm fine with that.  It's

7   whatever the MCC and Geo feels is appropriate for the

8   securities measures is the position I've taken on the issue

9   of segregation.  I learned today for the first time --

10          THE COURT:  So there's not a segregation order

11   emanating from the U.S. Attorney's Office to keep certain

12   defendants apart from one another or apart from other

13   potential witnesses?

14          MR. COLE:  There were separation orders initially.

15   We removed the separation orders because we were having

16   people out at CCA, and that was a complaint we were getting

17   from defense counsel, and there's only so many facilities,

18   and the separation orders were becoming a little bit like a

19   strange puzzle for all the facilities to figure out, and we

20   got rid of the separation orders except -- I think none of

21   the defendants I believe are ordered separated from each

22   other; they're all -- none of the defendants have a

23   separation order vis-a-vis each other, and thus they're all

24   able to be at Geo or at MCC, which is what defense counsel

25   had hoped for, here at Geo or MCC.

1            They were put -- some or all of them -- I guess

2    some of them were put into segregation entirely under

3    whatever protocols MCC or Geo uses to determine where they

4    ought to house the prisoners, and we have not made any effort

5    -- we have not made any effort to either have them be in

6    segregation or to get them out because we've looked at that

7    as an internal issue for the prison.  We have talked at

8    length in trying to help this issue of access.  We have --

9    access to the audio and the verbatim translations.  We have

10   corresponded at length with Nellie Klein and with Mr. Cleaves

11   from the Marshal's Service, and they have both assured us

12   that they will -- that they are -- they want nothing more

13   than to make this case work in an efficient way and that

14   they'll make -- make arrangements; they will -- the MCC, for

15   example, in the past has had a computer -- in drug cases with

16   lots of audio, has had a computer put in the SHU.  Charlie

17   Cleaves from the Marshal's Service said that he would work

18   with us at Geo to figure out what the best way is to get more

19   access to the audio for the -- the inmates there.

20           So I don't see any of this really as a

21   insurmountable problem.  It's just that we were only about

22   two weeks in to working on it before we came here for this

23   hearing.  It sounds like they all have access.  Some have

24   good access to the audio, like Ahmed Nasir; some have limited

25   access per day because they're in the SHU, or in segregation,

1    but we can work on that.  I believe that Ms. Han and I and

2    defense counsel, by working with Nellie Klein and with the

3    facility at Geo -- or with MCC and with Geo -- can

4    undoubtedly increase the number of hours of access, even for

5    those in segregation, to a computer with the audio.

6            Now, the verbatim transcripts shouldn't be a

7    problem because we can have those simply there with the disks

8    so that when you go out to the computer to see the disks,

9    there's a booklet or a binder with the verbatims waiting for

10   you.  The only thing the protective order -- currently the

11   protective order signed by Judge Miller requires the defense

12   counsel to keep the FISA-derived material in a secure place.

13   I proposed when I -- when it was brought to my attention that

14   there was going to be this inefficiency where every time a

15   defendant wants to -- under the protective order, when a

16   defendant wants to hear a call, defense counsel or an

17   investigator has to go across the street and do it, that's

18   going to be very inefficient.  I proposed an amendment that

19   would simply allow the facility to hold those materials, but

20   there's strong opposition from the FBI and from Main Justice

21   in letting the defendants themselves simply have their own

22   copy.  There is -- we have gotten agreement that the facility

23   can hold the copy for them, and that's where it stood before

24   we came into the hearing today.

25            We don't have it fully resolved yet exactly when

1   the computer can get set up in the SHU or what number of

2   hours they all can get, but we do have an agreement from both

3   facilities they'll work with us to increase the access.  And

4   I -- I guess I'll leave it at that.

5              I question -- it's not really the issue for the

6   day, but I question the notion that an interpreter has be

7   there or the defendant has a right to have an interpreter

8   there to review calls in their native language.  I mean if we

9   -- if they go over English calls to somebody whose primary

10  language is English, I don't send an English interpreter to

11  sit with them while they listen to the calls.  And I think

12  that is expensive, it's unnecessary when it's their primary

13  language, and as long as defense counsel has access to

14  interpreters and the defendant can understand the calls, it

15  seems to me that's -- that's what we're trying to get at.

