1                   United States District Court

2                  Southern District of California

3    UNITED STATES OF AMERICA,      ) Case No. 10-CR-4246 JM
                                    )
4                    Plaintiff,     ) San Diego, California
                                    )
5         v.                        ) Thursday, March 10, 2011
                                    ) 2:53 p.m.
6    BASAALY SAEED MOALIN,          ) Status Hearing
     MOHAMED MOHAMED MOHAMUD,       )
7    ISSA DOREH,                    )
     AHMED NASIR TAALIL MOHAMUD,    )
8                                   )
                     Defendants     )
9    _____)

10

11             Before the Honorable William V. Gallo
                  United States Magistrate Judge

12

13

14

15

16

17

18

19

20   Official Interpreter:  Ahmedei Farah, CCI

21   Transcriber:    Debra M. Henson, CSR, RPR
                     U.S. Courthouse Annex
22                   333 W. Broadway, Suite 420
                     San Diego, CA  92101
23                   (619) 238-4538

24

25   Proceedings recorded by electronic sound recording;
     Transcript produced by Official Court Reporter

```
1   Appearances:

2   For the Plaintiff:  Laura E. Duffy
                        UNITED STATES ATTORNEY
3                       By:  William P. Cole
                             Caroline P. Han
4                       ASSISTANT U.S. ATTORNEYS
                        880 Front Street, Suite 6293
5                       San Diego, CA  92101

6   For the Defendants:
    (Mr. Moalin)        Marc B. Geller, Esq.
7                       LAW OFFICES OF MARC B. GELLER
                        1010 Second Avenue, Suite 1820
8                       San Diego, CA  92101

9   (Mr. M. Mohamud)    Mahir T. Sherif, Esq.
                        LAW OFFICES OF MAHIR T. SHERIF
10                      3376 30th Street
                        San Diego, CA  92104
11
    (Mr. Doreh)         Kenneth J. Troiano, Esq.
12                      LAW OFFICE OF KENNETH J. TROIANO
                        P.O. Box 33536
13                      San Diego, CA  92163

14  (Mr. A. Mohamud)    Kenneth J. Troiano, Esq.
                        (Special Appearance)
15

16

17

18

19

20

21

22

23

24

25
```

 1   San Diego, California - Thursday, March 10, 2011, 2:53 p.m.

 2         (Defendant Mr. A. Mohamud is being assisted by a Somali

 3   interpreter.)

 4         THE CLERK:  -- Moalin, Mohamed Mohamed Mohamud,

 5   Issa Doreh, and Ahmed Nasir Taalil Mohamud.

 6         MR. SHERIF:  Good afternoon, your Honor.  Mahir

 7   Sherif on behalf of Mr. Mohamed Mohamed Mohamud.  He's

 8   present in custody.

 9         THE COURT:  Good afternoon.

10         MR. GELLER:  Good afternoon, your Honor.  Marc

11   Geller appearing on behalf of Mr. Moalin.  He's personally

12   present before the Court in custody.

13         THE COURT:  Good afternoon.

14         MR. TROIANO:  Good afternoon.  Kenneth Troiano on

15   behalf of Issa Doreh.  He speaks English and is in the back

16   row.  I'm also specially appearing for Holly Sullivan (sic)

17   on behalf of her client, who's defendant number 4, Mr.

18   Taalil, and he needs the Somali interpreter.  And I was just

19   in the middle of explaining to him why he was here today.

20         THE COURT:  Okay.  Go ahead, take a couple more

21   quick minutes to conclude that conversation then.

22         MR. SHERIF:  May our clients be seated, your Honor.

23         THE COURT:  Pardon me?

24         MR. SHERIF:  May they be seated?

25         THE COURT:  Not yet.

1          MR. SHERIF:  I need to talk to him for just --

2          THE COURT:  If the marshals are okay with it,

3  that's fine.

4          MR. SHERIF:  They said they're fine.

5          THE COURT:  That's fine.

6      (Brief pause in the proceedings.)

7          MR. TROIANO:  I think we're ready to go, your

8  Honor.

9          THE COURT:  All right.  Mr. Ahmed Nasir Taalil

10  Mohamud, your attorney, Holly Hanover, is not present this

11  afternoon and -- Mr. Troiano, you're specially appearing for

12  her did you say?