16  Thank you.

17             THE COURT:  All right.

18             MS. HANOVER:  Your Honor, just to address that last

19  point, my client is not that proficient in English, and the

20  verbatims are in English.  So the purpose of the interpreter

21  would be to assist in going over the English versions with my

22  client as he listened to the versions in his own language.

23             THE COURT:  All right.  Here's what I -- are there

24  any --

25             MR. SHERIF:  Your Honor, on that point, perhaps the

1   government could give us the Somali verbatims because the

2   clients -- the language spoken on the tapes is Somali, and I

3   am sure that when the government was listening to the -- or

4   their interpreters, the government's Somali interpreters were

5   listening to these conversations, I would tend to think that

6   first they would put it in the Somali language, they would

7   write the Somali, and then they'd take that and take it --

8   interpret it into English.  What we have is the English

9   version.  I think if they gave us the Somali version that

10  they have, then the clients would probably be able to not

11  need the interpreter more.

12          THE COURT:  Well, here's what I'd like to do.

13  Since this has just arisen and come to my attention today

14  without either side having an opportunity to brief it -- and

15  maybe we don't need to brief it; Mr. Cole's point is that

16  perhaps we just need a little time to try to resolve the --

17  the challenges that -- the unique challenges that a case like

18  this presents with opposing counsel -- and we don't have all

19  the attorneys here to begin with -- are there any -- the next

20  date that I see is a status hearing in -- on April 7, which

21  is about five, six weeks from today.  Are there any dates

22  beyond that that have been set like motion hearing dates

23  or -- okay.

24          So what I -- what I think I'd prefer to do is to

25  give all the attorneys here two weeks to try to resolve these

 1    logistical issues and, you know, work up a plan; and then if

 2    there -- a plan is mutually agreed upon, then there's no need

 3    for the Court to get involved as to how that plan will be

 4    implemented.  Assuming that the institutions are on board,

 5    defense counsel is on board, the United States is on board,

 6    then everybody's happy.

 7           If in that two-week period -- we'll have another

 8    status, but within the two-week period, if, you know, the

 9    plan is drawn up and there are some disagreements as to how

10    the plan ought to be implemented or you can't agree on

11    certain points, then we'll get back together, we'll have a --

12    you know, we'll have another status hearing, I'll have the

13    clients here, the defendants here, and we'll have -- I'll be

14    in a much better position to discuss, intelligently, ways to

15    resolve the disputes or differences that continue to exist.

16           Given the fact that we don't have something that's

17    on your calendar upstairs with Judge Miller that is urgent, I

18    think two weeks might be an acceptable time period for you

19    all to put your heads together, noodle it over, and come up

20    with something that is acceptable.  And if you can't, then

21    we'll come back and I'll get involved.  How's that?  Is that

22    acceptable?  I mean is time -- in other words, I guess my

23    question is is time of the essence that we need to do this

24    right now or within the next 24 or 48 hours to get a

25    resolution of this?

1          MR. GELLER:  I don't think so, your Honor, on

2     behalf of Mr. Moalin.  You know, we -- we want to have the

3     case move along --

4          THE COURT:  Sure.

5          MR. GELLER:  -- fairly rapidly.  It's not.  I don't

6     think we're going to go trial for a good year or more, but --

7     so I don't think that two weeks is going to make a big

8     difference in the long run.  I wondering though if the Court

9     might look into -- inasmuch as the government says there's no

10    -- they have no concerns with respect to how and where the

11    defendants are housed, if somehow the Court could assist in

12    to getting all the defendants into general population at MCC,

13    that might resolve the whole mess.