13          MR. TROIANO:  Yes.

14          THE COURT:  Mr. Troiano, who is the attorney for

15  one of your co-defendants, Mr. Doreh, has agreed to stand in

16  and represent you for the purposes of today's hearing, but I

17  will only allow that if you agree to Mr. Troiano's

18  representation this afternoon, and it's only for this

19  afternoon.  Do you agree?

20          DEFENDANT MR. A. MOHAMUD:  Yes.

21          THE COURT:  All right.  Okay.  So it looks like the

22  -- we've ironed out a few of the wrinkles -- oh, I didn't get

23  the -- the appearances for the government counsel I don't

24  think.  Did I?

25          MS. HAN:  No, your Honor.  Good afternoon, your

1    Honor.  Caroline Han and William Cole on behalf of the United

2    States.

3               THE COURT:  Thank you.

4               MS. HAN:  And, your Honor, we would also ask that a

5    representative from Geo appear, and the warden, Eric Noonan,

6    is present.

7               THE COURT:  Okay.  Thank you.  It looks like most

8    of the -- the wrinkles have been ironed out here, from what I

9    could tell from the joint report, but not all.

10              MR. GELLER:  I think the biggest problem we're

11   having right now, your Honor, is that -- is to -- how we're

12   going to get the computer and how -- who's going to pay for

13   the computer.  I spoke before we convened today -- actually

14   first by telephone this morning and then later out in the

15   hall -- with Mr. Cole about the possibility of -- I believe,

16   I don't know for sure, but there are some FBI agents present

17   in court, and they may know, and Mr. Cole may know -- that

18   the FBI -- and the Court may know from having been employed

19   at the U.S. Attorney's Office for quite some time -- I

20   believe that the FBI probably has a number of laptop

21   computers that they've seized with either child pornography

22   or other materials on them that can't be returned to the

23   individuals from whom they were seized.  And I think the most

24   expeditious way might be to provide these defendants with the

25   discovery, especially at Geo where they don't have a laptop

1   computer available, is if the government, or the FBI,

2   downloaded onto one of these laptops the CDs, and that could

3   be placed at the library at Geo.  It would also be further

4   secure because he wouldn't have any software that could

5   become lost or could disappear in some way; you just have it

6   all on the laptop.  It wouldn't be very complicated to

7   download it onto a hard drive; you don't need a very

8   sophisticated computer to do that.

9           The problem that we're having, as the Court

10  probably is aware of, due to the lack of budget right now,

11  none of the CJA vouchers are going to be paid that haven't

12  already been submitted.  I understand that while the Ninth

13  Circuit recommended that one of us go out and purchase a

14  computer, we were informed that the CJA clerk here in this

15  district said they didn't know why they would approve the

16  purchase of a laptop and who would own the laptop and what

17  would happen to the laptop later and then would they approve

18  the time that it would take to go out and purchase the

19  laptop.  So I think that that would make -- that might make

20  it real simple to provide these defendants with discovery and

21  give them the opportunity to go over it.

22          The other issue and I think the only remaining

23  issue that we need to deal with -- and I think Warden Noonan

24  might be able to solve that issue -- is the amount -- when

25  they could, the two defendants that are housed at Geo, would

1    be able to use the library and review the discovery.  And I

2    don't know if the Court wants to inquire with respect to that

3    issue with the warden or -- or not at this point.

4              THE COURT:  Now, am I correct in assuming that the

5    access to discovery at the MCC and the time slots or the time

6    available to the defendants who are housed at the MCC is

7    acceptable to all -- both sides?

8              MR. SHERIF:  Yes, your Honor.

9              THE COURT:  Okay.  So now we're just dealing with

10   the two defendants who are housed at -- at Geo; is that

11   correct?

12             MR. GELLER:  Yes, your Honor.

13             MS. HAN:  Yes, sir.

14             THE COURT:  Okay.  Now, let's -- let's deal first

15   with the issue of a laptop or some computer.  There's going

16   to need to be some access to a computer unless the defendants

17   -- and those are -- sorry -- the two defendants there are Mr.

18   Basaaly Moalin and Mr. Issa Doreh, correct?

19             MR. GELLER:  That is correct.

20             MR. TROIANO:  Right.

21             THE COURT:  Okay.  So there is a computer there

22   that can be used, if they want to use it, from midnight to 4

23   a.m. or something like that?