14         THE COURT:  Well, I'm not prepared to go there just

15    yet.  I'm -- like Mr. Cole, I'm a little loath to interfere

16    with the inner workings of an institution that may have

17    security concerns to -- to deal with, and there may be other

18    alternatives that -- that satisfy the needs of your clients

19    to get the information in a timely fashion, have access to

20    the information, review the information.  So I'm not prepared

21    to go there yet; that's why I'm suggesting that you all get

22    together and bandy about whatever suggestions you may have,

23    you know, asking all parties to be reasonable and -- and

24    confer in good faith over this, and I'm confident that you

25    can iron out many of these issues.  There may be some that

 1   linger; those ones that linger, if any, you know, then I'll
 2   -- I'll get involved.  And it may be, Mr. Geller, that
 3   ultimately I may, you know, seek the MCC or Geo's input as to
 4   why certain individuals are in segregation, is there a way to
 5   -- to reverse that decision and put folks in general
 6   population and perhaps even in the same institution seeing as
 7   how there's no separation order, but I'm not -- not there
 8   yet.  And this may be two weeks well spent that may
 9   ultimately inure to everyone's benefit in terms of speeding
10   up the review of discovery on your part so you're not going
11   to trial in 2015.
12             MR. SHERIF:  I hope not, Judge.
13             THE COURT:  I hope -- well, I don't think -- no
14   matter how it turns out, you're not going to be in trial in
15   2015.  I suspect it will be later this year or maybe 2012.
16   Judge Miller's not going to --
17             MR. SHERIF:  No.
18             THE COURT:  -- stick around until 2015 to try this
19   case.  So why don't we do that.  Let's have another status
20   hearing --
21             MR. SHERIF:  Should we have a date --
22             THE COURT:  -- in two weeks.  We'll set it right
23   now.
24             MR. GELLER:  March 8?
25             MS. HANOVER:  I'm going to be out of town from the

1   3rd to the 8th of March actually.

2              THE COURT:  Okay.  So how about the 10th?

3              MS. HANOVER:  I'll be back by then.

4              MR. GELLER:  That would be fine.  Could we do it at

5   2:30?

6              THE COURT:  Well, I think it'd probably be best if

7   we put it on towards the end of the calendar, so maybe even

8   three o'clock.  I don't know what the calendar looks like.

9   Don't have anything?

10             MR. GELLER:  Three o'clock's fine.

11             THE COURT:  All right.  2:30 would be fine.  So

12  March the 10th at 2:30.  Mr. Mohamud, you're ordered back

13  here to this courtroom on March the 10th at 2:30 for further

14  discussions regarding the issues that we've just talked

15  about.  Have you understood everything that's being -- that's

16  been said so far today?

17             DEFENDANT MR. MOHAMUD:  Yes, I understand it.

18             THE COURT:  All right.  And the other defendants

19  will also be present on that time as well.  What I would ask

20  all the parties, if -- if there is a -- a disagreement or a

21  dispute that continues to remain after a week and a half or

22  so of -- of talking about it, I would ask that by March 8th

23  -- I know you'll be out, Ms. Hanover, but maybe one of the

24  other defense counsel -- all I'll need is a -- I'd like a

25  joint statement from the two sides as to what the issues

1    remain that need to be resolved so I have some advance

2    warning of what's going to be discussed at the status hearing

3    on the 10th of March; so if you could file that by the 8th of

4    March, you know, these are the -- I don't really care.  If

5    you've resolved all the issues, then fine, I don't need to

6    even be concerned about that.

7              MR. COLE:  You mean each file a statement or one

8    statement?

9              THE COURT:  One statement --

10             MR. COLE:  Okay.

11             THE COURT:  -- of just what remains.  You know, I

12   don't -- I don't even really care to hear so much as, you

13   know, we had this issue, we resolved it, we had this issue,

14   we resolved it -- that's great.  All I want to know is the

15   things that are left unresolved and ways that the government

16   proposes to resolve it and suggestions on the -- on the

17   defense side as to ways to resolve that remaining issue or

18   issues, and then I'll have a better -- a better idea of what

19   is left on the table to discuss.  All right?

20             MR. SHERIF:  Thank you, your Honor.

21             MR. GELLER:  Thank you, your Honor.

22             MS. HANOVER:  Thank you, your Honor.

23             THE COURT:  Is that an acceptable way to resolve

24   this?

25             MR. COLE:  Yes, your Honor.

1               MS. HANOVER:  Yes, your Honor.  Thank you.

2               MR. SHERIF:  Yes, your Honor.

3               MR. GELLER:  Yes, your Honor.

4               THE COURT:  All right.  So I'll see you all here in

5  -- in a couple weeks on March 10th at 2:20.

6               MR. GELLER:  Thank you very much, your Honor.

7               MR. SHERIF:  Thank you, your Honor.

8               MS. HANOVER:  Thank you.

9               THE COURT:  Thank you.

10          (The proceedings were concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Debra M. Henson, an Official Court Reporter in and

2     for the United States District Court for the Southern

3     District of California, certify that the foregoing is a true

4     and correct transcription of the electronic sound recording

5     of the proceedings in the above-entitled matter, transcribed

6     to the best of my ability.

7

8     /s/ Debra M. Henson                    3-19-14
      Official Court Reporter                  Date
9     and Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25