24             MR. GELLER:  No, there's no computer.

25             THE COURT:  No --

1             MR. TROIANO:  Well, your Honor --

2             THE COURT:  -- computer at all?

3             MR. TROIANO:  -- I should -- that's a more

4    complicated question.  First of all, there's no guarantee

5    that that would work.  After speaking with Warden Noonan,

6    there's no guarantee that the law library would -- would

7    actually work well because of the inmates being in

8    segregation.  There is computer access there, and this could

9    be put on it.  Those hours are not workable for my client.

10   My client informed me as a backup, if they had to use the law

11   library as a backup, he'd be willing to start as late as 11

12   p.m. and go for a couple hours.  There is time that is taken

13   away because of movement of inmates, especially segregated

14   inmates, but he's willing to -- to work within the system.  I

15   think the idea of having to work between midnight and 6 a.m.

16   is not really such a great idea to begin with, but he's

17   willing to be flexible on that -- that -- that backup

18   alternative, which is why we -- I think the preference is the

19   attorney room option; I think that's more workable for the --

20   for Geo during certain hours of the day.

21            THE COURT:  According to the joint statement, the

22   hours in the attorney visitor room would be from 4 a.m. to 8

23   a.m., which are okay hours for me, but --

24            MR. TROIANO:  But those aren't -- those -- we've

25   come with another work-around.  That would require the

1  laptop, and that's the preferred option.

2          THE COURT:  Right.

3          MR. TROIANO:  Because of my client's religious

4  beliefs, he would -- apparently he prays a half hour before

5  sunrise, and when the time change comes I think this weekend

6  coming up, that would mean he'd be praying around 6:30, so he

7  said well, if he could do it from 7:00 to 9:00, that sounds

8  good to me.  Warden Noonan had expressed some concerns about

9  going as late as 9 a.m., but he also countered with the

10 possibility of going from 9:30 p.m. till 11:30 p.m. in the

11 attorney rooms, and I think that might be available seven

12 days a week.  And that would be -- to me as a primary option

13 would be best, although it's only two hours a day for

14 (unintelligible) defendants, there may be days where they can

15 share the time or alternate and --

16         THE COURT:  And what does that mean, "share," both

17 be in there at the same time?

18         MR. TROIANO:  Well, they're in the same cell now,

19 so --

20         THE COURT:  Oh, okay.

21         MR. TROIANO:  That wasn't our choice, but that's

22 the way it worked, and apparently that meets with the

23 security regulations that whoever put them in segregation --

24         THE COURT:  Okay.

25         MR. TROIANO:  -- both.

1              THE COURT:  So using the law library, the computer

2     in the law library, Warden, would be sort of hit or miss?

3              WARDEN NOONAN:  It would be hit or miss.  Depends

4     on how many other segregation that -- when we would allow our

5     segregation inmates to use the law library.  For the amount

6     of time they want to use it or going to need to use it, it's

7     -- it's going to be hit or miss.  I have 30 other segregation

8     inmates that want to use it also.

9              THE COURT:  Right.  So the best -- the best

10    alternative would be to have a independent computer, i.e., a

11    laptop that could be placed in the attorney visitor room;

12    that would be the best alternative.  All right.  So how do we

13    get the laptop?  Are there these spare laptops floating

14    around with child porn on them that we --

15             MR. COLE:  Your Honor, I have no idea.  I -- Mr.

16    Geller called me about this.  I -- I did not inquire about it

17    partly because I -- I had other things going this morning but

18    also mainly because I was reluctant to.  I just don't really

19    want to get into the precedent of the government providing

20    the equipment needed by defense.  We provided an extra set of

21    discovery already, we made a special set of discovery; we've

22    acted as liaison to try to work this out with Geo and the

23    defense, and that's worked; but now we're -- you know, the

24    defense is asking us to provide a computer as well.

25             This whole thing was pitched to me at least, to the

1    government, as a tremendous cost savings, and I believe that

2    it is; I mean they were talking about an investigator or an

3    attorney going over for countless hours versus just the CJA

4    budget buying one laptop, and I think the thing to do is to

5    get a new laptop.  It doesn't have to be fancy; it could be

6    from Costco for, you know, whatever those cost, and put it in

7    there, and then when it's done, it'll be -- belong to whoever

8    CJA says it does.  Maybe it goes to Federal Defenders

9    afterwards.  But it seems to me a very cheap alternative and

10   the best precedent.

11           THE COURT:  Well, there is -- there is -- there are

12   provisions in the CJA for the purchase of a computer, but as

13   -- I think it was Mr. Geller who stated that the CJA now is

14   under assault, like all federal budgetary concerns, and their

15   payments are not going out or not being made, and whenever

16   that's lifted, I don't know.  Has anybody explored this and

17   gotten a definitive answer that we're just not going to give

18   you a computer?  Because there is a provision for the

19   purchase of a computer.

20           MR. TROIANO:  I don't believe there's a definitive

21   answer.  I think there was initially some confusion.  We are

22   under a CJA budgeting executive from the Ninth Circuit, so

23   I'd say that as helpful as she is to organizing the budgeting

24   process, it's added another layer of communication between us

25   and Judge Miller or your Honor or the clerks in the CJA

1   office.  Quite frankly, I'm not even sure who puts the thing

2   into the machine to get the check generated at this point

3   when a vendor's involved; we haven't actually had to pay

4   anybody, so -- but she seems to think she can get a computer,

5   but we've lost communication on that issue.  And I know Mr.

6   Geller's investigator, Mr. Stevens, has attempted to

7   communicate this through the clerk's office to CJA people

8   there, but they're -- they're not really up to speed on our

9   case; I'm not sure we could really put much weight on their

10  answers at this point in time.

11          THE COURT:  I appreciate the government's --

12          MR. SHERIF:  Your Honor, if the Court will allow, I

13  will buy a computer and (inaudible) a laptop, 500 bucks?

14          THE COURT:  I certainly will allow that.

15          MR. SHERIF:  (inaudible) solved.

16          THE COURT:  Okay.  Is there anything else for us to

17  discuss now?

18          MR. TROIANO:  Well, I think that issue's still open

19  until -- until we see delivery.  I'm not going to hold -- I'm

20  not going to hold Mr. Sherif to it because he doesn't

21  actually represent either defendant --

22          THE COURT:  No.

23          MR. TROIANO:  -- and it's certainly not within the

24  scope of his representation of --

25          THE COURT:  No --

1          MR. TROIANO:  -- his client --

2          THE COURT:  -- I was being more flippant than

3    anything, and perhaps inappropriate, but the -- I understand

4    the government's position; you know, it becomes a slippery

5    slope of, you know, once they start providing this, you know,

6    service or product, where does the -- and then, you know, the

7    next case comes down the pike, and there'll be -- well, you

8    know, Mr. Cole and Ms. Han said yeah, we'll provide a

9    computer, and then it's pretty soon that's the norm and --

10          MR. GELLER:  One other -- and I don't mean to

11   interrupt the Court -- I was just thinking that it's possible

12   -- we're having Copy Connection do a certain amount of work

13   with respect to the discovery, and I -- what I think I --

14   what might not be a bad idea -- my office is in the same

15   building as Copy Connection -- is they may have laptops that

16   they might be able to work with, and they are a CJA provider

17   where they can submit their own vouchers so long as they're

18   less than $800.

19          THE COURT:  There's probably a lot of creative

20   solutions out there.  I don't know what sort of -- just

21   thinking out loud, and that's all I'm doing right now -- it

22   may behoove the government to want to be involved in the

23   process only because the computer that is ultimately provided

24   to the -- to the institution is one that the government is --

25   is confident is a secure computer, that it doesn't have

1    something in it that, you know, could somehow be a security

2    issue with the -- with the institution.

3            MR. SHERIF:  Are you suggesting anything --

4            THE COURT:  No, I'm not, I'm not.  I'm just -- I'm

5    not saying anything of the sort.  I'm just saying there's

6    that measure of confidence that this is a computer that the

7    government is providing, and we're confident that, you know,

8    there's not, you know, some -- whatever, you know -- you know

9    what I'm talking about -- there's not security issues with

10   the laptop itself.

11           MR. GELLER:  Well, also, if they downloaded all of

12   the disks into the computer and there was no software at all,

13   that's even more secure.

14           THE COURT:  Yeah.

15           MR. TROIANO:  Well, I've got -- your Honor, I

16   really think -- I'll let Mr. Cole have the final rebuttal on

17   this, but the government providing the computer, to me, is

18   the best thing because they've spent probably millions of

19   dollars totally investigating this case.  I know that's all

20   security clearance, need-to-know basis, information only, but

21   I think it's kind of obvious from reading anything in this

22   case the amount of money and resources that have gone into

23   it.  We're talking about under a thousand dollars, and they

24   would have complete control of the configuration of what was

25   provided to the defendants so that nobody could come back and

1    say you didn't give us that because they have it.  If they

2    want to add to it, they could take the computer, you know,

3    document what they're changing, and return it to the

4    defendants, and I think that's -- really, if I were them,

5    that would be the smartest way to spend my -- this small

6    pittance of money that's really involved here.

7                MR. COLE:  I understand what Mr. Troiano's saying,

8    but I have the completely opposite view of it.  I actually

9    want no control over this.  I want -- we have provided the

10   discovery to the defense in any case, we have worked with Geo

11   and Geo's been very cooperative, extra staffing issues for

12   them to make it available for -- in a much more convenient

13   way for defense counsel.  I don't want to download anything

14   for them.  I don't want to be responsible for what I

15   downloaded or didn't download.

16               We gave them the discovery.  The defense -- all

17   they need is a laptop to save what they say will be thousands

18   of dollars of CJA funds.  And I don't want to be responsible

19   when the laptop doesn't boot up right, when they say it's not

20   working right, when they need another one.  Really, I think

21   the best thing is for this to be between the defense and

22   their clients, and to -- the room's available now, the access

23   is available, and I don't think the government should be

24   involved.  We've given them the disks.  It's just audio

25   files.  It's not a complicated software, and so we really

1   would urge -- there's a provision for this in the CJA.   I

2   think that it's very -- it sounds like the Ninth Circuit --

3   my understanding, being once removed, is the Ninth Circuit

4   fully supports it, the CJA panel supports this as a

5   cost-saving thing.   If someone in the clerk's office doesn't

6   know this case, it seems it just takes the Court to say that

7   this will be approved, and there'll be a laptop.

8          THE COURT:   Well, I don't know -- it may be as

9   simple as that, but there's -- there's the budgetary issues

10  that we got to deal with, but I do think that that's probably

11  the better approach.   It may take a little more time to sort

12  out.   I'm going to ask Mr. Troiano and Mr. Geller to -- to

13  take the laboring oar on this.   I can give you the cite from

14  the CJA, the Guide to Judiciary Policy.   It's Section

15  320.70.40, and it specifically deals with computer hardware,

16  software, and litigation support services, and it

17  specifically authorizes the purchase of computers and so

18  forth, just what you're asking for.

19          Now, the question is is there the money to -- to

20  get that and get it in a timely fashion.   The money's going

21  to be there at some point; it's just that it may not come as

22  quickly as you want.   And so is -- is the time of 9:30 at

23  night to 11:30 at night in the attorney room at Geo

24  acceptable?

25          MR. TROIANO:   That's acceptable to Mr. Doreh.

1          MR. GELLER:  That's acceptable to Mr. Moalin as

2     well.

3          THE COURT:  Okay.  And, Warden, that would be a

4     time that they would have the access to that attorney room?

5     There's no other use for that room at that hour I would

6     presume.

7          WARDEN NOONAN:  Correct, yes.

8          THE COURT:  And so the laptop, where would that be

9     kept?

10          WARDEN NOONAN:  I would keep it in a secure area in

11     the (inaudible) office.

12          THE COURT:  Okay.  So then at 9:30 at night, the

13     laptop would be brought into the attorney room, at 11:30 it

14     would be taken away, and then the next night, it would be

15     brought in and brought back.

16          WARDEN NOONAN:  Yes --

17          THE COURT:  And is that an acceptable procedure to

18     both sides?

19          MR. GELLER:  There's one other thing too is that we

20     need to have -- and I think Mr. Cole's looked into this

21     and -- I'm not sure -- I think he's discussed it with Warden

22     Noonan -- there's hard copies, approximately 500, 600 pages

23     of text that the defendants need to review in conjunction

24     with listening to the audio to compare the translations that

25     the government made of the verbatim conversations.  So I

1   assume that, Warden, you'll have that and you'll be able to

2   provide that to them and take that from them and --

3              WARDEN NOONAN:  I will keep that secured also..

4              MR. COLE:  There'll be very organized binders by

5   the computer, no problem.

6              THE COURT:  Okay.

7              MR. TROIANO:  Well, I think just for the warden's

8   benefit, if I can just break down the paper discovery issue a

9   little better.  There's stuff the government that -- will

10  provide that's under protective order, there is things that

11  the defense will then provide -- because we may need to

12  translate portions the government hasn't translated -- that

13  may also be under a protective order -- it is under a

14  protective order.  That -- we would need to also provide that

15  to -- to the warden and his staff as, you know, marked that

16  it has to be secured.  And then there's the third, this type

17  of discovery, and that's just -- or paperwork that's, you

18  know, legal mail type thing but not protected that the

19  inmates can have in their cell subject to whatever rules the

20  institution normally imposes on inmates.

21             THE COURT:  Yeah.  I don't know if I need to get

22  this far down into the weeds on this.  I mean it seems that

23  the warden, who's present in court, is -- is cooperating,

24  will allow -- will facilitate the review of discovery,

25  whether it's under a protective order or not, and use of the

1  laptop during those hours in the evening in the attorney

2  visiting room, which I think is all I really need to order.

3  I mean I --

4         MR. TROIANO:  I just wanted to make sure that he

5  understood that he may be getting stuff from the defense too

6  that doesn't require the Court's intervention I don't think,

7  but I didn't know if he was aware of that.

8         THE COURT:  I -- he is now I guess.  All right.

9  You're aware of that now then, Warden?

10         WARDEN NOONAN:  Yes.

11         THE COURT:  All right.  So what I'm going to -- Mr.

12  Geller, Mr. Troiano, you know, you're going to have to make a

13  run at the clerk's office using this provision I've given

14  you.  I imagine that that CJA voucher, if -- it may even go

15  to Judge Miller as opposed to me, but seems to me since this

16  has been referred to me to handle, that that CJA voucher for

17  approval would come through to me, but I'm not standing on

18  that as gospel, and if it does, I would be certainly, you

19  know, prepared to sign off on it as immediately and as soon

20  as I get it as long as you're not asking for, you know, some

21  Apple iMac, whatever, that my kids want that cost thousands

22  of dollars, which I didn't approve that voucher either.

23         So I think that's the answer.  I think that's the

24  answer, and that's the way we should go.  I agree with the

25  government that it's probably best that they stay out of it

1   despite my musings that maybe it might be better if they were

2   involved in providing the -- a laptop.  And there is a

3   specific provision, so if we run into -- if you run into, you

4   know, some brick walls or some difficulties, then let me

5   know, and we'll -- we'll get back -- we'll reengage then.

6   All right?

7             MR. GELLER:  Yes, your Honor.

8             THE COURT:  Okay.  Now, gentlemen, let me just

9   advise all of you that the next status hearing I have is

10  April 7th, but I see it's as to everybody except Mr. Issa

11  Doreh.

12            MR. TROIANO:  I think that's just a typo.  I'm not

13  sure how it got generated.  It specifically says he is on

14  calendar for that day before Judge Miller.

15            THE COURT:  Okay.  All right.  So, gentlemen, each

16  of you are ordered to appear before Judge Miller on April the

17  7th, which is a little less than a month from now, at nine

18  o'clock in the morning for a status hearing.  Mr. Basaaly

19  Moalin, do you understand that?  I'm sorry?

20            DEFENDANT MR. MOALIN:  Yes.

21            THE COURT:  Okay.  Mr. Mohamed Mohamed Mohamud?

22            DEFENDANT MR. M. MOHAMUD:  Yes.

23            THE COURT:  Mr. Issa Doreh?

24            DEFENDANT MR. DOREH:  Yes.

25            THE COURT:  And Mr. Ahmed Nasir Taalil Mohamud?

1          DEFENDANT MR. A. MOHAMUD:  Yes, sir.

2          THE COURT:  Okay.  I think that concludes our

3   hearing for this afternoon.  Let me know if there's any other

4   issues.

5          MR. GELLER:  Thank you, your Honor.

6          MR. TROIANO:  Thank you.

7          MS. HAN:  Thank you, your Honor.

8       (The proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Debra M. Henson, an Official Court Reporter in and

2     for the United States District Court for the Southern

3     District of California, certify that the foregoing is a true

4     and correct transcription of the electronic sound recording

5     of the proceedings in the above-entitled matter, transcribed

6     to the best of my ability.

7

8     /s/ Debra M. Henson                    3-20-14
      Official Court Reporter                 Date
9     and Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25